ORIGINAL

ECF

FILED
FEB 10 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JAY CASHMAN, INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | Civil Action No. 06-101 C |

**COMPLAINT**

Plaintiff Jay Cashman, Inc., by the undersigned counsel, for its Complaint against the United States of America alleges as follows:

**PARTIES**

1. Plaintiff, Jay Cashman, Inc., is a corporation duly organized pursuant to the laws of the Commonwealth of Massachusetts with its principal place of business in Quincy, Massachusetts.

2. Defendant is the United States of America, acting by and through the New York District of the U.S. Army Corps of Engineers.

**JURISDICTION**

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. § 601 *et seq.* This action is a timely appeal pursuant to the CDA

of the Contracting Officer's final decision dated October 26, 2005.

**STATEMENT OF FACTS**

4. The Defendant, by and through the New York District, (the "District"), of the U.S. Army Corps of Engineers (the "Corps"), issued Solicitation No. DACW51-03-B-0004 to obtain the services of a dredging contractor to perform the deepening of an existing 40 foot navigation channel to a depth of 47 feet along the southern portion of the South Elizabeth Channel in Newark Bay and the western end of the Kill Van Kull Channel in New Jersey.

5. On May 23, 2003, following a public bid opening, the Defendant awarded Contract No. DACW51-03-C-0014, ("Contract"), in the amount of $35,460,430, to the Plaintiff.

6. Dredging involves the removal of material from the ground submerged under a body of water. The body of water where dredging was to be performed for this Contract was divided into six acceptance areas. The six acceptance areas totaled approximately 820,000 square yards in area, roughly an area the size of 164 football fields.

7. In order to measure the quantity of, and depth to which, material had been excavated by the Plaintiff, the Contract provided that Defendant was to examine the underwater area using an acoustic survey system, a type of remote sensing that indirectly measures the depth of the water in the area excavated.

8. The purpose of this type of examination is to generate "acceptance surveys," that are used to determine whether or not the subaqueous material has been removed from within the contract excavation limits, and consequently, whether or not the Plaintiff has performed the contract work in accordance with the contract requirements.

9. The acoustic survey system that was required to be used by Defendant is known as a multibeam sonar system, ("multibeam"). All multibeam sonar systems use the same basic approach to depth measurement. A machine generates sound waves underwater and the returning echoes reflected off of the submerged ground surface are processed and converted into vertical depths that are then depicted on a survey graph.

10. Operation of the multibeam sonar equipment generates hundreds of thousands of data points and computer programs are used to process the data. Processing of the data is performed in small, incremental areas, typically one square yard in area, referred to as "bins" or "cells."

11. Pertinent to this action are two different methods that are used to process the multibeam data; the minimum depth method and the average depth method.

12. In the minimum depth method, the computer program selects the shallowest data point to represent the depth within a "bin." In the average depth method, the computer program

averages all of the data points within a "bin" to determine the depth.

13. The Contract did not specify what method Defendant was to use to process the multibeam data for acceptance surveys.

14. The Contract required Plaintiff to perform pre-acceptance surveys to verify that the dredging had been satisfactorily completed prior to requesting examination by the Defendant. The Plaintiff was required to use a multibeam survey system, but the Contract did not specify what method Plaintiff was to use to process the data.

15. After Contract award, and during the performance of the Contract work, Plaintiff repeatedly requested Defendant to identify the method that the Defendant planned to use to process the multibeam data.

16. Plaintiff's understanding, after numerous discussions with representatives of the Defendant, was that the average depth method would be used in performing the Defendant's acceptance surveys.

17. Therefore, when Plaintiff performed its pre-acceptance surveys, it used the average depth method, and specifically notified Defendant that it was using the average depth method.

18. Based on the statements made by representatives of the Defendant, and the absence of any conduct by the Defendant that contradicted those statements, Plaintiff reasonably assumed that

the Defendant was using the average method to process multibeam data in the performance of acceptance surveys.

19. As the work progressed, however, Defendant repeatedly notified Plaintiff that its acceptance surveys indicated that material remained above the contract excavation limits and directed Plaintiff to redredge those areas.

