IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Francis M. Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Drive, Suite 100
Fort Washington, PA 19034
Tel: (215) 542-2777
Fax: (213) 542-2779
mhp@phslegal.com

Date: December 14, 2007

Attorney of Record for
Jay Cashman, Inc.

Of Counsel:
Joseph A. Hackenbracht, Esquire
Payne Hackenbracht & Sullivan

**TABLE OF CONTENTS**

Table of Authorities .......... ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT .......... 1

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 1

STATEMENT OF FACTS .......... 8

ARGUMENT .......... 8

I. Jurisdiction and Standard of Review .......... 8

II. The Corps Did Not Follow Its Own Guidance and Regulations in Drafting The Contract Specifications Relating To Final Acceptance Surveys .......... 10

III. Plaintiff Interpreted Its Survey Requirements In A Reasonable Manner .......... 14

IV. The Defendant's Failure To Disclose That It Was Calculating The Post-Dredge Survey Data In a Manner Different From The Plaintiff's Method Was A Breach Of The Defendant's Duty To Cooperate .......... 18

V. The Defendant's Ultimate Insistence That Post-Dredge Acceptance Survey Data Must Be Calculated Using The Minimum Sounding Method Was A Change To The Contract Entitling The Plaintiff To An Equitable Adjustment .......... 21

CONCLUSION .......... 23

# TABLE OF AUTHORITIES

**Cases**

Agosto v. INS, 436 U.S. 748, 98 S. Ct. 2081, 56 L. Ed. 2d 677 (1978)........................................ 9

Am. Ins. Co. v. United States, 62 Fed. Cl. 151 (2004) ............................................................... 9

American Coatings v. United States, 45 Fed. Cl. 280 (1999)...................................................... 19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)......... 9

Clay Bernard Systems International, Ltd v. U.S., 22 Ct. Cl. 804 (1991) .................................... 20

D.F.K. Enterprises, Inc. d/b/a American Coatings v. United States, 45 Fed. Cl. 280 (1999) 19

Erickson Air Crane Co. v. U.S., 731 F.2d 810 (Fed.Cir. 1984).................................................. 20

Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 444 F.2d 547 (1971).................. 20

Gov. Sys. Advisors, Inc. v. United States, 847 F.2d 811 (Fed. Cir. 1988).................................... 9

Granite Construction Co. v. United States, 962 F.2d 998 (Fed. Cir. 1992)................................. 10

John L. Corrigan v. U.S., 70 Fed. Cl. 665 (2006)........................................................................ 20

John Massman Contracting Co. v. United States, 23 Cl. Ct. 24 (1991) ...................................... 19

Lewis-Nicholson v. U.S., 213 Ct. Cl. 192 (1977)........................................................................ 21

Lockheed Martin Corp. v. U.S., 70 Fed. Cl. 745 (2006) .............................................................. 9

Logicvision, Inc. v. U.S., 54 Fed. Cl. 549 (2002)......................................................................... 20

M.A. Mortenson Company v. U.S., 29 Fed. Cl. 82 (1993).......................................................... 20

Malone v. U.S., 849 F.2d 1441 (Fed.Cir. 1988) .......................................................................... 21

Meyers Companies, Inc. v. United States, 41 Fed. Cl. 303 (1998).............................................. 19

North Star Alaska Housing Corp. v. U.S., 30 Fed. Cl. 259 (1993) ............................................. 15

Northrup Grumman Corporation v. U.S., 47 Fed. Cl. 20 (2000)................................................. 15

Redland Genstar, Inc. v. U.S., 39 Fed. Cl. 220............................................................................ 13

Singer-General Precision, Inc. v. United States, 192 Ct. Cl. 435, 427 F.2d 1187 (1970) ............ 21

SMS Data Products Group, Inc. v. U.S., 17 Ct. Cl. 1 (1989) ..................................................... 22

Southern Comfort Builders, Inc. v. U.S., 67 Fed. Cl. 124 (2005) ............................................... 21

Southwest Welding & Manufacturing Co. v. United States, 188 Ct. Cl. 925, 413 F.2d 1167 (1969) ........................................................................................................................ 23

Texas Health Choice, L.C. v. Office of Personnel Management, 400 F.3d 895 (Fed. Cir. 2005).. 8

Textron Defense Sys. v Widnall, 143 F.3d 1465 (Fed Cir. 1998) .................................................. 9

Travelers Casualty & Surety Company of America v. United States, 75 Fed. Cl. 696 (2007) .... 10

United States v. Diebold, 369 U.S. 654, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)............................ 9

United Technologies Corporation v. U.S., 31 Fed. Cl. 698 (1994) ............................................. 23

**Board Of Contract Appeals Cases**

Appeal of Cottrell Engineering Corp. 97-1 BCA 28852 ..................................................... 11

Appeal of Evans, Inc. VABCA No. 2043, 86-2 BCA 18760 .............................................. 20

Appeal of Warren, IBCA No. 1422, 81-2 BCA 15344........................................................ 22

**Statutes & Administrative Codes**

28 U.S.C. § 1491(a)(2)........................................................................................................... 8

41 U.S.C. § 601.................................................................................................................. 2, 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-101C<br>(Judge Francis M. Allegra) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, Jay Cashman, Inc., by its counsel, respectfully submits the following memorandum in support of Plaintiff's motion for partial summary judgment in accordance with RCFC 56. In support of its motion, Plaintiff relies upon the attached proposed findings of uncontroverted facts and the following brief.

