IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Francis M. Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Plaintiff, Jay Cashman, Inc., by its counsel pursuant to RCFC 56, respectfully submits the following proposed findings of uncontroverted facts setting forth the material facts upon which Plaintiff bases its motion for partial summary judgment and as to which Plaintiff believes there is no genuine dispute.

**UNCONTROVERTED FACTS**

1. The Defendant, by and through the New York District, ("District"), of the U.S. Army Corps of Engineers, ("Corps"), issued sealed bid Solicitation No. DACW51-03-B-0004 for dredging to deepen an existing 40-foot navigation channel to a depth of 47 feet along the southern portion of the South Elizabeth Channel in Newark Bay and the western end of the Kill Van Kull Channel in New Jersey. (Answer ¶4).

2. The bid opening was held on March 25, 2003 and three bids were received. The bid results, including the government estimate, were as follows: (App. 1)

| | |
|---|---|
| Jay Cashman, Inc. | $39,307,022.00 |
| Bean Stuyvesant | $46,567,085.00 |
| Weeks Marine, Inc. | $67,129,190.00 |
| Government Estimate | $42,058,948.00 |

3. The Plaintiff was asked to confirm its bid and it did so. (App. 2)

4. On May 23, 2003, following the public bid opening, the Defendant awarded Contract No. DACW51-03-C-0014, ("Contract"), in the amount of $35,460,430, to the Plaintiff. (Answer ¶5).

5. The Plaintiff is a large and experienced construction contractor who had previously performed dredging work for the New England District of the Corps of Engineers, but this was the first dredging contract awarded to the Plaintiff by the New York District.

6. The project was part of an extensive multi-billion dollar program authorized by Congress and undertaken by the New York District to deepen the existing navigation channel into Newark Bay and New York Harbor. (App. 3, http://www.nan.usace.army.mil/ project/newyork/factsh/pdf/kvknew.pdf).

7. This Contract was one of a number of related and similarly large dredging projects performed by other dredging contractors prior to the award of Plaintiff's contract, an effort that began in 1987 and is continuing to this day. The first phase of contracts deepened the channels to 40 feet, the second phase, of which this Contract was part, deepened the channels further. (App. 4, http://www.nan.usace.army.mil/project/newyork/factsh/pdf/nynj.pdf). Eight contracts were issued by the Corps to perform the second phase of the project. (App. 4). The third phase, which is continuing, will deepen the channel to 50 feet. (App. 5,6).

8. There are few dredging contractors who have the equipment and the capability to perform a project of the size and scope encompassed by the subject contract and prior to the award of Plaintiff's contract the previous seven contracts had been performed by only three contractors.

9. The New York District welcomed the Plaintiff's considerable investment in dredging equipment and its entry into the competition for the District's dredging projects, all of which were awarded competitively through sealed bidding.

10. As a "newcomer" to the New York District's dredging program the Plaintiff's lowest bid was closely scrutinized by the Contracting Officer and the District's personnel and an extensive pre-award survey was conducted by the Corps to assure that the Plaintiff had the capability to complete the project. (App. 7).

11. Dredging involves the removal of material from the ground under a body of water. The body of water where dredging under the Contract was to be performed was divided into six acceptance areas. The six acceptance areas totaled approximately 820,000 square yards in area. (Answer ¶6).

12. The project was "new work" dredging that required the excavation of material that had not been dredged before and was therefore harder, and more difficult to dredge than "maintenance" material, which involves the removal of material that has filled in a channel since the last time it was dredged. (App. 8).

13. The contract provided for payment to the contractor on a unit price basis of so many dollars per cubic yard of material excavated, at various line item unit prices in the contract that differed according to location and material type. (App. 9-11).

14. The Corps of Engineers performs before and after-dredging surveys to determine how much material has been excavated and is to be paid for at the agreed-upon contract unit prices, and also to assure that the required channel depth has been achieved.

15. The Congressionally authorized project depth for the Contract was 45 feet. (App. 3). The Contract, however, required excavation to a depth of 47 feet with an allowable

overdepth of one and one-half additional feet. (App. 12). The two foot cushion between the authorized depth, 45 feet, and the project depth, 47 feet, was an additional safety factor adopted by the Corps. (App. 13).

