IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Francis M. Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**APPENDIX**

# APPENDIX

## INDEX


| PAGE | DESCRIPTION |
|---|---|
| 1 | Bid Abstract dated March 25, 2003 |
| 2 | Cashman Letter dated March 27, 2003 |
| 3 | Project Fact Sheet - Kill Van Kull & Newark Bay |
| 4 | Project Fact Sheet - New York & New Jersey Harbor |
| 5 | Deposition of Harold Hawkins - p. 9, 10 |
| 7 | Corps Memorandum For Record dated May 12, 2003 |
| 8 | Deposition of Bruce Wood - p. 11 |
| 9 | Contract Price Schedule |
| 12 | Contract Specification Section 02900, p. 3 |
| 13 | Deposition of Harold Hawkins - p. 43 |
| 14 | Deposition of Richard Kiss - p. 15 |
| 15 | Deposition of Harold Hawkins - p. 14 |
| 16 | Deposition of Richard Kiss - p. 9 |
| 17 | EM 1110-2-1003 - p. 1-1 |
| 18 | EM 1110-2-1003 - p. 1-2 |
| 19 | EM 1110-2-1003 - p. 11-1 |
| 20 | EM 1110-2-1003 - p. 11-33 |
| 21 | EM 1110-2-1003 - p. 11-10 |
| 22 | Contract Special Requirement 1.15 |
| 23 | Deposition of Ronald Conetta - p. 14 |
| 24 | Deposition of William McDonald - p.11, 12 |
| 26 | Deposition of Harold Hawkins - p. 25,26 |

# INDEX


| PAGE | DESCRIPTION |
|---|---|
| 28 | Deposition of William McDonald - p. 13 |
| 29 | Deposition of Richard Kiss - p. 62,63 |
| 31 | Deposition of Ronald Conetta - p. 34 |
| 32 | Deposition of James Galli - p. 39 |
| 33 | Deposition of Alex Dick - p. 14 |
| 34 | Deposition of Bruce Wood - p. 25 |
| 35 | Deposition of Alex Dick - p. 20,21.22 |
| 38 | EC 1130-2-210 - p. A-2,3 |
| 40 | Deposition of James Galli - p. 29 |
| 41 | Deposition of James Galli - p. 37 |
| 42 | Deposition of James Galli - p. 18 |
| 43 | Deposition of James Galli - p. 19 |
| 44 | Cashman Pre-Final Survey of Area 1 dated December 1, 2003 (Oversize document, exhibit limited to relevant notations) |
| 45 | Deposition of Alex Dick - p. 31 |
| 46 | Corps Letter dated June 22, 2004 |
| 47 | Corps Acceptance Survey of Area 1 (Oversize document, exhibit limited to relevant notations) |
| 48 | Deposition of Mark Alton - p. 13 |
| 49 | Deposition of Ronald Conetta - p. 22,23 |
| 51 | Corps Letter dated October 1, 2004 |
| 54 | Deposition of Richard Kiss - p. 23 |
| 55 | Deposition of Richard Kiss - p. 30 |

## INDEX


| PAGE | DESCRIPTION |
|---|---|
| 56 | Deposition of Bruce Wood - p. 57,58 |
| 58 | EM 1110-2-1003 (1 Apr 04) - p. 11-44 |
| 59 | Cashman Pre-Final Survey Area 1&3A (Oversize document, exhibit limited to relevant notations) |
| 60 | Deposition of Mark Alton - p. 13,14 |
| 62 | Deposition of Richard Kiss - p. 63,64 |
| 64 | Deposition of Steven Weinberg - p. 30,31 |
| 66 | Deposition of Richard Kiss - p. 23 |

PRELIMINARY BID REPORT | Amendments 3 | DATE 13 MAR 03 | TIME 11:00 AM

INVITATION FOR BID NO. DACW51-03-B-0004

PROJECT & LOCATION KVK8 Channel Contract 8

Recorded By Scott Helmer

OPEN BY Myklande Lee

| BID ITEM NO. | DESCRIPTION | | GOVT. ESTIMATE | BID NO. 1 Weeks Marine | BID NO. 2 Jay Cashman | BID NO. 3 Bean Stuyvesant | |
|---|---|---|---|---|---|---|---|
| 0001 | CONST NAV CHANNEL | | | | | | |
| 0001AA | MOB/DEMOB | | 2,932,600.00 | 2,995,000.00 | 6,268,500.00 | 2,800,000.00 | |
| 0001AB | DEBRIS REMOVAL/DISPOSAL unit | | 510.00 | 500.00 | 200.00 | 200.00 | |
| | Total | | 25,500.00 | 25,000.00 | 10,000.00 | 10,000.00 | |
| 0001AC | DREDGING/DISPOSAL AT OENJ/other site Silt | | 49.90 | 49.95 | 44.80 | 45.00 | |
| | Total | | 10,698,560.00 | 10,709,280.00 | 9,605,120.00 | 9,648,000.00 | |
| 0001AD | DEWATERING unit | | 0.82 | 1.00 | 1.00 | 1.50 | |
| | Total | | 175,808.00 | 214,400.00 | 214,400.00 | 321,600.00 | |
| 0001AE | SUBSURFACE SAMPLING AND DRILLING UNIT | | 6,120.00 | 5,000.00 | 5,000.00 | 5,000.00 | |
| | Total | | 91,800.00 | 75,000.00 | 75,000.00 | 75,000.00 | |
| 0001AF | FIELD OFFICE | | 163,200.00 | 150,000.00 | 192,000.00 | 150,000.00 | |
| 0001AG | DREDGING/DISPOSAL AT HARS unit | | 12.45 | 29.95 | 13.00 | 18.00 | |
| | Total | | 16,737,406.00 | 40,263,881.50 | 17,476,810.00 | 24,198,660.00 | |
| 0001AH | DREDGING/DISPOSAL AT CDF unit | | 37.81 | 39.95 | 36.00 | 36.00 | |
| | Total | | 901,768.00 | 952,807.50 | 858,600.00 | 858,600.00 | |
| 0001AL | DREDGING/DISPOSAL AT reef unit | | 137.78 | 79.95 | 50.00 | 100.00 | |
| | Total | | 2,094,256.00 | 1,215,240.00 | 760,000.00 | 1,520,000.00 | |
| TOTAL | BASE BIDS | | 33,820,898.00 | 56,600,609.00 | 35,460,430.00 | 39,581,860.00 | |
| 0002 | OPTIONAL INSURANCE | | 51,700.00 | 50,000.00 | 100,000.00 | 10,000.00 | |
| 005A | DREDGING/DISPOSAL AT HARS unit | | 14.39 | 29.95 | 6.00 | 18.00 | |
| | Total | | 1,263,874.00 | 2,630,508.50 | 526,980.00 | 1,580,940.00 | |
| 005B | DREDGING/DISPOSAL AT OENJ/other site Silt | | 50.85 | 49.95 | 40.00 | 45.00 | |
| | Total | | 618,845.00 | 607,891.50 | 486,800.00 | 547,650.00 | |
| 005C | DEWATERING unit | | 0.83 | 1.00 | 1.00 | 1.50 | |
| | Total | | 10,101.00 | 12,170.00 | 12,170.00 | 18,255.00 | |
| 006A | DREDGING/DISPOSAL AT HARS unit | | 15.17 | 39.00 | 10.00 | 18.00 | |
| | Total | | 1,707,308.00 | 4,389,255.00 | 1,125,450.00 | 2,025,810.00 | |
| 006B | DREDGING/DISPOSAL AT reef unit | | 148.17 | 90.00 | 50.00 | 90.00 | |
| | Total | | 4,500,664.00 | 2,733,750.00 | 1,518,750.00 | 2,733,750.00 | |
| 006C | DREDGING/DISPOSAL AT OENJ/other site Silt | | 56.98 | 69.95 | 49.50 | 45.00 | |
| | Total | | 84,330.00 | 103,526.00 | 73,260.00 | 66,600.00 | |
| 006D | DEWATERING unit | | 0.88 | 1.00 | 2.15 | 1.50 | |
| | Total | | 1,228.00 | 1,480.00 | 3,182.00 | 2,220.00 | |
| TOTAL | OPTIONS | | 8,238,050.00 | 10,528,581.00 | 3,846,592.00 | 6,985,225.00 | |
| TOTAL | BASE BIDS PLUS OPTION | | 42,058,948.00 | 67,129,190.00 | 39,307,022.00 | 46,567,085.00 | |

