Echoscan?
A. Well, one reason was the -- I knew the Army Corps New York District had used that system previously. There were some advantages, like the motion sensor was actually built into the head of the transducer so there are no offsets, kind of minimizes the opportunity for errors that could occur due to that. So it was probably a little bit less expensive, also, than some of the newer systems that were coming out and we -- and, again, you know, we knew it was used in New York Harbor, in that area.
Q. Did you view a demonstration of the Odom Echoscan prior to purchasing it?
A. Yes.
Q. Where was that demonstration performed?
A. In Louisiana, Baton Rouge.
Q. And what type of a demonstration did Odom provide?
A. It -- they took us out on their boat and surveyed an area where there were some known obstructions and things that you would be able to see clearly with a multibeam system. They

had the side scan, as well. So it gave you a pretty good idea of what the capability of the system was.

Q. Did Odom provide any demonstration on processing multibeam data?

A. Yes.

Q. When did --

A. Not at that time. They did on-site, after we purchased it.

Q. Do you recall when that occurred?

A. I'm going to say July '03. I mean, I just knew that it was right around when we bought it, but maybe June.

Q. And what type of demonstration did they provide regarding processing multibeam data?

A. It was using the software that they recommended and running through cleaning files, tide reduction, software utilities for doing what they call patch tests and calibration and that --that kind of thing.

Q. What type of software did they recommend?

A. It was Coastal Oceanographics, Hypack.

Q. Do you recall whether Odom discussed the average method for processing multibeam

surveys?

A. Yes.

Q. What did they say regarding the average method for processing multibeam surveys?

A. That there was an average method, essentially. They just explained that there are, you know, various methods.

Q. Did they discuss the minimum method for processing multibeam surveys?

A. Yes.

Q. What did they say regarding the minimum method?

A. Well, they said that there's -- it's not always used as a -- as a method because they're -- it's not really representative of what's down there.

Q. Did you attend any training regarding multibeam surveys provided by the Army Corps prior to KVK 8?

A. No. I wasn't aware that there were any available.

Q. Who actually gathered the multibeam survey data during the KVK 8 contract?

A. Many employees took part in that. I did

authorized or maintenance dredging projects containing soft sand/silt bottoms not judged to be hazardous to vessel hulls; or in projects with soft, featureless, and relatively continuous channel bottoms where gaps in coverage between survey lines are unlikely to yield potential hazards/strikes. The vast majority of the Corps 926 navigation projects and 12,000 miles of maintained waterways fall within this category--e.g., inland and intracoastal navigation systems and most coastal harbor projects. Dredge measurement, payment, and acceptance surveys are typically performed by cross-section methods using single beam acoustic transducer systems. Acoustic multi-transducer or multibeam sweep systems may optionally be used if available.

www.MilitaryManuals.Com
Presentation copyrighted 2003

(3) Underwater Hazard Investigation Surveys. Detailed investigation surveys of hazardous objects lying within the authorized prism or project depth should follow Class 1 survey accuracy and quality control standards. These surveys may also include precise investigation surveys of/around locks, dams, abutments, jetties, bulkheads, and other structures in a navigation project. If full bottom coverage and/or object detection sweeping is required, then the standards for the most precise (Hard Material category) of Class 1 surveys should be followed. On critical surveys, 200% acoustic coverage is recommended.

b. Project Condition Surveys (Class 2). The EM 1110-2-1003 definition of the types of surveys included within this category are unchanged; however, the accuracy standards and quality control criteria have been modified, as indicated in Tables A-1 and A-2.

c. Reconnaissance Surveys (Class 3). Reconnaissance survey accuracy and quality control standards currently defined in EM 1110-2-1003 are largely obsolete and have been revised under this circular. The purpose of these surveys (as defined in EM 1110-2-1003) is still unchanged--they represent an economical method of rapidly assessing the condition of a project. With LIDAR and multibeam acoustic technology, there is essentially no distinction between a Class 2 Project Condition Survey and a Class 3 Reconnaissance Survey.

