No. 06-101C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JAY CASHMAN, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972

OF COUNSEL:
Donald M. Harris
Counsel
U.S. Army Engineer District
New York

January 31, 2008

## TABLE OF CONTENTS


STATEMENT OF THE ISSUES........................................................................................ 1

STATEMENT OF THE CASE........................................................................................ 2

A. Introduction......................................................................................... 2

B. The Nature Of The Work To Be Performed Under The KVK 8 Contract......................................................................................... 2

C. Multibeam Surveys For The KVK Phase II And KVK 8 Contracts. .......... 4

D. The Specifications for KVK 8. .............................................................. 8

E. The Award And Performance of KVK 8. ................................................ 9

STATEMENT OF FACTS. ........................................................................................ 12

ARGUMENT................................................................................................................ 12

I. Standard for Summary Judgment........................................................... 12

II. The Corps Properly Required Cashman To Meet the Contract Objective, And Cashman Is Not Entitled To Additional Compensation For Doing So......... 14

III. Failure to Comply With Corps Engineering Manual Requiring Information To Be Included In Dredging Contract Specification Cannot Form The Basis For Cashman's Contract Disputes Act Claim . ......................................... 16

IV. Cashman's Failure To Inquire Regarding A Patent Ambiguity Does Not Render The Corps Liable To Cashman.............................................................. 19

A. Legal Standards.............................................................................. 20

B. Cashman Did Not Inquire Regarding A Patent Ambiguity In The Specifications.............................................................................. 21

V. Cashman Did Not Reasonably Interpret The Contract To Provide That The Corps Would Produce Final Acceptance Surveys Using The Average Depth..................................................................................................... 23

A. Legal Standards.............................................................................. 23

B. Cashman's Interpretation That The Corps Would Produce Final Acceptance Surveys Using the Average Depth Was Unreasonable ......... 24

C. Evidence In the Record Does Not Support The Argument That Cashman Assumed That Final Acceptance Surveys Would Be Produced Using The Average Depth Based Upon The Nature of Dredging Equipment, And Such An Assumption Would Be Unreasonable ......... 26

D It Was Unreasonable For Cashman To Assume That Multibeam Surveys Would Change The Method That The Corps Used To Accept New Work Dredging of Hard Bottom Material. ......... 28

E. It Was Inherently Unreasonable For Cashman To Assume That The Corps Would Only Require Each Three Foot By Three Foot Cell To Be Dredged to An Average Depth of 47 Feet ......... 29

F. Information Or Opinions Acquired After Award Are Irrelevant To Whether Cashman's Interpretation Was Reasonable At The Time That Cashman Submit Its Bid ......... 31

VI. The Corps Did Not Breach The Duty To Cooperate With Cashman. ......... 32

A. Legal Standards. ......... 33

B. The Corps Did Not "Hide" The Product That It Would Use To Produce Acceptance Surveys From Cashman ......... 34

C. The Corps Did Not "Hide" Representatives of the Survey Section From Cashman. ......... 38

D. Cashman Failed To Make The Required Contract Sumbittals Regarding Its Proposed Method For Submitting Pre-Final Acceptance Surveys ......... 40

E. Mr. Galli's Testimony Indicates That Cashman Unreasonably Delayed In Seeking Formal Direction ......... 40

F. Engineering Manuals In Effect At The Time of Contract Award Did Not Prohibit Use Of The Minimum Depth Method To Produce Acceptance Surveys. ......... 41

G. The Corps Was Not Imposing "A More Stringent Tolerance To Determine Whether A Minimum Depth Survey Had Passed," Or Utilizing A "New Acceptance Criteria. ......... 44

CONCLUSION. .......................................................................................................................... 45

## TABLE OF AUTHORITIES

### CASES

Alliant Techsystems, Inc. v. United States,
74 Fed. Cl. 566 (2007). .......... 20

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002).......... 34

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986).......... 12

Avtel Servs. v. United States,
70 Fed. Cl. 173 (2005). .......... 34

Blake Constr. Co. v. United States,
987 F.2d 743 (Fed. Cir. 1993).......... 14

Bromley Contracting Co. v. United States,
15 Cl. Ct. 100 (1988). .......... 13

C&L Constr. Co. v. United States,
6 Cl. Ct. 791 (1984). .......... 19

Celotex Corp v. United States,
477 U.S. 317 (1986).......... 12

Centex Corp. v. United States,
395 F.3d 1283 (Fed. Cir. 2005).......... 34, 42

Conner Bros. Constr. Co. v. United States,
65 Fed. Cl. 657 (2005). .......... 14

Engineered Demolition, Inc. v. United States,
70 Fed. Cl. 580 (2006). .......... 21

Fortec Constructors v. United States,
760 F.2d 1288, 1291 (Fed. Cir. 1985).......... 21

Freightliner Corp. v. Caldera,
225 F.3d 1361 (Fed. Cir. 2000).......... 19

Fruin-Colnon Corp. v. United States,
912 F.2d 1426 (Fed. Cir. 1990)............................................................... 24, 26, 31

Fry Communications, Inc. v. United States,
22 Cl. Ct. 497 (1991). ......................................................................................... 31

Galen Med. Assocs. v. United States,
369 F.3d 1324 (Fed. Cir. 2004)........................................................................... 34

Granite Mgmt. Corp. v. United States,
74 Fed. Cl. 155 (2006). ....................................................................................... 34

HPI/GSA-3C, LLC v. Perry,
364 F.3d 1327 (Fed. Cir. 2004)..................................................................... 23, 24

Interwest Constr. v. Brown,
29 F.3d 611 (Fed. Cir. 1994)......................................................................... 15, 20, 23

Lockheed Martin IR Imaging Syst., Inc. v. West,
108 F.3d 319 (Fed. Cir. 1997)............................................................................. 20

M.G. Constr., Inc. v. United States,
67 Fed. Cl. 176 (2005). ....................................................................................... 21

Maintenance Engineers, Inc. v. United States,
21 Cl. Ct. 553 (1990). ................................................................................ 24, 26, 31

Manson Constr. Co. v. United States,
79 Fed. Cl. 16 (2007). ......................................................................................... 17

Mega Constr. Co. v. United States,
29 Fed. Cl. 396 (2003). ....................................................................................... 22

Metric Constructors v. Nat'l Aeronautics & Space Admin,
169 F.3d 747 (Fed. Cir. 1999)............................................................................. 20

NVT Techs., Inc. v. United States,
370 F.3d 1153 (Fed. Cir. 2004)........................................................................... 13

Natural Res. Def. Council v. United States Army Corps of Eng'rs,
399 F. Supp. 2d 386 (S.D.N.Y. 2005)..................................................................... 2

North Star Alaska Hous. Corp. v. United States,
76 Fed. Cl. 158 (2007). ....................................................................................... 34

O'Connor v. United States,
308 F.3d 1233 (Fed. Cir. 2002)........................................................................ 13

PDR , Inc. v. United States,
78 Fed. Cl. 201 (2007)..................................................................................... 13

P.R. Burke Corp. v. United States,
277 F.3d 1346 (Fed. Cir. 2002)................................................................ 15, 20

Precision Pine & Timber v. United States,
50 Fed. Cl. 35 (2001)....................................................................................... 33

Redland Genstar, Inc. v. United States,
39 Fed. Cl. 220 (1997)..................................................................................... 19

Reynolds Assocs. v. United States,
31 Fed. Cl. 335 (1994)..................................................................................... 18

S. Cal. Edison v. United States,
58 Fed. Cl. 313 (2003)..................................................................................... 34

Short Bros., PLC v. United States,
65 Fed. Cl. 695 (2005)..................................................................................... 34

St. Christopher Assocs., L.P. v. United States,
75 Fed. Cl. 1 (2006)......................................................................................... 18

St. Christopher Assocs., L.P. v. United States,
Fed. Cir. No. 2007-5069 at 10-14, 2008 U.S. App. LEXIS 324 (Jan. 9, 2008).............. 18

Stuyvesant Dredging Co. v. United States,
834 F.2d 1576 (Fed. Cir. 1987)........................................................................ 15

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987)........................................................................ 13

Sys. Fuels, Inc. v. United States,
66 Fed. Cl. 722 (2005)..................................................................................... 34

Tecom, Inc. v. United States,
66 Fed. Cl. 736 (2005)..................................................................................... 34

Torncello v. United States,
681 F.2d 756 (Ct. Cl. 1982)............................................................................. 34

Travelers Cas. & Sur. Co. of Am. v. United States,
75 Fed. Cl. 696 (2007). .......... 13

Travelers Cas. & Sur. of Am. v. United States,
74 Fed. Cl. 75 (2006). .......... 20, 22

Triax Pac., Inc. v. West,
130 F.3d 1469, 1474 (Fed. Cir. 1997).......... 21

Turner Constr. Co. v. United States,
367 F.3d 1319 (Fed. Cir. 2004).......... 23

United States v. Turner Constr. Co.,
819 F.2d 283 (Fed. Cir. 1987).......... 23

Walter Dawgie Ski Corp. v. United States,
30 Fed. Cl. 115 (1993). .......... 33

White v. Edsall Constr. Co.,
296 F.3d 1081 (Fed. Cir. 2002).......... 32

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court grant summary judgment in favor of defendant and deny plaintiff, Jay Cashman, Inc.'s ("Cashman's") motion for summary judgment. In support of our motion, we rely upon the Complaint, pleadings and appendix filed by Cashman, defendant's Answer, Proposed Findings of Uncontroverted Fact and responses to Cashman's Proposed Findings of Uncontroverted Fact, and the following brief and appendix.

**STATEMENT OF THE ISSUES**

1. Whether the United States Army Corps of Engineers (the "Corps") required Cashman to perform work beyond the requirements of contract DACW51-03-C-0014 (the "KVK 8 contract"), in requiring Cashman to dredge the contractually defined area to a depth of 47 feet.

2. Whether the Corps' failure to comply with a provision in a Corps engineering manual stating that certain information "shall" be included in dredging contract specifications provides Cashman with a cause of action against the United States, where the engineering manual was not part of or incorporated into Cashman's contract.

3. Whether the KVK 8 contract was patently ambiguous regarding the multibeam survey product that the Corps would use to determine that Cashman had achieved the contractually required depth, and whether Cashman failed to make inquiry regarding the ambiguity prior to submitting its bid.

