IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC., Plaintiff, | ) | |
| v. | ) | No. 06-101C (Judge Allegra) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERED FACT

Pursuant to Rule 56 of the Rules of Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits these proposed findings of uncontroverted fact in support of defendant's cross-motion for summary judgment.

1. The Port of New York and New Jersey (the "port") is the third largest port in the nation, and the largest port on the East Coast. See Natural Res. Def. Council v. United States Army Corps of Eng'rs, 399 F. Supp. 2d 386, 391 (S.D.N.Y. 2005); Pl. App. 4.[1] Billions of dollars worth of cargo pass through the port on an annual basis. Id.

2. Beginning in 1986, Congress authorized the Corps to undertake a number of projects to deepen the navigational channels in the New York and New Jersey Harbor to meet industry demand for larger and deeper-bottomed cargo vessels to use the channels. See Natural Res. Def. Council v. United States Army Corps of Eng'rs, 399 F. Supp. 2d at 391;

[1] "Pl. App." refers to plaintiff's Appendix in support of Plaintiff's Motion for Partial Summary Judgment.

Pl. App. 3-4; Def. App. 1-2.[2]

3. As part of this effort, the New York District of the Corps embarked upon the Kill Van Kull and Newark Bay Navigation Improvement Project (the "KVK project") to deepen the Kill Van Kull and Newark Bay Channels (the "channels"), which form the main artery linking the Ports of Elizabeth and Newark Bay. Pl. App. 4; Def. App. 1-2.

4. Phase I of the KVK project ("KVK Phase I"), which was substantially completed in 1995, involved a series of contracts to lower the depth of the channels to 42 feet[3] below mean low water. Pl. App. 3; Def. App. 77; 127; 153.

5. Phase II of the KVK project ("KVK Phase II"), which was completed between 1999 and 2004, involved a series of contracts to lower the depth of the channels to 47 feet below mean low water. Pl. App. 3; Def. App. 3-4; 77.

6. There are future plans to lower the depth of the channels to 52 feet below mean low water, but the channels are currently authorized for use by vessels as 45-foot channels and will be used as such for a substantial period of time. Pl. App. 4; Def. App. 5-6; 65; 79-80.

---

[2] "DA" refers to defendant's Appendix to its Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment.

[3] The authorized depth of the channels for navigational purposes was 40 feet. See Defendant's Proposed Finding of Uncontroverted Fact No. 8.

7. If the authorized depth of the channel for navigational purposes is 45 feet, a ship with a draft of more than 45 feet should not use the channel. Def. App. 78; 152.

8. For the KVK projects, Corps included a two foot safety factor beyond the authorized depth of the channel for navigational purposes, because the KVK project involved rock and hard material, raising concerns that a vessel could hit the bottom of the channel and be seriously damaged. Pl. App. 13, Def. App. 4; 77.

9. KVK Phase II involved "new work" dredging, meaning deepening projects that involve dredging below the published elevation of the channels at the time that the projects began. Pl. App. 8, Def. App. 7 KVK Phase II also involved the dredging of "hard bottom" materials, such as rock or compacted gravel, till, or heavy clays. See Pl. App. 8, Def. App. 4; 77-78.

10. KVK Phase II was divided into eight separate contracts for eight defined areas of the project. Def. App. 8. These eight contracts were awarded to five different dredging prime contractors, and were awarded and completed on a rolling basis between 1999 and 2004. Def. App. 8-9; Pl. App. 3.

11. Hydrographic multibeam surveys ("multibeam surveys") involve an acoustic survey system that indirectly measures the depth of a channel. A sonar system transmits a fan of

acoustic signals into the water to create a sounding. Def. App. 235 (Declaration of William McDonald ¶ 6); Def. App. 49-51. When the signals hit the seabed, or an object under water, energy is created that returns to the multibeam system. Def. App. 49-51; Def. App. 235 (Declaration of William McDonald ¶ 6). The multibeam system records the time that it takes for the acoustic signals to travel to the seafloor (or underwater object) and back to the system. Def. App. 51; 235 (Declaration of William McDonald ¶ 6); This information can be used to calculate the depth to the seafloor or underwater object. Def. App. 51; 235 (Declaration of William McDonald ¶ 6).

