No. 06-101C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JAY CASHMAN, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# APPENDIX IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972

OF COUNSEL:
Donald M. Harris
Counsel
U.S. Army Engineer District
New York

January 31, 2008

# INDEX TO DEFENDANT'S APPENDIX


| Description | Page |
|---|---|
| Description of Harbor Navigation, from United States Army Corps of Engineers, New York District Website, http://www.nan.usace.army.mil/harbor/deep.htm | 1 |
| April 1997 Limited Reevaluation Report and Final Environmental Assessment and Finding of No Significant Impact, Kill Van Kull - Newark Bay Channels Phase II Deepening Project, Cover and page 23 | 3 |
| August 15, 2007 Deposition of Harold Hawkins, pages 55-56 | 5 |
| Engineering Circular EC 1130-2-210, 1 October 1998, Appendix A page A-1 | 7 |
| Map of Kill Van Kull Contract Dredging Areas, from United States Army Corps of Engineers, New York District Website, http://www.nan.usace.army.mil/harbor/maps/graphics/kvkl.jpg | 8 |
| Kill Van Kull and Newark Bay Award and Completion Schedule, created by United States Army Corps of Engineers, New York District, last updated by Harold Hawkins on February 1, 2006 | 9 |
| August 6, 2007 Deposition of William Bruce Wood, page 53 | 10 |
| August 10, 2007 Deposition of John James Galli, pages 15-16 | 11 |
| August 15, 2007 Deposition of Harold Hawkins, page 13 | 13 |
| Solicitation, Offer and Award for Solicitation DACW51-03-B-0004-0005 | 14 |
| Abstract of Offers and Preliminary Bid Report for Solicitation DACW51-01-B-0024 | 15 |
| Abstract of Offers for Solicitation DACW51-00-B-0006 | 20 |
| Abstract of Offers and Bid Report for Solicitation DACW51-00-B-0011 | 22 |
| Preliminary Bid Report for Solicitation DACW51-01-B-0003 | 27 |

| Description | Page |
| --- | --- |
| Abstract of Offers and Preliminary Bid Report for Solicitation DACW51-00-B-0008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
| Abstract of Offers for Solicitation DACW51-03-B-0001 . . . . . . . . . . . . . . . . . . . . . . . . . | 33 |
| June 15, 2001 E-mail from Lisa Kraus, Subject: DACW51-01-B-0063, KVK Contract 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 |
| Contract Award Information for Solicitation DACW51-03-B-0004 . . . . . . . . . . . . . . . . . . . | 39 |
| Abstract of Offers for Solicitation DACW51-03-B-0004 . . . . . . . . . . . . . . . . . . . . . . . . . | 40 |
| August 14, 2007 Deposition of Michael Rovi, pages 10-11 . . . . . . . . . . . . . . . . . . . . . . . . | 44 |
| August 15, 2007 Deposition of Steven Weinberg, pages 10-12 . . . . . . . . . . . . . . . . . . . . . | 46 |
| Engineering Manual EM 1130-2-210, 1 January 2002, pages 11-1 through 11-3 . . . . . . . | 49 |
| Engineering Manual EM 1130-2-210, 1 January 2002, pages 11-29 through 11-33 . . . . . | 52 |
| August 14, 2007 Deposition of Richard Kiss, pages 62-63 .. . . . . . . . . . . . . . . . . . . . . . | 57 |
| August 14, 2007 Deposition of Richard Kiss, page 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 59 |
| August 15, 2007 Deposition of Harold Hawkins, page 30 . . . . . . .. . . . . . . . . . . . . . . . . . | 60 |
| August 14, 2007 Deposition of Richard Kiss, page 31 . . . . . . . . . . . . . . . . . . . . . . . . . | 61 |
| August 15, 2007 Deposition of Harold Hawkins, page 41 . . . . . . . . . . . . . . . . . . . . . . | 62 |
| August 16, 2007 Deposition of Ronald Conetta, page 41. . . . . . . . . . . . . . . . . . . . . . . . . | 63 |
| August 14, 2007 Deposition of Richard Kiss, page 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 64 |
| August 15, 2007 Deposition of Harold Hawkins, page 56 . . . . . . . . . . . . . . . . . . . . . . . . | 65 |
| Contract DACW51-03-C-0014, Section 800, Paragraph 1.24 . . . . . . . . . . . . . . . . . . . . . | 66 |

| Description | Page |
| --- | --- |
| Contract DACW51-03-C-0014, Section 800, Paragraph 1.44 | 69 |
| Contract DACW51-03-C-0014, page 7 of 72 | 70 |
| Contract DACW51-03-C-0014, Section 2900, page 4 | 71 |
| Contract DACW51-03-C-0014, Section 2900, pages 10 -11 | 72 |
| Contract DACW51-03-C-0014, Section 2900, page 3 | 74 |
| Contract DACW51-03-C-0014, Section 0451-1, page 1 | 75 |
| Contract DACW51-03-C-0014, Section 2900, page 2 | 76 |
| August 15, 2007 Deposition of Harold Hawkins, page 44 | 77 |
| August 14, 2007 Deposition of Michael Rovi, page 8 | 80 |
| August 15, 2007 Deposition of Harold Hawkins, page 53 | 81 |
| August 15, 2007 Deposition of Steven Weinberg, pages 25-26 | 82 |
| August 15, 2007 Deposition of Steven Weinberg, pages 14-15 | 84 |
| August 14, 2007 Deposition of William McDonald, page 12 | 86 |
| August 14, 2007 Deposition of Richard Kiss, page 58 | 87 |
| August 7, 2007 Deposition of Alex Dick, page 29 | 88 |
| August 7, 2007 Deposition of Alex Dick, pages 32-34 | 89 |
| August 10, 2007 Deposition of John James Galli, page 21 | 92 |
| August 7, 2007 Deposition of Dan Gaudet, page 8 | 93 |
| August 7, 2007 Deposition of Dan Gaudet, page 19 | 94 |
| August 10, 2007 Deposition of John James Galli, pages 38-39 | 95 |

Description Page

October 9, 2004 Letter from James Galli to
Ronald Conetta .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

August 14, 2007 Deposition of William McDonald, page 20 . . . . . . . . . . . . . . . . . . . . . . . 99

August 16, 2007 Deposition of Mark Alton, pages 12-13 . . . . . . . . . . . . . . . . . . . . . . . . . 100

August 16, 2007 Deposition of Mark Alton, pages 8-10 . . . . . . . . . . . . . . . . . . . . . . . . . 102

August 16, 2007 Deposition of Mark Alton, pages 28-29 . . . . . . . . . . . . . . . . . . . . . . . . 105

August 16, 2007 Deposition of Ronald Conetta, pages 21-24 . . . . . . . . . . . . . . . . . . . . . 107

August 16, 2007 Deposition of Ronald Conetta, pages 31-32. . . . . . . . . . . . . . . . . . . . . 111

August 16, 2007 Deposition of Ronald Conetta, page 61. . . . . . . . . . . . . . . . . . . . . . . . . 113

August 31, 2004 Letter from James Galli to
Ronald Conetta . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

August 14, 2007 Deposition of Richard Kiss, pages 65-66 . . . . . . . . . . . . . . . . . . . . . . . 117

August 6, 2007 Deposition of William Bruce Wood, page 12-14 . . . . . . . . . . . . . . . . . . 119

August 6, 2007 Deposition of William Bruce Wood, page 59 . . . . . . . . . . . . . . . . . . . . . 122

August 14, 2007 Deposition of Richard Kiss, page 15. . . . . . . . . . . . . . . . . . . . . . . . . . 123

August 14, 2007 Deposition of Michael Rovi, page 23 . . . . . . . . . . . . . . . . . . . . . . . . . 124

Engineering Regulation ER 1110-2-1150, 31 August 1999, pages 22-23 . . . . . . . . . . . . 125

Engineering Manual EM 1130-2-210, 1 January 2002, page 14-6 . . . . . . . . . . . . . . . . . 127

Engineering Circular EC 1130-2-210, 1 October 1998, cover page. . . . . . . . . . . . . . . . . 128

Engineering Manual EM 1130-2-210, 1 January 2002, pages 11-28 . . . . . . . . . . . . . . . . . 129

Contract DACW51-03-C-0014, Section 800, Paragraph 1.15 . . . . . . . . . . . . . . . . . . . . . 130

Description — Page

Engineering Manual EM 1130-2-210, 1 January 2002, page 3-1 . . . . . . . . . . . . . . . . . . . 131

June 22, 2004 letter from Ronald Conetta to Jay Cashman, Inc. . . . . . . . . . . . . . . . . . . 132

August 11, 2004 letter from Ronald Conetta to Jay Cashman, Inc. . . . . . . . . . . . . . . . 133

August 18, 2004 letter from Ronald Conetta to Jay Cashman, Inc. . . . . . . . . . . . . . . . . . . 135

August 19, 2004 letter from Ronald Conetta to Jay Cashman, Inc. . . . . . . . . . . . . . . . . 137

August 30, 2004 letter from Ronald Conetta to Jay Cashman, Inc. . . . . . . . . . . . . . . . 139

September 20, 2004 letter from Ronald Conetta to Jay Cashman, Inc. . . . . . . . . . . . . . . 141

October 28, 2004 letter from Ronald Conetta to Jay Cashman, Inc. . . . . . . . . . . . . . . . . 143

November 9, 2004 letter from Ronald Conetta to Jay Cashman, Inc. . . . . . . . . . . . . . . . . 145

November 15, 2004 letter from Ronald Conetta to Jay Cashman, Inc. . . . . . . . . . . . . . . . 149

National Oceanic and Atmospheric Association's Office of Coast Surveys Activity, from website at http://oceanservice.noaa.gov/topics/navops/marinenav/welcome.html. . . . . . . . . . . . . . 150

August 14, 2007 Deposition of Richard Kiss, page 34 . . . . . . . . . . . . . . . . . . . . . . . . . . 152

August 16, 2007 Deposition of Ronald Conetta, pages 38-39. . . . . . . . . . . . . . . . . . . . . . 153

August 6, 2007 Deposition of William Bruce Wood, page 25 . . . . . . . . . . . . . . . . . . . . . . 155

August 15, 2007 Deposition of Harold Hawkins, page 54 . . . . . . . . . . . . . . . . . . . . . . . . . 156

August 6, 2007 Deposition of William Bruce Wood, pages 22-23 . . . . . . . . . . . . . . . . . . 157

August 16, 2007 Deposition of Ronald Conetta, pages 42-43. . . . . . . . . . . . . . . . . . . . . . . 159

August 6, 2007 Deposition of William Bruce Wood, page 26. . . . . . . . . . . . . . . . . . . . . . 161

Contract DACW51-03-C-0014, Section 2900, pages 14 . . . . . . . . . . . . . . . . . . . . . . . . . 162

| Description | Page |
|---|---|
| Description of Historic Area Remediation Site, from United States Army Corps of Engineers, New York District Website, http://www.nan.usace.army.mil/business/prjlinks/dmmp/benefic/hars.htm. . . . . . . . . . | 163 |
| August 15, 2007 Deposition of Steven Weinberg, pages 21-23. . . . . . . . . . . . . . . . . . . . | 164 |
| August 15, 2007 Deposition of Harold Hawkins, page 28 . . . . . . . . . . . . . . . . . . . . . . . . | 167 |
| Engineering Manual EM 1130-2-210, 1 January 2002, page 13-3 . . . . . . . . . . . . . . . . . . | 168 |
| Engineering Manual EM 1130-2-210, 1 January 2002, page 1-1. . . . . . . . . . . . . . . . . . | 169 |
| August 6, 2007 Deposition of William Bruce Wood, pages 54-55. . . . . . . . . . . . . . . . . . | 170 |
| First page of Cashman Constructors Resume for Alex Dick . . . . . . . . . . . . . . . . . . . . . | 172 |
| August 7, 2007 Deposition of Alex Dick, pages 24 and 26 . . . . . . . . . . . . . . . . . . . . . . . | 173 |
| August 10, 2007 Deposition of John James Galli, pages 11, 28, 29. . . . . . . . . . . . . . . . . . | 175 |
| August 7, 2007 Deposition of Dan Gaudet, page 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 178 |
| August 6, 2007 Deposition of Paul Poirier, pages 8,14 . . . . . . . . . . . . . . . . . . . . . . . . . | 179 |
| August 10, 2007 Deposition of John James Galli, pages 46-47 . . .. . . . . . . . . . . . . . . . . . | 181 |
| August 16, 2007 Deposition of Ronald Conetta, page 16-18 . . . . . . . . . . . . . . . . . . . . . . | 183 |
| August 15, 2007 Deposition of Harold Hawkins, page 35. . . . . . . . . . . . . . . . . . . . . . . . | 186 |
| August 10, 2007 Deposition of John James Galli, pages 42-43. . . . . . . . . . . . . . . . . . . . | 187 |
| August 16, 2007 Deposition of Ronald Conetta, pages 10-12 . . . . . . . . . . . . . . . . . . . . | 189 |
| Letter from Major Freeman to Jay Cashman Inc., received May 27, 2003 . . . . . . . . . . . . . | 192 |
| August 16, 2007 Deposition of Ronald Conetta, page 64 . . . . . . . . . . . . . . . . . . . . . . . . | 193 |
| Fax Cover Sheet from Salvatore DiDato to Richard Kiss, dated August 31, 2004 . . . . . . | 194 |

Description — Page

August 6, 2007 Deposition of William Bruce Wood, pages 39-40 . . . . . . . . . . . . . . . . . . 195

September 3, 2004 letter from James Galli to Ron Conetta . . . . . . . . . . . . . . . . . . . . . . 197

September 4, 2004 letter from James Galli to Ron Conetta . . . . . . . . . . . . . . . . . . . . . . 198

September 5, 2004 letter from James Galli to Ron Conetta . . . . . . . . . . . . . . . . . . . . . . 199

September 20, 2004 letter from James Galli to Ron Conetta . . . . . . . . . . . . . . . . . . . . . . 200

July 22, 2005 Certified Claim from Jay Cashman, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . 201

October 26, 2005 Contracting Officer's Decision Denying
July 22, 2005 Certified Claim from Jay Cashman, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . 216

KVK 8 Submittal Register . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Photograph of Backhoe Dredge from United States Army
Corps of Engineers, New York District Website,
http://www.nan.usace.army.mil/harbor/nav/graphics/photo3l.jpg . . . . . . . . . . . . . . . . . . . 227

Photograph of Backhoe Dredge from United States Army
Corps of Engineers, New York District Website,
http://www.nan.usace.army.mil/harbor/nav/graphics/photo8l.jpg . . . . . . . . . . . . . . . . . . 228

KVK 8 Partnering Charter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Declaration of James Thomas . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

Declaration of William McDonald . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Declaration of Salvatore DiDato . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

Sections of Corps Final Acceptance Surveys for KVK 8
Sub-Area 5, Survey Conducted August 5, 2004
(oversized documents, relevant excerpts only) . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . 243

August 15, 2007 Deposition of Harold Hawkins, page 35. . . . . . . . . . . . . . . . . . . . . . . . 246

August 7, 2007 Deposition of Alex Dick, pages 21-22 . . . . . . . . . . . . . . . . . . . . . . . . . 247

# Harbor Navigation

**Important to the Nation:**
Container Terminals with massive cranes dot the landscape of the New York and New Jersey Harbor, providing goods to more than 21 million people locally. As the largest port on the East Coast, it provides more than 230,000 jobs to the region. Click here for more Port Fact Sheets

But its natural depth is between 15 and 18 feet. Without deepening, it would be impossible to provide access to the large container ships that currently call at the Port. For many years the Corps of Engineers, authorized by the United States Congress, has deepened the port to meet industry demand while providing safe and efficient navigation in the harbor.

Today, current channels within the harbor range in depths from 35 to 45 feet. The Corps, along with cost share sponsors such as the Port Authority of New York and New Jersey and the states of New York and New Jersey, has several construction projects underway to deepen the harbor 50 feet.

**Why Deepen the Port?**
Throughout the years, the shipping industry has created wider vessels that require deeper drafts to transport the maximum amount of goods in the most efficient manner. Today, this new generation of vessels requires channel depths in excess of 45 feet.
The Corps and the Port Authority began deepening the Harbor in the mid 90s to meet industry demand. The approach has been a phased deepening project, which will ultimately result in the construction of 50-foot channels.



Comparison of Ships size (Click on image for large view)

**What is the status of the deepening projects?**
• ***Kill Van Kull & Newark Bay Channels*** - The main artery that links Upper Harbor of New York Bay to Newark Bay providing access to Port Elizabeth and Port Newark. There were a total of eight contracts awarded with the final one completed in November 2004 bringing the channel from 40 to 45 feet. (Click here to view map). The $335 million project was cost shared with the Port Authority of New York and New Jersey and was completed on time and under budget.

The Kill Van Kull & Newark Bay Channels are currently open to 45-foot ships, although restricted to one-way passage.

