survey issues?

A There was a conflict with surveys, but most of the issues were variation in estimated quantity, that I mainly recall. Not so much because of survey itself as to the amount of material that was removed and conflicts with what our survey said and the contractor's survey said.

Q Do you recall what the project depth was for the KVK8 Project?

A It was required -- it was a forty-five foot project, but we required a clear forty-seven feet for the forty-five foot project. The two feet difference is the safety factor that the Corps requires for our hard bottom contracts.

Q What does a hard bottom contract mean?

A It's loosely defined to a certain extent, but it mainly is dealing with material in which if the ship hits, that there's the possibility of having damage done to the hull. Soft bottom if it hits the likelihood of damage to the bottom is highly unlikely. Rock

versus extremely hard clays and things like that can damage a vessel. Silts and sands wouldn't.

Q Do you know whether all of the material in the KVK8 Project could be characterized as hard bottom?

A We characterize the project as hard bottom. You had rock and you had very hard clays and maybe glacial too.

Q Did the authorized project depth for navigation purposes remain at forty-five feet after KVK8?

A The project is a forty-five foot project.

Q So that vessels that navigate that channel are not permitted to assume clearance to forty-seven?

A That's correct.

Q Is it also part of the Harbor Deepening plan to take the KVK8 area that has been dredged to minus forty-seven, to a lower depth?

A Yes.

Q Would the next stage be down to

minus fifty?

A Yes.

Q Are there other areas that have been done that way as well, meaning the first contract didn't take it down to fifty but a following contract will?

A The entrance to the Kill Van Kull, what we're calling SKVK1, which is the old, I guess, SKVK -- I'm sorry, KVK1 area and 2 was areas that we were going to bring down to fifty feet. SKVK2 that we just completed brought down areas that were in Area 3 of the forty-five foot project down as well as for 8 down to fifty feet, so we have basically gone back and re-dredged these areas and will dredge these areas.

Q So what else remains to go down to fifty besides KVK8?

A You have area -- there was Area 6 that's gonna be Newark Bay 1. The 8 will be Newark Bay 2 and Area 7, which is Elizabeth channel, will be brought down to fifty feet. All those were now at forty-five and will be re-dredged down to fifty.

preparation of reports from an engineering aspect for recon studies feasibility studies, limited reevaluation reports, general reevaluation reports and then preparation of plans specifications.

Q Were you involved in the specifications for any of the KVK8 projects?

A Yes.

Q All of them or any one in particular?

A All of them.

Q What?

A This is phase two.

Q What does phase two include?

A Phase two is the deepening of the Kill Van Kull Newark bay channels down to forty-five.

Q Is there a plan to go beyond forty-five for that phase two area?

A Yes.

Q In the future?

A Currently.

Q What is the objective?

A To go down to fifty feet.

projects before KVK8?

A Not as strong. There was other language about, you know, not exceeding, but at the time that Area 8 was ongoing, EPA was very upset over Area 3 that had a tremendous amount of over digging that they viewed, so as a result we did sort of stiffen up the language and warning the contractor to try to, you know, retain his enthusiasm.

Q Was there over digging in KVK2?

A In some degree. The nature of the area in SKVK2, the nature of the material, you have boulders and in order to remove a boulder that's the size of a truck, you're liable to go way below what, you know, we require with regard to depth in order to get the boulder out, so yes, there was some degree of over digging, but justifiable over digging.

Q Did the fact that KVK8 on the one hand required project depth of forty-seven but on the other hand greatly discouraged any dredging below minus 48.5 make it even more difficult in your view for a dredging contractor to achieve the minus forty-seven?

according to the average sounding method?

A I've seen surveys labeled one way or the other, yes.

Q If the Corps of Engineers was clear in its own mind that it was processing the acceptance survey data using the shoalest method, but was receiving pre-acceptance surveys from the contractor that indicated that he was using the average sounding method, should that not have triggered a question in the Corps of Engineers' mind?

A It sounds like you're asking me to tell you what Construction Division, who of course was going to receive the surveys, was thinking in their employees, and I can't tell you what their thought process was. You'd be best off asking them.

Q Okay, that's fair enough.

Do you recall anyone from Construction referring the matter to you during the performance of the project?

A No. It's very rare for Engineering to get involved, unless there's a specific conflict between the parties and any

interpretation on the specification. It's really very rare for me to be involved in a contract once it's awarded.

Q Is the method by which acceptance survey data is going to be processed something that's important for the contractor to know?

A I think you're better off asking a contractor what he considers important to know.

Q You don't know how the dredging community would view that?

A Well, since this has not been an issue heretofore in my experience of dredging, it seems to me that contractors understood clearly how things were to be done. I have never heard of this being a conflict in my time or in my predecessor's time, so my understanding was that my impression is that everything was frankly, fairly fine.

Q Were there instances in the previous KVK projects that you were involved with where a contractor submitted pre-acceptance survey showing that an area was clear but the Corps' survey did not confirm

Q I ask you to take a look at Page B-3. There is a paragraph labeled G on that page. Do you see that?

A Yes, I do.

Q It deals with dredging contract specifications?

A Right.

Q Do you see that?

A Yes, I do.

Q Without reading it word for word, in the first full sentence, it says that "The dredging contract specifications should clearly stipulate, among other things, data processing and binning techniques. Do you see that?

A Yes.

Q Was that done, as far as you know, in the preparation of the KVK8 solicitation?

A My recollection is Richard Kiss told me that the -- that the specifications adequately addressed requirements of the circulators and manuals.

Q So you would, since it was a survey matter, defer to his judgment on things

of that nature?

A That's right.

Q Have you had an opportunity to after the fact in connection with this claim and litigation, review the plans and specifications in some of these guidance documents?

A Yes, I have.

Q Is it your opinion, as we sit here now, that the contract specifications clearly stipulated the type of survey system and the data processing and binning techniques?

MS. KILFOYLE: I'm sorry, I'm not sure I understood you.

Q As you understand the solicitation package and the related documents, guidance documents, now after the fact do you have an opinion as to whether the contract specifications clearly stipulated the type of survey system?

A I continue to rely on the expertise of the surveyors.

Q In addition to, so as to not ask a compound question that I was chastised for

once in awhile I brought someone with me or someone else attended, but primarily myself.

Q You don't recall why you didn't attend this one?

A No.

Q You weren't told not to attend?

A No.

Q What was your normal role at those pre-con meetings?

A Main role was to be there for any questions on surveying methodology, how we do our volume computations and general knowledge of meeting all the partners of the team also so we know each other by face and so forth.

Q Including the contractor?

A Correct.

Q If there were no questions would you make a presentation?

A No.

Q Did you usually get questions?

A Generally what would occur, their surveyor and I would meet and it was an informal situation, either during lunch hour or something similar.

Q Do you know if that was ever done in connection with any of the KVK8 projects?
A Yes, it was in some of them. Again I can't isolate them and tell you which one it was and which one it was not.
Q At the pre-con itself would there be some opportunity for the survey people to speak about the survey issues?
A Yes.
Q Would they address the type of method that was going to be used for payment and acceptance purposes?
A Generally not. Generally the size of acceptance sections were discussed due to the need for rapid turnaround of the product. In other words the dredger was concerned that it wasn't going to take two weeks for him to receive the data from a survey so he could continue his dredging. So we would discuss the progress of the work, the plan for the dredging, how it was going to take place and the size of acceptance sections and things like that, but generally I don't ever recall this sort of detail at any of those meetings.

know, Mark -- Ron Conetta would have been there, Sam Didato.

