TOPICS

# Marine Navigation

Authorizing Mandate | Office of Coast Survey's Activities

One of NOAA's goals is to support the nation's commerce with information for safe, efficient, and environmentally sound marine transportation. While this goal encompasses all forms of transportation, including air and surface, ocean travel and related commerce offer a particular set of challenges. Accurate and current nautical charts, tide and current observations, weather forecasts, and other NOAA environmental information are important for making sea travel much safer. Also important is ensuring that port operations and development and marine transit proceed efficiently and in an environmentally sound manner. Coastal and ocean information and services including reduced risk of marine accidents and oil spills, enhanced search and rescue capabilities, and other efficiencies from improved navigation could be worth $300 million dollars annually to the nation's coasts.



Hydrographic surveys are performed by NOAA ships, such as the NOAA ship *Thomas Jefferson*, using multi-beam and side scan sonar systems to determine water depths, submerged dangers to navigation, and obstructions.

## Authorizing Mandate

The mandate to create nautical charts of the nation's coasts dates back to 1807, when President Thomas Jefferson ordered a survey of the young nation's coast. The Organic Act of 1807 authorized the newly formed coastal survey agency to construct and maintain the nation's nautical charts. This agency, then known as the U.S. Coast Survey, is the oldest scientific organization in the United States. It has been a part of NOS since 1970, when the National Oceanic and Atmospheric Administration (NOAA) was created.

The mandate to create and maintain nautical charts and related hydrographic information is meant to ensure safe navigation of maritime commerce within the U.S. Exclusive Economic Zone—an area of 3.4 million square nautical miles offshore from the coastline.

## Office of Coast Survey's Activities

**For More Information**

*Office of Coast Survey*

*National Ocean Service Data Explorer*

*Nautical Chart Critical Corrections Notices*

*Coast Pilot Critical Corrections Notices*

*NowCOAST Internet Mapping Tool*

*Historical Map and Chart Collection*

**Educational Resources**

*Marine Navigation Lesson Plan*

**Multimedia Presentations from *Wavebreaking News***

*Tide Predictions Accessible from Cell Phones: Spring 2004*

*Measuring Air Gap Aids Navigation: Spring 2004*

*The mandate to*

*Nautical Charts and Coast Pilots*

*create nautical charts of the nation's coasts dates back to 1807, when President Thomas Jefferson ordered a survey of the young nation's coast.*

Today, the Office of Coast Survey (OCS) remains the primary agency responsible for constructing and maintaining the nation's suite of nautical charts. Nautical charts contain information about the nature and form of the coast, the depths of the water and general character and configuration of the sea bottom, locations of dangers to navigation, the rise and fall of the tides, locations of navigation aids, and characteristics of the Earth's magnetism. Nautical charts are available in paper format, in a raster format (georeferenced digital pictures of paper nautical charts), and in vector format.



This Coast Survey cartographer (or map-maker) is preparing an electronic navigational chart, which will be used by mariners to lay out courses and navigate ships by the shortest and most economically safe routes.

The United States Coast Pilot® consists of a series of nautical books that cover a variety of information important to navigators of coastal and intracoastal waters and the Great Lakes. Issued in nine volumes, *Coast Pilots* contain supplemental information that is difficult to portray on a nautical chart. *Coast Pilots* include channel descriptions, anchorages, bridge and cable clearances, currents, tide and water levels, prominent features, pilotage, towage, traffic separation schemes, small-craft facilities, and federal regulations that are applicable to navigation. *Coast Pilots* are available online for download.

*Hydrographic Data*

To produce the nation's nautical charts and ensure safe navigation in U.S. waters and Exclusive Economic Zone, OCS conducts hydrographic surveys to measure the depth and bottom configuration of water bodies. In collecting hydrographic data, particular attention is paid to acquiring the precise location of least (shoalest) depths on dangers to navigation and depths significant to surface navigation. The precise locations of aids to navigation are also emphasized and tide or water level measurements are also recorded to provide a vertical reference (Mean Lower Low Water) for water depths. Hydrographic surveys identify sea-floor materials, dredging areas, cables, pipelines, wrecks and obstructions, piles, and fish habitats using multibeam and side scan sonar tools. Ongoing research and development efforts aim to improve NOS's marine navigation products and services.

*NOS collects marine hydrographic data (depth soundings) to construct and maintain more than 1,000 nautical charts and Coast Pilots...*

NOS's Navigation Response Teams conduct hazardous obstruction surveys and emergency response. Working from 10 strategically placed offices, the teams are available on short notice and use dive operations, electronic navigation data collection, and mapping support capabilities to promote safe navigation in emergency situations 365 days a year throughout U.S. waters.

*Autonomous Underwater Vehicles for Sea-bed Mapping*

To support nautical charting and

hydrographic data collection efforts, OCS is evaluating Autonomous Underwater Vehicles (AUVs) to more efficiently and accurately acquire hydrographic data for shallow-water hydrographic surveys. AUVs are unmanned, self-contained robotic submersibles that perform their missions without direct human control, so they can conduct surveys covering large areas not suitable for traditional shipboard surveying techniques.



The Hydroid Remus AUV with externally mounted Global Positioning System antenna and SeaBird CTD has been tested in the field by OCS for shallow-water hydrographic surveying. Upward looking Acoustic Doppler Current Profiler beams are depicted in this graphic.

*OCS maintains NOAA's nowCoast Internet mapping portal to real-time weather, ocean, river and water quality observations...*



nowCoast brings together information from federal, state, and independent observing networks combined with map-based access to NOAA's forecast products and visualization of near-real-time weather information from NOAA satellites and NEXRAD radar to offer one-stop access to current conditions and forecasts for Web users.

developing additional software and tools to disseminate nautical chart and hydrographic data on the Internet. ENC Direct to GIS allows users of geographic information system (GIS) software to acquire and incorporate data from OCS's Electronic Navigational Charts into their GIS systems. A suite of digital datasets and software products related to charting and bathymetry has been made available to support the coastal GIS community. OCS also makes available more than 21,000 historical maps and charts dating back to the late 1700s. The collection includes the nation's earliest nautical charts, hydrographic surveys, topographic surveys, geodetic surveys, city plans, and Civil War battle maps. OCS also maintains NOAA's nowCoast, an Internet mapping portal to real-time weather, ocean, river- and water-quality observations, and NOAA forecasts for U.S. coastal regions and the Great Lakes.

(top)

you're operating at your peril?
A Right.
Q You're not supposed to do that?
A Correct.
Q How close do the vessels normally come to that, would they come to twenty-nine if it was thirty?
A Thirty-one, thirty-three.
Q They do that?
A At high tide.
Q What about in terms of forgetting about high tide, you normally come in somewhat short of what you're allowed I would assume?
A I would assume they would try, yeah.
Q Are there penalties, does the Coast Guard prohibit a deeper draft vessel from operating in the channel?
A There are insurance problems, yes.
Q If KVK8 was being dredged to forty-seven did that mean that the new authorized project depth immediately became forty-seven?
A Not necessarily.

Q Yes.

A Three phases. The first phase brought it down to forty-two feet to the most part, if I understand with the possible exception Arthur Kill and Port Jersey. The second phase was to bring it to forty -- I said forty-five?

Q You said forty-two initially. You said take it down to forty-two in the first stage.

A Yes, in the second stage take it to forty-seven, forty-five authorized depth and forty-seven contract depth and the final phase was to bring everything down to fifty, fifty authorized and fifty-two contract.

Q So that the KVK8 area would be subsequently dredged again to take it down to fifty?

A Yes, eventually it would be, yes.

Q When the KVK8 project was finished, would vessels be allowed to assume a channel depth of forty-seven for navigation purposes?

A I don't have complete

understanding of the regulation, you know, the shipping regulation, how they work or not. My understanding was that they would use whatever depth they understood the channel to have been dug to.

Q Even if the authorized published project depth is forty-five?

A My understanding, and what was that they would have considered -- considered whatever it was dug to as well as the authorized depth, whatever that -- and what weight, what it took, I don't know. The container ships are extremely large vessels. I would take -- I would expect they'd utilize every bit of information in determining what they could -- what they could pass through there or not.

Q But these KVK8 Projects for the most part were contiguous to one another; were they not?

A You mean the acceptance areas?

Q Yes, the project --

A As best as I can remember, yes, I mean the whole channel network was ultimately

Q. That's fine. Prior to submitting the bid for the KVK 8 contract, did you ever discuss the method that the Corps would use to process acceptance surveys with anyone?
A. In-house, we probably discussed it.
Q. Do you recall who you discussed it with?
A. Probably Jim Galli.
Q. Do you recall the nature of the discussion?
A. It was just in a typical discussion of the project. I'm sure it was one of the items that we talked about before we put the final price in.
Q. Do you recall what Mr. Galli believed was the method that the Corps would use to process acceptance surveys?
A. I can't remember directly, but there was nothing about mentioning or any discussion about a minimum multibeam survey.
Q. Did you have an impression of the method that the Corps would use to process acceptance surveys at the time that you were preparing your bid for the contract?
A. Based on the plans and specs, I assumed it was an average multibeam survey.

A If there was a difficulty, the contractor never came back and said that, you know, we've introduced an impossibility or an unachievable requirement, as have other contractors that we've put out with regard to the fifty foot.

Q Does it seem reasonable to you, Mr. Hawkins, as the project manager to reject a tenth of a foot above minus forty-seven when the authorized project depth is minus forty-five and vessels are not permitted to assume or take advantage of any depth greater than that?

A We have a standard. You have to draw a line in the sand somewhere that a contractor has to meet. The line was drawn and quite clearly indicated in the plans and specifications that forty-seven was the plane in which he had to achieve in his contract area.

Q I understand that, but I'm asking you something beyond that. Does it make sense to you?

A If it's in the center of the

Q. Did Cashman perform surveys other than progress surveys for payment?
A. Yes.
Q. What type?
A. We would go out and survey every day areas that were dredged the day before.
Q. Why would you do that?
A. To check the grade.
Q. Did Cashman survey entire areas of the project before submitting them for acceptance?
A. We would -- I don't understand the question.
Q. Okay. Would they do a survey of a whole project area at once prior to submitting it for acceptance by the Corps?
A. We would survey an area that we felt was to grade. We wouldn't survey an area that we didn't think was to grade.
Q. Right. That's my question, when you thought it might be to grade.
A. Yes.
Q. How deep were the dredge cuts initially set for the KVK 8 contract?
A. On the screen of the dredge?
Q. Yes.

A. We split the difference between the required depth and the payment of overdepth, which was a foot and a half. I believe it was 48 -- we were digging to 48, and then we got paid to 49 1/2. I believe those were the numbers. And we set the screen on the computer between those two elevations.

Q. Okay. Let's just take a step back. What was the contract required grade -- contract actually required grade?

A. I believe it was 48 or 47. I can't remember. The numbers all run together.

Q. That's all right. And how much overdepth was paid overdepth?

A. A foot and a half.

Q. Okay. And so where would you set the cuts to initially?

A. Between the minimum required depth and the foot and a half overdepth.

Q. Why did you decide to do that?

A. Because our previous experience, it showed us that that was the best way to get it cleared and not overdig too much.

Q. Did you participate in preparing Cashman's bid

understanding why its pre acceptance surveys were not being verified by what the correlator found in its own surveys?

A No more so than -- than the other contracts, no. I mean yeah, no more so than the other contracts.

Q In other words the other contractors, as far as you can recall, were running into the same difference?

A Well, again, they would make multiple attempts at -- at meeting depth and achieving contract depth. Specific to what specific areas were more or less, I don't recall, but I know that we typically -- contractors typically would re-visit a site multiple times.

Q If a contractor is required to dredge to minus forty-seven, as far as you understand capabilities of dredging equipment, is it possible to dredge to that neat line?

A To a neat line?

Q Yes.

A No, not reasonably possible, no. There's over depth in the contract -- provided

in the contract to compensate that or to make that attainable.

Q So you'd have to dredge below minus forty-seven to achieve forty-seven?

A Correct.

Q How far below?

A Depends on the equipment and the contract and the operator, really. Some contractors six inches is enough. Other contractors -- and I should say some operators and some equipment. Other operators and equipment three feet wouldn't be enough.

Q In harder material is it more difficult?

A Typically it's more difficult in harder material, to my understanding.

Q What was the allowable over depth in KVK8?

A I don't specifically recall whether it was two, three feet or two feet or four --

Q If I suggested to you that it was one and a half feet, would that be possible?

