
LIEBHERR

KILL VAN KULL & NEWARK BAY CHANNELS NAVIGATION IMPROVEMENT PROJECT
PHASE II, CONTRACT 8, AREA 8

# PARTNERING CHARTER

We the project Partners on the Kill van Kull & Newark Bay Navigation Improvement Project, Phase II, Contract No. 8, commit to work and communicate professionally and with respect, trust, cooperation and harmony to provide the Port of New York and New Jersey with safer, more efficient navigation channels that enhance the regional economy and the image of the Port. We will accomplish our mission by achieving the following goals.

- Safe performance of the Project
- Completion of the Project on or ahead of schedule
- Minimal disruption of shipping traffic and dredging operations
- All the Partners meet their financial objectives
- Honest, open and timely communication between all the Partners and the Public
- Full compliance with WQC/FC and Ocean Placement Protocols
- Satisfied end users
- Have Fun!

US Army Corps of Engineers®

CASHMAN

METRO PILOTS

Sandy Hook PILOTS

U.S. COAST GUARD

THE PORT AUTHORITY OF NEW YORK & NEW JERSEY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Declaration of James Thomas

I, James Thomas, declare as follows:

1. I am currently employed as a Vice President with S.T. Hudson Engineers, Inc., a full service marine engineering company. I have been employed in this capacity since September 2007. I am currently serving as a consultant for the United States in the above-referenced case.

2. Prior to my employment with S.T. Hudson Engineers, Inc., I was employed as a Vice President with Bean Stuyvesant, LLC, a major dredging company, from June 2000 to August 2007. Prior to working for Bean Stuyvesant, LLC, I was employed as a Vice President with Weeks Marine, Inc, another major dredging company, between February 1993 to June 2000.

3. Through my employment with Bean Stuyvesant, I worked on many dredging projects, including projects where hydrographic multibeam surveys were used. I worked on a number of Army Corps of Engineers dredging contracts that were part of Phase II the Kill

Van Kull and Newark Bay Navigation Improvement Project (the "KVK Phase II"), including contracts for areas 1, 3, 4A, 5, and 6 of KVK Phase II as well as Area 5 Phase III deepening.

4. I have also worked on a number of other dredging contracts for the Army Corps of Engineers, including The Key West Entrance Channel Deepening project administered by the Jacksonville District, the Fenwick Island Beach Re-nourishment project administered by the Philadelphia District and the Morehead City Entrance Channel Dredging and Beach Re-nourishment project administered by the Wilmington District.

5. Based upon my experience in dredging, with hydrographic multibeam surveys, and working on the KVK Phase II deepening projects, I would expect that the Corps would employ a high level of scrutiny in analyzing survey data to ensure that the contractually required depth had been achieved, and that acceptance would be predicated on no high spots remaining above grade.

6. The KVK Phase II projects involved new work dredging of hard bottom material. In addition, the KVK Phase II project was situated in an extremely busy area of the Port of New York and New Jersey, resulting in potentially significant liability for the Corps if the material was not dredged to grade. For these reasons, every pinnacle above grade would be critical.

7. In my experience, the size of the bucket on a backhoe dredge does not directly correlate to whether a bin is dredged to a uniform depth. There are many variables involved in this process. The most important of these is the level of X-Y-Z bucket positioning accuracy, the actual character of material being dredged and its relation to the bank height of material lying in the dredge prism.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 28th day of January 2008.

James Thomas

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Declaration of William A. McDonald II

I, William McDonald, declare as follows:

1. I am currently the Deputy Chief, Survey Section, Operation Support Branch, Operations Division, United States Army Engineer District, New York. I have held this position since November 2007.

2. I served as a Cartographic Technician, Survey Section, Operation Support Branch, Operations Division, United States Army Engineer District, New York from August 1987 to November 2007.

3. I attended the Partnering Meeting for the New York Harbor, Kill Van Kull and Newark Bay Channels, Navigation Improvement Project Phase II ("KVKII"), Contract 8 ("KVK 8") contract, which was held on June 26, 2003.

4. I attended preconstruction conferences for many of the other KVK II contracts. I did not present information on the method that the Corps would use to process acceptance surveys at the KVK II preconstruction conferences, nor did any other representative from

the Survey Section. As far as I recall, no contractor asked about the method that the Corps would use to process acceptance surveys at the KVK II preconstruction conferences.

