IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED
FINDINGS OF UNCONTROVERTED STATEMENTS OF FACT

Pursuant to Rule 56(h)(2) of the Rules of this Court, defendant responds to plaintiff's proposed findings of uncontroverted fact as follows:

1. The Defendant, by and through the New York District, ("District"), of the U.S. Army Corps of Engineers, ("Corps"), issued sealed bid Solicitation No. DACW51-03-B-0004 for dredging to deepen an existing 40-foot navigation channel to a depth of 47 feet along the southern portion of the South Elizabeth Channel in Newark Bay and the western end of the Kill Van Kull Channel in New Jersey. (Answer ¶4).

**Response:**

Defendant does not dispute this fact.

2. The bid opening was held on March 25, 2003 and three bids were received. The bid results, including the government estimate, were as follows: (App. 1)

Jay Cashman, Inc. $39,307,022.00

Bean Stuyvesant $46,567,085.00

Weeks Marine, Inc. $67,129,190.00

Government Estimate $42,058,948.00

**Response:**

Defendant does not dispute this fact.

3. The Plaintiff was asked to confirm its bid and it did so. (App. 2)

**Response:**

Defendant does not dispute this fact.

4. On May 23, 2003, following the public bid opening, the Defendant awarded Contract No. DACW51-03-C-0014, ("Contract"), in the amount of $35,460,430, to the Plaintiff. (Answer ¶5).

**Response:**

Defendant does not dispute this fact.

5. The Plaintiff is a large and experienced construction contractor who had previously performed dredging work for the New England District of the Corps of Engineers, but this was the first dredging contract awarded to the Plaintiff by the New York District.

**Response:**

Plaintiff does not cite any evidence in support of this fact. Defendant does not dispute this fact, but avers that it is immaterial for purposes of resolving the pending motions. Furthermore, although Contract No. DACW51-03-C-0014 was the first dredging contract

awarded to Cashman by the New York District of the Army Corps of Engineers, Cashman submitted bids on several of the other contracts that were part of Phase II of the Kill Van Kull and Newark Bay Navigation Improvement Project ("KVK Phase II"). See Def. App. 15-38.[1] Cashman was the apparent low bidder on the contract for Area 5 of Phase II of the Kill Van Kull and Newark Bay Navigation Improvement Project, but asked to withdraw its bid due to an error in the bid. Def. App. 38.

6. The project was part of an extensive multi-billion dollar program authorized by Congress and undertaken by the New York District to deepen the existing navigation channel into Newark Bay and New York Harbor. (App. 3, http://www.nan.usace.army.mil/ project/newyork/factsh/pdf/kvknew.pdf).

**Response:**

Defendant does not dispute this fact.

7. This Contract was one of a number of related and similarly large dredging projects performed by other dredging contractors prior to the award of Plaintiff's contract, an effort that began in 1987 and is continuing to this day. The first phase of contracts deepened the channels to 40 feet, the second phase, of which this Contract was part, deepened the channels further. (App. 4, http://www.nan.usace.army.mil/project/newyork/factsh/pdf/nynj.pdf). Eight contracts were issued by the Corps to perform the second phase of the project. (App. 4). The third phase, which is continuing, will deepen the channel to 50 feet. (App. 5,6).

[1] "Def. App." refers to the appendix filed by defendant.

**Response:**

Defendant does not dispute the fact that**:**

> This Contract was one of a number of related and similarly large dredging projects performed by other dredging contractors prior to the award of Plaintiff's contract, an effort that began in 1987 and is continuing to this day.

Defendant disputes the fact that: [t]he first phase of contracts deepened the channels to 40 feet . . . . ." The first phase deepened the channel to 42 feet, and the authorized depth of the channels for navigational purposes was 40 feet. See Pl. App. 13,[2] Def. App. 4; 77; 127; 153.

Defendant does not dispute the fact that**:**

> the second phase, of which this Contract was part, deepened the channels further. (App. 4, http://www.nan.usace.army.mil/project/newyork/factsh/pdf/nynj.pdf). Eight contracts were issued by the Corps to perform the second phase of the project. (App. 4).

Defendant disputes the fact that "[t]he third phase, which is continuing, will deepen the channel to 50 feet." The third phase will deepen the channel to 52 feet, and the channel will be authorized to a depth of 50 feet for navigational purposes. Pl. App. 4; Def. App. 77; 127. Furthermore, although there are future plans to lower the channels to 52 feet, and some areas of the channels have been dredged to a depth of 52 feet, other areas have not, and the channels are currently authorized to a depth of 45 feet for navigational purposes. Def. App. 5-6; 65; 80.

8. There are few dredging contractors who have the equipment and the capability to perform a project of the size and scope encompassed by the subject contract and prior to the award of Plaintiff's contract the previous seven contracts had been performed by only three

---

[2] "Pl. App." refers to the appendix filed by plaintiff.

contractors.

**Response:**

Plaintiff does not cite any evidence in support of the proposed finding of fact that "There are few dredging contractors who have the equipment and the capability to perform a project of the size and scope encompassed by the subject contract." Defendant does not dispute this fact, but avers that it is immaterial for purposes of resolving the pending motions.

Defendant disputes the fact that "prior to the award of Plaintiff's contract the previous seven contracts had been performed by only three contractors." The previous seven contracts for KVK Phase II had been performed by four contractors: Great Lakes Dredging, Bean Stuyvesant, Don Jon Marine, and Weeks Marine. Def. App. 9.

9. The New York District welcomed the Plaintiff's considerable investment in dredging equipment and its entry into the competition for the District's dredging projects, all of which were awarded competitively through sealed bidding.

