IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**SUPPLEMENTAL APPENDIX**

# SUPPLEMENTAL APPENDIX

## INDEX


| PAGE | DESCRIPTION |
|---|---|
| 1 | EC 1130-2-210 - pp. 1 - 3 |
| 4 | Corps Letter Dated August 18, 2004 |
| 6 | Corps Letter Dated August 19, 2004 |
| 8 | Corps Letter Dated August 30, 2004 |
| 10 | Corps Letter Dated November 29, 2004 |
| 12 | Deposition of Ronald Conetta - p. 31 |
| 13 | Deposition of William Bruce Wood - pp. 34 - 35 |
| 15 | Deposition of William Bruce Wood - pp. 22 - 23 |
| 17 | Cashman Dredge Plan |
| 18 | Deposition of Richard Kiss - pp. 18 - 20 |
| 21 | Deposition of Richard Kiss - p. 31 |
| 22 | Deposition of Richard Kiss - p. 14 |
| 23 | Deposition of Richard Kiss - p. 30 |
| 24 | Deposition of Richard Kiss - p. 49 |
| 25 | Solicitation Amendment No. 0005 |
| 27 | Deposition of Harold Hawkins - pp. 52 - 53 |
| 29 | Specification Section 02900 - pp. 2, 8, 11 - 13 |
| 34 | Specification Section 01330 - pp. 10 - 12 |
| 37 | Quality Control Survey Plan |
| 39 | Deposition of John James Galli - p. 18 |
| 40 | Deposition of Alex Dick - p. 28 |
| 41 | Deposition of Paul Poirier- p. 17 |

# INDEX


| PAGE | DESCRIPTION |
|---|---|
| 42 | Corps Letter Dated November 22, 2004 |
| 44 | Claim Exhibit 17 |
| 45 | Deposition of William Bruce Wood - p. 53 |
| 46 | EM 1110-2-1003 - pp. 4 - 13, 14 |
| 48 | Deposition of Richard Kiss - pp. 47 - 51 |
| 53 | Deposition of William Bruce Wood - p. 38 |
| 54 | Deposition of Ronald Conetta - p. 51 |
| 55 | Deposition of Ronald Conetta - pp. 23 - 25 |
| 58 | Deposition of Mark Alton - pp. 11 - 13 |
| 61 | Deposition of Steven Weinberg - p. 27 |
| 62 | Deposition of Steven Weinberg - p. 10 - 11 |
| 64 | Deposition of Richard Kiss - p. 18 |

DEPARTMENT OF THE ARMY
U. S. Army Corps of Engineers
Washington, D.C. 20314-1000

EC 1130-2-210

CECW-OD/CECW-EP

Circular
No. 1130-2-210

1 October 1998

www.MilitaryManuals.Com

EXPIRES 30 SEPTEMBER 2000
Project Operations
HYDROGRAPHIC SURVEYING

1. Purpose. This circular disseminates updated policies, revised accuracy standards, and technical procedures for hydrographic surveying, superseding portions of EM 1110-2-1003, Hydrographic Surveying. New technical guidance on the use and calibration of acoustic multibeam survey systems is provided.

2. Applicability. This circular is applicable to USACE commands having responsibility for performing or contracting hydrographic measurement, construction payment, or condition surveys on civil works navigation or flood control projects.

3. References.

a. ER 1130-2-520, Navigation and Dredging Operations and Maintenance Policies.

b. EM 1110-1-2909, Geospatial Data and Systems.

c. EM 1110-2-1003, Hydrographic Surveying.

4. Distribution. Approved for public release. Distribution is unlimited.

5. Background. Procedural guidance and accuracy standards for performing hydrographic surveys are contained in EM 1110-2-1003. Since this manual was last updated in 1993-1994, significant technological improvements have occurred in vessel positioning (Global Positioning System), depth measurement (shallow-water acoustic multibeam swath systems), and near real-time data acquisition, editing, and processing systems. This new technology has been rapidly acquired by USACE commands and has resulted in significantly improved data accuracy and reliability.

6. Policy. Mandatory use of EM 1110-2-1003 for dredging measurement and payment surveys is prescribed by ER 1130-2-520. The revised accuracy standards and related technical guidance

contained in this circular supersede applicable portions of EM 1110-2-1003.

7. Scope. The following appendices are attached to this circular.

a. Appendix A: Hydrographic Survey Accuracy Standards and Classifications. New survey classifications and accuracy performance standards have been developed for USACE work. These accuracy standards supersede those currently shown in EM 1110-2-1003.

www.MilitaryManuals.Com
Presentation copyrighted 2021

b. Appendix B: Use of Acoustic Multibeam Survey Systems on Navigation, Flood Control, and Dredging Projects. This appendix disseminates policy for acquiring and using multibeam survey systems on Corps navigation and flood control projects, for design, construction, dredging measurement and payment, and project condition surveys. It replaces and updates EC 1130-2-205 that was first published on 1 July 1996 and expired on 30 June 1998.

c. Appendix C: Field Calibration Procedures and Quality Assurance Procedures for Acoustic Multibeam Survey Systems. This appendix describes current technical procedures for field calibration of acoustic multibeam systems. It contains recommended guidelines for quality control and quality assurance processes and allowable tolerances. Criteria contained in this appendix is guidance, not policy.

