# SUBMITTAL REGISTER

*(ER 415-1-10)*

TITLE AND LOCATION: KVK Contract 8

CONTRACTOR:

CONTRACT NO.:

SPECIFICATION SECTION:

| ACTIVITY NO. | TRANSMITTAL NO. | ITEM NO. | SPECIFICATION PARAGRAPH NUMBER | DESCRIPTION OF ITEM SUBMITTED | TYPE OF SUBMITTAL: DATA | DRAWINGS | INSTRUCTIONS | SCHEDULES | STATEMENTS | REPORTS | CERTIFICATES | SAMPLES | RECORDS | O&M MANUALS | CLASSIFICATION: INFORMATION ONLY | GOVERNMENT APPROVED | REVIEWER | CONTRACTOR SCHEDULE DATES: SUBMIT | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION: CODE | DATE | SUBMIT TO GOVERNMENT | GOVERNMENT ACTION: CODE | DATE | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a. | b. | c. | d. | e. | f. | g. | h. | i. | j. | k. | l. | m. | n. | o. | p. | q. | r. | s. | t. | u. | v. | w. | x. | y. | z. | aa. |
| | | | 00800, 1.6c | Pricing Data | x | | | | | | | | | | x | | | | | | | | | | | |
| | | | 00800, 1.8.a,b,c | Claims | | | | | x | | | | | | x | | | | | | | | | | | |
| | | | 00800, 1.16 | Fuel Usage Report | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 00800, 1.24 | Breakdown of Contract Work | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 00800, 1.26 | Accident Prevention Plan | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 00800, 1.29 | Certificate of Inspection | | | | | | | x | | | | x | | | | | | | | | | | |
| | | | 00800, 1.32 | Insurance Certificate | | | | | | | x | | | | x | | | | | | | | | | | |
| | | | 00800, 1.33 | Field Office | | | | | | | x | | | | | | | | | | | | | | | |
| | | | 00800, 1.37.b | Order of Work for Dredging and Others | | | | | x | | | | | | x | | | | | | | | | | | |
| | | | 00800, 1.41 | Safe Practice Manual & Diving Operation Plan | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 00800,1.45-1,2 | Sie desposal ALT | x | x | x | x | x | x | x | | x | | x | x | E | | | | | | | | | |
| | | | 01130, 1.6.a | Environmental Protection Plan | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 01312,1.9 | QCS Update | x | | | | | x | | | | | | | A | | | | | | | | | |
| | | | 01320, 1.1 | Initial Project Schedule | | | | x | | | | | | | | x | A | | | | | | | | | |
| | | | 01320, 1.1 | Preliminary Project Schedule | | | | x | | | | | | | | x | A | | | | | | | | | |
| | | | 01320, 1.1 | Periodic Schedule Update | | | | x | | | | | | | | x | A | | | | | | | | | |
| | | | 01320, 1.1 | Personnel Qualifications | | | | | x | | | | | | x | | | | | | | | | | | |
| | | | 01320, 1.1 | Narrative Report | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 01320, 1.1 | Schedule Report | | | | | | x | | | | | x | | | | | | | | | | | |

ENG FORM 4288, Jul 96 Page ________ of ________ Pages (Proponent: CEMP-CE)

## SUBMITTAL REGISTER

*(ER 415-1-10)*

TITLE AND LOCATION: KVK Contract 8

CONTRACTOR:

CONTRACT NO.:

SPECIFICATION SECTION:

| ACTIVITY NO. | TRANSMITTAL NO. | ITEM NO. | SPECIFICATION PARAGRAPH NUMBER | DESCRIPTION OF ITEM SUBMITTED | TYPE OF SUBMITTAL: DATA | DRAWINGS | INSTRUCTIONS | SCHEDULES | STATEMENTS | REPORTS | CERTIFICATES | SAMPLES | RECORDS | O&M MANUALS | CLASSIFICATION: INFORMATION ONLY | GOVERNMENT APPROVED | REVIEWER | CONTRACTOR SCHEDULE DATES: SUBMIT | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION: CODE | DATE | SUBMIT TO GOVERNMENT | GOVERNMENT ACTION: CODE | DATE | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a. | b. | c. | d. | e. | f. | g. | h. | i. | j. | k. | l. | m. | n. | o. | p. | q. | r. | s. | t. | u. | v. | w. | x. | y. | z. | aa. |
| | | | 01320, 3.5.1 | Data Disks | x | | | | | | | | | | x | | | | | | | | | | | |
| | | | 01320, 3.5.2 | Narrative Report | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 01320, 3.5.4 | Schedule Report | | | | x | | x | | | | | | x | A | | | | | | | | | |
| | | | 01320, 3.5.5 | Network Diagram | | | | x | | | | | | | | x | A | | | | | | | | | |
| | | | 01420, 2.0 | Accident Prevention Plan | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 01420, 5.0 | Daily Quality Control Report | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 01420, 5.0 | Daily Inspection Log | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 01420, 6.4 | Crane & Derrick Operator's Qualifications | | | | | | | | | x | | | x | A | | | | | | | | | |
| | | | 01420, 8.0 | Monthly Exposure Reports | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 01420, 10.3 | Energized Line Work Plan | | | | | x | | | | | | x | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | 01420, 12.0 | Safety Meeting Document | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | 01451, 3.2 | Quality Control Plan | | | x | | | | | | x | | | x | A | | | | | | | | | |
| | | | 01451, 3.3 | CQC System | | | | | x | | | | | | x | | | | | | | | | | | |
| | | | 01451, 3.9 | CQC Documentation | x | | | | | x | | | | | | x | | | | | | | | | | |
| | | | 02100, 4 | Driller's Log | | | | | | | | | x | | | x | A | | | | | | | | | |
| | | | 02100, 6 | Samples | | | | | | | | x | | | x | | | | | | | | | | | |
| | | | 02100, 9.2 | Equipment | x | | x | | | | | | | | x | | | | | | | | | | | |