20. Unable to determine why the Defendant's acceptance surveys purportedly indicated material above the excavation limits when its own pre-acceptance surveys indicated that no material remained above the excavation limits, Plaintiff redredged as directed by the Defendant, and altered its manner of performance in the remaining areas so as to excavate deeper before performing pre-acceptance surveys. Plaintiff notified Defendant that it considered the additional excavation to be extra work for which it was entitled to additional compensation.

21. On October 1, 2004, after Plaintiff had dredged most of the Contract areas, Defendant notified Plaintiff, for the first time, that its acceptance surveys had employed, and would continue to employ, the minimum depth method.

22. Use of the minimum depth method can adversely skew and erroneously portray clearance data because of the relatively high variance in acoustic depth data in multibeam surveys. The minimum depth method can indicate the existence of material where no material actually exists.

23. The Corps issues agency policy, regulations and technical guidance that are to be complied with in the performance of the agency's functions. The agency policy in effect at the time of the Contract award was contained in EM 1110-2-1003, HYDROGRAPHIC SURVEYS (1 Jan 02). Agency policy mandated that the minimum depth method was not to be used to process multibeam data for acceptance surveys because of the risk that the resulting survey results would be erroneous.

24. Following Defendant's notification that it was using the minimum depth method, Plaintiff proceeded to perform the redredging, as directed, and incurred additional expense in excavating areas where earlier surveys had indicated that the material had been removed to below the contract excavation limits.

25. Plaintiff notified Defendant that it considered the redredging after October 1, 2004 to be extra work under the contract for which it was entitled to additional compensation.

26. On July 22, 2005, Plaintiff submitted a properly certified claim under the CDA for the additional costs incurred in the amount of $6,538,769.

**FIRST CAUSE OF ACTION - EQUITABLE ADJUSTMENT**

27. The allegations contained in Paragraphs 1 through 26 are incorporated herein by reference.

28. Defendant's use of a methodology to interpret the multibeam survey data that was prohibited by agency policy, and

that differed from the methodology that Plaintiff had been led to believe would be used by Defendant when performing acceptance surveys, constituted a change in the contract for which Plaintiff is entitled to an equitable adjustment in the contract price.

29. Pursuant to FAR 52.243-4, "Changes," incorporated by reference in the Contract, Defendant was obligated to equitably adjust Plaintiff's Contract in the event, and to the extent, that Plaintiff's costs to perform the work increased as a result of the changes for which the Defendant was responsible.

30. The Defendant failed to equitably adjust Plaintiff's Contract. As a direct result of the Defendant's failure, Plaintiff has incurred damages in the amount of $6,538,769.

**SECOND CAUSE OF ACTION - BREACH OF CONTRACT**

31. The allegations contained in Paragraphs 1 through 30 are incorporated herein by reference.

32. By its actions and inactions, Defendant breached its express and implied contractual obligations to Plaintiff.

33. As a direct result of the breach of contract, Plaintiff has incurred damages in the amount of $6,538,769.

**THIRD CAUSE OF ACTION - QUANTUM MERUIT**

34. The allegations contained in Paragraphs 1 through 33 are incorporated herein by reference.

35. The Contract was only one in a series of contracts that will ultimately lower the channels to a depth of fifty feet.

36. When Plaintiff excavated deeper in order to accommodate the Defendant's changed acceptance survey criteria, it at times excavated material below the Contract excavation limits; material that would have otherwise been removed under subsequent contracts.

37. Defendant has been unjustly enriched by the efforts of Plaintiff and the Court should direct the Defendant to compensate Plaintiff for the reasonable value of the extra work performed.

38. The reasonable value of the extra work performed by Plaintiff is $6,538,769.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgment against the Defendant in the amount of $6,538,769, plus applicable interest, costs and attorneys' fees allowed by law, and for such other relief the Court deems appropriate.

Respectfully submitted,

Dated: 2-9-06

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Fort Washington, PA 19034
Tel: 215-542-2777
Fax: 215-542-2779
email: mpayne@phslegal.com

Attorneys for
Jay Cashman, Inc.

Of Counsel:

Joseph A. Hackenbracht, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Fort Washington, PA 19034
Tel: 215-542-2777
Fax: 215-542-2779
email: jah@phslegal.com