**STATEMENT OF THE ISSUES**

The issue is whether the Plaintiff properly interpreted the contract specifications to permit the use of the average depth method to process after-dredge survey data. (In dredging, an "after-dredge" survey is taken to determine whether an acceptance area of the project has been successfully dredged to the required depth).

**STATEMENT OF THE CASE**

This case arises from the performance of a dredging project, known as "New York Harbor, Kill Van Kull and Newark Bay Channels, Navigation Improvement Project Phase II, Contract 8 (Area 8)," and often referred to as the Kill Van Kull 8 ("KVK 8" ) project that was performed by the Plaintiff for the New York District of the U.S. Army Corps of Engineers in 2003-2004. The performance of dredging involves the excavation of materials consisting of soil,

rock, or a combination of both, that are located under a body of water and that must be removed to either deepen a navigable waterway or to maintain the required depth of an existing navigable waterway. "New work" dredging occurs when material is removed from an area that has not been dredged before, or that has not been previously dredged to the depth that is required by the specifications. "Maintenance dredging" occurs when material is removed from an existing channel where material has "shoaled" since the last time the channel was dredged.

In order not to present a hazard to navigation, shipping channels are dredged periodically in order to maintain the authorized project depth. This project was a "new work" dredging project that was part of an extensive and on-going multi-billion dollar effort to deepen the existing navigable channel leading into Newark Bay and New York Harbor. (Deepening a shipping channel makes it possible for larger, deeper-draft vessels to enter the harbor). At the conclusion of the project the Plaintiff filed a certified claim under the Contract Disputes Act of 1978, 41 U.S.C. 601, et. seq., to seek an equitable adjustment for the additional cost incurred to complete the project. The claim was based upon the Defendant's failure to disclose the manner in which the Corps would perform its after-dredge acceptance surveys, and its further failure to disclose that it would be using more stringent acceptance criteria than normally applied by the Corps of Engineers.

The Corps of Engineers has the congressionally mandated responsibility to maintain the navigable waters of the United States and the Corps awards hundreds of dredging contracts each year. The harbor deepening project in the New York and New Jersey Harbor, of which this contract was a part, has been underway since 1987 and is not projected to be completed for many more years. The contract required dredging to lower the depth of a certain section of the channel to minus forty-seven feet, and further dredging is planned for the future that will lower this

section of the channel, as well as the entire channel into Newark Bay, to a depth of minus fifty feet. (The currently authorized project depth for navigation purposes is minus forty-five feet).

The Plaintiff is a large and experienced construction contractor who had previously performed dredging projects for the New England District of the Corps. Prior to the Plaintiff's entry into the competition for work in New York, seven previous KVK projects had been performed by three dredging contractors, all of whom were established and well known to the New York District. As will be explained in the ensuing argument, although the Corps of Engineers welcomed the participation of the Plaintiff and approved of its capabilities in a preaward survey, the Corps failed to cooperate with the Plaintiff in the performance of "after-dredging" surveys that were vital to the successful and profitable performance of the project.

The project was divided into six acceptance areas (of varying dimensions) amounting to approximately 820,000 square yards in area that were to be surveyed after completion of the dredging to assure that the required depth of minus forty-seven feet had been achieved in each acceptance area. The measurement of the elevation of the ground under forty-plus feet of water is not easy, and the survey methods that are employed have ranged from the simple casting of lead lines over the side of a ship to the use of sophisticated sonar equipment. The accuracy of after-dredge surveys is important because those surveys are used by the Corps to calculate how many cubic yards of material the contractor will be paid for removing (at a unit price per cubic yard), and the surveys also are used to determine whether an area has been dredged to the required depth so that it can be finally accepted by the Corps. In other words, after-dredge surveys are used by the Corps for both payment and acceptance purposes. Once an area of the project has been accepted by the Corps, the contractor has no further responsibility to dredge that area and is free to move its equipment to other areas of the project.

The Plaintiff's contract required the contractor to use multibeam sonar surveying equipment that generates thousands of data points ("hits") by bouncing sound waves off the channel bottom and then feeding the information into a computer program for processing of the data. There are several methods that can be used to process and interpret the data, but once that method is selected a survey chart is plotted that depicts the depth of the area that has been surveyed. If the chart shows "high spots" (areas above the required depth), the Corps of Engineers frequently requires the dredging contractor to go back and re-dredge those spots. It is the manner in which that survey data was processed, and the Corps' determination of what the bottom profile of the channel looked like after dredging was completed, that is the main focus of this case.

The Corps of Engineers was required by its internal guidance to specify the data processing method that it would use to determine whether an area had been dredged to the required depth, as follows:

> Measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters (horizontal and vertical control, density, etc.), data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government.