16. The payment of allowable overdepth is a common practice in Corps of Engineers dredging projects because it is not possible to dredge to the "neat line" channel depth required by the terms of the contract. In other words, in order to achieve a depth of 47 feet, the sheer size of the excavation tool required a dredging contractor to dig somewhat below the required depth in order to safely achieve that depth. To cover these inaccuracies in the dredging process, the Corps included an additional "cushion" of a one and one-half feet of overdepth. (App. 12).

17. Dredging contractors all attempt to achieve the required depth before requesting after-dredge surveys so that they do not have to bring their expensive equipment back to an area to re-dredge.

18. In order to measure the depth to which material had been excavated by the Plaintiff, the Contract provided that Defendant was to examine the underwater area using an acoustic survey system, a type of remote sensing that indirectly measures the depth of the water in the area excavated. (Answer ¶7).

19. The purpose of this type of examination, also referred to as "hydrographic surveying," is to generate "acceptance surveys" that are used to determine whether or not the subaqueous material has been removed from within the required contract excavation limits, and consequently, whether or not the Plaintiff has performed the contract work in accordance with the contract requirements. (Answer ¶8).

20. These Corps of Engineers acceptance surveys are used by the Corps to determine how much material has been removed from an area for final payment purposes, and to also

assure that the required depth has been achieved in a particular acceptance area sufficient to excuse the contractor from performing any further dredging in that area. (App. 14).

21. At the time that the Contract was awarded, and continuing through the performance of the Contract, the New York District performed acceptance surveys using an acoustic survey system known as a multibeam sonar system. ("multibeam"). (App. 15).

22. Multibeam surveying and the processing of the data generated by multibeam was a relatively new technology being employed by the Defendant. Mr. Richard Kiss, who was the Chief of the Survey Section, testified that the District only began using the multibeam survey system in the late 1990's. (App. 16). Mr. Hawkins, the project manager for the harbor deepening project, testified that the District had "phased-in" the use of multibeam surveys during the Phase 2 contracts, which included Plaintiff's Contract. (App. 15).

23. All multibeam sonar systems use the same basic approach to depth measurement. A machine generates sound waves underwater and the returning echoes reflected off of the submerged ground surface are processed and converted into vertical depths that are then depicted on a survey graph. (Answer ¶9).

24. The Corps issues agency policy, regulations and technical guidance that are to be complied with in the performance of the agency's dredge surveying functions. (Answer ¶23).

25. When the Contract was awarded, the agency policy with regard to the performance of hydrographic surveying was set forth in EM 1110-2-1003, HYDROGRAPHIC SURVEYS (1 Jan 02), ("EM"). (Answer ¶23). (The letters “EM” are an abbreviation for the term “Engineer Manual).”

26. EM 1110-2-2003, with a reference to ER 1110-2-1150, "Engineering and Design for Civil Works Projects," states that Corps' policy prescribes that mandatory requirements be identified in engineer manuals. (App. 17,18). (The letters "ER" refer to "Engineer Regulation)."

27. The EM further states that "mandatory requirements in this manual are summarized at the end of each chapter." (App. 18).

28. Chapter 11 of the EM provides Corps' policy and guidance for multibeam survey systems used on deep-draft navigation projects. (App. 19).

29. At the end of Chapter 11 of the EM, the mandatory requirements are identified as follows: (App. 20) "The policy outlined in paragraph 11-4 (USACE Multibeam Policies, Procedures, and Applications) is considered mandatory."

30. Subparagraph g. of paragraph 11-4 in the EM identified the mandatory requirements concerning "Dredging Contract Specifications," as follows:

> Measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters (horizontal and vertical control, density, etc.), data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government.

(App. 21).

31. The subject dredging Contract did not contain any of this technical information regarding the hydrographic survey system that the Defendant intended to employ on the project. The Contract only stated the following concerning acceptance surveys: "As soon as practicable after the completion of an entire acceptance area, a final examination of the work will be conducted by the Contracting Officer, at the cost and expense of the Government by acoustic sweep survey system." (App. 22).