Myrlande

CASHMAN
CONSTRUCTORS

**W. Bruce Wood**
President, Marine and Equipment Division

617.287.1600
fax 617.288.4597
Email bwood@jaycashman.com

JAY CASHMAN, INC.
20 West Howell Street
Boston, MA 02125

March 27, 2003

Ms. Ella D. Snell
Contracting Officer
Department of the Army
New York District Corps of Engineers
Jacob K. Javits Federal Building
New York, NY 10278-0090

Attention: Myrlande Lee

RE: Kill Van Kull and New Bay Channels Navigation Improvements Project, Phase II, Contract 8 (Area 8 ),New York and New Jersey
DACW51-03-B-0004

Dear Ms. Snell:

This letter is to confirm the bid and prices as Jay Cashman, Inc., submitted for the above referenced project.

Jay Cashman, Inc., is looking forward to your notice of award.

If you have any questions, please contact me directly. Thank you for your cooperation.

Very truly yours,

JAY CASHMAN, INC.

W. Bruce Wood

W. Bruce Wood
President, Marine and Equipment Division

WBW/lkr

US Army Corps
of Engineers®
New York District

# Kill Van Kull & Newark Bay, NY & NJ

## Navigation Improvement Project

## FACT SHEET

**DESCRIPTION:** The General Design Memorandum, dated June 1986, recommended that the project be constructed in two phases:

Phase I - Deepening channels from 35 feet to 40 feet below mean low water.

Phase II - Deepening channels from 40 feet to 44 feet below mean low water. (Report recommended deferring the additional one-foot deepening until shipping usage warrants additional depth).

**AUTHORIZATION:** The project to deepen the Kill Van Kull and Newark Bay Channels to a depth of 45 feet was authorized for construction by the Supplemental Appropriation Act of 1985 (P.L. 99-88).

**STATUS:**

Phase I - Phase I construction was initiated in July 1987 and substantially completed in September 1995. A total of 7 construction contracts were awarded and completed.

Estimated Project Total Cost = $265,737,000
Federal Cost = $199,303,000
Non-Federal = $66,434,000

Phase II - A Limited Reevaluation Report (LRR), which recommended the deepening of the channels to 45 feet was submitted to Corps of Engineers Headquarters in April 1997 and was approved on 6 October 1997. The estimated fully funded project cost for the general navigation features for Phase II is $ 733 million, of which $550 million is the Federal cost and $183 million is the non-Federal cost. An additional 10 percent of cost allocated to general navigation will be required from the non-Federal sponsor within a period of 30 years following completion of construction.

The benefit to cost ratio is 3.2 to 1. The average annual benefits are $458 million, which are primarily for transportation cost savings.

The local sponsor for the Phase II is the Port Authority of New York and New Jersey.

The Project Cooperation Agreement (PCA) with the project sponsor was executed on 13 January 1999 and the first construction contract for (area 2) was awarded 16 March 1999, construction was initiation on 25 May 1999 and was completed 18 September 2000. The second contract for (area 1) was awarded 4 August 1999 and was completed 17 July 2001. The third contract for (area 4a) was awarded 29 February 2000 and was to be completed 15 February 2002. The fourth contract for (area 7) was awarded March 12, 2001, and was completed 28 March 2003. The fifth contract for (Area 5) was awarded 10 December 2001 and is scheduled to be completed August 2004. The sixth contract for Area 3 was awarded 20 August 2001 and was completed 2 October 2002. The seventh contract Area 6 was awarded 25 July 2002, and was completed 6 January 2004. The eighth contract was awarded 23 May 2004 and was completed November 2004.

**CONTACT:** Mr. Harold J. Hawkins, P.E. Project Manager, mailto: harold.j.hawkins@usace.army.mil tel: 917 790 8204
U.S. Army Corps of Engineers, New York District
26 Federal Plaza,
New York, NY 10278
http://www.nan.usace.army.mil

E

US Army Corps of Engineers®
New York District

# NEW YORK & NEW JERSEY HARBOR

## NAVIGATION PROJECT

## FACT SHEET

**PROJECT AREA AND PURPOSE:** The project area encompasses the Port of New York and New Jersey and includes the Ambrose and Anchorage Channel; New York and New Jersey Channels (Kill Van Kull and portion of the Arthur Kill); Newark Bay Channel; Bay Ridge; and the Port Jersey Channel. The Port of New York and New Jersey is the largest port on the East Coast, providing more than 230,000 direct and indirect jobs in port related activities and $20 billion in economic activity to the State of New York and New Jersey. The Port receives and ships waterborne general cargo to all parts of the United States and throughout the world, at the four major container terminals, two located in New Jersey; Pt. Newark/Pt Elizabeth and Global Marine Terminal, and two located in New York: New York Container Terminal in Staten Island and the Brooklyn Marine Terminal. Rail, truck, and inland waterway routes throughout the region are used to transport commerce to large segments of the northeast and mid-western states. The Port of New York-New Jersey receives container ships from the Far East as well as from on the Atlantic and Gulf Coasts, the Caribbean, Africa and the Persian Gulf. Current channels within the Harbor range in depths from 30 to 45 feet, which are inadequate to provide access to the large post -Pannamax ships, which require water drafts of 48 feet and more