A-3. Revised Survey Accuracy Performance Standards. Table A-1 contains revised performance standards for Corps hydrographic surveying, covering all survey classifications. These new standards supersede those shown in Table 2-1 (Maximum Allowable Errors for Hydrographic Surveys) of the current (1994) edition of

EM 1110-2-1003. These revised standards reflect current survey instrumentation, practices, and capabilities, whereas the standards and criteria in EM 1110-2-1003 are more representative of 10-year old hydrographic surveying technology--i.e., pre Global Positioning System and acoustic multibeam. In reality, position and depth accuracy criteria have not significantly changed: only the measurement statistic (95%) has been modified. These standards are considered "minimum technical performance standards" and are independent of the measurement process employed. In addition to performing standard survey quality control calibrations of system components, some form of accuracy performance (or quality assurance) test should be periodically performed to demonstrate and document that these accuracy standards are being achieved. In some instances, more rigid standards may need to be developed and followed to meet specific project requirements.

www.MilitaryManuals.com
Presentation copyrighted 2003

Table A-1. Accuracy Performance Standards for Corps of Engineers Hydrographic Surveys

| | USACE SURVEY CLASSIFICATION | | | |
|---|---|---|---|---|
| | Class 1 Contract Payment Surveys (Dredge Measurement/Payment) | | Class 2 Project Condition | Class 3 Recon |
| | Hard Mat'l | Soft Mat'l | | |
| HORIZONTAL ACCURACY [1] (95% Confidence Level) | 2 m (6 ft) | 5 m (16 ft) | 5 m (16 ft) | 5 m (16 ft) |
| DEPTH ACCURACY (95% Confidence Level) [2] | | | | |
| Mechanical (d<15 ft) | ±0.25 ft | ±0.25 ft | ±0.5 ft | ±1.0 ft |
| Acoustic (d<15 ft) | ±0.5 ft | ±0.5 ft | ±1.0 ft | ±1.0 ft |
| Acoustic (15>d<40 ft) | ±1.0 ft | ±1.0 ft | ±2.0 ft | ±2.0 ft |
| Acoustic (d>40 ft) | ±1.0 ft | ±2.0 ft | ±2.0 ft | ±3.0 ft |
| OBJECT DETECTION CAPABILITY (95% confidence) | | | | |
| cubic dimension [3] | > 0.5 m | > 1 m | N/A | N/A |
| BASE CONTROL NETWORK ACCURACY | | | | |
| Primary horizontal DGPS | USCG Radiobeacon DGPS System | | | |
| Supplemental horizontal [4] | 3rd order, Class I (1:10,000) | | | |
| Vertical control [5] | 3rd order | | | |
| FEATURE LOCATION ACCURACY (95% confidence) | | | | |
| Topographic features | 2 m (6 ft) [eg, bulkheads, dredging limits, etc] | | | |
| Fixed navigation aids | 2 m (6 ft) [e.g., lighthouses, ranges, beacons] | | | |
| Floating navigation aids | 10 m (30 ft) | | | |

multibeam process. It's a -- was a relatively new technology.

Q. So you did not have an opinion?

A. I did not know enough to have an opinion.

Q. Okay. Sure. At some point during work on the project, did you believe that the Corps would use the average method for acceptance surveys?

A. When we submitted the average soundings for the material unsuitable for unconfined aquatic disposal, and they were accepted and paid, at that point, we were under the understanding that would be the method used.

Q. Why did you decide to submit those materials using the average soundings?

A. Because the people that were directly involved with this thought that would be the correct methodology. They had some informal discussions with other people that had been doing that type of work.

Q. Who are those people that you're referring to that were directly involved in it?

A. The people whose depositions you have already taken.

Q. Okay. Mr. Dick?

A. Mr. Gaudette, Mr. Dick.

Q. Mr. Wood?

A. No.

A. Normally, the depth of which the dredge cuts are set changes almost daily as to -- because of the conditions. If you are attempting to minimize the amount dredged, which was the mandate -- it was mandated initially on this contract, and then it was changed to advisory. But there was some considerable discussion from the EPA that overdredging would be penalized, so Cashman's attempt was to minimize the amount of material taken.

So the normal thought process is to use the soundings from the day before to determine how deep to dig and to look at the material, specific material, as to how deep to dig. So I don't remember day-to-day, but it was often changed.