4. In the alternative, whether Cashman's interpretation regarding the multibeam survey product that the Corps would use to determine that Cashman had achieved the contractually required depth was reasonable.

5. Whether Cashman has established that the Corps breached its duty to cooperate.

## STATEMENT OF THE CASE

### A. Introduction

This case arises out of the KVK 8 contract, which was awarded to Cashman by the New York District of the Corps in May 2003. Defendant's Proposed Findings of Uncontroverted Fact ("DPFUF") ¶ 30; Defendant's Appendix ("Def. App.") 14; 39. The contract required Cashman to dredge the contract area to a depth of 47 feet, and stated that the Corps would use acoustic multibeam surveys to determine whether Cashman had achieved the required depth. DPFUF ¶¶ 31, 44; Def. App. 14; 71; 74; 130. A dispute arose regarding the multibeam acceptance survey product that the Corps used to determine that the contractually required depth had been achieved.

### B. The Nature Of The Work To Be Performed Under The KVK 8 Contract

The Port of New York and New Jersey (the "port") is the third largest port in the nation, and the largest port on the East Coast. See Natural Res. Def. Council v. United States Army Corps of Eng'rs, 399 F. Supp. 2d 386, 391 (S.D.N.Y. 2005); DPFUF ¶ 1; Plaintiff's Appendix ("Pl. App." 4). Billions of dollars worth of cargo pass through the port on an annual basis. See

id. Beginning in 1986, Congress authorized the Corps to undertake a number of projects to deepen the navigational channels in the New York and New Jersey Harbor to meet industry demand for larger and deeper-bottomed cargo vessels to use the channels. DPFUF ¶ 2; Pl. App. 3-4; Def. App. 1-2. As part of this effort, the New York District of the Corps embarked upon the Kill Van Kull and Newark Bay Navigation Improvement Project (the "KVK project") to deepen the Kill Van Kull and Newark Bay Channels (the "channels"), which form the main artery linking the Ports of Elizabeth and Newark Bay. DPFUF ¶ 3; Pl. App. 4; Def. App. 1-2..

Phase I of the KVK project ("KVK Phase I"), which was substantially completed in 1995, involved a series of contracts to lower the depth of the channels to 42 feet[1] below mean low water.[2] DPFUF ¶ 4; Def. App. 77; 127; 153. The Corps included a two foot safety factor beyond the authorized depth of the channel for navigational purposes, because the KVK project involved rock and hard material, raising concerns that a vessel could hit the bottom of the channel and be seriously damaged. DPFUF ¶ 8; Def. App. 4; 77. Phase II of the KVK project ("KVK Phase II"), which was completed between 1999 and 2004, involved a series of contracts to lower the depth of the channels to 47 feet below mean low water. DPFUF ¶ 5; Def. App. 3-4; 77. There are future plans to lower the depth of the channels to 52 feet below mean low water, but the channels are currently authorized for use by vessels as 45-foot channels.[3] DPFUF ¶ 6; Def. App. 5-6; 65; 79-80.

[1] The authorized depth of the channels for navigational purposes was 40 feet.

[2] In simplistic terms, "mean low water" refers to an average low tide.

[3] If the authorized depth of the channel for navigational purposes is 45 feet, a ship with a draft of more than 45 feet should not use the channel. Def. App. 78; 152.

KVK Phase II involved "new work" dredging, meaning deepening projects that involve dredging below the published elevation of the channels at the time that the projects began. DPFUF ¶ 9; Def. App. 7; Pl. App. 8. KVK Phase II also involved the dredging of "hard bottom" materials, such as rock or compacted gravel, till, or heavy clays. DPFUF ¶ 9; Pl. App. 8, Def. App. 4; 77-78.

KVK Phase II was divided into eight separate contracts for eight defined areas of the project. DPFUF ¶ 10; Def. App. 8-9; Pl. App. 3. These eight contracts were awarded to five different dredging prime contractors, and were awarded and completed on a rolling basis between 1999 and 2004.[4] Id. The KVK 8 contract, which was awarded to Cashman on May 23, 2003, was the final contract of KVK Phase II to be awarded and completed. DPFUF ¶ 26; Pl. App. 1-3, Def. App. 13; 40-43.

C. Multibeam Surveys For The KVK Phase II And KVK 8 Contracts

Hydrographic multibeam surveys ("multibeam surveys") involve an acoustic survey system that indirectly measures the depth of a channel. DPFUF ¶ 11. A sonar system transmits a fan of acoustic signals into the water to create a sounding. Id.; Def. App. 235 (Declaration of William McDonald ¶ 6); Def. App. 49-51. When the signals hit the seabed, or an object under water, energy is created that returns to the multibeam system. DPFUF ¶ 11; Def. App. 49-51; Def. App. 235 (Declaration of William McDonald ¶ 6). The multibeam system records the time

---

[4] In Cashman's motion, Cashman asserts that prior to the KVK 8 contract, the previous KVK Phase II contracts had been awarded to three different dredging contractors. See Memorandum of Points and Authorities In Support of Plaintiff's Motion For Summary Judgment ("Pl. Memo.") at 3. This is incorrect. Prior to the KVK 8 contract, the previous KVK Phase II contracts had been awarded to four different dredging prime contractors. See DPFUF ¶ 10; Def. App. 9.

that it takes for the acoustic signals to travel to the seafloor (or underwater object) and back to the system. Id. This information can be used to calculate the depth to the seafloor or underwater object. Id.

After data is recorded by the multibeam sonar system, it is edited and processed by computer programs to filter out extraneous data ("noise"). DPFUF ¶ 12; Def. App. 52; 235 (Declaration of William McDonald ¶ 7). There are a number of survey products that can be produced based upon the edited data.[5] DPFUF ¶ 13; Def. App. 52; 235 (Declaration of William McDonald ¶ 7). Surveys can be produced using the average depth, which averages the survey data points in a three foot by three foot "bin" or "cell" of a designated area of the contract. DPFUF ¶ 14; Def. App. 120-21; 235 (Declaration of William McDonald ¶ 7). Surveys can also be produced using the minimum depth or "shoalest" depth, which represents whether the shallowest data points in a three foot by three foot cell are above the contractually required depth. DPFUF ¶ 15; Def. App. 52; 120-21; 235 (Declaration of William McDonald ¶ 7). In a survey produced using the minimum depth, if at least three data points within a three foot by three foot cell are confirmed to be high spots above the contractually required depth, the cell is not at the contractually required depth. DPFUF ¶ 15; Def. App. 58-58; Def. App. 235 (Declaration of

[5] Cashman refers to the various survey products as "data processing methods." See Memorandum of Points and Authorities In Support of Plaintiff's Motion For Partial Summary Judgment ("Pl. Memo") at 5. The Corps considers the process of filtering or editing extraneous "noise" spikes, or inaccurate data points, out of multibeam survey data to be "data processing." See EM 1110-2-1003 ¶ 11-12(a), January 1, 2002, Def. App. 129. Average depth or minimum depth surveys are survey products produced from multibeam survey data after the data processing occurs, and are outputs, rather than processes. See EM 1110-2-1003 ¶ 11-12(b), January 1, 2002, Def. App. 129. The process of generating the survey outputs is known as "binning or gridding routines." Id. This explanation is provided solely to assist the Court in understanding why the parties have used slightly different terminology, and should not affect the outcome of this case.

William McDonald ¶ 7).

Both contractors and the Corps used multibeam surveys for a number of purposes on the KVK Phase II contracts. DPFUF ¶¶ 36-37; Pl. App. 22, Def. App. 68; 168-69; 242 (Declaration of Salvatore DiDato ¶ 8). Only "after-dredge surveys," or surveys undertaken after a contractor has commenced dredging operations, are at issue in the present litigation.

The KVK 8 contract required Cashman to perform monthly progress payment surveys, to determine the quantity of material dredged for progress payment purposes. DPFUF ¶ 37; Def. App. 168-69. When Cashman believed that it had reached the contractually required depth, it was required to perform a pre-final acceptance survey to advise the Corps that it believed that the area was ready for final acceptance. DPFUF ¶ 37; Pl. App. 22. The Corps would then perform a final acceptance survey to determine that the work had been dredged to the contractually required depth. Id. The Corps also performed final payment surveys to determine the final quantity of material removed for payment purposes.[6] DPFUF ¶ 37; Def. App. 168-69.

For all of the KVK Phase II contracts, payment surveys were produced using the average depth, because it provided a more equitable volume calculation for payment purposes. DPFUF ¶ 42; Def. App. 123; 167. Acceptance surveys were produced using the minimum depth, because it ensured that the contractor had achieved the contractually required depth, and there were no high spots or "shoals" that could potentially cause damages to vessels. Id.

There were three primary types of materials to be dredged under the KVK 8 Contract -

---

[6] In some instances, the Corps' survey data taken from a final acceptance survey could also be used to produce a final payment survey. However, this could only occur if an area was accepted on the first attempt. DPFUF ¶ 38; Def. App. 237 (Declaration of William McDonald ¶ 11).

softer materials, such as silt, that could not be placed in the Historic Area Remediation Site ("HARS") after removal, and hard materials such as glacial till, clay and rock material, that could be placed in the HARS after removal, and rock.[7] DPFUF ¶ 39; Def. App. 70; 162-63. For the material unsuitable for placement in the HARS, the contractor was to perform monthly progress payment surveys. DPFUF ¶ 40; Def. App. 168-69. In addition, the Corps conducted final payment surveys to determine the final quantity of material removed after dredging of the material unsuitable for the HARS in a contractually defined area was complete. DPFUF ¶ 40; Def. App. 69. However, the contractor was not required to perform pre-final acceptance surveys for the material unsuitable for placement in the HARS, and the Corps did not perform acceptance surveys for this material, because all of this material was located above the contractually required depth of 47 feet. DPFUF ¶ 40; Def. App. 71; 242 (Declaration of Salvatore J. DiDato ¶ 10). Therefore, the contractor could never achieve the contractually required depth by removing the material. The contractor was simply required to dredge this material with an environmental "bucket" until there was no more material to dredge. DPFUF ¶ 40; Def. App. 72-73.