12. After data is recorded by the multibeam sonar system, it is edited and processed by computer programs to filter out extraneous data ("noise"). Def. App. 52; 235 (Declaration of William McDonald ¶ 7).

13. There are a number of survey products that can be produced based upon the edited data. Def. App. 52; 235 (Declaration of William McDonald ¶ 7).

14. Surveys can be produced using the average depth, which averages the survey data points in a three foot by three foot "bin" or "cell" of a designated area of the contract. Def. App. 120-21; 235 (Declaration of William McDonald ¶ 7).

15. Surveys can also be produced using the minimum depth or "shoalest" depth, which represents whether the shallowest data points in a three foot by three foot cell are above

the contractually required depth. Def. App. 52; 120-21; 235 (Declaration of William McDonald ¶ 7). If at least three data points within a three foot by three foot cell are confirmed to be high spots above the contractually required depth, the cell is not at the contractually required depth. Def. App. 58-58; Def. App. 235 (Declaration of William McDonald ¶ 7).

16. Surveys produced using the average depth may "smooth out" or hide objects above the contractually required depth, making it difficult to detect them. Def. App. 52 ("The average depth over the series can overly smooth the data . . . ."); 164.

17. If the average depth of a cell is 47 feet, there may be points higher than 47 feet in the cell. See Def. App. 52; 164.

18. Prior to multibeam surveys, the Corps accepted new work hard bottom dredging projects by ensuring that the contractually required depth was the minimum depth of an acceptance area. Def. App. 59-60; Def. App. 234 (Declaration of William McDonald ¶ 5).

19. The Corps used this method of acceptance for new work hard bottom dredging as far back as the 1880's, when acceptance was determined by means of a "bar drag." Def. App. 59-60. A bar was placed in the water at a certain grade, and moved along. Def. App. 59-60. If the bar hit a shoal above the contractually required depth, it would be moved up until it

cleared the obstruction, the elevation of the shoal would be recorded, and the Corps would require that it be removed. Def. App. 59-60.

20. A ship using the channel would want to know the minimum depth of any three foot by three foot area of the channel, rather than the average depth. Def. App. 60-62. If a ship were to hit a pinnacle above grade in materials such as rock or heavy clays, it could seriously damage the vessel, resulting in significant liability for the Corps. Def. App. 60-62; 231 (Declaration of James Thomas ¶ 6).

21. The National Oceanic and Atmospheric Association ("NOAA") creates and maintains nautical charts and related hydrographic information to ensure safe navigation of maritime commerce. Def. App. 149-50. To produce the nation's nautical charts and ensure safe navigation in United States waters and Exclusive Economic Zone, NOAA's Office of Coast Survey ("OCS") conducts hydrographic surveys to measure the depth and bottom configuration of water bodies. Def. App. 150. In collecting hydrographic data, OCS pays "particular attention" to acquiring the "precise location of least (shoalest) depths on dangers to navigation and depths significant to surface navigation." Def. App. 150.

22. Dredging contractors for the KVK Phase II projects recognized that navigational hazards were of concern for the Corps, and that the Corps would be applying a high level of scrutiny to ensure that there were no pinnacles above grade. Def. App. 231 (Declaration

of James Thomas ¶¶ 5-6).

23. During KVK Phase I of the project, a ship had hit a pinnacle, resulting in "a million dollar problem" for the Corps. Def. App. 60.

24. The Corps was concerned that because ships would be aware that the actual depth of the channels was 47 feet below mean low water, they would try to take advantage of the two feet beyond the authorized depth for navigational purposes. Def. App. 15; 63; 153-54.