**Ongoing interim deepenings include:**
• ***Port Jersey Channel*** – The $120 million navigation project is located in the western side of the Upper Bay of New York Harbor and provides access to Global Container Terminal in Jersey City, New Jersey. The project area is divided into three contracts to deepen the 35-foot channel to 41 feet. To date, contract one is complete with the second near completion. With the issuance of the last remaining permit in September 2005, the third contract is scheduled to be advertised in November. This third contract will not only complete the cost-shared Port Jersey 41-foot channel project, but also advance the 50-foot Port Jersey channel segment of the Harbor Deepening Project with funding from the State of New Jersey as part of consolidated implementation. (Click here to view map). The third contract is scheduled to be complete in August 2008.

• ***Arthur Kill Channel to Howland Hook (NY Container Terminal)*** - The $200 million navigation project is located in northern end of the Arthur Kill. The project

Drilling & Blasting Schedule & Information


Project Fact Sheets


Harbor Environmental Photos


Harbor Navigation Photos


Links

CPIP

Ourpassaic.org

New York and New Jersey HEP

Port Authority of New York and New Jersey

area is divided into four contract areas and will deepen the 35-foot channel to 41 feet to New York Container Terminal in Staten Island and 40 feet to the TOSCO refinery south of the Goethals Bridge.. (Click here for Map of Arthur Kill) . The overall project is scheduled to be complete in 2008 (2006 to New York Container Terminal).

**NY & NJ Harbor Deepening (50 feet):**
This is a $1.6 billion project that will deepen the following channels to 50 feet in order to allow the safe and economically efficient passage of the newest container ships serving the Port of NY & NJ:

- *Ambrose Channel*
- *Anchorage Channel*
- *Kill Van Kull Channel*
- *Newark Bay Channels*
- *The Port Jersey Channel*
- *Arthur Kill (to Howland Hook)*
- *Bay Ridge Channel*

There are 15 construction contracts planned in order to complete this project. The first Corps contract was awarded in March 2005 for the Kill Van Kull Channel, S-KVK-2. Dredging for this contract started west of the Bayonne Bridge and will work east through the channel. Since the area along Bergen Point is made up of diabase rock, drilling and blasting will be required (Click here for information regarding drilling and blasting program). Drilling and blasting will start 8 Aug and will continue for 24 months. (Click here to view map).

The second contract, which is the first of two for Ambrose Channel, was awarded on 28 Sep 05. This contract will dredge sand from the western side of the Ambrose Channel, and when completed, will provide one-way 50 foot channel to the rest of the project area. The sand from this project will be used in a variety of beneficial ways such as remediation of the Historic Area Remediation Site, restoration of an island in Jamaica Bay and as capping material at the Liberty State Park.

Click here for contract area maps.

For questions regarding the Port of New York and New Jersey Harbor web page, please contact Public Affairs

Privacy and Security Notice
Disclaimer
© U.S. Army Corps of Engineers - New York District



This page was last updated: 11/26/2007

US Army Corps
of Engineers
New York District

# LIMITED REEVALUATION REPORT

# AND

# FINAL ENVIRONMENTAL ASSESSMENT AND FINDING OF NO SIGNIFICANT IMPACT

## Kill Van Kull-Newark Bay Channels Phase II Deepening Project



APRIL 1997

Contract 8: Dredge contaminated, non rock, and rock material in the Newark Bay Channel from Sta. 4 + 10N to Sta. 46 + 90N and from KVK Sta. 270 + 00K to Sta. 281 + 78K, and in the South Elizabeth Channel. Dredge rock material in the Port Elizabeth Channel, South Elizabeth Channel, and Newark Bay except in the area delineated in Contract 9.

Contract 9: Dredge contaminated, non rock, and rock material in the Port Newark and Port Newark Pierhead Channels and from Sta. 139 + 20N to Sta. 168 + 22N in the Newark Bay Channel.

The project depth of 45 feet below mlw in the nine contracts is increased by 2 feet for safety clearance and maintenance to give the required design depth of 47 feet below mlw. The MCACES estimate is based on November 1996 price levels for labor, materials, and equipment.

## Assumptions

The following assumptions are used in the project execution and construction cost estimate development:

a. In recognition of possible restrictions in State water quality certificates, a "no barge overflow" condition was assumed for removal of contaminated material.

b. Turbidity will be controlled using methods similar to that used in the Kill Van Kull Phase 1 project. Cutterhead dredges are not permitted to be used.

c. Mechanical dredges other than cutterheads are permitted to be used. All testing and evaluation will have been completed prior to the initiation of construction.

d. No regulatory compliance testing will be required during the removal of contaminated material. All testing and evaluation will have been completed prior to initiation of construction.

e. The construction cost estimate and schedules have not taken the environmental windows into consideration The proposed environmental windows restricting dredging and blasting are being discussed with other agencies.

f. Costs for environmental monitoring have been included in the estimate.

g. There are no restrictions on the transport or handling of dredged contaminated material. No dredge modifications are required for safety or environmental considerations, and inspection will be required for disposal at the HARS which will include the current Mud Dump site.

h. Clean, non-rock material will be disposed at the HARS.

i. Rock material will be placed at the artificial reef sites.

## Quantities

Quantities are prepared based on hydrographic surveys and boring logs in the channel area and are calculated to the required design depth with excavation side slopes of 1V to 3H in non rock

channel, yes. If it's on the edge, we have waived it.

Q Now let me add a little bit more to the scenario. You not only have a tenth of a foot above forty-seven in a project that's only authorized to forty-five, but you plan to remove that in the future and take it down to fifty anyway. Does that not dictate that the one tenth isn't all that important?

A At the present time you only have a forty-five foot channel. SKVK2, which is Area 8, will not be -- I mean sorry, SNB2, which is, I would say, at least a year and a half from being started, and then two years hence with regard to completion. See you have since 2004 a forty-five foot channel in Area 8. There's a -- quite a bit of time that that channel is gonna sit there as a forty-five foot channel, and as a result we have to meet the requirements of having a forty-five foot channel. If we were going to immediately turn around and dredge that area down to fifty feet, you may have an argument. Would be an argument, you know, for discussion, but that

was not the case. That was not being planned. It was to remain a forty-five foot channel for a good amount of time.

Q Is there a maintenance dredging being performed in that forty-five foot channel?

A Not of late and they only can dredge soft material. It's very difficult for O&M to dredge hard material, and if you leave a pinnacle of rock or something like that, it would be extremely difficult and we would basically have tremendous amount of arguments that we had not completed the deepening job and that they are dealing with a deepening factor in their maintenance.

Q When a dredging contractor is directed after an acceptance survey has been processed by the Corps to come back and get some high spots, based on what you know, is that an expensive proposition for the contractor?

A It's an inefficiency and as an inefficiency, you know, it costs. It costs at least 30 to $60,000 a day for a dredge, so

# Appendix A
## HYDROGRAPHIC SURVEY ACCURACY STANDARDS AND CLASSIFICATIONS

A-1. Purpose. This appendix contains revised survey classifications and technical performance standards for USACE hydrographic surveys. These classifications and standards supersede those currently shown in the 1994 edition of EM 1110-2-1003. Most of the standards and criteria contained in EM 1110-2-1003 were designed to support older analog depth recording fathometers; mechanical, visual, or microwave positioning; and manual data processing and drafting methods. Within the past five years most of these instruments and processes have been radically changed, requiring the updated standards herein.

A-2. Revised Survey Classifications.

a. Dredge Measurement and Payment Surveys (Class 1). The scope of Class 1 (Contract Payment Surveys) defined in EM 1110-2-1003 has been modified to include two distinct subcategories of payment surveys based on the characteristics of bottom conditions and the potential for navigation hazards in the project. These classifications, and related accuracy standards, are intended to correspond closely with recently revised international hydrographic surveying charting standards. Survey requirements, accuracy standards, and quality control procedures vary as a function of bottom type, as indicated in Tables A-1 and A-2.

(1) Hard Bottom Material and/or New Work. This category of dredge measurement, payment, and acceptance surveys includes dredging of newly authorized projects containing hard bottom material, such as rock or compacted material, or maintenance projects containing hard bottom material. All newly authorized projects are not necessarily in this category. This category may also include projects where low under-keel clearances are anticipated over potentially hazardous bottom conditions. Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category--for example, projects like Kill Van Kull, NJ and St. Marys River, MI.

(2) Soft Bottom Material and/or Maintenance Dredging. This category of dredge payment surveys is intended to cover newly


KILL VAN KULL
CONTRACT DREDGING AREAS
AREA 5
AREA 6
AREA 7
AREA 8
Deferred
AREA 4b
AREA 4a
AREA 3
AREA 2
AREA 1
NEW JERSEY
Arthur Kill
STATEN ISLAND (NY)
Elizabeth
Elizabeth Port Authority Marine Terminal
Newark Airport
Port Newark
Newark Bay
Shooters Island
Bergen Point
2.6 MILES
Bayonne
NEW JERSEY
Jersey City
Kill Van Kull
5.4 MILES
Upper New York Bay

**Kill Van Kull and Newark Bay award and completion schedule**

| | | Bid Date | Award | NTP | 2nd NTP | Completion | Contract # | Contractor | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Contract Area 1 | 7/1/00 | 8/5/99 | 8/23/99 | | 7/18/01 | DACW51-99-C-0027 | Bean Stuyvesant | 13,742,743 |
| 1 | Contract Area 2 | 3/11/99 | 3/16/99 | 3/31/99 | n/a | 9/18/00 | DACW51-99-C-0009 | Great Lakes | 23,667,600 |
| 6 | Contract Area 3 | 6/29/01 | 8/20/01 | 10/5/01 | n/a | 10/2/02 | DACW51-01-C-0025 | Great Lakes | 31,950,163 |
| 3 | Contract Area 4a | 2/1/00 | 2/28/00 | 3/27/00 | n/a | 2/12/02 | DACW51-00-C-0006 | Weeks Marine | $22,653,746.00 |
| 4 | Contract Area 7 | 9/8/01 | 3/12/01 | 3/27/01 | n/a | 3/28/03 | DACW51-01-C-0006 | Donjon | $28,067,780 |
| 5 | Contract Area 5 | 3/20/01 | 12/10/01 | 1/22/02 | 4/8/02 | 11/3/04 | DACW51-02-C-0001 | Bean Stuyvesant | $64,953,643 |
| 5 | Contract Area 5-50' | PA/NA | 8/26/02 | 8/27/02 | n/a | 12/15/04 | DACW51-02-C-0001 | Bean Stuyvesant | $102,063,875 |
| 7 | Contract Area 6 | 3/15/02 | 7/25/02 | 8/27/02 | n/a | 10/14/04 | DACW51-02-C-0019 | Bean Stuyvesant | $52,334,544 |
| 8 | Contract Area 8 | 3/25/03 | 5/23/03 | 6/25/03 | 3/29/04 | 11/16/04 | DACW51-03-C-0014 | Cashman | $35,259,717 |
| | S-KVK-2 | | 3/11/05 | 3/31/05 | n/a | 3/26/07* | W912DS-05-C-0004 | Bean Stuyvesant | 78,762,640* |
| | S-AM-1 | | 9/28/05 | 10/17/05 | n/a | 11/7/07* | W912DS-05-C-0018 | Great Lakes D&D Co | 15,136,779* |
| | S-AN-1a | | | | | | | | |
| | S-NB-1 | | | | | | | | |

Note: * designate current contract completion date and amount

Updated @ 1 Feb 2006

A. That 100 percent will give you 100 percent coverage. However you decipher that information is not explained here.

Q. Okay. How about the next sentence? "The most precise positioning and depth standards and techniques must be employed for this class of project." At the time you prepared your bid, what did that mean to you?

A. That you needed a multibeam system.

Q. Is a multibeam system the most precise positioning and depth measurement system?

A. I believe so. There may be more precise. I don't know.

Q. No worries. Did you ever make inquiry with the Corps regarding the method to be used to process acceptance surveys prior to submitting your bid for the contract?

A. No.

Q. Did you personally make inquiry regarding the method to be used for acceptance surveys after work began on the contract?

A. Myself, no.

MS. KILFOYLE: Can we go off for one second?

Q. Why would that happen?

A. That's -- that's the methodology. That's inherent in the methodology.

Q. Can you explain where that's inherent in the methodology?

MR. WEINBERG: I needed to borrow a paper from someone. Sorry.

THE WITNESS: No, I can't explain why it's inherent in the methodology, but that is part of the methodology. Because the method is imprecise. It's part of the imprecision in the method.

BY MS. KILFOYLE:

Q. Did you personally have any experience with multibeam surveys prior to KVK 8?

A. I supervised a couple of projects that used a multibeam survey.

Q. Do you recall which projects?

A. One was day -- and I don't remember the name of the base. But in Dover, New Hampshire, there's a sub base that the Navy required multibeam survey done by a contractor. And the project in Scituate, Massachusetts, S-c-i-t-u-a-t-e, for the Corps of Engineers, it also used a multibeam survey performed by the Corps.

Q. Was the Dover contract a contract that Jay Cashman was awarded?

A. It was. And so was the one in Scituate.
Q. For multibeam surveys, is all of the data used that's collected?
A. I don't know.
Q. Do you know whether there's methods of thinning the data recovered from a multibeam survey?
A. Sending?
Q. Thinning.
A. Thinning? There are programs that will do the processing that I referred to.
Q. And what are those programs?
A. It would take the spikes out that I mentioned earlier.
Q. Can you give me an example of what one of those type of programs might be?
A. By name?
Q. Yeah.
A. No, I don't know.
MS. KILFOYLE: Okay. Can we mark this as Exhibit 1?
(Exhibit No. 1 marked.)
MS. KILFOYLE: He gets his. You get to keep yours.
BY MS. KILFOYLE:
Q. Do you want to take some time to look that

A The plans and specifications for each contract was put together separately. Yes, we sort of had a sort of like a template that was sort of carried over from project to project, but there's lessons learned as we do each contract and the attempt was to improve upon each of the contracts, so if you looked at the first contract that we issued, it would be slightly different than Area 8, which was the last contract that we issued for the forty-five foot project.

Q Was there some boilerplate language that was carried from project to project?

A Some degree.

Q Was KVK8 the eighth project?

A It was, I believe, the eighth one.

Q Are you familiar with multi beam surveying?

A To some degree.

Q When did you first become familiar with it?

A When I was the chief of Navigation Branch and it was being introduced.

| SOLICITATION, OFFER, AND AWARD (*Construction, Alteration, or Repair*) | 1. SOLICITATION NO. DACW51-03-B-0004-0005 | 2. TYPE OF SOLICITATION [X] SEALED BID (IFB) [ ] NEGOTIATED (*RFP*) | 3. DATE ISSUED 2[illegible]-May-2003 | PAGE OF PAGES 1 OF 72 |
|---|---|---|---|---|

IMPORTANT - The "offer" section on the reverse must be fully completed by offeror.

| 4. CONTRACT NO. DACW51-03-C-0014 | 5. REQUISITION/PURCHASE REQUEST NO. SEE SCHEDULE | 6. PROJECT NO. |
|---|---|---|

| 7. ISSUED BY CODE DACW51 | 8. ADDRESS OFFER TO (*If Other Than Item 7*) CODE |
|---|---|
| USA ENGINEER DISTRICT, NEW YORK<br>ATTN: CENAN-CT ROOM 1843<br>26 FEDERAL PLAZA (DACW51)<br>NEW YORK NY 10278-0090 | See Item 7 |
| TEL: FAX: (212)264-3013 | TEL: FAX: |

| 9. FOR INFORMATION CALL: | A. NAME MYRLANDE LEE | B. TELEPHONE NO. (*Include area code*) (*NO COLLECT CALLS*) 212-264-0242 |
|---|---|---|

## SOLICITATION

**NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".**

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS (*Title, identifying no., date*):

1. The project consists of deepning of the existing 40 feet Federal Navigation Channel System to a depth of 47 feet. The project area is located along the southern portion of Newark Bay, South Elizabeth Channel and the western end of Kill Van Kull (KVK) Channel. The project consists of the dredging and disposal of non-rock and the drilling, blasting, dredging and disposal of rock.

2. This project is UNRESTRICTED
NAICS Code: 237990, size standard: $17.0 million

3. Contract Specialist: Myrlande Lee, (212) 264-0242
Technical Manager: Jamal Sulayman, (212) 264-9080 / Steven Weinburg, (212) 264-9081

4. This is a Continuing Contract.

5. PLEASE REVIEW ALL BONDS AND ACCOMPANYING DOCUMENTS REQUIRED TO BE SUBMITTED: Bonds, Powers of Attorney, statement of authenticity and continuing validity, and all related documents MUST NOT bear Computer printer-generated signatures and/or seals. Documents bearing signatures and/or seals generated as part of a document, as opposed to being affixed to the document after its generation, will not be accepted. submission of such documents may render the bid or offer non-responsive and ineligible for award.

11. The Contractor shall begin performance within 5 calendar days and complete it within 270 calendar days after receiving [ ] award, [X] notice to proceed. This performance period is [X] mandatory, [ ] negotiable. (*See* ______ .)

| 12 A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? (*If "YES," indicate within how many calendar days after award in Item 12B.*) [X] YES [ ] NO | 12B. CALENDAR DAYS 10 |
|---|---|

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 1 copies to perform the work required are due at the place specified in Item 8 by 11:00 AM (*hour*) local time 25 Mar 2003 (*date*). If this is a sealed bid solicitation, offers must be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due.