Q. Do you recall whether this was at the preconstruction conference?

A. No. It was not. No. We were introduced to the survey that -- Sandy McDonald at the precon, but -- oh, we had a partnering meeting at that point, too, and we met Sandy at the partnering meeting.

Q. But the partnering meeting wasn't where the average method for processing acceptance surveys --

A. No.

Q. -- was discussed? Okay.

A. No.

Q. Do you recall how the method for performing acceptance surveys came up in this discussion?

A. Yeah. We wanted clarification as to what method would be used. We requested clarification.

Q. Do you recall who specifically requested clarification?

A. I know I did. I think Jim Galli did, too.

Q. Do you recall whether Cashman had performed

Q. Do you recall who you spoke with?
A. We talked -- I talked to Richard Kiss at one point.
Q. Do you remember when you had this conversation with Mr. Kiss?
A. No.
Q. Do you remember whether it was before you spoke to either Ron --
A. No. I just -- I just know I talked to him.
Q. What did Mr. Kiss tell you regarding the method to be used to process acceptance surveys?
A. He wasn't specific.
Q. Did you ask him?
A. I can't remember if I actually asked him. I think we really focused more on the bin size, I remember as being the issue we were talking about.
Q. Do you know whether prior to October 2004 Cashman ever processed surveys for KVK 8 using the shoalest method?
A. Prior to 2004? Yes.
Q. Why?
A. It was useful to know what the difference was.

Q. What was it useful for?
A. It was useful for determining what method and how to set the digging system on the dredge, seeing that there were differences; in other words, if you wanted to clear an area, you would have to dig deep to have it accepted using the shoalest or minimum sounding. And, you know, we had some concern about that because we would get into an area of material that was not permitted for disposal at the HARS, so we were -- you know, we were a little concerned about that.
Q. Why were you performing this type of analysis prior to October 2004?
A. Well, we knew it was a method that was available, so we thought, well, let's check it out. So we checked it out, made some comparisons. We looked at average. We looked at shoalest. We looked at closest to the center and different bin sizes, as well. We experimented a little bit.
Q. What did you intend to use this information for?
A. To determine how we were going to dig the

area.
Q. Did you ever submit any surveys to the corps processed using the shoalest method prior to October 2004?
A. I don't believe there's any formal submissions, but we did produce maps and we discussed maps in certain meetings that we did provide. I mean, I can think of at least one.
Q. Can you tell me more about that?
A. No. I mean, I just know that there were.
Q. Why did you present these maps to the corps?
A. I think it was useful for the purposes of seeing where areas were clear and where they were not.
Q. Do you recall who you presented the maps to?
A. Again, the same individuals that were always present at the -- at the weekly meetings.
Q. Could you list these individuals for me?
A. Yeah. Mark Conetta (sic), Sam Didato, Mark Kucera at times, Mark Alton at times.
Q. Did you make any changes in the way that you performed the dredging based upon the results of the minimum surveys performed prior to October 2004?

You better write a letter, because I don't understand the specifications.
Q. So Mr. Conetta recommended that you write a letter?
A. Yes.
Q. Did he recommend that you write a letter to him?
A. Well, the letter was to the Corps of Engineers seeking direction. The correspondence went through him by contract.
Q. Uh-huh. And do you recall when Mr. Conetta made this recommendation?
A. It was many times. It was not only once. It was at these weekly meetings. It was a topic of almost every weekly meeting. He did not attend each meeting.
Q. Okay. If you could go down to the fifth paragraph of the letter and take a look.
A. Okay.
Q. Do you recall who told you that a three by three minimum standard applied on August 31st, 2004?
A. No. Do you know what day of the week that was?
Q. I don't. But maybe we can look it up.
A. It may have been discussed at the meetings.
Q. It looks like it was a Tuesday.

Q. Have you held any other positions during your time at Cashman?
A. Quality control manager.
Q. When did you hold that position?
A. I don't recall the actual dates, but it was somewhere towards the end of '04 to '05.
Q. What are your responsibilities as an engineer?
A. Surveys and layout.
Q. Can you be more specific about your responsibilities for surveys?
A. Collecting data.
Q. Do you actually drive the survey boat?
A. At times.
Q. Did you work for Cashman during the KVK 8 contract?
A. Yes.
Q. Did you work as an engineer at that time?
A. Yes.
Q. Did you have any other responsibilities specific to that contract?
A. No.
MS. KILFOYLE: Can we mark this as Exhibit 1, please.

Q. Okay. What is a survey tracking spreadsheet?
A. Boy, I don't know.
Q. Did you track the results of surveys for the KVK 8 contract?
A. The results of surveys? We track everything we do, yes.
MS. KILFOYLE: Could we take a break for a minute?
MR. PAYNE: Sure.
(Brief pause.)
BY MS. KILFOYLE:
Q. Before you learned that the corps was using the minimum method to process acceptance surveys, did you process any surveys for the KVK 8 contract using the minimum depth method?
A. Yes.
Q. Why?
A. Curiosity.
Q. Curiosity about what?
A. I was learning a system, I wanted to see the differences.
Q. Did you process surveys using the minimum depth method for every survey?
A. No.

Q. Do you know whether prior to October 2004 Cashman ever processed any surveys for the KVK 8 contract using the shoalest method?
A. The processing is not specific to one method or the other. The results that are published are.
Q. Oh.
A. But the processing isn't -- isn't done differently.
Q. Okay. Do you know whether prior to October 2004 Cashman ever published survey maps using the shoalest method?
A. We never submitted any for acceptance.
Q. Understood.
A. But, of course, they looked at them.
Q. Why?
A. To see what the -- because the initial surveys were not accepted, so there was a question as to why not. There was an investigation as to why not. That's why the question was asked in the previous correspondence.
Q. Who performed the investigation?
A. Whoever was doing the processing of the surveys. Investigation is merely looking at the computer.
Q. Do you know what conclusions were reached as a

result of that investigation?
A. The conclusions are that the shoalest method shows more higher -- the shoalest method would show nonacceptance more than the average method would.
Q. And do you recall when that investigation occurred?
A. Investigation was ongoing. You did that every time you were processed.
Q. Did you have the opportunity to meet with Army Corps of Engineers representatives from the survey branch during the KVK 8 contract?
A. My recollection is they attended the partnering meetings occasionally. I don't think we ever had a meeting with them. Our correspondence went through the designated representative.
Q. Did you ever have the opportunity to discuss the method for processing acceptance surveys with a representative of the survey branch?
A. I never did.
Q. Did you ever ride on the Army Corps of Engineers survey boat?
A. No.
MS. KILFOYLE: Can we mark this as an exhibit?
(Exhibit No. 9 marked.)
BY MS. KILFOYLE:

EXHIBIT
9

Jay Cashman, Inc.
132 Corbin Street
Elizabeth, N.J. 07201

October 9, 2004

Mr. Ronald Conetta
United States Army Corps of Engineers
Kill Van Kull Field Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, N.J. 07305

Re: Contract 8, DAC W 51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract 8 (Area 8)

Serial Letter S-0118

Gentlemen:

We transmit herewith 3 copies of drawings dated 10/06/2004 showing the current bathymetric data for acceptance area 5 represented as a 3 x 3 matrix of minimum soundings.

There have been ten months of discussions with the Corps and 14 sets of drawings submitted for approval from January 2004 through 28 September 2004, designated as 3 x 3 average soundings based on our read of the contract documents and applicable specifications and verbal direction form the government.