A It's possible. It's possible. I

Q. When you prepared the bid for the contract, did you assume that Cashman would perform any dredging beyond the paid overdepth?
A. Absolutely.
Q. Why?
A. It's just the nature of the business.
Q. Can you recall how much dredging beyond the paid overdepth you assumed that Cashman would perform?
A. I can't remember what we figured on this.
Q. Are you aware of any documents that might contain that information?
A. I don't have them or I -- if you people didn't find it in the document search, then I don't know where it would be.
Q. Okay. That's fine. At the time you prepared Cashman's bid for the contract, did you assume that Cashman would need to make more than one dredging pass to achieve grade?
A. We would go -- we would go back and pick up shoals, yes.
Q. Did you assume that this would happen after the Corps acceptance survey?
A. I would hope that it wouldn't. I hoped that we

during the duration of the dredging project and will become part of the contract specifications.

7.2 Ocean Placement Locations:for HARS and ROCK
For CLIN 0001AG and IF CLIN 0005A and 0006 exercised the Government has identified the Historic Area Remediation Site (HARS) for placement of dredged material, approved for ocean disposal, removed under this contract. However, barges that contain less than 25% non-rock material (i.e., vessels which contain 75% or more rock material) should not be transported to the HARS. (Non-rock material is defined as material that is less than 2.5 inches in diameter.)

7.2.1 HARS
The Contractor shall perform dredged material placement at specific locations within the HARS, defined by the following perimeter coordinates:

| Point | LatitudeDMS | LongitudeDMS | LatitudeDDM | LongitudeDDM |
|---|---|---|---|---|
| B | 40o 25' 23" N | 73o 53' 34" W | 40o 25.38' N | 73o 53.57' W |
| D | 40o 25' 22" N | 73o 52' 08" W | 40o 25.37' N | 73o 52.13' W |
| F | 40o 23' 13" N | 73o 52' 09" W | 40o 23.22' N | 73o 52.15' W |
| G | 40o 23' 13" N | 73o 51' 28" W | 40o 23.22' N | 73o 51.47' W |
| H | 40o 22' 41" N | 73o 51' 28" W | 40o 22.68' N | 73o 51.47' W |
| I | 40o 22' 41" N | 73o 50' 43" W | 40o 22.68' N | 73o 50.72' W |
| L | 40o 25' 22" N | 73o 50' 44" W | 40o 25.37' N | 73o 50.73' W |
| N | 40o 25' 22" N | 73o 49' 19" W | 40o 25.37' N | 73o 49.32' W |
| O | 40o 21' 35" N | 73o 49' 19" W | 40o 21.58' N | 73o 49.32' W |
| Q | 40o 21' 36" N | 73o 52' 08" W | 40o 21.60' N | 73o 52.13' W |
| T | 40o 22' 08" N | 73o 52' 08" W | 40o 22.13' N | 73o 52.13' W |
| U | 40o 22' 08" N | 73o 53' 34" W | 40o 22.13' N | 73o 53.57' W |

DMS = Degrees, Minutes, Seconds
DDM = Degrees, Decimal Minutes

7.2.2 The Contractor will also use exact placement criteria set by the New York District Corps of Engineers. All placement of dredged material within the HARS will occur in strict accordance with the guidelines and locations attached to these specifications, and any future updates when provided by USACE, particularly at the pre-construction meeting.

7.2.3 All non-rock material approved for ocean disposal, excluding floating debris and trash, shall be transported to the HARS, unless otherwise directed.

7.2.4 Rock
The Government has identified the **Shark River reef** for placement of dredged rock (i.e., vessels that contain 75% or more rock material) that is approved for ocean disposal.(see map in section 00902)

The rock material to be dredged, exclusive of all floatable material, will be disposed of at the Shark River Reef Site in New Jersey State. The artificial reef site is located approximately from Manasquan Inlet 100 degrees - 15.6 nautical miles and from Shark River Inlet 119 degrees - 14.8 nautical miles.
Boundaries of the site are as follows:

HOME | WHO WE ARE | NEWS RELEASES | CONTACT US

HARBOR HOMEPAGE
REPORTS/PRESENTATIONS
NEWS
PUBLIC NOTICES
PROJECT FACT SHEETS
ENVIRONMENTAL INITIATIVES >
HARBOR NAVIGATION >
MAPS
PHOTOS
DRILLING & BLASTING INFO
HARS

Drilling & Blasting Schedule & Information

**HARS--Historic Area Remediation Site**

Dredging navigation channels, berthing piers and anchorage areas in the Port of New York and New Jersey is necessary to maintain our harbor and it's water dependent facilities (Figure 1). The harbor requires dredging because fine-grained sediments, transported by rivers and within estuaries, settle and accumulate on the sea floor, causing shoaling which interferes with safe navigation.



Figure 1. Backhoe dredge New York (Great Lakes Dredge and Dock Company) working in the Kill Van Kull.

The success of ocean commerce within the Port depends on a regular and predictable maintenance and new work dredging program. Existing channel depths must be maintained to allow safe clearance, and deeper navigation channels must be excavated for modern cargo ships if the viability of the Port is to continue.

Using dredged material from the Harbor to cover existing sediments at the recently designated Historic Area Remediation Site (HARS) represents an environmentally beneficial use of this resource. Bottom sediments at the HARS which may have the potential to cause adverse effects can be capped with cleaner sediments dredged from the Harbor which meet the criteria of the Ocean Dumping Act and will not cause adverse effects. Placement of this material at the HARS will serve to remediate the site by reducing impacts to acceptable levels and improving habitat conditions for bottom dwelling organisms.

## Mud Dump Site History

Historically, most of the material dredged from the Port has been disposed in the Atlantic Ocean, in and around an area known as the New York Bight Dredged Material Disposal Site. Commonly referred to as the Mud Dump Site (MDS), it is located in a region of the inner New York Bight known as the New York Bight Apex (Figure 2). The location of the former MDS is still marked by a surface buoy (Figure 3). The use of this region as an area for the disposal of an assortment of materials dates back to the mid-1800s (Figure 4).



Figure 2. Location of old Mud Dump Site (MDS) and Historic Area Remediation Site (HARS) off the coast of Sandy Hook, New Jersey, within the inner New York Bight. (Click picture to enlarge)



Figure 4. Tugboats pulling waste barges in NY Harbor, 1884



Figure 3. Buoy marking the position of the Mud Dump Site within the inner New York Bight.

To accommodate the increasing need for the disposal of the assorted material, The Office of Supervisor of New York Harbor was established by an act of Congress in 1888. The Harbor Supervisor, acting through the Office of the Chief of Engineers (of the U.S. Army Corps of Engineers), was responsible for the designation of specific disposal sites and for

discussing, and I recall the EM discusses this in several places.

Q Can you point me to any of those by any chance?

MR. PAYNE: Off the record.

(Whereupon, a discussion was held off the record.)

A For example, if you refer to EC-1130-2-210 which we discussed before, on Page A-1, Paragraph A-2.1, it talks about hard bottom material in new work, specifically calling out projects like the Kill Van Kull, of which this project was a piece of, and it talks about the importance in the most precise systems available in order to detect small objects above project depth. If one was to use a different kind of binning other than shoalest, it would tend to smooth out these small objects and you wouldn't detect them, which certainly I would expect any surveyor to know or experienced dredger or even a fairly -- anybody doing dredging should know this. Similarly when you look at in EM 1110-2-1003 it discusses that a shoal-biased minimum depth

dredging, I'm sorry, that's paragraph C near the bottom of the page.

Q Which page?

A Sorry, 11-29.

Q 11-29?

A That's right.

That you can use this kind of surveying particularly for strike detection, which after all is what an acceptance survey in rock and hard material essentially is.

Q Does it not say that such biased depths should be used with caution on navigation project condition surveys as well?

A Well, you have to look at it in context because it discusses particularly in light of volume computations, which of course we didn't do with shoalest surveys. That was done with average surveys, as you would, as I'm sure you're well aware.

Q What about the sentence a couple sentences later in that same paragraph, "Use of minimum shoal-biased depths can adversely skew dredge quantity computations and erroneously portray clearance data"?

A As I answered before, we didn't use it for quantity data, so it wouldn't skew that.

Q What about clearance data?

A That's why you have to use it with caution, as it says before, which fortunately we have fine and highly trained surveyors to make sure that it's used properly. That's why, for example, elsewhere in the document it talks about the importance of having multiple hits, if you're going to be using shoal-biased binning, of course we absolutely made sure that any shoal showed up on several passes before it would be reported to the contractor.

Q Is it your testimony that these two manuals and circulars read together make it clear that the Corps of Engineers would be using the shoalest method for acceptance survey purposes on KVK8?

A That is my understanding, particularly given that I'm sure if there was any confusion the contractor would have asked it during the bidding period, so it seems to be pretty much clear that everybody had to

that we had this conflict. It was, you know, all the other projects it was clearly understood, and as I said we were arguing over a tenth of an inch and most of the other ones in trying to get, you know, the contractor was trying to get us to accept, you know, these hits and I'd have to go back to get them or whether or not the hits existed.

Q What is it that was "clearly understood", using your words, in the other projects?

A That you would use the minimum depth. You would use average depth to pay and minimum depth to accept.

Q Are those contracts that were performed by dredging contractors who had done work for the New York District before?

A Yes.

Q Had Cashman done any prior dredging projects for the New York District?

A No.

Q Do you think that it was fair to have expected Cashman to have known what acceptance survey method would be employed by

only 20 ft horizontal accuracy. In cases where these standards are considered too rigid, then waivers must be requested from HQUSACE.

### 3-5. Navigation and Dredging Support Surveys

This classification applies to all surveys performed in support of the Corps navigation mission. It includes both deep-draft (> 15 ft) and shallow-draft (< 15 ft) navigation projects. Types of surveys include: project condition surveys of navigation channels, dredging contract plans and specifications surveys, dredging measurement, payment, clearance, and acceptance surveys, and river charting surveys. The two distinct sub-categories are based on the characteristics of bottom conditions and the potential for navigation hazards in the project. These sub-classifications, and related accuracy standards, are intended to correspond closely with recently revised international and Federal hydrographic surveying standards for navigation projects. In effect, the survey instrumentation requirements, accuracy standards, and quality control procedures vary as a function of bottom type in a navigation channel; as does the required accuracy of dredge measurement and payment. The standards in Table 3-1 are mandatory for this class of survey.

*a. Hard bottom material and/or new work.* This sub-category of surveys includes those involving newly authorized navigation projects containing hard bottom material, such as rock or highly compacted material, or maintenance dredging of existing navigation projects containing hard bottom or otherwise hazardous material. This would also include recurring condition surveys of these projects. This category may also include navigation projects where low under-keel clearances are anticipated over potentially hazardous bottom conditions, hazardous cargo is transported, or where bottom sediment could adversely impact naval vessels transiting a project. Mechanical or acoustic sweep methods must be employed to ensure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise carrier-phase DGPS positioning and elevation measurement techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category--for example, projects such as Kill Van Kull, NJ, Port of Los Angeles/Long Beach, and St. Marys River, MI. A hard bottom classification does not require *in situ* bottom density sampling but should be based on a professional geotechnical opinion given local project knowledge, historical information, and project requirements.

*b. Soft bottom material and/or maintenance dredging.* This sub-category of surveys is intended to cover navigation projects containing soft sand/silt bottoms not judged to be hazardous to vessel hulls; or in projects with soft, featureless, and relatively continuous channel bottoms where gaps in coverage between survey lines are unlikely to yield potential hazards/strikes. The vast majority of the Corps 926 deep- and shallow-draft navigation projects and 12,000 miles of maintained waterways fall within this category--e.g., inland and intracoastal navigation systems and most coastal harbor projects. Accuracy, QC, and QA standards are slightly relaxed for this class of projects. Vessel positioning is usually accomplished using nationwide or local DGPS -- e.g., USCG Radiobeacon System. Dredge measurement, payment, and acceptance surveys are typically performed by cross-section methods using single beam acoustic transducer systems. Acoustic multi-transducer or multibeam sweep systems may optionally be used on deep-draft projects.

*c. Underwater investigation surveys.* These surveys include precise investigation surveys of/around locks, dams, power plants, abutments, piers, jetties, bulkheads, and other structures. Detailed investigation surveys of hazardous objects lying within the authorized navigation prism or project depth should follow the accuracy standards prescribed for navigation and dredging surveys. If full bottom coverage and/or object detection sweeping is required, then the standards for the most precise (Hard Material) sub-category of surveys should be followed. On critical surveys, 200% acoustic coverage is usually recommended.

# Chapter 1
# Introduction

## 1-1. Purpose

This manual provides technical guidance for performing hydrographic surveys that support the planning, engineering design, construction, operation, maintenance, and regulation of navigation, flood control, river engineering, charting, and coastal engineering projects. Accuracy standards and quality control criteria are defined to establish US Army Corps of Engineers (USACE)-wide uniformity in performing surveys involving dredging measurement, payment, and acceptance.

## 1-2. Applicability

This manual applies to all USACE commands having responsibility for performing, contracting, or monitoring hydrographic surveys in support of the Corps civil works activities.

## 1-3. Distribution

This publication is approved for public release; distribution is unlimited.