5. Prior to multibeam technology single track echo sound systems were used to survey the bottom of the seafloor. Single track echo sounder systems use a transducer that sends sound pulses straight down into the water. The sound reflects off the seafloor and returns to the transducer. The time the sound takes to travel to the bottom and back is used to calculate the distance to the seafloor. Water depth is estimated by using the speed of sound through the water (approximately 1,500 meters per second) and a simple calculation: Distance = speed x time/2. The product is divided by two because the measured time is the round-trip time (from the transducer to the seafloor and back to the transducer). The faster the sound pulses return to the transducer from the ocean floor, the shallower the water depth is and the higher the elevation of the sea floor. The first object within the coverage of the sound pulse, which, simplified, travels downward as a cone shape, covering a large circlular area on the seafloor, is the first signal returned back to the transducer. This would most often be the minimum, or shoalest depth of that area of the seafloor. The sound pulses are sent out regularly as the ship moves along the surface, producing the depths of the seafloor beneath the vessel. The Multitrack system is a system with 5 to 10 single track transducers all spread out approximately 4-6 feet apart from each other in a straight line.

6. In Hydrographic multibeam surveys, multibeam sonar systems provide fanshaped coverage of the seafloor.




Multibeam sonar systems transmit a fan of ultrasonic energy into the water (a sweep). When the sound hits the seabed, or some underwater structure, a reflection or backscatter energy is generated which returns to the transducer where it is detected. The multibeam system measures and records the time and angle for the acoustic signal to travel from the transmitter to the seafloor (or object) and back to the receiver. If one knows the speed of sound in water then one can use the time to figure the distance and the angle to figure the position.

7. There are a number of products used to represent the processed data from the Multibeam sonar system. Selected representative shot, average, or minimum depths referred throughout this declaration document are derived from the entire <u>edited</u> multibeam dataset. This implies that extraneous noise spikes have been filtered or manually edited out of the raw dataset before binning is performed. Cell size plays a big role in the

representative depth that is used. Shot depth is used to represent the general condition of the bottom for mapping purposes. Shot depth is: the closest depth to the center of the cell. We plot our maps at the scale of one inch is equal to 100 feet. Shot depth cell size utilized is 15 by 15 foot. Shot depth is then a sounding on the map every 15 feet. Average depth is used for volume quantity computations for payment purposes. Average is: the average of all the depths within the cell. The cell size used for volume computations is three by three foot. Average depth is then a sounding every 3 feet utilizing the entire dataset. The minimum depth is the shoalest depth within a cell. The cell size used for minimum depth is three by three foot. Shoals above grade must be assessed based on multiple hits, a minimum of 3 hits, over successive passes. A single high spot unsupported by other data would be disregarded. Minimum depth dataset is then a sounding every 3 feet. The minimum depth was always separated into two three foot cell size sets of data. The first was all the 3 foot cell size data points, and the other was only the minimum depths above the Project accepted depth of 47 feet. The purpose of the minimum depth dataset was, and is, used only for the purpose to accept an area for clearance to the required prism (project depth), shoal strike detection purposes, and not to be used for dredging payment purposes.

8. The Corps used multibeam surveys on the KVK II contracts, with the exception of a brief time in KVK Area 3 when the Corps had a problem with its multibeam, and used a multi-track system instead.

9. The KVK 8 contract did not require acceptance surveys, using the minimum depth (or shoalest) as criteria for clearance, for the upland materials unsuitable for unconfined aquatic disposal, and the Corps did not perform acceptance surveys for the upland materials unsuitable for unconfined aquatic disposal. This was because the upland materials were above the contract's required depth, and removing these materials would not enable a contractor to meet the contractually required depth.

10. The Corps did not use the average depth as the criteria to represent any acceptance surveys under the KVK 8 contract. However, if an area met the required depth of 47 feet with the Corps' surveys, after using the minimum depth (or shoalest) as criteria for clearance to the project depth, the area would be accepted, regardless of whether Cashman had used the average depth to represent their pre-final survey.

11. Acceptance surveys are different than payment surveys. The Corps would take the first acceptance survey and use that survey as a payment survey if, and only if, the area surveyed met the required depth of 47 feet with the Corps' surveys (after using the minimum depth (or shoalest) as criteria for clearance). Otherwise, a separate payment survey was required, or composite survey data from multiple acceptance surveys were utilized and joined together for use as a payment survey.