**Response:**

Plaintiff does not cite any evidence in support of this fact, and defendant avers that it is immaterial for purposes of resolving the pending motions. Cashman made investments in dredging equipment of its own volition, not the direction of the Corps. Defendant does not disagree that the New York District welcomed Cashman's participation in the bidding process, and that the New York District's projects were awarded competitively through sealed bidding.

10. As a "newcomer" to the New York District's dredging program the Plaintiff's

lowest bid was closely scrutinized by the Contracting Officer and the District's personnel and an extensive pre-award survey was conducted by the Corps to assure that the Plaintiff had the capability to complete the project. (App. 7).

**Response**:

Plaintiff does not cite any evidence in support of this fact, and defendant avers that it is immaterial for purposes of resolving the pending motions. Defendant agrees that Cashman's bid was scrutinized, and that the Corps performed a responsibility determination for Cashman pursuant to 48 C.F.R. § 9.104, and concluded that Cashman was responsible. Defendant disputes that Cashman was evaluated differently because it was a "newcomer" to the New York District's dredging program. Rather, a responsibility determination is a standard procedure that is performed for new work dredging contracts.

.

11. Dredging involves the removal of material from the ground under a body of water. The body of water where dredging under the Contract was to be performed was divided into six acceptance areas. The six acceptance areas totaled approximately 820,000 square yards in area. (Answer ¶6).

**Response:**

Defendant does not dispute this fact. However, some of the acceptance areas were subsequently sub-divided to assist Cashman.

12. The project was "new work" dredging that required the excavation of material that had not been dredged before and was therefore harder, and more difficult to dredge than

"maintenance" material, which involves the removal of material that has filled in a channel since the last time it was dredged. (App. 8).

**Response:**

Defendant does not dispute that the project at issue in this litigation was "new work" dredging, and the specific contract area was more difficult to dredge than maintenance material. However, defendant does not agree that all "new work" dredging is more difficult to dredge than all "maintenance material." Furthermore, defendant avers that these facts are immaterial for purposes of resolving the pending motions.

13. The contract provided for payment to the contractor on a unit price basis of so many dollars per cubic yard of material excavated, at various line item unit prices in the contract that differed according to location and material type. (App. 9-11).

**Response:**

Defendant does not dispute this fact.

14. The Corps of Engineers performs before and after-dredging surveys to determine how much material has been excavated and is to be paid for at the agreed-upon contract unit prices, and also to assure that the required channel depth has been achieved.

**Response:**

Plaintiff does not cite any evidence in support of this fact. Defendant does not dispute this fact, but believes it is stated in a misleading and confusing manner. The Corps performs different types of after-dredge surveys, from which different survey products can be produced.

Def. App. 68-69; 119-121; 236 (Declaration of William McDonald ¶¶ 7, 11).

15. The Congressionally authorized project depth for the Contract was 45 feet. (App. 3). The Contract, however, required excavation to a depth of 47 feet with an allowable overdepth of one and one-half additional feet. (App. 12). The two foot cushion between the authorized depth, 45 feet, and the project depth, 47 feet, was an additional safety factor adopted by the Corps. (App. 13).

**Response:**

Defendant does not dispute that the Congressionally authorized project depth for the Contract for navigational purposes was 45 feet. Defendant also agrees that the contract required excavation to a depth of 47 feet with an allowable overdepth of one and one-half additional feet. The Corps considers the two foot safety factor to be part of the authorized depth. Def. App. 4; 127.

16. The payment of allowable overdepth is a common practice in Corps of Engineers dredging projects because it is not possible to dredge to the "neat line" channel depth required by the terms of the contract. In other words, in order to achieve a depth of 47 feet, the sheer size of the excavation tool required a dredging contractor to dig somewhat below the required depth in order to safely achieve that depth. To cover these inaccuracies in the dredging process, the Corps included an additional "cushion" of a one and one-half feet of overdepth. (App. 12).

**Response:**

Defendant does not dispute the statement that "[t]he payment of allowable overdepth is a

common practice in Corps of Engineers dredging projects because it is not possible to dredge to the 'neat line' channel depth required by the terms of the contract." Defendant disagrees that the "sheer size of the excavation tool" is the sole reason that a dredging contractor would be required to dig deeper than the required depth; rather, the nature of the material to be removed also plays a role. Def. App. 81. Defendant also disputes that the paid overdepth is included to enable the contractor to "safely achieve that depth," rather, it is included for "inaccuracies." Def. App. 74.

17. Dredging contractors all attempt to achieve the required depth before requesting after-dredge surveys so that they do not have to bring their expensive equipment back to an area to re-dredge.

**Response:**

Plaintiff does not cite any evidence in support of this fact. Defendant does not have sufficient information either to confirm or dispute this fact, and avers that it is immaterial for the purpose of resolving the pending motions.

18. In order to measure the depth to which material had been excavated by the Plaintiff, the Contract provided that Defendant was to examine the underwater area using an acoustic survey system, a type of remote sensing that indirectly measures the depth of the water in the area excavated. (Answer ¶7).

**Response:**

Defendant does not dispute this fact.

19. The purpose of this type of examination, also referred to as "hydrographic surveying," is to generate "acceptance surveys" that are used to determine whether or not the subaqueous material has been removed from within the required contract excavation limits, and consequently, whether or not the Plaintiff has performed the contract work in accordance with the contract requirements. (Answer ¶8).

**Response:**

Defendant does not dispute that this is one purpose of hydrographic surveying. However, hydrographic surveys are used for a number of different purposes, including both acceptance that the work has been dredged to the contractually required depth, and payment for the material removed. Def. App. 68-69; 119-121; 236-37 (Declaration of William McDonald ¶¶ 7, 11).