8. Proponency. This circular is issued jointly by the Operations Division and the Engineering and Construction Division, Directorate of Civil Works. The proponents for policy contained in this circular are CECW-OD (ATTN: Tom Verna) and CECW-EP (ATTN: Bill Bergen). Technical issues shall be addressed to CECW-EP (Bill Bergen) or CETEC-TD-G (Robert Mann). Comments, recommended changes, or waivers to this circular should be forwarded to CECW-EP. This circular may be reissued prior to its

expiration. Portions of policy contained in this circular will eventually be incorporated in reference 3a. Technical guidance will be incorporated into reference 3b when it is next published during FY 2000.

FOR THE COMMANDER:

www.MilitaryManuals.Com

Presentation

3 Appendices
APP A - Hydrographic Survey Accuracy Standards and Classifications
APP B - Use of Acoustic Multibeam Survey Systems on Navigation, Flood Control, and Dredging Projects
APP C - Field Calibration Procedures and Quality Assurance Procedures for Acoustic Multibeam Survey Systems

ERIC R. POTTS
Colonel, Corps of Engineers
Executive Director of Civil Works

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

18 August 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Government Survey of Acceptance Area 4A.

Serial Letter No. G-083

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-079, dated 26 June 2004 (received 26 July 2004); Subject: Government Examination and Acceptance of Area 4A.

c. USACE Survey Map No. 2669D/N, dated 16 August 2004

A hydrographic survey was conducted on 27 July and 9 August 2004 upon your notification that Acceptance Area 4A under the subject contract was ready for acceptance, ref. b. The results of the survey, ref. c, indicate that the contract grade elevation of -47.00 feet MLW in Aceptance Area 4A has not been achieved.

As a result, Area 4A cannot be accepted at this time. You are reminded that in accordance with Reference a, if required contract grade is not demonstrated after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

19 August 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Government Survey of Acceptance Area 5.

Serial Letter No. G-084

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-081, dated 28 June 2004 (received 28 July 2004); Subject: Government Examination and Acceptance of Area 5.

c. USACE Survey Map No. 2678D/N, dated 19 August 2004

A hydrographic survey was conducted on 5 August 2004 (4th survey) upon notification that Acceptance Area 5 under the subject contract was ready for acceptance, ref. b. The results of the survey, ref. c, indicate that the contract grade elevation of -47.00 feet MLW in Acceptance Area 5 has not been achieved.

As a result, Area 5 cannot be accepted at this time. You are reminded that in accordance with Reference a, if required contract grade is not demonstrated after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

30 August 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Government Survey of Acceptance Area 1/3A.

Serial Letter No. G-086

Gentlemen,

References:

a. Specification Section 00800, paragraph 1.15 "Final Examination and Acceptance"

b. Jay Cashman, Inc. Serial Letter No. S-089, dated 24 Aug 2004; Subject: Government Examination and Acceptance of Area 1/3A.

c. USACE Survey Map No. 2692D, dated 30 August 2004

A hydrographic survey was conducted on 25 August 2004 upon notification that Acceptance Area 1/3A under the subject contract was ready for acceptance, ref. b. The results of the survey, ref. c, indicate that the contract grade elevation of -47.00 feet MLW in Acceptance Area 1/3A has not been achieved.

As a result, Area 1/3A cannot be accepted at this time. You are reminded that in accordance with Reference a, if required contract grade is not demonstrated after 2 Government surveys, the cost of a third, and all subsequent Government surveys will be charged to Jay Cashman, Inc. at the rate of $8,200.00 per occurrence.

Upon satisfactory completion of the required excavation please formally notify this office. If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

29 November 2004

Jay Cashman, Inc.
549 South St.
P.O. Box 692396
Quincy, MA 02269-2396

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), Government Surveys

Serial Letter No. G-104

Gentlemen,

References:

a. Jay Cashman, Inc. Serial Letter No. 158, dated 1 November 2004; Subject: Area 3 et al

b. Specification Section 00800, Special Contract Requirement 1.15 'Final Examination and Acceptance'.

c. Specification Section 01270 'Measurement and Payment'

We have reviewed your letter concerning alleged "additional dredging" ref a.

Our review of the referenced 25 October 2004 survey results identified an area above the required contract grade elevation of -47 feet MLW. This "high spot" was determined to have been the result of your most recent activity in that area and was identified as requiring removal.

Your attention is called to Ref b which states requirements for acceptance. This paragraph states in part: "…A final examination will be conducted by the Contracting Officer…Should any shoals, lumps, be disclosed by this examination, the contractor will be required to remove same. Also, Paragraph 1.2.2.2 of ref c allows for payment of dredged materials up to 1.5 feet beyond the contract depth of -47 feet MLW.