ENG FORM 4288, Jul 96

Page ________ of ________ Pages

(Proponent: CEMP-CE)

## SUBMITTAL REGISTER
*(ER 415-1-10)*

CONTRACT NO.

TITLE AND LOCATION: KVK Contract 8

CONTRACTOR

SPECIFICATION SECTION

| ACTIVITY NO. a. | TRANS-MITTAL NO. b. | ITEM NO. c. | SPECIFICATION PARAGRAPH NUMBER d. | DESCRIPTION OF ITEM SUBMITTED e. | TYPE OF SUBMITTAL: DATA f. | DRAWINGS g. | INSTRUCTIONS h. | SCHEDULES i. | STATEMENTS j. | REPORTS k. | CERTIFICATES l. | SAMPLES m. | RECORDS n. | O & M MANUALS o. | CLASSIFICATION: INFORMATION ONLY p. | GOVERNMENT APPROVED q. | REVIEWER r. | CONTRACTOR SCHEDULE DATES: SUBMIT s. | APPROVAL NEEDED BY t. | MATERIAL NEEDED BY u. | CONTRACTOR ACTION: CODE v. | DATE w. | SUBMIT TO GOVERN-MENT x. | GOVERNMENT ACTION: CODE y. | DATE z. | REMARKS aa. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 02200, 1.2.1 | Weekly Inspections and Claim Reports | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 02200, 1.3.1 | Explosive Inventory | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 02200, 1.5.2 | Public Meeting Correspondence | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 02200, 2.5 | Contingency Plan | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 02200, 4.3 | Vibration Monitoring Plan | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 02200, 4.3 | Blast Records | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 02200, 4.4 | Air Blast Data | x | | | | | | | | | | x | | | | | | | | | | | |
| | | | 02200, 5.2.1 | Test Blast Plan | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 02200, 5.4 | Report | | | | | | x | | | | | | x | A | | | | | | | | | |
| | | | 02200, 6.1 | Operational Blast Plan | | | | | x | | | | | | | x | A | | | | | | | | | |
| | | | 02200, 7 | Drill Log and Blast Report Form | x | | | | | x | | | | | | | | | | | | | | | | |
| | | | 02220, 1.3 | Workplan | | | | | x | | | | | | | x | | | | | | | | | | |
| | | | 02900, 4 | Transportation Log Form | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 02900, 6.2 | Disposal Schedule w/anticipated quantities | | | | | | | | | x | | | x | A | | | | | | | | | |
| | | | 02900, 6.7 | Non-HARS Material Disposal Schedule | | | | x | | | | | | | x | | | | | | | | | | | |
| | | | 02900, 7.4 | Observation Report | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 02900, 7.3 | All Placement Activities | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 02900, 8 | Daily Report of Operation | | | | | | x | | | | | x | | | | | | | | | | | |
| | | | 11010, 1.2 | Digital Photo Management System | x | | | | | | | | | | | x | A | | | | | | | | | |

ENG FORM 4288, Jul 96 Page ______ of ______ Pages (Proponent: CEMP-CE)

~~[illegible]~~
SURVEY
EQUIP.

Quality Control
Survey Plan

Hydrographic Surveys will be performed on a daily basis for each dredge to confirm the design depth has been achieved and to determine if any dredging has occurred deeper than 48.5 feet MLLW. The survey equipment will consist of an Odom Hydrographic Echo Scan Multibeam system. This system will use 15 channels for a total beam width of 90 degrees. The horizontal positions will be derived from a trimble MS 750 RTK GPS receiver. The receiver will use RTK adjustments from a base receiver at a known location. The position of soundings from each beam are adjusted with readings from a TSS Meridian Gyro and a TSS heave, pitch, and roll motion sensor.