(App. 21). This requirement was not part of the contract and it was not disclosed to the Plaintiff prior to award of the contract. As will be discussed below, the Corps planned to use what is known as the "minimum depth" method to process its after-dredge survey data, but the Corps failed to follow its own guidance by not providing the required information in the solicitation and the resulting contract. It also did not address the subject of how the after-dredge survey data would be processed at the pre-construction conference (as had been its practice in the past). Consequently, even though the Plaintiff knew that it was required to use a multibeam survey

system, and in fact did so, the Plaintiff had no way of knowing that the Corps' planned data processing method, the "minimum depth" method, was any different from what the Plaintiff reasonably determined was required, the "average depth" method..

There are a number of ways that the data generated by an after-dredging multibeam survey can be processed. The methods are termed minimum depth, maximum depth, average depth, and centroid depth. In all four methods, the area surveyed is subdivided into smaller areas called "bins" that are usually one square yard in size. Depending on which method is used to process the data points the depth of the excavation can appear to be different on a survey chart. (Only the average and the minimum depth methods are at issue for the purposes of this motion). The average depth (or average sounding) method, for example, averages all of the data points within a bin and if the average is minus forty-seven feet or deeper, the bin is deemed to be dredged to the required grade. When the minimum depth (or minimum sounding) method is used, if any three data points within a bin show a depth above minus forty-seven feet, the bin is considered to be a "high spot" and the entire acceptance area is rejected until that high spot, and any others, are re-dredged and re-surveyed. In other words, if any three data points within a single bin are above the minimum depth of minus forty-seven feet, that minimum sounding controls the acceptability of the entire acceptance area. Under this system, by analogy, a student who receives three equally weighted test scores of A, B, and C would receive a grade of "B" using the average method and a grade of "C" using the minimum method.[1]

In the absence of any information in the contract to the contrary, the Plaintiff reasonably employed the average depth method to process the data obtained from its multibeam surveys

[1] Only the average and the minimum depth methods are the subject of this motion. By way of explanation, however, in the maximum depth method, the computer program selects the deepest data point to represent the depth within a bin, and in the centroid depth method, the data point nearest the geometric center of a bin is arbitrarily selected as representative of the depth.

both on a daily basis to manage its dredging operations, and on a “pre-final” survey basis. The Plaintiff chose this method because it appeared to be the method that would be most representative of the conditions. Plaintiff believed that the centroid method (picking a data point in the center of an area) was clearly arbitrary, and that both the maximum and the minimum depth methods resulted in biased, skewed results. As the supplier of the multibeam equipment had warned Plaintiff, the results using the minimum depth method were "not really representative of what was down there." (PPFUF 44; App. 37). The objective of the Plaintiff’s “pre-final” survey was to assure that an area had been dredged to the required depth before requesting the Corps to perform its final acceptance survey. It made sense for the Plaintiff to process its survey data in a manner that would accurately predict the outcome of the Corps’ acceptance surveys, but it had no way of knowing that the Corps intended to use minimum depth method.[2]

When the Plaintiff completed its first acceptance area and requested that the Corps perform its final acceptance survey the Plaintiff furnished the Corps with its “pre-final” survey chart that contained a notion “Average sounding. . . .” The Defendant did not respond by stating that the average sounding method was unacceptable and, in fact, accepted the area as dredged to grade. The Plaintiff subsequently continued to perform its daily and “pre-final” surveys using the average method and continued to furnish “pre-final” survey charts to the Corps that also included that notation “Average sounding . . . .”

The Corps, after approving the first area submitted for acceptance, did not agree that subsequent acceptance areas had been successfully completed and furnished charts to the

[2] The Plaintiff also was not on notice that the Corps’ internal guidance found in EM 1110-2-1003(1 JAN 02), a manual that was in effect at the time of award, actually prohibited the Corps from using the minimum depth method to process after-dredge survey data.

Plaintiff showing "high spots" that the Corps required be re-dredged. Some of these "high spots" were as little as one-tenth of a foot (i.e., a little over one inch), and they were not shown on the Plaintiff's "pre-final" survey charts that were prepared using the average depth method

The Plaintiff was uncertain as to why there were discrepancies between its surveys and those performed by the Corps. It is very time-consuming and costly to re-mobilize dredging equipment to an area that was thought to have been completed, and dredging contractors do their best to complete an area in one pass. Not knowing whether its surveys or the Corps' surveys were in error, or whether its or the Corps' equipment or data processing were faulty, the Plaintiff was in a quandary to explain the discrepancy. As the Corps continued to require costly re-dredging, the Plaintiff raised the issue at weekly progress meetings and asked the Corps' representatives if they were using the average depth method. The representatives of the Corps either indicated that they did not know the answer, or they failed to understand the issue.

In reality, the depositions of the Corps' witnesses made it clear that there was considerable confusion within the Corps. When the Plaintiff furnished its "pre-final" surveys to the Corps' construction personnel who administered the contract, they did not actually send the Plaintiff's data to the survey branch. The Corps' survey branch was simply notified that an area was ready for a final acceptance survey, and the Corps' survey personnel performed the survey and furnished the results to the Corps' construction personnel. Incredibly, the Corps' survey branch was unaware that the Plaintiff had provided notice that it was using the average sounding method. It was, in every sense, a case of one hand not knowing what the other was doing. The Corps' survey personnel did not know that the Plaintiff was using the average depth method to determine that an area had been dredged to grade, and neither the Corps' construction personnel nor the Plaintiff knew that the Corps' survey branch was using the minimum depth method for

final acceptance purposes. It was not until October 1, 2004 that the Corps finally notified the Plaintiff in writing that it had been using the minimum depth method. By that time it was too late for the Plaintiff to mitigate its damages by dredging deeper on the first pass in order to account for the less forgiving results of a minimum depth acceptance survey.