32. It was the District's practice for representatives of its survey section to attend the Pre-Construction meeting to explain the survey system Defendant would use and to answer any questions. (App. 23).

33. No representatives from the survey section attended the Pre-Construction meeting for Plaintiff's Contract. (App. 24,25). The survey system and data analysis methods that Defendant intended to use for performing acceptance surveys of Plaintiff's work was not disclosed or discussed at the Pre-Construction meeting. (App. 26,27). No subsequent, separate meeting to discuss the survey methods was held with the survey section. (App. 28).

34. Multibeam sonar equipment generates hundreds of thousands of data points. (Answer ¶10). This data is represented in small, incremental areas, typically one square yard in size, referred to as "bins" or "cells" and that was the information that was plotted by the Corps on its acceptance survey charts. (Answer ¶10).

35. Multibeam sonar equipment generates three separate data sets, the minimum depth, the average depth, and the map data set. (Answer ¶11).

36. In the minimum depth method, the computer program selects the shallowest data point to represent the depth within a "bin." As applied by the New York District, if this “minimum depth” or “shallowest depth” method indicated as few as three data points, out of the hundreds in a bin, that measurement was used as the basis to require the re-dredging of a bin if those three data points were above the required grade. (App. 29,30).

37. In other words, even if these three data points indicated that the material was above grade by as little as one-tenth of a foot, that survey was then utilized by the Corps as the basis to direct the Plaintiff to re-dredge the acceptance area. (App. 31).

38. In the average depth method, the computer program averages all of the data points within a "bin" to determine the depth. (Answer ¶12).

39. The average method is less likely to result in a requirement to re-dredge because the average of all of the data points in a bin may be below grade even though not all of the data points in the bin are below grade. (App. 32).

40. Before it prepared its bid for this Contract, Plaintiff's experience with multibeam surveying consisted of two projects that Plaintiff performed for the New England District where the Corps used multibeam and experimented with different methods of processing the multibeam data. (App. 33).

41. When Plaintiff submitted its bid, Plaintiff was aware that the New York District was using multibeam surveying, and assumed that the New York District would employ the average depth method to process multibeam data. (App. 34).

42. Following contract award, Plaintiff purchased multibeam survey equipment, Odom Echoscan, primarily because it was the type of multibeam survey equipment used by the District. (App. 35).

43. Based on the recommendations of the supplier of the multibeam survey equipment, Plaintiff purchased Hypack software for processing of the multibeam data. (App. 36).

44. The supplier informed Plaintiff that the minimum method was not used very often because the results are not representative of the actual depths in an area that has been dredged. (App. 37).

45. Prior to notifying the Corps that an area was considered to be completed and therefore ready for an acceptance survey by the Corps, the Contract required Plaintiff to perform

a pre-final survey to verify that the dredging had been satisfactorily completed and that the required grade had been achieved. (App. 22).

46. The contract required the Plaintiff to perform its pre-acceptance surveys using a multibeam survey system, and the Plaintiff did so, but the Contract did not specify what method (minimum or average) Plaintiff was to use to process the data for its pre-final surveys. (Answer, ¶14).

47. There was no guidance in the contract, or elsewhere, that specified whether the minimum or average depth method was to be used.

48. The Contract only required that Plaintiff's pre-final "hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys." (App. 22). None of these referenced standards addressed the data processing method for multibeam surveys. (App. 38,39).

49. After discussing the different methods of processing the data, including the minimum and average depth methods, Plaintiff chose to use the average depth method to represent the results of its multibeam surveys. (App. 40).

50. Plaintiff used the results obtained by using the average depth method on a daily basis to evaluate and direct the performance of the dredging, and based on the previous day's survey, Plaintiff would determine each day how deep to dredge. (App. 41).

51. When Plaintiff completed the first phase of the dredging, excavation of the upland disposal material, it submitted its after-dredge surveys based on the average depth method, the Corps accepted the work based on the average depth method, and the Corps paid for the work based on the average depth method surveys. (App. 42,43).