**PROJECT AUTHORIZATION:** Section 101(a)(2), Water Resources Development Act of 2000 (P.L. 106-541)

**AUTHORIZED PROJECT:** The authorized project provides 50 ft water access to the each of the four container terminal and includes deepening the Ambrose Channel from deep water to the Verrazano-Narrows Bridge to 53 feet below mean low water (mlw), and also deepening the Anchorage Channel (from the Verrazano-Narrows Bridge to its confluence with the Port Jersey Channel), the Kill Van Kull Channel, portion of the Newark Bay Channels, the Arthur Kill Channel (from the Kill Van Kull to the New York Container Terminal), the Port Jersey Channel and the Bay Ridge Channel to 50 feet mlw (52 feet mlw in rock or otherwise hard material). The current estimate for the 50 ft project, project is $1.6 billion. The benefit-to-cost ratio is 2.5 to 1 based on annualized costs of $109,404,000 and annualized benefits of $161,525,000, which results in net excess benefits of $52,121,000. In 2002 Congress consolidated the NY and NJ Harbor 50 ft project with prior authorized projects that provided for deepening the Kill van Kull and Newark Bay Channels to 45 ft; for deepening of the Arthur Kill Channel to 41 ft to the New York Container Terminal; and for deepening the Port Jersey Channel to 41 ft. The cost of the consolidated project is $2,500,000,000.

**STATUS:** The Project includes 16 dredging contracts and construction of 2 marsh restoration projects to mitigate project impacts. To date, the two marsh restoration contracts and three dredging contracts have been awarded with scheduled completion as follows: Woodbridge, NJ marsh restoration (completed), Elders Pt, Jamaica Bay, NY (completed), Contract Area S-KVK-2 (March 2007), Ambrose Channel contact area 1 (August 2007), Anchorage Channel Contract 1a ( January 2008). Remaining contracts scheduled for award in 2007 include: Newark Bay Contract Area 1, Pt Jersey Contract Area 3, and Anchorage Channel Contract 1b.

**AUTHORIZED PROJECT (Consolidated) COST:**

| | | |
|---|---|---|
| Estimated Federal Cost | | $1,300,000,000 |
| Estimated Non-Federal Cost | | $1,200,000,000 |
| | Total | $2,500,000,000 |

**CONTACT:** Harold J. Hawkins, P.E., Project Manager, mail to: harold.j.hawkins@usace.army.mil , (917) 790-8204
U.S. Army Corps of Engineers, New York District http://www.nan.usace.army.mil/
26 Federal Plaza
New York, NY 10278

A

sort of being admitted as expert.

Q What did you seek to qualify as in terms of being an expert?

A That was for my father-in-law and that was about a home air-conditioning system.

Q Okay. Have you been the project manager for the Harbor Deepening Project from the inception of that project?

A Pretty much. Tully was the first project manager during the feasibility stage of the forty-five foot project. I'm not exactly sure who was commanding the forty foot project. We had a different sort of organization at that time and it was more of a handoff, so you had probably several people that was involved in what would now be called project management.

Q Is the current Harbor Deepening Project one that you would refer to as the fifty foot project?

A Yes.

Q About when did that start in terms of your involvement as the project manager of it?

A The official start was probably March of 2004 with the award of SKVK2 for the Federal Government. You had the award of area five where the Port Authority piggybacked on to ours, so depending on how you want to interpret when the fifty foot started, it either started with the Port Authority deepening of that area or with us initiating SKVK2.

Q Have you been involved in all of the KVK Harbor Deepening Projects that have occurred in recent years?

A For the forty-five, yes.

Q And for the fifty?

A Yes.

Q Were you the project manager of the KVK8 project that's the subject of this litigation?

A Yes.

Q As a project manager did you have any role to play in the preparation of the plans and specifications for the KVK8 Project?

A Yes.

Q What was your role?

CENAN-CT

12 May 03

MEMORANDUM FOR RECORD

SUBJECT: Determination of Responsible Bidder for Kill Van Kull and Newark Bay Channels Phase II Contract 8, New York and New Jersey

Re: Solicitation DACW51-03-B-0004

1. Jay Cashman, Inc. in response to the reference IFB solicitation, subsequent to the bid opening, on 25 March 03, was determined to be the apparent low bidder.

2. The technical PDT members performed a rigorous responsibility determination for this effort, IAW FAR 9.104-2 and 9.104-3.

3. Based on the findings provided by the technical members of the PDT, as provided by the responsibility position paper on Jay Cashman, Inc. it is the determination of the undersigned that Jay Cashman, Inc. is considered responsible for contract performance IAW the subject solicitation.

David H. Freedman

Encl

DAVID H. FREEDMAN
MAJ, USA
Contracting Officer

Q. What does it mean for a dredging contract to be a new work contract?
A. Can you repeat that?
MS. KILFOYLE: Can you read it back?
(Reporter read back the last question.)
A. It's dredging deeper than the published elevation of the channel, a deepening project.
Q. Okay. Was KVK 8 a new work contract?
A. Yes.
Q. What does hard bottom material mean in the context of a dredging contract?
A. It means that it's rock or hard till.
Q. What is till?
A. Hard-packed material.
Q. Can you give an example of something that might fall into that category?
A. Gravel, heavy clays, rock.
Q. Did -- I'm sorry. Are you finished?
A. Yes.
Q. Did KVK 8 contain hard bottom material?
A. Yes.
Q. Are you familiar with multibeam surveys?
A. Yes.
Q. What are multibeam surveys?