Q. Do you know if it was changed as a result of Mr. Conetta's letter?

A. It was deepened.

Q. Do you know by how much?

A. No.

Q. Okay. Did you meet with Mr. Conetta to discuss this letter?

A. We discussed the letter at the next weekly meeting after it was issued.

Q. Do you recall the nature of the discussion?

A. No.

Q. Okay. Prior to writing this letter, did Army Corps of Engineers personnel tell you that the standard of acceptance for the KVK 8 contract would be a matrix of three by three average soundings?
A. Three by three wasn't mentioned, but average soundings were discussed any number of times.
Q. Do you recall who from the Army Corps of Engineers told you that acceptance would be measured by average soundings?
A. I recall a number of people when asked that question were -- did not respond directly.
Q. Okay. Who didn't respond?
A. Well, they did not respond. They said that it may be. Sandy McDonnell (ph) and Ron Conetta, Mark Alton, Sam DiDato.
MR. WEINBERG: A-l-t-o-n. D-i-D-a-t-o. D-i is lower case. Both Ds are capital. Sorry. Never mind.
BY MS. KILFOYLE:
Q. Do you recall when these discussions occurred?
A. There were two phases of the project. One was material that was unsuitable for unconfined aquatic disposal. That material went upland. The other was material that was suitable for aquatic disposal. The unconfined aquatic disposable material was done with

average soundings, it was submitted to the Corps as average soundings, it was accepted and paid for as average soundings. Based on that information, we proceeded with the rest of the work on the same basis. And in some places, those sites went to final acceptance grade.

Q. Do you recall which specific areas of the project --

A. No.

Q. -- by number? Okay.

A. Almost the entire project was overlaid with the material that was -- that was unsuitable for unconfined aquatic disposal.

Q. Did you personally request that anyone from the Corps clarify what method would be used for these acceptance surveys?

A. We did with this letter.

Q. Right.

A. And this is stated in the letter, seven times we submitted soundings for acceptance. It clearly stated on the document was that they were average soundings, and in the transmittal letter asked if that was the method that was accepted, and if it was not acceptable, please respond. We never received an answer other than the response to this particular letter.





**Jay Cashman, Inc.**

**Boston Ma.**

**Area 1 Post Dredge Survey**

**Dec.1, 2003**

000044



005269

**Average sounding located in the center of a 15' X 15' cell.**

point at rock areas specifically. And then we were also told that average would be used for HARS material.

Q. Do you recall who told you that the average method would be used to process acceptance surveys for HARS areas?

A. Ron or -- Ron or Mark Kucera, Ron Conetta.

Q. Do you recall when this discussion occurred?

A. In several of the progress meetings.

Q. Do you recall the time period of these discussions?

A. I'm going to say fairly early on in the project. I know after Area 1, because in Area 1 I was told that that was actually accepted on average.

Q. Who told you that Area 1 was accepted on average?

A. I don't recall specifically, but again, it would have been, you know, the individuals in the weekly meetings.

Q. Did you ever speak with anyone in the survey branch regarding the method to be used to perform acceptance surveys?

A. Yes.

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

22 June 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Partial Acceptance of Area 1

Serial Letter No. G-71

Gentlemen,

References:

a. Specification Section 00800, Paragraph 1.15, Final Examination and Acceptance.

b. USACE Survey Map No. 2536D/N, dated 4 June 2004

Based upon your verbal request at our meeting on 1 June 2004, the issue of partial acceptance of Area 1 has been evaluated.

It is noted that a Government hydrographic survey was conducted of Area 1 on 31 December 2003. The results of the reprinted survey, ref. b, indicate that high spots remain at the eastern portion of the area. Since the remainder of Area 1 is clear to the contract grade elevation of -47.0 ft MLW and easily delineated, it has been determined that the portion of Area 1 between Stations 5+10 and 27+46.972 (eastern boundary line) is accepted as of 22 June 2004.