For the material that was suitable for placement in the HARS and rock, the contractor also performed monthly progress payment surveys. DPFUF ¶ 41; Def. App. 68-69. In addition, the contractor was required to perform a pre-final acceptance survey to advise the Corps that the contractor believed that the area was ready for final acceptance. DPFUF ¶ 41; Def. App. 130. The Corps would then perform a final acceptance survey to determine whether the work had been

---

[7] Though not especially relevant to the pending motions, for informational purposes, the HARS is an area where "cleaner" sediments dredged from the harbor are used to "cap" older materials that have the potential to cause environmentally adverse effects. Def. App. 163. If rock met certain criteria, it would be placed in a reef. Def. App. 162.

dredged to the contractually required depth. Id. After the work had been accepted, the Corps would either perform or produce another survey to determine the final volume that had been dredged for payment purposes.[8] DPFUF ¶ 41; Def. App. 68-69.

D. The Specifications for KVK 8

The specifications for KVK 8 provided that the awardee would be required to dredge the contractually defined area to a depth of 47 feet below mean low water. DPFUF ¶ 31; Def. App. 14; 71; 74. The specifications further provided that:

> If during the dredging or upon completion of the post-dredging surveys and soundings, materials are found above the required depth of 47 feet, below MLW [mean low water], these materials shall be removed immediately at the Contractor's expense.

DPFUF ¶ 33; Def. App. 71. However, because of inaccuracies in the dredging process, the specifications provided that the awardee would be compensated at the contract price for "allowable overdepth," defined as material removed up to 1.5 feet beyond the contractually required depth of 47 feet. DPFUF ¶ 34; Def. App. 74. Any material removed more than 1.5 feet beyond the contractually required depth was the responsibility of the contractor, and would not be paid for by the Corps. DPFUF ¶ 33; Def. App. 71.

Paragraph 1.15 of the Section 0800 of the specifications for KVK 8, entitled "Final Examination and Acceptance," provided in relevant part:

> As soon as practicable after the completion of an entire acceptance area a final examination of the work will be conducted by the Contracting Officer at the cost and expense of the Government by acoustic sweep survey system. Should any

[8] As previously discussed, in some cases, the same multibeam survey dataset that is used to produce the final acceptance survey can also be used to produce the final payment survey. However, this only occurs when an area is accepted the first time that it is submitted for a final acceptance survey. DPFUF ¶ 38.

> shoals or lumps or other lack of contract depth be disclosed by this examination the Contractor will be required to remove same. The Contractor or his authorized representative will be notified when soundings or sweepings are to be made and will be permitted to accompany the survey party.
>
> ****
>
> The Contractor shall perform pre-final hydrographic sweep surveys of an entire acceptance area to verify the area is satisfactorily completed prior to final examination by the Government. The pre-final surveys shall be performed using a multitrack or multibeam survey system to insure 100% coverage of the entire acceptance area. The proposed method for performing these surveys and all equipment and programs shall be submitted for approval. The Contractor's hydrographic surveys shall meet or·exceed the survey standards listed in EC 1130-2-210 HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys.

DPFUF ¶ 44; Def. App. 130. However, the specifications did not state how the Corps would produce the final surveys that it would use to determine acceptance.

The “EC 1130-2-210" referenced in Paragraph 1.15 of the solicitation is an engineering circular issued by the Corps. Paragraph A-2 of Appendix A of EC 1130-2-210, entitled “Revised Survey Classifications,” provides in relevant part:

> Hard Bottom Material and/or New Work. This category of dredge measurement, payment, and acceptance surveys includes dredging of newly authorized projects containing hard bottom material, such as rock or compacted material, or maintenance projects containing hard bottom material. . . . Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary’s River, MI.

DPFUF ¶ 45; Def. App. 7.

E. <u>The Award And Performance of KVK 8</u>

Prior to KVK 8, Cashman had not been awarded any of the KVK Phase II contracts.

DPFUF ¶ 28. However, Cashman had submitted bids for several of the contracts, and had been the apparent low bidder for KVK contract for Area 5, but had requested and was granted permission to withdraw its bid due to a bid error. DPFUF ¶ 28; Def. App. 15-38.

On March 23, 2003, Cashman submitted a bid for the KVK 8 contract. DPFUF ¶ 26; Pl. App. 1-3. Prior to submitting its bid, Cashman did not make inquiry regarding the method that the Corps would use to produce acceptance surveys, although Cashman knew that there were different ways to produce multibeam surveys. DPFUF ¶ 26; Def. App. 10-12.

Bruce Wood, Cashman's Vice President and the Project Director for the KVK 8 contract, testified that at the time that he prepared Cashman's bid for the KVK 8 contract, he assumed that the Corps would process multibeam acceptance surveys using the average method "[b]ased upon the plans and specs . . . ." DPFUF ¶ 27; Def. App. 155.. However, Alex Dick, Cashman's Dredging Project Manager, James Galli, Cashman's Project Manager, Dan Gaudet, one of Cashman's surveyors, and Paul Poirier, Cashman's Quality Control Manager, all testified that they had no opinion regarding the method that the Corps would use to produce acceptance surveys data at the time they began work on the contract. DPFUF ¶¶ 58-61; Def. App. 172-80.

Either at the time of bid or as work progressed, Cashman's employees decided that the Corps would produce final acceptance surveys using the average depth. DPFUF ¶ 64. Therefore, Cashman produced its pre-final acceptance surveys using the average depth. DPFUF ¶ 64. However, Cashman produced surveys for its own internal use using the minimum depth, because Cashman found it useful in determining how deep to set the digging system on the dredge, and to compare the difference between the average and minimum depth survey products. DPFUF ¶ 65; Def. App. 89-91.

The KVK 8 contract was divided into a number of sub-areas for acceptance purposes. Answer ¶ 6. As work progressed, on numerous occasions, the Corps' final acceptance surveys showed high spots above the contractually required depth in sub-areas that Cashman's pre-final acceptance surveys indicated had been dredged to grade. DPFUF ¶ 75; Def. App. 132-48. As Cashman continued to be unable to achieve the contractually required depth based upon the Corp's acceptance surveys, Cashman began an internal investigation as to why this was occurring. DPFUF ¶ 78; Def. App. 95-96. As a result of this investigation, Cashman determined that surveys produced using the minimum depth would be more likely to show high spots above the contractually required depth than surveys produced using the average depth method. Id.

Mr. Galli testified that he verbally asked Ronald Conetta, the Administrative Contracting Officer, how the Corps was producing its acceptance surveys. DPFUF ¶ 83; Def. App. 92; 192. Mr. Conetta had no experience with dredging prior to the KVK Phase II contracts, no knowledge of which survey products were available for use and in use by the Corps' Survey Section to produce final acceptance surveys, and did not even know that there were multiple ways to produce surveys from multibeam survey data. DPFUF ¶ 84; Def. App. 107-113; 189-92. Mr. Galli testified that Mr. Conetta stated that he did not know, but advised Mr. Galli to write a letter seeking formal direction on the issue "many times." DPFUF ¶ 85; Def. App. 92.

On August 31, 2004, Mr. Galli finally wrote a letter seeking direction. DPFUF ¶ 86; Def. App. 114.. The letter stated that Mr. Galli had been verbally informed on August 31, 2004 that the Corps produced acceptance surveys using the minimum depth, and requested confirmation of the acceptance standard that the Corps was using. Id. The Corps responded by letter on October 1, 2004, stating that the Corps produced acceptance surveys using the minimum

depth. DPFUF ¶ 87; Pl. App. 51-53. Until receiving the letter, Cashman continued to produce pre-final acceptance surveys using the average depth. DPFUF ¶ 88; Def. App. 197-200.

After the October 1, 2004 letter, Cashman began to produce its pre-final acceptance surveys using the minimum depth. DPFUF ¶ 89; Def. App. 97-98. However, the Corps' acceptance surveys continued to find shoals on many areas of the project that Cashman believed had been dredged to the contractually required depth. DPFUF ¶ 89; Def. App. 143-48; 195-96.

Cashman completed work on KVK 8 in November 2004. DPFUF ¶ 91; Def. App. 9; Pl. App. 3. On July 22, 2005, Cashman submitted a certified claim under the Contract Disputes Act, requesting $6,538,769 in damages, consisting of $4,430,561 in damages for "Extra Effort to Remove HARS material," and $2,108,208 in damages for "Days Spent Removing Shoaling." DPFUF ¶ 92; Def. App. 213. The Contracting Officer issued a final decision denying Cashman's claim on October 26, 2005. DPFUF ¶ 93; Def. App. 216-23. Cashman filed this action on February 10, 2006. See Compl.

## STATEMENT OF FACTS

For our statement of facts, we respectfully refer the Court to the accompanying Defendant's Proposed Findings of Uncontroverted Facts, and Defendant's Responses to Plaintiff's Proposed Findings of Uncontrovered Facts.

## ARGUMENT

### I. Standard for Summary Judgment

Summary judgment is proper if no genuine question of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex Corp v. United States, 477 U.S. 317, 322 (1986). A fact qualifies as "material" if it would affect the outcome of the case. Anderson, 477

U.S. at 248. The burden of showing the absence of a genuine question of material fact rests with the movant, and the Court must view all evidence in the light most favorable to the non-movant, resolving all doubts in that party's favor. O'Connor v. United States, 308 F.3d 1233 (Fed. Cir. 2002).

After the moving party has met its burden, the non-movant "must proffer countering evidence sufficient to create a genuine issue of factual dispute." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987). The non-movant's burden is to set forth specific facts that generate issues for trial. This burden "is not met by reliance on its pleadings alone, or by conclusory allegations and generalizations." Bromley Contracting Co. v. United States, 15 Cl. Ct. 100, 105 (1988). The non-movant must present sufficient evidence of a dispute as to "material fact such that the trier of fact could reasonably find in favor of the non-movant." Id. at 105.