25. In addition, having pinnacles above 47 feet below mean low water would necessarily cause difficulties with the Corps's maintenance dredging contractors, who are responsible for ensuring that the area remains at a depth of 47 feet below mean low water, but not responsible for deepening the area to 47 feet below mean low water, or removing hard materials. Def. App. 6; 64-65.

26. On March 23, 2003, Cashman submitted a bid for the KVK 8 contract, the eighth and final contract to be awarded under KVK Phase II. Pl. App. 1-3, Def. App. 13; 40-43. Prior to submitting its bid, Cashman did not make inquiry regarding the method that the Corps would use to produce acceptance surveys, although Cashman knew that there were different ways to produce multibeam surveys, and had performed other contracts where multibeam surveys were used. Def. App. 10-12; Pl. App. 33.

27. Bruce Wood, Cashman's Vice President and the Project Director for the KVK 8 contract, testified that at the time that he prepared Cashman's bid for the KVK 8 contract, he assumed that the Corps would process multibeam acceptance surveys using the average method "[b]ased upon the plans and specs . . . ." Def. App. 155.

28. Prior to KVK 8, Cashman had not been awarded any of the KVK Phase II contracts. However, Cashman had submitted bids for several harbor deepening contracts for the New York District, and had been the apparent low bidder for KVK contract for Area 5, but had requested and was granted permission to withdraw its bid due to a bid error. Def. App. 15-38.

29. Prior to award, Cashman did not contend that the requirement to dredge to a depth of 47 feet was impossible. Def. App. 156.

30. The KVK 8 contract was awarded to Cashman on May 23, 2003. Def. App. 14; 39; Pl. App. 3. The award amount for the KVK 8 contract was $35,460,430. Def. App. 39.

31. The specifications for the KVK 8 contract provided that the awardee would be required to dredge the contractually defined area to a depth of 47 feet below mean low water. Def. App. 14; 71; 74.

32. The specifications for the KVK 8 contract did not require Cashman to use a particular

type of dredging equipment to achieve the contractually required depth. See Def. App. 73; 76. In addition the contract did not direct Cashman how to set the digging system on the dredge to achieve the contractually required depth - the decision was Cashman's. Def. App. 157-58.

33. The specifications further provided that: "If during the dredging or upon completion of the post-dredging surveys and soundings, materials are found above the required depth of 47 feet, below MLW [mean low water], these materials shall be removed immediately at the Contractor's expense." Def. App. 71, 74.

34. Because of inaccuracies in the dredging process, the specifications for the KVK 8 contract provided that the awardee would be compensated at the contract price for "allowable overdepth," defined as material removed up to 1.5 feet beyond the contractually required depth of 47 feet. Def. App. 74; 159-60. Any material removed more than 1.5 feet beyond the contractually required depth was the responsibility of the contractor, and would not be paid for by the Corps. Def. App. 71-74.

35. When preparing Cashman's bid, Mr. Wood assumed that Cashman would need to perform dredging even beyond the paid overdepth to meet the required depth of 47 feet. Def. App. 161.

36. The KVK 8 contract required both Cashman and the Corps to use multibeam surveys for

a number of purposes. Pl. App. 22, Def. App. 68; 242 (Declaration of Salvatore DiDato ¶ 8).

37. The KVK 8 contract required Cashman to perform monthly progress payment surveys, to determine the quantity of material dredged for progress payment purposes. Def. App. 168-69. When Cashman believed that it had reached the contractually required depth, it was required to perform a pre-final acceptance survey to advise the Corps that it believed that the area was ready for final acceptance. Pl. App. 22. The Corps would then perform a final acceptance survey to determine that the work had been dredged to the contractually required depth. Id. The Corps also performed final payment surveys to determine the final quantity of material removed for payment purposes. Def. App. 168-69.

38. In some instances, the Corps' survey data taken from a final acceptance survey could also be used to produce a final payment survey. However, this could only occur if an area was accepted on the first attempt. Def. App. 237 (Declaration of William McDonald ¶ 11).