B. An offer guarantee [X] is, [ ] is not required.

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than 120 calendar days for Government acceptance after the date offers are due will not be considered and will be rejected.



EXHIBIT
WOOD
7

# ABSTRACT OF OFFERS - CONSTRUCTION

1. SOLICITATION NUMBER: DACW51-01-B-0024

2. DATE ISSUED: 04 SEP 2001

BID Opening

PAGES

4. ISSUING OFFICE
US Army Corps of Engineers
26 Federal Plaza
New York, New York 10278-0090

I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation.

NAME AND TITLE OF CERTIFYING OFFICIAL (TYPE)

SIGNATURE

DATE SIGNED

5. PROJECT TITLE
New York Harbor, KVK & Newark Bay Channels
Phase II, Contract 7, Area 6

6. NUMBER OF AMENDMENTS ISSUED: 11

8. GOVERNMENT ESTIMATE
(Check A, B or C and complete D, E, and F)

- ☐ A. HIRED LABOR
- ☐ B. REASONABLE CONTRACT (Without Profit)
- X C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

NO. 1
A. OFFEROR: WEEKS MARINE, INC.
B. BID SECURITY (Type and amount): 3,000,000
C. AMENDMENTS ACKNOWLEDGED: YES

NO. 2
B. OFFEROR
B. BID SECURITY (Type and amount)
C. AMENDMENTS ACKNOWLEDGED

| 7A. ITEM NO. | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | NO. 1 D. UNIT PRICE | NO. 1 E. ESTIMATED AMOUNT | NO. 2 D. UNIT PRICE | NO. 2 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | Const. Nav. Channel (INFO) | | | | | | | | |
| 0001A A | MOB/DEMOB | 1.00 | LS | | 1,332,000 | 2,995,000 | 2,995,000 | | |
| 0001A B | Debris/Removal/Disposal | 50.00 | TON | 10.00 | 50,000 | 2,000 | 100,000 | | |
| 0001A C | Dredging/Disposal at OENJ/other site | 608,400 | CY | 68.97 | 41,961,350 | 31.99 | 19,462,716 | | |
| 0001A D | Dewatering | 608,400 | CY | 2.13 | 1,295,900 | 0.00 | 0.00 | | |
| 0001A E | Dredging/Disposal at HARS | 2,063,100 | CY | 7.22 | 14,895,600 | 8.95 | 18,464,745 | | |
| 0001A F | Subsurface Sampling and Drilling | 15.00 | EA | 6,000 | 90,000 | 5,000 | 75,000 | | |
| 0001A G | Field Office | 1.00 | LS | | 178,000 | 240,000 | 240,000 | | |
| 0001A H | Dredging/Disposal at CDF | 67,600 | CY | 44.17 | 2,985,900 | 41.60 | 2,812,160 | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Base Bid | | | | 62,788,750 | | 44,149,621 | | |
| 0002 | Optional Insurance | 1.00 | LS | | 50,000 | | 50,000 | | |
| | BASE BID PLUS OPTIONS | | | | 62,838,750 | | 44,199,621 | | |

NSN 7540-01-150-0981 501419-101 NOTE: If more than two offers are received, continue on OF 1419A. OPTIONAL FORM 1419 (11-88)
Prescribed by GSA - FAR (48 CFR) 53.236-1

**ABSTRACT OF OFFERS - CONSTRUCTION CONTINUATION SHEET**

1. SOLICITATION NUMBER: DACW51-01-B-0024 — PAGE OF PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE

New York Harbor
Kill Van Kull and Newark Bay Channels, Contract 7, Area 6

4. OFFERS (Continued)

| | NO.: 2 | NO.: 3 | NO.: 3 | NO.: |
|---|---|---|---|---|
| A. OFFEROR | Great Lakes Dredge & Dock | Jay Cashman | Bean Stuyvesant | |
| B. BID SECURITY (Type and Amount) | 3,000,000 | 3,000,000 | 3,000,000 | |
| C. AMENDMENTS ACKNOWLEDGED | Yes | Yes | Yes | |

3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | | | | | | | | | | |
| 0001 AA | 1.00 | LS | 944,000 | 944,000 | 10,000,000 | 10,000,000 | 1,585,000 | 1,585,000 | | |
| 0001 AB | 50 | TONS | 300.00 | 15,000 | 150.00 | 7,500 | 100.00 | 5,000 | | |
| 0001 AC | 608,400 | CY | 50.88 | 30,955,392 | 45.00 | 27,378,000 | 37.10 | 22,571,640 | | |
| 0001 AD | 608,400 | CY | .44 | 267,696 | .55 | 334,620 | 1.03 | 626,652 | | |
| 0001 AE | 2,063,100 | CY | 6.23 | 12,853,113 | 8.68 | 17,907,708 | 9.69 | 19,991,439 | | |
| 0001 AF | 15 | EA | 6,000 | 90,000 | 5,000 | 75,000 | 4,000 | 60,000 | | |
| 0001 AG | 1.00 | LS | 295,100 | 295,100 | 185,000 | 185,000 | 195,580 | 195,580 | | |
| 0001 AH | 67,600 | CY | 35.25 | 2,382,900 | 38.00 | 2,568,800 | 34.25 | 2,315,300 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL BASE | | | 47,803,201 | | 58,456,628 | | 47,350,611 | | |
| 0002 | 1.00 | LS | 125,000 | 125,000 | 95,000 | 95,000 | 52,500 | 52,500 | | |
| | TOTAL BASE BID | PLUS OPTIONS | | 47,928,201 | | 58,551,628 | | 47,403,111 | | |

NSN 7540-01-280-5502 501419-201 OPTIONAL FORM 1419A (11-88)
53.236-1 Prescribed by GSA - FAR (48 CFR)

Area 6

# PRELIMINARY BID REPORT

| INVITATION FOR BID NO. | | PROJECT & LOCATION | | | | | OPEN BY | DATE | TIME |
|---|---|---|---|---|---|---|---|---|---|
| DACW51-01-B-0024 25 | | NEW YORK HARBOR, KVK & NB CHANNELS, PH II, CONT 7 (AREA 6) | | | | | SPIEGELBERG | 15-Mar-02 | 11:00AM |
| BID ITEM NO. | DESCRIPTION | GOVT. ESTIMATE | BID NO. 1<br>Weeks Marine | BID NO. 2<br>Great Lakes | BID NO. 3<br>J: Cashman,JV | BID NO. 4<br>Bean | BID NO. 5 | BID NO. 6 | |
| 0001 | CONST NAV CHANNEL | | | | | | | | |
| 0001AA | MOB/DEMOB | $1,332,000 | $2,995,000 | $944,000 | $10,000,000 | $1,585,000 | | | |
| 0001AB | DEBRIS REMOVAL/DISPOSAL | $50,000 | $100,000 | $15,000 | $7,500 | $5,000 | | | |
| 0001AC | DREDGING/DISPOSAL AT OENJ/other site | $41,961,350 | $19,462,716 | $30,955,392 | $27,378,000 | $22,571,640 | | | |
| 0001AD | DEWATERING | $1,295,900 | $0 | $267,696 | $334,620 | $626,652 | | | |
| 0001AE | DREDGING/DISPOSAL AT HARS | $14,895,600 | $18,464,745 | $12,853,113 | $17,907,708 | $19,991,439 | | | |
| 0001AF | SUBSURFACE SAMPLING AND DRILLING | $90,000 | $75,000 | $90,000 | $75,000 | $60,000 | | | |
| 0001AG | FIELD OFFICE | $178,000 | $240,000 | $295,100 | $185,000 | $195,580 | | | |
| 0001AH | DREDGING/DISPOSAL AT CDF | $2,985,900 | $2,812,160 | $2,382,900 | $2,568,800 | $2,315,300 | | | |
| | | | | | | | | | |
| TOTAL | BASE BIDS | $62,788,750 | $44,149,621 | $47,803,201 | $58,456,628 | $47,350,611 | | | |
| | | | | | | | | | |
| 0002 | OPTIONAL INSURANCE | $50,000 | $50,000 | $125,000 | $95,000 | $52,500 | | | |
| TOTAL | BASE BIDS PLUS OPTION | $62,838,750 | $44,199,621 | $47,928,201 | $58,551,628 | $47,403,111 | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | Schedule Total | | | | | | | | |

Area 4A

# ABSTRACT OF OFFERS -

1. SOLICITATION NUMBER: DACW51-00-B-0006
2. DATE ISSUED:
3. DATE OPENED:
PAGE OF PAGES

4. ISSUING OFFICE
Department of the Army
26 Federal Plaza
New York, N.Y. 10278-0090

I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation.

John Phelps
Anne Spiegelberg - Recorder

SIGNATURE | DATE SIGNED

5. PROJECT TITLE
New York Harbor, Kill Van Kull & Newark Bay Channels Navigation Improvement Project

6. NUMBER OF AMENDMENTS ISSUED
4

8. GOVERNMENT ESTIMATE
(Check A, B or C and complete D, E, and F)
☐ A. HIRED LABOR
☐ B. REASONABLE CONTRACT (Without Profit)
X☐ C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

NO. 1
A. OFFEROR: Jay Cashman
B. BID SECURITY (Type and amount): BID BOND $5,113,600
C. AMENDMENTS ACKNOWLEDGED: yes

NO. 2
B. GREAT LAKES Dredge & Dock Co.
B. BID SECURITY (Type and amount): BID BOND $5,714,500
C. AMENDMENTS ACKNOWLEDGED: yes

| 7A. ITEM NO. | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | Gov. Est. E. UNIT PRICE | Gov. Est. F. ESTIMATED AMOUNT | No. 1 D. UNIT PRICE | No. 1 E. ESTIMATED AMOUNT | No. 2 D. UNIT PRICE | No. 2 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | Mobilization & Demobilization | 1 | LS | | 1816000 | | $4,000,000 | | 1378500 |
| 0002 | Drilling, Blasting, Dredging and Disposal to –47 feet, complete | 1 | LS | | 10901000 | | $18,871,000 | | 26868900 |
| 0003 | Subsurface Drilling and Sampling | 15 | EA | 6000 | 900000 | 8,000 | $120,000 | 3500 | 52500 |
| 0004 | Disposal Inspectors | 1 | LS | | 75000 | | $800,000 | | 78800 |
| 0005 | Field Office | 1 | LS | | 474000 | | $1,500,000 | | 156200 |
| 0006 | Optional Item | 1 | LS | | 16000 | | $220,000.00 | | 37600 |

## ABSTRACT OF OFFERS - CONSTRUCTION CONTINUATION SHEET

DACW51-00-B-0006

PAGE 2 OF 2 PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE

New York Harbor, Kill Van Kull & Newark Bay Channels, Navigation Improvements Project

4. OFFERS (Continued)

| | NO.: 3 | NO.:___ | NO.:___ | NO.:___ |
|---|---|---|---|---|
| A. OFFEROR | Weeks Marine<br>901 Beach Street Camden NJ | | | |
| B. BID SECURITY (Type and Amount) | BID BOND $44,508,600 | | | |
| C. AMENDMENTS ACKNOWLEDGED | yes | | | |

3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | 1 | LS | | 3,100,000 | | | | | | |
| 0002 | 1 | LS | | 18,871,000 | | | | | | |
| 0003 | 15 | EA | 10,000 | 150,000 | | | | | | |
| 0004 | 1 | LS | | 180,000 | | | | | | |
| 0005 | 1 | LS | | 220,000 | | | | | | |
| 0006 | 1 | LS | | 22,000 | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

# PRELIMINARY BID REPORT

| INVITATION FOR BID NO. | PROJECT & LOCATION | OPEN BY | DATE |
|---|---|---|---|
| DACW51-00-B-0011 | NEW YORK HARBOR, KVK & NB CHANNELS, PH II, CONT 4 (AREA 7) | SPIEGELBERG | 8-Sep-00 |

| BID ITEM NO. | DESCRIPTION | GOVT. ESTIMATE | BID NO. 1 Jay Cashman | BID NO. 2 Weeks Marine | BID NO. 3 Bean/Stuyvesant | BID NO. 4 Donjon | BID NO. 5 Great Lakes | BID NO. 6 |
|---|---|---|---|---|---|---|---|---|
| 0001 | CONST NAV CHANNEL | | | | | | | |
| 0001AA | MOB/DEMOB | $1,888,000 | $6,500,000 | $3,400,000 | $3,600,000 | $2,800,000 | $2,025,000 | |
| 0001AB | DRILLING, DREDGING, & DISPOSAL | $20,935,000 | $51,224,750 | $38,133,000 | $43,000,000 | $24,600,000 | $27,642,345 | |
| 0001AC | SUBSURFACE SAMPLING AND DRILLING | $90,000 | $60,000 | $52,500 | $88,500 | $75,000 | $74,775 | |
| 0001AD | FIELD OFFICE | $431,000 | $800,000 | $240,000 | $441,000 | $200,000 | $67,655 | |
| 0002 | OPTIONAL INSURANCE | $23,000 | $300,000 | $50,000 | $10,000 | $100,000 | $80,250 | |
| TOTAL | | $23,367,000 | $58,884,750 | $41,875,500 | $47,139,500 | $27,775,000 | $29,890,025 | |
| | | | | | | | | |
| 0003 | OPTIONAL ITEM/DIFFERENCE IN COST TO PROJECT FOR USING NBCDF IN LIEU OF OENJ | ($1,500,000.00) | ($8,380,700.00) | ($8,608,500.00) | ($8,388,376.00) | ($4,000,000.00) | ($500,000.00) | |
| TOTAL | Less 0003 | $21,867,000 | $50,504,050 | $33,267,000 | $38,751,124 | $23,775,000 | $29,390,025 | |
| | | | | | | | | |

| | |
|---|---|
| TIME | 11:00AM |

# ABSTRACT OF OFFERS - CONSTRUCTION

Solicitation No. DACW51-00-B-0011

2. DATE ISSUED: 07 August 2000

3. DATE OPENED: 08 SEP 2000

PAGE OF PAGES

4. ISSUING OFFICE
Department of the Army
26 Federal Plaza
New York, New York 10278-0090

I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation.

NAME AND TITLE OF CERTIFYING OFFICIAL (TYPE): Anne Spiegelberg

SIGNATURE

DATE SIGNED

5. PROJECT TITLE
KVK & Newark Bay Channels Navigation Improvement Project, Phase II, Area 7, Contr. 4, Elizabeth Channel

6. NUMBER OF AMENDMENTS ISSUED
9 Amendments Issued

8. GOVERNMENT ESTIMATE (Check A, B or C and complete D, E, and F)
- ☐ A. HIRED LABOR
- ☐ B. REASONABLE CONTRACT (Without Profit)
- X C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

NO. 1
A. OFFEROR: Jay Cashman
B. BID SECURITY (Type and amount): 11,776,950
C. AMENDMENTS ACKNOWLEDGED: 10

NO. 2
B. OFFEROR
B. BID SECURITY (Type and amount)
C. AMENDMENTS ACKNOWLEDGED

| 7A. ITEM NO. | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | NO. 1 D. UNIT PRICE | NO. 1 E. ESTIMATED AMOUNT | NO. 2 D. UNIT PRICE | NO. 2 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | Construct Navigation Channel | | | | | | | | |
| 0001A A | Mobilization and Demobilization | 1.00 | LS | | 1,888,000 | | 6,500,000 | | |
| 0001A B | Drilling, Blasting, Dredging, and Disposal to –47 feet, complete | 1.00 | LS | | 20,935,000 | | 51,224,750.00 | | |
| 0001A C | Subsurface Drilling and Sampling | 15.00 | EA | 6,000 | 90000 | 4,000 | 60,000 | | |
| 0001A D | Field Office | 1.00 | LS | | 431,000 | | 800,000 | | |
| 0002 | Optional Item/Additional Cost For Optional Insurance | 1.00 | LS | | 23,000 | | 300,000 | | |
| 0003 | Opt. Item/Difference in cost to the project for using NBCDF | 1.00 | LS | | -1,500,000 | | -8,380,700 | | |
| | | TOTAL | | | 21,867,000 | | 58,884,750 | | |
| | | | | | | | | | |

## ABSTRACT OF OFFERS - CONSTRUCTION CONTINUATION SHEET

1. SOLICITATION NUMBER: DACW51-00-B-0011

PAGE OF PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE

Kill Van Kull and Newark Bay Channels Navigation Improvement Project Phase II, Area 7, Contract 4, Elizabeth Channel N.J.