On 1 October 2004, the government informed us that the Corps uses some unique version of a 3 x 3 matrix of minimum soundings for approval. There is no mention as to the software distributor or whether or not the program is proprietary.

The 1 October 2004 government Serial Letter No. G-095 in direct contrast to the ten months of submittals and 14 requests directs that all future survey submittals for acceptance should be based on the minimum depth criteria.

This is apparently in consort with EM-110-2-1003 revised on 1 April 2004. Notice to proceed was issued on June 26, 2003, when a different standard was in effect

Serial Letter No. G-095 is clear direction on how to proceed. Consequently, we are submitting 3 sets of drawings for area 5 represented as 8 x 8 matrix of minimum soundings.

DJC004218

As the entire area thus displayed is at or below -47 feet MLW, we request a government acceptance survey without delay.

Please call the undersigned with any questions.

Sincerely,

James J. Galli P.E.
Project Manager,

A Construction, it would be either Mark Altman or Sam or Ron Conetta.

Q And then you would then just go and do it?

A Correct.

Q Were you furnished with a copy of the pre-acceptance survey?

A No.

Q Was that customary that you do not receive that?

A We have not received, to my knowledge, any survey from a contractor for the pre-acceptance.

Q Why not?

A Because construction has not given it to us.

Q Wouldn't that seem to be a good idea to let you have a look at it?

A It could be, but one would presume that the gentleman that are running the job know what a survey map looks like. If a surveyor hands in a map from the contractor and it's clear and whether I look at it or whether I don't would show it is clear.

yeah.

Q Who did you generally deal with?

A Jim Gally.

Q What would you do with a pre acceptance survey when you received it?

A What we would do is go down to our Survey Branch or call them and set up a Government acceptance survey.

Q Would you look at the pre acceptance survey yourself first?

A Well, usually they were a blank sheet of paper. I think the first couple of times I did, but the reason why they gave it to us they said Cashman was saying the area was clear and yeah, I think we'd open it up and look at it and yeah, it looks clear. Let's do a Government survey type thing.

Q Was there something provided to you in an electronic form as well?

A You know, it's been so long ago, I think yeah, they had to give us a disk too, if I remember correctly. Yeah, I think so.

Q Would you look at the electronic data?

A Never.

Q You would look at the map or whatever was on paper?

A Right, right, right.

Q Would you go over that with Mr. Conetta as well?

A Usually not these pre acceptance surveys. There was -- it was almost a formality, I think, they were sending us a letter saying yeah, we feel we're clear, go do a Government survey.

Q I assume there was no point in the contractor giving you a pre acceptance survey if he didn't feel the area was clear?

A Yeah.

Q So you would take it and present it to Survey and say here, do your thing?

A I don't even think we'd give it to Surveys. We wouldn't present it to them. We'd pretty much either call or go down to talk to them. They would never see the pre acceptance, I don't believe.

Q They just would get an authorization or request from you to go ahead

there was another dredging one. There was three of them and actually they had them on disk and I took them at -- I took them right there at Maguire. I didn't actually go away to somewhere for a week, but I just took them by disk or whatever at Maguire, and then I started up there.

Q Were you working exclusively on dredging projects after 1999?

A Yeah, when I was at that KVK project office, that's all I did was involved with dredging, um-hum.

Q Who did you report to?

A Sam Didato was my team leader. Ron Conetta was the resident engineer and Dave Leech was the area engineer, who technically is our supervisor.

Q Was your title project engineer?

A Yes, it was.

Q Were you project engineer on any other project other than KVK8?

A Yes, I was. That other one also had some problems. It was the Weeks Marine contract. I think it was contract 3. I don't

know if you were involved with that one too or not.

Q I think I was. Maybe that's where you heard my name.

Were those the only two that you were the project engineer?

A Yes.

Q Did you have any responsibilities with regard to any of the other projects?

A On 5 Sharif was lead project engineer and I was the other project engineer, I guess, but that was a big, big project and they threw a couple of us on that one.

Q What are the duties of a project engineer?

A Monthly progress payment. It's administration of the contract. Let's see. There's letter writing, submittal review, work quality assurance, you know, the contractor's Quality Control, and it's almost a similar role with safety. The contractor's really in charge of safety, but we do a little bit of oversight on that too.

Q Did you used to go on KVK8, would

you go out to the dredge from time to time?
A Yes, I would, yeah.
Q Are you aware of the issue that has arisen on the KVK8 project with regard to the way the acceptance surveys were being processed by the Corps of Engineers?
A Yeah, I've never really read any of the like the claim letter or anything like that, but yes, I'm aware of it, um-hum.
Q Was surveying something that you had received any particular training in with regard to the KVK project?
A No, no training.
Q Do you know what I mean by the term pre acceptance survey?
A No.
Q I'm referring to those surveys that the contractor turns in --
A Okay, yeah.
Q -- that he believes showed that an area is clear and then he hopes will then trigger a survey by the Corps.
A Right. Does the contract call that a pre acceptance survey?

A Okay, it looks like this letter addressed those questions.

Q Is this a letter that you drafted?

A I don't think so.

Q Did you write letters like this from time to time that would be signed by Mr. Conetta or somebody else?

A Yes, yeah.

Q But you don't think this is one of those?

A No.

Q At the bottom of the second page of the letter in the paragraph beginning with the words "Regarding acoustic --"

A Yeah, yeah.

Q -- there is a statement that "The Corps of Engineers uses a three foot by three foot matrix using the minimum shoalest depth". Do you see that?

A Yeah.

Q Did you know that that was the case at the time that this contract was awarded?

A No, I didn't know that much about

surveying to even know these type of details at the time that the contract was awarded.

Q You only came to learn about that during the performance of the project?

A Yeah, it just came up as an issue, yeah.

Q I'd also like to show you a letter dated August the 26th. Really you're free to read it, obviously, but my question is going to be whether you drafted it.

A You know, I'll tell you I'm laughing because I don't -- I -- I might have or I might not have. I don't remember who drafted the letter.

Q Okay. Sometimes people can tell by the writing style.

A Yeah, that's true too. It sort of doesn't seem like mine, yeah. I really don't remember.

Q How about this one of August 26, does that one look like one that you drafted?

A I'm certain I didn't, and I'll tell you why.

Q You're certain that you?

worked on them and I'm not sure what they were called now, whether it was class one or class -- I -- I really don't remember.

Q How about the term multi beam?

A Yes.

Q Is that an accurate description of the general survey method?

A As best as I recall, yes.

Q Did you receive any training in multi beam surveys?

A No, I didn't receive any training and I didn't perform them either.

Q Do you know whether the multi beam surveys were employed from the beginning of your involvement in the Harbor Deepening projects?

A I believe -- as well as I remember, yes.

Q Would it be correct for me to assume that you deferred to the Survey Branch for matters involving the performance of multi beam surveys?

A Yes, it would.

Q Do you know or did you know at the

time that there were any different ways to process the data that was collected from a multi beam survey?

A Not prior to the issue arising in contract eight and not until -- well, not until then.

Q So in other words that issue had not come before you --

A Correct.

Q -- prior to KVK8?

A Correct.

Q What issue was it that did come to your attention with regard to KVK8?

A Specifically as well as I remember, I should say specifically I remember, I only remember as specifically as that there was an issue that in the number of times the contractor was asked to return to an area and then ultimately the question arose as to what type of surveys we were doing for acceptance and that -- yeah, that's about as much.