## 1-4. References and Bibliography

Referenced USACE publications are listed at Appendix A. Where applicable, bibliographic information is listed at the end of each chapter.

## 1-5. Use of Manual

This manual shall be used as a technical guide in performing hydrographic surveys with USACE hired-labor forces or contracted survey forces. It should be directly referenced in contract specifications for dredging or Architect-Engineer survey services. The accuracy standards and quality control criteria in the manual shall be specified for all surveys supporting dredging measurement, payment, and acceptance functions. This manual may be referenced should hydrographic surveying functions be required as part of a USACE military construction or environmental restoration activity. It is also applicable to surveys performed or procured by local interest groups under various cooperative or cost-sharing agreements.

## 1-6. Background

The original version of this manual was published in 1991 and was revised in 1994. Most of the standards and technical guidance in the 1991 and 1994 versions were designed to support older analog depth recording instruments, mechanical, visual, or microwave positioning, and manual data processing and drafting methods. Since the last update, significant advances in hydrographic surveying technology have occurred. These include replacement of short-range microwave positioning techniques with local and nationwide Differential Global Positioning System (DGPS) systems, enhanced applications of and expanded use of full-bottom coverage acoustic multibeam systems, airborne LIDAR hydrographic survey systems, and functional use of carrier phase DGPS for accurate water surface determination. Field-finish data collection equipment and software has also become more robust, allowing for near-final data editing and processing on board the survey boat. Data accuracies have been enhanced through use of inertial and DGPS vessel motion sensors. Automated data editing, processing, transfer, and Internet display methods have also evolved considerably since 1994. In addition, the International Hydrographic Organization (IHO) and the Federal Geographic Data Committee (FGDC) have promulgated updated hydrographic survey accuracy

(Discussion off the record)

MS. KILFOYLE: Can we please mark this?

(Plaintiff's Responses to Defendant's First Set of Interrogatory and Defendant's First Request For Production of Documents was marked Exhibit Number 9 for identification.)

MS. KILFOYLE: Let's take a break.

(Luncheon recess taken from 12:51 p.m. to 1:24 p.m.)

Q. Actually, before we move on, can we go back to Exhibit 7 for a minute, which was this big pack? And if we could go back to Page 44.

A. Okay.

Q. Do you see at the end of that Paragraph 1.15, I think it's the second to last sentence, "The proposed method for performing these surveys and all equipment and programs shall be submitted for approval"?

A. Okay.

Q. Do you know whether Cashman ever submitted the proposed method for performing the prefinal surveys for approval?

A. I believe so.
Q. Do you know what document they would have submitted that in?
A. It would have been one of the submittals required after we were awarded the contract.
Q. Who would it have gone to?
A. Ron Conetta, I believe.
Q. Do you know who would have prepared that submittal?
A. Jim Galli would have instructed the surveyors, and he would have been the final blessing if he brought one in.
Q. Okay. Thank you. Are you familiar with this document?
A. Yes.
Q. Is that your signature on the second to last page?
A. Yes.
Q. If we could turn to the question numbered Question 4. I believe it's on Page 5.
A. Question 4?
Q. Yes.
A. Okay.
Okay.

CASHMAN CONSTRUCTORS

617.287.1600
fax 617.288.4597
Email info@jaycashman.com
JAY CASHMAN, INC.
20 West Howell Street
Boston, MA 02125

**ALEX DICK**
Dredging Project Manager
Jay Cashman, Inc.

### EXECUTIVE SUMMARY

Alex has been active in the marine-dredging industry for nearly twenty five years. During that period he has assumed increasingly more responsible positions from Field Engineer to Survey Superintendent to Administrative Engineer to his present role as Project Manager. This experience has been gained under the employ of some of the most respected names in the dredging industry from Great Lakes Dredging to Dutra to Jay Cashman, Inc.

*Areas of expertise:*
- developing budgets
- estimating
- cost analysis

### PROFESSIONAL EXPERIENCE (HIGHLIGHTS)

- *Project Manager - Scituate South River & Scituate Harbor.* Oversaw dredging operations of both these projects.

- *Project Manager – Metro North Railroad Bridge, Bridgeport, Connecticut.* Dredging and obstruction removal of material.

- *Project Manager – Pilgrim Power Plant, Plymouth.* Dredged and removed approximately 40,000 cubic yards in front of the cooling intake system for the nuclear power plant. Excavated material, loaded to dump scows, and hauled to the Mass Bay Disposal area. Dredging was performed by a clamshell bucket. Client: Boston Edison Company. (Project Value: $500,000)

- *Project Manager - Mamaroneck Harbor, New York.* Dredging/ocean disposal of 170,000 cubic yards in 3.5 months. Worked in shallow waters that required constant tide monitoring. Restored harbor to over 10 feet MLW, to allow commercial and recreational boating, and maintain a federal channel. Client: Department of the Army, New York District. (Project Value: $5,223,680)

- *Project Manager – Perth Amboy Marina, Perth Amboy, New Jersey.* Mechanically dredged and off loaded contaminated material from inside the marina onto water tight scows. Transported material to a dewatering facility in Port Elizabeth, NJ. Material was stabilized using

EXHIBIT Dick #1 8/7/07 JB

PJC 0002918

you can produce a volume that way. It's a simple check.

Q. At the time you participated in preparing Cashman's bid, did you have an opinion regarding which method the corps would use to process acceptance surveys?

A. No.

MS. KILFOYLE: Could we mark this as Exhibit 2.

(Whereupon, Dick Exhibit No. 2 was marked for identification.)

(Witness reviewing.)

BY MS. KILFOYLE:

Q. Have you seen this document before?

A. Yes.

Q. Who is Shashi?

A. Shashi is -- he was a former employee of Cashman, an engineer, and he did some take-offs for us.

Q. Was this prior to submitting the bid for KVK 8?

A. Yes. This is like December 10th, '02, so I believe it was.

I can't remember how many contracts

occasionally, informally. We didn't -- we didn't ask them to do it, but I think they did.

Q. Did they provide you with the results of those quality control surveys?

A. Not in a formal way.

Q. Did they provide them to you informally?

A. Yes.

Q. Did you ever discuss the method to be used for processing acceptance surveys with anyone at Norfolk?

A. Probably, but -- and I can't remember anything specific.

Q. Okay. That's fine.

When Cashman began work on the KVK 8, did you have an opinion as to the method that the corps would use to process acceptance surveys?

A. No.

Q. Did you review any Army Corps of Engineer manuals relating to acceptance surveys at the beginning of the KVK 8 contract?

A. Yes.

Q. Do you recall which manuals you reviewed?

Strike that. You didn't work for Cashman. How did you come to work as a consultant for Cashman?
A. I was doing consulting work for Gahagan & Bryant, and they were asked to get involved in a dispute between Mr. Cashman and his brother.
Q. Did this dispute between Mr. Cashman and his brother relate to dredging?
A. It related to the split-up of the company, and yes, there was a dredging element.
Q. Did you hold any title specific to the KVK 8 project?
A. Project manager.
Q. Did you supervise other employees?
A. I did.
Q. Who did you supervise?
A. Paul Poirier, Dan Gaudette, John Martin, Alex Dick, Brian Henry. There's a lot of other tradespeople.
Q. Do you know what Mr. Martin's position was?
A. He was a general superintendent.
Q. And how about Mr. Henry?
A. He was the safety manager.
Q. Are you familiar with multibeam surveys?
A. Yes.
Q. Can you explain to me your understanding of

determined for this initial schedule?
A. It's an estimate.
Q. What was the estimate based upon?
A. The area.
Q. What aspects of the area?
A. The area, the square footage, the surface area.
Q. Is the type of material taken into account in preparing the estimate as well?
A. Yes. I'm trying to remember if there was not a contractual stipulation for the amount of cleanup at the time.
Q. I don't know.
A. That is not uncommon.
Q. When Cashman first began dredging on KVK 8, did you have an opinion as to the method the Corps would use for acceptance surveys?
A. When Cashman first started using, they were new to the multibeam.
Q. Sure.
A. That was a requirement. And so we were learning as to what the methodology requirements were.
Q. I'm just asking if you personally had any opinion at the time the --
A. Well, I was learning as well about the

multibeam process. It's a -- was a relatively new technology.

Q. So you did not have an opinion?

A. I did not know enough to have an opinion.

Q. Okay. Sure. At some point during work on the project, did you believe that the Corps would use the average method for acceptance surveys?

A. When we submitted the average soundings for the material unsuitable for unconfined aquatic disposal, and they were accepted and paid, at that point, we were under the understanding that would be the method used.

Q. Why did you decide to submit those materials using the average soundings?

A. Because the people that were directly involved with this thought that would be the correct methodology. They had some informal discussions with other people that had been doing that type of work.

Q. Who are those people that you're referring to that were directly involved in it?

A. The people whose depositions you have already taken.

Q. Okay. Mr. Dick?

A. Mr. Gaudette, Mr. Dick.

Q. Mr. Wood?

A. No.

that time.
Q. Okay. No problem.
At the time that you began work for the KVK 8 contract, what method did you think the corps was going to use to process acceptance surveys?
A. I had no clue.
Q. Okay. Did anyone from the corps ever tell you that the average method would be used to process acceptance surveys?
A. No.
Q. Did you ever hear anyone from the corps tell any other employee of Jay Cashman that the average method would be used to process --
A. No.
Q. -- acceptance surveys?
At some point during the KVK 8 contract, did you become aware that the corps was using the minimum depth method to process acceptance surveys?
A. Yes.
Q. Do you remember when that was?
A. I can't recall.
Q. Do you know whether there was any change in

Q. Okay. Great. Are you familiar with this litigation?
A. In some way, yes.
Q. Can you tell me what you understand the main issues to be?
A. It is the excessive time for shoaling due to the discrepancy in what Cashman thought was used for acceptance.
Q. Okay. You're currently employed at Jay Cashman, correct?
A. Correct.
Q. What's your current position?
A. I'm a quality control manager and dredging superintendent.
Q. How long have you held this position?
A. It varies. As a quality control manager, probably four years. As dredging, probably seven years.
Q. And what are your major responsibilities as a quality control manager?
A. Daily reporting to the Corps and all the submittals and the paperwork associated with tracking the project for the Corps and the QCS system.

A. I do not know.
Q. Did you ever ride on the Army Corps of Engineers survey boat?
A. No. I visited it tied up at their dock, but I didn't ride on it.
Q. Did anyone show you the boat?
A. No, not really.
Q. When Cashman began work on KVK 8, did you have an opinion as to what method the Corps would use for acceptance surveys?
A. Repeat the question?
MS. KILFOYLE: Do you want to read it back?
(Reporter read back the last question.)
A. No, I didn't have an opinion.
Q. Okay. That's fine. Did you review any Corps manuals relating to surveys prior to the KVK 8 contract?
A. No.
Q. Did you review any Corps manuals relating to surveys during the KVK 8 contract?
A. Near the end.
MS. KILFOYLE: Could you mark this as Exhibit 2?

BY MS. KILFOYLE:
Q. Are you familiar with this document?
A. Yes.
Q. Did you write it?
A. I did.
Q. Was it actually ever sent to the Corps?
A. I don't know.
Q. Could we take a look at the second paragraph?
A. Okay.
Q. Prior to March 2004, did Cashman submit drawings delineated as a matrix of average soundings?
A. I don't know. I don't remember.
Q. Can we look at the third page one second? And it's the fourth paragraph. What does it mean, it was impossible to excavate only the neat line over dredge volume and achieve grade when checked against the minimum four by four survey?
A. That the methodology underwater where you can't see, and it's impossible to precisely excavate.
Q. Is it impossible because of visibility issues?
A. It's impossible because you're using a machine at 60 or 70 feet lower than where the machine is physically, and even with the most up-to-date technology, it's impossible to know precisely where the machine is and what the results are going to be after

the machine digs.

Q. Can we look at page six of this? Do you know why the total amount requested in this letter is different than the amount requested?

A. I don't remember. I would have to study it. I don't know. This is not a claim, as I understand it.

Q. No. No.

MS. KILFOYLE: Can we mark this as an exhibit?

(Exhibit No. 12 marked.)

BY MS. KILFOYLE:

Q. Did you draft this document?

A. I did.

Q. Do you know whether it was ever submitted to the Corps?

A. I don't remember.

Q. Can we turn to the last page? Do you know why the damages in this version are different than what was requested in the claim?

A. I don't remember. I would have to study the details. I don't remember without studying it. I don't remember.

Q. Have you worked on any contracts where multibeam surveys were used after KVK 8?

A. After KVK 8. I'm trying to remember. Yes.

Q. Was this during your time as a contractor for

the pre con. just dealing with surveys?

A Not uniformly or routinely. If -- if after discussing -- if after whatever discussions were had during the pre construction conference, it was mutually felt that that would be beneficial, then such a meeting would be scheduled, but again specifically specific to individual contracts, I -- I don't remember whether, you know, they were or not.