12. Our job as hydrographic surveyors has not changed since its inception: Where am I and how deep is it? In hard bottom material and/or new work a method "must be employed

to ensure 100% bottom coverage in order to detect small objects remaining above the required dredging prism" EM 1110-2-1003, Page 3-3, Paragraph 3-5a. In the past this meant a mechanical sweep bar lowered to the required depth and using barges, tow lines, small boats, tugs, and numerous personnel to constantly keep the barges on line, update of tide correction to raise or lower the bar, and to stop all vessel traffic to minimize error and for safety purposes. With the advent of modern technology, we are able to do the same thing using multibeam, with 200 to 300% overlapping coverage, to "ensure 100% bottom coverage in order to detect small objects remaining above the required dredging prism" EM 1110-2-1003, Page 3-3, Paragraph 3-5a.

13. At the time of the KVK 8 contract, the New York District had discontinued use of the Odom Echoscan system, because the system was perceived as having accuracy problems. The New York District has never used the Odom Echoscan "multibeam" system for any type of payment surveys. After much testing we did not deem it sufficient for any survey work.

14. The New York District did not apply a "more stringent tolerance to determine whether a minimum depth acceptance survey had 'passed' than was customary in the Corps of Engineers." Rather, a more stringent tolerance was applied to the quality controls used by the New York District to achieve a high level of accuracy in our surveys. This would provide a fairer evaluation of whether a contractor's work had actually been dredged to the required depth, and ensure that high spots disclosed by the surveys actually existed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 29th day of January 2008.

William A. McDonald II

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC., Plaintiff, | ) | |
| v. | ) | No. 06-101C (Judge Allegra) |
| THE UNITED STATES, Defendant. | ) | |

Declaration of Salvatore J. DiDato

I, Salvatore J. DiDato, declare as follows:

1. I have been employed by the United States Army Engineer District, New York ("New York District") since May 1999. I am currently the Acting Resident Engineer of Metro Area, West Residency, Construction Division. I have held this position since November 2005. As Acting Resident Engineer, I am in charge of the administration, prosecution, and construction of the New York Harbor Deepening Program.

2. From April 1978 to December 1985, I have held various positions with New Orleans District, Philadelphia District, and New York District of the Army Corps of Engineers.

3. During performance of the New York Harbor, Kill Van Kull and Newark Bay Channels, Navigation Improvement Project Phase II ("KVK Phase II), Contract 8 contract ("KVK 8"), I served as Team Leader and Contracting Officer's Representative ("COR"). In those positions, I was responsible for the administration and management of

the New York Harbor Deepening Program.

4. I am fully familiar with the KVK 8 contract documents, required procedures, and project files.

5. The KVK 8 contract, Paragraph 00800-1.44.c, Contractor Surveys, calls for contractor submission/documentation for government review..."indicating that modern electronic horizontal positioning and sounding system equipment will be used for the surveys to be performed as well as documentation verifying the experience of the operators using the equipment. Typical information that will be required, as a minimum, includes the name, model, and year of manufacturer of the electronic equipment, the electronic frequencies of the horizontal positioning and sounding accuracies, and capability of the equipment proposed for usage..."

6. The KVK 8 contract, Paragraph 0800-1.15, Final Examination and Acceptance, provided that "[t]he pre-final surveys shall be performed using a multitrack or multibeam system to insure 100% coverage of the entire acceptance area. The proposed method for performing these surveys and all equipment and programs shall be submitted for approval."

7. After diligent search, I cannot find any such Contractor survey submittals/documentation in our contract files. Furthermore, our Submittal Register, which is a spreadsheet of all Contractor required submittals under the contract, does not indicate any such submissions.

8. Progress payments and pre-acceptance volume computations for the KVK Phase II contracts were based upon Contractor surveys. The Contractor quantity surveys were used as the basis for computing the quantities of work performed, the actual construction completed, and the in-situ volume of the dredged material removed.

9. For new work dredging contracts of hard bottom material, which involve dredging materials such as rock, till, or heavy clays to a deeper elevation, there are different types of after-dredge surveys and survey data used by the contractor and the Government.

10. The KVK 8 contract did not require acceptance surveys, produced as minimum depth or average depth, for the upland materials unsuitable for unconfined aquatic disposal, and the Corps did not perform acceptance surveys for the upland materials unsuitable for unconfined aquatic disposal. This was because the upland materials were above the contract's required depth, and removing these materials would not enable a contractor to meet the contractually required depth.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of January 2008.