20. These Corps of Engineers acceptance surveys are used by the Corps to determine how much material has been removed from an area for final payment purposes, and to also assure that the required depth has been achieved in a particular acceptance area sufficient to excuse the contractor from performing any further dredging in that area. (App. 14).

**Response:**

Defendant disputes this fact. Acceptance survey data is rarely used for purposes of final payment to the contractor, and when it is, the data is handled differently than for acceptance purposes. Def. App. 236-37 (Declaration of William McDonald ¶¶ 7, 11). For the KVK Phase II project, the Corps produced payment surveys using the average depth, and acceptance surveys using the minimum depth. Def. App. 236-37 (Declaration of William McDonald ¶¶ 7, 11).

Defendant also disputes that the purpose of an acceptance survey is to "assure that the required depth has been achieved in a particular acceptance area sufficient to excuse the contractor from performing any further dredging in that area." The contract required that Cashman dredge the area to 47 feet below mean low water, and that if material was found shallower than 47 feet below mean low water, Cashman would remove the material at its cost. Def. App. 71.

21. At the time that the Contract was awarded, and continuing through the performance of the Contract, the New York District performed acceptance surveys using an acoustic survey system known as a multibeam sonar system. ("multibeam"). (App. 15).

**Response:**

Defendant does not dispute this fact.

22. Multibeam surveying and the processing of the data generated by multibeam was a relatively new technology being employed by the Defendant. Mr. Richard Kiss, who was the Chief of the Survey Section, testified that the District only began using the multibeam survey system in the late 1990's. (App. 16). Mr. Hawkins, the project manager for the harbor deepening project, testified that the District had "phased-in" the use of multibeam surveys during the Phase 2 contracts, which included Plaintiff's Contract. (App. 15).

**Response:**

Defendant disputes that multibeam surveying and the processing of the data generated by multibeam was a "relatively new technology being employed by the Defendant." The KVK 8

contract was awarded in 2003, and Mr. Richard Kiss, the Chief of the Survey Section, testified that the District began using the multibeam survey system in the late 1990's. Defendant agrees that Mr. Hawkins, the project manager for the harbor deepening project, testified that the District had "phased-in" the use of multibeam surveys during the Phase II contracts. However, the Corps used multibeam surveys for all of the KVK Phase II contracts, except for a brief period during the contract for Area 3, when the multibeam survey equipment required repairs. Def. App. 235 (Declaration of William McDonald ¶ 8).

23. All multibeam sonar systems use the same basic approach to depth measurement. A machine generates sound waves underwater and the returning echoes reflected off of the submerged ground surface are processed and converted into vertical depths that are then depicted on a survey graph. (Answer ¶9).

**Response:**

Defendant does not dispute this fact.

24. The Corps issues agency policy, regulations and technical guidance that are to be complied with in the performance of the agency's dredge surveying functions. (Answer ¶23).

**Response:**

Defendant does not dispute this fact.

25. When the Contract was awarded, the agency policy with regard to the performance of hydrographic surveying was set forth in EM 1110-2-1003, HYDROGRAPHIC SURVEYS (1 Jan 02), ("EM"). (Answer ¶23). (The letters "EM" are an abbreviation for the term "Engineer Manual)."

**Response:**

Defendant does not dispute this fact.

26. EM 1110-2-2003, with a reference to ER 1110-2-1150, "Engineering and Design for Civil Works Projects," states that Corps' policy prescribes that mandatory requirements be identified in engineer manuals. (App. 17,18). (The letters "ER" refer to "Engineer Regulation)."

**Response:**

Defendant does not dispute this fact. However, not all requirements set forth in engineer manuals are mandatory. See Def. App. 125-26.

27. The EM further states that "mandatory requirements in this manual are summarized at the end of each chapter." (App. 18).

**Response:**

Defendant does not dispute this fact.

28. Chapter 11 of the EM provides Corps' policy and guidance for multibeam survey systems used on deep-draft navigation projects. (App. 19).

**Response:**

Defendant does not dispute this fact.

29. At the end of Chapter 11 of the EM, the mandatory requirements are identified as follows: (App. 20) "The policy outlined in paragraph 11-4 (USACE Multibeam Policies, Procedures, and Applications) is considered mandatory."

**Response:**

Defendant does not dispute this fact.

30. Subparagraph g. of paragraph 11-4 in the EM identified the mandatory requirements concerning "Dredging Contract Specifications," as follows:

> Measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters (horizontal and vertical control, density, etc.), data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government.

(App. 21).

**Response:**

Defendant does not dispute this fact.

31. The subject dredging Contract did not contain any of this technical information regarding the hydrographic survey system that the Defendant intended to employ on the project. The Contract only stated the following concerning acceptance surveys: "As soon as practicable

after the completion of an entire acceptance area, a final examination of the work will be conducted by the Contracting Officer, at the cost and expense of the Government by acoustic sweep survey system." (App. 22).

**Response:**

Defendant agrees that the contract specifications themselves did not contain the technical information regarding the hydrographic survey system that the Corps intended to use on the project. However, the contract referenced Engineering Circular ("EC") 1130-2-210, 1 October 1998, which in turn stated that "procedural guidance and accuracy standards for performing hydrographic surveys are contained in EM 1110-2-1003." Def. App. 128, 130. The Corps believed that this was sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-65.

Defendant agrees that the contract made the statement in quotations in sentence 2 of paragraph 31, but disagrees that it is the "only" statement concerning acceptance surveys. See Def. App. 130.