Our direction to you for the removal of the aforementioned "high spot" is consistent with the contract requirements and considered appropriate.

If you have any questions regarding this matter, please contact Mr. Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-D/Leach

point. From the beginning, no, I was not aware of it.

Q But at some point during the performance of the project you became aware of it?

A Yes, it's -- yeah.

Q Do you recall seeing any of the pre acceptance surveys that Cashman submitted that included the notation average sounding?

A That I don't recall.

Q Did anyone who worked for you mention having seen such notations on pre acceptance surveys?

A I don't recall that they did, but -- well, I don't recall that they did.

Q Do you recall anyone from the Cashman organization coming to you during the performance of the project and asking you what data processing method the New York District was using?

A Specifically, no, I don't recall.

Q Do you recall telling anyone at some point that the average sounding method was being used by the New York District?

A. I can't remember the exact date, but there was discussions at the weekly meetings about it.
Q. Did you regularly attend the weekly meetings?
A. I did not go to every one, no.
Q. Did you attend some of them?
A. Yes.
Q. Do you remember the nature of the discussion at the weekly meetings regarding acceptance surveys?
A. It was a question that was asked, I believe, early on and then kind of got dropped from the agenda until we started submitting surveys towards the end of the job.
Q. Do you remember who the request was asked by?
A. Jim Galli, myself. Whether Paul was there, Paul Poirier, the QC manager. Alex. I can't remember exactly who brought it up. Most likely, it was Jim.
Q. Do you remember who the question was asked to?
A. Mark Alton was usually there, and Sam Didato was there and Ron Conetta.
Q. Did any of these individuals give you a response --
A. No.

Q. What did they tell you?
A. They'll get back to us.
Q. Was the issue raised before you began work on the contract?
A. No.
Q. Can you give me an estimate of the time frame when the issue was first raised?
A. Around the beginning of '03.
Q. Do you know what month?
A. January, February.
Q. Did the issue continue to be raised at weekly meetings?
A. At first when we brought it up, it kind of disappeared until we started getting into submitting areas for acceptance towards the summer of '04, I believe.
Q. Were you told anything other than that Mark, Sam, and Ron would get back to you?
A. We really didn't have a definitive answer until it was the end of August, September, and finally got something in writing, I believe, in October.
Q. Did any employee of the Corps ever tell you personally that the average method would be used to process acceptance surveys?

Q. Did Cashman perform surveys other than progress surveys for payment?
A. Yes.
Q. What type?
A. We would go out and survey every day areas that were dredged the day before.
Q. Why would you do that?
A. To check the grade.
Q. Did Cashman survey entire areas of the project before submitting them for acceptance?
A. We would -- I don't understand the question.
Q. Okay. Would they do a survey of a whole project area at once prior to submitting it for acceptance by the Corps?
A. We would survey an area that we felt was to grade. We wouldn't survey an area that we didn't think was to grade.
Q. Right. That's my question, when you thought it might be to grade.
A. Yes.
Q. How deep were the dredge cuts initially set for the KVK 8 contract?
A. On the screen of the dredge?
Q. Yes.

A. We split the difference between the required depth and the payment of overdepth, which was a foot and a half. I believe it was 48 -- we were digging to 48, and then we got paid to 49 1/2. I believe those were the numbers. And we set the screen on the computer between those two elevations.

Q. Okay. Let's just take a step back. What was the contract required grade -- contract actually required grade?

A. I believe it was 48 or 47. I can't remember. The numbers all run together.

Q. That's all right. And how much overdepth was paid overdepth?

A. A foot and a half.

Q. Okay. And so where would you set the cuts to initially?

A. Between the minimum required depth and the foot and a half overdepth.

Q. Why did you decide to do that?

A. Because our previous experience, it showed us that that was the best way to get it cleared and not overdig too much.

Q. Did you participate in preparing Cashman's bid

Section 02900

# DREDGE PLAN

Captain A.J. Fournier

Dredging will be accomplished with the Dredge "Captain A.J. Fournier" using a 7 CY backhoe style bucket for the HARS material. A Liebherr 994 excavator will be the prime mover. The cut sheets are attached showing a plan view of the cuts. The basic cut width is 50 feet. Dredging will be undertaken to the design depth plus 1.5 foot or 48.5 feet MLLW. Material will be placed in a scow and taken to the HARS for disposal. Each scow will be equipped with a scow monitoring system.

Horizontal and vertical control will be maintained via an IHC guidance system. This system incorporates a Real Time Kinematics Global Positioning System and is a satellite based state of the art positioning system. To provide accurate positioning on all three axes the system integrates the satellite position with the readings from the angle sensors to provide the operator with a cross section and plan view of the bucket position.

Dredge cuts will initially be set for –48' MLLW to avoid over dredging. The New Jersey Mercator state plane 1983 coordinate system will be the basis for the horizontal coordinates. Vertical control will be determined by using a Hazen Electronic Tide Gauge adjusted for Mean Lower Low water and input into the IHC RTK guidance system.