The calibration of each device will be checked prior to conducting a survey. The velocity of sound in water will be observed by physically hanging a disc beneath the transducer at pre measured depths and adjusting the velocity of sound accordingly. Readings will also be recorded from an Odom Digibar at elevations consistent with the expected range of depths to be encountered.

Survey lines will be pre planned to include an overlap of at least 20 feet between passes. The helmsman will navigate the survey vessel with guidance from "Coastal Oceanographics HYSWEEP" software. The hydrographer will have an independent display for observing soundings and side scan returns in real time. Tides will be recorded and time stamped during the survey to develop a tide curve for post processing of the data. During post processing, data will compared in the overlap region to confirm repeatable consistency. Soundings will be plotted on board the survey vessel. The plots will consist of bathymetric maps and cross sections marked with stations corresponding to the cuts on the dredge plan. In the event, there is any questions about the integrity of the soundings, the survey will be re-performed and a comparison will be made. Also soundings will be performed in a "control area" which will be established prior to the start of excavation. The control area will be adjacent to the work area where no dredging is anticipated. The results in this area will be the same when all equipment is properly calibrated. The only exception will be when some shoaling has occurred which will be noticeable over time.

Plotted soundings will be discussed with the captain and the operator. Any adjustments to the digging depth and width will determined from results of theses soundings. The plotted soundings will be archived on the dredge and in the field office as a hard copy and in digital form. These archives will be used as a basis for any future clean up if needed.

On a bi-weekly basis, a complete survey of all current work areas will be performed to determine the payable volume of material removed in each acceptance Section. Each survey will be conducted using the methods previously described.

Q. Okay. Prior to writing this letter, did Army Corps of Engineers personnel tell you that the standard of acceptance for the KVK 8 contract would be a matrix of three by three average soundings?
A. Three by three wasn't mentioned, but average soundings were discussed any number of times.
Q. Do you recall who from the Army Corps of Engineers told you that acceptance would be measured by average soundings?
A. I recall a number of people when asked that question were -- did not respond directly.
Q. Okay. Who didn't respond?
A. Well, they did not respond. They said that it may be. Sandy McDonnell (ph) and Ron Conetta, Mark Alton, Sam DiDato.
MR. WEINBERG: A-l-t-o-n. D-i-D-a-t-o. D-i is lower case. Both Ds are capital. Sorry. Never mind.
BY MS. KILFOYLE:
Q. Do you recall when these discussions occurred?
A. There were two phases of the project. One was material that was unsuitable for unconfined aquatic disposal. That material went upland. The other was material that was suitable for aquatic disposal. The unconfined aquatic disposable material was done with

A. Yeah.
Q. Do you remember when the first time you discussed that with the corps?
A. I don't. I don't recall. We had several meetings, we had progress meetings all the time, but early -- early in the project.
Q. Did any representative of the corps ever tell you that the average method would be used to process acceptance surveys?
A. Yes.
Q. Do you recall when that occurred?
A. It was early in the project because we were in acceptance Area 1, so I don't remember the date exactly. I mean, I don't even remember the month exactly, but it was around that time.
Q. Do you recall who told you that the average method would be used to process acceptance surveys?
A. It was either Ron Conetta or Mark Kucera or it might -- probably one or two of them. Probably Mark Kucera.
Q. Was anyone else present for that discussion?
A. Yeah. Jim Galli, I believe Paul Porter, you

it specifically.
Q. Does this document refresh your recollection as to whether surveys were discussed?
A. Under Surveys, it says surveys were discussed, and under RFI, it says, "None," and somebody wrote in an EM manual number.
Q. But it doesn't help you remember anything about the meeting?
A. Oh, no. There was one every week.
Q. That's fine. Did you ever hear anybody from the Corps state the average method would be used for acceptance surveys?
A. I recollect way in the beginning during the preconstruction era, way in one of those meetings, as one of the meetings broke, somebody from the Corps -- and I don't remember the person, but they said that areas would be accepted on a 3 by 3 matrix minimum soundings for rock and a 5 by 5 average soundings for HARS material.
Q. What's the difference between rock and HARS material?
A. One's rock and one was HARS material. HARS material was categorized as material that could

**United States Army Corps of Engineers**
**Kill Van Kull Project Office**
**Caven Point Marine Terminal**
**3 Chapel Avenue, Port Liberte'**
**Jersey City, New Jersey 07305**

22 November 2004

Jay Cashman, Inc.
20 West Howell St.
Boston, MA 02125

Subject: Contract No. DACW51-03-C-0014, Kill Van Kull & Newark Bay Channels Navigation Improvement Project, Phase II, Contract VIII (Area 8), R0014, Survey Reconciliation Elizabeth Channel