The parties agreed that it would be appropriate to file cross-motions for partial summary judgment to seek the Court's ruling on the issue of whether the Plaintiff's use of the average depth survey method to determine whether an area had been dredged to grade was reasonable. If the Court agrees that it was reasonable, the parties agree that only quantum must ultimately be resolved at trial. If the Court disagrees with the Plaintiff's position, however, the parties have also agreed that the issue of whether the Plaintiff was misled by the Corps will need to be considered at trial and that only if the Plaintiff prevails on that entitlement issue will the Court be requested to consider the issue of quantum.

## STATEMENT OF FACTS

The facts are set forth at length in the accompanying Plaintiff's Proposed Findings of Uncontroverted Facts (referenced as "PPFUF") and are incorporated herein by reference.

## ARGUMENT

### I. Jurisdiction And Standard Of Review

The Court has jurisdiction over this matter by virtue of the Contract Disputes Act, 41 U.S.C. 601, et. seq., and the Tucker Act, 28 U.S.C. 1491(a)(2). Texas Health Choice, L.C. v. Office of Personnel Management, 400 F.3d 895 (Fed. Cir. 2005). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 (c). Summary judgment is only precluded if there are

facts in dispute that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." Lockheed Martin Corp. v. U.S., 70 Fed.Cl. 745 (2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Agosto v. INS, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); Am. Ins. Co. v. United States, 62 Fed.Cl. 151, 154 (2004). Rather, the court must determine whether the evidence presents a disagreement sufficient to require fact finding, or whether it is so one-sided that one party must prevail as a matter of law. Anderson, 477 U.S. at 250-52, 106 S.Ct. 2505; Lockheed Martin Corp. v. United States, 70 Fed.Cl. 745, 748-49 (2006). In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. Matsushita, 475 U.S. at 587-88, 106 S.Ct. 1348 (citing United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also* Lockheed Martin, 70 Fed.Cl. at 749; L.P. Consulting Group, Inc. v. United States, 66 Fed.Cl. 238, 240 (2005).

The Plaintiff's motion involves a question of the legal effect of the Defendant's failure to place information in the contract specifications that it was required to insert by mandatory internal guidance; and, the further question of whether the Plaintiff interpreted the specified after-dredge survey requirements in a reasonable manner. This case therefore involves a matter of contract interpretation that is a question of law well-suited to disposition by summary judgment. Gov. Sys. Advisors, Inc. v. United States, 847 F.2d 811 (Fed. Cir. 1988); Textron

Defense Sys. v Widnall, 143 F.3d 1465 (Fed Cir. 1998). The Court's examination of the contract interpretation issue must necessarily begin with the plain language used by the government in the contract. Textron, supra. The Court's examination is also guided by the well-reasoned principle that the contract must be viewed as a whole, giving reasonable meaning to all of the provisions and avoiding both conflicts in and negating of the various provisions. Granite Construction Co. v. United States, 962 F.2d 998 (Fed. Cir. 1992). If, after applying these principles, there are no factual disputes that are material to the interpretation of the contract, then summary judgment is appropriate. Travelers Casualty & Surety Company of America v. United States, 75 Fed. Cl. 696 (2007).

## II. The Corps Did Not Follow Its Own Guidance and Regulations In Drafting The Contract Specifications Relating To Final Acceptance Surveys

The Corps of Engineers is a very active Federal agency that solicits and administers Congressionally authorized construction projects, both civil and military. Many of these projects involve marine construction, and the Corps is one of the most prestigious and well-respected water resources engineering organizations in the world. The agency accomplishes its mission through an organization of regional divisions that are further separated into area districts. Although each District functions in a decentralized manner, the Office of the Chief of Engineers remains responsible for the successful accomplishment of the Corps' mission. In order to manage and control its far-flung organization, the Corps has prepared and published a copious and comprehensive compendia of engineer regulations, manuals, and pamphlets that are to be employed by the individual districts in the design and construction of military and civil works projects, including dredging. Compliance with the requirements in these documents ensures consistency and uniformity within the agency, and the Chief's Office considers that compliance

with mandatory requirements in the engineering publications to be a matter of agency policy. (ER 1110-2-1150).[3]

Typically, in issuing a solicitation for dredging, the Corps prepares a detailed set of contract terms and conditions, including technical specifications, to which a contractor is required to adhere in the performance of the contract work. In addition to setting forth the obligations of the contractor in detail, the contract terms and conditions also specify the contractual duties of the Corps. However, the Corps normally provides little detail concerning the means and methods it employs to discharge its obligations, in contrast to the detail required for the Contractor to discharge its obligations. Such was the case here.