52. Plaintiff proceeded to perform the surveys for its remaining work, excavation of the HARS material, using the same average depth method. (App. 43).

53. The first acceptance area of HARS material completed under the Contract was acceptance area 1, where the dredging was performed by a subcontractor. Plaintiff submitted its first pre-final survey on December 1, 2003, and clearly identified by a large notation on the face of its submitted survey chart that the survey used the average depth method. (App. 44).

54. Defendant accepted the work in Acceptance Area 1 based on the average depth method multibeam survey. (App. 45,46).

55. Plaintiff proceeded to dredge the remaining acceptance areas and continued to use the average depth method to interpret the multibeam survey data. (App. 43). On at least seven occasions, when Plaintiff submitted its pre-final surveys, it used the average depth method and clearly identified that the average depth method was used. (App. 43).

56. As the work progressed, Defendant repeatedly notified Plaintiff that the Corps' acceptance surveys indicated that material remained above the contract excavation limits and directed Plaintiff to redredge those areas. (Answer, ¶19).

57. The survey charts that Defendant provided Plaintiff did not identify the survey system or data analysis method employed by the Defendant to reject the work as unacceptable. (App. 47). The only information provided by Defendant was to note that: "The sounding data depicted on this map was collected using Class I survey standards. . ." and that "The data on this map is representative of a larger data set."

58. When the Plaintiff furnished the pre-final surveys to the Corps' construction personnel who administered the Contract, the Corps' personnel did not provide the pre-final

surveys to the Corps' survey branch. The Corps' construction personnel merely requested the Corps' survey branch to perform a final acceptance survey. (App. 48).

59. The Corps' construction personnel were not aware that there were different ways to process multibeam data until approximately midway through the contract performance. (App. 49,50).

60. Plaintiff notified Defendant that it considered the additional excavation to be extra work for which it was entitled to additional compensation. (Answer, ¶20).

61. As the work proceeded, Defendant failed to identify the data analysis method, causing Plaintiff to rely, to its detriment, on the average depth surveying method.

62. Defendant did not furnish the technical information that its internal guidance, EM 1110-2-1003, had required to be in the Contract specifications, until October 1, 2004. (App. 51-53).

63. On October 1, 2004, after Plaintiff had dredged most of the acceptance areas, Defendant notified Plaintiff that its acceptance surveys had employed, and would continue to employ, the minimum depth method. (Answer, ¶21).

64. Not only did the Defendant fail to disclose that it was processing the survey data in a manner that had not been disclosed to the Plaintiff, the Defendant applied a more stringent tolerance to determine whether a minimum depth acceptance survey had "passed" than was customary in the Corps of Engineers or than was anticipated by Corps' policy in effect when the Plaintiff's contract was awarded. (App. 54,55).

65. The version of EM 1110-2-1003 in effect at the time of contract award provided that for dredging acceptance the minimum depth method shall not be used. (App. 20,56,57).

66. On April 1, 2004, during Plaintiff's performance of its contract, the Corps issued a new version of EM 1110-2-1003 providing that the minimum (also referred to as "shoalest") depth method was to be used for dredging acceptance. (App. 58).

67. As a result of the Defendant's failure to comply with its internal guidance, and as a further result of its failure to promptly notify the Plaintiff that the average depth method it was using was not acceptable to the Corps, the Plaintiff was unnecessarily required to redredge and incur additional costs.

68. On July 22, 2005, Plaintiff submitted a properly certified claim for the additional costs incurred resulting from the Defendant's use of an undisclosed survey acceptance criteria. (Answer ¶25). On October 26, 2005, the Contracting Officer issued a Final Decision denying the claim.

Respectfully submitted,

Dated: December 14, 2007

/s/ Michael H. Payne

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Drive, Suite 100
Fort Washington, PA 19034
Tel: (215) 542-2777
Fax: (213) 542-2779
mhp@phslegal.com

Attorney of Record for
Jay Cashman, Inc.

Of Counsel:
Joseph A. Hackenbracht, Esquire
Payne Hackenbracht & Sullivan