**SECTION 00010**
**SUPPLIES OR SERVICES AND PRICES/COSTS**
**PRICE SCHEDULE**

| ITEM | DESCRIPTIONS | QUANTITY | U/I | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| **BASE BID ITEMS** | | | | | |
| 0001 | CONSTRUCT NAVIGATION CHANNEL | | | | |
| 0001AA | MOBILIZATION AND DEMOBILIZATION | 1 | LS | $ | $6,268,500.00 |
| 0001AB | DEBRIS REMOVAL AND DISPOSAL | 50 | TON | $200 | $10,000.00 |
| 0001AC | DREDGING, TRANSPORTATION, DELIVERY, PROCESSING AND PLACEMENT OF NON-ROCK MATERIALS UNSUITABLE FOR PLACEMENT AT THE HARS, EXCLUDES DEWATERING: ITEM 0001AD (PLACEMENT AT either the OENJ CHEROKEE BAYONNE LANDFILL REMEDIATION AND/OR AT THE CONTRACTOR'S PROPOSED DISPOSAL FACILITY (IES))<br>Name of Site (s) OENJ Golf Course Site<br>Name of POC(s) Jessica Vreiland<br>Address of Site (s) Bayonne NJ<br>Phones (s) 201-377-9330 | 214,400 | CY | $44.80 | $9,605,120.00 |
| 0001AD | DEWATERING IN ACCORDANCE WITH THE HOST STATE WQC AND DISPOSAL FACILITY TERMS AND CONDITIONS FOR UPLAND PLACEMENT | 214,400 | CY | $1.00 | $214,400.00 |
| 0001AE | SUBSURFACE DRILLING AND SAMPLING | 15 | EA | $5,000 | $75,000.00 |
| 0001AF | FIELD OFFICE | 1 | LS | $192,000 | $192,000.00 |
| 0001AG | DREDGING, TRANSPORTATION, DELIVERY, AND PLACEMENT OF NON-ROCK MATERIALS SUITABLE FOR PLACEMENT AT THE HARS | 1,344,370 | CY | $13.00 | $17,476,810.00 |
| 0001AH | DREDGING, TRANSPORTATION, DELIVERY, AND PLACEMENT OF NON-ROCK MATERIALS UNSUITABLE FOR PLACEMENT AT THE HARS for PLACEMENT AT THE NEWARK BAY CONFINED DISPOSAL FACILITY, CDF. | 23,850 | CY | $36.00 | $858,600.00 |
| 0001AL | THE DRILLING, BLASTING, DREDGING, AND DISPOSAL OF ROCK MATERIALS AT THE ARTIFICIAL REEF | 15,200 | CY | $50.00 | $760,000.00 |

**TOTAL BASE BID: $35,460,430.00**

**OPTIONAL ITEMS**

| | | | | | |
|---|---|---|---|---|---|
| 0002 | ADDITIONAL COST FOR OPTIONAL INSURANCE | 1 | LS | $100,000 | $100,000.00 |
| 0003 | not used | | | | |
| 0004 | not used | | | | |

**0005 Materials within Acceptance Area 4A**

| | | | | | |
|---|---|---|---|---|---|
| 0005A | DREDGING, TRANSPORTATION, DELIVERY, AND PLACEMENT OF NON-ROCK MATERIALS SUITABLE FOR PLACEMENT AT THE HARS | 87,830 | CY | $6.00 | $526,980.00 |
| 0005B | DREDGING, TRANSPORTATION, DELIVERY, PROCESSING AND PLACEMENT OF NON-ROCK MATERIALS UNSUITABLE FOR PLACEMENT AT THE HARS, EXCLUDES DEWATERING:ITEM 0005C (PLACEMENT AT either the OENJ CHEROKEE BAYONNE LANDFILL REMEDIATION AND/OR AT THE CONTRACTOR'S PROPOSED DISPOSAL FACILITY (IES) AS IN ITEM 0001AC) | 12,170 | CY | $40.00 | $486,800.00 |

Name of Site (s) OENJ Golf Course Site
Name of POC(s) Jessica Vreeland
Address of Site (s)
Bayonne, NJ

Phones (s) 201-377-9330

| | | | | | |
|---|---|---|---|---|---|
| 0005C | DEWATERING IN ACCORDANCE WITH THE HOST STATE WQC AND DISPOSAL FACILITY TERMS AND CONDITIONS FOR UPLAND PLACEMENT | 12,170 | CY | $1.00 | $12,170.00 |

**0006 All Materials in Acceptance area 6 and 7**

| | | | | | |
|---|---|---|---|---|---|
| 0006A | DREDGING, TRANSPORTATION, DELIVERY, AND PLACEMENT OF NON-ROCK MATERIALS SUITABLE FOR PLACEMENT AT THE HARS | 112,545 | CY | $10.00 | $1,125,450.00 |
| 0006B | THE DRILLING, BLASTING, DREDGING, AND DISPOSAL OF ROCK MATERIALS AT THE ARTIFICIAL REEF | 30,375 | CY | $50.00 | $1,518,750.00 |
| 0006C | DREDGING, TRANSPORTATION, DELIVERY, PROCESSING AND PLACEMENT OF NON-ROCK MATERIALS UNSUITABLE FOR PLACEMENT AT THE HARS, EXCLUDES DEWATERING:ITEM 0006D (PLACEMENT AT either the OENJ CHEROKEE BAYONNE LANDFILL REMEDIATION AND/OR AT THE CONTRACTOR'S PROPOSED DISPOSAL FACILITY (IES) AS IN ITEM 0001AC) | 1,480 | CY | $49.50 | $73,260.00 |

Name of Site (s) OENJ Golf Course Site
Name of POC(s) Jessica Vreeland
Address of Site (s)
Bayonne NJ

Phones (s) 201-377-9330

| | | | | | |
|---|---|---|---|---|---|
| 0006D | DEWATERING IN ACCORDANCE WITH THE HOST STATE WQC AND DISPOSAL FACILITY TERMS AND CONDITIONS FOR UPLAND PLACEMENT | 1,480 | CY | $2.15 | $3,182.00 |

Total of all Options only 0002 –0006 $3,846,592.00

**TOTAL BASE BID PLUS OPTIONAL ITEMS: $39,307,022.00**

problems with operation/function of the ADISS/ADISSPlay/ADISSLt equipment should be directed to SAIC personnel immediately, at (401) 261-4931, (401) 847-4210, and to the NY District at (212) 264-1853 or x1585.

4. **Dredge/Disposal Inspector.**

The Contractor at his/her own expense shall have the USACE certified Inspector(s) of Open Water Disposal of Dredged Material oversee the placement activities of all dredged materials at the upland disposal sites, Newark Bay Confined Disposal Facility and the HARS or artificial reef site, or other ocean placement location, if used. The Dredge/Disposal Inspector shall be responsible for ensuring that the requirements contained in the drawings, specifications, the New Jersey DEP Water Quality Certificate/Coastal Zone Determination and NYS DEC WQC/CZM are met. The Inspector must complete USACE Transportation and Placement Logs and checklists for all placement activities performed. Inspectors will be required to be on duty and in the towing vessel wheelhouse, to observe scow monitoring equipment function, watch for endangered species, and perform other inspector duties, from the time the towing vessel departs from the dredging site until the scow has completly emptied and all reporting requierments have been completed.