If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

E 589.000

DEPARTMENT OF THE ARMY
NEW YORK DISTRICT CORPS OF ENGINEERS
NEW YORK, N.Y. 10278-0090

SURVEY OF: KVK AND NEWARK BAY CHANNELS
NAVIGATION IMPROVEMENT PROJECT
CONTRACT 8 (AREA 1) SPOT ELEVATIONS
AFTER DREDGE SURVEY

SCALE: ONE INCH = 100 FEET

APPROVED: R. VIRKMAA — FIELD CARTOGRAPHER

APPROVED: M. FORTE — CIVIL ENGINEERING TECHNICIAN

APPROVED: W. MCDONALD II — LEAD CARTOGRAPHER

APPROVED: R. KISS — CHIEF OF SURVEY

DATE: 4 JUNE 2004

DATE OF SURVEY: 8,9,17 & 31 DEC 2003

FIELD BOOKS: 14186, 14180, 14178

SHEET 1 OF 1

REQUEST NO.: 2536D/N

FILE NO.: CT8 (AREA 1) 2NDHARS AD

NOTE:

THE INFORMATION DEPICTED ON THIS MAP REPRESENTS THE RESULTS OF SURVEYS MADE ON THE DATES INDICATED AND CAN ONLY BE CONSIDERED AS INDICATING THE GENERAL CONDITIONS EXISTING AT THAT TIME.

COORDINATES REFER TO THE NEW JERSEY MERCATOR STATE PLANE COORDINATE SYSTEM (NAD 1983).

SOUNDINGS REFER TO THE PLANE OF MEAN LOW WATER. THE PLANE OF MEAN LOW WATER IS 2.3 BELOW NGVD 29.

THE SOUNDING DATA DEPICTED ON THIS MAP WAS COLLECTED USING CLASS 1 SURVEY STANDARDS IN ACCORDANCE WITH EM 1110-2-1003.

THE DATA ON THIS MAP IS REPRESENTATIVE OF A LARGER DATA SET.

THE CONTOUR ON THIS MAP WAS CREATED FROM THE LARGER DATA SET.

E 588.000

A Never.

Q You would look at the map or whatever was on paper?

A Right, right, right.

Q Would you go over that with Mr. Conetta as well?

A Usually not these pre acceptance surveys. There was -- it was almost a formality, I think, they were sending us a letter saying yeah, we feel we're clear, go do a Government survey.

Q I assume there was no point in the contractor giving you a pre acceptance survey if he didn't feel the area was clear?

A Yeah.

Q So you would take it and present it to Survey and say here, do your thing?

A I don't even think we'd give it to Surveys. We wouldn't present it to them. We'd pretty much either call or go down to talk to them. They would never see the pre acceptance, I don't believe.

Q They just would get an authorization or request from you to go ahead

Q Do you know or did you know at the time that there were any different ways to process the data that was collected from a multi beam survey?

A Not prior to the issue arising in contract eight and not until -- well, not until then.

Q So in other words that issue had not come before you --

A Correct.

Q -- prior to KVK8?

A Correct.

Q What issue was it that did come to your attention with regard to KVK8?

A Specifically as well as I remember, I should say specifically I remember, I only remember as specifically as that there was an issue that in the number of times the contractor was asked to return to an area and then ultimately the question arose as to what type of surveys we were doing for acceptance and that -- yeah, that's about as much.

Q Do you remember when that question

came up?

A When?

Q Yes.

A Not specifically.

Q Early in the job, middle of the job, end of the job?

A I -- I'd be guessing, but it was -- to be honest I'm not sure if the job was complete when I left. I think it was, but I wouldn't swear to that. I'm guessing it's probably about mid way. It could have been two-thirds through. I -- I -- I really don't recall.

Q How did it come up in terms of how was it communicated to you?

A I don't specifically recall short of the information that -- that's in the correspondence -- that list of correspondence I mentioned earlier. That kind of tracks, you know, a history of the issue.

Q As you refer to the surveying methods being employed, what did you come to learn about what methods existed?