Contract interpretation is a question of law that is particularly well suited for summary judgment. PDR , Inc. v. United States, 78 Fed. Cl. 201, 204 (2007); Travelers Cas. & Sur. Co. of Am. v. United States, 75 Fed. Cl. 696, 703 (2007). Whether a contract provision is ambiguous is a question of law, and whether an ambiguity is patent or latent is likewise a question of law. NVT Techs., Inc. v. United States, 370 F.3d 1153, 1156 (Fed. Cir. 2004). However, the interpretation of "language, conduct and parties' intent . . . may sometimes involve questions of material fact and not present a pure question of law." PDR, Inc., 78 Fed. Cl. at 204 (citing Beta Systems, Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir. 1988)).

## II. The Corps Properly Required Cashman To Meet the Contract Objective, And Cashman Is Not Entitled To Additional Compensation For Doing So

Cashman argues that because the Corps used a minimum depth survey product for its final acceptance surveys, there was a "change to the contract entitling Cashman to an equitable adjustment." Pl. Memo. at 21. Cashman's numerous arguments regarding the survey product that the Corps would use for final acceptance surveys ignores the fact that the Corps did nothing but require Cashman to meet the contract objective of dredging the contractually defined area to a depth of 47 feet below mean low water. See Pl. Memo at 7-8; 11-12; 15; 19. Essentially, Cashman is arguing that it is entitled to additional compensation for meeting the contract objective, and that the Corps should not have required Cashman to do so.

Paragraph 5.1.1. of Section 2900 of the KVK 8 contract provided that "the required dredging depth as shown on the drawings is 47 feet below [mean low water]." Def. App. 74. The contract also provided that:

> If during the dredging or upon completion of the post-dredging surveys and soundings, materials are found above the required dredging depth of 47 ft below [mean low water], these materials shall be removed immediately at the contractor's expense.

Def. App. 71. The provisions addressing the required depth were not design specifications, setting forth in precise detail the materials to be employed and the manner in which the work is to be performed. See Blake Constr. Co. v. United States, 987 F.2d 743, 745 (Fed. Cir. 1993); Conner Bros. Constr. Co. v. United States, 65 Fed. Cl. 657, 685 (2005). For example, the specifications did not require Cashman to use a particular type of dredging equipment to achieve the contractually required depth. See Def. App. 73; 76. Similarly, the contract did not direct Cashman how to set the digging system on the dredge to achieve the contractually required depth

- the decision was Cashman's. Def. App. 157-58.

Instead, the specification was a performance specification, setting forth an objective or standard to be achieved, and expecting Cashman to exercise its ingenuity in achieving that objective or standard of performance. See P.R. Burke Corp. v. United States, 277 F.3d 1346, 1357 (Fed. Cir. 2002); see also Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987) ("Technical provision 4-1 did not instruct Stuyvesant how it should perform the dredging of the channel. It merely stated the result to be achieved, namely, that the channel was to be dredged to its acceptable prism."). Where, as here, the contract states the performance requirements, the contractor is obligated to meet them. See Interwest Constr. v. Brown, 29 F.3d 611, 615 (Fed. Cir. 1994).

Cashman argues that the Corps should have used average depth survey products to accept Cashman's work. Pl. Memo. at 6, 15-16. However, if the Corps had used average depth survey products, it would necessarily not have required Cashman to dredge the entire contract area to the contractually required depth of 47 feet. By Cashman's own description, the average depth survey product is produced by taking data points within a three foot by three foot bin, "averag[ing] all of the data points within a bin, and if the average is minus forty-seven feet or deeper, the bin is determined to be dredged to the required grade." Pl. Memo. at 5. However, the fact that the average depth of the bin is 47 feet means that there would be points higher than 47 feet, and therefore, not dredged to the contractually required depth. Def. App. 52; ("The average depth over the series can overly smooth the data . . . ."); 164. According to Cashman, therefore, it should have been permitted to achieve less than what the contract required.

Prior to award, Cashman did not contend that the requirement to dredge to a depth of 47

feet was impossible. Def. App. 156. Nor can Cashman do so now, as it ultimately completed the contract and achieved the required depth. Although Cashman could not dredge to a neat line of 47 feet, the contract provided that Cashman would receive compensation for materials removed up to one and one-half feet below the contractually required depth, to ensure that it would meet the requirement to dredge to a depth of at least 47 feet. Def. App. 74. In fact, when Cashman prepared its bid, Cashman assumed that it would need to perfom dredging even beyond the paid overdepth to meet the required depth of 47 feet. Def. App. 161. Despite this, Cashman now contends that it was a change to Cashman's contract to require Cashman to meet the contract objective.

Cashman's pre-bid expectation conformed with the contract's clearly specified provision that the Corps would direct Cashman return to sub-areas with high spots shallower than 47 feet at Cashman's expense, and achieve the contractually required depth. Def. App. 71. Cashman contends that the Corps should be required to compensate Cashman for the cost of removing high spots above the contract depth. Pl. Memo. at 23. However, according to the plain language of the KVK 8 contract, Cashman is not entitled to additional compensation for this work.

## III. Failure to Comply With Corps Engineering Manual Requiring Information To Be Included In Dredging Contract Specification Cannot Form The Basis For Cashman's Contract Disputes Act Claim

Cashman contends that it is entitled to recover damages because the contract did not specify the survey product for the Corps' final acceptance surveys, as required by "the Corps mandatory internal guidance for the preparation of dredging specifications." Pl. Memo. at 12. Cashman has identified "the legal effect of the Defendant's failure to place information in the contract specifications that it was required to insert by mandatory internal guidance . . . ." as a

relevant legal issue to be determined by the Court. See Pl. Memo. at 9. However, any failure by the Corps to comply with its own "internal guidance" cannot form the basis for Cashman's Contract Disputes Act claim.

Cashman notes that paragraph 11-4(g) of the Corps' Engineering and Design Manual ("EM") 1110-2-1003 (1 January 2002) applicable at the time of Cashman's contract, provided that:

> Measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters (horizontal and vertical control, density, etc.), data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government.

Plaintiff's Appendix ("Pl. App.") 21. Cashman then argues that the specifications for the KVK 8 contract did not clearly state the binning techniques that the Corps would use to produce acceptance surveys, and therefore, the Corps violated its internal policy, and is liable to Cashman. See Pl. Memo at 10-14. Strangely, at the same time, Cashman argues that EM 1110-2-1003 was "not part of the contract and it was not disclosed to [Cashman] prior to award of the contract."[9] Pl. Memo. at 4.

First, "internal guidance" of the Corps that is "not part of the contract" does not confer legal rights upon Cashman. See Manson Constr. Co. v. United States, 79 Fed. Cl. 16, 19 (2007).

---

[9] Although Cashman continuously refers to EM 1110-2-1003 as the Corps' "internal guidance," it was a publicly available document, and was referenced in EC 1130-2-210, which the KVK 8 contract stated set forth standards that the contractor should "meet or exceed" for its hydrographic surveys, as a manual containing "[p]rocedural guidance and accuracy standards for performing hydrographic surveys." See Pl. Memo at 4; Pl. Memo at 6 fn. 2; Pl. Memo at 9; Plaintiff's Proposed Finding of Uncontrovered Fact No. 62, see Def. App. Def. App. 128; 130; see also http://web.archive.org/web/19980529092937/www.usace.army.mil/inet/usace-docs/eng-manuals/em1110-2-1003/toc.htm.

A Corps manual requiring certain information to be included in dredging contract specifications that was not part of or incorporated into Cashman's contract imposes no legal obligation upon the Corps that Cashman can rely upon in its pursuit of damages in its claim under the contract. See St. Christopher Assocs., L.P. v. United States, Fed. Cir. No. 2007-5069 at 10-14, 2008 U.S. App. LEXIS 324 at *19-20 (Jan. 9, 2008); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 10-11 (2006); Reynolds Assocs. v. United States, 31 Fed. Cl. 335, 339 (1994).

Second, although EM 1110-2-1003 indicated that the information identified in paragraph 11-4(g) "shall" be included in dredging contract specifications, there is no evidence that the Corps intended to promulgate EM 1110-2-1003 into a regulation providing a cause of action for contractors.[10] If the Corps had intended to do so, it would have codified EM 1110-2-1003 in the Code of Federal Regulations. In fact, the stated purpose of EM 1110-2-1003 is to "provide technical guidance for performing hydrographic surveys," not to provide contractors with legal rights. Def. App. 169.

Third, there is no indication that paragraph 11-4(g) was included in EM 1110-2-1003 to protect Cashman, or for Cashman's benefit. Indeed, if EM 1110-2-1003 were "internal guidance" for the Corps that was "not disclosed to [Cashman] prior to award of the contract," it would indicate that the provision was included to protect the Corps against claims by contractors, not to protect the legal rights of contractors. See Pl. Memo. at 4. "It is clearly established that when rules and regulations are promulgated for the benefit of the government and no one else,

[10] Cashman presents several statements about concerns or beliefs allegedly possessed by the Office of the Chief of Engineers had. See Pl. Memo. at 10-11. Cashman has not cited evidence in support of those statements, or included evidence in the appendix to support those statements.

the other party to a contract cannot complain if such regulations are not complied with." C&L Constr. Co. v. United States, 6 Cl. Ct. 791 (1984), aff'd, C&L Constr. Co. v. United States, 790 F.2d 93 (1986) (table). Therefore, even if EM 1110-2-1003 could be given the effect of a regulation, which it cannot, Cashman could not bring suit against the Government based upon a failure to comply with paragraph 11-4 of EM 1110-2-1003. See Freightliner Corp. v. Caldera, 225 F.3d 1361, 1365 (Fed. Cir. 2000) ("In order for a private contractor to bring suit against the Government for violation of a regulation, that regulation must exist for the benefit of the private contractor.").

Furthermore, Cashman incorrectly contends that in Redland Genstar, Inc. v. United States, 39 Fed. Cl. 220, 234 (1997), this Court has made a determination regarding the "duty of the Corps to follow the requirements in its engineer manuals." See Pl. Memo. at 13. Redland Genstar was a pre-award bid protest, where the relevant inquiry was whether the Corps' decision to depart from engineering guidance relating to the requirements of a solicitation in a manner that potentially violated the Competition in Contracting Act lacked a rational basis. See 39 Fed. Cl. at 234. The Court never held that there was an independent cause of action arising from the Corps' lack of compliance with its engineering manuals. Here as well, there is not, and Cashman's arguments are inapposite to the issues to be determined in this litigation.