39. There were three primary types of materials to be dredged under the KVK 8 Contract - softer materials, such as silt, that could not be placed in the Historic Area Remediation Site ("HARS") after removal, hard materials such as glacial till, clay and rock material, that could be placed in the HARS after removal, and rock.[4] Def. App. 70; 162-63.

[4] Though not especially relevant to the pending motions, for informational purposes, the HARS is an area where "cleaner" sediments dredged from the harbor are used to "cap" older materials that have the potential to cause environmentally adverse effects. Def. App. 163. If rock

40. For the material unsuitable for placement in the HARS, the contractor was to perform monthly progress payment surveys. Def. App. 168-69. In addition, the Corps conducted final payment surveys to determine the final quantity of material removed after dredging of the material unsuitable for the HARS in a contractually defined area was complete. Def. App. 69. However, the contractor was not required to perform pre-final acceptance surveys for the material unsuitable for placement in the HARS, and the Corps did not perform acceptance surveys for this material, because all of this material was located above the contractually required depth of 47 feet. See Def. App. 71; 242 (Declaration of Salvatore J. DiDato ¶ 10). The contractor was simply required to dredge this material with an environmental "bucket" until there was no more material to dredge. Def. App. 72-73.

41. For the material that was suitable for placement in the HARS and rock, the contractor also performed monthly progress payment surveys. Def. App. 68-69. In addition, the contractor was required to perform a pre-final acceptance survey to advise the Corps that the contractor believed that the area was ready for final acceptance. Def. App. 130. The Corps would then perform a final acceptance survey to determine whether the work had been dredged to the contractually required depth. Id. After the work had been accepted, the Corps would either perform or produce another survey to determine the final volume

met certain criteria, it would be placed in a reef. Def. App. 162.

that had been dredged for payment purposes.[5] Def. App. 68-69.

42. For all of the KVK Phase II contracts, payment surveys were produced using the average depth, because it provided a more equitable volume calculation for payment purposes. Def. App. 123. Acceptance surveys were produced using the minimum depth, because it ensured that the contractor had achieved the contractually required depth, and there were no high spots or "shoals" that could potentially cause damages to vessels. Def. App. 123; 167.

43. The Corps produced all of its acceptance surveys for the KVK 8 contract using the minimum depth. Def. App. 59-60; 237 (Declaration of William McDonald ¶ 10).

44. Paragraph 1.15 of the Section 0800 of the specifications for the KVK 8 contract, entitled "Final Examination and Acceptance," provided:

> As soon as practicable after the completion of an entire acceptance area a final examination of the work will be conducted by the Contracting Officer at the cost and expense of the Government by acoustic sweep survey system. Should any shoals or lumps or other lack of contract depth be disclosed by this examination the Contractor will be required to remove same. The Contractor or his authorized representative will be notified when soundings or sweepings are to be made and will be permitted to accompany the survey party.

****

[5] In some cases, the same multibeam survey dataset that is used to produce the final acceptance survey can also be used to produce the final payment survey. However, this only occurs when an area is accepted the first time that it is submitted for a final acceptance survey. See Defendant's Proposed Finding of Uncontroverted Fact No. 38.

> The Contractor shall perform pre-final hydrographic sweep surveys of an entire acceptance area to verify the area is satisfactorily completed prior to final examination by the Government. The pre-final surveys shall be performed using a multitrack or multibeam survey system to insure 100% coverage of the entire acceptance area. The proposed method for performing these surveys and all equipment and programs shall be submitted for approval. The Contractor's hydrographic surveys shall meet or·exceed the survey standards listed in EC 1130-2-210 HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys.

Def. App. 130.

45. Paragraph A-2 of Appendix A of EC 1130-2-210, entitled "Revised Survey Classifications," provides:

> Hard Bottom Material and/or New Work. This category of dredge measurement, payment, and acceptance surveys includes dredging of newly authorized projects containing hard bottom material, such as rock or compacted material, or maintenance projects containing hard bottom material. . . . Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7, see also Def. App. 168 (EM 1110-2-1003, 1 January 2002, Paragraph 3.5).