### 4. OFFERS (Continued)

| | NO.: 2 | NO.:__ | NO.:__ | NO.:__ |
|---|---|---|---|---|
| A. OFFEROR | Weeks Marine | Bean Stuyvesant | DONJON Marine | |
| B. BID SECURITY (Type and Amount) | 8,375,100 | 9,427,900 | 5,555,000 | |
| C. AMENDMENTS ACKNOWLEDGED | 10 | 10 | 10 | |

### 3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | | | | | | | | | | |
| 0001 AA | 1.00 | LS | | 3,400,000 | | 3,600,000 | | 2,800,000 | | |
| 0001 AB | 1.00 | LS | | 38,133,000 | | 43,000,000 | | 24,600,000 | | |
| 0001 AC | 15.00 | EA | 3500 | 52,500 | 5,960 | 88,500 | 5,000 | 75,000 | | |
| 0001 AD | 1.00 | LS | | 240,000 | | 441,000 | | 200,000 | | |
| 0002 | 1.00 | LS | | 50000 | | 10,000 | | 100,000 | | |
| 0003 | 1.00 | LS | | -8,608,500 | | -8,388,376 | | -4,000,000 | | |
| | | | TOTAL | 41,875,500 | | 47,139,500 | | 27,775,000 | | |

**ABSTRACT OF OFFERS - CONSTRUCTION CONTINUATION SHEET**

1. SOLICITATION NUMBER DACW51-00-B-0011

PAGE OF PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE

Kill Van Kull and Newark Bay Channels Navigation Improvement Project

Phase II, Area 7, Contract 4, Elizabeth Channel, N.J.

4. OFFERS (Continued)

| | NO.: 5 | NO.: __ | NO.: __ | NO.: __ |
|---|---|---|---|---|
| A. OFFEROR | Great Lakes Dredge and Dock | | | |
| B. BID SECURITY (Type and Amount) | 5,978,005 | | | |
| C. AMENDMENTS ACKNOWLEDGED | 10 | | | |

3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | | | | | | | | | | |
| 0001 AA | 1.00 | LS | | 2,025,000 | | | | | | |
| 0001 AB | 1.00 | LS | | 27,642,345 | | | | | | |
| 0001 AC | 15.00 | EA | 4,985 | 74,775 | | | | | | |
| 0001 AD | 1.00 | LS | | 67,655 | | | | | | |
| 0002 | 1.00 | LS | | 80250 | | | | | | |
| 0003 | 1.00 | LS | | -500,000 | | | | | | |
| | | | | | | | | | | |
| | | TOTA: | | 29,890,025 | | | | | | |

# PRELIMINARY BID REPORT

| INVITATION FOR BID NO. | PROJECT & LOCATION | OPEN BY | DATE | TIME |
|---|---|---|---|---|
| DACW51-01-B-0003 | NEW YORK HARBOR, KVK & NB CHANNELS, PH II, CONT 5 (AREA 5) | SPIEGELBERG | 20-Mar-01 | 11:00AM |

| BID ITEM NO. | DESCRIPTION | GOVT. ESTIMATE | BID NO. 1<br>Weeks Marine | BID NO. 2<br>Bean/Stuyvesa nt | BID NO. 3<br>Jay Chashman | BID NO. 4 | BID NO. 5 | BID NO. 6 | |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | CONST NAV CHANNEL | | | | | | | | |
| 0001AA | MOB/DEMOB | $2,391,600 | $6,300,000 | $2,345,000 | $7,000,000 | | | | |
| 0001AB | DEBRIS REMOVAL/DISPOSAL | $41,700 | $50,000 | $10,000 | $15,000 | | | | |
| 0001AC | DREDGING/DISPOSAL AT OENJ | $5,011,310 | $5,026,950 | $5,998,827 | $6,479,180 | | | | |
| 0001AD | DEWATERING | $131,818 | $558,550 | $55,855 | $301,617 | | | | |
| 0001AE | DREDGING/DISPOSAL AT HARS | $62,878,374 | $79,324,700 | $48,383,140 | $27,924,200 | | | | |
| 0001AF | SUBSURFACE SAMPLING AND DRILLING | $90,000 | $150,000 | $76,500 | $113,025 | | | | |
| 0001AG | FIELD OFFICE | $1,122,400 | $240,000 | $375,000 | $312,430 | | | | |
| 0002 | OPTIONAL INSURANCE | $50,000 | $25,000 | $55,000 | $225,000 | | | | |
| TOTAL "A" | BASE BIDS PLUS OPTION | $71,717,202 | $91,675,200 | $57,299,322 | $42,370,452 | $0 | $0 | $0 | |
| | | | | | | | | | |
| 0003 | CONST NAV CHANNEL | | | | | | | | |
| 0003AA | MOB/DEMOB | $2,107,400 | $6,300,000 | $1,985,000 | $7,000,000 | | | | |
| 0003AB | DREDGING/DISPOSAL AT NBCDF | $4,374,564 | $4,077,415 | $5,909,459 | $5,362,080 | | | | |
| 0003AC | DREDGING/DISPOSAL AT HARS | $62,878,374 | $79,324,700 | $48,383,140 | $27,591,200 | | | | |
| 0003AD | SUBSURFACE DRRILLING/SAMPLING | $90,000 | $150,000 | $76,500 | $113,025 | | | | |
| 0003AE | FIELD OFFICE | $1,122,400 | $220,000 | $375,000 | $312,510 | | | | |
| 0004 | OPTIONAL INSURANCE | $50,000 | $25,000 | $55,000 | $225,000 | | | | |
| TOTAL "B" | BASE BIDS PLUS OPTION | $70,622,738 | $90,097,115 | $56,784,099 | $40,603,815 | $0 | $0 | $0 | |
| | | | | | | | | | |
| | Schedule A - Schedule B | $1,094,464 | $1,578,085 | $515,223 | $1,766,637 | | | | |

Area 3

# PRELIMINARY BID REPORT

| INVITATION FOR BID NO. | PROJECT & LOCATION | OPEN BY | DATE | TIME |
|---|---|---|---|---|
| DACW51-01-B-0008 | NEW YORK HARBOR, KVK & NB CHANNELS, PH II, CONT 6 (AREA 3) | OHRWASHEL | 29-Jun-01 | 11:00AM |

| BID ITEM NO. | DESCRIPTION | GOVT. ESTIMATE | BID NO. 1 Weeks Marine | BID NO. 2 GLDD | BID NO. 3 JAY CASHMAN | BID NO. 4 | BID NO. 5 | BID NO. 6 | |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | CONST NAV CHANNEL | | | | | | | | |
| 0001AA | MOB/DEMOB | $1,238,400 | $2,000,000 | $1,747,000 | $6,000,000 | | | | |
| 0001AB | DREDGING/DISPOSAL AT HARS | $26,945,400 | $36,660,000 | $27,403,350 | $32,260,800 | | | | |
| 0001AC | SUBSURFACE SAMPLING AND DRILLING | $90,000 | $75,000 | $55,875 | $113,025 | | | | |
| 0001AD | FIELD OFFICE | $810,600 | $400,000 | $216,000 | $239,000 | | | | |
| | | | | | | | | | |
| TOTAL | BASE BIDS | $29,084,400 | $39,135,000 | $29,422,225 | $38,612,825 | | | | |
| | | | | | | | | | |
| 0002 | OPTIONAL INSURANCE | $50,000 | $25,000 | $48,000 | $225,000 | | | | |
| 0003 | REMOVE & DISPOSE OF TELEPHONE CABLES | $120,000 | $150,000 | $121,000 | $160,000 | | | | |
| 0004 | CONST NAV CHANNEL | $1,793,700 | $2,580,000 | $1,251,300 | $2,150,000 | | | | |
| | | | | | | | | | |
| TOTAL | OPTIONAL ITEMS | $1,963,700 | $2,755,000 | $1,420,300 | $2,535,000 | | | | |
| | | | | | | | | | |
| TOTAL | BASE BIDS PLUS OPTION | $31,048,100 | $41,890,000 | $30,842,525 | $41,147,825 | | | | |

## ABSTRACT OF OFFERS - CONSTRUCTION

DACW51-01-B-0008

2. DATE ISSUED 31 JANUARY 2001 | 29 JUNE 01 | PAGE OF PAGES

U.S. ARMY CORPS OF ENGINEERS
26 FEDERAL PLAZA
NEW YORK, NEW YORK 10278-0080
CONTRACTING DIVISION

I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation.

INA J. OHRWASHEL

SIGNATURE | DATE SIGNED

5. PROJECT TITLE

KVK PHASE 11 CONTRACT 6 (AREA 3)

6. NUMBER OF AMENDMENTS ISSUED
11 (ELEVEN)

8. GOVERNMENT ESTIMATE
(Check A, B or C and complete D, E, and F)

☐ A. HIRED LABOR

☐ B. REASONABLE CONTRACT (Without Profit)

☐ C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

NO. 1
A. OFFEROR WEEKS MARINE
8,378,000
YES

NO. 2
B. OFFEROR
B. BID SECURITY (Type and amount)
C. AMENDMENTS ACKNOWLEDGED

| 7A. ITEM NO. | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | NO. 1 D. UNIT PRICE | NO. 1 E. ESTIMATED AMOUNT | NO. 2 D. UNIT PRICE | NO. 2 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| | CONSTRUCT NAVIGABLE CHANNEL | | | | | | | | |
| 0001 | | | LS | 0 | 0 | 0 | 0 | | |
| 0001A A | MOBILIZATION AND DEMOBILIZATION | 1 | LS | | 1,234,500 | LS | 2,000,000 | | |
| 0001A B | DREDGING AND DISPOSAL OF NON-ROCK MATERIALS | 1,833,000 | CY | 14.70 | 26,945,400 | 20 | 36,660,000 | | |
| 0001A C | SUBSURFACE DRILLING AND SAMPLING | 15 | EA | 6,000 | 90,000 | 5000 | 75,000 | | |
| 0001A D | FIELD OFFICE | 1 | LS | 1 | 810,600 | 1 | 400000 | | |
| 0002 | OPTIONAL ADDITIONAL COST INSURANCE | 1 | LS | 1 | 50,000 | 25,000 | 25,000 | | |
| 0003 | OPT REMOVAL AND DISPOSAL OF ABANDONED | 1 | LS | 1 | 120,000 | | 150,000 | | |
| 0004 | OPT DREDGING AND DISPOSAL OF NON-ROCK | 86,000.00 | CY | 20.86 | 1,793,700 | 30.00 | 2,580,000 | | |
| | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | TOTAL BASE PLUS OPTION | | | | 31,044,200 | | 41,890,000 | | |
| | | | | | | | | | |
| | | | | | | | | | |

NSN 7540-01-150-0981 501419-101 NOTE: If more than two offers are received, continue on OF 1419A. OPTIONAL FORM 1419 (11-88)
Prescribed by GSA - FAR (48
CFR) 53.236-1

# ABSTRACT OF OFFERS - CONSTRUCTION CONTINUATION SHEET

1. SOLICITATION NUMBER DACW51-01-B-0008

PAGE OF PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE

KVK PHASE 11 CONTRACT 6

AREA 3

4. OFFERS (Continued)

| | NO.: 2 | NO.:3 | NO.:__ | NO.:__ |
|---|---|---|---|---|
| A. OFFEROR | GREAT LAKES DREDGE AND DOCK CO | JAY CASHMAN INC. | | |
| B. BID SECURITY (Type and Amount) | 5,884,445 | 7,722,565 | | |
| C. AMENDMENTS ACKNOWLEDGED | YES | YES | | |

3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | D. UNIT PRICE (No. 2) | E. ESTIMATED AMOUNT (No. 2) | D. UNIT PRICE (No. 3) | E. ESTIMATED AMOUNT (No. 3) | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 0 | LS | 0 | 0 | 0 | 0 | | | | |
| 001A A | 1 | LS | | 1,747,000.00 | 1 | 6,000,000 | | | | |
| 0001 AB | 1,833,000 | CY | 14.95 | 27,403,350.00 | 17.60 | 32,260,800 | | | | |
| 0001 AC | 15 | EACH | | 3,725.00 | 7,535 | 113,025 | | | | |
| 0001 AD | 1 | LS | | 216,000 | | 239,000 | | | | |
| 0002 | 1 | LS | | 48,000.00 | | 225,000 | | | | |
| 0003 | 1 | LS | | 121,000 | | 160,000 | | | | |
| 0004 | 86,000.00 | CY | 14.55 | 1,251,300.00 | 25 | 2,150,000 | | | | |
| | TOTAL | | | | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | BASE BID PLUS | | | | | | | | | | |
| | OPTIONAL | | | | | | | | | | |
| | ITEMS 002-0004 | | | 30,842,525.00 | | 41,147,825.00 | | | | | |

NSN 7540-01-280-5502 501419-201 OPTIONAL FORM 1419A (11-88)

53.236-1 Prescribed by GSA - FAR (48 CFR)

# ABSTRACT OF OFFERS - CONSTRUCTION

1. SOLICITATION NUMBER: DACW51-03-B-0001
2. DATE ISSUED: 30 NOV
3. DATE OPENED: 16 DEC 02
PAGE 1 OF PAGES

4. ISSUING OFFICE
U.S. ARMY CORPS OF ENGINEERS
26 FEDERAL PLAZA
NEW YORK, NEW YORK 10278-0090
CONTRACTING DIVISION

I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation.

NAME AND TITLE OF CERTIFYING OFFICIAL (TYPE): SCOTT HELMER

SIGNATURE

DATE SIGNED

5. PROJECT TITLE
ARTHUR KILL CHANNEL NAVIGATION IMPROVEMENT PROJECT CONTRACT #1
NEW YORK AND NEW JERSEY

6. NUMBER OF AMENDMENTS ISSUED: THREE

8. GOVERNMENT ESTIMATE (Check A, B or C and complete D, E, and
- A. HIRED LABOR
- ☐ B. REASONABLE CONTRACT (Without Profit)
- ☐ C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

NO. 1 — A. OFFEROR: WEEKS MARINE/ — B. BID SECURITY (Type and amount): 20% — C. AMENDMENTS ACKNOWLEDGED: YES

NO. 2 — B. OFFEROR: DONJON MARINE — B. BID SECURITY (Type and amount): 20% — C. AMENDMENTS ACKNOWLEDGED: YES

| 7A. ITEM NO. | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | No. 1 D. UNIT PRICE | No. 1 E. ESTIMATED AMOUNT | No. 2 D. UNIT PRICE | No. 2 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | BASE BID ITEM | | | | | | | | |
| 0001AA | MOBILIZATION AND DEMOBILIZATION | LS | LS | | 2,397,800 | 1 | 1,495,000 | LS | 1,000,000 |
| 0001AB | DEBRIS AND WOODEN DIKE REMOVAL AND DISPOSAL | 600 | TON | 0 | 300,000 | 500 | 300,000 | 300.00 | 180,000 |
| 001AC | DREDGING, TRANSPORTATION | 566,000 | CY | 47.94 | 27,134,000 | 49.95 | 28,271,700 | 42.00 | 23,772,000 |
| 0001AD | DEWATERING | 566,000 | CY | 0.60 | 339,600 | 1 | 566,000 | 1 | 566,000 |
| 0001AE | SUBSURFACE DRILLING | 15 | EA | 6,000 | 90,000 | 5,000 | 75,000 | 4,000 | 60,000 |
| 001AF | FIELD OFFICE | 1 | LA | | 164,300 | 1 | 150,000 | 75,000 | 75,000 |
| 0001AG | DREDGING, TRANSPORT | 278,000 | CY | 43.16 | 11,998,500 | 40.40 | 11,231,200 | 47.25 | 13,135,500.00 |
| 0001AH | DEWATERING | 278,000 | CY | .60 | 166,800 | 1 | 278,000 | 1 | 278,000 |
| 0001AJ | DREDGING | 35,000 | CY | 42.19 | 1,476,700 | 39.95 | 1,398,250 | 41.35 | 1,447,,250.00 |
| 0001AK | DREDGING | 108,000 | CY | 29.18 | 3,151,400 | 11.95 | 1,290,600 | 17.00 | 1,836,000 |
| 0001AI | THE DRILLING BLASTING | 159,000 | CY | 77.19 | 12,311,800 | 79.50 | 12,680,250 | 51.00 | 8,134,500.00 |

NSN 7540-01-150-0981 501419-101

NOTE: If more than two offers are received, continue on OF 1419A.