Q Do you remember when that question came up?

A When?

Q Yes.

A Not specifically.

Q Early in the job, middle of the job, end of the job?

A I -- I'd be guessing, but it was -- to be honest I'm not sure if the job was complete when I left. I think it was, but I wouldn't swear to that. I'm guessing it's probably about mid way. It could have been two-thirds through. I -- I -- I really don't recall.

Q How did it come up in terms of how was it communicated to you?

A I don't specifically recall short of the information that -- that's in the correspondence -- that list of correspondence I mentioned earlier. That kind of tracks, you know, a history of the issue.

Q As you refer to the surveying methods being employed, what did you come to learn about what methods existed?

A Well, it really depends about where in the process. I -- prior to the

correspondence and our discussions with surveys in, you know, relation to the correspondence, prior to that I -- I had no -- I was really -- I wouldn't say I wasn't aware of any differentiation. I wasn't familiar with any differentiation between types of surveys. As a result of -- of that whole or that survey, as a result of -- I'm going to say as a result of reading the correspondence because I -- I really remember very little specifically actually, I should say as it -- as it, you know, may have occurred, but it became apparent that there was more than one way to analyze the data and there was a -- one being a -- an average method, the other being a shoalest and to be honest, all I remember about the difference is that the shoalest was apparently what we used because it represented our best -- our best assurance that the contract depth had been met and that there were in fact no areas above minus forty-seven feet.

Q Do you know whether it was important for the dredging contractor to

point. From the beginning, no, I was not aware of it.

Q But at some point during the performance of the project you became aware of it?

A Yes, it's -- yeah.

Q Do you recall seeing any of the pre acceptance surveys that Cashman submitted that included the notation average sounding?

A That I don't recall.

Q Did anyone who worked for you mention having seen such notations on pre acceptance surveys?

A I don't recall that they did, but -- well, I don't recall that they did.

Q Do you recall anyone from the Cashman organization coming to you during the performance of the project and asking you what data processing method the New York District was using?

A Specifically, no, I don't recall.

Q Do you recall telling anyone at some point that the average sounding method was being used by the New York District?

A No.

Q You don't have a specific recollection?

A I don't have a specific recollection and given my limited -- the limited depth of my understanding of the whole survey process, it's, you know, the analysis process, I'm not guessing I would have said that. It's more information than -- than I would likely have --

Q Would it have been more likely that you just would have said that you didn't know?

A If I was asked a question, it was most -- yeah, that would be the most probable.

Q When a Corps of Engineers survey comes back in response to the pre acceptance survey that the contractor submitted showing that as far as the Corps is concerned an area is not clear, who does the Survey Branch provide that information to?

A Well, formally to me. In practical terms project engineer would pick up the survey map from Surveys and bring it back

it doesn't seem likely at all that I would have, at least certainly not portions of it. I relied on -- if I somehow constructed this thing, I would have relied on someone else's input, if I had.

Q On Page 9 second paragraph first sentence says "The Government has always utilized the shoalest or shallowest point in an area for determination of an acceptance"; do you see that?

A (Nodding).

Q Did you know that at the time that the KVK8 project was awarded?

A At the time it was awarded I'm going to -- I would have to say no. When this was prepared if I wasn't aware of it prior to that point, I would have had to become aware of it at that point.

Q Do you know whether the KVK8 solicitation advised the bidders that the Government always uses the shoalest point for purposes of acceptance surveys?

A I don't specifically recall that it does, yeah, I don't recall that it does.

EXHIBIT
1

Cashman Constructors
132 Corbin Street
Elizabeth, N.J. 07201

August 31, 2004

Mr. Ronald Conetta
United States Army Corps of Engineers
Kill Van Kull Field Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, N.J. 07305

Re: Contract 8, DAC W 51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract 8 (Area 8)

Serial Letter S-0090

Gentlemen:

We seek information and clarification on specification section Am2-Section 00800 1.15 labeled "Final Examination and Acceptance." This section discusses standards for acceptance of dredging works.

To wit; "As soon as practicable after the completion of the entire acceptance area, a final examination of the work will be conducted by the Contracting Officer at the cost and expense of the Government by acoustic sweep survey system."

Further in the same paragraph: 'The Contractor shall perform pre-final hydrographic sweep surveys of an entire acceptance area to verify the area is satisfactorily completed prior to final examination by the Government. The pre-final survey shall be performed using a multitrack or multibeam survey system to insure 100% coverage of the entire acceptance area. The proposed method for performing these surveys and all equipment and programs shall be submitted for approval. The Contractor's hydrographic surveys shall meet or exceed the survey standards listed in EC-1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class 1 surveys."

N.B. Final Examination i.e. – Final Acceptance will be conducted and determined by the Contracting Officer by "Acoustic Sweep Survey System." What type of sweep? What standards are to be followed? What tolerances apply? What class or order survey is to be used? What type of accuracy will be expected?

The specifications are quite clear for the Contractor's pre-final survey. Use EC 1130-2-210. For order I work, EM 1130-2-210 yields a description of a maximum allowable bias in hard material of 0.1 feet and in soft material of 0.3 feet.(Table 3.1)

DJC005164

We have been informed that there is a zero tolerance for sounding acceptance. How is that supported by EM-1130-2-210? Is the Corps able to collect, edit and present data to that standard in their check surveys?

Our understanding after numerous discussions with Corps of Engineer personnel is that the standard of acceptance would be a matrix of 3 x 3 average soundings. On seven different occasions, we have submitted surveys for acceptance. Each map clearly states the method of data presentation as 3 x 3 average soundings. This was done in line with the information furnished verbally by Corps of Engineer personnel,

In each case, the Corps responded by taking a survey and in all but one case rejecting the work as being incomplete. No mention was made concerning the use of a 3x3 matrix of average soundings for judging acceptance.

The Corps rejection maps furnished to us refer to a EM 1130-2-210 Class 1 survey. Our perusal yields a table (3.1) describing an Order 1 survey. Is that Class 1?

Our analysis of the numerous rejections is that a much more stringent standard possibly a minimum sounding standard is being applied. Today, August 31, 2004, 15 months into the project we have been informed that a 3x 3 <u>**MINIMUM**</u> or shoalest standard applies.

This is an astounding revelation after repeated questions and seven rounds of sounding submittals.

In lieu of any specific direction, we have been re dredging in areas indicated by the Corps rejection "hit" maps despite repeated experience that there is no material present when we attempt to re dredge. Consequently, we have been dredging deeper than necessary on an ongoing basis.

The benefit to the government is manifestly obvious. Much of the deepening for the next phase to 50 feet has already been accomplished. Several hundred thousand cubic yards have been dredged on this contract with no compensation given to the contractor.

If the government would share the acceptance standards employed with their surveys e.g. – mapping software, mapper, representation, editing logic, data collection, it may be possible to avoid further excess dredging.

It is our understanding that the transparency of the process is not optional and is mandated by The Freedom of Information Act

Please call the undersigned with any questions.

Sincerely,

James J. Galli P.E.
Project Manager,

MR. PAYNE: Mr. Kiss, I appreciate you coming here today and I have no further questions.

EXAMINATION BY

MS. KILFOYLE:

Q Mr. Kiss, did you say earlier that the method that the New York district used to perform surveys was more stringent than EM1110-2, the January '02 survey?

A Yes.

Q How was it more stringent?