Q Was your office responsible for the review of pre acceptance surveys furnished by dredging contractors?

A We would typically review them to insure that they showed no areas above forty-seven feet. In the case of KVK it would be forty-seven feet and, you know, if they appeared clean, we would then ask our Survey Branch to -- to perform a survey and provide us -- provide us maps.

Q So were you the point of contact for the contractor in terms of getting the ball rolling to get an acceptance survey?

A No, well, typically the survey map

would be submitted to the project engineer and the case of KVK8 it was either Mark Alton, Mark Kucera. I don't recall specifically whether anyone else would have worked directly on that and -- and they would typically be the point man. They would then, you know, contact Survey Branch and, you know, schedule a survey.

Q Would that normally happen without your needing to get involved at that stage?

A Typically, yeah, typically, exactly.

Q Is that basically the procedure that not only took place on KVK8 but the KVK projects and the Harbor Deepening projects that preceded it?

A Typically, yes, well, although the point person would vary depending on the contract, yes.

Q Understand, understand.

Was it unusual for a Government survey to come back and find that an area that had been submitted by a contractor as clear was not clear?

A Correct, it was not unusual. It was -- it was -- it was -- it was definitely not unusual.
Q Even on the projects that preceded KVK8?
A Yes, correct.
Q Do you recall that there were surveys done on the KVK8 project that were not clear by the Government's calculation?
A Yes, I mean ultimately the final survey that we do is -- is the one that's clear and typically regardless of the contract, it would involve more than one iteration, frequently two or three in some cases more before -- before it was -- before it was actually validated as clear and we accept the area.
Q How about on the prior projects to KVK8 --
A Yes, I was talking in general.
Q -- two, three, four iterations would be required?
A Typically.
Q Did that strike you as a problem?

looked like to what the Corps was finding?
A Can you rephrase your question?
Q Well, if a contractor is using the minimum sounding method and the Government is using the minimum sounding method --
A Yes.
Q -- shouldn't they basically be coming to the same conclusion as to what the bottom looked like?
A One would hope, but again it's the way that the equipment is mounted, the quality of the equipment that's being deployed, you know, by the contractor. There's all sorts of factors that can enter into error and with these errors and the degree of accuracy that sometimes we're forced to deal with, you know, there can be differences in opinion as to what the bottom looks like.
Q In some of the KVK dredging projects the New York District was dealing with the very largest and most experienced dredging companies in this country; is that correct?
A That's correct.

of Cashman ever rode the survey boat with the Army Corps of Engineers?
A. I do not.
Q. Okay. If we could go back for a minute and -- I'm sorry -- I'm going to need to touch your exhibits to look at the number. Ahh. Exhibit 1.
A. Okay.
Q. Did anyone assist you in writing this letter?
A. I don't think so.
Q. Great. That's it. After Cashman became aware that the Corps was using the minimum method for acceptance surveys, did Corps surveys continue to find high spots in areas that Cashman believed were clear?
A. Yes.
Q. Why do you think that was?
A. Yes, but they were much many less, because the methodologies are not precise, and no two surveys are ever going to agree. The environment, the water, the water depth, the chop, the water temperature all affect how accurate the surveys are.
Q. What is the chop?
A. The water is not level.
Q. Is it like waves?
A. Yeah.
Q. Okay.

A. Two surveys taken by the same method with the same boat half an hour apart are different.

Q. Do you know whether, overall, Cashman lost money on the KVK 8 contract?

A. I don't know.

MS. KILFOYLE: Can we mark this?

(Exhibit No. 10 marked.)

MS. KILFOYLE: Off the record.

(Off-the-record discussion.)

BY MS. KILFOYLE:

Q. Are you familiar with this?

A. Yes.

Q. Did you assist Mr. Wood in preparing this document?

A. As well as Mr. Hackenbracht.

MR. HACKENBRACHT: Me.

MS. KILFOYLE: Oh, okay.

THE WITNESS: Hackenbracht.

BY MS. KILFOYLE:

Q. Can you turn to the -- page 13? Did you assist in preparing this summary of damages?

A. Yes.

Q. Do you see where it says extra effort to remove HARS material?

A. Yes.

Terminal in Bayonne and from about '99 through 2006 primarily in and eventually exclusively Harbor Deepening contracts.

Q The Harbor Deepening projects that you were involved in began when?

A I believe in '99. Somewhere between '99 and 2000, the first -- first contract, I believe, was awarded.

Q Those are the KVK projects?

A Correct, KVK and Arthur Kill.

Q Had you had any prior experience before that with dredging?

A Specifically with dredging?

Q Yes.

A No.

Q So this, I assume, was quite a change to go from military construction to dredging?

A Somewhat. I had done some civil works contracts prior to that, mostly beach nourishment of that nature, so it involved dredging, but not for the same reasons.

Q Was this the first time you were involved in new work dredging?

A Correct.

Q Did you receive any training at the outset to prepare you for your duties with regard to these Harbor Deepening projects?

A Formal training, no. The only training we got basically was discussions with the project team, project delivery team members, things of that nature, and again we're talking specific to dredging, specific to construct -- military construction and civil works construction as required to complete by the Corps. I was required to complete a series of DAWI training courses. Defense acquisition, I don't remember what the rest of the acronym, you know, represents, but essentially it was training in the -- in the -- in the administration of construction -- Government construction contracts.

Q But not specifically dredging?

A Correct.

Q As the resident engineer, what were your duties as they were communicated to you by your superiors with regard to the Harbor Deepening project?

A Administer the contract, administer the contract, supervise the project engineers performing that function.

Q So that your involvement began once a contract was awarded?

A My direct involvement, yes, once the contract was awarded.

Q Did you take part in the pre construction meetings for the various projects?

A Yes.

Q What was your role at a pre con. meeting?

A As resident engineer represent -- representing -- represented the resident office, introducing the -- the various personnel that were -- were going to work, perform specific functions on that contract and to try to answer whatever questions came up during -- answer or re direct questions that -- that arose during the conference or if the contractor had, you know, prepared previously.

Q Did you basically run the pre con.

DEPARTMENT OF THE ARMY
NEW YORK DISTRICT, CORPS OF ENGINEERS
JACOB K. JAVITS FEDERAL BUILDING
NEW YORK, N.Y. 10278-0090

REPLY TO ATTENTION OF

CENAN-CT/ML

Jay Cashman, Inc.
20 West Howell Street
Boston, MA 02125

Dear Mr. Cashman:

Reference is made to Contract No. DACW51-03-C-0014 (initiated under Invitation For Bid (IFB)) DACW51-02-B-0004 KVK/Newark Bay Channels Improvement Project, Phase II, Contract 8, New York, New Jersey

Attached for your information are Notices of Appointment on your contract of Mr. Ron Conetta as Administrative Contracting Officer ("ACO") and Mr. Salvatore DiDato as the Contracting Officer's authorized Representative ("COR").

Please acknowledge receipt by signature on this original and return to Contracting Division, Room 1843, ATTN: Myrlande Lee.

Sincerely

David H. Freedman

DAVID H. FREEDMAN
MAJ, USA
Contracting Officer

Receipt acknowledged:

Signature W. Bruce Vo[illegible]

Date May 27, 2003

Title Pres.

Encl.

DJC001821

Q Mr. Conetta, I'm handing go you a letter dated October the 1, 2004 that bears a line for your signature. Do you see that?

A Yes.

Q Do you recall this letter?

A Not specifically, no.

Q Can you tell whether you drafted the letter?

A I don't specifically recall drafting the letter, and again there's more detail survey specific detail than I would have likely authored myself, so I -- I'm guessing someone else drafted it, and I'm assuming it was with input from our Surveys Branch.

Q Do you have any idea who might have drafted it?

A Project engineer, either Mark Alton or Mark Kucera, and if -- possibly, possibly Sam too. Possibly Sam Didato.

Q Do you recall having a conversation with Mr. Gally at the end of August 2004 where he directly asked you what data processing system is the District using

## ROUTING OF SHOP DRAWINGS, EQUIPMENT DATA, MATERIAL SAMPLES, OR MANUFACTURER'S CERTIFICATES OF COMPLIANCE FOR APPROVAL

*(Used to route ENG Form 4025 with items attached. Not to become a part of the Contractor's record.)*

**1**

TO: CENAN-EP-SURVEY BRANCH ATTN: RICHARD KISS

FROM: CENAN-CO-NAN-KVK S. DiDATO

DATE: 31 AUG 04

The attached items listed on ENG Form 4025 are forwarded for approval action.

CONTRACT NUMBER: DACW 51-03-C-0014, KVK AREA B

CONTRACTOR: JAY CASHMAN INC

TRANSMITTAL NUMBERS:

PROJECT TITLE AND LOCATION: KVK CONTRACT VIII - AREA B

COMMENTS (Attach additional sheet, if necessary.) PLEASE REVIEW & COMMENT ON THE TECHNICAL DETAILS OF THE ATTACHED LETTER OF 31 AUG 04 BY CASHMAN CONSTRUCTORS.

NO. OF INCL.: 2

TYPED NAME AND TITLE: SALVATORE J. DiDATO

SIGNATURE: [signature]

**2**

TO:

FROM:

DATE:

COMMENTS (Attach additional sheet, if necessary.)

NO. OF INCL.

TYPED NAME AND TITLE

SIGNATURE

**3**

TO:

FROM:

DATE:

COMMENTS (Attach additional sheet, if necessary.)

NO. OF INCL.

TYPED NAME AND TITLE

SIGNATURE

**4**

TO:

FROM:

DATE:

The following action codes are given to items listed on ENG Form 4025:

ACTION CODES

- A - APPROVED AS SUBMITTED.
- B - APPROVED, EXCEPT AS NOTED ON DRAWINGS. RESUBMISSION NOT REQUIRED.
- C - APPROVED, EXCEPT AS NOTED ON DRAWINGS. REFER TO ATTACHED SHEET. RESUBMISSION REQUIRED.
- D - WILL BE RETURNED BY SEPARATE CORRESPONDENCE.
- E - DISAPPROVED. SEE REVERSE SIDE FOR COMMENT.
- F - SEE COMMENTS ON REVERSE SIDE.
- G - OTHER (specify)

ACTION CODES TO BE INSERTED IN COLUMN G, SECTION I, ENG FORM 4025 *(Attach sheets, when required.)*

| ITEM NO. (Taken from ENG Form 4025) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CODE GIVEN | | | | | | | | |

REMARKS

NO. OF INCL.

TYPED NAME AND TITLE

SIGNATURE

ENG FORM 4026 NOV 66 PREVIOUS EDITION MAY BE USED.

DJC004579

A. Because the damage was already done. We had already gone through -- done the dredging on the project, and the soundings are -- a lot more high spots were in that acceptance area than on an average survey. So we had dug it using an average survey, and now we're told that we're being checked on a minimum survey. You've already gone through and dug the plane to an elevation that shows a lot more high spots than an average would.
Q. Would Cashman submit an area to the Corps for acceptance surveys if Cashman did not believe the area was clear of high spots?
A. No.
Q. So prior to submitting an area to the Corps for acceptance surveys, Cashman would perform its own survey of the area?
A. Yes.
Q. So Cashman performed a survey of areas, did not find high spots, and then the Corps survey found high spots; is that correct?
A. Yes.
Q. And this happened after Cashman realized that the minimum method was used to process

acceptance surveys?
A. It happened from the beginning of the job until the end of the job.
Q. Okay.
MS. KILFOYLE: We've been going about an hour. Do you want to take a break or keep going?
MR. PAYNE: Take a break.
MR. WEINBERG: Yes.
(Recess taken from 12:02 p.m. to 12:13 p.m.)
Q. Did anyone from Cashman ever ride on the Corps survey boat?
A. I don't know.
Q. Before we broke a little earlier on, you were talking about, I believe, a bar sweep method of determining whether contract depth had been reached. Did I misunderstand?
A. I don't remember talking about bar sweep.
Q. Okay. We were talking about before there were multibeam or single beam systems.
A. Oh, going back twenty years?
Q. Yes.
A. It was a -- I don't remember doing the bar

Cashman Constructors
132 Corbin Street
Elizabeth, N.J. 07201

September 3, 2004

Mr. Ronald Conetta
United States Army Corps of Engineers
Kill Van Kull Field Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, N.J. 07305

Re: Contract 8, DAC W 51-03-C-0014, Kill Van Kull & Newark Bay Channels
Navigation Improvement Project, Phase II, Contract 8 (Area 8)

Serial Letter S-0095

Gentlemen:

We transmit herewith 3 drawings dated 9/3/2004 showing the current bathymetric data for acceptance area 3A represented as a 3 x 3 matrix of average soundings. Our understanding after numerous discussions with Corps personnel is that this is the proper format for presenting soundings data acquired via the multi beam process.