Salvatore J. DiDato


U. S. ARMY
ACCEPTANCE AREA 4
ACCEPTANCE AREA 3
CT 8 ACCEPT. AREA 5 (4thAD)
5 AUGUST 2004
ONE INCH = 20 FEET
SHEET 4
SHEET 3
SHEET 2
SHEET 1
BARGE ON LINE
FIXED NAVIGATION AID "4"
TANK
TANKS
STACK
PARKING
N 663,000
N 662,000
N 661,000
E 589,000
E 590,000
E 591,000
CONTROL DATA
BENCHMARK: N825A
ELEVATION: 9.70' (NGVD 29)
NOTE:
THE INFORMATION DEPICTED ON THIS MAP REPRESENTS THE RESULTS OF SURVEYS MADE ON THE DATES INDICATED AND CAN ONLY BE CONSIDERED AS INDICATING THE GENERAL CONDITIONS EXISTING AT THAT TIME.
COORDINATES REFER TO THE NEW JERSEY MERCATOR SYSTEM (NAD 1983)
SOUNDINGS REFER TO THE PLANE OF MEAN LOW WATER
THE PLANE OF MEAN LOW WATER IS 2.3 FEET BELOW NGVD (1929)
THE SOUNDING DATA DEPICTED ON THIS MAP WAS COLLECTED USING CLASS I SURVEY STANDARDS IN ACCORDANCE WITH EM 1110-2-1003.
TOPOGRAPHY COMPILED BY STERIOPHOTOGRAMMATRIC METHODS FROM AERIAL PHOTOGRAPHY FLOWN 7 JUN 1991
THE DATA ON THIS MAP IS REPRESENTATIVE OF A LARGER DATA SET.
THE CONTOUR ON THIS MAP WAS CREATED FROM THE LARGER DATA SET.
DEPARTMENT OF THE ARMY
NEW YORK DISTRICT CORPS OF ENGINEERS
NEW YORK, NEW YORK 10278
SURVEY OF:
KVK AND NEWARK BAY CHANNELS
NAVIGATION IMPROVEMENT PROJECT
CONTRACT 8 (ACCEPT. AREA 5)
AFTER DREDGE SPOT ELEVATION SURVEY
SCALE: ONE INCH = 100 FEET
APPROVED: R. VIRKMAA
FIELD CARTOGRAPHER
APPROVED: M. FORTE
CIVIL ENGINEERING TECHNICIAN
APPROVED: W. MCDONALD II
LEAD CARTOGRAPHER
APPROVED: R. KISS
CHIEF OF SURVEY
DATE: 19 AUG 2004
DATE OF SURVEY: 5 AUG 2004
FIELD BOOKS: 14195, 14179
SHEET 1 OF 1
REQUEST NO.: 2678D/M
FILE NO.: CT8 (ACCEPT. AREA 5) 4th AD





)04
0 FEET

effect during the, you know, duration of KVK8 Contract.

Q If this particular manual was not referenced in the KVK8 solicitation, would that be of any significance in your mind?

A Yes.

Q Why would that be significant?

A I would ask how the contractor bid the job if he had no clear understanding of how he was going to do it.

Q Is it your understanding that this manual provides guidance to the contractor on how to do the job?

A How to perform the surveys that we require on the job.

Q I direct your attention to Page 1.1, please -- 1-1, I'm sorry. There's a paragraph 1-5?

A Yes.

Q It refers to the use of this manual and says in the second sentence that "It should be directly referenced in the contract specifications for dredging". Do you see that?

had the side scan, as well. So it gave you a pretty good idea of what the capability of the system was.
Q. Did Odom provide any demonstration on processing multibeam data?
A. Yes.
Q. When did --
A. Not at that time. They did on-site, after we purchased it.
Q. Do you recall when that occurred?
A. I'm going to say July '03. I mean, I just knew that it was right around when we bought it, but maybe June.
Q. And what type of demonstration did they provide regarding processing multibeam data?
A. It was using the software that they recommended and running through cleaning files, tide reduction, software utilities for doing what they call patch tests and calibration and that --that kind of thing.
Q. What type of software did they recommend?
A. It was Coastal Oceanographics, Hypack.
Q. Do you recall whether Odom discussed the average method for processing multibeam

surveys?
A. Yes.
Q. What did they say regarding the average method for processing multibeam surveys?
A. That there was an average method, essentially. They just explained that there are, you know, various methods.
Q. Did they discuss the minimum method for processing multibeam surveys?
A. Yes.
Q. What did they say regarding the minimum method?
A. Well, they said that there's -- it's not always used as a -- as a method because they're -- it's not really representative of what's down there.
Q. Did you attend any training regarding multibeam surveys provided by the Army Corps prior to KVK 8?
A. No. I wasn't aware that there were any available.
Q. Who actually gathered the multibeam survey data during the KVK 8 contract?
A. Many employees took part in that. I did