32. It was the District's practice for representatives of its survey section to attend the Pre-Construction meeting to explain the survey system Defendant would use and to answer any questions. (App. 23).

**Response:**

Defendant disputes this fact. Defendant agrees that it was the New York District's practice for representatives of the Survey Section to attend the Pre-Construction Conferences for KVK Phase II to answer any questions that contractors might have. Defendant disagrees that

representatives of the Survey Section attended the Pre-Construction Conferences to "explain the survey system Defendant would use." Def. App. 86-87; 233-34 (Declaration of William McDonald ¶ 4). Representatives of the Survey Section would not make a presentation regarding the survey system that the Corps would use, and would only attend to answer questions if they were posed by the contractor. Def. App. 86-87; 233-34 (Declaration of William McDonald ¶ 4).

33. No representatives from the survey section attended the Pre-Construction meeting for Plaintiff's Contract. (App. 24, 25). The survey system and data analysis methods that Defendant intended to use for performing acceptance surveys of Plaintiff's work was not disclosed or discussed at the Pre-Construction meeting. (App. 26, 27). No subsequent, separate meeting to discuss the survey methods was held with the survey section. (App. 28).

**Response:**

Defendant does not dispute these facts. However, William McDonald, a Cartographic Technician with the Survey Section was present at the KVK 8 partnering meeting with Cashman held on June 26, 2003, 11 days after the preconstruction conference. Def. App. 88; 229; 233 (Declaration of William McDonald ¶ 3). Alex Dick, Cashman's Dredging Project Manager, testified that he had the opportunity to meet Mr. McDonald at the partnering meeting. Def. App. 88. Mr. McDonald was not asked what method would be used to process acceptance surveys under the contract. Def. App. 233-34 (Declaration of William McDonald ¶ 4).

In addition, during contract performance, Mr. Dick contacted Richard Kiss, the Chief of the Survey Section, to ask him other questions relating to survey matters other than method that the Corps used to produce acceptance surveys. Def. App. 89.

34. Multibeam sonar equipment generates hundreds of thousands of data points. (Answer ¶10). This data is represented in small, incremental areas, typically one square yard in size, referred to as "bins" or "cells" and that was the information that was plotted by the Corps on its acceptance survey charts. (Answer ¶10).

**Response:**

Defendant does not dispute this fact, but believes that it is stated in a confusing manner. Defendant agrees that multibeam sonar equipment generates "hundreds of thousands of data points." However, Mr. Kiss testified that there were "fifty or sixty" data points generated in a given three foot by three foot cell. Def. App. 58.

35. Multibeam sonar equipment generates three separate data sets, the minimum depth, the average depth, and the map data set. (Answer ¶11).

Response:

Defendant disputes this fact, which is unsupported by the evidence cited. Paragraph 11 of defendant's answer states that:

> three separate data sets used to represent the bathymetry at the time of the survey: the minimum depth, which is used for acceptance; the average depth, which is used for volume calculations; and the map data set, which represents general condition of the bottom at the time of the survey.

In fact, the data sets are generated by computer programs, not the multibeam sonar equipment. See Answer ¶ 10.

36. In the minimum depth method, the computer program selects the shallowest data point to represent the depth within a "bin." As applied by the New York District, if this “minimum depth” or “shallowest depth” method indicated as few as three data points, out of the hundreds in a bin, that measurement was used as the basis to require the re-dredging of a bin if those three data points were above the required grade. (App. 29,30).

**Response:**

Defendant disputes that the process is as simple as a computer program selecting the shallowest data point to represent the depth within a bin. Each spot above grade is manually researched to ensure that it made sense and appeared on multiple passes. Def. App. 57-58. Defendant also disputes that there are “hundreds” of data points in a bin. See Defendant’s Response to Plaintiff’s Proposed Finding of Fact No. 34. Defendant agrees that if at least three confirmed data points in a bin were above the required grade, the contract would require the contractor to eliminate the high spot.

37. In other words, even if these three data points indicated that the material was above grade by as little as one-tenth of a foot, that survey was then utilized by the Corps as the basis to direct the Plaintiff to re-dredge the acceptance area. (App. 31).

**Response:**

Defendant agrees that if three data points indicated that the material was above grade by one-tenth of a foot, the area would not be accepted by the Corps. However, disagrees that the evidence cited supports the statement that the “survey was then utilized by the Corps as the basis to direct the Plaintiff to re-dredge the acceptance area.” Rather, it states that the contractor would

be required to remove the shoal or high spot. Pl. App. 31. Furthermore, the KVK8 contract required Cashman to dredge to a depth of 47 feet, and to remove materials above that depth at its expense. Def. App. 14; 71.

38. In the average depth method, the computer program averages all of the data points within a "bin" to determine the depth. (Answer ¶12).

**Response:**

Defendant agrees that this statement is generally true, but believes that it oversimplifies the process for reasons not relevant to the pending motions.

39. The average method is less likely to result in a requirement to re-dredge because the average of all of the data points in a bin may be below grade even though not all of the data points in the bin are below grade. (App. 32).

**Response:**

Defendant does not dispute this fact.

40. Before it prepared its bid for this Contract, Plaintiff's experience with multibeam surveying consisted of two projects that Plaintiff performed for the New England District where the Corps used multibeam and experimented with different methods of processing the multibeam data. (App. 33).

**Response:**

Defendant has no independent basis to form a belief as to the truth of this proposed finding or fact. Defendant agrees that the evidence cited supports the statement that before it prepared a bid for the KVK 8 contract, Cashman's experience with multibeam surveys consisted of two projects that Cashman performed for the New England District. Mr. Galli, Cashman's dredging project manager, also identified a third contract in Dover, New Hampshire that Cashman had performed requiring the use of multibeam surveys. Def. App. 11-12.