Daily surveys will be conducted of the areas completed the prior shift. The survey results will be given to the dredge Captains and the equipment operators. The results of the survey will be used to critique the methods used to complete the work and make any needed adjustments to the method, resulting in a more efficient process.

associated with this particular contract or another one. I was consulted on some minor issues, minor questions.

Q Would it be correct for me to assume that with regard to surveying the language and contracts it was sort of boiler plate across the KVK8 projects?

A That sounds about right, yeah.

Q Do you know whether the KVK8 contract did indeed include any measurement and payment provisions stipulating the type of survey system that was to be used?

A No, I don't.

Q Do you know whether this engineer circular defines the accuracy that the Core of Engineers surveys are required to meet?

A Yes, it does. I would like to qualify that.

Q Sure.

A It's always our feelings within the New York district that it defines minimum criteria.

Q I'll direct your attention to page A3 where there's a table. You see the table

A1 in the middle of the page, Mr. Kiss?

A Yes, I do.

Q In the first column under class one there is a column, hard material, do you see that?

A Right.

Q It speaks in terms of depth accuracy and in one place it says acoustic depths greater than forty feet plus or minus one foot, is that an indication of the accuracy that's to be achieved?

A I believe that's an indication of the minimum requirements and what they feel is the -- we always felt we did much better than that.

Q Better in what sense?

A We felt that our product was good to at least two tenths of a foot.

Q In other words you felt that if you surveyed an area that showed a hit of two tenths of a foot that that was accurate?

A Yes.

Q Even though that was a tighter tolerance than at least this table required?

A Absolutely.

Q Is the fact that you felt you could achieve that tolerance something that was communicated in any of the plans and specifications on the KVK8 projects that your aware of?

A Not that I'm aware of.

Q In your job did you have much interaction with the dredging contractors who were performing these projects?

A Only during meetings that were held here at the KVK8 office.

Q What sort of meetings?

A Whenever there was a problem about surveys or questions about surveys they would call us in and try to resolve those issues.

Q Did you have any working relationships with any of the people from the various companies over the years?

A Our contact was not that consistent so I would say no.

Q Is there any particular dredging contractor who you felt had more experience than another in doing these projects for the

method?

A No.

Q Why not?

A For the very reason I stated before, that if the ship is going to come in and hit something it's going to hit the shoalest thing out there, not the sounding closest to the center of the cell.

Q What kind of material are we dealing with here for the most part? I understand that some of it is rock, what else generally would you have been dealing with?

A There's some soft material, but as far as I was concerned everything here was rock, that had to be my attitude.

Q I can understand that you might be concerned about a vessel striking rock, but would you also have concern about a vessel striking soft material?

A Not to the same degree, but yes.

Q Why?

A We don't want to strike anything out there and we want to make sure the information we provide is the most accurate.

A Yes.

Q For example?

A Manufacturers guidelines as to how to utilize the equipment that was within the system.

Q Did the New York district have it's own way of doing things that might have differed in some ways from the circular?

A Yes.

Q Would that have involved the manner in processing data?

A Yes, I believe so.

Q What would you say was different or unique about the way New York did things?

A Because of the nature of KVK8 we realized early on that it was important to produce the most accurate survey possible. As a result our initial thrust was to insure the quality control of the product that came out of the field. We took extensive pain to make sure the data we received out of the field was both reproducible and accurate. We instituted a lot of quality control procedures that were not in the manual and in fact that were

Q In other words three feet by three feet roughly?

A Yes.

Q Shot point depth nearest the bin centroid shall be used, what does that mean "nearest the bin centroid?"

A Again, there are many ways to present the data. This statement is saying that the data, that sounding closest to the center of the cell should be used.

Q And then it goes on, after a semicolon, to say "not average or minimum or shoal base depth." And yet, if I understood your testimony, the New York district was using the minimum or shoal base depth?

A Yes, absolutely.

Q Was that not in contradiction to what the statement in the manual said to do?

A Absolutely.

Q Did you need any kind of special authority to do that?

A No, guidelines did not write out a requisite.

Q Did you ever use the centroid

clauses for insertion, would I be correct in my recollection?

A Yes, you would.

Q I'll direct your attention to page 1145, which I think is the last page, and there's a chart there that provides recommended depth selection and data processing?

A Right.

Q First indented listing, "depth selection method used to select representative shoalest depth from multiple depths of the cell." So this manual is making it clear that that's what's recommended?

A Yes.

Q No longer saying, as earlier versions did, that minimum should not be used or centroid should be used, that's a change, I take it?

A Everybody finally saw things my way.

Q So you're recommendations led to this change in the manual?