Serial Letter No. G-109

Gentlemen,

You are requested to submit a proposal for the following work being considered for adjustment under the subject contract:

Credit the Government, for additional Acceptance Surveys performed by the Government, as follows:

| Acceptance Area | Government Surveys Performed | Gov't Surveys Allowed | Credit to Gov't |
|---|---|---|---|
| 13 | 3 | 2 | 1 |
| 2 | 3 | 2 | 1 |
| 3 | 5 | 2 | 3 |
| 4 | 4 | 2 | 2 |
| 4A | 4 | 2 | 2 |
| 5 | 5 | 2 | 3 |
| | 24 | 12 | 12 |

Under Authority of Contract Clause "Changes," FAR 52.243-4 (Aug 1987) you are requested to submit a cost proposal within seven (7) calendar days. The breakdown of your proposal shall be in accordance with Contract Clause 252.236-7000 'Modification proposals - Price Breakdown'. Your proposal must include sufficient detail to permit an analysis of profit, and all costs for material, labor, equipment and overhead, for prime and subcontractors.

If you have any questions regarding this matter, please contact Mark Alton at (201) 433-9232.

Sincerely,

Ronald D. Conetta, P.E.
Resident Engineer

CC: CENAN-CO-M/Leach

| | | | | | | |
|---|---|---|---|---|---|---|
| | KVK 8 | Production | Record | HARS | | |
| Area | Dredge | Start | Finish | Days | | |
| | | | | Virginian | AJF | JCI |
| 2 | JAY C | 3/31/2004 | 6/1/2004 | | | 63 |
| 2 | JAY C | 6/2/1994 | 6/9/2004 | | | 9 |
| 2 | JAY C | 6/16/2004 | 6/23/2004 | | | 8 |
| 2 | JAY C | 6/26/2004 | 7/3/2004 | | | 8 |
| 2 | JAY C | 7/10/2004 | 7/15/2004 | | | 6 |
| 2 | JAY C | 7/28/2004 | 8/10/2004 | | | 14 |
| 2 | AJF | 3/15/2004 | 6/1/2004 | | 79 | |
| 2 | AJF | 7/27/2004 | 7/28/2004 | | 2 | |
| 2 | AJF | 10/2/2004 | 10/2/2004 | | 1 | |
| | | | | | | |
| 3A | JAY C | 7/4/2004 | 7/6/2004 | | | 3 |
| 3A | JAY C | 7/15/2004 | 7/15/2004 | | | 1 |
| 3A | AJF | 8/1/2004 | 8/9/2004 | | 9 | |
| 3A | AJF | 9/2/2004 | 9/5/2004 | | 4 | |
| 3A | AJF | 9/24/2004 | 9/24/2004 | | 1 | |
| 3A | Virginian | 8/9/2003 | 9/2/2003 | 25 | | |
| | | | | | | |
| 3 | AJF | 8/10/2003 | 9/2/2003 | | 24 | |
| 3 | AJF | 9/22/2003 | 10/15/2003 | | 25 | |
| 3 | AJF | 11/7/2003 | 11/10/2003 | | 4 | |
| 3 | AJF | 10/16/2003 | 11/13/2003 | | 29 | |
| 3 | Virginian | 8/5/2003 | 8/9/2003 | 5 | | |
| 3 | Virginian | 9/3/2003 | 9/16/2003 | 15 | | |
| | | | | | | |
| 4 | AJF | 11/17/2003 | 1/30/2004 | | 76 | |
| 4 | AJF | 6/23/2004 | 6/29/2004 | | 7 | |
| 4 | AJF | 7/2/2004 | 7/4/2004 | | 3 | |
| 4 | AJF | 8/4/2004 | 8/26/2004 | | 23 | |
| 4 | Jay C. | 6/9/2004 | 6/20/2004 | | | 12 |
| 4 | Jay C. | 7/3/2004 | 7/3/2004 | | | 1 |
| 4 | Jay C. | 8/12/2004 | 8/30/2004 | | | 19 |
| 4 | Virginian | 11/10/2003 | 12/14/2003 | 35 | | |
| | | | | | | |
| 4A | AJF | 6/2/2004 | 6/15/2004 | | 14 | |
| 4A | AJF | 6/29/2004 | 7/2/2004 | | 4 | |
| 4A | AJF | 7/5/2004 | 7/7/2004 | | 3 | |
| 4A | Jay C. | 6/23/2004 | 6/24/2004 | | | 2 |
| 4A | Jay C. | 7/16/2004 | 7/19/2004 | | | 4 |
| | | | | | | |
| | | | | | | |
| 5 | AJF | 1/31/2004 | 3/15/2004 | | 44 | |
| 5 | AJF | 3/25/2004 | 5/5/2004 | | 42 | |
| 5 | Jay C. | 6/6/2004 | 6/9/2004 | | | 4 |
| 5 | Virginian | 12/14/2003 | 1/5/2004 | 23 | | |
| | | | | | | |
| Totals | | | | 103 | 394 | 154 |