The Contract that is the subject of this litigation is a lengthy document of more than two hundred pages. The technical specifications regarding dredging, Section 02900, are twenty-five pages long. Under the terms of the contract's Final Examination and Acceptance clause (PPFUF 31; App. 22) it is the Corps' responsibility to conduct final acceptance surveys of each project area to determine when the contractor has successfully completed dredging to the required grade of minus forty-seven feet. (PPFUF 19).[4] Special Contract Requirement 1.15 provided that "As soon as practicable after the completion of an entire acceptance area, a final examination of the

[3] The Chief's Office became concerned when certain districts chose to consider the requirements in the engineer manuals as being merely suggested methods. In 1999, the Corps issued ER 1110-2-1150 to firmly establish that the agency policy was that requirements in engineer manuals that were specifically identified as mandatory were to be followed.

[4] "The nature of dredging is such that it is harder for both the contractor and the Government to verify contract compliance than it is with traditional, land-based construction. As underwater work, it generally cannot be directly viewed; it must be measured by more inferential means." In addition, "As in the dredging process, the performance of after-dredging surveys is also confronted by technical obstacles, including measuring depths not visible, . . . and reasonably interpreting data in the face of possible human or mechanical margins of error." Appeal of Cottrell Engineering Corp., Eng BCA No. 6064, 97-1 BCA 28852.

work will be conducted by the Contracting Officer, at the cost and expense of the Government by acoustic sweep survey system." (emphasis added) (PPFUF 31; App. 22). The specifications did not require the contractor to process the survey data obtained during the acoustic sweep ("multibeam") survey in any particular manner, and the specifications did not state that the Corps planned to process its survey data in any particular manner. The Plaintiff was not aware, and had no reason to be aware, moreover, that the Corps' failure to specifically provide the method that it would use to process multibeam survey data was contrary to the Corps' mandatory internal requirements for the preparation of dredging specifications. (PPFUF 30; App. 21).

The Engineer Manual concerning hydrographic surveys was issued in 2002, and in accordance with agency policy, contained specifically identified mandatory requirements, including the requirement that the contract must contain the technical specifications, including binning techniques and data processing method, for the Government's performance of acceptance surveys.[5] Accordingly, EM 1110-2-1003, which was in effect at the time of contract award, provided that it was the Corps' policy to provide dredging contractors with substantial detail concerning the means and methods the Corps would employ in conducting acceptance surveys. (PPFUF 30; App. 21). The Manual stated the following concerning Dredging Contract Specifications:

> Measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters (horizontal and vertical control, density, etc.), data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government.

[5] In order to process the hundreds of thousands of data points generated by the multibeam equipment, the area surveyed must be divided into smaller areas for analysis. These small areas, referred to as "bins" or "cells," are typically one square yard in size. The data points that fall within a bin are then processed using one of the four methods to select a depth that is reported as representative for the bin.

(PPFUF 30; App. 21). In addition to details concerning multibeam survey equipment and its operation, the contract was to provide details concerning the methods of data processing that would be employed in conducting acceptance surveys. (PPFUF 30; App. 21). The Corps failed to comply with this requirement and the Plaintiff had no way of knowing that the means and methods of data processing Defendant would employ in performing its acceptance surveys were different from that which the Plaintiff reasonably interpreted as being required to satisfy the after-dredging survey requirements of the contract.

The legal significance of the agency's engineer manuals requiring the inclusion of technical details on the survey methods in its dredging solicitations cannot be dismissed lightly. In a case dealing with the import of the survey criteria contained in an earlier version of the very same EM 1110-2-1003 (1991), the Engineer Board not only accepted the manual as "authoritative guidance with respect to hydrographic surveys," it also held that "The Board regards compliance with the manual as binding upon the Government, to the extent it establishes policy and procedures to be followed." Appeal of Cottrell Engineering Corporation, EngBCA No. 6064, 97-1 BCA 28852. This Court, when faced with the determination of the duty of the Corps to follow the requirements in its engineer manuals, held that the agency, if it had a rational basis for doing so, was certainly entitled to depart from the nonbinding engineering guidance contained in [an] EM. Redland Genstar, Inc. v. U.S., 39 Fed.Cl. 220, 234. However, the situation in this case is substantially different from the situation in Redland, for, in this case, the engineering guidance on providing the technical details in the Contract specifications was binding, i.e. mandatory.

It would have been entirely appropriate and reasonable for the Corps to have included the technical details of how it intended to interpret the multibeam survey data in the contract. The

multibeam survey and the attendant processing of the data was a relatively new technology that the Corps was only beginning to implement on a wide scale.[6] It stands to reason that the agency would strive to notify its contractual partners, to the maximum extent possible, about the details of its new technology. Since the EM clearly establishes that it was the agency's policy to provide the Plaintiff with the technical details of its multibeam survey, this requirement was binding on the Defendant. Defendant's failure to do so was not in accordance with agency regulations and was arbitrary, capricious and an abuse of discretion. Most assuredly, it was particularly egregious for the Defendant to not only fail to follow its mandatory guidance regarding the information that was to be placed in the specifications, but then to secretly employ the minimum depth data processing method that it was prohibited from using elsewhere in its guidance documents, as will be discussed below. (EM 1110-2-1003 (1 JAN 02); PPFUF 65; App. 56, 57).