5. **General Requirements**

5.1 **Overdepth and Side Slopes**

5.1.1 **Allowable Overdepth**

To cover inaccuracies of the dredging process, material actually removed from within the specified areas to be dredged, to depths as specified below for allowable overdepth, will be estimated and paid for at the contract price. Allowable overdepth dredging will be permitted to a depth of not more than 1.5 ft for all dredging areas. The required dredging depth as shown on the drawings is 47 ft below MLW. An allowable overdepth dredging will be measured and paid for at the applicable contract price in the same manner as specified for the overlying material.

5.1.2 **Side Slopes**

The side slope dredging requirements as shown on the drawings are as follows:

**Non-Rock material: 1V to 3H**

**Rock material: 1V to 1H**

Material actually removed within limits shall provide for final side slopes not flatter than those indicated on the drawings and will be estimated and paid for. The Contractor may dredge material in original position or may dredge below the pay slope plane at the bottom of the slope to allow for sloughing of upslope material capable of falling into the cut. However, material removed below any pay slope plane will not be estimated for payment. In computing the limiting amount of side slope dredging, the required depth indicated on the drawings, measured vertically, will be used. The quantity of material to be paid for shall not be in excess of that originally lying above this limiting slope. Side slopes are given for payment purposes only and are not necessarily the angle of repose of the soil. Sloughing side slopes shall not be the basis for claims against the Government. End slopes, where indicated on the drawings, shall be treated in the same manner as side slopes.

survey issues?

A There was a conflict with surveys, but most of the issues were variation in estimated quantity, that I mainly recall. Not so much because of survey itself as to the amount of material that was removed and conflicts with what our survey said and the contractor's survey said.

Q Do you recall what the project depth was for the KVK8 Project?

A It was required -- it was a forty-five foot project, but we required a clear forty-seven feet for the forty-five foot project. The two feet difference is the safety factor that the Corps requires for our hard bottom contracts.

Q What does a hard bottom contract mean?

A It's loosely defined to a certain extent, but it mainly is dealing with material in which if the ship hits, that there's the possibility of having damage done to the hull. Soft bottom if it hits the likelihood of damage to the bottom is highly unlikely. Rock

redundant and looked upon as time wasting things. Our crew chiefs in the field always complained they were spending most of their time doing quality control work rather than doing surveys. I said that's my money, I'll take care of that and you just do what I tell you to do. So A, it was a quality control in the field and B, we realized early on that due to the number of -- the amount of data that was available one product for the purposes of new work dredging was not sufficient so we decided inhouse to provide two products to the construction division for their use.

Q What were the two products?

A One was a hit map, which was strictly the shallowest soundings available from the database and that product was the result of the shoalest soundings that were available within the data cells. We then produced another product, which was a general sounding map, which used the average depth of the sounds within a cell in order to produce a more equitable volume number for payment purpose s.

Q When was that?

A That was back in the early '90s.

Q Was a decision made to employ multi beam surveying in the KVK projects?

A Yes.

Q Who made that decision?

A Sort of made by our headquarters people who felt that that was the most accurate method of doing surveys.

Q Was multi beam surveying used from the beginning of the KVK Harbor Deepening projects?

A Offhand I -- I can't remember what we used in the first one, but I believe it was.

Q Can you remember any particular time when multi beam surveying was in wide spread use in the New York District?

A I would say that the multi beam survey was utilized extensively starting right after we had completed the -- the forty foot project. We, you know, phased it in, or I should say the forty foot project we phased it into the forty-five foot project. Prior to

Q In the field of multi-beam surveying?

A And bringing various parts of the Core surveying organizations together.

Q You said with the advance of multi-beam surveying, is there a particular time period that you would assign to describe the advance of multi-beam surveying?

A I would say probably around 1995, 1996 is when it sort of began, but within the Core of Engineers it probably was a few years after that, maybe in the late nineties.

Q Is there any sort of a surveying conference that's held on a yearly basis or anything like that in the North Atlantic Division or in the Core?

A Yes, we began a North Atlantic Division multi-beam conference a number of years ago, I don't remember the exact year, but we, in the New York district, were the ones who initiated that conference. It used to be a tri annual survey conference that most of the survey organizations would attend historically.

# Chapter 1
# Introduction

## 1-1. Purpose

This manual provides technical guidance for performing hydrographic surveys that support the planning, engineering design, construction, operation, maintenance, and regulation of navigation, flood control, river engineering, charting, and coastal engineering projects. Accuracy standards and quality control criteria are defined to establish US Army Corps of Engineers (USACE)-wide uniformity in performing surveys involving dredging measurement, payment, and acceptance.

## 1-2. Applicability

This manual applies to all USACE commands having responsibility for performing, contracting, or monitoring hydrographic surveys in support of the Corps civil works activities.

## 1-3. Distribution

This publication is approved for public release; distribution is unlimited.

## 1-4. References and Bibliography

Referenced USACE publications are listed at Appendix A. Where applicable, bibliographic information is listed at the end of each chapter.

## 1-5. Use of Manual

This manual shall be used as a technical guide in performing hydrographic surveys with USACE hired-labor forces or contracted survey forces. It should be directly referenced in contract specifications for dredging or Architect-Engineer survey services. The accuracy standards and quality control criteria in the manual shall be specified for all surveys supporting dredging measurement, payment, and acceptance functions. This manual may be referenced should hydrographic surveying functions be required as part of a USACE military construction or environmental restoration activity. It is also applicable to surveys performed or procured by local interest groups under various cooperative or cost-sharing agreements.

## 1-6. Background

The original version of this manual was published in 1991 and was revised in 1994. Most of the standards and technical guidance in the 1991 and 1994 versions were designed to support older analog depth recording instruments, mechanical, visual, or microwave positioning, and manual data processing and drafting methods. Since the last update, significant advances in hydrographic surveying technology have occurred. These include replacement of short-range microwave positioning techniques with local and nationwide Differential Global Positioning System (DGPS) systems, enhanced applications of and expanded use of full-bottom coverage acoustic multibeam systems, airborne LIDAR hydrographic survey systems, and functional use of carrier phase DGPS for accurate water surface determination. Field-finish data collection equipment and software has also become more robust, allowing for near-final data editing and processing on board the survey boat. Data accuracies have been enhanced through use of inertial and DGPS vessel motion sensors. Automated data editing, processing, transfer, and Internet display methods have also evolved considerably since 1994. In addition, the International Hydrographic Organization (IHO) and the Federal Geographic Data Committee (FGDC) have promulgated updated hydrographic survey accuracy

standards, statistical measures, and reporting standards. The accuracy standards in this manual were revised to more closely conform to these international and Federal standards. Older survey classifications (i.e., Contract Payment, Project Condition, and Reconnaissance) were originally developed to reflect accuracy limitations in manual and microwave positioning equipment. DGPS positioning has largely eliminated these distinctions; thus survey classifications have been modified accordingly. The manual now contains separate chapters that detail current procedures for dredging surveys, river engineering and charting surveys, airborne LIDAR surveys, and coastal engineering surveys. The chapter on contracted surveys has been expanded to reflect the increasing use of Architect-Engineer service contracts for hydrographic surveying.