A Well, it really depends about

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

1 October 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Final Examination and Acceptance

Serial Letter No. G-095

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15, "Final Examination and Acceptance"

b. EC 1130-2-210, Hydrographic Surveying, 1 October 1998

c. EM 1110-2-1003, Hydrographic Surveying, 1 January 2002

d. Jay Cashman, Inc. Serial letter No. S-0111, dated 28 September 2004; Subject: Government Examination and Acceptance of Area 3A.

e. Jay Cashman, Inc. Serial letter No. S-0108, dated 26 September 2004; Subject: Government Examination and Acceptance of Area 13.

f. Jay Cashman, Inc. Serial letter No. S-0107, dated 26 September 2004; Subject: Government Examination and Acceptance of Area 3.

g. Jay Cashman, Inc. Serial letter No. S-0103, dated 21 September 2004; Subject: Government Examination and Acceptance of Area 4.

h. Jay Cashman, Inc. Serial letter No. S-0102, dated 20 September 2004; Subject: Government Examination and Acceptance of Area 2.

i. Jay Cashman, Inc. Serial Letter No. S-097, dated 5 September 2004; Subject: Government Examination and Acceptance of Area 3.

j. Jay Cashman, Inc. Serial Letter No. S-096, dated 4 September 2004; Subject: Government Examination and Acceptance of Area 13.

k. Jay Cashman, Inc. Serial Letter No. S-095, dated 3 September 2004; Subject: Government Examination and Acceptance of Area 13.

l. Jay Cashman, Inc. Serial Letter No. S-090, dated 3 August 2004; Subject: Final Examination and Acceptance.

m. Jay Cashman, Inc. Serial Letter No. S-089, dated 24 August 2004; Subject: Government Examination and Acceptance of Area 13.

Receipt is acknowledged of your letter of 24 August 2004 regarding the contract requirements for hydrographic surveys, ref m.

The minimum performance standards and critical quality control and quality assurance criteria for Corps of Engineers hydrographic surveys for navigation projects are outlined in Engineering Manual (EM) 1110-2-1003, dated 1 Jan 02, ref. c. It is further noted that the mandatory accuracy performance criteria shown in Tables 3-1 and 11-2 of this reference follows the more stringent "hard bottom material and/or new work" survey sub-category. The Kill van Kull, NJ project was specifically cited as one project under this sub-category. This survey sub-category would involve employing the "most precise carrier-phase DGPS positioning and elevation measurement techniques… for this class of project."

Regarding acoustic multibeam survey systems for deep-draft navigation projects, ref. m, the Corps of Engineers utilizes a 3 foot by 3 foot matrix using the minimum (shoalest) depth after confirming a minimum of 3 hits within the matrix that are above grade for the purpose of acceptance. For payment purposes (volume computations), a 3 foot by 3 foot matrix using the average sounding is used.

Be advised that your recent request for surveys, references d through k, have been based on an average depth matrix, not the minimum. All future survey standards for acceptance should be based on the minimum depth matrix criteria.

If you have any questions and/or would like to discuss this in further detail, we can meet with you at a mutually agreeable time and date in the near future. Please contact Mr. Mark Alton or Mr. Sam DiDato at (201) 433-9232 for such an arrangement.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

way you performed your surveys and processed your data, did you follow this manual or did you have any local procedures?

A Again our local procedures were more stringent than the procedures put forth in the manual because the manual was a consensus of many different districts within the division. So we always felt our procedures were going to remain more stringent than the manual. Those were suggested guidelines.

Q Were those more stringent procedures publicized?

A No.

Q Do you have any ideas of whether it would be important for a dredging contractor to know that you were following more stringent procedures than the manual?

A It wasn't my problem.

Q Why did you feel that it was necessary, if that's the right word, or advisable for the New York district to have somewhat more stringent procedures?

A Because I didn't want anybody from

Q In other words three feet by three feet roughly?

A Yes.

Q Shot point depth nearest the bin centroid shall be used, what does that mean "nearest the bin centroid?"

A Again, there are many ways to present the data. This statement is saying that the data, that sounding closest to the center of the cell should be used.

Q And then it goes on, after a semicolon, to say "not average or minimum or shoal base depth." And yet, if I understood your testimony, the New York district was using the minimum or shoal base depth?

A Yes, absolutely.

Q Was that not in contradiction to what the statement in the manual said to do?

A Absolutely.

Q Did you need any kind of special authority to do that?

A No, guidelines did not write out a requisite.