## IV. Cashman's Failure To Inquire Regarding A Patent Ambiguity Does Not Render The Corps Liable To Cashman

In fact, Cashman's own arguments regarding the Corps' failure to specify the survey product that it would use for final acceptance surveys demonstrates that the Corps is not liable to Cashman. On numerous occasions throughout Cashman's brief, Cashman argues that

information regarding the survey product that the Corps would use for final acceptance surveys was essential in determining Cashman's "daily dredging regimen" and how deep Cashman would dredge the contractually defined areas. Pl. Memo. at 8, 19; see also Pl. Memo. at 4, 12-13, 19, 22. Cashman also argues that the Corps did not identify the criteria that it would use to accept Cashman's work. See Pl. Memo. at 22. However, if the solicitation failed to include essential information that Cashman needed to determine how it would perform the work necessary to achieve the contractually defined objective, or what standard the Corps would employ to accept the work, this is by definition a patent ambiguity, giving rise to a duty of inquiry by Cashman prior to submitting its bid.

A. Legal Standards

If a contract term does not have a plain meaning, it is ambiguous, and the Court must then determine whether the ambiguity is patent or latent. Alliant Techsystems, Inc. v. United States, 74 Fed. Cl. 566, 577 (2007). A patent ambiguity encompasses "an obvious omission, inconsistency, or discrepancy of significance." Interwest Constr. v. Brown, 29 F.3d 611, 617 (Fed. Cir. 1994); Travelers Cas. & Sur. of Am. v. United States, 74 Fed. Cl. 75, 88 (2006). The relevant question is whether the ambiguity would have been apparent to a reasonable contractor. See Lockheed Martin IR Imaging Syst., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997).

With a patent ambiguity, if the non-drafting party fails to make an appropriate inquiry, the ambiguous provision will be construed against the non-drafting party. P.R. Burke Corp. v. United States, 277 F.3d 1346, 1355 (Fed. Cir. 2002); Metric Constructors v. Nat'l Aeronautics & Space Admin, 169 F.3d 747, 751 (Fed. Cir. 1999). The existence of a patent ambiguity in a Government contract raises a duty of inquiry, regardless of the reasonableness of a contractor's

interpretation. Triax Pac., Inc. V. West, 130 F.3d 1469, 1474 (Fed. Cir. 1997), Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985). This duty of inquiry prevents contractors from taking advantage of ambiguities in contracts by adopting narrow interpretations in their bids, and then, after the award is made, seeking equitable adjustments to perform the additional work that the Government actually wanted. Triax Pac, Inc., 130 F.3d at 1475.

The duty to inquire starts at the pre-award phase, at a time when the parties are able to take prophylactic action. M.G. Constr., Inc. v. United States, 67 Fed. Cl. 176, 186-87 (2005); see also Engineered Demolition, Inc. v. United States, 70 Fed. Cl. 580, 591 n. 15 (2006). Even if the contractor raised discrepancies with the contracting officer after commencing performance of the contract, that would be too late. M.G. Constr., Inc., 67 Fed. Cl. at 186-87

B. Cashman Did Not Inquire Regarding A Patent Ambiguity In The Specifications

The specifications for the KVK 8 contract did not explicitly state the survey product that the Corps would use for its final acceptance surveys. Paragraph 1.15 of Section 800 of the KVK 8 contract provided:

> As soon as practicable after the completion of an entire acceptance area, a final examination of the work will be conducted by the Contracting Officer, at the Court and expense of the Government by acoustic sweep survey system. Should any shoals, lumps, or other lack of contract depth be disclosed by this examination, the Contractor will be required to remove same.

Def. App. 130. Cashman notes that the specifications "did not state that the Corps planned to process its survey data in any particular manner." Pl. Memo. at 12. Cashman also contends that it needed this information to determine what its daily dredging regimen for the project would be, how deep it would dredge, and because it established the Corps' standard for determining

whether Cashman had met the contract objective. See Pl. Memo. at 8, 19; see also Pl. Memo. at 7-8, 23.

The omission of information necessary to either determine how Cashman would perform the work under the contract, or the standard for determining that the contract objective had been met, would be an obvious omission of significance, that would be neither hidden nor subtle to a contractor preparing a bid for the contract. See Travelers Cas. & Sur., 74 Fed. Cl. at 93-94; Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 457 (2003). According to Cashman's own brief, if Cashman had known that the Corps would use a minimum depth survey product for its acceptance surveys, Cashman would have "dredg[ed] deeper . . . in order to account for the less forgiving results of a minimum depth acceptance survey." Pl. Memo. at 8.

Cashman was aware that there were multiple survey products that could be produced from multibeam survey data prior to submitting its bid for the KVK 8 contract. Def. App. 10-12; Pl. App. 33. Furthermore, EC 1130-2-210, which set forth the standards that the solicitation required the awardee to meet or exceed in its own hydrographic surveys, provided that "procedural guidance and accuracy standards for performing multibeam surveys are contained in EM 1110-2-1003." Def. App. 128. EM 1110-2-1003 discussed multiple survey products that could be produced from multibeam survey data. Def. App. 52.

Although Cashman knew that different survey products existed, and although Cashman asserts that it needed to know the survey product that the Corps would use for final acceptance surveys both to determine how it would perform the work under the solicitation, and the standard for acceptance of the work, Cashman did not make inquiry regarding the survey product that the Corps would use for final acceptance surveys prior to submitting its bid for the KVK 8 contract.

Def. App. 10-12; Pl. App. 33. As Mr. Hawkins, the Corps' Project Manager for the Harbor Deepening Project testified, it was unclear " . . . how the contractor bid the job if he had no clear understanding of how he was going to do it." Def. App. 246. Cashman cannot simultaneously argue that information on the survey product for final acceptance surveys was essential to its performance, and simultaneously argue that it did not notice that the information was not included in the specifications. See Pl. Memo. at 4. Because Cashman did not seek clarification of the contract requirements, it cannot now secure an equitable adjustment arising from the alleged ambiguity. See Interwest Constr. v. Brown, 29 F.3d at 615-16.

V. Cashman Did Not Reasonably Interpret The Contract To Provide That The Corps Would Produce Final Acceptance Surveys Using The Average Depth

However, even if the Court were to determine that the specifications were latently ambiguous in failing to specify the survey product that Cashman would use for final acceptance surveys, Cashman's interpretation that the Corps would produce final acceptance surveys using the average depth was unreasonable, precluding Cashman from recovery.

A. Legal Standards

Where an ambiguity is not sufficiently glaring to trigger the patent ambiguity exception, it is deemed latent and the general rule of contra proferentem applies. HPI/GSA-3C, LLC v. Perry, 364 F.3d 1327, 1334 (Fed. Cir. 2004). The rule of contra proferentem requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document. United States v. Turner Constr. Co., 819 F.2d 283, 286 (Fed. Cir. 1987). However, before a court may enforce the general rule of contra proferentem against the drafter of a latent ambiguity, the contractor's interpretation of that ambiguity must be

reasonable. HPI/GSA-3C, LLC, 364 F.3d at 1334; see also Turner Constr. Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004).

In addition, the contractor must have actually construed the specifications in accordance with one of the meanings to which the language was susceptible. HPI/GSA-3C, LLC, 364 F.3d at 1334 (citing W. Contracting Corp. v. United States, 144 Ct. Cl. 318, 326 (1958)). Where a contractor seeks recovery based on his interpretation of an ambiguous contract, he must show that he relied on this interpretation in submitting his bid. Fruin-Colnon Corp. v. United States, 912 F.2d 1426, 1430 (Fed. Cir. 1990). Such reliance must be shown at the time that the contractor entered into the contract. See Maintenance Engineers, Inc. v. United States, 21 Cl. Ct. 553, 562 (1990).

B. Cashman's Interpretation That The Corps Would Produce Final Acceptance Surveys Using the Average Depth Was Unreasonable

As previously discussed, Paragraph 1.15 of Section 0800 of the KVK 8 contract provided that "[t]he Contractor's hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys." Def. App. 130. Based upon EC 1130-2-210, Cashman could not reasonably have believed that the Corps would produce final acceptance surveys using the average depth, or that it would be advisable for Cashman to produce its pre-final acceptance surveys using the average depth.

Appendix A of EC 1130-2-210, Paragraph A-2(a)(1), provided:

> Hard Bottom Material and/or New Work. This category of dredge measurement, payment, and acceptance surveys includes dredging of newly authorized projects containing hard bottom material, such as rock or compacted material, or maintenance projects containing hard bottom material. All newly authorized projects are not necessarily in this category. This category may also include projects where low under-keel clearances are anticipated over potentially

> hazardous bottom conditions. Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7, see also Def. App. 168

The KVK 8 project contained hard bottom material, and was new work dredging. See Pl. Memo. at 2; See Pl. App. 8, Def. App. 4; 77-78. In fact, the Kill Van Kull projects were specifically identified as a type of Corps project that would be governed by Paragraph A-2(a)(1). Def. App. 7

EC 1130-2-210, Paragraph A-2(a)(1) provides that for hard bottom or new work dredging, such as the KVK projects, the most precise positioning and depth measurement standards must be employed. Def. App. 7. Average depth survey products are certainly not the "most precise positioning and depth measurement" standard, because they "average[] all of the data points within a bin, and if the average is minus forty-seven feet or deeper, the bin is determined to be dredged to the required grade." See Pl. Memo. at 5. This would "smooth out" or hide objects above the contractually required depth, making it difficult to detect them. Def. App. 52; 164.

Paragraph A-2(a)(1) also provides that, "[m]echanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism." Def. App. 7. As Cashman itself notes in its proposed findings of fact, "[t]he average method is less likely to result in a requirement to re-dredge because the average of all the data points in a bin may be below grade, even though not all of the points in the bin are

below grade." Plaintiff's Proposed Finding of Uncontroverted Fact ("PFOUF") No. 39. Therefore, the average method of processing multibeam acceptance surveys is less likely to "detect small objects remaining above the required dredging prism." Def. App. 7. For these reasons, any assumption that the Corps would produce final acceptance surveys using the average depth was unreasonable.