46. EC 1130-2-210 provided that "procedural guidance and accuracy standards for performing multibeam surveys are contained in EM 1110-2-1003." Def. App. 128. EM 1110-2-1003 (1 Jan 02) was a publicly available document, and was referenced in EC 1130-2-210, which the KVK 8 contract stated set forth standards that the contractor should "meet or exceed" for its hydrographic surveys, as a manual containing "[p]rocedural guidance and accuracy standards for performing hydrographic surveys."

See Pl. Memo at 4; Pl. Memo at 6 fn. 2; Pl. Memo at 9; Plaintiff's Proposed Finding of Uncontrovered Fact No. 62; Def. App. 128; 130; see also http://web.archive.org/web/19980529092937/www.usace.army.mil/inet/usace-docs/eng-manuals/em1110-2-1003/toc.htm.

47. The stated purpose of EM 1110-2-1003 is to "provide technical guidance for performing hydrographic surveys." Def. App. 169.

48. EM 1110-2-1003 discussed multiple survey products that could be produced from multibeam survey data. See Def. App. 52.

49. EM 1110-2-1003 paragraph 11-12(c) provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes." Def. App. 52. Paragraph 11-12(c) also provides that "[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52.

50. In performing its surveys, the Corps assessed shoals based upon multiple hits over successive passes. See Def. App. 57-58; 166.

51. The basic language of the specifications for the KVK 8 contract was not changed from the earlier KVK Phase II contracts. Def. App. 13; 44-48.

52. There is no indication that any of the other contractors assumed that the Corps would produce final acceptance surveys using a method other than the minimum depth, or encountered any confusion. Def. App. 167. Therefore, the Corps assumed that Cashman understood this as well. Def. App. 82-83; 166-67.

53. The specifications for the KVK 8 contract provided that it was the contractor's responsibility to ensure that it had an adequate system in place to produce an end product that complied with the contract objectives. See Def. App. 75.

54. The KVK 8 contract required Cashman to formally submit the proposed method for performing its pre-final acceptance surveys to the Corps for approval. See Def. App. 130.

55. Mr. Wood testified that he "believed" that Cashman had submitted its proposed method for performing pre-final acceptance surveys to the Corps for approval. Def. App. 170-71.

56. However, the Corps has no record of Cashman submitting a proposed method for performing pre-final acceptance surveys, or the Corps receiving a proposed method for performing pre-final acceptance surveys from Cashman. Def. App. 224-26; 241 (Declaration of Salvatore J. DiDato ¶ 7).

57. Alex Dick, Cashman's Dredging Project Manager, had no opinion as to the method that

the Corps would use to produce acceptance surveys at the time that he assisted in preparing Cashman's bid for the KVK 8 contract, or at the time that work began under the contract. See Def. App. 172-74.

58. James Galli, Cashman's Project Manager, did not have an opinion as to the method that the Corps would use to produce acceptance surveys at the time that Cashman began work on the project. See Def. App. 175-77.

59. Dan Gaudet, one of Cashman's surveyors for the KVK 8 project, began work on the contract, he had "no clue" what method the Corps would use to produce acceptance surveys at the time that work began on the contract. See Def. App. 93; 178.

60. At the time that Cashman began work on the KVK 8 project, Cashman's Quality Control Manager, Paul Poirier, had no opinion as to the method that the Corps would use to produce multibeam acceptance surveys under the contract. Def. App. 179-80.

61. Dredging equipment and the nature of the material to be removed made it impossible to dredge to an even, neat, uniform line. See Def. App. 81; 159; 181-82.

62. The bucket of a backhoe dredge contains large teeth. Def. App. 227-28.

63. The size of a bucket on a backhoe dredge does not directly relate to whether a cell is

dredged to a uniform depth. Def. App. 232 (Declaration of James Thomas ¶ 7).