OPTIONAL FORM 1419 (11-88)
Prescribed by GSA - FAR (48 CFR) 53.236-1

| ABSTRACT OF OFFERS - CONSTRUCTION | 1. SOLICITATION NUMBER DACW51-03-B-0001 | 2. DATE ISSUED 30 NOV | 3. DATE OPENED 16 DEC 02 | PAGE OF PAGES |
|---|---|---|---|---|
| 4. ISSUING OFFICE<br>US ARMY CORPS OF ENGINEERS<br>26 FEDERAL PLAZA,<br>NEW YORK, NEW YORK 12078-0090<br>CONTRACTING DIVISION | offers received in response to this solicitation. | NAME AND TITLE OF CERTIFYING OFFICIAL (TYPE)<br>SCOTT HELMER<br>SIGNATURE | | DATE SIGNED |

5. PROJECT TITLE

ARTHUR KILL CHANNEL NAVIGATION IMPROVEMENTS PROJECT CONTRACT #1

6. NUMBER OF AMENDMENTS ISSUED: THREE

8. GOVERNMENT ESTIMATE (Check A, B or C and complete D, E, and F)

- ☐ A. HIRED LABOR
- ☐ B. REASONABLE CONTRACT (Without Profit)
- ☐ C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

| | NO. 3 | NO. 4 |
|---|---|---|
| A./B. OFFEROR | JAY CASHMAN | GREAT LAKES |
| B. BID SECURITY (Type and amount) | 20% | 20% |
| C. AMENDMENTS ACKNOWLEDGED | YES | yes |

| 7A. ITEM NO. | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | NO. 3 D. UNIT PRICE | NO. 3 E. ESTIMATED AMOUNT | NO. 4 D. UNIT PRICE | NO. 4 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | | | | | | | | | |
| 0001AA | | LS | | | | LS | 6,200,000 | 495,000 | 495,000 |
| 0001AB | | 600 | | | | 150 | 90,000.00 | 380 | 228,000 |
| 0001AC | | 566,000 | | | | 55 | 31,130,000 | 48.10 | 27,224,,600 |
| 0001AD | | 566,000 | | | | 1.50 | 849,000 | 0.88 | 498,080 |
| 0001AE | | 15 | | | | 5,000 | 75,000 | 5,500 | 82,500 |
| 0001AF | | 1 | | | | 1 | 400,000 | 272,000 | 272,000 |
| 0001AG | | 278,000 | | | | 36.50 | 10,147,000 | 39.75 | 11,050,500 |
| 0001AH | | 278,000 | | | | 1.50 | 417,000 | 0.88 | 244,640 |
| 0001AJ | | 35,000 | | | | 36.00 | 1,260,000 | 34.75 | 1,216,250 |
| 0001AK | | 108,000 | | | | 31.00 | 3,348,000 | 19.80 | 2,138,400 |
| 0001AL | | 159,000 | | | | 64.00 | 10,208,000 | 58.75 | 9,370,625 |

NSN 7540-01-150-0981 501419-101

NOTE: If more than two offers are received, continue on OF 1419A.

OPTIONAL FORM 1419 (11-88)
Prescribed by GSA - FAR (48 CFR) 53.236-1

## ABSTRACT OF OFFERS - CONSTRUCTION

1. SOLICITATION NUMBER DACW51-03-B-0001
2. DATE ISSUED 30 NOV
3. DATE OPENED 16 dec 02
PAGE OF PAGES

4. ISSUING OFFICE
US ARMY CORPS OF ENGINEERS
26 FEDERAL PLAZA
NEW YORK, N.Y. 10278-0090

I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation.

NAME AND TITLE OF CERTIFYING OFFICIAL (TYPE)

SIGNATURE

DATE SIGNED 19 DEC 02

5. PROJECT TITLE
ARTHUR KILL CHANNEL NAVIGATION IMPROVEMENTS PROJECT, CONTRACT #1

6. NUMBER OF AMENDMENTS ISSUED
THREE

8. GOVERNMENT ESTIMATE (Check A, B or C and complete D, E, and
☐ A. HIRED LABOR
☐ B. REASONABLE CONTRACT (Without Profit)
☐ C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

NO. 5
A. OFFEROR BEAN STUYVESANT
B. BID SECURITY (Type and amount) 20%
C. AMENDMENTS ACKNOWLEDGED YES

NO. 2
B. OFFEROR
B. BID SECURITY (Type and amount)
C. AMENDMENTS ACKNOWLEDGED

| 7A. ITEM NO. | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | NO. 5 D. UNIT PRICE | NO. 5 E. ESTIMATED AMOUNT | NO. 2 D. UNIT PRICE | NO. 2 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | | | | | | | | | |
| 0001AA | | | | | | | 1,061,109 | | |
| 0001AB | | | | | | 289 | 173,400 | | |
| 0001AC | | | | | | 48 | 26,036,000 | | |
| 0001aAD | | | | | | 1.55 | 877,300 | | |
| 0001AE | | | | | | 6,500 | 97,500 | | |
| 0001AF | | | | | | | 218,232 | | |
| 0001AG | | | | | | 34 | 9,452,000 | | |
| 0001AH | | | | | | 1.56 | 433,680 | | |
| 000IAJ | | | | | | 45.46 | 1,591,100 | | |
| 0001AK | | | | | | 14.20 | 1,533,600 | | |
| 0001AJ | | | | | | 55.60 | 8,871,390 | | |

NSN 7540-01-150-0981 501419-101

NOTE: If more than two offers are received, continue on OF 1419A.

OPTIONAL FORM 1419 (11-88)
Prescribed by GSA - FAR (48 CFR) 53.236-1

## ABSTRACT OF OFFERS - CONSTRUCTION CONTINUATION SHEET

1. SOLICITATION NUMBER: DACW51-03-B-0001

PAGE OF PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE

ARTHUR KILL CHANNEL NAVIGATION IMPROVEMENT PROJECT CONTRACT #1, NEW YORK AND NEW JERSEY

### 4. OFFERS (Continued)

| | NO.: 1 | NO.: 2 | NO.: 3 | NO.: 4 |
|---|---|---|---|---|
| A. OFFEROR | WEEKS MARINE | DONJON | JAY CASHMAN | GREAT LAKES |
| B. BID SECURITY (Type and Amount) | 20% | 20% | 20% | 20% |
| C. AMENDMENTS ACKNOWLEDGED | YES | YES | YES | YES |

### 3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | No. 1 D. UNIT PRICE | No. 1 E. ESTIMATED AMOUNT | No. 2 D. UNIT PRICE | No. 2 E. ESTIMATED AMOUNT | No. 3 D. UNIT PRICE | No. 3 E. ESTIMATED AMOUNT | No. 4 D. UNIT PRICE | No. 4 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0001AM | LS | 15,000 | LS | 100,000 | 40,000 | 40,000 | 125.000 | 125.000 | 54,000 | 54,000 |
| 0002 | LS | 50,000 | LS | 100,000 | 100,000 | 100,000 | 225,000 | 225,000 | 100,000 | 100,000 |
| 0003 | -30.90 | -7,879,500 | CY | -5,100,000 | 36 | -9,180,000 | 19 | -4,845,000 | 20.33 | -5,184,150 |
| | TOTAL | 51,716.400 | | 52,836,000 | | 41,444,250 | | 59,629,000 | | 43,985.315 |
| | | | \ | | | | | | | 47,790,445 |

NSN 7540-01-280-5502 501419-201 OPTIONAL FORM 1419A (11-88) Prescribed by GSA - FAR (48 CFR) 53.236-1

# ABSTRACT OF OFFERS - CONSTRUCTION CONTINUATION SHEET

1. SOLICITATION NUMBER: DACW51-03-B-0001

PAGE 5 OF 5 PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE: ARTHUR KILL CHANNEL

## 4. OFFERS (Continued)

| | NO. 5 | NO.: | NO.: | NO.: |
|---|---|---|---|---|
| A. OFFEROR | BEAN STUYVESANT | | | |
| B. BID SECURITY (Type and Amount) | 20% | | | |
| C. AMENDMENTS ACKNOWLEDGED | YES | | | |

## 3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | D. UNIT PRICE (No. 5) | E. ESTIMATED AMOUNT (No. 5) | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | LS | | 15,003 | 15,003 | | | | | | |
| 0002 | LS | | 1 | 1 | | | | | | |
| 0003 | | | 25 | -6,375,000 | TOTAL | 43,985.315 | | | | |

501419-201 OPTIONAL FORM 1419A (11-88)

Prescribed by GSA - FAR (48 CFR) 53.236-1

-----Original Message-----
From: Kraus, Lisa R NAN02
Sent: Friday, June 15, 2001 3:28 PM
To: Hawkins, Harold J NAN02
Cc: Lee, Lorraine C NAN02; Harris, Donald M NAN02; Rovi, Michael NAN02; Weinberg, Steven R NAN02; Snell, Ella D NAN02; Mcrimmon, Martin M NAN02; Piken, Stuart NAN02; Caspe, Jerome NAN02; Connolly, Arthur J NAN02; Seebode, Joseph J NAN02; Ohrwashel, Ina J NAN02; Lew, Edward T NAN02
Subject: DACW51-01-B-0063, KVK Contract 5

Please be advised, as of 15 Jun 2001 14:15, Jay Cashman, Inc., has requested to be permitted to withdraw its bid due to a computational error in the calculation of the quantity of rock to be removed under this contract. In view of the PDT's analysis of the firm's ability to complete the project within the authorized contractual period with the assets proposed to be devoted to the job, the withdrawal will be permitted.

Please advise as to when the team should convene to determine the capabilities of the second low offeror.

Lisa Renee Kraus
Contracting Officer

Welcome to the US Army Corps of Engineers

New York District

# CONTRACT AWARD INFORMATION

| | | | |
|---|---|---|---|
| Solicitation Number: | DACW51-03-B-0004 | | |
| Title: | Kill Van Kull and Newark Bay Channels, Contract 8, Area 8 | | |
| Location: | New York, New Jersey | | |
| Contracting POC: | Myrlande Lee | Phone: | 212-264-6707 |

| | |
|---|---|
| CONTRACT NUMBER: | DACW51-03-C-0014 |
| CONTRACT AMOUNT: | $39,307,022.00 |
| AWARD AMOUNT: | $35,460,430.00 |
| AWARD DATE: | 23 May 2003 |
| CONTRACTOR: | Jay Cashman Inc. |
| ADDRESS: | 20 West Howell Street<br>Boston, MA 02125-1108 |
| POINT OF CONTACT: | Bruce Wood |
| TELEPHONE NUMBER: | 617-287-1600 |
| BUSINESS SIZE/TYPE | Large Business |
| CONTRACTING OFFICER: | David H. Freedman |

| | |
|---|---|
| * = Total Base Plus all Options | ** = Total Amount Obligated |

1

**ABSTRACT OF OFFERS - CONSTRUCTION**

1. SOLICITATION NUMBER: DACW51-03-B-0004
2. DATE ISSUED: 25 MARCH 2003
3. DATE OPENED: 25 MARCH 2003

PAGE 1 OF 4 PAGES

4. ISSUING OFFICE
USA ENGINEER DISTRICT, NEW YORK
CENAN-CT, ROOM 1843
26 FEDERAL PLAZA (DACW51))
NEW YORK. NY 10278-0090

I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation.

NAME AND TITLE OF CERTIFYING OFFICIAL (TYPE)
MYRLANDE LEE
CONTRACT SPECIALIST

SIGNATURE

DATE SIGNED: 25 MARCH 2003

5. PROJECT TITLE
KVK/NEWARK BAY AREA 8

6. NUMBER OF AMENDMENTS ISSUED
5

8. GOVERNMENT ESTIMATE (Check A, B or C and complete D, E, and F)
☐ A. HIRED LABOR
☐ B. REASONABLE CONTRACT (Without Profit)
☐ C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

NO. 1
A. OFFEROR: WEEKS MARINE, INC
B. BID SECURITY (Type and amount): 20%, $3,000,000.00
C. AMENDMENTS ACKNOWLEDGED: YES

NO. 2
B. OFFEROR: JAY CASHMAN, INC
B. BID SECURITY (Type and amount): 20%, $3,000,0000.00
C. AMENDMENTS ACKNOWLEDGED: YES

| 7A. ITEM NO. | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | E. UNIT PRICE (Gov. Est.) | F. ESTIMATED AMOUNT (Gov. Est.) | D. UNIT PRICE (No. 1) | E. ESTIMATED AMOUNT (No. 1) | D. UNIT PRICE (No. 2) | E. ESTIMATED AMOUNT (No. 2) |
|---|---|---|---|---|---|---|---|---|---|
| 0001AA | Mob/Demob | | LS | | $2,932,600.00 | | $2,995,000.00 | | $6,268,500.00 |
| 0001AB | Debris Removal/Disposal | | TON | 510.00 | $25,500.00 | 500.00 | $25,000.00 | 200.00 | 10,000.00 |
| 0001AC | Dredging/Disposal at OENJ/ other site silt | | CY | 49.90 | 10,698,560.00 | 49.95 | $10,709,280.00 | 44.80 | $9,605,120.00 |
| 0001AD | Dewatering | | CY | 0.82 | $175,808.00 | 1.00 | $214,400.00 | 1.00 | $214,400.00 |
| 0001AE | Subsurface Sampling and Drilling | | EA | 6,120.00 | 91,800.00 | 5,000.00 | $75,000.00 | 5,000.00 | $75,000.00 |
| 0001AF | Field Office | | LS | | $163,200.00 | | $150,000.00 | | $192,000.00 |
| 0001AG | Dredging/Disposal at HARS | | CY | 12.45 | $16,737,406.00 | 29.95 | $40,263,881.50 | 13.00 | $17,476,810.00 |
| 0001AH | Dredging/Disposal at CDF | | CY | 37.81 | $901,768.00 | 39.95 | $952,807.50 | 36.00 | $858,600.00 |
| 0001AL | Dredging/Disposal at Reef | | CY | 137.78 | $2,094,256.00 | 79.95 | $1,215,240.00 | 50.00 | $760,000.00 |
| TOTAL | BASE BIDS | | | | $33,820,898.00 | | $56,600,609.00 | | $35,460,430.00 |
| 0002 | Optional Insurance | | LS | | $51,700.00 | | $50,000.00 | | $100,000.00 |
| 0005A | Dredging/Disposal at HARS | | CY | 14.39 | $1,263,874.00 | 29.95 | $2,630,508.50 | 6.00 | $526,980.00 |

NSN 7540-01-150-0981 501419-101

NOTE: If more than two offers are received, continue on OF 1419A.

OPTIONAL FORM 1419 (11-88)
Prescribed by GSA - FAR (48 CFR) 53.236-1

**ABSTRACT OF OFFERS - CONSTRUCTION**
**CONTINUATION SHEET**

1. SOLICITATION NUMBER: DACW51-03-B-0004

PAGE 2 OF 4 PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE: KVK/NEWARK BAY AREA 8

4. OFFERS (Continued)

| | NO.: | NO.: 1 | NO.: 2 | NO.: |
|---|---|---|---|---|
| A. OFFEROR | GOVERNMENT ESTIMATE | WEEKS MARINE, INC | JAY CASHMAN, INC | |
| B. BID SECURITY (Type and Amount) | | 20%, $3,000,000.00 | 20%, $3,000,000.00 | |
| C. AMENDMENTS ACKNOWLEDGED | | YES | YES | |

3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0005B | | CY | 50.85 | $618,845.00 | 49.95 | $607,891.50 | 40.00 | $486,800.00 | | |
| 0005C | | CY | 0.83 | $10,101.00 | 1.00 | $12,170.00 | 1.00 | $12,170.00 | | |
| 0006A | | CY | 15.17 | $1,707,308.00 | 39.00 | $4,389,255.00 | 10.00 | $1,125,450.00 | | |
| 0006B | | CY | 148.17 | $4,500,664.00 | 90.00 | $2,733,750.00 | 50.00 | $1,518,750.00 | | |
| 0006C | | CY | 56.98 | $84,330.00 | 69.95 | $103,526.00 | 49.50 | $73,260.00 | | |
| 0006D | | CY | 0.83 | $1,228.00 | 1.00 | $1,480.00 | 2.15 | $3,182.00 | | |
| TOTAL | OPTIONS | | | $8,238,050.00 | | $10,528,581.00 | | $3,846,592.00 | | |
| TOTAL | Base Bid + Options | | | $42,058,948.00 | | $67,129,190.00 | | $39,307,022.00 | | |

NSN 7540-01-280-5502 501419-201

OPTIONAL FORM 1419A (11-88)
Prescribed by GSA - FAR (48 CFR) 53.236-1

# ABSTRACT OF OFFERS - CONSTRUCTION CONTINUATION SHEET

1. SOLICITATION NUMBER: DACW51-03-B-0004

PAGE 3 OF 4 PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

ROJECT TITLE: ·VK/NEWARK BAY AREA 8

## 4. OFFERS (Continued)

| | NO.: 3 | NO.: __ | NO.: __ | NO.: __ |
|---|---|---|---|---|
| A. OFFEROR | BEAN STUYVESANT | | | |
| B. BID SECURITY (Type and Amount) | 20%, $3,000,000.00 | | | |
| C. AMENDMENTS ACKNOWLEDGED | yes | | | |

## 3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0001AA | | LS | | $2,800,000.00 | | | | | | |
| 0001AB | | TON | 200.00 | $10,000.00 | | | | | | |
| 0001AC | | CY | 45.00 | $9,648,000.00 | | | | | | |
| 0001AD | | CY | 1.50 | $321,600.00 | | | | | | |
| 0001AE | | EA | 5,000.00 | $75,000.00 | | | | | | |
| 0001AF | | LS | | $150,000.00 | | | | | | |
| 0001AG | | CY | 18.00 | $24,198,660.00 | | | | | | |
| 0001AH | | CY | 36.00 | $858,600.00 | | | | | | |
| 0001AL | | CY | 100.00 | $1,520,000.00 | | | | | | |
| TOTAL | BASE BID | | | $39,581,860.00 | | | | | | |
| 0002 | Optional Insurance | LS | | $10,000.00 | | | | | | |
| 0005A | | CY | 18.00 | $1,580,940.00 | | | | | | |

**ABSTRACT OF OFFERS - CONSTRUCTION**

**CONTINUATION SHEET**

1. SOLICITATION NUMBER: DACW51-03-B-0004

PAGE 4 OF 4 PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accommodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE: KVK/NEWARK BAY AREA 8

4. OFFERS (Continued)

| | NO.: 3 | NO.: ___ | NO.: ___ | NO.: ___ |
|---|---|---|---|---|
| A. OFFEROR | BEAN STUYVESANT | | | |
| B. BID SECURITY (Type and Amount) | 20%, $3,000,000.00 | | | |
| C. AMENDMENTS ACKNOWLEDGED | YES | | | |

3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0005B | | CY | 45.00 | $547,650.00 | | | | | | |
| 0005C | | CY | 1.50 | $18,255.00 | | | | | | |
| 0006A | | CY | 18.00 | $2,025,810.00 | | | | | | |
| 0006B | | CY | 90.00 | $2,733,750.00 | | | | | | |
| 0006C | | CY | 45.00 | $66,600.00 | | | | | | |
| 0006D | | CY | 1.50 | $2,220.00 | | | | | | |
| TOTAL | OPTIONS | | | $6,985,225.00 | | | | | | |
| TOTAL | Base Bid + Options | | | $46,567,085.00 | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

NSN 7540-01-280-5502 501419-201 OPTIONAL FORM 1419A (11-88)
Prescribed by GSA - FAR (48 CFR) 53.236-1

A Yes.
Q Did you do that?
A Yes.
Q What sort of a review is that, is it a very detailed review, can you describe what you do in connection with that sort of a review?
A I generally read the plans and specifications. I'll read, in particular, the special contract requirements in a section and some of the technical spec sections, in particular the dredging and blasting. Then I'll go through the plan sheets and look at the quality and look for consistencies within the plan sheets to see whether or not they meet the requirements of both the environmental documentation that we have and the requirements to the contract.
Q Was there, as far as you recall, anything particularly unique about the KVK8 project?
A Nothing unique with the exception I can't remember if it may have been the first contract, we may have used environmental

windows, but really nothing unique.