A Our procedures in performing our field surveys are much tighter than those laid out as requirements in the manual. We would perform more field checks than were necessary in order to assure the quality of the data. For instance we have, I don't know, about four different survey vessels that we use. Two of them are multi-beam systems, two of them are single tract systems. We would have each one of these vessels typically on any given job. When these guys would leave Caven Point in the morning they would run over what we call our historic area and we would compare the data

from all of these vessels to insure that each of the vessels would give us the same sounding in the same place all the time. So, as I said before, our guys were so upset with me that they would complain they were only surveying a couple hours a day and wasting their time on quality control procedures so that's what I meant by that statement.

Q Were the requirements for the New York district more stringent for the contractors performing the dredging?

A I don't know, not my business. I just worry about the contents of our surveys.

MS. KILFOYLE: That is it. Thank you.

-o0o-

(Whereupon, the deposition of Richard Kiss was concluded at 11:56 a.m.)

____________________
RICHARD KISS

Subscribed and sworn to
before me this ________ day
of ________________, 2007.

____________________
NOTARY PUBLIC

A. It's a survey that's performed using sophisticated equipment that spreads many beams from underneath the boat to show what the bottom looks like.

Q. How does it show what the bottom looks like?

A. Well, it's sound bouncing up against the bottom, coming back up to the boat, and collecting the data in a computer to print out.

Q. What are acceptance surveys?

A. Surveys that are performed by the Corps to say that an area has met the requirements and it's cleared.

Q. What are progress payment surveys?

A. Surveys that estimate the amount of material that was taken out in that area to be paid for.

Q. Does the Corps do progress payment surveys?

A. No.

Q. The contractor does progress payment surveys?

A. Yes.

Q. What is the minimum depth method for processing multibeam survey data?

A. The minimum survey is defined in different ways. It takes a cell that could be 3 by 3 -- 3 foot by 3 foot, 4 foot by 4 foot, 5 foot by 5 foot,

whatever you tell the computer to print out. It takes the minimum elevations, the highest points in that box and plots them. It can be done a bunch of different ways.

Q. Does the minimum depth method look at all the data points taken in the survey?

A. It probably has it in there some way, but it plots the highest point in that designated box.

Q. So only the highest points are actually plotted?

A. Well, you can plot everything, but it will show -- it depends on how they reduce it or show it on a plan. They can show the high spots; they can show the low spots, but a minimum survey, they plot the highest points in some sort of fashion that they ask the computer to plot it up, whether it's in the middle, three highest, four highest. It can do whatever you ask it to do.

Q. Okay. What is the average depth method for processing multibeam survey data?

A. It takes the points in the designated box area and averages out the high points and the low points. I'm not exactly sure how many points they do it or if it's the whole thing. I'm not

exactly sure, but they take the high points and the low points and average them together.
Q. Did you personally have any experience with multibeam surveys prior to the KVK 8 contract?
A. In my capacity as a manager, yes.
Q. Can you describe the nature of this experience?
A. We bought the survey equipment and instructed our survey people to learn how to use it, and they discovered how to use it. Multibeam survey -- a minimum survey is one way to show the survey. Average is another way to show the survey. There's a bunch of different ways you can collect the information and tell the computer how to plot it up.
Q. Did you buy the multibeam survey specifically for the KVK 8 contract?
A. We bought it after we were notified we were low bidder, yes.
Q. Where did you purchase the system?
A. It was an Odom system that was purchased. I'm not sure where it was.
Q. Did you have any responsibility for selecting the system?
A. Not -- I was consulted on what system to buy.

Q. What is a navigation project condition survey?
A. I believe that's a Corps term. They do a survey to say what the condition of the channel is.
Q. Do you know what those kind of surveys are used for?
A. Which what?
Q. What navigation project condition surveys are used for?
A. I don't know exactly, but just what it sounds like is they use it to publish charts to say what the depth of the channel is.
Q. Is it different than acceptance survey?
A. I believe so.
Q. How is it different?
A. It might be done at a different time. I mean I'm not 100 percent sure the definition of it, but just what it sounds like is that it's a survey that the Corps will do to go verify that a channel can be published as a certain depth. Acceptance survey is something that's done for the Corps on a particular project.
Q. Is there anywhere else in these pages that you have that you think it says that agency policy mandated that the minimum depth method was not

redundant and looked upon as time wasting things. Our crew chiefs in the field always complained they were spending most of their time doing quality control work rather than doing surveys. I said that's my money, I'll take care of that and you just do what I tell you to do. So A, it was a quality control in the field and B, we realized early on that due to the number of -- the amount of data that was available one product for the purposes of new work dredging was not sufficient so we decided inhouse to provide two products to the construction division for their use.

Q What were the two products?

A One was a hit map, which was strictly the shallowest soundings available from the database and that product was the result of the shoalest soundings that were available within the data cells. We then produced another product, which was a general sounding map, which used the average depth of the sounds within a cell in order to produce a more equitable volume number for payment purpose s.

the shoalest method would that not seem to be inconsistent with the requirement of the circular or the manual?

A I'm not sure if you're basically taking that one sentence out of context.

Q Perhaps the context can be made more clear if I refer you to the early sentence just above the one read. "For dredging payment or acceptance, the bin size should be kept as small as possible." And then it goes on to say that the shot point depth nearest the centroid should be used. I think implying in terms of measured payments or acceptance, is that the way you read it?

A I read this for dredge payment applications for volume calculations.

Q But not for acceptance calculations?

A Not for acceptance in the channel.

Q Was the centroid method used for payment purposes?

A Average.

Q So that's different then the centroid?

16.8. *Emergency Action Plans.* Engineering shall assist the project operators in the preparation, maintenance, and testing of Emergency Action Plans.

**17. Design Quality**

Product quality is the responsibility of everyone on the PDT. Execution of design and technical quality is the responsibility of engineering. Technical quality must be achieved while conforming to schedules, budgets, and customer expectations. To ensure these goals are met simultaneously, it is essential that coordinating and planning the work effort occur at the earliest stage of project development, through preparation and execution of the Management Plan. Engineering must provide input for development of the plan. Engineering in conjunction with project management must ensure that the work is properly defined and schedules are attainable. Technical quality shall be achieved mainly through the a process that includes development of realistic comprehensive work plans, definition of functional and technical criteria, adequate coordination among the project team and technical disciplines, and continuous coordination with the PM and non-Federal sponsor. In addition proper oversight by senior design experts, and full participation in constructibility and other feedback sessions is required. Quality is further achieved by participation in value engineering studies and thorough internal checking and review by qualified engineers. Application of lessons learned during current planning and design work can enhance quality of future work. To take advantage of an opportunity for improvement, designers shall document any problems experienced and effective solutions developed during the design and other processes. These may occur in any aspect of design, such as coordination, scheduling, criteria, design methods, regulations, or other areas. Written lessons learned reports shall be forwarded through the command so the entire Corps can benefit from experiences with each project. Specific guidance on design and technical quality is contained in ER 1110-1-12.

**18. Continuing Authorities Program.**

District staff will use judgment to perform the appropriate level of detail of analyses to produce a quality project and meet Continuing Authorities Program time and cost targets. The level of detail should be minimized to that which is necessary to determine the recommended plan. This does not authorize commanders to deviate from legislative or regulatory requirements. However, districts and divisions are encouraged to be innovative and develop their own time and cost saving measures. Issues that arise over appropriate level of detail should be elevated to the MSC for resolution.