As the entire area thus displayed is at or above –47 feet MLW, we request a government acceptance survey without delay.

Please call the undersigned with any questions.

Received
SEP 6 3:54PM

Sincerely,

James J. Galli P.E.
Project Manager,

DJC004247

Cashman Constructors
132 Corbin Street
Elizabeth, N.J. 07201

September 4, 2004

Mr. Ronald Conetta
United States Army Corps of Engineers
Kill Van Kull Field Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, N.J. 07305

Re: Contract 8, DAC W 51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract 8 (Area 8)

Serial Letter S-0096

Gentlemen:

We transmit herewith 3 drawings dated 9/3/2004 showing the current bathymetric data for acceptance area 13 represented as a 3 x 3 matrix of average soundings. Our understanding after numerous discussions with Corps personnel is that this is the proper format for presenting soundings data acquired via the multi beam process.

As the entire area thus displayed is at or above –47 feet MLW, we request a government acceptance survey without delay.

Please call the undersigned with any questions.

Received
SEP 6 3:55PM

Sincerely,

James J. Galli P.E.
Project Manager,

DJC004246

Cashman Constructors
132 Corbin Street
Elizabeth, N.J. 07201

September 5, 2004

Mr. Ronald Conetta
United States Army Corps of Engineers
Kill Van Kull Field Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, N.J. 07305

Re: Contract 8, DAC W 51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract 8 (Area 8)

Serial Letter S-0097

Gentlemen:

We transmit herewith 3 drawings dated 9/4/2004 and 3 drawings dated 9/5/04 showing the current bathymetric data for acceptance area 3 represented as a 3 x 3 matrix of average soundings. Our understanding after numerous discussions with Corps personnel is that this is the proper format for presenting soundings data acquired via the multi beam process.

As the entire area thus displayed is at or above –47 feet MLW, we request a government acceptance survey without delay.

Please call the undersigned with any questions.

Received
SEP 6 3:54PM

Sincerely,

James J. Galli P.E.
Project Manager,

DJC004245

Cashman Constructors
132 Corbin Street
Elizabeth, N.J. 07201

September 20, 2004

Mr. Ronald Conetta
United States Army Corps of Engineers
Kill Van Kull Field Office
Caven Point Marine Terminal
3 Chapel Avenue, Port Liberte'
Jersey City, N.J. 07305

Re: Contract 8, DAC W 51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract 8 (Area 8)

Serial Letter S-0102

Gentlemen:

We transmit herewith 3 drawings dated 9/20/2004 showing the current bathymetric data for acceptance area 2 represented as a 3 x 3 matrix of average soundings. Our understanding after numerous discussions with Corps personnel is that this is the proper format for presenting soundings data acquired via the multi beam process.

As the entire area thus displayed is at or below –47 feet MLW, we request a government acceptance survey without delay.

Please call the undersigned with any questions.

Sincerely,

James J. Galli P.E.
Project Manager,

DJC004243

CASHMAN

W. Bruce Wood
President, Marine and Equipment Division

Telephone: 617.890.0600
Main Fax: 617.890.0606
Accounting Fax: 617.890.0609
Email bwood@jaycashman.com

JAY CASHMAN, INC.
549 South Street
P.O. Box 692396
Quincy, MA 02269-2396

July 22, 2005

Major David H. Freeman
Contracting Officer
Corps of Engineers
New York District
26 Federal Plaza, Rm. 1843
New York, NY 10278-0090

Re: Contract No. DACW51-03-C-0014
Kill Van Kull & Newark Bay Channels
Navigation Improvement Project
Phase II, Contract VIII (Area 8)

Dear Major Freeman:

Jay Cashman, Inc., ("Cashman"), respectfully submits the following claim under the Disputes clause of the contract for extra costs incurred in performing the work. The certification required by the Contract Disputes Act is attached and we request your decision as Contracting Officer.

Background

1. On January 21, 2003, the New York District issued Solicitation No. DACW51-03-B-0004 for deepening of the existing 40 foot channel to a depth of 47 feet, along the southern portion of the South Elizabeth Channel in Newark Bay and the western end of the Kill Van Kull channel. (Exhibit 1).

2. The specifications separated the material to be dredged into three categories: non-HARS material; non-rock material suitable for HARS disposal; and, rock material for disposal on the Artificial Reef. (Exhibit 2). The area to be dredged was divided into a number of acceptance areas. (Exhibit 3).

3. Concerning the acceptance of the work, the specifications provided, in paragraph 1.15 of Section 0800, FINAL EXAMINATION AND ACCEPTANCE (1965 APR OCE), that: (Exhibit 4)

> As soon as practicable after the completion of an entire acceptance area, a final examination of the work will be conducted by the Contracting Officer, at the cost and expense of the Government by acoustic sweep survey system. Should any shoals, lumps, or other lack of contract depth be disclosed by this examination, the Contractor will be required to remove same.

This paragraph in the specifications also required that the Contractor: (Exhibit 4)

> shall perform pre-final hydrographic sweep surveys of an entire acceptance area to verify the area is satisfactorily completed prior to final examination by the Government. The pre-final surveys shall be performed using a multitrack or multibeam survey system to insure 100% coverage of the entire acceptance area. . . . The Contractor's hydrographic surveys shall meet or exceed the survey standards in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys.

4. Paragraph 5.1.1 of Section 02900, Allowable Overdepth, provided that "to cover inaccuracies of the dredging process, material actually removed from within the specified areas to be dredged" within a depth of not more than 1.5 feet below the contract depth of 47 feet would be paid for at the contract price. (Exhibit 2).

5. The specifications as amended, in paragraph 5.1.4, Excessive Dredging, provided that "material should not be dredged below this depth (-48.5 ft MLW)," and to do so could result in violations of Federal law. (Exhibit 2).

6. When Jay Cashman, Inc., ("Cashman"), prepared its bid, it was aware that the New York District had begun to use multibeam hydrographic surveys when it conducted final acceptance surveys, and that the contract required pre-final surveys to also be performed using a multibeam system.

7. On March 25, 2003, bids were opened and subsequently, on May 23, 2003, the Corps notified Cashman that its bid was accepted and that Contract No. DACW51-03-C-0014 was awarded to Cashman. (Exhibit 5). Notice to Proceed was issued on June 26, 2003, and Cashman proceeded with the work. (Exhibit 6).

8. Although the specifications required Cashman to employ a multibeam system when performing its pre-final surveys, the referenced survey standards in the specifications, EC 1130-2-210, did not address this type of survey and only provided a maximum allowable bias for the accuracy of the survey, within 0.1 feet in hard materials and 0.3 feet in soft materials. The specifications did not identify what methodology should be employed in processing the voluminous data generated by a multibeam survey.

9. At time of contract award, Chapter 11 of EM 1110-2-1003, HYDROGRAPHIC SURVEYS (1 Jan 02), which had superseded EC 1110-2-210, identified four methods for analyzing the results of a multibeam survey, as follows: (Exhibit 7)

(1) Minimum depth within the cell (i.e. shoal biasing)
(2) Maximum depth within the cell
(3) Average of all depths recorded within the cell
(4) Shot depth closest to the cell center

10. Paragraph 11-4(a) of the manual noted that: (Exhibit 7)

> Multibeam swath survey systems that provide complete bottom coverage are recommended for use in dredging measurement and payment surveys . . . and final acceptance/clearance surveys.

11. EM 1110-2-1003 cautioned about the use of minimum, or shoal-biased depths. Paragraph 11-12(c) provided that: (Exhibit 7)

> The minimum depth recorded within a bin area may be used for some strike detection purposes. However, such biased depths shall not be used for dredging payment surveys, and should be used with caution on navigation project condition surveys.

> This is due to the relatively high variance in acoustic depth data. Use of minimum shoal-based depths can adversely skew dredge quantity computations and erroneously portray clearance data.

12. In Paragraph 3-5 of EM 1110-2-1003, the Corps discussed the survey accuracy standards for hard bottom material and noted that "in actuality, only a small number of Corps projects fall under this category -- for example, projects such as the Kill Van Kull, NJ." (Exhibit 8). The standards that were mandated for use on surveys of hard bottom material in depths greater than forty feet were contained in Table 3-1, as follows: (Exhibit 8)

| | |
|---|---|
| Depth Accuracy | ± 1.0 feet |
| Object/Shoal Detection | > 0.5 meter cube |
| Bottom Coverage | 100% |

13. In Paragraph 11-13 of EM 1110-2-1003, the Corps required the following for multibeam surveys for acceptance purposes: (Exhibit 7)

> For dredging measurement, payment, or **acceptance**, the bin size should be kept as small as possible -- typically less than 1 to 5 m is recommended. The **shot point depth nearest the bin centroid shall be used**; **not** average or **minimum, or shoal-biased depths**. (Emphasis added)

14. Although Paragraph 11-14 of EM 1110-2-1003 mandated that "measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters (horizontal and vertical control, density, etc.), data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government," (Exhibit 7), Cashman's contract did not contain this information. Neither did Cashman's contract contain this information concerning acceptance surveys. After contract award, the appropriate survey methodology was discussed with the Corps and Cashman was informed that the multibeam survey data should be processed using a 3 foot by 3 foot matrix and average depth soundings for acceptance purposes, and for payment.

15. When Cashman submitted its pre-final surveys beginning in March and continuing through September, it clearly delineated that the surveys were analyzed based on average depth.

16. However, when the Corps performed its final acceptance surveys, it continually found "high spots" and directed Cashman to redredge and resurvey.

17. When Cashman received the results of the Corps surveys, it found that the "high spots" were frequently only marginally above grade, and repeatedly were identified in areas that on previous surveys had been "clear," that is, shown to be acceptable.

18. On June 27, 2004, Cashman notified the Corps that the repeated requirements to redredge areas were considered to be extra work under the contract for which it should be compensated. (Exhibit 9).

19. Although Cashman repeatedly requested what standards were being employed on the final acceptance surveys, the Corps did not respond. With the lack of response and hoping to avoid the necessity to redredge areas, Cashman altered its method of performance and dug deeper before performing pre-final surveys in the hope that the areas would then be acceptable.

20. On August 31, 2004, Cashman requested in writing that the Corps specify the survey standards being employed by the Corps' surveyors. (Exhibit 10). Cashman also notified the Corps that it considered any excavation performed to be extra work for which it was entitled to an equitable adjustment for additional costs.

21. In September, Cashman completed dredging in a number of acceptance areas and provided the Corps with the results of its pre-final multibeam survey, clearly indicating that it used the average depth method. (Exhibit 11). All four areas were rejected by the Corps, and during the month, Cashman redredged in three of the areas and resubmitted pre-final surveys, again based on the average depth method.

22. On October 1, 2004, the Corps finally notified Cashman that the Corps was using a different methodology

when it analyzed its multibeam surveys for final acceptance, as follows: (Exhibit 12)

> Regarding acoustic multibeam survey systems for deep-draft navigation projects, the Corps utilizes a 3 foot by 3 foot matrix using the minimum (shoalest) depth . . . for purposes of acceptance.

The Corps directed Cashman to also use the minimum depth matrix criteria, instead of the average depth method, for its pre-final surveys.

23. Although the Corps referenced EM 1110-2-1003 (1 Jan 02) in its letter as the basis for this criteria, the criteria actually was extracted from a revision to the EM that was issued on April 1, 2004, almost one year after the contract award. (Exhibit 13).

24. As Cashman proceeded with its redredging, it utilized the minimum depth method instead of the average depth method when it performed its pre-final surveys. In October, Cashman requested acceptance of five areas based on the results of its pre-final surveys.

25. Although the Corps and Cashman were now using the same methodology for interpretation of the multibeam survey data, the Corps continued to reject the work and directed Cashman to redredge areas.

26. On November 29, 2004, the Corps informed Cashman that a "high spot" still was indicated on the survey for Area 3, and directed its removal. (Exhibit 14). Cashman responded on December 7, 2004, noting that the location in question had shown clear on several Cashman surveys as well as two previous Corps' surveys, and that when Cashman had redredged the area the "high spot" appeared to have been a tire. (Exhibit 15).

27. Subsequently, the Corps accepted all of the areas as complete. In summary, Cashman was directed to redredge Areas 2 and 3A twice, Areas 4 and 4A three times, Area 3 five times, and Area 5 six times. (Exhibit 16).

Discussion

From the outset of the project until Cashman was given clear direction to the contrary on October 1, 2004, Cashman was under the impression that final acceptance of its work would be based on multibeam survey results represented as a matrix of average soundings. The specific question was raised at many weekly job coordination meetings and each area submittal was clearly marked as average soundings. On numerous occasions starting in March of 2004, when Cashman requested a government acceptance survey, it submitted drawings that were clearly delineated to be a matrix of average soundings.