Defendant also agrees that Mr. Dick testified that, for the two dredging projects for the New England District, he thought that the Corps used:

> every technique that's available and looked at the results and they made evaluations based on the different results that you could expect.

See Pl. App. at 14. However, Mr. Dick also testified that "any evaluation that they did was not distributed to us." Pl. App. at 14. Therefore, it is unclear whether Mr. Dick had any basis for his belief.

41. When Plaintiff submitted its bid, Plaintiff was aware that the New York District was using multibeam surveying, and assumed that the New York District would employ the average depth method to process multibeam data. (App. 34).

**Response:**

Defendant agrees that when Cashman submitted its bid, it was aware that the New York District was using multibeam surveying, and that Mr. Bruce Wood, Cashman's former Vice President, testified that he assumed that the New York District would employ the average depth

method to process multibeam data. Def. App. 155. However, Cashman's personnel, including Project Manager James Galli, Dredging Project Manager Alex Dick, Surveyor Daniel Gaudet, and Quality Control Manager Paul Poirier, testified that they had no opinion as to the method that the Corps would use to produce multibeam acceptance surveys at the time that Cashman began work on the KVK 8 contract. Def. App. 173-80.

42. Following contract award, Plaintiff purchased multibeam survey equipment, Odom Echoscan, primarily because it was the type of multibeam survey equipment used by the District. (App. 35).

**Response:**

Defendant agrees that following contract award, Cashman purchased Odom Echoscan multibeam survey equipment. Defendant agrees that Mr. Dick testified that Cashman did so because this was the type of multibeam survey equipment used by the New York District; however, Mr. Dick was incorrect. The New York District owned an Odom Echoscan system, but did not use the system, due to accuracy problems with the system. Def. App. 238 (Declaration of William McDonald ¶ 13).

43. Based on the recommendations of the supplier of the multibeam survey equipment, Plaintiff purchased Hypack software for processing of the multibeam data. (App. 36).

**Response:**

Defendant agrees that this fact appears to be supported by the evidence cited, and has no basis upon which to dispute this fact. However, defendant avers that it is immaterial for the purpose of resolving the pending motions.

44. The supplier informed Plaintiff that the minimum method was not used very often because the results are not representative of the actual depths in an area that has been dredged. (App. 37).

**Response:**

This proposed finding of fact is unsupported by any admissible evidence. Without knowing the identity of the individual who supposedly made this statement to Mr. Dick, or having access to a declaration, affidavit, or testimony from that individual, defendant does not have sufficient information either to confirm or dispute this fact.

45. Prior to notifying the Corps that an area was considered to be completed and therefore ready for an acceptance survey by the Corps, the Contract required Plaintiff to perform a pre-final survey to verify that the dredging had been satisfactorily completed and that the required grade had been achieved. (App. 22).

**Response:**

Defendant disputes this fact as phrased. Defendant agrees that prior to notifying the Corps that Cashman considered an area to be completed and therefore ready for an acceptance survey by the Corps, the Contract required Cashman to produce a pre-final survey to verify that

Cashman believed the dredging had been satisfactorily completed and that the required grade had been achieved. Cashman's surveys were not used to determine that the area had been dredged to the contractually required depth; the Corps' surveys were. Def. App. 130.

46. The contract required the Plaintiff to perform its pre-acceptance surveys using a multibeam survey system, and the Plaintiff did so, but the Contract did not specify what method (minimum or average) Plaintiff was to use to process the data for its pre-final surveys. (Answer, ¶14).

**Response:**

This proposed finding of fact is not supported by the evidence cited. Defendant agrees that contract required the Cashman to perform its pre-acceptance surveys using a multibeam survey system, and that Cashman did so. Defendant agrees that the contract specifications themselves did not contain the technical information regarding the process that Cashman should use to produce its pre-final acceptance surveys. Defendant avers that for acceptance, the relevant inquiry was the process that the Corps would use to produce its final acceptance surveys, as the Corps surveys were used to determine acceptance. Def. App. 130.

Furthermore, the contract specifications provided that "the Contractor's hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys." Def. App. 130.

Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

> Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging

> prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b) of EM 1110-2-1003 (January 1, 2002) provided that "the average depth over the series can overly smooth the data . . . ." Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes." Def. App. 52. Paragraph 11-12(c) also provides that "[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. The Corps believed that these references were sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-66.

47. There was no guidance in the contract, or elsewhere, that specified whether the minimum or average depth method was to be used.

**Response:**

This proposed finding of fact is not supported by the evidence cited. Defendant agrees that contract required the Cashman to perform its pre-acceptance surveys using a multibeam survey system, and that Cashman did so Defendant agrees that the contract specifications themselves did not contain the technical information regarding the process that Cashman should use to produce its pre-final acceptance surveys. Defendant avers that for acceptance, the relevant inquiry was the process that the Corps would use to produce its final acceptance surveys, as the Corps surveys were used to determine acceptance. Def. App. 130.

Furthermore, the contract specifications provided that "the Contractor's hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys." Def. App. 130.

Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

> Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b) of EM 1110-2-1003 (January 1, 2002) provided that "the average depth over the series can overly

smooth the data . . . ." Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes." Def. App. 52. Paragraph 11-12(c) also provides that "[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. The Corps believed that these references were sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-66.

Defendant also disagrees with this proposed finding of fact because Mr. Galli testified that Administrative Contracting Officer Ronald Conetta advised him to write a letter seeking formal direction on the issue of how multibeam acceptance surveys would be processed "many times." Def. App. 92.