A Yes, or at least had a lot of

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE OF PAGES | |
|---|---|---|
| J | 1 | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 0005 | 14-Mar-2003 | W16ROE-2338-0139 | |

6. ISSUED BY CODE DACW51

USA ENGINEER DISTRICT, NEW YORK
ATTN: CENAN-CT ROOM 1843
26 FEDERAL PLAZA (DACW51)
NEW YORK NY 10278-0090

7. ADMINISTERED BY (If other than item 6) CODE

**See Item 6**

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)

CODE FACILITY CODE

| | |
|---|---|
| X | 9A. AMENDMENT OF SOLICITATION NO. DACW51-03-B-0004 |
| X | 9B. DATED (SEE ITEM 11) 21-Jan-2003 |
| | 10A. MOD. OF CONTRACT/ORDER NO. |
| | 10B. DATED (SEE ITEM 13) |

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer [ ] is extended, [X] is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

[ ] A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

[ ] B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

[ ] C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

[ ] D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor [ ] is not, [ ] is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The purpose of this amendment is to incorporate the attached changes to the specifications. The date of receipt of bids, 25 March 2003 at 11:00 AM, remains unchanged. All other terms remain unchanged as a result of this amendment.

NOTE: Bidders must acknowledge receipt of this amendment by the date specified in the solicitation (or as amended) by one fo the following methods: in the space provided on the SF1442, by separate letter, or by telegram, or by signing block 15 below. FAILURE TO ACKNOWLEDGE AMENDMENTS BY THE DATE AND TIME SPECIFIED MAY RESULT IN REJECTION OF YOUR BID IN ACCORDANCE WITH THE LATE BID, LATE MODIFICATIONS OF BIDS OR LATE WITHDRAWAL OF BIDS (FAR14.304).

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>TEL: EMAIL: | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br>__________<br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY __________<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>14-Mar-2003 |

EXCEPTION TO SF 30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

**SUMMARY OF CHANGES**

SECTION 00010 - SOLICITATION CONTRACT FORM

The following have been added by full text:

AMENDMENT #5

**DACW51-03-B-0004**

**Amendment No. 5**

Bid opening date is 25 March 2003 at 11:00 A.M., local time.

The following changes shall be made to the specifications.

SECTION 02900

1-Replace paragraph 5.1.4 in Amendment No. 4 with the paragraph below.

5.1.4 The dredged material was characterized by testing cores down to -48.5 ft. MLW. Material should not be dredged below this depth. Should specific circumstances require the removal of material below -48.5 ft MLW, the Contracting Officer and the Contracting Officer Representative shall be notified. Potential environmental consequences from dredging below -48.5 ft MLW could result in violations of the Ocean Dumping Provisions of the Marine Protection, Research, and Sanctuaries Act (33 U.S.C. §§ 1401-1445) and may lead to a federal enforcement action.

(End of Summary of Changes)

A There was a degree of over depth. It's required in our Government estimates to, you know, you know, factor in what will be, you know, taken out. I would be shocked if they didn't, but I'm pretty sure they did.

Q Do you recall whether there were some environmental or other restrictions that prohibited dredging below the allowable over depth in the KVK8 Project?

A Yes, we did not have and we still do not have the environmental clearances to go down below the forty -- forty-eight foot depth. I forget how much it was characterized, but, you know, we didn't and we don't have the authority to really do a fifty foot project in the old Area 8 or what will be SNB2.

Q As I recall in the KVK8 Project there are some pretty strong restrictions or warnings to the contractor about exceeding the allowable over depth; is that correct?

A That's correct.

Q Were there similar restrictions or warnings to the contractors that performed

projects before KVK8?

A Not as strong. There was other language about, you know, not exceeding, but at the time that Area 8 was ongoing, EPA was very upset over Area 3 that had a tremendous amount of over digging that they viewed, so as a result we did sort of stiffen up the language and warning the contractor to try to, you know, retain his enthusiasm.

Q Was there over digging in KVK2?

A In some degree. The nature of the area in SKVK2, the nature of the material, you have boulders and in order to remove a boulder that's the size of a truck, you're liable to go way below what, you know, we require with regard to depth in order to get the boulder out, so yes, there was some degree of over digging, but justifiable over digging.

Q Did the fact that KVK8 on the one hand required project depth of forty-seven but on the other hand greatly discouraged any dredging below minus 48.5 make it even more difficult in your view for a dredging contractor to achieve the minus forty-seven?

1) **Dark gray to black, very soft, organic Silt and Clay**, little to some Sand, frequent shells and shell fragments.

2) **Red-brown**, dense to **very dense Sand and Gravel**, with little to some Silt and Clay, and occasional Cobbles and Boulders.

3) **Red-brown**, soft to **hard Silt and Clay**, with little to some Sand and Gravel, and occasional Cobbles and Boulders.

4) **Cobbles and Boulders** with a matrix of Sand, Silt and Clay occur in layers of varying thickness. Cobbles and boulders typically increase with depth and are generally most frequent immediately above the bedrock.

5) **Dark gray, gray-green to red-brown**, fine to medium grained Sandstone Bedrock. **Sandstones** are typically described as hard to very hard with varying degrees of fracturing and weathering. Conventional cores generally indicate the sandstone to be slightly to moderately fractured with rock quality designations (RQD) ranging from poor to good.