A. That 100 percent will give you 100 percent coverage. However you decipher that information is not explained here.
Q. Okay. How about the next sentence? "The most precise positioning and depth standards and techniques must be employed for this class of project." At the time you prepared your bid, what did that mean to you?
A. That you needed a multibeam system.
Q. Is a multibeam system the most precise positioning and depth measurement system?
A. I believe so. There may be more precise. I don't know.
Q. No worries. Did you ever make inquiry with the Corps regarding the method to be used to process acceptance surveys prior to submitting your bid for the contract?
A. No.
Q. Did you personally make inquiry regarding the method to be used for acceptance surveys after work began on the contract?
A. Myself, no.
MS. KILFOYLE: Can we go off for one second?

Some of the variation could be attributable to the uneven bottom topography coupled with the 10-ft HYPACK search radius. The footprint size of the acoustic beam covers a larger area in these 50-foot depths, causing a generalization in the recorded depths. In general, however, standard deviations at this level would be expected based on the estimated results back in Table 4-1 and the fact that this distant project area represents a "worst case" condition than that assumed in Table 4-1. (Note that the computed standard deviation is not the same as the RMS in that the (-) 0.04 ft is not included. The difference is negligible given the small mean bias--the RMS (95%) could be computed from Equation 4-1, e.g., RMS (95%) = 1.96 $(0.944^2 + 0.043^2)^{1/2} = \pm 1.85$ ft). Like the computed mean above, the confidence level of the computed deviation could also have been computed--Mikhail, 1976. Such a computation would have shown that the $\pm$ 0.94 standard deviation actually lies somewhere between $\pm$ 0.8 and $\pm$ 1.2 (95% confidence level). Additional cross-line comparisons would have reduced this spread.

*d. Multiple transducer or multibeam comparison.* Had the above project been surveyed using swath survey systems, then two digital elevation models could have been generated with which to perform a comparison. Thousands of comparison points would have resulted rather than the 78 in the single beam example. Regardless of the number of comparative points, the computed mean and deviation should not be significantly different--at least within the range of the confidence interval estimations described above. The standard deviation of multibeam data might be slightly higher since the accuracy of the outer rays is not as good as near-vertical depths. However, the confidence level of the mean would have a very small value since a larger number of points are included.

*e. Unaccounted biases.* It is again emphasized that such comparisons are only indicators of data quality. There could be biases in the data that would not be detected. Examples might include: (1) a constant error in the tidal datum reference plane or MLLW elevation reference, (2) an error in the DGPS vertical geoid model, or (3) a constant vessel draft error. Data outliers can also be present in the data, such as the 4.05 foot difference in Table 4-2. These outliers represent values well outside the 95% confidence level. They may or may not be correct. Typically, outliers falling more than 3 times the estimated standard error (i.e., $3 \cdot 0.944$ ft) are rejected.

*f. Final analysis of results.* The nearly $\pm$ 2 foot depth deviation in this example clearly exhibits the case that individual depth observations contain significant random errors. It also illustrates that a single depth observation cannot be evaluated based on the "apparent accuracy" of its plotted value (i.e., nearest 0.1 foot). Moreover, this case shows that the accuracy of a survey must be evaluated based on the statistical agreement of the entire data set--or portions of that data set. Minimizing constant bias errors is far more important than reducing deviations. More refined acoustic measurement techniques will have to be developed if more accurate depth observations are required.

## 4-8. Evaluation of Depth Accuracy on Dredging Projects

Evaluating channel clearance on dredging projects involves a review of the soundings obtained on the final after dredge survey and/or final channel clearance sweep survey. Numerous shoals or strikes above the required grade may be present on these surveys. The project manager or contracting officer's representative (COR) must determine whether these shoals/strikes above grade warrant additional work effort to assure project clearance, or they are isolated, stray soundings within the "noise" (i.e., accuracy) level of depth measurement. Therefore, this assessment of above-grade soundings must consider (1) the error budget of individual depth measurements, (2) their relative magnitude, (3) survey accuracy standards specified for the project--Table 3-1, and (4) the detection repeatability of the acoustic system.

*a.* The object detection standard in Table 3-1 specifies that a *minimum* of three acoustic "hits" be obtained on a potential shoal or strike. These hits should ideally be obtained on repeated passes over an object. A single pass is adequate if numerous hits above grade are obtained, and the depths are consistently above the required grade.