## III. Plaintiff Interpreted The Contract's Survey Requirements In A Reasonable Manner

The Contract provided that, before the District would perform an acceptance survey, Plaintiff was to conduct a "pre-final survey" to verify that an acceptance area was successfully dredged to the required depth. (PPFUF 45; App. 22). In performing the "pre-final surveys," the Contract required Plaintiff to employ a multibeam survey system. (PPFUF 46). Although the Contract, by reference, included certain standards the Plaintiff was to meet when performing its pre-final surveys, those standards did not address the data processing method Plaintiff was to employ to interpret the data obtained during the multibeam survey. (PPFUF 48; App. 22, 38, 39). In the absence of any information to the contrary, in the absence of any indication from the

[6] Mr. Richard Kiss, who was the Chief of the Survey Section, testified that the District only began using the multibeam survey system in the late 1990's. (PPFUF 22; App. 16). Mr. Hawkins, the project manager for the harbor deepening project, testified that the District had "phased-in" the use of multibeam surveys during the Phase 2 contracts, which included Plaintiff's Contract. (PPFUF 22; App. 15).

Defendant that the selection of a data processing method was even an issue, and after investigation and consideration of the best way to process the survey data, the Plaintiff reasonably selected the average depth method. (PPFUF 49; App. 40).

There is a well-settled doctrine that when a government specification does not require a certain method of performance, the contractor is entitled to perform by its chosen manner or method. North Star Alaska Housing Corp. v. U.S., 30 Fed.Cl. 259, 285 (1993). "A Government order rejecting the proposed method and requiring the contractor to perform in some other specified manner denies the contractor the opportunity to exercise a valid option as to the method of performance and changes the contract, justifying an equitable adjustment for additional costs incurred thereby." Northrup Grumman Corporation v. U.S., 47 Fed.Cl. 20 (2000); North Star Alaska Housing Corp. v. U.S., 30 Fed.Cl. 259, 285 (1993).

A comparison of the different survey data processing methods (average, minimum, maximum, centroid) and the characteristics of the dredging being performed demonstrates that Plaintiff's selection of the average depth method was eminently logical and reasonable. In all four methods, the tremendous amount of data generated by a multi-beam survey is processed in small incremental areas, called bins. The size of a bin typically used in these methods is one square yard, while the total area being surveyed typically includes tens of thousands of square yards of river bottom. The dredging that was to be performed for this contract involved the use of large hydraulic excavators that would remove the river bottom about forty seven feet below the water surface. The bucket on the hydraulic excavator was much larger in size than the one square yard bin size that would be measured by the multi-beam survey system. In the dredging process, therefore, each swing of the bucket would remove material from more than one bin at a time.

In the minimum depth method, the computer program selects the shallowest ("shoalest") data point to represent the depth of a bin. In contrast, the average depth method takes all of the data points within a bin and then averages the data to determine the depth. Since the entire bin area is covered by the bucket of the excavator, it would be reasonable to anticipate that the depth within the bin would be uniform and that extreme high or low data points would not be representative. The arbitrary selection of a data point near the center of a bin, or the selection of the minimum or maximum depths within a bin, would all seem to be less than reliable indicators of the actual depth achieved within a bin.

Given the equipment being employed to perform the dredging, it was reasonable for Plaintiff to conclude that the average method was the appropriate method for processing the data that it obtained when performing its surveys. Significantly, the Plaintiff did not keep its interpretation of the data processing requirements a secret. As the Plaintiff prepared and submitted its "pre-final survey" charts, it clearly placed notations indicating the average sounding method had been used. On its first "pre-final" survey chart, the notation stated:

> **Area 1 Post Dredge Survey**
> **Dec. 1, 2003**
>
> **Average sounding located in the center of a 15' by 15' cell**

(PPFUF 53; App. 44). (The statement "located in the center of a 15' by 15' foot cell" meant that the Plaintiff had averaged the survey data and plotted the result in the center of a 15' by 15' cell, or "bin," on the survey chart.) The reference to "average sounding" meant that Plaintiff was using the average depth method to process its survey data.

On subsequent "pre-final" survey charts, the Plaintiff indicated the following:

> **3X3 MATRIX**
> **AVERAGE SOUNDING**

(App. 59).

It is noteworthy that when the Plaintiff furnished its "pre-final" surveys to the Corps' construction personnel who administered the contract, they did not actually send the Plaintiff's data to the Corps' survey branch. The survey branch was simply notified that an area was ready for a final acceptance survey, and the Corps' survey personnel performed the survey and furnished the results to the Corps' construction personnel. Incredibly, the survey branch was unaware that the Plaintiff had provided notice that it was using the average sounding method. In fact, Mr. Alton, the Defendant's Project Engineer, and the Plaintiff's primary point of contact on the project, testified at his deposition as follows:

> Q. I assume there was no point in the contractor giving you a pre-acceptance survey if he didn't feel the area was clear?
>
> A. Yeah.
>
> Q. So you would take it and present it to Survey and say here, do your thing?
>
> A. I don't even think we'd give it to Surveys. We wouldn't present it to them. We'd pretty much either call or go down to talk to them. They would never see the pre-acceptance, I don't believe.
>
> Q. They just would get an authorization or request from you to go ahead and do an acceptance survey?
>
> A Yeah, yeah.