## 1-7. Mandatory Requirements

ER 1110-2-1150 (Engineering and Design for Civil Works Projects) prescribes that mandatory requirements be identified in engineer manuals. Mandatory requirements in this manual are summarized at the end of each chapter. Mandatory accuracy standards, quality control, and quality assurance criteria are summarized in tables within each chapter. The mandatory criteria contained in this manual are based on the following considerations: (1) assurance of navigation safety, (2) essential to navigation project function, (3) previous Corps experience and practice has demonstrated criteria are critical, (4) Corps-wide geospatial data standardization requirements, (5) adverse economic impacts if criteria are not followed, and (6) HQUSACE commitments to the dredging industry.

*a.* Previous versions of this manual contained more rigid prescriptive criteria for performing all aspects of hydrographic surveys, including mandatory plant and survey instrumentation, equipment calibration procedures, accuracy standards, data collection procedures, and data plotting criteria. This updated version of the manual now limits mandatory requirements to those dealing with resultant accuracy standards and selected quality control and quality assurance criteria. This change more closely conforms to USACE policy emphasizing performance-based specifications--and recognizes the fact that technical procedures, equipment, and operating specifications are now evolving at a rapid pace.

*b.* Equipment calibration, operation, and procedural methods for performing and processing automated field hydrographic surveys are now usually detailed in operation manuals provided by the various equipment and software vendors. References and recommendations in this manual to specific operational methods must be carefully weighed against newly evolving technology and the latest manufacturer's recommendations.

*c.* Other Corps regulations may dictate mandatory requirements for processing, displaying, transferring, and archiving hydrographic survey data. These mandatory regulations will be referenced in each chapter when applicable. As survey technology and procedures develop, districts are strongly encouraged to recommend modifications to all mandatory criteria or technical guidance contained in this manual--see Proponency and Waivers section at the end of this chapter.

## 1-8. Scope of Manual

This manual covers all aspects of hydrographic surveying performed to support USACE river and harbor navigation activities, flood control projects, and coastal engineering projects. Special emphasis is placed on surveys that support construction/dredging of coastal and inland waterway projects. An overview of these support functions is covered in Chapter 2. The manual focuses on the preparation of design drawings and other documents associated with these projects, including related contracted construction performance activities. Throughout the manual, mandatory or recommended hydrographic survey criteria are normally summarized in tables. Technical or procedural guidance is in more general terms where methodologies are described in readily available references or survey instrumentation operating manuals. Numerous references are made to those more detailed operation manuals. Where procedural guidance is otherwise unavailable

# Chapter 11
# Acoustic Multibeam Survey Systems for Deep-Draft Navigation Projects

## 11-1. General Scope and Applications

This chapter provides USACE policy and guidance for acquisition, calibration, quality control, and quality assurance of multibeam survey systems used on deep-draft navigation, flood control, and charting projects. Instructions for operating specific multibeam systems, or the acquisition, processing, and editing of data from these systems, are found in manufacturer's operating manuals and software processing manuals specific to the systems employed.



**Figure 11-1. Full-coverage multibeam survey of coastal inlet navigation project (Galveston District)**

## 11-2. Background

The US Navy developed multibeam swath survey technology in the early 1960s for deep-water bathymetric mapping. Only since the early 1990s has this technology been developed and marketed for shallow-water USACE applications, such as those illustrated in Figure 11-1. It is expected that the use of multibeam systems will significantly increase over the next few years, and will gradually supplant single beam transducer survey systems in deep-draft navigation projects. Multibeam systems, when coupled with digital side-scan imaging systems, have the potential to become a primary strike detection method in USACE. Multibeam systems have technically advanced since their introduction in the early 1990's to the point that they now have a direct application to most Corps navigation project survey activities. When

more data than can be plotted or is needed for volume computations, it may optionally be thinned down into rectangular bins (or grids) using standard commercial software routines. The maximum bin size will depend on the application. For dredging measurement, payment, or acceptance, the bin size should be kept as small as possible--typically less than 1 to 5 m is recommended. The shot point depth nearest the bin centroid shall be used; not average or minimum, or shoal-biased depths. Bin size may be increased for smooth, soft bottoms.

## 11-14. Multibeam Publications

The following publications provide additional technical information on the use and calibration of multibeam systems.

*a.* Field Procedures for the Calibration of Shallow Water Multibeam Echo-Sounding Systems, André Godin, Canadian Hydrographic Service, February 1996.

*b.* HYPACK MAX User's Manual, Coastal Oceanographics, Inc., Middlefield, CT., www.coastalo.com, May 2000.

*c.* Multibeam Surveying Workshop Proceedings, U.S. Army Corps of Engineers and NOAA Surveying, Mapping, and Remote Sensing Conference, St. Louis, MO, 19 Aug 1997.

*d.* Trimble HYDROpro Navigation Software Manual, Trimble Navigation Limited, Sunnyvale, CA, http://www.trimble.com

*e.* American Congress on Surveying and Mapping (ACSM), ACSM-ASPS-MAPS-MARLS 2000 Workshop Program, Hydrographic Surveying, Little Rock, AR, 21 March 2000 (Shallow Water Multibeam Systems for NOAA Hydrographic Surveys)

## 11-15. Mandatory Requirements

The policy outlined in paragraph 11-4 (USACE Multibeam Policies, Procedures, and Applications) is considered mandatory. All calibration, QC, and QA criteria summarized in Table 11-2 are mandatory.