Q Did you ever use the centroid

depth method was not to be used to process data
for acceptance surveys?
A. Yes, I do.
Q. Can you tell me why?
A. I believe if you go back to some of these
tables --
Q. Sure.
Would it make it easier for you rather
than asking paragraph by paragraph if I just
asked you to look at the paragraphs identified
in response to Question 4 and tell me where any
of them say that agency policy mandated that the
minimum depth method was not to be used?
A. As I recall reading one of these paragraphs in
here, I do recall it saying that the data is not
accurate -- you know, the multibeam data is not
accurate, but I have to read the thing over to
find it.
Q. Sure. I didn't want to rush you. I just wanted
to ask the question in the way to make it
easiest.
A. I understand the question.
MR. PAYNE: Off the record.
(Discussion off the record)

A. Well, Paragraph 11-14 or -- actually, it's 11-15 that mandates this whole -- it's mandatory. Now, I don't know if that's a misprint.
Q. Are you referring back to Table 11-2?
A. I think it's 11-4. Wait a minute. Maybe it's 11-13. I believe on Page 11-22 -- excuse me, 11-29, it's C at the bottom of the page, "Shoal biased or minimum depth. The minimum depth recorded within a bin area may be used for some strike detection purposes. However, such biased depths shall not be used for dredging payment surveys, and should be used with caution on navigation project condition surveys. This is due to the relatively high variance in acoustic depth data - see discussions on data accuracy and confidence intervals in Chapter 4. Use of minimum shoal-biased depths can adversely skew dredge quantity computations and erroneously portray clearance data. Shoal biasing can also skew minimum clearance computations on channel condition surveys."
So we see this as saying they don't even recommending that shoalers should be used on clearance surveys.

**Table 11-2. Recommended Minimum Quality Control and Quality Assurance Criteria for Multibeam Surveys (Concluded)**

| Criteria | PROJECT CLASSIFICATION Navigation & Dredging Surveys Bottom Material Classification: Hard | Soft | Section Reference and Notes |
|---|---|---|---|
| RECOMMENDED DEPTH SELECTION AND DATA PROCESSING/THINNING BIN MATRIX LIMITS (Continued) | | | *[Reference Sections 11-13 through 11-16]* |
| Dredge Clearance & Acceptance Surveys (Shoal/Strike detection) and Minimum Channel Clearance Condition Reports | | | *Surveys using "minimum" or "shoal biased" depths shall NOT be used for Plans & Specs or volume computations.* |
| Depth Selection--Method used to select representative "shoalest" depth from multiple depths in a cell | Shoalest of 3 confirmed depth hits above project grade in 3x3 cell | Shoalest of 3 confirmed depth hits above project grade in 5x5 cell | Individual cells must be assessed to determine multiple hits above grade. Reference Section 11-16e. |
| Number of confirmed "hits" above grade required per cell | 3 hits | 3 hits | Based on a single pass or multiple passes. Hits on multiple passes provide better confidence. Reference Section 11-16e(1). |
| Depth Plot (Plan)--Method used to select plotted depths from cell matrix for a generalized hard copy display of the shoalest individual depths above grade | Selected 3x3 ft cells containing representative shoalest confirmed depth | Selected 5x5 ft cells containing representative shoalest confirmed depth | Density of selected cells that can be plotted dependent on output drawing scale. Reference Section 11-16e(2). |
| Contour or Color-Coded Plot-- Method used to select depths from cell matrix for generating contours or DTM color plots | Use all 3x3 cells containing representative shoalest depth | Use all 5x5 cells containing representative shoalest depth | Full edited database matrix used. Reference Section 11-16e(2). |
| Tabular Report of Channel Conditions (ENG Form 4020/4021) Method used to select minimum controlling depth for channel reach | Least recorded depth in 3x3 ft cells containing representative shoalest confirmed depth | Least recorded depth in 5x5 ft cells containing representative shoalest confirmed depth | Select least controlling depth from all the cells contained over a given channel reach. Selected controlling depth should be shown on plan of condition survey if submitted Reference Section 11-16f. |
| Record minimum controlling depth to nearest | 1 ft | 1 ft | Reference EP 1130-2-520 (Chapter 2) |

AREA 1&3A
SURVEYED 05-23-04
Area Above 47' 66,000 sq.ft.
3X3 MATRIX
AVERAGE SOUNDING