C. Evidence In the Record Does Not Support The Argument That Cashman Assumed That Final Acceptance Surveys Would Be Produced Using The Average Depth Based Upon The Nature of Dredging Equipment, And Such An Assumption Would Be Unreasonable

In Cashman's memorandum in support of its motion for summary judgment, Cashman's counsel presents an elaborate explanation of why, in light of the nature of dredging equipment, it was reasonable for Cashman to assume that the Corps would produce acceptance surveys using the average depth. See Pl. Memo. at 15-16. As defendant understands Cashman's argument, Cashman contends that because the bucket of a backhoe dredge is larger than a three foot by three foot cell for multibeam surveying, Cashman assumed that the depth would be uniform across the cell. Id. As discussed below, defendant disagrees with this reasoning. More importantly, however, there is no evidence in the record that this reasoning was actually relied upon by any employee, agent, or representative of Cashman at the time that Cashman prepared its bid for KVK 8, rendering it irrelevant for purposes of determining whether Cashman's interpretation was reasonable. See Fruin-Colnon Corp., 912 F.2d at 1430; Maintenance Engineers,, 21 Cl. Ct. at 562 (1990).

Bruce Wood, Cashman's Vice President and the Project Director for the KVK 8 contract, testified that at the time that he prepared the bid for the KVK 8 contract, he assumed that the

Corps would process multibeam acceptance surveys using the average method "[b]ased upon the plans and specs . . . .," not the nature of dredging equipment. Def. App. 155. In Cashman's brief, however, Cashman argues that the plans and specifications said nothing on the issue. Pl. Memo. at 9, 12-13, 15.

Although Mr. Wood may have believed that the Corps would produce acceptance surveys using the average depth, it was not a belief that he shared with his technical personnel. Alex Dick, Cashman's Dredging Project Manager, had no opinion as to the method that the Corps would use to produce acceptance surveys at the time that he assisted in preparing Cashman's bid for the KVK 8 contract, or at the time that work began under the contract. Def. App. 172-74. James Galli, Cashman's Project Manager, did not have an opinion as to the method that the Corps would use to produce acceptance surveys at the time that work began. Def. App. 175-77. Dan Gaudet, one of Cashman's surveyors for the KVK 8 project, began work on the contract, he had "no clue" what method the Corps would use to produce acceptance surveys at the time that work began on the contract. Def. App. 93; 178. At the time that Cashman began work on the KVK 8 project, Cashman's Quality Control Manager, Paul Porier, had no opinion as to the method that the Corps would use to produce multibeam acceptance surveys under the contract. Def. App. 179-80. Surely, if the nature of dredging equipment itself led to the assumption that an average depth survey product would be used for final acceptance surveys, these individuals should have formulated an opinion.

The evidence in the record demonstrates that, to the extent that anyone at Cashman actually believed that the nature of dredging equipment meant that average depth survey products would be used for final acceptance surveys, such a belief was unreasonable. First, the depth

within a three foot by three foot cell was not uniform, because the Corps' final acceptance surveys, produced using the minimum depth, continued to find at least three high spots within the cells. DPFUF ¶ 75; Def. App. 132-48. Second, there is testimony in the record that dredging equipment made it impossible to dredge to an even, neat, uniform line. DPFUF ¶ 61; Def. App. 81; 159; 181-82. Third, evidence indicates that individuals in the dredging industry would not reasonably conclude that the size of the bucket on a backhoe dredge would directly relate to whether the height of the material dredged was uniform. See Def. App. 232 (Declaration of James Thomas ¶ 7).

Furthermore, as a matter of simple common sense, Cashman's argument that the nature of dredging equipment led Cashman to conclude that the Corps would produce final acceptance surveys using the average depth, advanced for the first time in its motion for summary judgment, is inherently unreasonable. The bucket of a backhoe dredge contains large teeth, indicating that as the dredge scooped material up for removal, the material would not be removed at a uniform height. Def. App. 227-28.

D It Was Unreasonable For Cashman To Assume That Multibeam Surveys Would Change The Method That The Corps Used To Accept New Work Dredging of Hard Bottom Material

Any assumption that the Corps would produce multibeam acceptance surveys using the average depth was unreasonable because it presumed a fundamental change in the way that the Corps had historically accepted hard bottom, new work dredging projects. Prior to multibeam surveys, the Corps accepted work by ensuring that the contractually required depth was the minimum depth of an acceptance area. Def. App. 59-60; Def. App. 234 (Declaration of William McDonald ¶ 5). The Corps used this method of acceptance for new work hard bottom dredging

as far back as the 1880's, when acceptance was determined by means of a "bar drag." Def. App. 59-60. A bar was placed in the water at a certain grade, and moved along. Id. If the bar hit a shoal above the contractually required depth, it would be moved up until it cleared the obstruction, the elevation of the shoal would be recorded, and the Corps would require that it be removed. Id. Nothing would be "averaged." Multibeam technology did not change the Corps' method of acceptance, nor was it reasonable for Cashman to assume that it would. Def. App. 59-60; see also Def. App. 234 (Declaration of William McDonald ¶ 5).

### E. It Was Inherently Unreasonable For Cashman To Assume That The Corps Would Only Require Each Three Foot By Three Foot Cell To Be Dredged to An Average Depth of 47 Feet

In addition, it was inherently unreasonable for Cashman to assume that the Corps would only require Cashman to dredge each three foot by three foot cell of the contract area to an average depth of 47 feet. First, as previously discussed, this is contrary to the stated contract objective.

Second, a ship using the channel would not be interested in whether a given three foot by three foot area of the channel had been dredged to an average depth of 47 feet. Def. App. 60-62. This would mean that the three foot by three foot bin could have extreme high spots, as long as it also included extreme low spots, resulting in an average depth of at least 47 feet. DPFUF ¶ 17. For this reason, when the National Oceanic and Atmospheric Association's ("NOAA") Office of Coast Survey ("OCS") conducts hydrographic multibeam surveys "[t]o produce the nation's nautical charts and ensure safe navigation," "particular attention is paid to acquiring the precise location of least (shoalest) depths on dangers to navigation and depths significant to surface navigation." Def. App. 149-50.

If a ship were to hit a pinnacle above grade in materials such as rock or heavy clays, it could seriously damage the vessel, resulting in significant liability for the Corps. Def. App. 60-62; 231 (Declaration of James Thomas ¶ 6). In fact, during KVK Phase I, a ship had hit a pinnacle, resulting in "a million dollar problem" for the Corps. Def. App. 60. This was of special concern for the KVK project, because it was situated in such a busy port, with such a high volume of cargo passing through. Def. App. 231 (Declaration of James Thomas ¶ 6).

Although the authorized depth of the channels for navigational purposes was 45 feet, the Corps included a two foot safety factor in the KVK Phase II Contracts, because the area involved hard bottom material. Def. App. 4; 77. [11] The Corps paid contractors to dredge to a required depth of 47 feet below mean low water to ensure that safety factor, and was entitled to receive it. Furthermore, the Corps was concerned that because ships would be aware that the actual depth of the channels was 47 feet below mean low water, they would try to take advantage of the two feet beyond the authorized depth for navigational purposes. Def. App. 15; 63; 153-54.

In addition, having pinnacles above 47 feet below mean low water would necessarily cause difficulties with the Corps's maintenance dredging contractors, who are responsible for ensuring that the area remains at a depth of 47 feet, but not responsible for deepening the area to 47 feet below mean low water, or removing hard materials. Def. App. 6; 64-65. For all of these reasons, any assumption that final acceptance surveys would be produced using the average depth would be inherently unreasonable.

[11] Although the channel will eventually be dredged to 50 feet, it is to be used as a 45 foot channel for a long period of time. Def. App. 65.

F. Information Or Opinions Acquired After Award Are Irrelevant To Whether Cashman's Interpretation Was Reasonable At The Time That Cashman Submit Its Bid

Cashman also argues that it reasonably concluded that the Corps would produce acceptance surveys using the average depth based upon events or information that occurred after award to Cashman. However, events that occurred after award are irrelevant to determining whether Cashman reasonably interpreted a latent ambiguity at the time of award. See Fruin-Colnon Corp., 912 F.2d at 1430; Fry Communications, Inc. v. United States, 22 Cl. Ct. 497, 503 (1991); Maintenance Engineers, 21 Cl. Ct. at 562 (1990).

For example, Cashman argues that the supplier of some multibeam equipment informed Mr. Dick that surveys produced using the minimum depth were "not really representative of what was down there." See Pl. Memo. at 6. Not only is that assertion based upon inadmissible hearsay from Mr. Dick's deposition regarding what a supplier claimed, but the conversation with the unidentified representative of the supplier occurred after award to Cashman. Def. App. 247-48. Thus, if Mr. Dick had questions regarding the method that the Corps would use to produce final acceptance surveys, it is unclear why he would rely upon information from a producer of multibeam survey equipment, rather than contacting the Survey Section of the Corps.

Similarly, Cashman argues that it was reasonable for Cashman to continue to assume that the Corps would produce final acceptance surveys using the average depth, because Mark Alton, a Project Engineer with the Construction Division of the Corps responsible for receiving Cashman's pre-final acceptance surveys and notifying the Survey Sections that Cashman believed it was ready for a final acceptance survey, did not realize that there were different ways to produce surveys. See Pl. Memo at 16-18. Therefore, because Mr. Alton did not correct

Cashman, Cashman contends that it was reasonable for Cashman to keep producing its pre-final surveys using the average depth. This argument will be further addressed in response to Cashman's argument that the Corps breached the duty to cooperate, or misrepresented information to Cashman. However, it has nothing to do with whether Cashman's initial assumption that final acceptance surveys would be produced using the average method was reasonable.

VI. The Corps Did Not Breach The Duty To Cooperate With Cashman

Cashman attempts to circumvent its duty to make inquiry regarding a patent ambiguity prior to submitting its bid, or to reasonably interpret a latent ambiguity, by arguing that the Corps breached the duty to cooperate by failing to specify the method that the Corps would use to produce acceptance surveys in the contract specifications. Pl. Memo. at 18-19. However, if a contractor could circumvent the duty to inquire regarding a patent ambiguity or to reasonably interpret a latent ambiguity based upon mere arguments that the Government improperly failed to be specific in the contract, this would render the law regarding ambiguities meaningless. See White v. Edsall Constr. Co., 296 F.3d 1081, 1085 (Fed. Cir. 2002).