64. Either at the time of bid or as work progressed, Cashman's employees decided that the Corps would produce final acceptance surveys using the average depth. Def. App. 58. Therefore, Cashman produced its pre-final acceptance surveys using the average depth. See Def. App. 177.

65. However, Cashman produced surveys for its own internal use using the minimum depth, because Cashman found it useful in determining how deep to set the digging system on the dredge, and to compare the difference between the average and minimum depth survey products. Def. App. 89-91.

66. The Corps believed that Cashman understood that acceptance surveys would be produced using the minimum depth, and payment surveys would be produced using the average depth. See Def. App. 82-83; 164-64; 167.

67. There is no indication that any of the other KVK Phase II contractors assumed that the Corps would produce final acceptance surveys using a method other than the minimum depth, or encountered any confusion. Def. App. 83-83; 167.

68. The Survey Section did not make presentations at the pre-construction conferences for the KVK Phase II projects, and were simply present to meet the contractor, and to answer

questions regarding surveys if the contractor raised them. Def. App. 86; 233-34 (Declaration of William McDonald ¶ 4); If there were no questions, the Survey Branch would not make any presentation. Def. App. 86.

69. The type of survey products that the Corps would use for payment and acceptance surveys were generally not discussed at the preconstruction conferences for KVK Phase II contracts. Def. App. 87, Def. App. 233-34 (Declaration of William McDonald ¶ 4).

70. For the other KVK Phase II contracts, additional meetings between contractors and the Survey Section were not held "uniformly or routinely." Def. App. 183. Representatives from the Survey Section occasionally attended partnering meetings throughout the KVK 8 contract. Def. App. 96.

71. William McDonald, a Cartographic Technician with the Survey Section at the time of the KVK 8 contract, attended a KVK 8 partnering meeting with representatives of Cashman, which was held 11 days after the preconstruction conference. Def. App. 228; 232 (Declaration of William McDonald ¶ 3); Def. App. 88. At this meeting, Mr. McDonald met Mr. Dick, Cashman's Dredging Project Manager. Def. App. 88.

72. Mr. Dick testified that he was able to contact Richard Kiss, the Chief of the Survey Section, to ask him questions regarding multibeam surveys during contract performance. Def App. 89.

73. Although the contract provided that Cashman's employees could accompany the Corps' surveyors when the Corps conducted its acceptance surveys, Cashman did not pursue this option. See Def. App. 96; 130; 180; 187.

74. The KVK 8 contract was divided into a number of sub-areas for acceptance purposes. Answer ¶ 6.

75. As work progressed, on numerous occasions, the Corps' final acceptance surveys showed high spots above the contractually required depth in sub-areas that Cashman's pre-final acceptance surveys indicated had been dredged to grade. Def. App. 132-48.

76. The Corps provided Cashman with survey results showing the high spots. Def. App. 132-48; 243-45.

77. It is fairly common for the Corps' acceptance surveys to find some high spots in areas that contractors believe have been dredged to grade, based upon a variety of different factors**,** including the way that survey equipment is mounted on the survey boat, the quality of the survey equipment used, and differences in conditions on days that surveys are performed. Def. App. 159; 184-86; 188.

78. Cashman began an internal investigation as to why the Corps continued to find high spots

when Cashman believed that areas were clear. Def. App. 95-96. As a result of this investigation, Cashman determined that surveys produced using the minimum depth would be more likely to show high spots above the contractually required depth than surveys produced using the average depth method. Def. App. 95-96.

79. The contract provided that after two final acceptance survey attempts for any sub-area of the KVK 8 contract, the Corps was to charge Cashman $8,200 for each additional final acceptance survey. See Def. App. 130. The Corps has never sought to charge Cashman for any final acceptance surveys, although it could have done so pursuant to the contract.

80. It was not the policy of the New York District for the Survey Section to receive the contractor's pre-final acceptance surveys, and the Survey Section did not receive Cashman's pre-final acceptance surveys. Def. App. 99-101. The Survey Branch did not need to receive Cashman's pre-final acceptance surveys, because Corps surveys were used for final acceptance, not Cashman's surveys. Def. App. 130.