Q Was there any interaction between your office and the survey branch of the New York district in regards to the preparation of the plans and specs?

A Yes.

Q How would you describe that?

A As part of our specifications we have requirements in there for accepted surveys that are time periods that we incorporate in that as far as when we will be available to provide information back to the contractor so that portion of the specifications is coordinated with them as far as the requirements of the survey, type of survey, the duration for us to provide information back to the contractor, basically technical aspects relative to survey.

Q Do you know who in the survey branch would have been the point of contact for that coordination that you described?

A We spoke with Richard Kiss and that was primarily through Steve, Richard Kiss.

A I wrote portions of it. A lot of portions were written by other people. I can talk to you about what I wrote, what I got from other people and how we coordinated, but I can't talk to you about the writing of all parts of it.

Q Were some parts of it boilerplate in the sense that they were taken from previous packages?

A That is also true, yes.

Q It's not necessary to re-draft the entire plan and specification package?

A That is true.

Q Is there any way to easily identify those portions that you wrote in the KVK8 project package by category, for example?

A Well, most of my contributions would have been parts of what is called section 800, section 2900 and I think there was a 2200 still in this spec.

Q What were those sections? What did those sections deal with, if you recall?

A Section 800 was general contract provisions. Section 2900 is the dredging

specification. 2200 would have involved blasting.

Q Was the Survey Branch required to draft or furnish any parts of the specification?

A Their contribution was more or less boilerplate that was recycled from previous contracts and then sent back to them for review.

Q What who was your point of contact in Surveys?

A Let's see. This was 2003. I'm trying to remember if then it was Richard or -- Kiss or if it was still Ray Elmore. I'm trying to remember when Ray retired.

MS. KILFOYLE: Off the record.

(Whereupon, a discussion was held off the record.)

Q Mr. Weinberg, I'm handing you a copy of solicitation Paragraph 1.15, a provision dealing with final examination and acceptance, and ask you whether that is a provision that you are familiar with?

A Yes, I believe this was part of the Section 800.
Q Is this something that you drafted?
A Parts of it were changed for this contract. Parts of it were reused.
Q Do you know what parts were changed for this contract?
A Well, certainly the part about the re-surveying charge and the specific acceptance areas were changed. Just let me have a moment to take a closer look at it.
Q Sure. Take your time.
A Those are the changes that I recall. I cannot say certainly whether anything else had been changed from previous contracts at this point.
Q The provision does say in the third to the last sentence that "The pre final surveys shall be performed using a multi track or multi beam survey". Do you see that?
A Yes, I see that.
Q Is that a requirement that had existed in prior KVK projects as well?

# Chapter 11
# Acoustic Multibeam Survey Systems for Deep-Draft Navigation Projects

## 11-1. General Scope and Applications

This chapter provides USACE policy and guidance for acquisition, calibration, quality control, and quality assurance of multibeam survey systems used on deep-draft navigation, flood control, and charting projects. Instructions for operating specific multibeam systems, or the acquisition, processing, and editing of data from these systems, are found in manufacturer's operating manuals and software processing manuals specific to the systems employed.



Figure 11-1. Full-coverage multibeam survey of coastal inlet navigation project (Galveston District)

## 11-2. Background

The US Navy developed multibeam swath survey technology in the early 1960s for deep-water bathymetric mapping. Only since the early 1990s has this technology been developed and marketed for shallow-water USACE applications, such as those illustrated in Figure 11-1. It is expected that the use of multibeam systems will significantly increase over the next few years, and will gradually supplant single beam transducer survey systems in deep-draft navigation projects. Multibeam systems, when coupled with digital side-scan imaging systems, have the potential to become a primary strike detection method in USACE. Multibeam systems have technically advanced since their introduction in the early 1990's to the point that they now have a direct application to most Corps navigation project survey activities. When

properly deployed and operated, the accuracy, coverage, and strike detection capabilities of multibeam systems now exceeds that of traditional vertical single beam echo sounding methods.

## 11-3. Principles of Operation

Multibeam sonar systems employ beamforming or interferometric (phased array) acoustic detection techniques from which detailed terrain cross-section (swath) data can be developed many times per second. A single transducer, or pair of transducers, form a fan array of narrow beams that result in acoustic travel-time measurements over a swath that varies with system-type and bottom depth--typically mapping an area 2 to 14 times the channel depth with each array pulse--see Figure 11-2. Generating many sweeps per second (e.g., the Reson Seabat 8101 generates 30 profiles per second at 7.4 times water depth), multibeam systems can obtain 100% bottom coverage, and can provide high resolution footprints when narrowly focused beams are formed--e.g., < 1 deg. Multibeam systems can also be configured for waters-edge to waters-edge coverage (i.e., over 180 degree swath), allowing side-looking, full-coverage underwater topographic mapping of constricted channels, lock chambers, revetments, breakwaters, and other underwater structures. Some systems collect acoustic backscatter information which can produce digital side-scan imagery simultaneously with the swath mapping data, an advantage in locating underwater rock, hazards, shoals, or other objects (strike detection). Multibeam acoustic frequencies and signal processing methods may be adjusted to match the survey requirements--dredging measurement and payment, strike detection, structure mapping, etc. Some systems can provide near real-time data collection, filtering, editing, quality assessment, and display; along with near real-time (i.e., on board) data processing, plotting, and volume computations; thus, final plan drawings, 3D terrain models, and dredged quantities can be completed in the field the same day the survey is performed.




Figure 11-2. Multibeam transducers and beam geometry (NOAA)

*a. General.* All multibeam swath systems use the same basic approach to depth measurement. A lateral swath of sea floor is illuminated acoustically and the returning echo signals are processed into vertical depths. Travel time estimates are converted into slant ranges, horizontal off-center distances, and then depth by applying beam angles and sound velocity profile data. The object is to convert two-way slope distance travel times to a vertical depth at points along the bottom. Slope distances are resolved using amplitude and/or phase detection methods. Amplitude detection relies on finding the time of beam bore site interception with the bottom, typically determined using a center-of-energy method or matched filter method. Phase detection relies on finding the time of the zero phase crossing using two or more subsections of the receive array. Amplitude detection is typically used for the inner beams (e.g., 0 deg to 45-deg off-nadir) and phase detection is typically used for the outer beams (e.g., 45 deg out to 100-deg off-nadir). The changeover point between amplitude and phase detection varies by design; methods include absolute cutoff, real-time analysis of each beam, and combination amplitude and phase. Depth accuracy can change at bottom detection transition points.

*b. Beam spacing.* Swath systems are typically designed with between a 0.5 deg and 3.0 deg beam spacing. Due to the physics involved, a half-degree beam spacing is about the best that can be achieved and still have a portable electronically beam-formed system. To increase resolution, interferometric phased array techniques are employed. The accuracy of a wide-swath multibeam is determined by the ability of a multibeam system to resolve the actual beam angle in varying situations.

*c. Signal parameters.* Each individual bottom spot within the ensonifinied swath responds with an echo signal in which signal parameters (amplitude, frequency, phase) are all dependent. These parameters are dependent upon the characteristics of the bottom, namely (1) bottom reflectivity and (2) slope angle of incidence of the beam. The quality of the return signal is dependent upon the primary projector/receiver characteristics and the geometrical and reflective properites of the particular bottom spot. The hardware is a factor in the quality of the final data. In designs that rely totally on electronic beamforming, the transducer must be optimized for a particular application. A multibeam sonar's bottom detection thus provides three pieces of information: (1) the angle of the beam along which the acoustic pulse traveled, relative to the sonar head, (2) the round-trip travel time of the acoustic pulse, and (3) a signal intensity time series of the bottom return. These three pieces of information must be integrated with the other sensor data to determine the total sounding solution (i.e., X-Y-Z) relative to our Earth-fixed coordinate system. Most multibeam systems can also output the angle independent imagery--more commonly called pseudo side scan imagery.

*d. Vessel roll, pitch, and yaw effects.* Horizontal positioning accuracy is dependent upon the ability of the system to compensate for pointing errors caused by vessel roll, pitch, and yaw--Figure 11-3. Across-track location of each bottom point is critical. In wider swath systems, even a small degree of roll can cause large errors in the outer beams; thus restrictions are typically placed on use of outer beam data. These errors are compounded due to beam spreading.

post-processing editing work previously associated with large multibeam datasets. Procedures and guidance in software manuals should be consulted. The procedures used for such data thinning/binning could adversely corrupt or erroneously warp the reduced model, and could impact dredged volume computations. Automated filtering for data spikes must be closely monitored. Data thinning routines must be intelligent in order to maintain the integrity of the topography. Averaging data into bins must also ensure that the basic topography is not compromised. If bin sizes are too large, data may be overly smoothed. Topographic data corruption can also occur if shoal biasing or averaging is used to form bins or cells in a digital terrain model (DTM) or digital elevation model (DEM)--such biasing processes should be avoided. Many of these procedures, and related intelligent data thinning software routines, are being continually updated as new algorithms and performance test techniques become validated.

*a. Data filtering and editing.* Multibeam data typically contains many spikes that must be edited out of the database. Filtering and editing can be done in real-time, in post-processing, or in combination. Manual editing could be performed by viewing each cross-sections and editing out spikes from individual beams. At 40 cross-sections/sec, this is not practical. More commonly, the entire dataset is viewed in 3-D form and data spikes are edited out manually in the 3-D model. This is likewise a labor-intensive process. Spike or data anomaly filtering can also be performed during data acquisition or during post-processing. Such "intelligent" filtering is usually based on setting up maximum data quality or magnitude changes. During this process, data can also be automatically thinned and binned. Final 3-D model review and editing is still recommended. Given the increasing densities of collected multibeam data, coupled with requirements for minimum bin sizes (e.g., 20 cm), automated filtering and editing is the only practical way to process these large datasets.

*b. Binning or gridded depth reduction.* Binning or gridding routines (e.g., HYPACK MAPPER) display a depth in a selected grid cell of a size to prevent overplotting adjacent depths. Although designed for reducing the size of multibeam data, these binning routines may also be used for single beam data as well. Various depth outputs are possible with binned data:

(1) Minimum depth within the cell (e.g., shoal biasing)
(2) Maximum depth within the cell
(3) Average of all depths recorded within the cell
(4) Shot depth closest to the cell center

The shot depth closest to the cell center should be used rather than minimum, maximum, or average options. The "shot" depth option is recommended for USACE navigation and dredging surveys. The average depth over the series can overly smooth the data; however, this may be desirable in some instances. It is not desirable on excavated slopes since the average depth does not correlate with the position. Visual interpolation of analog depth records basically averages the depths nearest the fix event mark and interpolated intermediate points. If averaged depths are recorded, the system software must tag a position with the center of the depth series. This requires some form of on-line position interpolation.

*c. Shoal-biased or minimum depth.* The minimum depth recorded within a bin area may be used for some strike detection purposes. However, such biased depths shall not be used for dredging payment surveys, and should be used with caution on navigation project condition surveys. This is due to the relatively high variance in acoustic depth data--see discussion on data accuracy and confidence intervals in Chapter 4. Use of minimum shoal-biased depths can adversely skew dredge quantity computations and erroneously portray clearance data. Shoal biasing can also skew minimum clearance computations on channel condition surveys. Shoals above grade must be assessed based on multiple hits over successive passes--the least depth recorded in a bin is not necessarily the absolute elevation over an object.

*d. Maximum bin size.* Table 11-2 specifies that bin sizes should not exceed 1 meter or 5 meters, depending on the type of bottom. In irregular topography, 5 meters may be too large, and a smaller bin size would be recommended. Bin sizes as small as 20 cm are used for applications where maximum detail is required--e.g., underwater structure surveys.

## 11-13. Summary or Multibeam QC and QA Criteria

Table 11-2 below summarizes criteria for using multibeam systems. The measurement, alignment, calibration tests, and quality assurance procedures and criteria standards are based on procedures currently followed by a variety of government and commercial sources. Multibeam component calibrations and accuracy performance tests must be performed and documented for all surveys. QC and QA performance tests are recommended at beginning of all critical dredging projects, or occasionally on surveys within a project where high quality assurance is required. Depending on documented stability of system, frequency of QC calibrations and QA performance tests may be locally modified from the indicated intervals. Much of the following criteria duplicate single-beam or multiple transducer criteria, so explanations for these items are covered in these previous chapters.

*a. Maximum beam angle.* Beam/swath width should generally not exceed the indicated values, unless independent QA performance test results indicate depth accuracies can be achieved with wider arrays. The beam angle should be reduced for critical object detection or should QA performance test results indicate poor correlation in the outermost portion of the array. Larger beam widths must be recorded to compensate for roll. Excessive footprint size should be avoided by reducing beam width.

*b. Beam overlap.* In navigation projects a 50% side overlap (i.e., 200% bottom coverage) is strongly recommended when sweeping for rock shards or other hazardous objects remaining above project grade. Beam angle should not generally exceed 90 degrees in strike detection work--due to expansion and poorer return from outer beams.

*c. Velocity and bar check calibrations.* Velocity casts should be taken at the indicated intervals. They shall be taken directly in the work area and at a density such that the water column is adequately modeled. A QC Bar Check should be made under the center beam, if feasible. Bar check procedures should follow those prescribed for single- and multiple-transducer systems.

*d. System alignment and patch test calibrations.* Multibeam system alignment checks and Patch tests are performed on an as needed basis; usually when mandatory QA Performance Tests indicate data is not meeting standards. The time interval required between Patch tests is dependent on QA test results -- no specific interval is mandated.

*e. QA performance tests.* Performance tests on multibeam data are absolutely essential and are mandatory. They should be performed at the beginning of each new project, and periodically during a project. The time interval needed between QA performance tests will depend on the consistency of test results. The maximum mean bias computed between two data sets should not exceed the indicated tolerances. The allowable standard deviation is a function of the project depth, as indicated in Table 3-1.

*f. Minimum depth.* Multibeam systems should not be used for dredge measurement, payment, and acceptance purposes in project depths less than those shown in Table 11-2. Exceptions should be requested from HQUSACE (ATTN: CECW-OD).

*g. Maximum survey speed.* Recommended maximum velocities are prescribed to ensure data integrity. Further limitations may be required for multibeam or side-scan systems to ensure 100% or greater forward (along-track) coverage or object detection.