Specific instructions for level of detail are not possible due to the variation in type, scope and extent of problems and the issues surrounding recommended solutions, The Continuing Authorities Program procedures allow the Corps of Engineers to bring expertise and experience to bear to solve identified water resource problems of a more limited scope than those projects, which are pursued under congressional authorization. This mission works best when the program is used to solve the problems for which it was designed, leaving complex projects to the specifically authorized program and very small projects to non-Federal entities. Successful performance on the Continuing Authorities Program's limited funding and time targets requires significant reliance on professional judgment and prudent engineering practices. The Continuing Authorities Program process requires staff skilled in the principles and practices of engineering, economic and environmental evaluation, real estate, and contracting procedures.

**19. Published Criteria Mandatory Requirements.**

Engineering policy for civil works projects is issued in the form of official publications, primarily engineer regulations (ER's) and engineer manuals (EM's). Engineer circulars (EC's); engineer pamphlets (EP's);

and engineer technical letters (ETL's) are also used. Generally, ER's have been viewed as conveying mandatory policy requirements for management of the engineering function. However, the engineering requirements contained in EM's and other publications have been considered as mandatory standards by some offices, while being treated as mere suggested methods by other offices. This difference has resulted in inconsistent application of engineering requirements throughout USACE, sometimes not in accordance with HQUSACE intent. This intent has not always been clearly stated in the publications; however, many specific provisions have been intended as mandatory. For example, minimum safety factors and minimum clearances to ensure functional adequacy are intended to be mandatory requirements. These mandatory engineering standards ensure reasonable uniformity throughout USACE, and are intended to ensure project safety and functional adequacy.

19.1. *Publications*

19.1.1. Engineer Regulations. ER's contain policy requirements for engineering management. All ER requirements will be considered mandatory unless otherwise indicated within the regulation or as clarified by official correspondence from CECW-E.

19.1.2. Engineer Manuals. EM's contain policy standards for uniform engineering practice related to civil works projects. Existing EM's contain some mandatory requirements to ensure project safety and function. These requirements shall be identified annually in an ETL. These interim annual lists of mandatory requirements will be in effect until individual EM's are updated. In all new EM's and future revisions of each EM, the HQUSACE proponent shall ensure that the mandatory engineering requirements are specifically identified.

19.1.3. Engineer Technical Letters. ETL's contain information similar to EM's, and the above policies for EM's are also applicable to ETL's. However, ETL's are intended for temporary use. Their content should be incorporated into appropriate EM's as soon as practical.

19.1.4. Engineer Circulars. EC's are used for temporary publication of draft content of ER's or EM's, All EC's will clearly state which provisions are mandatory.

19.1.5. Engineer Pamphlets, EP's are used to distribute general information within USACE or to the public. EP's never establish requirements; this is done other publications. EP's may include discussion of specific mandatory standards.

19.1.6. Guide Specifications. Each design district is responsible for producing contract specifications for each project. The project specifications must conform to engineering policies established in any of the above types of publications. Guide specifications are useful tools for producing these project specifications, but do not, by themselves, set any mandatory requirements for civil works projects. Where there is a conflict between a guide specification and another publication (ER, EM, EC or ETL), the other publication will govern.

19.2. *Proponent Office Symbol.* Each official publication identifies the HQUSACE proponent by including an office symbol in the heading. This symbol is primarily for administrative purposes. It shall not be interpreted to limit the applicability of the publication. The scope and applicability of the publication are described within the body of the publication.

## 14-6. Dredged Material Payment Prisms

Hydrographic surveys supporting dredging operations, and related dredge volume and payment computations, are performed with respect to a variety of payment prisms. Survey data must be collected at sufficient accuracy and density so it can be evaluated relative to these prisms. Failure to collect survey data with sufficient coverage makes accurate pay quantity computation difficult, and can result in payment disputes. The following parameters are used to define the various payment reference surfaces found on navigation projects. Refer back to Figure 14-1 for a graphical depiction of the following prisms.

*a. Authorized project dimensions.* A channel's "required depth" or "project depth" and width are specified in the Congressional authorizing legislation for each project. This legislation may also detail the dimensions of channel entrances, bends (wideners), sidings, anchorages, and turning basins. The required project depth (authorized project depth) is based on the draft of the loaded design vessel plus, squat, sinkage in fresh water, effect of wind and wave action, under-keel safety and efficiency clearance, etc.--see ER 1110-2-1404, "Hydraulic Design of Deep-Draft Navigation Projects." Project width of a channel is a function of traffic, winds, currents, curvature, vessel maneuverability, bank conditions, etc. See Figure 14-4. In some instances, over-width dredging may be performed for advance maintenance purposes--EM 1110-2-1202, "Environmental Engineering for Deep-Draft Navigation Projects."




**Figure 14-4: Typical Deep-Draft Navigation Channel Dimension and Clearance Parameters**

*b. Allowable overdepth.* Dredging below the required project depth prism is permitted (and paid) to allow for inaccuracies in the dredging process. This is called the "overdepth allowance." A maximum two-foot overdepth is typically allowed for coastal, Great Lakes, and inland waterway projects. Payment is made for material excavated above both the required depth and the allowable overdepth grade. In some cases, no overdepth allowance is paid--termed "zero tolerance" dredging. In such cases, surveys must assure that the contractor has dredged below the required depth to ensure all material has been removed .

EXHIBIT
4

DEPARTMENT OF THE ARMY
U. S. Army Corps of Engineers
Washington, D.C. 20314-1000

EC 1130-2-210

CECW-OD/CECW-EP

Circular
No. 1130-2-210

1 October 1998

EXPIRES 30 SEPTEMBER 2000
Project Operations
HYDROGRAPHIC SURVEYING

1. Purpose. This circular disseminates updated policies, revised accuracy standards, and technical procedures for hydrographic surveying, superseding portions of EM 1110-2-1003, Hydrographic Surveying. New technical guidance on the use and calibration of acoustic multibeam survey systems is provided.

2. Applicability. This circular is applicable to USACE commands having responsibility for performing or contracting hydrographic measurement, construction payment, or condition surveys on civil works navigation or flood control projects.

3. References.

a. ER 1130-2-520, Navigation and Dredging Operations and Maintenance Policies.

b. EM 1110-1-2909, Geospatial Data and Systems.

c. EM 1110-2-1003, Hydrographic Surveying.

4. Distribution. Approved for public release. Distribution is unlimited.

5. Background. Procedural guidance and accuracy standards for performing hydrographic surveys are contained in EM 1110-2-1003. Since this manual was last updated in 1993-1994, significant technological improvements have occurred in vessel positioning (Global Positioning System), depth measurement (shallow-water acoustic multibeam swath systems), and near real-time data acquisition, editing, and processing systems. This new technology has been rapidly acquired by USACE commands and has resulted in significantly improved data accuracy and reliability.