On August 31, 2004, Cashman specifically requested that the government survey standards be clarified in order for it to proceed with the work. On seven distinct occasions after August 31, 2004 by letter Cashman clearly asked the question "What standards apply," i.e. - 9/3, 9/4, 9/5, 9/13, 9/22, 9/26, 9/28, and on 9/30. Cashman sought this specific direction because the assumed standards seemed to be at odds with actual acceptance. A response was forthcoming on October 1, 2004, sixteen months after the notice to proceed, defining and clearly stating the acceptance criteria. The lack of clear direction for many months, and the subsequent revision in the midst of the project, caused Cashman to re-dredge areas several times and to excavate areas deeper than anticipated. Furthermore, Cashman found that the essentially "zero tolerance" criteria applied by the Corps exceeded the accuracy obtainable by the survey equipment currently available.

Moreover, the applicable manual, EM-1110-2-1003, was not referenced in the contract, and the Corps' acceptance criteria that was communicated to Cashman on October 1, 2004, (use of minimum soundings), was not the method mandated by the version of the EM that was in existence at the time of contract award. The use of minimum soundings in the interpretation of multibeam survey data was a criteria contained in the EM revision issued on April 1, 2004, well after the date of contract award. This revision specifically designated that a multi beam presentation of minimum soundings with a proprietary sub routine be used to determine acceptance. The Corps also stated that contractor

acceptance soundings should be presented as a 3x3 matrix of minimum soundings.

The extent of the impact to the dredging is most clearly evident in the redredging of Area 5. Production dredging was completed in Area 5 in mid March of 2004. The Corps surveyed the area on June 5, 2004 and again on June 16, 2004. An inspection of either of the Corps' survey results show that the area is all but clear. Only some minor shoals remain on either plot. If the two plots are overlain, it becomes clear that the entire area may well be clear. There is only one small spot very close to grade that appears on both plots which is within the range of accuracy (0.2 feet) of the equipment available for measurement in 48 feet of water.

It would have been reasonable to expect that, in the administration of the contract, the Corps would have focused on the sole shoal, and only, at the most, promptly directed the contractor to clear that area so that the equipment would have been able to move on to the next acceptance area. Instead, five more submissions after redredging were necessary before the area was acceptable in late October. The work was completed and was acceptable in June 2004, however it took over four months to clear the area, a time during which Cashman also had to remove shoals that developed. An impartial review of the data clearly indicates that the eastern bank in Area 5 is unstable and the material did not remain at a 3 to 1 side slope. Essentially, the material was found to be cohesionless and exhibited no natural angle of repose. A substantial portion of the days of excessive and counterproductive dredging of shoals in this area also involved the dredging of material that hurricanes and other natural events were constantly depositing.

## Basis for Entitlement

In the performance of this contract, Cashman encountered conditions that impacted critical activities and extended the performance time of the work. Cashman believes that adequate basis exists to justify the issuance of an equitable adjustment for increases in contract cost. These issues were raised, in one form or another, during contract performance.

The most significant impact to Cashman's performance of the work resulted from the Corps' decision to apply a survey criteria in the performance of the acceptance surveys that was contrary to agency procedure at the time of contract, and from the Corps' instructions to Cashman to use, in the performance of its pre-final surveys, a method of analysis of the multibeam survey data that differed from the method of analysis the Corps was employing on the acceptance surveys. The application of criteria that were not part of the contract was a change in the contract for which Cashman should be compensated.

It is improper for the Government to change its inspection methods or to enforce a new and higher standard without alerting prospective bidders in the contract documents. E.W. Eldridge, Inc., EngBCA No. 5269, 89-3 BCA 21,899; Randall H. Sharpe, ASBCA No. 22800, 79-1 BCA 13869. In fact, the new version of EM 1110-2-1003 adopted in April 2004, provides in Paragraph 11-4(g) that dredging contract specifications should "clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters, data processing and binning techniques." The new manual recommends, in Paragraph 11-17, the contract language that is to be incorporated in a contract when multibeam systems are to be used for acceptance surveys. Coincidentally, the recommended contract language was developed by the North Atlantic Division Multibeam User's Group, which included the New York District. This contract language, however, was not in Cashman's contract.

Contributing to the impact on Cashman's performance of the work were the Corps' repeated directives to redredge areas that on earlier surveys were apparently to grade. ER 1130-2-520, "Navigation and Dredging Operations and Maintenance Policies," in Para. 8-2.b.(1) provides that:

> It is the policy of the Corps of Engineers that:
>
> . . .at the discretion of the Contracting Officer, the contractor may be released from removing all the material in the required prism based on navigation requirements and other factors, such as: deviations from the maintained dimensions can be attributed to the inaccuracies in the surveying measurement process. . .

The employment of multibeam sonar technology for the survey of navigation channels is a relatively recent development, and EM 1110-2-1003, "Hydrographic Surveys," Paragraph 3-9 indicates that, concerning the detection of shoals:

> A minimum of three acoustic returns must be received from a shoal or object to confirm its existence. These acoustic hits may be obtained on a single pass or, more conclusively, over successive passes. Reconfirmation of a strike above project grade by successive passes on different courses is strongly recommended for dredging clearance surveys.

The manual also stresses in Paragraph 4-8 that:

> The project manager or contracting officer's representative (COR) must determine whether these shoals/strikes above grade warrant additional work effort to assure project clearance, or they are isolated, stray soundings within the "noise" (i.e., accuracy) level of depth measurement.

and warns that:

> A single hit 0.1-ft to 0.5-ft above grade presents problems . . . . Thus, additional observations are needed to confirm the existence (or non-existence) of material lying above the project grade. Additional passes should be run over the area.

The care with which the determination that further dredging is necessary is emphasized in the manual at Paragraph 14-3, where it is noted that:

> Typically, disputes over remaining material above the required depth involve shoal material or objects that are well less than the accuracy tolerances of most echo sounding equipment - i.e., 0.2 ft to 0.5 ft. Other disputes involve remaining shoal material 5 to 10 feet inside the channel toes - also near the tolerances of dredging or hydrographic survey positioning. In many cases, repeated surveys of these shoal areas yield different results . . . Payment for this

disputed work may be difficult to resolve, and often is decided years later by the Engineer Board of Contract Appeals. . . .

The arbitrary nature of the Corps' interpretation of the survey results and repeated directives to redredge is typified by Cashman's experience in Area 5. Production dredging was completed in Area 5 in mid-March of 2004. The Corps surveyed the area on June 5, 2004 and again on June 16, 2004. A careful inspection of either of these surveys shows that the dredge area should have been considered acceptable. Only some minor areas above grade remain on either plot and if the two plots are overlain, only one small spot very close to grade appears on both plots.

Certainly, it is important to consider the navigational requirements of the ships that will use the channel in evaluating whether material that appears to be above grade is substantial enough to pose a hazard to navigation. Such an evaluation is certainly a serious matter in a channel, like the Kill Van Kull, where portions of the bottom are hard material. However, such a determination must be tempered by realistic considerations in order to be considered reasonable, and not arbitrary, capricious or an abuse of discretion.

In measuring the reasonableness of the Corps' action, a totality of the surrounding circumstances would be appropriate. In an instance like this contract, it would be appropriate to take into account the relatively minor nature of the apparent elevations above project grade, the location of the apparent elevations above project grade at or near the channel toes, and the inaccuracies inherent in the performance of hydrographic surveys, even with the multibeam system. In particular, it would seem that the exercise of discretion in waiving relatively minor and isolated elevations above grade would have been appropriate in this case. This is particularly true in the case of Area 5 where the subsurface information in the contract indicated that the bottom was not hard, but rather consisted of softer material. In fact, the contract only indicated that rock, the type of hard material most likely to penetrate a ship's hull, was anticipated to be present above -48.5 ft MLW in only small isolated areas on the project, specifically on the boundary between Areas 1 and 3, in the northwestern corner of Area 2, in the southwestern corner of Area 4 north of the pipelines, and

in the southwestern corner of Area 3 south of the pipeline crossings.

Furthermore, this contract was for dredging the channel to an intermediate depth, the areas dredged will be deepened to the overall project design depth within a short time in future contracts. The additional volume that Cashman had to dredge in order to meet the Corps' more stringent acceptance criteria represents a volume of material that now will not have to dredged by the follow-on contractor. The public has benefited from the circumstances that led Cashman to redredge the acceptance areas.

## Damages

Cashman found that the costs to remove the HARS material in the acceptance areas impacted by the survey issue significantly exceeded the contract price. When reviewed by acceptance area, the effort for HARS work totaled as follows:

Actual Effort to Remove HARS Material

| Area | Days JCI | Days AJF | Days Virginian | Corps Volume Cy |
|---|---|---|---|---|
| 2 | 108 | 82 | | 334,320 |
| 3B | | 82 | 20 | 193,320 |
| 3A | 4 | 14 | 25 | 72,710 |
| 4 | 32 | 109 | 35 | 303,025 |
| 4A | 6 | 21 | | 72,740 |
| 5 | 4 | 86 | 23 | 213,045 |
| Totals | 154 | 394 | 103 | 1,189,160 |

(See Exhibit 17 for HARS Production Records)

Estimate of Cost to Remove HARS Material

| | Daily Rate | # Days | Estimated Cost |
|---|---|---|---|
| Virginian | $ 40,535 | 103 | $ 4,175,105 |
| JCI | $ 30,726 | 154 | $ 4,731,804 |
| AJF | $ 26,398 | 394 | $ 10,400,812 |
| Total | | | $ 19,307,721 |

(See Exhibit 18 for calculation of daily rate)

Contract payments for this effort totaled:

| | | |
|---|---|---|
| Areas 2,3A,3B,4,5 | 1,116,420 cy x $13.00/cy = | $ 14,513,460 |
| Area 4A | 72,740 cy x $ 5.00/cy = | $ 363,700 |
| Contract Compensation | = | $ 14,877,160 |

Costs of performance in these acceptance areas exceeded contract revenue by $4,430,561 ($19,307,721 - $14,877,160).

Additionally, Cashman performed excessive maintenance dredging for seventy-six (76) dredge days as per the attached schedule. (See Exhibit 19).

Estimate of Cost for Days Spent Removing Shoaling

| Dredge/Equipment | No. Days | Daily Rate ($) | Totals ($) | Remarks |
|---|---|---|---|---|
| JCI | 5 | 8,360 | 41,800 | Region 1 Manual |
| AJF | 71 | 4,781 | 339,451 | Region 1 Manual |
| Offshore Tugs | 76 | 5,600 | 425,600 | Paid |
| Scows | 152 | 1,127 | 171,304 | Market |
| Tender Tug | 76 | 3,300 | 250,800 | Paid |
| Cost Code Data | | | 879,253 | Actual Costs |
| Total | | | 2,108,208 | |

Summary of Damages

| | |
|---|---|
| Extra Effort to Remove HARS material | $ 4,430,561 |
| Days Spent Removing Shoaling | $ 2,108,208 |
| Total | $ 6,538,769 |

Conclusion

We respectfully submit that the facts in this case entitle Cashman to an equitable adjustment under the Changes clause of the contract for the extra costs incurred to perform the work in order to meet the Corps' survey criteria and to comply with the Corps' repeated directives to redredge the acceptance areas. We request your decision as Contracting Officer. We are available to meet at your convenience to discuss these issues.

Sincerely,

Encl.
cc: Michael H. Payne, Esq.

Certification

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

DEPARTMENT OF THE ARMY
NEW YORK DISTRICT, CORPS OF ENGINEERS
JACOB K. JAVITS FEDERAL BUILDING
NEW YORK, N.Y. 10278-0090

REPLY TO
ATTENTION OF

Office of Counsel

October 26, 2005

Jay Cashman, Inc.
Attn: Mr. W. Bruce Wood
President, Marine and Equipment Division
549 South Street
P.O. Box 692396
Quincy, MA 02269-2396

SUBJECT: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels, Navigation Improvement Project, Phase II, Contract VIII (Area 8), HARS Shoaling

Dear Mr. Wood:

I reviewed your certified claim dated July 22, 2005 seeking $6,538,769 for additional dredging efforts due to survey issues ("the claim"). Following are my findings of fact, analysis, conclusion, and decision.

FINDINGS OF FACT

1. Contract No. DACW51-03-C-0014 ("the contract") was awarded to Jay Cashman, Inc. ("the contractor") in the amount of $35,460,430 on May 23, 2003. (Tab 3)

2. The contract provided for the dredging, drilling and blasting of rock material, non-rock material and non-rock material unsuitable for placement at the Historic Area Remediation Site ("HARS") upland in Newark Bay.