48. The Contract only required that Plaintiff's pre-final "hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys." (App. 22). None of these referenced standards addressed the data processing method for multibeam surveys. (App. 38, 39).

**Response:**

This proposed finding of fact is not supported by the evidence cited. Defendant agrees that contract required the Cashman to perform its pre-acceptance surveys using a multibeam survey system, and that Cashman did so. Defendant agrees that the contract specifications themselves did not contain the technical information regarding the process that Cashman should use to produce its pre-final acceptance surveys. Defendant avers that for acceptance, the relevant

inquiry was the process that the Corps would use to produce its final acceptance surveys, as the Corps surveys were used to determine acceptance. Def. App. 130.

Defendant agrees that the contract specifications themselves did not contain the technical information regarding the process that Cashman should use to produce its pre-final acceptance surveys. Defendant avers that for acceptance, the relevant inquiry was the process that the Corps would use to produce its final acceptance surveys, as the Corps surveys were used to determine acceptance. Def. App. 130.

Furthermore, the contract specifications provided that "the Contractor's hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys." Def. App. 130.

Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

> Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b) of EM 1110-2-1003 (January 1, 2002) provided that "the average depth over the series can overly smooth the data . . . ." Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes."

Def. App. 52. Paragraph 11-12(c) also provides that "[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. The Corps believed that these references were sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-66.

49. After discussing the different methods of processing the data, including the minimum and average depth methods, Plaintiff chose to use the average depth method to represent the results of its multibeam surveys. (App. 40).

**Response:**

Defendant agrees that this proposed finding of fact is supported by the testimony of Mr. Galli, and defendant does not have a basis upon which to dispute this fact. However, Mr. Galli testified that the discussions referred to took place between Mr. Dick, Mr. Gaudette, and unspecified "other people that had been doing that type of work," not employees or representative of the Corps. See Pl. App. 40. Furthermore, it is unclear when these discussions took place, because when work began on the job, Mr. Galli and Mr. Dick did not have an opinion regarding the method that the Corps would use to produce multibeam acceptance surveys. Def. App. 172-80. In addition, defendant notes that Mr. Galli is referring to his decision to produce surveys for material unsuitable for placement in the Historic Area Remediation Site ("HARS") using the average depth. Pl. App. at 41. These surveys would be payment surveys, not acceptance surveys, as no acceptance surveys were performed for this material, since it was all above the contractually required depth. See Def. App. 237 (Declaration of William McDonald ¶

9). The Corps did pay for volume removed based upon surveys produced using the average depth. Def. App. 123; 167.

50. Plaintiff used the results obtained by using the average depth method on a daily basis to evaluate and direct the performance of the dredging, and based on the previous day's survey, Plaintiff would determine each day how deep to dredge. (App. 41).

**Response:**

Defendant does not dispute this fact. However, Mr. Dick also testified that Cashman would produce multibeam surveys using the minimum depth to determine how to set the dredge. Def. App. Def. App. 89-91. Mr. Gaudet also testified that he would produce surveys using the minimum depth out of "curiosity." Def. App. 94. Mr. Galli testified that Cashman produced surveys using the minimum depth as part of an investigation into why Cashman was not passing the Corps' acceptance surveys. Def. App. 95-96.

51. When Plaintiff completed the first phase of the dredging, excavation of the upland disposal material, it submitted its after-dredge surveys based on the average depth method, the Corps accepted the work based on the average depth method, and the Corps paid for the work based on the average depth method surveys. (App. 42,43).

**Response:**

Defendant disputes that the Corps produced acceptance surveys for the upland material based upon the average depth method, or any other method. Surveys for the upland material were only performed for payment purposes, not acceptance. Def. App. 242 (Declaration of

Salvatore DiDato ¶ 10); 237 (Declaration of William McDonald ¶ 9). Because all of the "upland material" was above the required grade no acceptance survey was performed. Id. Rather the "upland material" dredging was considered complete when a specific type of bucket (known as an "environmental bucket") was no longer able to dig material. Def. App. 72-73. Defendant agrees that Cashman submitted its payment surveys for the upland work, which were produced using the average depth method, and that the Corps paid for the work based upon this method.

52. Plaintiff proceeded to perform the surveys for its remaining work, excavation of the HARS material, using the same average depth method. (App. 43).

**Response:**

Defendant does not dispute that Cashman produced surveys for remaining work, including excavation of the HARS material, using the average depth. However, Cashman ceased using the average depth to produce its pre-final acceptance surveys in October 2004. Def. App. 97-98.

53. The first acceptance area of HARS material completed under the Contract was acceptance area 1, where the dredging was performed by a subcontractor. Plaintiff submitted its first pre-final survey on December 1, 2003, and clearly identified by a large notation on the face of its submitted survey chart that the survey used the average depth method. (App. 44).

**Response:**

Defendant does not dispute this fact. However, it was not the policy of the New York District for the Survey Section to receive the contractor's pre-final acceptance surveys, and the

Survey Section did not receive Cashman's pre-final acceptance surveys. Def. App. 99-101. The pre-final acceptance surveys were furnished to the Construction Division, who let the Survey Section know that the contractor believed that it was ready for an acceptance survey. Def. App. 99-102; 183-84. The Survey Section did not need to receive Cashman's pre-final acceptance surveys, because Corps surveys were used for final acceptance, not Cashman's surveys. Def. App. 130.