6) **Red-brown to gray Shale Bedrock**. The **Shale** ranges from soft to very hard depending on the degree of weathering and other factors. Weathering ranges from slightly weathered to decomposed. Conventional cores typically describe the shale as highly fractured and broken with rock quality designations (RQD) ranging from very poor to fair.

7) **Dark gray-green to black Diabase Bedrock**. The Diabase is typically very hard and displays varying degrees of fracturing. Weathering typically ranges from fresh (unweathered) to slightly weathered.

8) **Trash and debris** - Trash, debris and other miscellaneous man-made and natural objects should be expected to be encountered during the course of the dredging. This material may be encountered at any location above the required depth indicated on drawings. The objects may include but are not limited to, wood, sheet metals, glass, lumber, plastics, tires, hoses, chains, cables and hawsers.

3. **Dredging Equipment.**

3.1 **Dredges.**
It is anticipated that a variety of dredging equipment will be necessary for the removal of soils and rock within the project area. All material shall be removed with dredging equipment appropriate for the material encountered (i.e. clamshell, closed clamshell "environmental" bucket dredge, dipper, powershovel, etc.). The use of hopper and cutterhead dredges is prohibited.

3.2 **Scow monitoring equipment (ADISS/ADISSPlay/ADISSLt).**
The contractor is required, at his/her own expense, to have all scows or other vessels used to transport dredged material to designated placement locations (HARS, artificial reefs, or other locations in the New York Bight or Lower Bay) equipped with scow monitoring equipment (ADISS/ADISSPlay/ADISSLt, from Science Applications International, Inc. (SAIC)). The ADISSPlay software/equipment shall be programmed by SAIC personnel for use aboard any towing, or other, vessels used to transport dredged material. The contractor shall ensure that the ADISS/ADISSPlay/ADISSLt equipment is operational at all times dredged material is transported from the dredging site and while returning to the dredging site after ocean placement. Although the Corps Disposal Inspector (CDI) will observe the operation of the ADISS/ADISSPlay/ADISSLt equipment, operation and maintenance of the ADISS/ADISSPlay/ADISSLt equipment will be the responsibility of the dredging contractor. It is the contractor's responsibility to ensure that the ADISS/ADISSPla y/ADISSLt equipment is in continuous, operable condition. Any

-suitable location for completing paperwork associated with CDI duties;

-a fully operational fax machine must be onboard the towing vessel for use by the CDI within 2 hours of each placement event, or available for use by the CDI at the dredging site within 4 hours of each placement event;

--Any discrepancies or other concerns noted by the CDI regarding placement activities shall be reported immediately, via cellular phone from the tug, to the KVK Project Office at (201) 433-9232 or 9228 and USACE HARS Manager at (212) 264-1853 or x5620.

Additional items related to the duties of the CDI may be required at any time during the period of the dredging contract;

5.14 CDIs shall submit a report of all placement activities authorized by this contract for each scow of dredged material within 6 hours of the time of placement at the HARS, reef, or other open-water placement location. CDIs must complete a USACE Transportation and Placement Log form (TPLF) electronically, using the ADISSPlay or ADISSLt system, or manually if necessary. Logs should be faxed to (212) 264-4260, or hand delivered to room 1937 of 26 Federal Plaza within 6 hours of each placement event. Any discrepancies or other concerns noted by the CDI regarding placement activities shall be reported immediately (via cellular phone from the tug, or within one-half hour of return to the dredge site or port) to the USACE HARS Manger at (212) 264-1853 or x5620, to the USACE Construction Division POC, and a dredging contractor POC not onboard the towing vessel. CDIs may communicate with towing vessel captains to help ensure correct placement of dredged materials. However, CDIs are not authorized to operate towing vessel equipment, and in particular, remotely operated scow control equipment. CDIs are required to use hand-held laser range finders (required to be aboard all towing vessels used for dredged material placement) to determine the tow lengths used at the time of dredged material placement. CDIs are required to communicate with the towing vessel crew to obtain information necessary to document the position of the scow at the time placement occurs. In the event of ADISS/ADISSPlay/ADISSLt malfunction, the CDI must complete a map of the placement area showing the position of the scow at the time scow doors were first opened, including the distance from the towing vessel to the scow (as determined using the hand-held laser range finder), the towing vessel DGPS position at the time of initial scow door opening, the vessel direction of travel, and the bearing to the scow from the towing vessel. Manually prepared maps, if necessary, associated with an ocean placement trip, should also be faxed to NY District with the TPLF and other required documents. If TPLFs (electronically or manually produced) and any other required placement documents are not received within 6 hours of each placement event, scows may be directed to standby at the dredging site until all items have been received at NY District.

5.15 Specific Placement Grid Details And Additional Placement Guidelines

More detailed placement guidelines and specific placement grid information will be provided prior to commencement of dredging, particularly at a pre-construction meeting of the dredging contractor and Corps. Additional placement guidelines and modifications may be provided to the dredging contractor at any time during the dredging contract.