*b.* A single hit 0.1-ft to 0.5-ft above grade presents problems. This hit could be the edge of a shoal or rock of larger size and shoaler elevation. If the estimated accuracy of the depth measurement process used is $\pm$ 1.0 ft, then this could be an observation lying within that 95% accuracy tolerance--e.g., taken when a vessel without heave compensation was surging down in the trough of a wave. Such a potential variation between depths and surveys is clearly exhibited in Table 4-2. Thus, additional observations are needed to confirm the existence (or non-existence) of material lying above the project grade. Additional passes should be run over the area. If acoustic hits above grade are repeatedly obtained on these additional passes, then a high probability exists that a shoal or rock strike is present in the channel. The confidence levels of shoal detection can be estimated given (1) height of hits above grade (dZ), (2) standard error of depth measurements (s), and (3) number of hits (n). Using approximate t-density functions, it can be shown that all three of the above factors (variables) will determine the overall confidence of detection, which can be roughly computed by the following:

$$t_{\alpha/2,\,n-1} \approx \mathrm{sqrt}(n)\,(dZ)\,/\,s$$

For example, given 3 hits averaging 1-ft above grade and a $\pm$ 1.0 ft standard error, the detection confidence is roughly 75%. If only 2 hits were recorded, the confidence of a shoal drops to 60%. If 10 hits are recorded, the confidence of detection is 98%. Thus, obtaining a 95% detection confidence may require more than 3 hits, depending on the magnitude of the three variables described above.

*c.* Obtaining multiple hits with a single, narrow beam echo sounder is difficult. Stealth-like objects may not always be detected with vertical beams. Close line spacing must be run over a suspected strike--e.g., 10 ft to 20 ft intervals. A multiple transducer or multibeam system is far more efficient in detecting strikes and confirming them with multiple passes. Multibeam sweeps should be conducted such that the beam aspect is varied from near-vertical to an outside beam. Multibeam side scan imagery on the outer beams will also be of value in detecting strikes above grade. On critical projects, towed side scan may be necessary to locate strikes.

*d.* The relative height of an object or shoal above grade will determine the need for clearance. This may depend on the location of the shoal within the channel, type of bottom material, size of shoal, potential navigation hazard, etc. The project COR makes the final determination on whether to mobilize or remobilize a dredge to remove the object/shoal.

## 4-9. Evaluation of Dredge Quantity Estimates Based on Depth Accuracy and Density

Three primary factors impact the accuracy of dredge volume computations, in this order:

- Terrain irregularity and data density
- Bias errors in depth measurements
- Deviation of depth observations

It has been shown that data density has the most important effect on the overall accuracy of a quantity computation. Required data density is a function of the irregularities in the terrain, as is clearly illustrated in Figure 4-3. Systematic biases in the depth database will obviously cause constant dredge volume errors. The deviation or estimated accuracy of the depths can cause volume errors if the standard error is large and an insufficient number of points are observed. A volume derived from a densely gridded/binned multibeam survey will yield a more accurate quantity than that obtained from 100-ft spaced cross-sections, even if the depth accuracy (i.e., standard deviation) of the multibeam survey is not a good as the cross-section depths. These concepts are discussed below.

version to the '04 were definitely as a result of our multi-beam user group meetings.

Q And that was something that really was the brain child, if that's the right word, of the New York district?

A We began it.

Q Would it be correct to say that the New York district was in the forefront in multi-beam technology for dredging for the Core of Engineers?

A Actually Philadelphia was ahead of us at one point, but I think we ultimately -- there's a tremendous fear of multi-beam technology, about the accuracies that could be attained and things like that. I believe as time went on we did move to the forefront of it.

Q There was a lot more new work dredging that was done in New York than in Philadelphia, correct?

A Absolutely.

Q Did you have decision making authority with regard to the engineer manual or was it just advisory?

A Advisory.

Q Could I direct your attention to page 11-35, please. Paragraph 11-17 says "contract specifications for multi-beam measurement and payment," and there are some contract clauses that are recommended; you see those?

A Yes.

Q Did you have any role to play in preparing those clauses?

A I believe those clauses were discussed at the multi-beam user meetings.

Q Do you know if they were ever actually inserted in dredging solicitations?

A That I don't know.

Q Do you know if a clause, either this clause or a clause like it, was inserted in New York district dredging contracts prior to this EM being issued?

A No, I don't believe it would have been, no.

Q Correct me if I'm wrong, but I don't recall seeing a similar provision in those earlier manuals about recommended

clauses for insertion, would I be correct in my recollection?

A Yes, you would.

Q I'll direct your attention to page 1145, which I think is the last page, and there's a chart there that provides recommended depth selection and data processing?

A Right.

Q First indented listing, "depth selection method used to select representative shoalest depth from multiple depths of the cell." So this manual is making it clear that that's what's recommended?

A Yes.

Q No longer saying, as earlier versions did, that minimum should not be used or centroid should be used, that's a change, I take it?

A Everybody finally saw things my way.

Q So you're recommendations led to this change in the manual?