(App. 60-61; Alton Deposition Tr. 8, 13-14). In other words, the Corps' survey personnel did not know that the Plaintiff was using the average sounding method to determine that an area had been dredged to grade, and neither the Corps' construction personnel nor the Plaintiff knew that the Corps' survey branch was using the minimum sounding method for final acceptance purposes. This was also confirmed by Mr. Kiss, the Chief of the New York District's Survey Branch, who provided deposition testimony, as follows:

Q. Do you know whether Cashman was using the shoalest or minimum sounding method on its pre-acceptance surveys?

A. After reviewing some of the material, apparently, he was using an average method.

Q. Understanding that, I think you said a minute ago you didn't receive these for review during the course of the contract?

A That is correct.

Q. So you may have learned it since, you didn't know it then?

A. That is correct.

(App. 62-63; Kiss Deposition Tr. 7, 63-64).

## IV. The Defendant's Failure To Disclose That It Was Calculating The Post-Dredge Survey Data In A Manner Different From The Plaintiff's Method Was A Breach Of The Defendant's Duty To Cooperate

The Defendant did not disclose the mandated technical criteria that pertained to its use of multibeam acceptance surveys in the solicitation or in the contract, and the Defendant also failed to provide survey information at the Pre-Construction conference that was held at the beginning of the project.[7] No representative of the District's Survey Section attended the Pre-Construction conference, and the technical details of the Corps' surveying methods were not discussed. (PPFUF 33; App. 24-27). Furthermore, no subsequent meeting to discuss the details of the District's multibeam survey method occurred. (PPFUF 33; App. 28).

In fact, when the Defendant's Team Leader/Project Engineer, Mr. Weinberg, the person who had primary responsibility for the preparation of the plans and specifications, provided deposition testimony, he stated the following:

[7] Plaintiff learned during discovery that it was customary for the Defendant to address survey requirements during the pre-construction conference that occurs before the commencement of each dredging project. (PPFUF 32; App. 23).

Q. Was any consideration given to making what I would call an unequivocal statement in the plans and specifications saying something to the effect that acceptance surveys will be processed by the Corps of Engineers using the shoalest sounding method?

A. No.

Q. No consideration was given to that?

A. It had been discussed during previous job after the EC came out and we thought -- and again as we discussed before, I was assured by the surveyors that our language was fine.

Q. You relied on what they told you without making your own independent determination as to whether they were correct?

A. They're much more qualified than I am.

(App. 64-65; Weinberg Deposition Tr. 8-10, 30-31).

A misrepresentation occurs when the government fails to disclose information that it has a duty to disclose. D.F.K. Enterprises, Inc. d/b/a American Coatings v. United States, 45 Fed.Cl. 280 (1999); Meyers Companies, Inc. v. United States, 41 Fed.Cl. 303, 311 (1998) (quoting John Massman Contracting Co. v. United States, 23 Cl.Ct. 24, 31 (1991)). Providing the details of how the Corps intended to process survey data in the solicitation, or at the very least before the performance of the dredging, would have allowed Plaintiff to have adjusted its daily dredging regimen to dig deeper. In fact, the only way to avoid the need to re-dredge an area when the minimum depth method is used is to over-dig. Instead, when Plaintiff submitted its pre-final surveys it clearly indicated that the survey data had been processed using the average depth method. (PPFUF 55; App. 43). In addition to using the average depth method on its pre-final surveys, Plaintiff employed the average depth method in the daily surveys that it used to manage and control its dredging operations. (PPFUF 55; App. 43).

The pre-final survey for the first acceptance area completed was submitted on December 1, 2003. (PPFUF 53; App. 44). The Corps did not raise any objection to the Plaintiff's use of the

average depth method, and to the contrary accepted the area as complete based on the average depth method. (PPFUF 53; App. 44). As Plaintiff continued to perform pre-final surveys and submit them to the Corps, it used the average depth method and clearly notified the Corps of the method it was using. Although the Defendant rejected the work in these acceptance areas as incomplete, it did not take any exception to Plaintiff's use of the average depth method. Instead, it merely furnished Plaintiff with the results of the Government's acceptance surveys without identifying the data processing method used by the Corps. (PPFUF 57; App. 47).

The Corps cannot, without liability, allow a contractor to proceed in a manner that it finds unacceptable without notifying the contractor of its disagreement. As the Veterans Board has held, where the Government knows that the contractor's methodology is wrong and cannot work, and where the error is so obvious that the Government has seen or should have seen it, then the Government cannot idly stand by and watch the contractor commit waste. Appeal of Evans, Inc., VABCA No. 2043, 86-2 BCA 18760.[8] Furthermore, the "unexpressed, subjective, unilateral intent of one party is insufficient to bind the other contracting party, especially when the latter reasonably believes otherwise." M.A. Mortenson Company v. U.S., 29 Fed.Cl. 82 (1993); Firestone Tire & Rubber Co. v. United States, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971); Singer-General Precision, Inc. v. United States, 192 Ct.Cl. 435, 446-47, 427 F.2d 1187, 1193 (1970).

It was not until near the end of the contract performance that it became clear that the Corps was using the minimum depth method to process multibeam survey data. (PPFUF 66;

[8] While this Court is not bound by the Boards of Contract Appeals' decisions, it has recognized their expertise in cases involving government contracts. Logicvision, Inc. v. U.S. 54 Fed.Cl. 549 (2002); citing Erickson Air Crane Co. v. U.S., 731 F.2d 810, 814 (Fed.Cir.1984). It has also been held that Board decisions on questions of law "are entitled to careful consideration and are accorded great respect." John L. Corrigan v. U.S., 70 Fed.Cl. 665 (2006); Clay Bernard Systems International, Ltd v. U.S., 22 Ct.Cl. 804 (1991).