*f. Volume computations.* Measurement and payment surveys performed using either multibeam or multiple transducer boom systems shall compute pay quantities using the full, densely populated, data digital terrain models (DTM) generated by swath survey data. Data sets should be thinned to a gridded or binned to a digital elevation model (DEM) only when multiple or duplicate points within a specified bin size exist; the representative depth selected within a fixed bin should not be biased or overly smoothed. The bin (or DEM post) size should not exceed either the estimated positional accuracy or the acoustic beam footprint size. The algorithms used for data thinning routines must be thoroughly tested to verify that thinned volume quantities do not differ from raw data set quantities. In effect, data thinning shall be kept to an absolute minimum. Actual dredged quantities should be computed from either the raw DTM or the gridded DEM relative to the applicable payment template using standard CADD software routines. (For sparse data sets, such as traditional single-beam cross-section surveys, dredged volumes may be computed using traditional average end area routines or from triangulated irregular network (TIN) models).

*g. Dredging contract specifications.* Measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters (horizontal and vertical control, density, etc.), data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government. In order to ensure consistency when performing measurement and payment surveys, commercially available software should be employed for data collection, data processing, data quality control, and volume computations.

*h. Training requirements.* Multibeam system operators require considerable expertise in both surveying and on CADD workstations. Prior to using multibeam systems on USACE surveys, system operators should have completed specialized training. Presently, the Corps PROSPECT course on Hydrographic Surveying Techniques is not considered sufficient for multibeam training. Comprehensive training courses are available from: (1) the University of New Brunswick, (2) Coastal Oceanographics, Inc., (3) Triton Elics International, (4) Odom Hydrographic Systems, Inc., (5) University of New Hampshire-NOAA Joint Hydrographic Center, or (6) The Hydrographic Society of America seminars. Multibeam manufacturers may also offer specialized training sessions. In addition, the operator should have completed a manufacturer or Corps PROSPECT course associated with the differential GPS system, inertial compensating system, and CADD processing/editing system employed. For contracted multibeam survey services, the Architect-Engineer (A-E) contract solicitations shall require that proposals identify the experience and training of system operators in Block 7 of the SF 255.

*i. Plant utilization and justification.* Multibeam surveys may be obtained using hired-labor forces or through A-E service contracts. Commands considering procurement of multibeam systems should internally determine that such a system represents an effective and efficient utilization of floating plant, given the $200 K to $500 K investment for a complete system. Some factors that should be evaluated include: (1) proposed multibeam vessel, (2) system configuration (hardware and software), (3) estimated annual utilization (time and location), (4) FTE allocations, (4) system operator qualifications, (5) field data processing, editing, and plotting, and turnaround capabilities, (6) estimated daily plant and survey crew rental rate, and (7) comparative analyses between hired-labor and contract costs.

*j. Calibration and quality control.* Field calibration of multibeam acoustic refractions and vessel motion is significantly more critical and complicated than that required for standard single beam systems. Recommended calibration requirements, procedures, and allowable tolerances are described in later sections of this chapter. Accuracy performance tests are essential in order to demonstrate data quality. These quality control calibrations and quality assurance performance tests must be processed and adjusted on board the survey vessel prior to and during the survey--after-the-fact checks in the district office are of

communication range of approximately ten (10) miles. The frequency has been approved by the Federal Communications Commission.

1.14 PERFORMANCE EVALUATION OF CONTRACTOR (1985 JAN HQ USACE)

a. As a minimum, the Contractor's performance will be evaluated upon final acceptance of the work. However, interim evaluations may be prepared at any time during contract performance when determined to be in the best interest of the Government.

b. The format for the evaluation will be SF 1421, and the Contractor will be rated either outstanding, satisfactory, or unsatisfactory in the areas of Contractor Quality Control, Timely Performance, Effectiveness of Management, Compliance with Labor Standards, and Compliance with Safety Standards. The Contractor will be advised of any unsatisfactory rating, either in an individual element or in the overall rating, prior to completing the evaluation, and all Contractor comments will be made a part of the official record. Performance Evaluation Reports will be available to all DoD contracting offices for their future use in determining Contractor responsibility, in compliance with DFARS 36.201(c)(1).

1.15 FINAL EXAMINATION AND ACCEPTANCE (1965 APR OCE)

As soon as practicable after the completion of an entire acceptance area, a final examination of the work will be conducted by the Contracting Officer, at the cost and expense of the Government by acoustic sweep survey system. Should any shoals, lumps, or other lack of contract depth be disclosed by this examination, the Contractor will be required to remove same. The Contractor, or his authorized representative, will be notified when soundings or sweepings are to be made, and will be permitted to accompany the survey party. The Government shall notify the Contractor of the findings of survey within ten (10) calendar days from the date the survey was performed by the Government. When the area is found to be in a satisfactory condition, it will be accepted. Should more than two sounding or sweeping operations by the Government over an area be necessary by reason of work for the removal of shoals disclosed at a prior sounding or sweeping, the cost of such third and any subsequent sounding or sweeping operations will be charged against the Contractor at the rate of **$8,200.00** per occurrence. **For purposes of this Contract, Acceptance Area 1,2,2A,3,4,4A,5,6 and 7 as defined on the drawings have been identified as acceptance areas.** Progress payment shall be arranged at the pre-construction conference. The Contractor shall perform pre-final hydrographic sweep surveys of an entire acceptance area to verify the area is satisfactorily completed prior to final examination by the Government. The pre-final surveys shall be performed using a multitrack or multibeam survey system to insure 100% coverage of the entire acceptance area. The proposed method for performing these surveys and all equipment and programs shall be submitted for approval. The Contractor's hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys.

1.16 FUEL USAGE

York and we would meet with the contractor prior to, typically prior to stop and start of construction. In some cases construction would already be underway by the time we had that meeting, but those were the two pre construction, so to speak, conferences we would have.

Q Do you specifically remember whether there was a pre construction conference that you attended on the KVK8 project?

A Specifically?

Q Yes.

A I can't say I remember specifically that I was at the KVK8 pre construction conference.

Q Do you recall whether the subject of surveys was something that was normally addressed at the pre construction conferences for dredging?

A Yes, typically we would have representatives from our Survey Branch at the pre construction conference and to varying degrees the topic would be -- would be

Q Did you have any involvement in the preparation of the plans and specifications for KVK8?

A No.

Q Or any input with regard to any surveying procedures that should be specified in the contract?

A No.

Q Were you involved at all in the pre construction meetings that took place on KVK8?

A We did not attend, no.

Q Is that typical for your office not to attend it?

A Not typical at all.

Q You normally do attend?

A Yes.

Q Why is it that there was no one that attended this particular one?

A I don't know.

Q Who would normally attend, any particular person?

A I was the one that attended ninety-five percent of all of those and every

once in awhile I brought someone with me or someone else attended, but primarily myself.

Q You don't recall why you didn't attend this one?

A No.

Q You weren't told not to attend?