005201

A Never.
Q You would look at the map or whatever was on paper?
A Right, right, right.
Q Would you go over that with Mr. Conetta as well?
A Usually not these pre acceptance surveys. There was -- it was almost a formality, I think, they were sending us a letter saying yeah, we feel we're clear, go do a Government survey.
Q I assume there was no point in the contractor giving you a pre acceptance survey if he didn't feel the area was clear?
A Yeah.
Q So you would take it and present it to Survey and say here, do your thing?
A I don't even think we'd give it to Surveys. We wouldn't present it to them. We'd pretty much either call or go down to talk to them. They would never see the pre acceptance, I don't believe.
Q They just would get an authorization or request from you to go ahead

and do an acceptance survey?

A Yeah, yeah.

Q Now do you recall whether those acceptance surveys that your survey people were performing generally verified the pre acceptance survey?

A (No response).

Q In other words did the acceptance survey verify in most cases that the surveyor was indeed clear?

A No, there were times where the contractor's survey would show clear and we would show high spots on the Government acceptance survey.

Q Would that happen frequently?

A Actually I tabulated it and it's too bad it's not in somebody's file. I don't know what frequently is, but yeah, it'd happen. We had however many survey areas and it would happen.

Q Do you know how that compared to the frequency on previous KVK projects?

A No, I don't.

Q Did it concern you that these

have to be three hits of that elevation seen within the data cell. So you have to actually go back research the data cell, research the hit, find the cell and take a look at the cell itself and make sure there were three of those soundings in that cell.

Q Cell being three feet by three feet roughly?

A Right.

Q How many data points would there typically be in a cell?

A Could be fifty or sixty and generally we look for them to be on separate passes.

Q Do you know whether Cashman was using the shoalest or minimum sounding method on its pre-acceptance surveys?

A After reviewing some of the material, apparently, he was using an average method.

Q Understanding that, I think you said a minute ago you didn't receive these for review during the course of the contract?

A That is correct.

Q So you may have learned it since you didn't know it then?

A That is correct.

Q Are you aware of the fact that Cashman submitted a claim on this project or after the completion of the project?

A Yes.

Q Was that something you were made aware of when you were still employed by the district?

A Yes.

Q Were you given that claim to review?

A I believe I was, but I don't recall specifically.

Q Have you been told that you may be a witness if this case ever goes to trial? Is that something that has ever been discussed with you?

A I assume that was the case.

Q Have you formed any conclusions about the merits of the claim submitted by Cashman?

A No.

conversations with representatives of contractor during performance of the project?

A I believe I spoke to them a couple of times, but not about this issue. We would -- I would look for some performance-type data to help estimate later jobs, things like that.

Q And you would make that request of Cashman personnel or?

A Sometimes I would need clarification, particularly given there seems -- there was often disconnection between various Cashman reports and every now and then I would just need to get a clarification on something. This may have happened once or twice over two years.

Q Was any consideration given to making what I would call an unequivocal statement in the plans and specifications saying something to the effect that acceptance surveys will be processed by the Corps of Engineers using the shoalest sounding method?

A No.

Q No consideration was given to that?

A It had been discussed during previous job after the EC came out and we thought -- and again as we discussed before, I was assured by the surveyors that our language was fine.

Q You relied on what they told you without making your own independent determination as to whether they were correct?

A They're much more qualified than I am.

Q Have you ever testified in a board hearing or at trial in connection with a Government contract matter?

A No.

(Continued on next page to accommodate jurat.)

way you performed your surveys and processed your data, did you follow this manual or did you have any local procedures?

A Again our local procedures were more stringent than the procedures put forth in the manual because the manual was a consensus of many different districts within the division. So we always felt our procedures were going to remain more stringent than the manual. Those were suggested guidelines.

Q Were those more stringent procedures publicized?

A No.

Q Do you have any ideas of whether it would be important for a dredging contractor to know that you were following more stringent procedures than the manual?

A It wasn't my problem.

Q Why did you feel that it was necessary, if that's the right word, or advisable for the New York district to have somewhat more stringent procedures?

A Because I didn't want anybody from