It appears that Cashman also argues that the Corps either breached the implied duty to cooperate or made misrepresentations by failing to notify Cashman that Cashman's belief that the Corps would produce final acceptance surveys using the average depth was incorrect. As discussed below, Cashman submitted its pre-final acceptance surveys to employees of the Construction Division responsible for administrative contract functions, who were not aware that there were multiple ways to produce acceptance surveys. Def. App. 102-13; 183-84; 189-92. No employee of the Corps who had any familiarity with multibeam survey products knew that

Cashman was proceeding upon an incorrect assumption and failed to inform Cashman.

In the interim, Cashman was producing acceptance surveys using both the average and minimum depths for its own use and internal investigation, and failing to clear multiple acceptance surveys. Def. App. 95-96. However, Cashman did not change its methods, and did not seek formal direction from the Corps until August 31, 2004, when Mr. Galli was verbally informed that acceptance surveys would be produced using the minimum depth. Def. App. 114. Even after August 31, 2004, Cashman continued to produce pre-final acceptance surveys using the average depth until it received a formal response to Mr. Galli's letter. Def. App. 197-200.

The evidence does not establish that the Corps breached the duty to cooperate - rather, it demonstrates that Cashman refused to revise its unreasonable assumptions and make reasonable efforts to determine how it should meet the required objective of a $35 million dredging contract.

A. Legal Standards

The implied duty to cooperate and not to hinder performance are subspecies of the duty of good faith and fair dealing. Precision Pine & Timber v. United States, 50 Fed. Cl. 35, 58-59 (2001) ("The implied duty to cooperate and the implied duty not to hinder performance of contracts (both being subspecies of the implied duty of good faith) are present in all government contracts."); Walter Dawgie Ski Corp. v. United States, 30 Fed. Cl. 115, 130 (1993) ("Specifically, . . . the singular duty [of good faith] implicates the disparate aspects of the duty to cooperate and the duty not to hinder performance."). The obligation of good faith and fair dealing is an implied covenant in every contract, which imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.

Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 160 (2006); S. Cal. Edison v. United States, 58 Fed. Cl. 313, 325 (2003).

To prove a claim based on the Government's breach of its implied obligation of good faith and fair dealing, the contractor must rebut a "presumption of regularity . . . that public officers perform their duties correctly, fairly, in good faith and in accordance with law and governing regulations." Short Bros., PLC v. United States, 65 Fed. Cl. 695, 799 (2005). In order to demonstrate that the Government breached its duty of good faith, a plaintiff must allege and prove specific acts of bad faith on the part of the Government. Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004); Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002); North Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 187-88 (2007) Torncello v. United States, 681 F.2d 756, 771 (Ct. Cl. 1982); cf., Tecom, Inc. v. United States, 66 Fed. Cl. 736, 757-72 (2005). Plaintiff's burden of proof is "intended to be very difficult," requiring proof that the Government intended to injure plaintiff. Am-Pro Protective Agency, Inc., 281 F.3d at 1240; Avtel Servs. v. United States, 70 Fed. Cl. 173, 222 (2005); Sys. Fuels, Inc. v. United States, 66 Fed. Cl. 722, 735 (2005).

B. The Corps Did Not "Hide" The Product That It Would Use To Produce Acceptance Surveys From Cashman

Cashman argues that the Corps was "secretly" producing its acceptance surveys using the minimum depth, insinuating that the Corps was trying to hide its acceptance survey product from Cashman for some unknown reason. See Pl. Mot. at 14, See also Pl. Mot. at 20. As a practical matter, this makes no sense, as the Corps would have no reason to want the project to take longer

than necessary, or desire to continuously perform final acceptance surveys on the same sub-areas of the project until they were finally dredged to grade. There is no evidence that the Corps had any animus towards Cashman, or wanted to hide information from Cashman.[12]

The Corps believed that it was understood that acceptance surveys would be produced using the minimum depth, and payment surveys would be produced using the average depth. See Def. App. 82-83; 166-67. The Corps also believed that it was understood that acceptance surveys would be produced using the minimum depth, in light of the nature of the hard bottom new work dredging to be performed under the contract, EM 1110-2-1003, and EC 1130-2-210. Def. App. 82-83; 166-67. Furthermore, Cashman's contract was the eighth and final contract of KVK Phase II to be awarded. Def. App. 13. The basic language of the KVK 8 contract was not changed from the earlier KVK Phase II contracts. Def. App. 13; 44-48. There is no indication that any of the other contractors assumed that the Corps would produce final acceptance surveys using a method other than the minimum depth, or encountered any confusion. Def. App. 167. Therefore, the Corps assumed that Cashman understood this as well.

Although the Corps' assumption ultimately proved to be incorrect, it does not evidence that the Corps sought to withhold information from Cashman, acted so as to destroy Cashman's reasonable expectations, or failed to discharge its duties in good faith. Furthermore, the fact that the Corps found high spots on areas that Cashman believed were dredged to the contractually required depth was not something unusual, or which should have indicated to the Corps that

[12] In fact, according to the contract, after two final acceptance survey attempts for any sub-area of the KVK 8 contract, the Corps was to charge Cashman $8,200 for each additional final acceptance survey. See Def. App. 130. The Corps has never sought to charge Cashman for any final acceptance surveys, although it could have done so, demonstrating that the Corps has no animus towards Cashman or desire to harm Cashman.

Cashman was proceeding under an incorrect assumption. It is fairly common for the Corps' acceptance surveys to find some high spots in areas that contractors believe have been dredged to grade, based upon a variety of different factors, including the way that survey equipment is mounted on the survey boat, the quality of the survey equipment used, and differences in conditions on days that surveys are performed. Def. App. 159; 184-86; 188.

The same is true of Cashman's argument that it "clearly notified the Corps of the method that it was using" on its pre-final acceptance surveys, and the Corps did not "take any exception to Cashman's use of the average depth method." Pl. Memo. at 20. It was not the policy of the New York District for the Survey Section to receive the contractor's pre-final acceptance surveys, and the Survey Section did not receive Cashman's pre-final acceptance surveys. Def. App. 99-101. The pre-final acceptance surveys were furnished to Mark Alton, a project engineer in the Construction Division, who let the Survey Section know that the contractor believed that it was ready for an acceptance survey. Def. App. 99-101. The Survey Section did not need to receive Cashman's pre-final acceptance surveys, because Corps surveys were used for final acceptance, not Cashman's surveys. Def. App. 130.

Mr. Alton was responsible for administrative functions and quality assurance, had no training in multibeam surveys, and did not know that there were multiple ways to produce them. Def. App. 102-06. If the pre-final survey submitted by Cashman appeared to be a blank piece of paper showing no high spots above the contractually required project depth, Mr. Alton would simply call the Survey Section and represent that Cashman was ready for a final acceptance survey. Def. App. 100. Mr. Alton could not correct Cashman's assumption, because he did not know that there were multiple ways to produce surveys, nor did he give Cashman any reason to

believe that he did.

The same is true of Cashman's argument that the Corps somehow "tricked" Cashman in accepting the first sub-area of the contract as being dredged to the required depth "based on the average depth method." Pl. Memo. at 20. The Corps did not accept any sub-areas of the contract as being dredged to the contractually required depth based on surveys produced using the average depth. Def. App. 237 (Declaration of William McDonald ¶ 10). The Corps produced all of its acceptance surveys for the KVK 8 contract using the minimum depth. Def. App. 123; 167. Cashman produced its pre-final acceptance survey for sub-area 1 of the contract as an average depth survey product, but the Corps did not accept the work based upon Cashman's survey, because the Corps' surveys are used for final acceptance, not the contractor's. Def. App. 130. The area was only accepted because it was dredged to the required depth of 47 feet based upon the Corps' survey produced using the minimum depth. The Corps did not change its standard, or accept the area to mislead Cashman.

Furthermore, the Corps certainly did not hide the fact that many of the Corps' final acceptance surveys were finding high spots above the contractually required depth. Instead, the Corps provided Cashman with survey data showing the high spots. DPFUF ¶ 76. As a result of its inability to achieve the contractually required depth, as determined by Corps acceptance surveys, Cashman began an investigation, which determined that surveys produced using the minimum depth would be more likely to show high spots above the contractually required depth than surveys produced using the average depth method. Def. App. 95-96. In addition, throughout the project, Cashman produced surveys for its own internal use using the minimum depth to compare the difference between the average and minimum depth survey products. Def.

App. 89-91. Despite these investigations, Cashman did not change its course of action.

It was Cashman's responsibility to ensure that it had an adequate system in place to produce an end product that complied with the contract objectives, not the Corps' responsibility to ensure that Cashman did. See Def. App. 75. It is not appropriate for Cashman to shift responsibility for its failure to do so unto the Corps.

C. The Corps Did Not "Hide" Representatives of the Survey Section From Cashman

Cashman insinuates that the Corps' Survey Section ordinarily made a presentation at pre-construction conferences for the KVK Phase II contracts explaining exactly how the Corps would produce its final acceptance surveys, but did not do so for Cashman on the KVK 8 contract, depriving Cashman of a benefit that other contractors received. Pl. Memo. at 18; PFOUF 32. This is completely inaccurate. Defendant agrees that no representative of the survey section attended the pre-construction conference for KVK 8. However, Mr. William McDonald, a Cartographic Technician with the Survey Section at the time of the KVK Phase II contracts, testified that the Survey Section did not make presentations at the pre-construction conferences for the KVK Phase II projects, and were simply present to meet the contractor, and to answer questions regarding surveys if the contractor raised them. Def. App. 86; 233-34 (Declaration of William McDonald ¶ 4); If there were no questions, the Survey Section would not make any presentation. Id.

Furthermore, Mr. McDonald attended most of the pre-construction conferences for the KVK Phase II projects, and does not recall any contractor asking him about the survey produce that would be used for final acceptance surveys. Def. App. 86; 233-34 (Declaration of William McDonald ¶ 4); Mr. Kiss, the former Chief of the Survey Section, testified that the type of

survey products that the Corps would use for payment and acceptance surveys were generally not discussed at the preconstruction conferences for KVK Phase II. Def. App. 87.