81. Cashman's pre-final acceptance surveys were furnished to Mark Alton, a project engineer in the Construction Branch, who let the Survey Section know that the contractor believed that it was ready for an acceptance survey. Def. App. 99-102; 183-84.

82. Mr. Alton was responsible for administrative functions and quality assurance, had no training in multibeam surveys, and did not know that there were multiple ways to produce

them. Def. App. 102-06. If the pre-final survey submitted by Cashman appeared to be a blank piece of paper showing no high spots above the contractually required project depth, Mr. Alton would simply call the Survey Branch and represent that Cashman was ready for a final acceptance survey. Def. App. 100; 183-84.

83. Mr. Galli testified that he verbally asked Ronald Conetta, the Administrative Contracting Officer, how the Corps was producing its acceptance surveys. Def. App. 92; 192.

84. Mr. Conetta had no experience with dredging prior to the KVK Phase II contracts, no knowledge of which survey products were available for use and in use by the Corps' Survey Section to produce final acceptance surveys, and did not even know that there were multiple ways to produce surveys from multibeam survey data. Def. App. 107-113; 189-92.

85. Mr. Galli testified that Mr. Conetta stated that he did not know, but advised Mr. Galli to write a letter seeking formal direction on the issue "many times." Def. App. 92.

86. On August 31, 2004, Mr. Galli wrote a letter seeking direction. Def. App. 114. The letter stated that Mr. Galli had been verbally informed on August 31, 2004 that the Corps produced acceptance surveys using the minimum depth, and requested confirmation of the acceptance standard that the Corps was using. Def. App. 114.

87. The Corps responded by letter on October 1, 2004, stating that the Corps produced acceptance surveys using the minimum depth. Pl. App. 51-53. The letter was signed by Mr. Conetta, as the Corps' contract correspondence went through him, but he believed that someone else drafted it. Def. App. 193-94.

88. Until receiving the letter, Cashman continued to produce pre-final acceptance surveys using the average depth. Def. App. 197-200.

89. After the October 1, 2004 letter, Cashman began to produce its pre-final acceptance surveys using the minimum depth. Def. App. 97-98. However, the Corps' acceptance surveys continued to find shoals on many areas of the project that Cashman believed had been dredged to the contractually required depth. Def. App. 143-48; 195-96.

90. Mr. Wood testified that this "happened from the beginning of the job until the end of the job." Def. App. 195-96.

91. Cashman completed work on KVK 8 in November 2004. Def. App. 9; Pl. App. 3.

92. On July 22, 2005, Cashman submitted a certified claim under the Contract Disputes Act, requesting $6,538,769 in damages, consisting of $4,430,561 in damages for "Extra Effort to Remove HARS material," and $2,108,208 in damages for "Days Spent Removing Shoaling." Def. App. 201-15; 213.

93. The Contracting Officer, issued a final decision denying Cashman's claim on October 26, 2005. Def. App. 216-23.

94. Mr. Kiss testified that the Corps performed more stringent quality control procedures of its own surveys than EM 1110-2-1003, 1 January 2002 required, to ensure that the results were accurate and reproducible. Def. App. 117-18.

95. EM 1110-2-1003, 1 January 2002**,** Table 3-1, identifies the accuracy standards for Corps surveys as "minimum performance standards." Def. App. 131.

96. Navigation project condition surveys are not acceptance surveys, and were not at issue in Cashman's contract. Def. App. 122. Payment surveys are also not acceptance surveys, and the Corps produced payment surveys using the average depth, not the minimum. Def. App. 123-24.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

OF COUNSEL:
Donald M. Harris
Counsel
U.S. Army Engineer District
New York

s/ Tara Kilfoyle
TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972

January 31, 2008

CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2008, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Tara J. Kilfoyle
TARA J. KILFOYLE