Table 11-2. Critical Quality Control and Quality Assurance Criteria for Multibeam Surveys

| | PROJECT CLASSIFICATION | | |
|---|---|---|---|
| | Navigation & Dredging Support Surveys<br>Bottom Material Classification | | Other General Surveys & Studies |
| | Hard | Soft | |
| **MULTIBEAM QUALITY CONTROL** | | | |
| Maximum beam angle | 90-degrees | 120-degrees | Unlimited |
| Beam overlap | 10%-50% | 10% | N/A |
| Bar check (center) | 1/day | 1/day | optional |
| Alignment calibrations | as reqd | as reqd | as reqd |
| Patch test calibrations | periodic | periodic | periodic |
| **MINIMUM PROJECT DEPTH** | | | |
| Dredging surveys | > 15 ft | > 15 ft | N/A |
| Condition surveys | > 20 ft | > 20 ft | any depth |
| **MAXIMUM SURVEY SPEED** | 2-5 knots | 5-10 knots | Unlimited |
| **ACOUSTIC FREQUENCY (± 20%)** | 200 kHz | 200 kHz | 200 kHz |
| **VELOCITY PROBE CALIBRATIONS** | | | |
| Perform velocity calibration | > 2/day | 2/day | 2/day |
| Record velocity to nearest | 1 fps | 1 fps | 1 fps |
| Record velocities at maximum every | 5 ft | 5 ft | 5 ft |
| Reject tolerance between checks | 5 fps | 5 fps | 5 fps |
| Location of calibration | At project site | Near project site | Vicinity |
| Perform internal calibration | Weekly | Weekly | Monthly |
| **MISCELLANEOUS CHECKS** | | | |
| Squat test calibration performed | Annually | Annually | Annually |
| Check vessel draft variations | 2/day | 2/day | 2/day |
| **QA PERFORMANCE TEST** | | | |
| Requirement | 1/project | 1/project | 3 mos |
| Maximum Outliers | 1 ft | 1 ft | 2 ft |
| Maximum allowable mean bias | < 0.1 ft | < 0.2 ft | N/A |
| Standard deviation (95%) | [ per Table 3-1 ] | | N/A |
| **RECORDED DEPTH** | | | |
| Dredge payment quantities | Full density shot | Full density shot | N/A |
| B/D or A/D plot | Selected shot | Selected shot | N/A |
| Project condition plot (thinned/binned) | Centroid shot | Shot or minimum | Optional |
| Maximum bin size (quantities) | 1 m | 5 m | as reqd |
| Record depth to nearest | 0.1 ft | 0.1 ft | 0.1 ft |
| **ARCHIVED ANALOG DEPTH RECORDS** | | | |
| Contracted construction | [ Write-once disc | | ] |
| Project condition surveys | Digital | Digital | Optional |

Table 11-2. Critical Quality Control and Quality Assurance Criteria for Multibeam Surveys (Continued)

| | Frequency of Measurement (Minimum)[1] | Calibration Procedure | Allowable Tolerance (95%) | Corrective Action |
|---|---|---|---|---|
| SENSOR ALIGNMENT AND OFFSET MEASUREMENTS: | | | | |
| Transducer | Initial installation | Leveling/Tot Station | 0.5 degrees | Remount |
| Gyro | Initial installation | Self calibration | Manufacturer's specification | Replace |
| Heave/Pitch/Roll | Start of project | Self calibration | 0.1 degree | Remount |
| GPS Antenna | Initial installation | Leveling | 0.1 foot | Remount |
| Squat | Annually | Transit/level/DGPS | 0.1 foot | None |
| Dynamic Draft | As required | Fixed vessel marks | 0.1 foot | None |
| PATCH TEST (RESIDUAL BIAS CALIBRATION): | | | | |
| Pitch | Init Install or Mod | 2 pairs or reciprocal lines on slope | 0.2 feet | apply corr'n in software |
| Roll | Init Install or Mod | 1 pair of reciprocal lines over flat area | 0.2 feet | apply corr'n in software |
| Time Delay (latency) | Init Install or Mod | 2 pairs of reciprocal lines on slope | 0.2 feet | apply corr'n in software |
| Azimuth/Yaw | Init Install or Mod | 2 pairs of adjacent lines over shoal | 0.2 feet | apply corr'n in software |

1. Calibration frequency indicated should not be considered absolute as it is subject to local conditions, such as stability of project area, stability between repeated tests, nature of project, etc.

*h. Acoustic frequency.* The 200 kHz frequency is recommended for most USACE navigation projects; however, different frequency systems may optionally be used if needed for better beam definition or to penetrate suspended sediments in a particular project area. Frequency is not considered as a mandatory criteria.

*i. Velocity calibrations.* Velocity probe calibrations are critical to obtaining high quality multibeam data--especially if beam width is extended. More frequent calibrations may be needed in conditions where temperature or salinity is variable.

*j. Squat tests.* Squat tests should be performed at the intervals indicated.

*k. Recorded depths.* For dredge payment applications, the full multibeam dataset is recommended for clearance and volume computations. Since many newer multibeam systems record far

more data than can be plotted or is needed for volume computations, it may optionally be thinned down into rectangular bins (or grids) using standard commercial software routines. The maximum bin size will depend on the application. For dredging measurement, payment, or acceptance, the bin size should be kept as small as possible--typically less than 1 to 5 m is recommended. The shotpoint depth nearest the bin centroid shall be used; not average or minimum, or shoal-biased depths. Bin size may be increased for smooth, soft bottoms.

## 11-14. Multibeam Publications

The following publications provide additional technical information on the use and calibration of multibeam systems.

*a.* Field Procedures for the Calibration of Shallow Water Multibeam Echo-Sounding Systems, André Godin, Canadian Hydrographic Service, February 1996.

*b.* HYPACK MAX User's Manual, Coastal Oceanographics, Inc., Middlefield, CT., www.coastalo.com, May 2000.

*c.* Multibeam Surveying Workshop Proceedings, U.S. Army Corps of Engineers and NOAA Surveying, Mapping, and Remote Sensing Conference, St. Louis, MO, 19 Aug 1997.

*d.* Trimble HYDROpro Navigation Software Manual, Trimble Navigation Limited, Sunnyvale, CA, http://www.trimble.com

*e.* American Congress on Surveying and Mapping (ACSM), ACSM-ASPS-MAPS-MARLS 2000 Workshop Program, Hydrographic Surveying, Little Rock, AR, 21 March 2000 (Shallow Water Multibeam Systems for NOAA Hydrographic Surveys)

## 11-15. Mandatory Requirements

The policy outlined in paragraph 11-4 (USACE Multibeam Policies, Procedures, and Applications) is considered mandatory. All calibration, QC, and QA criteria summarized in Table 11-2 are mandatory.

A I assume it was the construction division representatives, we never saw them.
Q You would, I assume, at some point receive a request from construction to please go out and survey this area?
A That is correct.
Q And you would go out and do it and you would return the results back to construction?
A Correct.
Q What was the normal turn around time with something like that?
A It depends on two factors, the size of the area to be surveyed and how well the dredger dredged. The more hits that we located the longer it would take us to process the data because each individual hit had to be manually researched. It's a long process to take care of.
Q What's involved in manually researching the hit?
A You have to actually go through the data sets. In order for a sounding, a shoal sounding to be put on the survey, there

have to be three hits of that elevation seen within the data cell. So you have to actually go back research the data cell, research the hit, find the cell and take a look at the cell itself and make sure there were three of those soundings in that cell.

Q Cell being three feet by three feet roughly?

A Right.

Q How many data points would there typically be in a cell?

A Could be fifty or sixty and generally we look for them to be on separate passes.

Q Do you know whether Cashman was using the shoalest or minimum sounding method on its pre-acceptance surveys?

A After reviewing some of the material, apparently, he was using an average method.

Q Understanding that, I think you said a minute ago you didn't receive these for review during the course of the contract?

A That is correct.

Q But you always used the shoalest method for acceptance purposes?

A Yes.

Q Was that the purpose before the advent of multi-beam?

A Yes, as I said, when we used to do manual bar sweeps the bar would be lowered to a certain grade, whatever the grade was. When the bar would hit something on the bottom it would crank up until it cleared the obstruction and that shallowest sound was always the one that was recorded.

Q You mentioned the cell size that was being surveyed, did that vary from time to time?

A Generally we used the smallest data cell possible depending on the side of the area being surveyed, it was generally a meter by a meter.

Q Would you please turn to page E3 of the engineers' circular in front of you and I direct your attention to paragraph G, dredging contracts specifications and it says that measurement and payment provision in

that correct?

A Yes.

Q Are there any others, that you know of?

A There's many ways of manipulating the data with multi beam. You end up having a lot of data that you have to analyze and sort, but fundamentally the way that we have always accepted a new work job has always been since the time that we've done new work, which is probably going back to the 1880s, has always been a minimum depth. The use of bars that used to be employed for acceptance was in essence going for minimum point that could exist of concern. When we used to do acoustical soundings the idea was to try to make sure that, you know, the channel was down to depth. A ship does not know average. It knows minimum, and if it comes in and hits a pinnacle, as it has happened -- Tyson's light was the case in point in the forty foot project, where there was a minimum point that was above the depth and that was a million dollar problem that the Corps had to deal

method?

A No.

Q Why not?

A For the very reason I stated before, that if the ship is going to come in and hit something it's going to hit the shoalest thing out there, not the sounding closest to the center of the cell.

Q What kind of material are we dealing with here for the most part? I understand that some of it is rock, what else generally would you have been dealing with?

A There's some soft material, but as far as I was concerned everything here was rock, that had to be my attitude.

Q I can understand that you might be concerned about a vessel striking rock, but would you also have concern about a vessel striking soft material?

A Not to the same degree, but yes.

Q Why?

A We don't want to strike anything out there and we want to make sure the information we provide is the most accurate.

place. As project manager I am, you know, as a conductor sort of thing, I am trying to get everybody, and the contractor's part of my team, to play on the same page, all right, and if there is a -- an issue with regard to equipment or these survey results, and it's approached by either party with regard to partnering, which is one of the key things now of the Corps is a partnership, the partnership basically tries to resolve issues, and if there's a conflict, that's when I get employed to try to be fair to both sides.

Q Well, with that very admirable outlook, I would be correct to conclude that you would not be gratified if contractors are complaining about inflexibility in the District?

A Only if it's not on the basis of being, you know, justified. I mean there's a time in which you have a standard and you basically have to maintain a standard. A ship comes in and hits a pinnacle, we got problems. The Corps has major problems, so you have to have a standard. You have to have integrity

there later and taking it down to fifty anyway?

A Well, he's going to be coming in later, but exactly how much later we don't know, and the expectation is that is that channel is going to be used at forty-seven feet before it gets taken to fifty.

Q But you're assuming that if a channel has been dredged to forty-seven that that becomes the authorized project depth that the navigation community can rely upon?

A It's gonna be the -- it's gonna be the depth that the navigation community is going to be aware of and, you know, again I -- I am not intimately familiar with the regulations governing shipping and, you know, what they do or what they're allowed to do and what they're not allowed to do. I -- you know, it -- if they know the contract took it to forty-seven, they're going to know that and, you know, I don't think they'll operate blind to it by any means.

Q Did you become aware of the fact that Cashman was having a difficult time

Q Why?

A Because once a channel is accepted for navigational purposes, and this is my understanding I just heard this from my bosses, it's turned over for OM, operation and maintenance. Operation division has no authority to remove hard material. They have to -- it really becomes problematic from a maintenance stand point so I can see where it's important for all of the -- for the contract to be dredged to the proper depth in order for the area to be turned over for O and M.

Q In these KVK8 sections were they turned over to O and M?

A Yes.

Q Even though they were going to be the subject of a follow up new work contract to go to a lower depth?

A Sure, once the contract was completed and once a dredging contract was completed and the area was shown clear ultimately it was turned over for O and M at a prescribed navigational depth.

was not the case. That was not being planned. It was to remain a forty-five foot channel for a good amount of time.

Q Is there a maintenance dredging being performed in that forty-five foot channel?

A Not of late and they only can dredge soft material. It's very difficult for O&M to dredge hard material, and if you leave a pinnacle of rock or something like that, it would be extremely difficult and we would basically have tremendous amount of arguments that we had not completed the deepening job and that they are dealing with a deepening factor in their maintenance.

Q When a dredging contractor is directed after an acceptance survey has been processed by the Corps to come back and get some high spots, based on what you know, is that an expensive proposition for the contractor?

A It's an inefficiency and as an inefficiency, you know, it costs. It costs at least 30 to $60,000 a day for a dredge, so

right, after notice to the Contractor, to reduce said reservation by the amount of such excess.

j. The term "Reservation" means monies that have been set aside and made available for payments under this contract.

## 1.23 VERIFICATION OF SMALL BUSINESS UTILIZATION

a. This clause is applicable to small business concerns whose contracts exceed $1,000,000.

b. In accordance with the clause at FAR 52.219-8, entitled UTILIZATION OF SMALL BUSINESS CONCERNS AND SMALL DISADVANTAGED BUSINESS CONCERNS, in effect on the date of this contract, the Contracting Officer may survey the extent of small and small disadvantaged business utilization under this contract. The Contractor may be required to report to the Contracting Officer statistical data on the number and dollar amounts of subcontracting awards with small businesses and small disadvantaged businesses.

c. As appropriate, the Contracting Officer may require one or more follow-up reports to the initial report.

d. The Contractor agrees to insert this clause in any subcontract that may exceed $1,000,000, including this subparagraph d.

## 1.24 PROCEDURES FOR SUBMISSION AND PAYMENT OF ALL CONTRACT PAYMENTS

In addition to the requirements contained in the Contract Clause entitled "PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS" in Section 00700 and to implement the requirements of the Prompt Payment Act Amendments of 1988, P.L. 100-496, the following shall apply to all payments made under this contract:

a. At the time of submission of the progress chart, the Contractor shall submit for approval by the Contracting Officer or his authorized representative a breakdown of the contract work which shall be to the degree of detail required by the Contracting Officer or his representative to effect reasonable progress payments. The schedule of values (or prices) shall consist of a detail breakdown of the contract price, giving quantities breakdown for each of the various kinds of work (rock and non-rock materials), unit prices, and extended prices therefor. The required schedule shall be based on the actual breakdown of the bid price. The Contracting Officer or his representative shall review this breakdown within 30 calendar days after receipt and either advise the Contractor that it is approved or disapproved, and if disapproved the reasons for disapproval. Only after the breakdown is approved shall any payment invoice be accepted from the Contractor and any payment made to him. The Contracting Officer can determine it is in the best interest of the Government to make payment without an approved breakdown, however, in no case shall more than 10% of the contract amount be paid unless the breakdown is approved.

b. The Contractor shall submit his request for payment by submission of a proper invoice to the office or person(s) designated in subparagraph (c). For purposes of payment a "proper invoice" is defined as the follows:

1. An estimate of the work completed in accordance with the approved breakdown indicating the percentage of work of each item and associated costs.

2. A properly completed Eng Form 93 and 93a (where required).

3. All contractual submissions indicated elsewhere in this contract to be submitted with payment, such as updated progress schedule, updated submittal registers, etc.

4. The following certification executed by a responsible official of the organization authorized to bind the firm. A "responsible official" would be either a corporate officer, partner, or owner, in the case of a sole proprietorship.

I hereby certify, to the best of my knowledge and belief, that -

(1) The amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract;

(2) Payments to subcontractors and suppliers have been made from previous payments received under the contract and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract requirements and the requirements of chapter 39 of Title 31, United States Code; and

(3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontractor.

(4) All required prime and subcontractor payrolls have been submitted.

______________________________
(Name)

______________________________
(Title)

______________________________
(Date)

c. The Government shall designate the office or person(s) who shall first receive the invoice submission and the Contractor shall be so notified at the pre-dredging conference. In addition to the designated Project Engineer, the Contractor shall at the same time submit one copy of the detailed breakdown and the Eng Form 93 and 93a Form to the Area Engineer.

d. The Government representative shall return any request for payment which is deemed defective within 7 days of receipt and shall specify the defects. If the defect concerns a disagreement as to the amount of work performed and/or the amount of the payment being submitted, the Government and the Contractor's representative should meet to resolve the differences and reach agreement. Upon agreement, the Contractor shall submit a new

breakdown and Eng Form 93 (and 93a) and any other submissions requiring correction. These will be incorporated with the previous submittal and will then constitute a proper invoice.

e. If agreement cannot be reached, the Government shall determine the proper amount per Contract Clause, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS and process the payment accordingly. In this event, a "proper invoice" for Prompt Payment Act purposes will not have been submitted to the Government.

f. The Government shall pay the Contractor in accordance with the following time frames:

1. Progress Payments - From the date a "proper invoice" is received, in accordance with subparagraphs b and d of this clause, the Government will issue a check within 14 calendar days.

2. Reduction in Retainage Payment: If during the course of the contract, a reduction in retainage payment is required, the Government shall issue a check within 14 calendar days after the approval of the release to the Contractor by the Contracting Officer or his authorized representative.

3. Final Payment. A final payment request shall not be considered valid until the Contractor has fulfilled all contract requirements including all administrative items, payrolls, warranties, etc. and has submitted a release of claims. When the Contractor has fulfilled all contract requirements and a "proper invoice" has been submitted, the Government shall issue a check within 14 days from the date of acceptance of the project by the Contracting Officer.

g. The Contractor is required to perform monthly progress payment surveys as permitted by the Contracting Officer. Surveys shall be in accordance with EC 1130-2-210, Hydrographic Surveying, 1 Oct 1998, for Class I Surveys. The method(s) to measure material dredged shall be established at the pre-construction conference or some other time as directed by the Contracting Officer's Representative. Survey quantity calculations shall be based upon the average end area method or triangulated irregular network systems (TINS) method. Progress payments on estimates of work accomplished for Bid Item Nos. 0001AC, 0001AG, 0001AH and 0001AL; and Optional Items 0005A, 0005B, 0006A, 0006B and 0006C shall be 90 percent of the line item amount until the area is surveyed and accepted by the Government. The Contractor's proposed method for performing progress surveys and all equipment and computer programs shall be submitted for approval. Progress surveys shall be performed with digital depth sounders, heave compensators and appropriate survey data processing programs. Bar checks and calibrations shall be performed at the beginning and conclusion of all progress payment surveys.