6. Policy. Mandatory use of EM 1110-2-1003 for dredging measurement and payment surveys is prescribed by ER 1130-2-520. The revised accuracy standards and related technical guidance

Results of the comparison of the multibeam check lines to the reference surface. This report is generated by the Beam Angle Test section of HYSWEEP multibeam processing program MB Max (Figure 11-14).

| ± Beam Angle Limit | Max Outlier | Mean Diff | Std Dev | 95% Confidence |
|---|---|---|---|---|
| 20 | 0.37 | 0.11 | 0.08 | 0.16 |
| 25 | 0.37 | 0.11 | 0.08 | 0.16 |
| 30 | 0.37 | 0.11 | 0.08 | 0.15 |
| 35 | 0.40 | 0.11 | 0.08 | 0.15 |
| 40 | 0.40 | 0.10 | 0.08 | 0.15 |
| 45 | 0.40 | 0.10 | 0.07 | 0.15 |
| 50 | 0.40 | 0.10 | 0.07 | 0.15 |
| 55 | 0.45 | 0.10 | 0.07 | 0.15 |
| 60 | 0.88 | 0.10 | 0.08 | 0.15 |
| 65 | 0.88 | 0.10 | 0.08 | 0.16 |
| 70 | 0.88 | 0.10 | 0.08 | 0.16 |
| 75 | 0.88 | 0.11 | 0.08 | 0.16 |




Figure 11-14. Histogram showing dispersions of performance test against reference surface--at beam angle of 45 deg (Coastal Oceanographics, Inc.)

## 11-12. Multibeam Data Editing and Processing

Multibeam data is processed and edited on a variety of commercial platforms and software packages--e.g., HYPACK MAX Sweep Editor. Data processing software has now progressed to the point that multibeam data may be filtered, edited, thinned, and binned in real-time; thus eliminating much of the

either in an individual element or in the overall rating, prior to completing the evaluation, and all Contractor comments will be made a part of the official record. Performance Evaluation Reports will be available to all DoD contracting offices for their future use in determining Contractor responsibility, in compliance with DFARS 36.201(c)(1).

## 1.15 FINAL EXAMINATION AND ACCEPTANCE (1965 APR OCE)

As soon as practicable after the completion of an entire acceptance area, a final examination of the work will be conducted by the Contracting Officer, at the cost and expense of the Government by acoustic sweep survey system. Should any shoals, lumps, or other lack of contract depth be disclosed by this examination, the Contractor will be required to remove same. The Contractor, or his authorized representative, will be notified when soundings or sweepings are to be made, and will be permitted to accompany the survey party. The Government shall notify the Contractor of the findings of survey within ten (10) calendar days from the date the survey was performed by the Government. When the area is found to be in a satisfactory condition, it will be accepted. Should more than two sounding or sweeping operations by the Government over an area be necessary by reason of work for the removal of shoals disclosed at a prior sounding or sweeping, the cost of such third and any subsequent sounding or sweeping operations will be charged against the Contractor at the rate of **$8,200.00** per occurrence. **For purposes of this Contract, Acceptance Area 1,2,2A,3,4,4A,5,6 and 7 as defined on the drawings have been identified as acceptance areas.** Progress payment shall be arranged at the pre-construction conference. The Contractor shall perform pre-final hydrographic sweep surveys of an entire acceptance area to verify the area is satisfactorily completed prior to final examination by the Government. The pre-final surveys shall be performed using a multitrack or multibeam survey system to insure 100% coverage of the entire acceptance area. The proposed method for performing these surveys and all equipment and programs shall be submitted for approval. The Contractor's hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys.

## 1.16 FUEL USAGE

The Contractor shall furnish the Contracting Officer a report, to be received on or before the last day of the calendar month, listing the totals of fuels consumed by the dredging plant and support vessels. The report shall list quantities of different fuels separately. The report shall cover the period from the 25th of the preceding month to the 25th of the current month.

## 1.17 OIL TRANSFER OPERATIONS (NAP-1/81)

The Contractor shall assure that oil transfer operations to or from his plant comply with all Federal, state, and municipal laws, codes and regulations. Particular attention is invited to 33 CFR Subchapter O, "Pollution." The Contractor shall incorporate in the accident prevention program, submitted in compliance with contract clause ACCIDENT PREVENTION in Section 00700, sufficient information to demonstrate that all fuel transfers will be made in compliance with 33 CFR 156 and any other applicable laws, codes and regulations.

## Chapter 3
## Corps Accuracy Standards, Quality Control, and Quality Assurance Requirements

### 3-1. Purpose

This chapter contains survey accuracy, quality control, and quality assurance criteria for USACE hydrographic surveys. These criteria are intended to provide Corps-wide consistency and uniformity in performing surveys on civil works projects.

Table 3-1. Minimum Performance Standards for Corps of Engineers Hydrographic Surveys (Mandatory)

| PROJECT CLASSIFICATION | | Navigation & Dredging Support Surveys<br>Bottom Material Classification<br>Hard | <br><br>Soft | Other General Surveys & Studies<br>(Recommended Standards) |
|---|---|---|---|---|
| RESULTANT ELEVATION/DEPTH ACCURACY (95%) | | | | |
| System | Depth (d) | | | |
| Mechanical | (d<15 ft) | ± 0.25 ft | ± 0.25 ft | ± 0.5 ft |
| Acoustic | (d<15 ft) | ± 0.5 ft | ± 0.5 ft | ± 1.0 ft |
| Acoustic | (15>d<40 ft) | ± 1.0 ft | ± 1.0 ft | ± 2.0 ft |
| Acoustic | (d>40 ft) | ± 1.0 ft | ± 2.0 ft | ± 2.0 ft |
| OBJECT/SHOAL DETECTION CAPABILITY | | | | |
| Minimum object size (95% confidence) | | > 0.5 m cube | > 1 m cube | N/A |
| Minimum number of acoustic hits | | > 3 | 3 | N/A |
| HORIZONTAL POSITIONING SYSTEM ACCURACY (95%) | | < 2 m (6 ft) | 2 m (6 ft) | 5 m (16 ft) |
| REPORTED FEATURE HORIZONTAL LOCATION ACCURACY (95%) | | | | |
| Plotted depth location | | 2 m (6 ft) | 5 m (16 ft) | 5 m (16 ft) |
| Fixed planimetric features | | 3 m (10 ft) | 3 m (10 ft) | 3 m (10 ft) |
| Fixed navigation aids | | 3 m (10 ft) | 3 m (10 ft) | 3 m (10 ft) |
| Floating navigation aids | | 10 m (30 ft) | 10 m (30 ft) | 10 m (30 ft) |
| SUPPLEMENTAL CONTROL ACCURACY | | | | |
| Horizontal Control | | 3rd order (I) | 3rd order (I) | 3rd order (I) |
| Vertical Control | | 3rd order | 3rd order | 3rd order |
| WATER SURFACE MODEL ACCURACY | | [½ depth accuracy standard] | | ½ depth accuracy |
| MINIMUM SURVEY COVERAGE DENSITY | | 100% Sweep | NTE 200 ft or 60 m | NTE 500ft (150m) |
| QUALITY CONTROL & ASSURANCE CRITERIA | | | | |
| Sound velocity QC calibration | | > 2/day | 2/day | 1/day |
| Position calibration QC check | | 1/day | 1/project | 1/project |
| QA performance test | | Mandatory | Required (multibeam) | Optional |
| Maximum allowable bias | | ± 0.1 ft | ± 0.2 ft | ± 0.5 ft |

### 3-2. USACE Hydrographic Survey Accuracy Performance Standards (Mandatory)

Table 3-1 contains the most critical technical performance standards for Corps hydrographic surveying activities. These standards are mandatory for "Navigation and Dredging Support Surveys." The standards for "Other Surveys and Studies" are recommended. These standards are designed to reflect current survey instrumentation, practices, and capabilities; however, it is fully recognized that exceptions

United States Army Corps of Engineers
Kill Van Kull Project Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, New Jersey 07305

22 June 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Partial Acceptance of Area 1

Serial Letter No. G-71

Gentlemen,

References:

a. Specification Section 00800, Paragraph 1.15, Final Examination and Acceptance.

b. USACE Survey Map No. 2536D/N, dated 4 June 2004

Based upon your verbal request at our meeting on 1 June 2004, the issue of partial acceptance of Area 1 has been evaluated.