3. Through contract modification P00016, the final contract amount is $35,259,717.20.

4. The awarded contract was divided into six (6) acceptance areas. The acceptance areas are noted on the drawings as acceptance area 1, acceptance area 2, acceptance area 2A, acceptance area 3, acceptance area 4 and acceptance area 5. Although there was no order of work specified for the acceptance areas, acceptance areas 1, 3, and 4 were not allowed to be dredged between February 1 and May 31 (environmental window) of any year. The contract required all upland material to be removed from an acceptance area before dredging of HARS suitable, non-rock and rock material from that area.

5. The Notice to Proceed was acknowledged by the contractor on June 25, 2003. (Tab 4)

6. The original contract completion date was March 21, 2004. Through contract modification P00016, the contract completion date was extended to November 16, 2004.

7. The contract contained the following relevant clauses:

> 00800-1.15 FINAL EXAMINATION AND ACCEPTANCE (1965 APR OCE)
> As soon as practicable after the completion of an entire acceptance area, a final examination of the work will be conducted by the Contracting Officer, at the cost and expense of the Government by acoustic sweep survey system. Should any shoals, lumps, or other lack of contract depth be disclosed by this examination, the Contractor will be required to remove same . . . When the area is found to be in a satisfactory condition, it will be accepted. . . Progress payment shall be arranged at the pre-construction conference. The Contractor shall perform pre-final hydrographic sweep surveys of an entire acceptance area to verify the area is satisfactorily completed prior to final examination by the Government. The pre-final surveys shall be performed using a multitrack or multibeam survey system to insure 100% coverage of the entire acceptance area. The proposed method for performing these surveys and all equipment and programs shall be submitted for approval. The Contractor's hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys.
>
> 00800-1.24 PROCEDURES FOR SUBMISSION AND PAYMENT OF ALL CONTRACT PAYMENTS
> g. The Contractor is required to perform monthly progress payment surveys as permitted by the Contracting Officer. Surveys shall be in accordance with EC 1130-2-210, Hydrographic Surveying, 1 Oct 1998, for Class I Surveys.
>
> 00800-1.44 QUANTITY SURVEYS
> a. Quantity Surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed and the in-situ volume of the dredged material removed.
> b. …the Government will conduct post-dredge surveys…..Quantity computations for the volume of Non-Rock Material removed will be based on these surveys.

02900-5.1.1 Allowable Overdepth
To cover inaccuracies of the dredging process, material actually removed from within the specified areas to be dredged, to depths as specified below for allowable overdepth, will be estimated and paid for at the contract price. Allowable overdepth dredging will be permitted to a depth of not more than 1.5 ft for all dredging areas. The required dredging depth as shown on the drawings is 47 ft below MLW. An allowable overdepth dredging will be measured and paid for at the applicable contract price in the same manner as specified for the overlying material.

02900-5.1.3 Excessive Dredging
Material taken from beyond the allowable overdepth or side slope limits may be deducted from the total amount dredged as excessive dredging, or excessive side-slope dredging. Materials dredged from below the depth limit which result in extra costs shall be the responsibility of the Contractor. Nothing here shall be construed to prevent the inclusion in the measurement of material dredged for the removal of shoals performed in accordance with the applicable of the paragraph: FINAL EXAMINATION AND ACCCEPTANCE in section 00800,1.15.

02900-5.2
If during the dredging or upon completion of the post-dredging surveys and soundings, materials are found above the required dredging depth of 47 ft below MLW, these materials shall be removed immediately at the Contractor's expense.

8. EC 1130-2-210, Hydrographic Surveying, dated October 1, 1998, provides--

> A-2.a.(1): Hard Bottom Material and/or New Work. This category of dredge measurement, payment, and acceptance surveys includes dredging of newly authorized projects containing hard bottom material, such as rock or compacted material, or maintenance projects containing hard bottom material. All newly authorized projects are not necessarily in this category. This category may also include projects where low under-keel clearances are anticipated over potentially hazardous bottom conditions. Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dreging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category—for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

9. As set forth in its claim (Tab 5), the contractor's allegations relative to survey issues may be summarized into three categories:

a. The government's lack of direction and subsequent revision of the survey standards for acceptance criteria caused the contractor to re-dredge areas several times and to excavate areas deeper than anticipated (additional material both within and below the pay prism);

b. The government's "zero tolerance" criteria regarding high spots exceeded the accuracy obtainable by the survey equipment available at the time.

c. The applications of survey manual, EM-1110-2-1003, Hydrographic Surveying, dated January 1, 2002, were used by the government and were not referenced in the contract. Moreover, the government's acceptance criteria (of minimum soundings in an area) that was communicated to the contractor on October 1, 2004 was not the method mandated by the version of the EM that was in existence at the time of contract award. The use of minimum soundings in the interpretation of multi-beam survey data was a criteria contained in the EM revision issued on April 1, 2004, well after the date of contract award.

10. More specifically, the contractor contends that the "…most significant impact… resulted from the Corps' decision to apply a survey criteria in the performance of the acceptance surveys that was contrary to agency procedure at the time of contract, and from the Corps' instructions to Cashman to use, in the performance of its pre-final surveys, a method of analysis of the multi-beam survey data that differed from the method of analysis the Corps was employing on the acceptance surveys. The application of criteria that were not part of the contract was a change in the contract…" (Tab 5, p.9)

11. The standard for survey applications referenced in the contract is EC 1130-2-210, dated October 1, 1998 (Tab 6), and the standard used by the government was a successive manual, EM 1110-2-1003, dated January 1, 2002 (Tab 7) and then again revised on January 1, 2004. The contractor contends that the later standard, being based on the shoalest (shallowest) point in an area, changed the way the surveys were accepted by the government.

12. The contractor further contends additional impacts resulted from the "… Corps' repeated directives to re-dredge areas that on earlier surveys were apparently to grade." The contractor cites several paragraphs of ER 1130-2-520, "Navigation and Dredging Operations and Maintenance Policies," that would allow the Contracting Officer to use discretion to waive "… deviations … attributed to the inaccuracies in the surveying measurement process,… whether shoals/strikes above grade warrant additional work effort to assure project clearance", and forewarns that "[i]n many cases, repeated surveys of these shoal areas yield different results…." (Tab 5, pp. 9-10)

13. According to the claim, the Corps' repeated directives to re-dredge areas caused the contractor to remove material within and below the pay prism. The contractor changed "…its method of performance and dug deeper before performing pre-final surveys in the hope that the areas would then be acceptable." (Tab 5, p. 5)

14. Cashman contends that the need to deepen its excavation in order to attempt to satisfy the alleged unknown criteria applied by the Corps resulted in Cashman digging below the excavation limit of -48.5 ft MLW.

15. The contractor refers to acceptance area 5 as a good example. The claim indicates that production dredging was completed in this area on June 5, 2004 but it was not until October 23, 2004 that it was finally accepted, despite several prior attempts. (Tab 8)

ANALYSIS

Consistent with the "Final Examination and Acceptance" clause of the contract, acceptance of an area is determined by government surveys and not contractor surveys. Moreover, the "Quantity Surveys" clause provides that final quantity computations for the volume of dredged material are based on government surveys. The contractor is required to perform pre-final hydrographic sweep surveys using survey methods, equipment, and programs approved by the government.

It is further noted that the "Final Examination and Acceptance" clause provides that the contractor's "hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys." Consistent with the "Procedures for Submission and Payment of All Contract Payments" clause and "Quantity Surveys" clause, the contractor surveys are conducted for progress payment purposes only.

We acknowledge that the referenced survey standard was updated during the term of the contract. The survey standard specified in the contract is EC 1130-2-210, Hydrographic Surveying, October 1, 1998 for Class I surveys. The survey standard that the government used was EM 1110-2-1003, dated January 1, 2002, and the subsequent revised edition of January 1, 2004. Despite the change in the referenced survey standards, the government acceptance survey method did not change and, therefore, did not have an impact on the contractor's dredging operations. It is noted that the later EM 111-2-1003 standard was intended to document details of how the EC 1130-2-210 standard had been implemented. Therefore, there are no conflicts between the two standards.

The government has always used the shoalest (or shallowest) point in an area for determination of an acceptance. This was true in the past whether the application was by multi-beam surveys, acoustic sweep surveys, or bar sweeps. The EC 1130-2-210 survey standard does state that for a hard bottom material sub-category, which specifically includes the Kill Van Kull, New Jersey channel, that "[t]he most precise positioning and depth measurement standards and techniques must be employed for this class of project" in order to detect small objects remaining above the required dredging prism. For this reason, the use of shoalest data from an area is necessary. The average, in lieu of shoalest, depth survey data would not present a safe and accurate picture as to what draft vessel can use the channel without undue hazard. A Memorandum for Record prepared by our Engineering Division provides additional detail on these points and is attached hereto at Tab 9.

The contract provides that the contractor is required to remove shoals identified by government surveys. As stated in the "Final Examination and Acceptance" clause "[s]hould any shoals, lumps, or other lack of contract depth be disclosed by this [Government survey] examination, the Contractor will be required to remove same." Also, clause 02900-5.2 provides that "[i]f during the dredging or upon completion of the post-dredging surveys and soundings, materials are found above the required dredging depth of 47 ft below MLW, these materials shall be removed immediately at the contractor's expense."

Any allegation regarding lack of direction from the government is unfounded. Indeed, the contract itself provided the necessary guidance: the required dredging depth is 47 feet below MLW.

The "Excessive Dredging" clause plainly states that "[m]aterial taken from beyond the allowable overdepth or side slope limits may be deducted from the total amount dredged as excessive dredging, or excessive side-slope dredging. Materials dredged from below the depth limit which result in extra costs shall be responsibility of the Contractor. Nothing here shall be construed to prevent the inclusion in the measurement of material dredged for the removal of shoals performed in accordance with the applicable paragraph: FINAL EXAMINATION AND ACCEPTANCE in section 00800-1.15."

Moreover, any allegation that the government's "zero tolerance" criteria regarding high spots exceeded the accuracy of the available survey equipment is unfounded. Recognizing that dredging operations are imprecise and to cover inaccuracies, material actually removed from within the specified areas to be dredged, to depths as specified below for allowable overdepth, will be estimated and paid for at the contract price. In this contract, the allowable overdepth dredging was permitted to a depth of not more than 1.5 feet for all dredging areas. The contractor was compensated for the material dredged within this overdepth prism.

<u>CONCLUSION</u>

The contractor's allegation that a change in the referenced survey standards throughout the contract caused him to re-dredge areas several times and to excavate areas deeper than anticipated is unfounded. The Government followed the same acceptance criteria of the shoalest principle in all survey standards.

The contractor was properly compensated for material removed within the pay prism.

The contract requirements were clear that any material removed beyond the pay prism was the responsibility of the contractor.

DECISION

Based upon the above, I determine that payment to the contractor was made consistent with the terms of the contract requirements, and any alleged changes in the referenced survey standards did not affect the government's survey acceptance criteria. Therefore, the claim is denied.

This is the final decision of the Contracting Officer in accordance with the Disputes clause of the contract. You may appeal this decision to the Armed Services Board of Contract Appeals ("ASBCA"). If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals, Room 703, Skyline Six, 5109 Leesburg Pike, Falls Church, Virginia 22041-3208, and provide a copy to the undersigned Contracting Officer. The notice shall indicate that an appeal is intended and shall reference this decision. Instead of appealing to the ASBCA, you may bring an action directly in the United States Court of Federal Claims within 12 months from the date you receive this decision.