Cashman's pre-final acceptance surveys were provided to Mark Alton, who was a project engineer for the Corps. Def. App. 99-102; 183-84. Mr. Alton was responsible for administrative functions and quality assurance, had no training in multibeam surveys, and did not know that there were multiple ways to produce them. Def. App. 102-06. If the pre-final survey submitted by Cashman appeared to be a blank piece of paper showing no high spots above the contractually required project depth, Mr. Alton would simply call the Survey Branch and represent that Cashman was ready for a final acceptance survey. Def. App. 100; 183-84.

54. Defendant accepted the work in Acceptance Area 1 based on the average depth method multibeam survey. (App. 45, 46).

Response:

Defendant disputes this fact. Defendant accepted Area 1 based upon a final acceptance survey produced using the minimum depth. Def. App. 237 (Declaration of William McDonald ¶ 10). Cashman appears to have produced its pre-final acceptance survey using the average method, but the work was accepted because met the contractually required depth according to an acceptance survey performed by the Army Corps of Engineers, which was produced using the

minimum depth, not the average depth. Def. App. 30; 237 (Declaration of William McDonald ¶ 10).

55. Plaintiff proceeded to dredge the remaining acceptance areas and continued to use the average depth method to interpret the multibeam survey data. (App. 43). On at least seven occasions, when Plaintiff submitted its pre-final surveys, it used the average depth method and clearly identified that the average depth method was used. (App. 43).

**Response:**

Defendant agrees that Cashman proceeded to dredge additional acceptance areas, and apparently continued to use the average depth to produce its pre-final acceptance surveys. However, Cashman ceased using the average depth method to produce its pre-final acceptance surveys in October 2004. Def. App. 97-98. Defendant also agrees that on a number of occasions, when Cashman submitted its pre-final acceptance surveys, it indicated that the surveys were produced using the average depth.

Cashman's pre-final acceptance surveys were provided to Mark Alton, who was a project engineer for the Corps. Def. App. 99-102; 183-84. Mr. Alton was responsible for administrative functions and quality assurance, had no training in multibeam surveys, and did not know that there were multiple ways to produce them. Def. App. 102-06. If the pre-final survey submitted by Cashman appeared to be a blank piece of paper showing no high spots above the contractually required project depth, Mr. Alton would simply call the Survey Branch and represent that Cashman was ready for a final acceptance survey. Def. App. 100; 183-84.

56. As the work progressed, Defendant repeatedly notified Plaintiff that the Corps' acceptance surveys indicated that material remained above the contract excavation limits and directed Plaintiff to redredge those areas. (Answer, ¶19).

**Response:**

Defendant disputes this fact as stated, but agrees that the work progressed, Defendant repeatedly notified Cashman that the Corps' acceptance surveys indicated that material remained above the contractually required depth, and directed Cashman to remove the high spots.

57. The survey charts that Defendant provided Plaintiff did not identify the survey system or data analysis method employed by the Defendant to reject the work as unacceptable. (App. 47). The only information provided by Defendant was to note that: "The sounding data depicted on this map was collected using Class I survey standards. . ." and that "The data on this map is representative of a larger data set."

**Response:**

Defendant does not dispute this fact. However, Mr. Galli testified that Administrative Contracting Officer Ronald Conetta advised him to write a letter seeking formal direction on the issue of how multibeam acceptance surveys would be processed "many times." Def. App. 92. In addition, The Corps provided Cashman with survey results showing the high spots. Def. App. 132-48; 243-45.

58. When the Plaintiff furnished the pre-final surveys to the Corps' construction personnel who administered the Contract, the Corps' personnel did not provide the pre-final

surveys to the Corps' survey branch. The Corps' construction personnel merely requested the Corps' survey branch to perform a final acceptance survey. (App. 48).

**Response:**

Defendant does not dispute this fact. The Survey Section did not need to receive Cashman's pre-final acceptance surveys, because Corps surveys were used for final acceptance, not Cashman's surveys. Def. App. 130.

59. The Corps' construction personnel were not aware that there were different ways to process multibeam data until approximately midway through the contract performance. (App. 49, 50).

**Response:**

Defendant does not dispute this fact. The employees of the Construction Branch that Cashman submitted its pre-final acceptance surveys to served an administrative, quality assurance role, and did not have any expertise in multibeam surveying. Def. App. 100-113; 189-92. They did not know that there were different ways to produce surveys until the issue was raised because of the dispute with Cashman that is the subject of the present litigation. Id.

60. Plaintiff notified Defendant that it considered the additional excavation to be extra work for which it was entitled to additional compensation. (Answer, ¶20).

**Response:**

Defendant does not dispute that Cashman notified the Corps that it believed that it had performed additional excavation and was entitled to additional compensation. However,

defendant disputes that the excavation was additional, or that Cashman is entitled to additional compensation, because the contract required Cashman to dredge the area to a depth of 47 feet, and to remove any material found shallower than 47 feet at Cashman's expense. Def. App. 71. The contract also specified that Cashman would be paid for material removed up to a depth of 48.5 feet, but not beyond that. Def. App. 71; 74.

61. As the work proceeded, Defendant failed to identify the data analysis method, causing Plaintiff to rely, to its detriment, on the average depth surveying method.

**Response:**

This is not a fact, but rather, argument and legal conclusions. Cashman never inquired regarding the method that the Corps would use to produce final acceptance surveys prior to submitting its bid for the contract. Def. App. 10.

Furthermore, the contract specifications provided that "the Contractor's hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys." Def. App. 130.

Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

> Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b) of EM 1110-2-1003 (January 1, 2002) provided that "the average depth over the series can overly smooth the data . . . ." Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes." Def. App. 52. Paragraph 11-12(c) also provides that "[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. The Corps believed that this was sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-65.