**6. Dredging and Disposal of "Non-rock materials" unsuitable for placement at the HARS**

6.1 The "non-rock" dredged material is composed of the material identified in para. 2.2.1.2 item numbers 1 through 4 that are deposited within the dredging limits as shown on the contract drawings is considered unsuitable for placement at the HARS.

7) Should decanting of water from barges be required before disposal, PANYNJ will make berthing area(s) available for dewatering purpose (Section 00903). The Contractor may use the berthing area designated by the Contracting Officer for this project unless otherwise directed by the Contracting Officer.

The **New Jersy Marine Terminals** Berth **63** at the Port Newark/Elizabeth Marine Terminal is the dewatering site that NYNJPA is providing for this contract, A 400 feet berth located on the north side of the Elizabth channel in New Jersey; is available for mooring a dewatering scow. **(Section 00903)**

POC for the berth is **Gregory Bulthaup (973)-690-3482.**

All operation and management rules shall be in accordance with the requirements specified in the State of New Jersey Water Quality Certificate (WQC)/Federal Consistency and NY WQC **(Section 00902).**

6.7 The Contractor shall submit a schedule for disposal of non-rock dredged material to the disposal facility and Point of Contact to the Contracting Officer's Representative at least 30 calendar days prior to the commencement of the dredging of said material. The schedule shall indicate the anticipated flow of material.

6.8 The towing vessel captain is responsible to ensure, prior to the departure of the towing vessel from the dredge site, that the forecasted weather and sea conditions at the expected time of arrival at the disposal facility will allow for safe conditions. If upon arrival at the disposal site facility, prevailing conditions are such that deviation from the operating procedures of the disposal facility is necessary to ensure the safety of the operation, the responsibility for the determination of a minimum safe speed for the towing vessel, and a minimum safe distance will rest solely with the captain of the towing vessel

6.9 The Contractor shall be responsible for the transport of dredged material and the tie-down of the scow to the designated location identified by the disposal operator. The Contractor is required to take all necessary precautions for the safety of, and to provide necessary protection to prevent damage, injury or loss to any person or property, including but not limited to: a) All employees of the Contractor, public, and other persons and entities who may be affected by thereby; b) the physical structure(s) in surrounding the navigation channel; and c) other property at the upland disposal facility, including piers, docks, berths, vessels, markers, lights, buoys, and other structures.

6.10 The dredging and placement logs for dredged material unsuitable for placement at the HARS placement shall be completed and attached to the Contractor's daily CQC report and submitted on a daily basis.

6.11 The USACE certified dredge inspector shall verify acceptance of the dredge material unsuitable for the placement at the HARS from the upland facility at the time of arrival.

## 7. PLACEMENT OF DREDGED MATERIAL AT OPEN-WATER PLACEMENT SITES

Dredged Material Placement Protocol for the HARS. For **CLIN 0001AG** and **CLIN 0005A** and **CLIN 0006A** the following requirements are applicable. All non-rock dredged material overlying the red-brown silt and clay that is capable of being dredged with an "Environmental" Bucket shall be removed under **CLIN 0001AC, CLIN 0005B and CLIN 0006C**

All of the provisions, guidelines, requirements, and instructions (PGRIs) in this section of the contract specification must be completed/complied with before any dredged material may be placed at a designated ocean placement site. Many of the PGRIs must be completed/complied with prior to the start

of dredging. Any misplaced dredged material deemed to constitute a potential hazard to navigation by the Corps will be the sole liability of the dredging contractor to remove, as directed by the Corps. This would include, for example, placement of dredged material in a navigation channel that results in a mound or causes an area of shallower water within the channel; or any dredged material placed above a permitted depth associated with an artificial reef. The dredging contractor will assume all expenses and liabilities associated with creating mounds of dredged material above a permitted depth at an artificial reef site and expenses and liabilities associated with bringing such mounds below permitted depths.

7.1 Personnel Notification: This section of the contract specification must be provided to all contractor personnel working on any aspect of open-water placement of dredged material associated with this project, including personnel loading scows at the dredging site, personnel working on scows at the dredge site, personnel onboard towing vessels at the dredging site or while towing scows, including USACE NY District certified Inspectors of Open Water Disposal of Dredged Material (Corps Disposal Inspectors (CDIs)), and personnel aboard scows being towed. All personnel associated with loading of scows, transportation of dredged material, and placement of dredged material must be familiar with the guidelines and requirements contained in this portion of the contract specifications. Prior to the start of dredging, the contractor must submit a letter to the NY District listing the name, position title, and job description of each person who will be working on the towing vessels used to transport dredged material, each person who will be loading the scows with dredged material at the dredging site, and anyone else involved with scows at the dredge site or while being towed to the designated placement location. This letter must include verification that each person has been provided a copy of this portion of the contract specification, has read this portion of the contract specification, and understands the requirements described in this contract specification as related to their job duties. Additional guidelines and directives may be provided at any time during the duration of the dredging project and will become part of the contract specifications.