A Yes, or at least had a lot of

impact on it.

Q You referred to the multi-beam users group and apparently there was a meeting in November of 2003. Let me show you a document that will help you remember. Do you recall attending that particular meeting?

A Yes, I do.

Q I noticed on the second page of this document, which ends in the number 269, there's an e-mail message that you were copied on and then at the bottom of the page it says, in the last paragraph, "this year the main topic was review update of chapter eleven of the engineer manual and mandatory requirements for multi-beam surveying." Do you recall that being the main topic?

A Yes.

Q Is that the discussion that lead to the changes we just talked about in the 2004 manual?

A Yes.

Q So would it be correct to say, at least at this time in November '03, there was a lot of active discussion within the

multi-beam users group as to what revisions should be made to the guidance and what kind of provisions should be inserted and that sort of thing?

A Yes.

Q On the page that ends with the numbers 272A.

A Yes.

Q There are some administrative issues that were apparently the topic of the meeting. Were you involved in the discussion of those things?

A Yes.

Q Do you recall what was discussed with regard to that first copy contract language currently in use?

A I have some general recollections, yeah.

Q What do you recall?

A Most of the other districts in the NAD apparently their dredging contracts did include some verbiage about the surveying end of it. My impression was that it concluded more than New York's did at the time and they

minimum.

Q. How did you become aware that the Corps was using the minimum?

A. Through conversations with Jim Galli and then, as I said, the letter in October.

Q. Did Cashman's performance of the KVK 8 contract change after you became aware that the Corps was using the minimum depth method to process acceptance surveys?

A. Probably.

Q. How?

A. We had to dig deeper and take more material.

Q. Why did you have to dig deeper?

A. Because the minimum survey shows -- has more information and shows higher spots than the average, and to get that acceptance area, you have to dig deeper.

Q. After Cashman began -- realized -- strike. After Cashman realized that the minimum depth method was used to process acceptance surveys, did the Corps acceptance surveys continue to find high spots?

A. I believe so.

Q. Why do you think that was?

or two deeper than allowable over depth to achieve the requirements of these hard digging projects?

A I'm sorry, let me read it again. I didn't specifically get that out of there. Yes, correct. He's suggesting yes, that it should be, yeah, it should be expected. There should be non paid over depth beyond paid over depth. There should be allowable beyond the paid over depth. Well, again in the context of that I haven't read the whole -- the whole presentation and I don't know specifically what he's -- what he's, you know, what his reference is and what his general point is. It would seem -- it would also seem from that same if you -- if you make that leap, it would certainly seem reasonable that the expectation is that they're going to go after the paid over depth. Otherwise it wouldn't matter how much, you know, whether you went -- whether you allowed over depth beyond the paid over depth. It speaks -- it speaks to whether or not the contract or what effort the contractor is going to make to get the over depth.

came up?

A When?

Q Yes.

A Not specifically.

Q Early in the job, middle of the job, end of the job?

A I -- I'd be guessing, but it was -- to be honest I'm not sure if the job was complete when I left. I think it was, but I wouldn't swear to that. I'm guessing it's probably about mid way. It could have been two-thirds through. I -- I -- I really don't recall.

Q How did it come up in terms of how was it communicated to you?

A I don't specifically recall short of the information that -- that's in the correspondence -- that list of correspondence I mentioned earlier. That kind of tracks, you know, a history of the issue.

Q As you refer to the surveying methods being employed, what did you come to learn about what methods existed?

A Well, it really depends about

where in the process. I -- prior to the correspondence and our discussions with surveys in, you know, relation to the correspondence, prior to that I -- I had no -- I was really -- I wouldn't say I wasn't aware of any differentiation. I wasn't familiar with any differentiation between types of surveys. As a result of -- of that whole or that survey, as a result of -- I'm going to say as a result of reading the correspondence because I -- I really remember very little specifically actually, I should say as it -- as it, you know, may have occurred, but it became apparent that there was more than one way to analyze the data and there was a -- one being a -- an average method, the other being a shoalest and to be honest, all I remember about the difference is that the shoalest was apparently what we used because it represented our best -- our best assurance that the contract rate had been met and that there were in fact no areas above minus forty-seven feet.

Q Do you know whether it was important for the dredging contractor to

understand what method was going to be employed by the New York District with regard to acceptance surveys?

A I was listening to the second part of your question and I forgot what you initially asked.

Q That's okay.

Do you know whether it was important for the dredging contractors to understand what survey method was being used?

A How important it was to the contractor, I don't know. I'm sure it had some importance. How much importance, I don't know. I -- I know that we needed -- we needed -- we needed everything to be below forty-seven feet and as much information as he needed to insure that, that's how much it was important.

Q Well, when you finish an acceptance survey, in simple terms you end up with a picture of what the bottom looks like; is that right?