App. 58). Use of the minimum depth method results in shallower depths being shown on the survey charts. That is, the minimum depth method can result in material being shown as remaining within the contract excavation limits when the average depth method does not. (PPFUF 39; App. 32). The Corps therefore was requiring Plaintiff to re-dredge areas where Plaintiff reasonably believed the work had been completed.

The Corps' use of the minimum depth method to process multibeam survey data was not in accordance with the requirements of the EM in effect at the time the contract was awarded. (PPFUF 65; App. 20, 56, 57). In fact, the EM prohibited the use of the minimum depth method for acceptance purposes. (PPFUF 65; App. 20, 56, 57). The Government has a duty not to act in a way that will hinder a contractor's performance. Southern Comfort Builders, Inc. v. U.S., 67 Fed.Cl. 124, 144 (2005). This duty goes hand in hand with the Government's implied duty to cooperate. Malone v. U.S., 849 F.2d 1441, 1445 (Fed.Cir.1988). Not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform. Lewis-Nicholson v. U.S. 213 Ct.Cl. 192 (1977). The Corps' failure to notify Plaintiff that it was using a different data processing method than Plaintiff reasonably believed was being used for acceptance purposes constituted a breach of the Government's duty to cooperate and obligation not to hinder the Plaintiff's performance.

**V. The Defendant's Ultimate Insistence That Post-Dredge Acceptance Survey Data Must Be Calculated Using The Minimum Sounding Method Was A Change To The Contract Entitling The Plaintiff To An Equitable Adjustment**

On October 1, 2004, when the Defendant finally notified Plaintiff of the technical details of its method of processing multibeam data, it stated that "the Corps of Engineers utilizes a 3 foot by 3 foot matrix using the minimum (shoalest) depth after confirming a minimum of 3 hits with the matrix that are above grade for the purposes of acceptance." (PPFUF 63; App. 52). The Defendant proceeded to direct Plaintiff that it was to use this criteria in performing its pre-final

surveys, and that the Corps would use it for acceptance purposes. This criteria was not in the Contract, nor was this the criteria for acceptance in the 2002 version of the Corps' EM in existence at the time of Contract award. This acceptance criteria, however, was contained in the new 2004 version of the Corps' EM issued on April 1, 2004, long after Plaintiff had been awarded the contract. (PPFUF 66; App. 58).

Apparently, in view of the convergence of the April 1, 2004 issuance of the new EM and the issuance of acceptance surveys that rejected Plaintiff's work, the Defendant was using this new acceptance criteria long before the October 1, 2004 notification to Plaintiff. The Defendant's insistence on the use of acceptance criteria different from the criteria in existence at the time of award constitutes a change in the contract. SMS Data Products Group, Inc. v. U.S., 17 Ct.Cl. 1, 10 (1989); Appeal of Warren, IBCA No. 1422, 81-2 BCA 15344. In fact, the Defendant was apparently quite proud of the fact that it had imposed tolerances in the determination of what depth was "acceptable" that were more stringent than generally imposed by other Corps districts. Mr. Kiss, the Chief of the New York District's Survey Branch at the time when the Plaintiff's contract was solicited and performed, in responding to questions about the 2002 Engineer Manual, provided deposition testimony as follows:

> A. Again our local procedures were more stringent than the procedures put forth in the manual because the manual was a consensus of many different districts within the division. So we always felt our procedures were going to remain more stringent than the manual. Those were suggested guidelines.
>
> Q. Were those more stringent procedures publicized?
>
> A. No.
>
> Q. Do you have any ideas of whether it would be important for a dredging contractor to know that you were following more stringent procedures than the manual?
>
> A. It wasn't my problem.

(App. 66; Kiss Deposition Tr. 7, 23).

The Corps' imposition of a survey method that was not specified in the contract, and that was more stringent than what would have been imposed even if the minimum depth had been specified, entitles the Plaintiff to additional compensation. Indeed, it has been held that the government cannot impose a more stringent testing procedure or standard for demonstrating compliance than is set forth in the contract. United Technologies Corporation v. U.S., 31 Fed.Cl. 698 (1994); Southwest Welding & Manufacturing Co. v. United States, 188 Ct.Cl. 925, 951-53, 413 F.2d 1167, 1183-84 (1969); see also SMS Data Products Group, Inc. v. United States, 17 Cl.Ct. 1, 10 (1989).

**CONCLUSION**

Based upon the foregoing argument, the Court is respectfully requested to grant the Plaintiff's Motion for Partial Summary Judgment and to rule that the Plaintiff is entitled to an equitable adjustment of its contract. The Court is further requested to schedule a trial to determine quantum.

Respectfully submitted,

Dated: December 14, 2007

/S/ Michael H. Payne

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Drive, Suite 100
Fort Washington, PA 19034
Tel: (215) 542-2777
Fax: (213) 542-2779

Attorney of Record for
Jay Cashman, Inc.

Of Counsel:
Joseph A. Hackenbracht, Esquire
Payne Hackenbracht & Sullivan