A No.

Q What was your normal role at those pre-con meetings?

A Main role was to be there for any questions on surveying methodology, how we do our volume computations and general knowledge of meeting all the partners of the team also so we know each other by face and so forth.

Q Including the contractor?

A Correct.

Q If there were no questions would you make a presentation?

A No.

Q Did you usually get questions?

A Generally what would occur, their surveyor and I would meet and it was an informal situation, either during lunch hour or something similar.

A I believe so.

Q Were you in charge of it?

A No.

Q Were you similarly involved in pre construction meetings for the other KVK projects as well?

A Yes.

Q Do you recall whether the survey methods that would be employed for acceptance surveys were discussed at the pre con.?

A We discussed something about surveys. Surveys was not present, but I'm pretty sure that I mentioned at that time, as I usually mention, that instead of fighting over tenths of inches that they should try to get as much of the paid over depth as possible to avoid the conflicts of tenth of an inch that we've run into, you know, in all the other forty-five foot projects.

Q Do you know why Survey was not in attendance at the pre con.?

A Offhand I don't recall why they were not.

Q Were they in attendance at some of

the pre con. meetings?

A I would say they were in attendance -- I'm pretty sure they were in attendance by somebody from Surveys in all the other ones. I cannot say for certain, but, you know, I'm pretty sure that the majority of the other pre cons somebody was there.

Q Is it customary to have a separate meeting after the pre con. either that day or some time thereafter dealing just with surveys?

A If the contractor, you know, so asks, we usually at the pre con., and I'm pretty sure I'd mention at the pre con. that they had the ability to ride our boat and I usually highly recommend that they, you know, ride our survey vessel so that an understanding could be, you know, obtained of what we're doing and they better understand what we're doing and hopefully that helps in, you know, resolving conflicts.

Q Do you recall having any discussions with the contractor during a performance of the KVK8 Project about the

Q Did that happen on the KVK8 project?

A No, not that I'm aware of, I wasn't there so.

Q Some time thereafter did you meet with the Cashman surveyor?

A No.

Q Did you ever meet the people who were doing the surveys for Cashman?

A No.

Q What about the project meetings that would occur on the project, did you attend any of those?

A No.

Q Is that also something that normally is not done by your people?

A Correct, we do not attend the meetings. You're talking about the meetings held by construction?

Q Yes.

A No.

Q Even if there were survey issues they wouldn't ask you to attend?

A If there was a survey issue it

A I assume it was the construction division representatives, we never saw them.

Q You would, I assume, at some point receive a request from construction to please go out and survey this area?

A That is correct.

Q And you would go out and do it and you would return the results back to construction?

A Correct.

Q What was the normal turn around time with something like that?

A It depends on two factors, the size of the area to be surveyed and how well the dredger dredged. The more hits that we located the longer it would take us to process the data because each individual hit had to be manually researched. It's a long process to take care of.

Q What's involved in manually researching the hit?

A You have to actually go through the data sets. In order for a sounding, a shoal sounding to be put on the survey, there

have to be three hits of that elevation seen within the data cell. So you have to actually go back research the data cell, research the hit, find the cell and take a look at the cell itself and make sure there were three of those soundings in that cell.

Q Cell being three feet by three feet roughly?

A Right.

Q How many data points would there typically be in a cell?

A Could be fifty or sixty and generally we look for them to be on separate passes.

Q Do you know whether Cashman was using the shoalest or minimum sounding method on its pre-acceptance surveys?

A After reviewing some of the material, apparently, he was using an average method.

Q Understanding that, I think you said a minute ago you didn't receive these for review during the course of the contract?

A That is correct.

A No, I don't specifically recall that.

Q When a survey map is provided to you showing hits, how do you define a hit?

A Any spot as identified under -- above forty-seven feet, 47.0.

Q Even a tenth of an inch or a tenth of a foot, I should say?

A Correct.

Q Would a contractor be required to go back and re-dredge a spot that's a tenth of a foot?

A Yes.

Q Is that an expensive proposition for a contractor to go back and get spots like that?

A I'm not qualified to say whether it's expensive or not. My guess is that it -- it's not cheap. It -- I'm sure it costs them money to get his equipment out there, but I don't have a -- I don't have first hand knowledge of exactly what -- what the expenses are.

Q Did you or your office ever do any

result of that investigation?
A. The conclusions are that the shoalest method shows more higher -- the shoalest method would show nonacceptance more than the average method would.
Q. And do you recall when that investigation occurred?
A. Investigation was ongoing. You did that every time you were processed.
Q. Did you have the opportunity to meet with Army Corps of Engineers representatives from the survey branch during the KVK 8 contract?
A. My recollection is they attended the partnering meetings occasionally. I don't think we ever had a meeting with them. Our correspondence went through the designated representative.
Q. Did you ever have the opportunity to discuss the method for processing acceptance surveys with a representative of the survey branch?
A. I never did.
Q. Did you ever ride on the Army Corps of Engineers survey boat?
A. No.
MS. KILFOYLE: Can we mark this as an exhibit?
(Exhibit No. 9 marked.)
BY MS. KILFOYLE:

the multibeam surveys for both of these projects, Scituate and Hyannis?
A. Yes.
Q. Do you know how the Army Corps of Engineers processed the survey data?
A. They used, I think, every technique that's available and looked at the results and they made evaluations based on the different results that you could expect.
Q. Did you have a chance to look at the evaluations that the Army Corps performed?
A. Only -- only the end product. They would produce maps. So any -- any evaluation that they did was not distributed to us.
Q. Did the maps for those projects say what system was being -- what method was being used to process the survey data?
A. I can't recall if they did, but we would typically, you know, look at them and -- you know, it was multibeam at the time. We understood that there were various methods.
MS. KILFOYLE: Okay. Can we mark this as Exhibit 1.

Q. That's fine. Prior to submitting the bid for the KVK 8 contract, did you ever discuss the method that the Corps would use to process acceptance surveys with anyone?
A. In-house, we probably discussed it.
Q. Do you recall who you discussed it with?
A. Probably Jim Galli.
Q. Do you recall the nature of the discussion?
A. It was just in a typical discussion of the project. I'm sure it was one of the items that we talked about before we put the final price in.
Q. Do you recall what Mr. Galli believed was the method that the Corps would use to process acceptance surveys?
A. I can't remember directly, but there was nothing about mentioning or any discussion about a minimum multibeam survey.
Q. Did you have an impression of the method that the Corps would use to process acceptance surveys at the time that you were preparing your bid for the contract?
A. Based on the plans and specs, I assumed it was an average multibeam survey.