Cashman also complains that the Survey Section did not hold a subsequent meeting to explain the method that the Corps would use to produce multibeam acceptance surveys to Cashman. Pl. Memo. at 18. However, Cashman did not request a meeting with the Survey Section, and additional meetings between contractors and the Survey Section were not held "uniformly or routinely." Def. App. 183.

The Corps absolutely did not refuse to make the Survey Section available to answer questions. Cashman was welcome to and could have contacted the Survey Section any time. Although Mr. McDonald was not present at the pre-construction conference for KVK 8, he attended a KVK 8 partnering meeting with representatives of Cashman, which was held a mere 11 days later. Def. App. 228; 232 (Declaration of William McDonald ¶ 3). At this meeting, Mr. McDonald met Mr. Dick, Cashman's Dredging Project Manager, and Mr. Dick could have asked Mr. McDonald any questions about surveys that he wanted at that time. Def. App. 88.

Mr. Galli also testified that representatives from the Survey Section occasionally attended partnering meetings throughout the KVK 8 contract. Def. App. 96. Furthermore, Mr. Dick testified that he was able to contact Richard Kiss, the Chief of the Survey Section, to ask him other types of questions regarding multibeam surveys during contract performance. Def App. 89. In addition, although the contract provided that Cashman could accompany the Corps' surveyors when the Corps conducted its acceptance surveys, Cashman did not pursue this option. Def. App. 130; 180; 187. There is simply no evidence that the Corps withheld the Survey Section from Cashman, making it impossible for Cashman to determine how final acceptance surveys

would be produced.

D. Cashman Failed To Make The Required Contract Sumbittals Regarding Its Proposed Method For Submitting Pre-Final Acceptance Surveys

Throughout its brief, Cashman blames the Corps for not noticing that Cashman was processing its pre-final acceptance surveys using the average depth method. However, the contract required Cashman to formally submit the proposed method for performing its pre-final acceptance surveys to the Corps for approval. See Def. App. 130. Mr. Wood testified that he "believed" that Cashman had submitted its proposed method for performing pre-final acceptance surveys to the Corps for approval. Def. App. 170-71. However, the Corps has no record of receiving a proposed method for performing pre-final acceptance surveys from Cashman. It is not in the contract files for KVK 8, it is not listed on the submittal register for KVK 8, and it has not been produced by Cashman through discovery. Def. App. 224-26; 241 (Declaration of Salvatore J. DiDato ¶ 7). Cashman's confusion could have been easily corrected through Cashman's compliance with the required contract submitals.

E. Mr. Galli's Testimony Indicates That Cashman Unreasonably Delayed In Seeking Formal Direction

Mr. Galli testified that after Cashman had failed a number of final acceptance surveys, he asked Administrative Contracting Officer Ronald Conetta what method the Corps was using to process final acceptance surveys. Def. App. 92. Mr. Galli also testified that Mr. Conetta advised him to write a letter seeking formal direction, because Mr. Conetta did not know the answer. Def. App. 92. Mr. Conetta does not recall this conversation. Def. App. 112.

Mr. Conetta was an administrative contracting officer whose function was to administer the KVK 8 contract. Def. App. 192. He had no experience with dredging prior to the KVK Phase

II contracts, no knowledge of which method would be used to produce final acceptance surveys, and did not even know that there were multiple ways to produce multibeam surveys. Def. App. 107-113; 189-92. Mr. Galli testified that Mr. Conetta recommended that he draft a letter seeking direction "many times." Def. App. 92.

On August 31, 2004, Mr. Galli finally wrote a letter seeking direction. Apparently, the impetus for the letter was that Mr. Galli was verbally informed on August 31, 2004 that the Corps produced acceptance surveys using the minimum depth. Def. App. 115. However, until the Corps responded by letter on October 1, 2004, Cashman continued to produce pre-final acceptance surveys using the average depth.[13] Def. App. 197-200. Contrary to Cashman's assertions, the Corps did not prevent Cashman from "mitigating its damages." See Pl. Memo. at 8. Rather, Cashman refused to take any steps to do so.[14]

F. Engineering Manuals In Effect At The Time of Contract Award Did Not Prohibit Use Of The Minimum Depth Method To Produce Acceptance Surveys

Cashman further argues that the Corps breached its duty to cooperate because EM 1110-2-1003 "prohibited the use of the minimum depth method for acceptance purposes." Pl. Memo. at 21. Again, it is unclear how the Corps' alleged failure to comply with an engineering manual

---

[13] Although the October 2004 response letter to Mr. Galli was signed by Mr. Conetta as the administrative contracting officer, it was drafted for him, as he did not know about multibeam surveys. Def. App. 193-94.

[14] Furthermore, after Cashman received the Corps' letter of October 2004, the Corps' acceptance surveys continued to find high spots in areas that Cashman's pre-final acceptance surveys had indicated were dredged to grade. Def. App. 143-48; 195-96. Mr. Wood testified that this "happened from the beginning of the job until the end of the job." Def. App. 195-96. Mr. Wood also testified that Cashman would not submit an area to the Corps to conduct a final acceptance survey unless Cashman believed that it was clear. Def. App. 195. This clearly indicates that Cashman's difficulties extended beyond a misunderstanding regarding the method that the Corps would use to produce acceptance surveys.

that Cashman contends was "not part of the contract" could constitute a breach of the duty to cooperate. If the manual was not part of the contract, any failure to comply with it would necessarily not "interfer[e] with the plaintiffs' enjoyment of the benefits contemplated by the contract, which is among the core functions served by the implied covenant of good faith and fair dealing." Centex Corp. v. United States, 395 F.3d 1283, 1306 (Fed. Cir. 2005).

Furthermore, EM 1110-2-1003 did not prohibit the use of the minimum depth method for producing acceptance surveys. During his deposition, Mr. Wood testified that Paragraph 11-12(c) of EM 1110-2-1003 (January 1, 2002), entitled "Shoal biased or minimum depth," prohibited the Corps from using the minimum depth method to produce acceptance surveys because it states that "such biased depths shall not be used for dredging payment surveys, and shall be used with caution on navigation project condition surveys." Pl. App. 56-57. However, navigation project condition surveys are not acceptance surveys, and were not at issue in Cashman's contract. Def. App. 122. Payment surveys are also not acceptance surveys, and acceptance surveys were produced using the average depth, not the minimum. Def. App. 122. Therefore, paragraph 11-12(c) did not prohibit the Corps from producing acceptance surveys using the minimum depth method.

In fact, paragraph 11-12(c) provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes." Def. App. 52. This is precisely the purpose of an acceptance survey - to detect whether there are shoals above the required depth. In addition, paragraph 11-12(c) also provides that "[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. This sentence makes it clear that acceptance surveys

can be produced using the minimum depth to determine that there are no shoals above grade, provided that the shoals are assessed based upon multiple hits over successive passes - which is exactly how the Corps performed its surveys. See Def. App. 166.

In support of its argument that Corps Engineering Manuals prohibited use of the minimum depth method of processing multibeam acceptance surveys, Cashman points to Paragraph 11-13 of EM 1110-2-1003, which is entitled "Summary or Multibeam QC and QA Criteria." See PFOUF 65. This paragraph provides:

> When more data than can be plotted or is needed for volume computations, it may optionally be thinned down into rectangular bins (or grids) using standard commercial software routines. The maximum bin size will depend on the application. For dredging measurement, payment, or acceptance, the bin size should be kept as small as possible--typically less than 1 to 5 m is recommended. The shot point depth nearest the bin centroid shall be used; not average or minimum, or shoal-biased depths. Bin size may be increased for smooth, soft bottoms.

Pl. App. 20.

It appears that Cashman contends that this paragraph mandates that the Corps use a method of producing acceptance surveys known as the "shot depth" or "centroid" method, in which a data point closest to the center of a cell is used to determine whether the cell is dredged to the contractually required depth. First, the paragraph cited could not be intended to mandate the use of shot depth surveys nor prohibit the use of the minimum or average depth surveys because preceding sections of the manual discussed circumstances where it would be appropriate to use minimum or average depth surveys. See Def. App. 52. More importantly, the possible relevance of this paragraph is unclear, since Cashman never believed that the centroid method would be used during the contract, and has argued in its motion for summary judgment that it

would be arbitrary to use the centroid method. See Pl. Memo. at 6. Cashman's arguments regarding this paragraph are unrelated to any belief that Cashman held, either at the time of the KVK 8 contract, or at the time of this case.

G. The Corps Was Not Imposing "A More Stringent Tolerance To Determine Whether A Minimum Depth Survey Had Passed," Or Utilizing A "New Acceptance Criteria"

Cashman also argues that because a new version of EM 1110-2-1003 was issued in April 2004 that included a chart specifying that for hard bottom materials, acceptance surveys should be produced using the minimum depth, the Corps improperly adopted a new standard for its work under the contract in advance of the issuance of the new version of EM 1110-2-1003. See Pl. Memo. 22. As discussed supra at pages 28-29, the Corps did not adopt a "new" standard or acceptance criteria. Rather, the minimum depth was always used for acceptance surveys for hard bottom material. Although defendant agrees that the chart in the April 2004 version of EM 1110-2-1003 states this more explicitly than the earlier version, it did not change the method that the Corps had always used.

Furthermore, Cashman erroneously contends that Mr. Kiss testified that the New York District imposed "more stringent criteria" upon contractors than other districts of the Corps. Mr. Kiss did not testify that the Corps was imposing more stringent acceptance criteria upon dredging contractors, much less Cashman. Rather, Mr. Kiss testified that the Corps performed more stringent quality control procedures of its own surveys than EM 1110-2-1003, 1 January 2002 required, to ensure that the results were accurate and reproducible. Def. App. 117-18. Cashman's characterization of Mr. Kiss' testimony is completely inaccurate. Furthermore, EM 1110-2-1003, 1 January 2002, Table 3-1, clearly identifies the accuracy standards for Corps

surveys as "minimum performance standards." Def. App. 131.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court grant defendant's cross-motion for summary judgment, and deny Cashman's motion for summary judgment.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Tara Kilfoyle
TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972

OF COUNSEL:
Donald M. Harris
Counsel
U.S. Army Engineer District
New York

January 31, 2008

CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2008, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Tara J. Kilfoyle
TARA J. KILFOYLE