1.25 TIME EXTENSIONS FOR UNUSUALLY SEVERE WEATHER

1. This provision specifies the procedure for determination of time extensions for unusually severe weather in accordance with the contract clause entitled "DEFAULT: (FIXED PRICE CONSTRUCTION)" (ER 415-1-15) (31 Oct 89). In order for the Contracting Officer to award a time extension under this clause, the following conditions must be satisfied (See paragraph 1.5 part 11 for weather conditions):

a. The weather experienced at the contract site during the contract period must be found to be unusually severe, that is, more severe

Contractor hereby agrees to perform a substantial portion of the contract work in this or in any other labor surplus area. "Substantial portion" means the aggregate costs that will be incurred by the Contractor and his first-tier subcontractors and suppliers, on account of manufacturing, production, or services performed in this or any labor surplus area, and the costs that will be incurred by second-tier and lower-tier subcontractors on the construction site will exceed fifty percent (50%) of the price of this contract.

b. Upon request, the Contractor shall furnish to the Contracting Officer data to substantiate that this obligation is satisfied.

c. The Contracting Officer will furnish upon request a list of labor surplus areas.

1.44 QUANTITY SURVEYS

a. Quantity Surveys

Quantity Surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed and the in-situ volume of the dredged material removed.

b. Government Surveys

The Contracting Officer will conduct the pre-dredge survey of the contract area as close to commencement of dredging as possible.

Upon the removal of the **Non-Rock Material, Bid Item Nos (CLIN). 0001AC, 0001AG, and 0001AH; 0005A and 0005B and 0006A, and 0006C** the Government will conduct post-dredge surveys, at no expense to the Contractor, except as noted in Section 00800, Special Contract Requirements entitled "Final Examination and Acceptance". Quantity computations for the volume of Non-Rock Material removed will be based on these surveys.

c. Contractor Surveys

The Contractor shall conduct the surveys for any periods for which progress payments are requested and shall make the computations based on these surveys. All surveys accomplished by the Contractor shall be conducted under the direction of the Contracting Officer, unless the Contracting Officer waives these requirements for each specific instance. For the Contracting Officer to approve the selected survey firm or licensed surveyor, the Contractor must provide documentation indicating that modern electronic horizontal positioning and sounding system equipment will be used for the surveys to be performed as well as documentation verifying the experience of the operators using the equipment. Typical information that will be required, as a minimum, includes the name, model, and year of manufacturer of the electronic equipment, the electronic frequencies of the horizontal positioning equipment and the sounding equipment, and manufacturer's stated positioning and sounding accuracies, and capability of the equipment proposed for usage. In addition, the Contractor must provide the information that a safe and suitable vessel meeting U.S. Coast Guard requirements is available and will be used for operation in the waters where the surveys are to be performed. The Contractor shall submit credentials/qualifications as evidence that qualified, experienced staff are available and will be used for the operation of the vessel as well as the electronic positioning and sounding equipment.

d. Field Notes

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001AG | DREDGING, TRANSPORTATION, DELIVERY | 1,344,370 | Cubic Yard | $13.00 | $17,476,810.00 |

AND PLACEMENT OF NON-ROCK
MATERIALS SUITABLE FOR PLACEMENT
AT THE HISTORIC AREA REMEDIATION SITE (HARS)

NET AMT $17,476,810.00

Funded Amount $0.00

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001AH | DREDGING, TRANSPORTATION, DELIVERY | 23,850 | Cubic Yard | $36.00 | $858,600.00 |

AND PLACEMENT OF NON-ROCK
MATERIALS UNSUITABLE FOR PLACEMENT
AT THE HARS (PLACEMENT AT THE NEWARK BAY CONFINED
DISPOSAL FACILITY), CDF

NET AMT $858,600.00

Funded Amount $0.00

Rock material: 1V to 1H

Material actually removed within limits shall provide for final side slopes not flatter than those indicated on the drawings and will be estimated and paid for. The Contractor may dredge material in original position or may dredge below the pay slope plane at the bottom of the slope to allow for sloughing of upslope material capable of falling into the cut. However, material removed below any pay slope plane will not be estimated for payment. In computing the limiting amount of side slope dredging, the required depth indicated on the drawings, measured vertically, will be used.. The quantity of material to be paid for shall not be in excess of that originally lying above this limiting slope. Side slopes are given for payment purposes only and are not necessarily the angle of repose of the soil. Sloughing side slopes shall not be the basis for claims against the Government. End slopes, where indicated on the drawings, shall be treated in the same manner as side slopes.

5.1.3 Excessive Dredging

Material taken from beyond the allowable overdepth or side slope limits may be deducted from the total amount dredged as excessive dredging, or excessive side-slope dredging. Materials dredged from below the depth limit which result in extra costs shall be the responsibility of the Contractor. Nothing here shall be construed to prevent the inclusion in the measurement of material dredged for the removal of shoals performed in accordance with the applicable of the paragraph: FINAL EXAMINATION AND ACCCEPTANCE in section 00800,1.15.

5.2 If during the dredging or upon completion of the post-dredging surveys <u>and soundings, materials are found above the required dredging depth of 47 ft</u> below MLW, these materials shall be removed immediately at the Contractor's expense.

5.3 The maximum allowable depth of non-rock material to remain over the rock prior to blasting shall be 1.0 foot.

5.4 Reprofiling of the channel bottom in any area is prohibited.

5.5 Order and Sequence of Work

5.5.1 The contractor is required to remove the overlying non-rock material unsuitable for placement at the HARS prior to the start of dredging the HARS and rock materials in each acceptance area.

5.5.2 Material Types

5.5.2.1 Non-Rock

The Contractor shall commence work with the removal of "Non-Rock Material" in each acceptance area. Removal of Rock is prohibited during the dredging of non-rock material in each acceptance area.

5.5.2.2 Rock

after the Contractor has used the "environmental" bucket and has not achieved 47 ft below MLW, the Contractor shall use a conventional bucket to remove the non-rock material to 47 ft below MLW.

These dredged materials shall be disposed of at the disposal site designated by the Government. The Contractor Quality Control (CQC) personnel, the Contracting Officer Representatives, and USACE certified Dredge/Disposal Inspector shall jointly determine the character of materials to be disposed of at the non-ocean placement site or designated upland disposal sites.

6.2 Disposal Facilities

The Government has identified the following sites for the processing and disposal of non-rock dredged material. The Contractor shall coordinate with the operator of the disposal facility to ensure that the necessary facility requirements are included in the Contractor's bid price. The Contractor shall submit a schedule and the anticipated quantity to be placed at the disposal sites within 3 calendar days from the date the contractor is notified as the apparent low bidder.

1) The following site shall be the only government identified non-ocean placement site used for item number 0001AC and 0005B in the price schedule.

Disposal Site: Bayonne Landfill Remediation Site
Operator: Cherokee/OENJ
Location: 61 North Hook Road, Bayonne, NJ 07002
Point of contact: Mr. Mark Sanborn, Chief Operating Officer,
Phone Number: (201) 377-9343
Location of Unloading Facility: Northeast corner of the property

2) The following site shall be the only non-ocean placement site used for number 0001AH.

Disposal Site: Newark Bay Confined Disposal Facility (NBCDF)
Operator: Port Authority of New York and New Jersey
Location: Newark Bay
Point of contact: Mr. Atef Ahmed
Phone Number: 212 435-4271
Location of Unloading Facility: Disposal will take place above the NBCDF

The Contractor will be required to pay a management fee of $29.00 per cubic yard disposed of at the NBCDF. A management fee will be derived from volume calculation taken from a before-dredge and after-dredge bathymetric survey of the contract limit area as designated in the contract drawings and specifications based upon in-situ non-HARS sediment at the origin dredging site. The after-dredge survey will be performed for an area after the material for NBCDF disposal has been removed and before underlying material for HARS remediation or reef construction is removed. All other payment to the Port Authority of New & New Jersey shall be in accordance with the requirements specified in the NBCDF Final Operation and Management Plan.

6.3 Any non-rock material capable of being removed using an "environmental" bucket shall be removed with an "environmental" bucket to refusal. The defining characteristics of environmental bucket are as follows:

a. The bucket shall be provided with welded steel covers and rubber seals specifically designed and installed by the bucket manufacturer to minimize leakage from the closed bucket.

b. The closed bucket shall be equipped with vertical side plates, with rubber seals, which overlap or have some method to reduce sediment loss at closure and shall act as an enclosure to eliminate redeposit of soil from the bucket.

c. The bucket shall be equipped with a switch, with signal light in the control station, to verify bucket closure and seal.

d. The bucket will be designed to produce a flat cut and to minimize resuspension during closing and lifting.

A shop drawing of the contractor's bucket shall be provided to the Contracting Officer for approval prior to the commencement of dredging.

6.4 No dredging operations shall be done unless the Dredge/Disposal Inspector(CDI), approved by the Contracting Officer, is present. The Inspector shall visually inspect the dredged material and take photographs or videos to document the conditions of the dredged material.

6.5 For the purpose of progress payment, the Contractor shall perform bathymetric surveys immediately following removal of debris and prior to removing any non-rock material destined for the upland disposal site to determine the contract dredged volume of non-rock materials disposal at the upland disposal facility. The contract volume is derived from volume calculations taken from a pre- and post-dredge bathymetric surveys based upon in-situ non-rock sediment at the origin of dredge site. Refer to Section 00800, Quantity Surveys.

6.6 When working in non-rock dredged material, the Contractor shall employ the following best management practices:

1) No barge overflow shall be permitted during the dredging and transport of any contaminated dredged material.

2) Dredging of non-rock materials shall be accomplished using a closed "environmental" bucket. Dredging of consolidated "new work" material is not subject this equipment restriction, but shall be accomplished using best management techniques to minimize the suspension of sediment.

3) Dredged material shall be placed deliberately in the barge in order to prevent spillage of material overboard.

4) The dredge shall be operated so as to maximize the bite of the environmental bucket. This will reduce the amount of free water in the dredged material and the number of the bites required for completing the job.

5) To minimize the loss of material during the excavation the environmental bucket lift speed shall not exceed 2 feet per second.

locations (HARS, artificial reefs, or other locations in the New York Bight or Lower Bay) equipped with scow monitoring equipment (ADISS/ADISSPlay/ADISSLt, from Science Applications International, Inc. (SAIC)). The ADISSPlay software/equipment shall be programmed by SAIC personnel for use aboard any towing, or other, vessels used to transport dredged material. The contractor shall ensure that the ADISS/ADISSPlay/ADISSLt equipment is operational at all times dredged material is transported from the dredging site and while returning to the dredging site after ocean placement. Although the Corps Disposal Inspector (CDI) will observe the operation of the ADISS/ADISSPlay/ADISSLt equipment, operation and maintenance of the ADISS/ADISSPlay/ADISSLt equipment will be the responsibility of the dredging contractor. It is the contractor's responsibility to ensure that the ADISS/ADISSPlay/ADISSLt equipment is in continuous, operable condition. Any problems with operation/function of the ADISS/ADISSPlay/ADISSLt equipment should be directed to SAIC personnel immediately, at (401) 261-4931, (401) 847-4210, and to the NY District at (212) 264-1853 or x1585.

4. Dredge/Disposal Inspector.
The Contractor at his/her own expense shall have the USACE certified Inspector(s) of Open Water Disposal of Dredged Material oversee the placement activities of all dredged materials at the upland disposal sites, Newark Bay Confined Disposal Facility and the HARS or artificial reef site, or other ocean placement location, if used. The Dredge/Disposal Inspector shall be responsible for ensuring that the requirements contained in the drawings, specifications, the New Jersey DEP Water Quality Certificate/Coastal Zone Determination is met. The Inspector must complete USACE Transportation and Placement Logs and checklists for all placement activities performed. Inspectors will be required to be on duty and in the towing vessel wheelhouse, to observe scow monitoring equipment function, watch for endangered species, and perform other inspector duties, from the time the towing vessel departs from the dredging site until the scow has completly emptied and all reporting requierments have been completed.

5. General Requirements

5.1 Overdepth and Side Slopes

5.1.1 Allowable Overdepth

To cover inaccuracies of the dredging process, material actually removed from within the specified areas to be dredged, to depths as specified below for allowable overdepth, will be estimated and paid for at the contract price. Allowable overdepth dredging will be permitted to a depth of not more than 1.5 ft for all dredging areas. The required dredging depth as shown on the drawings is 47 ft below MLW. An allowable overdepth dredging will be measured and paid for at the applicable contract price in the same manner as specified for the overlying material.

5.1.2 Side Slopes

The side slope dredging requirements as shown on the drawings are as follows:

Non-Rock material: 1V to 3H

SECTION 01451

CONTRACTOR QUALITY CONTROL

(NYD EDITION 12/99)

PART 1 GENERAL

1.1 REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

ASTM D 3740 (1996) Evaluation of Agencies Engaged in the Testing and/or Inspection of Soil and Rock as Used in Engineering Design and Construction

ASTM E 329 (1995b) Agencies Engaged in the Testing and/or Inspection of Materials Used in Construction

1.2 MEASUREMENT AND PAYMENT

No separate measurement and payment will be made for providing and maintaining an effective Quality Control program, and all costs associated therewith shall be included in the applicable unit prices or lump-sum prices contained in the Bidding Schedule.

PART 2 PRODUCTS (Not Applicable)

PART 3 EXECUTION

3.1 GENERAL

The Contractor is responsible for quality control and shall establish and maintain an effective quality control system in compliance with the Contract Clause entitled "Inspection of Construction." The quality control system shall consist of plans, procedures, and organization necessary to produce an end product which complies with the contract requirements. The system shall cover all construction operations, both onsite and off site, and shall be keyed to the proposed construction sequence. For purposes of this section the term "construction" shall include all items of work, activities, materials and equipment as indicated in the contract documents. Other sections of the contract documents may also require separate, specially qualified individuals in such areas as chemical data acquisition, sampling and analysis, medical monitoring, industrial hygiene, safety officer, etc. The CQC organization will coordinate the activities of these individuals. The project superintendent will be held responsible for the quality of work on the job and is subject to removal by the Contracting Officer for non-compliance with quality requirements specified in the contract. The

Contract Clause entitled "Different Site Conditions" Section 00700.

2.2.1.2 The materials to be found above the required depth, 47 ft below MLW for Area 8 as shown on the drawings, include, but are not limited to:

1) Dark gray to black, very soft, organic Silt and Clay, little to some Sand, frequent shells and shell fragments.

2) Red-brown, dense to very dense Sand and Gravel, with little to some Silt and Clay, and occasional Cobbles and Boulders.

3) Red-brown, soft to hard Silt and Clay, with little to some Sand and Gravel, and occasional Cobbles and Boulders.

4) Cobbles and Boulders with a matrix of Sand, Silt and Clay occur in layers of varying thickness. Cobbles and boulders typically increase with depth and are typically most frequent immediately above the bedrock.

5) Dark gray, gray-green to red-brown, fine to medium grained Sandstone Bedrock. Sandstones are typically described as hard to very hard with varying degrees of fracturing and weathering. Conventional cores generally indicate the sandstone to be slightly to moderately fractured with rock quality designations (RQD) ranging from poor to good.

6) Red-brown to gray Shale Bedrock. The Shale ranges from soft to very hard depending on the degree of weathering and other factors. Weathering ranges from slightly weathered to decomposed. Conventional cores typically describe the shale as highly fractured and broken with rock quality designations (RQD) ranging from very poor to fair.

7) Dark gray-green to black Diabase Bedrock. The Diabase is typically very hard and displays varying degrees of fracturing. Weathering typically ranges from fresh (unweathered) to slightly weathered.

8) Trash and debris - Trash, debris and other miscellaneous man-made and natural objects should be expected to be encountered during the course of the dredging. This material may be encountered at any location above the required depths indicated on drawings. The objects may include but are not limited to, wood, sheet metals, glass, lumber, plastics, tires, hoses, chains, cables and hawsers.

3. Dredging Equipment.

3.1 Dredges.
It is anticipated that a variety of dredging equipment will be necessary for the removal of soils and rock within the project area. All material shall be removed with dredging equipment appropriate for the material encountered (i.e. clamshell, closed clamshell "environmental" bucket dredge, dipper, powershovel, etc.). The use of hopper and cutterhead dredges is prohibited.

3.2 Scow monitoring equipment (ADISS/ADISSPlay/ADISSLt).
The contractor is required, at his/her own expense, to have all scows or other vessels used to transport dredged material to designated placement