It is noted that a Government hydrographic survey was conducted of Area 1 on 31 December 2003. The results of the reprinted survey, ref. b, indicate that high spots remain at the eastern portion of the area. Since the remainder of Area 1 is clear to the contract grade elevation of -47.0 ft MLW and easily delineated, it has been determined that the portion of Area 1 between Stations 5+10 and 27+46.972 (eastern boundary line) is accepted as of 22 June 2004.

If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

PJC 0010420

United States Army Corps of Engineers
Kill Van Kull Project Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, New Jersey 07305

11 August 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Partial Acceptance of Area 5

Serial Letter No. G-81

Gentlemen,

References:

a. Specification Section 00800, Paragraph 1.15, Final Examination and Acceptance.

b. USACE Survey Map No. 2661D, dated 23 June 2004

Based upon your verbal request at our meeting on 23 June 2004, the issue of partial acceptance of Area 5 has been evaluated.

A Government hydrographic survey was conducted of Area 5 on 16 June 2004. The results of the survey, ref. b, indicate that high spots remain within 100 feet of the Eastern toe area and within 100 feet of the Western toe area. The remainder of Area 5 is clear to the contract grade elevation of -47.0 ft MLW. It has been determined that the 300 foot wide inside portion of Area 5, between 100 feet of the Eastern toe and 100 feet of the Western toe of Area 5, is accepted by the Government. The contract grade elevation of -47 feet MLW has not been achieved in the two outside portions of Area 5. As a result, the two remaining portions cannot be accepted at this time.

DJC003816

If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

DJC003817

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

18 August 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II Contract VIII (Area 8), Government Survey of Acceptance Area 4A.

Serial Letter No. G-083

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-079, dated 26 June 2004 (received 26 July 2004); Subject: Government Examination and Acceptance of Area 4A.

c. USACE Survey Map No. 2669D/N, dated 16 August 2004

A hydrographic survey was conducted on 27 July and 9 August 2004 upon your notification that Acceptance Area 4A under the subject contract was ready for acceptance, ref. b. The results of the survey, ref. c, indicate that the contract grade elevation of -47.00 feet MLW in Aceptance Area 4A has not been achieved.

As a result, Area 4A cannot be accepted at this time. You are reminded that in accordance with Reference a, if required contract grade is not demonstrated after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

DJC003814

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

United States Army Corps of Engineers
Kill Van Kull Project Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, New Jersey 07305

19 August 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II Contract VIII (Area 8), Government Survey of Acceptance Area 5.

Serial Letter No. G-084

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-081, dated 28 June 2004 (received 28 July 2004); Subject: Government Examination and Acceptance of Area 5.

c. USACE Survey Map No. 2678D/N, dated 19 August 2004

A hydrographic survey was conducted on 5 August 2004 (4th survey) upon notification that Acceptance Area 5 under the subject contract was ready for acceptance, ref. b. The results of the survey, ref. c, indicate that the contract grade elevation of -47.00 feet MLW in Acceptance Area 5 has not been achieved.

As a result, Area 5 cannot be accepted at this time. You are reminded that in accordance with Reference a, if required contract grade is not demonstrated after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

DJC003812

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

30 August 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II Contract VIII (Area 8), Government Survey of Acceptance Area 1/3A.

Serial Letter No. G-086

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-089, dated 24 Aug 2004; Subject: Government Examination and Acceptance of Area 1/3A.

c. USACE Survey Map No. 2692D, dated 30 August 2004

A hydrographic survey was conducted on 25 August 2004 upon notification that Acceptance Area 1/3A under the subject contract was ready for acceptance, ref. b. The results of the survey, ref. c, indicate that the contract grade elevation of -47.00 feet MLW in Acceptance Area 1/3A has not been achieved.

As a result, Area 1/3A cannot be accepted at this time. You are reminded that in accordance with Reference a, if required contract grade is not demonstrated after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

DJC003810

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

DJC003811

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

20 September 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Government Survey of Acceptance Area 1/3A, Area 3A and Area 3.

Serial Letter No. G-093
Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-097, dated 5 September 2004; Subject: Government Examination and Acceptance of Area 3.

c. Jay Cashman, Inc. Serial Letter No. S-096, dated 5 September 2004; Subject: Government Examination and Acceptance of Area 13

d. Jay Cashman, Inc. Serial Letter No. S-095, dated 5 September 2004; Government Examination and Acceptance of Area 3A.

e. USACE Survey Map No. 2697D/N, Date of Survey 7, 8 and 13 September 2004

A hydrographic survey was conducted on 7, 8 and 13 September 2004 upon notification that Acceptance Areas 1/3A, 3 and 3A under the subject contract were ready for acceptance, ref. B, ref c and ref d. The results of this survey indicate that the contract grade elevation of -47.00 feet MLW in Acceptance Areas 1/3A, 3 and 3A has not been achieved.

DJC003794

As a result, Area 1/3A. 3 and 3A cannot be accepted at this time. You are reminded that in accordance with Reference a, if required contract grade is not demonstrated after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

RECEIVED
NOV - 1 2004

28 October 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Government Survey of Acceptance Area 4.

Serial Letter No. G-099

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-0137, dated 10 October 2004; Subject: Government Examination and Acceptance of Area 4.

c. USACE Survey Map No. 2718D/N, dated 28 October 2004

A hydrographic survey was conducted on 21 and 25 October 2004 upon notification that Acceptance Area 4 under the subject contract was ready for acceptance, ref. b. The results of the survey, ref. c, indicate that the contract grade elevation of -47.00 feet MLW in Acceptance Area 4 has not been achieved.

As a result, Area 4 cannot be accepted at this time. You are reminded that in accordance with Reference a, if required contract grade is not demonstrated after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

PJC 0006981

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

9 November 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Government Survey of Acceptance Area 4.

Serial Letter No. G-106

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-0141, dated 29 October 2004; Subject: Government Examination and Acceptance of Area 4.

c. USACE Survey Map No. 2726D, dated 9 November 2004

A hydrographic survey was conducted on 4 November 2004 upon notification that Acceptance Area 4 under the subject contract was ready for acceptance, ref. b. The results of the survey, ref. c, indicate that the contract grade elevation of -47.00 feet MLW in Acceptance Area 4 has not been achieved.

As a result, Area 4 cannot be accepted at this time. You are reminded that in accordance with reference a, if required contract grade is not achieved after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

United States Army Corps of Engineers
Kill Van Kull Project Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, New Jersey 07305

15 November 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Government Survey of Acceptance Area 4.

Serial Letter No. G-107

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-0167, dated 10 November 2004; Subject: Government Examination and Acceptance of Area 4.

c. USACE Survey Map No. 2729D, dated 15 November 2004

A hydrographic survey was conducted on 10 November 2004 upon notification that Acceptance Area 4 under the subject contract was ready for acceptance, ref. b. The results of the survey, ref. c, indicate that the contract grade elevation of -47.00 feet MLW in Acceptance Area 4 has not been achieved.

As a result, Area 4 cannot be accepted at this time. You are reminded that in accordance with reference a, if required contract grade is not achieved after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

DJC003772

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

DJC003773