Sincerely,

Ella D. Snell
Contracting Officer

# SUBMITTAL REGISTER (ER 415-1-10)

TITLE AND LOCATION KVK Phase II, Contract 8 (Area 8),New York and New Jersey Harbor | DATE 30 Jan 2008

CONTRACTOR Jay Cashman, Inc. | CONTRACT NUMBER DACW51-03-C-0014 NA

| ACTIVITY No. | TRANS-MITTAL No. | ITEM No. | SPEC PARAGRAPH No. | DESCRIPTION OF SUBMITTAL | TYPE OF SUBMITTAL | CLASSIFICATION FIO GA, DA or CR | REVIEWER OFFICE | REVIEWER NAME | CONTRACTOR SCHEDULE DATES SUBMIT NEEDED BY | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION CODE | CORPS RECEIVED DATE | GOVERNMENT ACTION CODE | CORPS RETURNED DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SECTION - 00800** | | | **Special Clauses** | | | | | | | | | | | | |
| | 3 | 2 | 00800 1.41 | Safe Practice Manual & Diving Operation | CERTIFICATES | GA | | | | | | A | 17 Jul 03 | F | 23 Jul 03 |
| | | 3 | 00800 1.37.b | Order of Work for Dredging and Others | CERTIFICATES | FIO | | | | | | | | | |
| | | 4 | 00800 1.33 | Field Office | CERTIFICATES | FIO | | | | | | | | | |
| 0001AC | 10 | 6 | 00800 1.29 | Certificate of Inspection | CERTIFICATES | FIO | | | 21 Jul 03 | 21 Jul 03 | 21 Jul 03 | A | 31 Oct 03 | F | |
| | | 7 | 00800 1.26 | Accident Prevention Plan | CERTIFICATES | GA | | | | | | | | | |
| | | 8 | 00800 1.24 | Breakdown of Contract Work | CERTIFICATES | GA | | | | | | | | | |
| | 9 | 9 | 00800 1.16 | Fuel Usage Report | CERTIFICATES | FIO | | | | | | A | 30 Sep 03 | F | 19 Jan 04 |
| | | 10 | 00800 1.8.a,b,c | Claims | CERTIFICATES | FIO | | | | | | | | | |
| | | 11 | 00800 1.6c | Pricing Data | PRODUCT DATA | FIO | | | | | | | | | |
| | 1 | 12 | 00800 | Certificate of Inspection | CERTIFICATES | FIO | RO | Kucera, Mark | | | | A | 30 Sep 03 | F | 19 Jan 04 |
| | 2 | 13 | 00800 | Letter Appionting Superintendent | QUALIFICATIONS | FIO | RO | Kucera, Mark | | | | A | 15 Jul 03 | F | 17 Jul 03 |
| 0001AC | 4 | 14 | 00800 | SIE Disposal Alternate | QUALIFICATIONS | GA | | | 21 Jun 03 | 21 Jul 03 | 21 Jul 03 | A | 23 Jul 03 | F | 23 Jul 03 |
| | 5 | 15 | 00800 | Insurance Certificate | CERTIFICATES | FIO | RO | Kucera, Mark | | | | A | 24 Jul 03 | F | 25 Jul 03 |
| 0001AG | | 16 | 00800 | Vessel Documentation | CERTIFICATES | FIO | | | 01 Aug 03 | 01 Aug 03 | 01 Aug 03 | | | | |
| | | 17 | 00800 | | | FIO | | | | | | | | | |
| 0001AG | | 18 | 00800 | Vessel Documentation | CERTIFICATES | FIO | | | 01 Aug 03 | 01 Aug 03 | 01 Aug 03 | | | | |
| | | 19 | 00800 1.4 f | Record Drawings | CLOSEOUT SUBMTL. | FIO | | | | | | | | | |
| **SECTION - 01130** | | | **Environmental Protection** | | | | | | | | | | | | |
| | 3 | 1 | 01130 1.6.a | Environmental Protection Plan | PROTECTION PLAN | GA | RO | Kucera, Mark | | | | A | 23 Jul 03 | F | 24 Sep 03 |
| **SECTION - 01312** | | | **Resident Managment System (RMS)** | | | | | | | | | | | | |
| | | 1 | 01312 1.9 | QCS Update | PRODUCT DATA | FIO | | | | | | | | | |
| **SECTION - 01320** | | | **Project Schedule** | | | | | | | | | | | | |
| | 4 | 1 | 01320 3.5.5 | Network Diagram | PRODUCT DATA | GA | RO | Alton, Mark | | | | A | 16 Oct 03 | F | |
| | 1.1 | 2 | 01320 3.5.4 | Schedule Report | PRODUCT DATA | GA | RO | Alton, Mark | | | | A | 16 Oct 03 | F | |
| | 2.1 | 3 | 01320 3.5.2 | Narrative Report | PRODUCT DATA | FIO | RO | Alton, Mark | | | | A | 16 Oct 03 | F | |
| | 2 | 4 | 01320 3.5.1 | Data Disks | PRODUCT DATA | FIO | RO | Alton, Mark | | | | A | 10 Jul 03 | F | 23 Jul 03 |
| | 2 | 5 | 01320 1.1 | Schedule Report | PRODUCT DATA | FIO | RO | Alton, Mark | | | | A | 10 Jul 03 | E | 23 Jul 03 |
| | 2 | 6 | 01320 1.1 | Narrative Report | PRODUCT DATA | FIO | RO | Alton, Mark | | | | A | 10 Jul 03 | E | 23 Jul 03 |
| | 2 | 7 | 01320 1.1 | Personnel Qualifications | CERTIFICATES | FIO | RO | Alton, Mark | | | | A | 10 Jul 03 | F | 23 Jul 03 |
| | 2.3 | 8 | 01320 1.1 | Periodic Schedule Update | PRODUCT DATA | FIO | RO | Alton, Mark | | | | A | 16 Oct 03 | F | 23 Mar 05 |
| | 2 | 9 | 01320 1.1 | Preliminary Project Schedule | PRODUCT DATA | FIO | RO | Alton, Mark | | | | A | 10 Jul 03 | E | 23 Jul 03 |
| | 2 | 10 | 01320 1.1 | Initial Project Schedule | PRODUCT DATA | FIO | RO | Alton, Mark | | | | A | 10 Jul 03 | E | 23 Jul 03 |
| | | 11 | 01320 | | | FIO | | | | | | | | | |
| | | 12 | 01320 | | | FIO | | | | | | | | | |

RANGE : ALL SORT : SECTION & ITEM



224

# SUBMITTAL REGISTER (ER 415-1-10)

TITLE AND LOCATION: KVK Phase II, Contract 8 (Area 8),New York and New Jersey Harbor — DATE: 30 Jan 2008

CONTRACTOR: Jay Cashman, Inc. — CONTRACT NUMBER: DACW51-03-C-0014 NA

| ACTIVITY No. | TRANS-MITTAL No. | ITEM No. | SPEC PARAGRAPH No. | DESCRIPTION OF SUBMITTAL | TYPE OF SUBMITTAL | CLASSIFICATION FIO GA, DA or CR | REVIEWER OFFICE | REVIEWER NAME | CONTRACTOR SCHEDULE DATES: SUBMIT NEEDED BY | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION: CODE | CORPS RECEIVED DATE | GOVERNMENT ACTION: CODE | CORPS RETURNED DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 13 | 01320 | Schedule Update | SCHEDULES | GA | | | | | | | | | |
| **SECTION - 01420** | | | **Safety** | | | | | | | | | | | | |
| | | 1 | 01420 12.0 | Safety Meeting Document | PRODUCT DATA | FIO | | | | | | | | | |
| | | 2 | 01420 10.3 | Energized Line Work Plan | CERTIFICATES | FIO | | | | | | | | | |
| | | 3 | 01420 8.0 | Monthly Exposure Reports | PRODUCT DATA | FIO | | | | | | | | | |
| | | 4 | 01420 6.4 | Crane & Derrick Operator's Qualification | PRODUCT DATA | GA | | | | | | | | | |
| | | 5 | 01420 5.0 | Daily Inspection Log | PRODUCT DATA | FIO | | | | | | | | | |
| | | 6 | 01420 5.0 | Daily Quality Control Report | PRODUCT DATA | FIO | | | | | | | | | |
| | 5 | 7 | 01420 2.0 | Accident Prevention Plan | PRODUCT DATA | GA | RO | Kucera, Mark | | | | A | 19 Sep 03 | F | 23 Sep 03 |
| | 3 | 9 | 01420 | Site Safety Professional | | FIO | RO | Kucera, Mark | | | | A | 29 Jul 03 | E | 01 Aug 03 |
| | 4 | 10 | 01420 | Site Safety Proffessional | | FIO | | | | | | A | 13 Sep 03 | F | 19 Jan 04 |
| | | 11 | 01420 | Accident Prevention Plan | | FIO | RO | Kucera, Mark | | | | | | | |
| | | 12 | 01420 | Job specific dive plan | SAFETY PLAN | GA | | | | | | | | | |
| **SECTION - 01451** | | | **Contractor Quality Control** | | | | | | | | | | | | |
| | | 1 | 01451 3.9 | Pay Estimate | PRODUCT DATA | GA | | | | | | | | | |
| | | 2 | 01451 3.3 | CQC System | PRODUCT DATA | FIO | | | | | | | | | |
| | 2 | 3 | 01451 3.2 | Quality Control Plan | PRODUCT DATA | GA | | | | | | A | 25 Jul 03 | A | 11 Jul 03 |
| | 4.1 | 4 | 01451 | Quality Control Team Member | QUALIFICATIONS | FIO | RO | Kucera, Mark | | | | A | 16 Dec 03 | F | |
| 0001AG | | 8.1 | 01451 | Vessel Documentation | CERTIFICATES | FIO | | | 01 Aug 03 | 01 Aug 03 | 01 Aug 03 | | | | |
| | | 9 | 01451 | Progress Payment | | FIO | | | | | | | | | |
| | | 10 | 01451 | | | FIO | | | | | | | | | |
| | | 11 | 01451 | Quality Control team member | QUALIFICATIONS | FIO | | | | | | | | | |
| **SECTION - 02100** | | | **Subsurface Drilling and Blasting** | | | | | | | | | | | | |
| | | 1 | 02100 9.2 | Equipment | PRODUCT DATA | FIO | | | | | | | | | |
| | | 2 | 02100 6 | Samples | SAMPLES | FIO | | | | | | | | | |
| | | 3 | 02100 4 | Driller's Log | PRODUCT DATA | GA | | | | | | | | | |
| **SECTION - 02200** | | | | | | | | | | | | | | | |
| | | 1 | 02200 7 | Drill Log and Blast Report Form | PRODUCT DATA | FIO | | | | | | | | | |
| | | 2 | 02200 6.1 | Operational Blast Plan | PRODUCT DATA | GA | | | | | | | | | |
| | | 3 | 02200 5.4 | Report | PRODUCT DATA | GA | | | | | | | | | |
| | 5 | 4 | 02200 5.2.1 | Test Blast Plan | PRODUCT DATA | GA | | | | | | A | 11 Dec 03 | F | |
| | | 5 | 02200 4.4 | Air Blast Data | PRODUCT DATA | FIO | | | | | | | | | |
| | | 6 | 02200 4.3 | Blast Records | PRODUCT DATA | FIO | | | | | | | | | |
| | | 7 | 02200 4.3 | Vibration Monitoring Plan | MFRS INSTR | GA | | | | | | | | | |
| | | 8 | 02200 2.5 | Contingency Plan | MFRS INSTR | GA | | | | | | | | | |

RANGE : ALL — SORT : SECTION & ITEM

# SUBMITTAL REGISTER (ER 415-1-10)

TITLE AND LOCATION KVK Phase II, Contract 8 (Area 8),New York and New Jersey Harbor DATE 30 Jan 2008

CONTRACTOR Jay Cashman, Inc. CONTRACT NUMBER DACW51-03-C-0014 NA

| ACTIVITY No. | TRANS-MITTAL No. | ITEM No. | SPEC PARAGRAPH No. | DESCRIPTION OF SUBMITTAL | TYPE OF SUBMITTAL | CLASSIFICATION FIO GA, DA or CR | REVIEWER OFFICE | REVIEWER NAME | CONTRACTOR SCHEDULE DATES SUBMIT NEEDED BY | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION CODE | CORPS RECEIVED DATE | GOVERNMENT ACTION CODE | CORPS RETURNED DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 9 | 02200 1.5.2 | Public Meeting Correspondence | MFRS INSTR | GA | | | | | | | | | |
| | | 10 | 02200 1.3.1 | Explosive Inventory | PRODUCT DATA | FIO | | | | | | | | | |
| | | 11 | 02200 1.2.1 | Weekly Inspections and Claim Reports | PRODUCT DATA | FIO | | | | | | | | | |
| | 5 | 12 | 02200 5.2.1 | Blasting Plan | PRODUCT DATA | GA | | | | | | A | 11 Dec 03 | | |
| | | 13 | 02200 | | | FIO | | | | | | | | | |
| **SECTION - 02900** | | | **Dredging and Disposal** | | | | | | | | | | | | |
| | | 1 | 02900 8 | Daily Report of Operation | PRODUCT DATA | FIO | | | | | | | | | |
| | | 2 | 02900 7.3 | All Placement Activities | PRODUCT DATA | FIO | | | | | | | | | |
| | | 3 | 02900 7.4 | Observation Report | PRODUCT DATA | FIO | | | | | | | | | |
| | | 4 | 02900 6.7 | Non-HARS Material Disposal Schedule | PRODUCT DATA | FIO | | | | | | | | | |
| | | 5 | 02900 6.2 | Disposal Schedule w/anticipated quantiti | PRODUCT DATA | FIO | | | | | | | | | |
| | | 6 | 02900 4 | Transportation Log Form | PRODUCT DATA | GA | | | | | | | | | |
| 0001AG | | 7 | 02900 | Hydro Hammering | WORK PLAN | FIO | | | 01 Aug 03 | 01 Aug 03 | 01 Aug 03 | | | | |
| **SECTION - 11010** | | | **Digital Photo Documents and Communications** | | | | | | | | | | | | |
| | 1 | 1 | 11010 1.2 | Digital Photo Management System | PRODUCT DATA | GA | RO | Kucera, Mark | | | | A | 15 Jul 03 | A | 17 Jul 03 |

RANGE : ALL SORT : SECTION & ITEM