Furthermore, Mr. Galli testified that Mr. Conetta advised him to write a letter seeking formal direction on the issue of how acceptance surveys would be produced "many times." Def. App. 92. In addition, the contract required Cashman to submit the proposed method for performing its pre-final acceptance surveys to the Corps for approval, and Cashman did not do so. Def. App. 130; Def. App. 224-26; 241 (Declaration of Salvatore J. DiDato ¶ 7). Furthermore, although Cashman was not passing numerous Government acceptance surveys, and had conducted an investigation into whether it would pass the surveys using a minimum depth product, Cashman did not change its course of action or seek formal direction. Def. App. 95-96.

62. Defendant did not furnish the technical information that its internal guidance, EM 1110-2-1003, had required to be in the Contract specifications, until October 1, 2004. (App. 51-53).

**Response:**

Defendant disputes this fact. First, Mr. Galli's serial letter of August 31, 2004 stated that he had been informed on that day that the Corps would produce and had been producing multibeam acceptance surveys using the minimum depth. Def. App. 114-115.

the contract specifications provided that "the Contractor's hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys." Def. App. 130.

Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

> Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b) of EM 1110-2-1003 (January 1, 2002) provided that "the average depth over the series can overly smooth the data . . . ." Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes." Def. App. 52. Paragraph 11-12(c) also provides that "[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily

the absolute elevation over an object." Def. App. 52. The Corps believed that this was sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-65.

The Corps did not know that Cashman was confused, because Cashman waited until August 31, 2004 to seek formal direction from the Corps. Def. App. 114-15.

63. On October 1, 2004, after Plaintiff had dredged most of the acceptance areas, Defendant notified Plaintiff that its acceptance surveys had employed, and would continue to employ, the minimum depth method. (Answer, ¶21).

**Response:**

Defendant agrees that Cashman has correctly characterized the October 1, 2004 letter. However, Mr. Galli's serial letter of August 31, 2004 stated that he had been informed on that day that the Corps would produce and had been producing multibeam acceptance surveys using the minimum depth method. Def. App. 114-15.

64. Not only did the Defendant fail to disclose that it was processing the survey data in a manner that had not been disclosed to the Plaintiff, the Defendant applied a more stringent tolerance to determine whether a minimum depth acceptance survey had "passed" than was customary in the Corps of Engineers or than was anticipated by Corps' policy in effect when the Plaintiff's contract was awarded. (App. 54, 55).

**Response:**

Defendant disputes this fact. Mr. Kiss testified that the quality control procedures employed by the Corps to ensure the quality and accuracy of their survey data were more

stringent than was required by Corps manuals, not that the Corps was imposing more stringent requirements upon the contractor. Def. App. 117-18. This was done to ensure that the Corps could identify high spots in the interest of navigational safety, and that the Corps would not send contractors after "fake" high spots that did not actually exist. EM 1110-2-1003, 1 January 2002**,** Table 3-1, identifies the accuracy standards for Corps surveys as "minimum performance standards." Def. App. 131.

65. The version of EM 1110-2-1003 in effect at the time of contract award provided that for dredging acceptance the minimum depth method shall not be used. (App. 20,56,57).

**Response:**

Defendant disputes this fact, which is unsupported by the evidence cited. Mr. Wood's testimony states that EM 1110-2-1003 provided that the minimum depth method was not to be used for acceptance surveys based upon paragraph 11-12(b), which states that the minimum depth method "shall not be used for dredging payment surveys, and should be used with caution on navigation project surveys." Def. App. 52. Payment surveys and navigation project surveys are not acceptance surveys. Navigation project surveys are not at issue in this case, and were not performed as part of Cashman's contract. Def. App. 122-24. The Corps produced payment surveys using the average depth method. Def. App. 123-24. EM 1110-2-1003 paragraph 11-12(b) specifically provided that "[t]he minimum depth method within a bin area may be used for some strike detection purposes." Def. App. 52.

66. On April 1, 2004, during Plaintiff's performance of its contract, the Corps issued a new version of EM 1110-2-1003 providing that the minimum (also referred to as "shoalest") depth method was to be used for dredging acceptance. (App. 58).

**Response:**

Defendant does not dispute this fact, but avers that it is immaterial for the purpose of resolving the pending motions. The New York District did not change its method of processing acceptance surveys as a result of the new version of EM 1110-2-1003. Def. App. 59.

67. As a result of the Defendant's failure to comply with its internal guidance, and as a further result of its failure to promptly notify the Plaintiff that the average depth method it was using was not acceptable to the Corps, the Plaintiff was unnecessarily required to redredge and incur additional costs.

**Response:**

The proposed fact in paragraph 67 constitutes conclusions of law and Cashman's characterization of its case, to which no response is required. To the extent that they may be deemed facts, defendant disputes these facts. Cashman was required to dredge the contractually defined area to a contractually required depth of 47 feet below mean low water, and to remove material above the required dredging depth at Cashman's cost. Def. App. 71. Any "additional costs" incurred by Cashman were a result of Cashman's failure to make inquiry regarding the contract requirements prior to submitting its bid, or to seek formal direction, as Mr. Galli testified that Mr. Conetta recommended, during performance.

68. On July 22, 2005, Plaintiff submitted a properly certified claim for the additional costs incurred resulting from the Defendant's use of an undisclosed survey acceptance criteria. (Answer ¶25). On October 26, 2005, the Contracting Officer issued a Final Decision denying the claim.

**Response:**

Defendant does not dispute this fact.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Tara Kilfoyle
TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972

OF COUNSEL:
Donald M. Harris
Counsel
U.S. Army Engineer District
New York

January 31, 2008

CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2008, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED STATEMENTS OF FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Tara J. Kilfoyle
TARA J. KILFOYLE