7.2 **Ocean Placement Locations: for HARS and ROCK**

For **CLIN 0001AG** and **CLIN 0005A** and **CLIN 0006A**: the Government has identified the Historic Area Remediation Site (HARS) for placement of dredged material, approved for ocean disposal, removed under this contract. However, barges that contain less than 25% non-rock material (i.e., vessels which contain 75% or more rock material) should not be transported to the HARS. (Non-rock material is defined as material that is less than 2.5 inches in diameter.)

7.2.1 **HARS**

The Contractor shall perform dredged material placement at specific locations within the HARS, defined by the following perimeter coordinates:

| Point | LatitudeDMS | LongitudeDMS | LatitudeDDM | LongitudeDDM |
|---|---|---|---|---|
| B | 40o 25' 23" N | 73o 53' 34" W | 40o 25.38' N | 73o 53.57' W |
| D | 40o 25' 22" N | 73o 52' 08" W | 40o 25.37' N | 73o 52.13' W |
| F | 40o 23' 13" N | 73o 52' 09" W | 40o 23.22' N | 73o 52.15' W |
| G | 40o 23' 13" N | 73o 51' 28" W | 40o 23.22' N | 73o 51.47' W |
| H | 40o 22' 41" N | 73o 51' 28" W | 40o 22.68' N | 73o 51.47' W |
| I | 40o 22' 41" N | 73o 50' 43" W | 40o 22.68' N | 73o 50.72' W |
| L | 40o 25' 22" N | 73o 50' 44" W | 40o 25.37' N | 73o 50.73' W |
| N | 40o 25' 22" N | 73o 49' 19" W | 40o 25.37' N | 73o 49.32' W |
| O | 40o 21' 35" N | 73o 49' 19" W | 40o 21.58' N | 73o 49.32' W |
| Q | 40o 21' 36" N | 73o 52' 08" W | 40o 21.60' N | 73o 52.13' W |
| T | 40o 22' 08" N | 73o 52' 08" W | 40o 22.13' N | 73o 52.13' W |
| U | 40o 22' 08" N | 73o 53' 34" W | 40o 22.13' N | 73o 53.57' W |

DMS = Degrees, Minutes, Seconds
DDM = Degrees, Decimal Minutes

7.2.2 The Contractor will also use exact placement criteria set by the New York District Corps of Engineers. All placement of dredged material within the HARS will occur in strict accordance with the guidelines and locations attached to these specifications, and any future updates when provided by USACE, particularly at the pre-construction meeting.

7.2.3 All non-rock material approved for ocean disposal, excluding floating debris and trash, shall be transported to the HARS, unless otherwise directed.

7.2.4 **Rock**

For **CLIN 0001AL** and **CLIN 0006B**: The Government has identified a **reef** (section 00903) for placement of dredged rock (i.e., vessels that contain 75% or more rock material) that is approved for ocean disposal. (See map in section 00903)

The rock material to be dredged, exclusive of all floatable material, will be disposed of at the Reef Site.

Note: The coordinates of the exact location of the grid used for placement of dredged material at the HARS will be provided during the pre-construction meeting and may be changed at any time during the dredging project.

7.3 **General Requirements: ALL PLACEMENT ACTIVITIES MUST BE RECORDED, AND REQUIREMENTS ADHERED TO, AS SPECIFIED BELOW.**

a. Twenty four (24) hours prior to departure of the first project vessel from port for the open water placement of any dredged material, the Contractor must notify the New York District USACE by telephone. Calls regarding departures must be made to the Dredged Material Management Section at (212) 264-1853 or 5620. The Contractor must furnish the Contractor name, project name, inspector name and estimated time of departure.

b. The Contracting Officer, or his Representative, reserves the right to have Corps of Engineers and/or Environmental Protection Agency employees and other invited representatives accompany all trips to the placement site to certify compliance with any contract specifications or environmental regulations.

c. The Contracting Officer, or his authorized Representative, must give notice of sailing by telephone, or via direct radio transmission between the Contractor's tug and the US Coast Guard two hours prior to departure of a vessel from port. Telephone calls must be made to (718) 354-4088.

d. CDIs must submit reports of all placement activities authorized by this contract on the basis of one report for each scow of dredged material within 6 hours after each placement event. Reports must be printed from the ADISSPlay system aboard the towing vessel and must be transmitted via a cell phone link with the ADISSPlay system, and faxed to NY District at (212) 264-4260. If the electronic form can not be printed, a hand written form must be completed and submitted. Individual trip reports must utilize the USACE Transportation and Placement Log Form (TPLF), which must be fully completed electronically on board the towing vessel, or manually if equipment failure prevents electronic completion. Any discrepancies or other concerns noted by the inspector regarding placement activities must be reported immediately, via cellular phone from the tug, to the USACE Ocean Placement Manager at (212) 264-1853 or (212) 264-5620, the towing vessel captain, the dredging contractor POC not onboard