A In simplest terms, yes.

Q You're interested in elevations?

Q I'm not sure, but that's the term I've heard.

A Okay, we were calling it the contractor's survey or we call it Cashman's survey most of the time and then our survey, okay.

MS. KILFOYLE: Can we take a break for a moment since there's no question pending? If you feel there is a question pending --

MR. PAYNE: That's fine.

(Whereupon, a brief recess was taken.)

Q So you know at least what I'm referring to when I use the term pre acceptance survey?

A Yeah, yeah.

Q Would those surveys on the KVK8 project have been presented by the contractor to you?

A Yes.

Q Were you the main point of contact with the contractor?

A Yeah, on a day-to-day basis, yeah,

yeah.

Q Who did you generally deal with?

A Jim Gally.

Q What would you do with a pre acceptance survey when you received it?

A What we would do is go down to our Survey Branch or call them and set up a Government acceptance survey.

Q Would you look at the pre acceptance survey yourself first?

A Well, usually they were a blank sheet of paper. I think the first couple of times I did, but the reason why they gave it to us they said Cashman was saying the area was clear and yeah, I think we'd open it up and look at it and yeah, it looks clear. Let's do a Government survey type thing.

Q Was there something provided to you in an electronic form as well?

A You know, it's been so long ago, I think yeah, they had to give us a disk too, if I remember correctly. Yeah, I think so.

Q Would you look at the electronic data?

A Never.

Q You would look at the map or whatever was on paper?

A Right, right, right.

Q Would you go over that with Mr. Conetta as well?

A Usually not these pre acceptance surveys. There was -- it was almost a formality, I think, they were sending us a letter saying yeah, we feel we're clear, go do a Government survey.

Q I assume there was no point in the contractor giving you a pre acceptance survey if he didn't feel the area was clear?

A Yeah.

Q So you would take it and present it to Survey and say here, do your thing?

A I don't even think we'd give it to Surveys. We wouldn't present it to them. We'd pretty much either call or go down to talk to them. They would never see the pre acceptance, I don't believe.

Q They just would get an authorization or request from you to go ahead

pre-acceptance survey showing that an area was clear but the Corps' survey did not confirm that?

A Yes.

Q Is that a fairly common thing --

A Yes.

Q -- to have happen?

A Yes.

Q Did it happen, if you know, to any greater degree in KVK8 than in those earlier projects?

A I do not know. I -- I don't have the -- as I said, I'm rarely involved once a contract is awarded, so I can't just -- I have no idea how many surveys are submitted on other contractors' jobs.

Q If all of the other contractors, as I think you're saying, understood that the shoalest method was going to be used, how do you account for the fact that they nevertheless submitted acceptance surveys that weren't clear?

A As a non surveyor, I can only speculate, and I don't know if that's helpful.

A I wrote portions of it. A lot of portions were written by other people. I can talk to you about what I wrote, what I got from other people and how we coordinated, but I can't talk to you about the writing of all parts of it.

Q Were some parts of it boilerplate in the sense that they were taken from previous packages?

A That is also true, yes.

Q It's not necessary to re-draft the entire plan and specification package?

A That is true.

Q Is there any way to easily identify those portions that you wrote in the KVK8 project package by category, for example?

A Well, most of my contributions would have been parts of what is called section 800, section 2900 and I think there was a 2200 still in this spec.

Q What were those sections? What did those sections deal with, if you recall?

A Section 800 was general contract provisions. Section 2900 is the dredging

specification. 2200 would have involved blasting.

Q Was the Survey Branch required to draft or furnish any parts of the specification?

A Their contribution was more or less boilerplate that was recycled from previous contracts and then sent back to them for review.

Q What who was your point of contact in Surveys?

A Let's see. This was 2003. I'm trying to remember if then it was Richard or -- Kiss or if it was still Ray Elmore. I'm trying to remember when Ray retired.

MS. KILFOYLE: Off the record.

(Whereupon, a discussion was held off the record.)

Q Mr. Weinberg, I'm handing you a copy of solicitation Paragraph 1.15, a provision dealing with final examination and acceptance, and ask you whether that is a provision that you are familiar with?

associated with this particular contract or another one. I was consulted on some minor issues, minor questions.

Q Would it be correct for me to assume that with regard to surveying the language and contracts it was sort of boiler plate across the KVK8 projects?

A That sounds about right, yeah.

Q Do you know whether the KVK8 contract did indeed include any measurement and payment provisions stipulating the type of survey system that was to be used?

A No, I don't.

Q Do you know whether this engineer circular defines the accuracy that the Core of Engineers surveys are required to meet?

A Yes, it does. I would like to qualify that.

Q Sure.

A It's always our feelings within the New York district that it defines minimum criteria.

Q I'll direct your attention to page A3 where there's a table. You see the table