IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-101C<br>(Judge Francis M. Allegra) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to RCFC 56(h)(2), Plaintiff, Jay Cashman, Inc., responds to Defendant's proposed findings of uncontroverted fact as follows:

1. The Port of New York and New Jersey (the "port") is the third largest port in the nation, and the largest port on the East Coast. See Natural Res. Def. Council v. United States Army Corps of Eng'rs, 399 F. Supp. 2d 386, 391 (S.D.N.Y. 2005); Pl. App. 4. Billions of dollars worth of cargo pass through the port on an annual basis. Id.

**Response:**

Plaintiff does not dispute this fact.

2. Beginning in 1986, Congress authorized the Corps to undertake a number of projects to deepen the navigational channels in the New York and New Jersey Harbor to meet industry demand for larger and deeper-bottomed cargo vessels to use the channels. See Natural Res. Def. Council v. United States Army Corps of Eng'rs, 399 F. Supp. 2d at 391; Pl. App. 3-4; Def. App. 1-2.

**Response:**

Plaintiff does not dispute this fact.

3. As part of this effort, the New York District of the Corps embarked upon the Kill Van Kull and Newark Bay Navigation Improvement Project (the "KVK project") to deepen the Kill Van Kull and Newark Bay Channels (the "channels"), which form the main artery linking the Ports of Elizabeth and Newark Bay. Pl. App. 4; Def. App. 1-2.

**Response:**

Plaintiff does not dispute this fact.

4. Phase I of the KVK project ("KVK Phase I"), which was substantially completed in 1995, involved a series of contracts to lower the depth of the channels to 42 feet below mean low water. Pl. App. 3; Def. App. 77; 127; 153.

**Response:**

Plaintiff does not dispute this fact.

5. Phase II of the KVK project ("KVK Phase II"), which was completed between 1999 and 2004, involved a series of contracts to lower the depth of the channels to 47 feet below mean low water. Pl. App. 3; Def. App. 3-4; 77.

**Response:**

Plaintiff does not dispute this fact.

6. There are future plans to lower the depth of the channels to 52 feet below mean low water, but the channels are currently authorized for use by vessels as 45-foot channels and will be used as such for a substantial period of time. Pl. App. 4; Def. App. 5-6; 65; 79-80.

**Response:**

Plaintiff does not dispute this fact.

7. If the authorized depth of the channel for navigational purposes is 45 feet, a ship with a draft of more than 45 feet should not use the channel. Def. App. 78; 152.

**Response:**

Plaintiff does not dispute this fact.

8. For the KVK projects, Corps included a two foot safety factor beyond the authorized depth of the channel for navigational purposes, because the KVK project involved rock and hard material, raising concerns that a vessel could hit the bottom of the channel and be seriously damaged. Pl. App. 13, Def. App. 4; 77.

**Response:**

Plaintiff does not dispute this fact.

9. KVK Phase II involved "new work" dredging, meaning deepening projects that involve dredging below the published elevation of the channels at the time that the projects began. Pl. App. 8, Def. App. 7 KVK Phase II also involved the dredging of "hard bottom" materials, such as rock or compacted gravel, till, or heavy clays. See Pl. App. 8, Def. App. 4; 77-78.

**Response:**

Plaintiff does not dispute this fact.

10. KVK Phase II was divided into eight separate contracts for eight defined areas of the project. Def. App. 8. These eight contracts were awarded to five different dredging prime contractors, and were awarded and completed on a rolling basis between 1999 and 2004. Def. App. 8-9; Pl. App. 3.

**Response:**

Plaintiff does not dispute this fact.

11. Hydrographic multibeam surveys ("multibeam surveys") involve an acoustic survey system that indirectly measures the depth of a channel. A sonar system transmits a fan of acoustic signals into the water to create a sounding. Def. App. 235 (Declaration of William McDonald ¶ 6); Def. App. 49-51. When the signals hit the seabed, or an object under water, energy is created that returns to the multibeam system. Def. App. 49-51; Def. App. 235 (Declaration of William McDonald ¶ 6). The multibeam system records the time that it takes for the acoustic signals to travel to the seafloor (or underwater object) and back to the system. Def. App. 51; 235 (Declaration of William McDonald ¶ 6); This information can be used to calculate the depth to the seafloor or underwater object. Def. App. 51; 235 (Declaration of William McDonald ¶ 6).

**Response:**

Plaintiff does not dispute this fact.

12. After data is recorded by the multibeam sonar system, it is edited and processed by computer programs to filter out extraneous data ("noise"). Def. App. 52; 235 (Declaration of William McDonald ¶ 7).

**Response:**

Plaintiff does not dispute this fact.

13. There are a number of survey products that can be produced based upon the edited data. Def. App. 52; 235 (Declaration of William McDonald ¶ 7).

**Response:**

Plaintiff does not dispute this fact.

14. Surveys can be produced using the average depth, which averages the survey data points in a three foot by three foot "bin" or "cell" of a designated area of the contract. Def. App. 120-21; 235 (Declaration of William McDonald ¶ 7).

**Response:**

Plaintiff does not dispute this fact.

15. Surveys can also be produced using the minimum depth or "shoalest" depth, which represents whether the shallowest data points in a three foot by three foot cell are above the contractually required depth. Def. App. 52; 120-21; 235 (Declaration of William McDonald ¶ 7). If at least three data points within a three foot by three foot cell are confirmed to be high spots above the contractually required depth, the cell is not at the contractually required depth. Def. App. 58-58; Def. App. 235 (Declaration of William McDonald ¶ 7).

**Response:**

Plaintiff disputes the fact as stated that: "Surveys can also be produced using the minimum depth or "shoalest" depth, which represents whether the shallowest data points in a three foot by three foot cell are above the contractually required depth." The evidence cited by Defendant supports the fact that "Surveys can also be produced using the minimum depth or "shoalest" depth, which represents the shallowest data point in a three foot by three foot cell." Def. App. 52; 235. Minimum depth is considered to be biased depths that are to be used with caution due to the relatively high variance in acoustic depth data. Def. App. 52. Furthermore, use of minimum shoal-biased depths can erroneously portray clearance data and the least depth recorded in a cell is not necessarily the absolute elevation over an object. Def. App. 52. The Plaintiff does not dispute the remaining statement of fact as a description of how minimum depth is used by the New York District.

16. Surveys produced using the average depth may “smooth out” or hide objects above the contractually required depth, making it difficult to detect them. Def. App. 52 (“The average depth over the series can overly smooth the data . . . .”); 164.

**Response:**

Plaintiff disputes the fact as stated. The evidence cited supports the fact that "the average depth over the series can overly smooth the data; however, this may be desirable in some instances." Def. App. 52. Mr. Weinberg, however, did not testify that the "average depth may 'smooth out' or hide objects above the contractually required depth, making it difficult to detect them." Mr. Weinberg's testimony did not refer to the average depth method and referred to "small objects" without defining what was meant by "small." ("If one was to use a different kind of binning technique other than shoalest, it would tend to smooth out these small objects and you wouldn't detect them . . ." Def. App. 164.

17. If the average depth of a cell is 47 feet, there may be points higher than 47 feet in the cell. See Def. App. 52; 164.

**Response:**

The evidence cited by Defendant does not support the fact as stated. Plaintiff would not dispute that, as a general proposition, if a number is an average of a group of numbers, some of the numbers may be greater and some may be lower.

18. Prior to multibeam surveys, the Corps accepted new work hard bottom dredging projects by ensuring that the contractually required depth was the minimum depth of an acceptance area. Def. App. 59-60; Def. App. 234 (Declaration of William McDonald ¶ 5).

**Response:**

Plaintiff does not dispute this fact, but avers that it is immaterial for purposes of resolving the pending motions.

19. The Corps used this method of acceptance for new work hard bottom dredging as far back as the 1880's, when acceptance was determined by means of a "bar drag." Def. App. 59, 60. A bar was placed in the water at a certain grade, and moved along. Def. App. 59-60. If the bar hit a shoal above the contractually required depth, it would be moved up until it cleared the obstruction, the elevation of the shoal would be recorded, and the Corps would require that it be removed. Def. App. 59-60.

**Response:**

Plaintiff does not dispute this fact, but avers that it is immaterial for purposes of resolving the pending motions.

20. A ship using the channel would want to know the minimum depth of any three foot by three foot area of the channel, rather than the average depth. Def. App. 60-62. If a ship were to hit a pinnacle above grade in materials such as rock or heavy clays, it could seriously damage the vessel, resulting in significant liability for the Corps. Def. App. 60-62; 231 (Declaration of James Thomas ¶ 6).

**Response:**

Plaintiff disputes this fact as phrased. Plaintiff avers that ships do not know anything, let alone what is minimum depth or average depth. Operators of ships, however, would want to know the authorized depth, since that is the depth that controls the size of vessel that can use the channel. **DPFOUF ¶7**. The evidence cited by Defendant does not support the proposed fact that a pinnacle of heavy clay could seriously damage a vessel. Plaintiff would not dispute that if a

ship were to hit a rock pinnacle above the authorized depth of the channel and be damaged, such an event could result in significant liability to the Corps, however, this constitutes a conclusion of law to which no response is required.

21. The National Oceanic and Atmospheric Association ("NOAA") creates and maintains nautical charts and related hydrographic information to ensure safe navigation of maritime commerce. Def. App. 149-50. To produce the nation's nautical charts and ensure safe navigation in United States waters and Exclusive Economic Zone, NOAA's Office of Coast Survey ("OCS") conducts hydrographic surveys to measure the depth and bottom configuration of water bodies. Def. App. 150. In collecting hydrographic data, OCS pays "particular attention" to acquiring the "precise location of least (shoalest) depths on dangers to navigation and depths significant to surface navigation." Def. App. 150.

**Response:**

Plaintiff does not dispute this fact, but avers that it is immaterial for purposes of resolving the pending motions.

22. Dredging contractors for the KVK Phase II projects recognized that navigational hazards were of concern for the Corps, and that the Corps would be applying a high level of scrutiny to ensure that there were no pinnacles above grade. Def. App. 231 (Declaration of James Thomas ¶¶ 5-6).

**Response:**

Plaintiff disputes this fact as stated. The evidence cited by the Defendant does not support that "dredging contractors for the KVK Phase II projects recognized that navigational hazards were of concern for the Corps, and that the Corps would be applying a high level of scrutiny to ensure that there were no pinnacles above grade." The evidence only provides the

expectation of one individual, who had prior experience performing dredging for the New York District, that the Corps "would employ a high level of scrutiny in analyzing survey data to ensure that the contractually required depth had been achieved, and that acceptance would be predicated on no high spots remaining above grade." Def. App. 231. Interestingly, while the individual expected that the Corps would employ a high level of scrutiny, he did not indicate that he would expect the Corps to employ the minimum depth method. Def. App. 231. Plaintiff avers, however, that what dredging contractors with prior experience performing dredging for the New York District knew, or expected, is immaterial for the purpose of resolving the pending motions.

23. During KVK Phase I of the project, a ship had hit a pinnacle, resulting in “a million dollar problem” for the Corps. Def. App. 60.

**Response:**

Plaintiff agrees that this fact appears to be supported by the evidence cited, and has no basis upon which to dispute this fact. However, Plaintiff avers that it is immaterial for the purpose of resolving the pending motions.

24. The Corps was concerned that because ships would be aware that the actual depth of the channels was 47 feet below mean low water, they would try to take advantage of the two feet beyond the authorized depth for navigational purposes. Def. App. 15; 63; 153-54.

**Response:**

Plaintiff disputes this fact as stated. Mr. Harold Hawkins, the Project Manager for the Defendant, testified that vessel operators in the channel where the authorized depth is forty-five feet "are not permitted to assume clearance to forty-seven." Def. App. 77. Furthermore, Plaintiff avers that the proposed fact is immaterial for the purpose of resolving the pending motions.

25. In addition, having pinnacles above 47 feet below mean low water would necessarily cause difficulties with the Corps's maintenance dredging contractors, who are responsible for ensuring that the area remains at a depth of 47 feet below mean low water, but not responsible for deepening the area to 47 feet below mean low water, or removing hard materials. Def. App. 6; 64-65.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact, and avers that it is immaterial for the purpose of resolving the pending motions. It should be noted that maintenance dredging contracts are typically issued for removal of material from above the authorized depth of a channel, which in this case would be 45 feet below mean low water not 47 feet below mean low water. Furthermore, Plaintiff avers that the proposed fact is immaterial for the purpose of resolving the pending motions.

26. On March 23, 2003, Cashman submitted a bid for the KVK 8 contract, the eighth and final contract to be awarded under KVK Phase II. Pl. App. 1-3, Def. App. 13; 40-43. Prior to submitting its bid, Cashman did not make inquiry regarding the method that the Corps would use to produce acceptance surveys, although Cashman knew that there were different ways to produce multibeam surveys, and had performed other contracts where multibeam surveys were used. Def. App. 10-12; Pl. App. 33.

**Response:**

Plaintiff does not dispute this fact. However, the evidence cited by Defendant indicates that Plaintiff did not perform the multibeam surveying on other contracts, rather that the surveying was performed by the government, and Plaintiff was only furnished with sounding

charts that depicted the results of the multibeam surveys without being informed what method was used to generate the charts. Def. App. 10-12; Pl. App. 33.

27. Bruce Wood, Cashman's Vice President and the Project Director for the KVK 8 contract, testified that at the time that he prepared Cashman's bid for the KVK 8 contract, he assumed that the Corps would process multibeam acceptance surveys using the average method "[b]ased upon the plans and specs . . . ." Def. App. 155.

**Response:**

Plaintiff does not dispute this fact.

28. Prior to KVK 8, Cashman had not been awarded any of the KVK Phase II contracts. However, Cashman had submitted bids for several harbor deepening contracts for the New York District, and had been the apparent low bidder for KVK contract for Area 5, but had requested and was granted permission to withdraw its bid due to a bid error. Def. App. 15-38.

**Response:**

Plaintiff does not dispute this fact.

29. Prior to award, Cashman did not contend that the requirement to dredge to a depth of 47 feet was impossible. Def. App. 156.

**Response:**

Plaintiff does not dispute this fact.

30. The KVK 8 contract was awarded to Cashman on May 23, 2003. Def. App. 14; 39; Pl. App. 3. The award amount for the KVK 8 contract was $35,460,430. Def. App. 39.

**Response:**

Plaintiff does not dispute this fact.

31. The specifications for the KVK 8 contract provided that the awardee would be required to dredge the contractually defined area to a depth of 47 feet below mean low water. Def. App. 14; 71; 74.

**Response:**

Plaintiff does not dispute this fact.

32. The specifications for the KVK 8 contract did not require Cashman to use a particular type of dredging equipment to achieve the contractually required depth. See Def. App. 73; 76. In addition the contract did not direct Cashman how to set the digging system on the dredge to achieve the contractually required depth - the decision was Cashman’s. Def. App. 157-58.

**Response:**

Plaintiff disputes this fact as stated. The specifications for the KVK 8 contract prohibited the Plaintiff from using particular types of dredging equipment, hopper and cutterhead dredges, Def. App. 76, and required Plaintiff to perform dredging of non-rock materials using a closed "environmental" bucket. Def. App. 73. The evidence cited by Defendant does not support the proposed fact that "the contract did not direct Cashman how to set the digging system on the dredge to achieve the contractually required depth - the decision was Cashman's." Def. App. 157-8.

33. The specifications further provided that: “If during the dredging or upon completion of the post-dredging surveys and soundings, materials are found above the required depth of 47 feet, below MLW [mean low water], these materials shall be removed immediately at the Contractor's expense.” Def. App. 71, 74.

**Response:**

Plaintiff does not dispute that the specifications include the quoted statement. However, the contract also provided that "when an area is found to be in a satisfactory condition, it will be accepted." Pl. App. 22. The Defendant, therefore, could exercise discretion in determining what constituted "a satisfactory condition" so that the dredging work could be accepted without the removal of all materials above a depth of 47 feet.

34. Because of inaccuracies in the dredging process, the specifications for the KVK 8 contract provided that the awardee would be compensated at the contract price for "allowable overdepth," defined as material removed up to 1.5 feet beyond the contractually required depth of 47 feet. Def. App. 74; 159-60. Any material removed more than 1.5 feet beyond the contractually required depth was the responsibility of the contractor, and would not be paid for by the Corps. Def. App. 71-74.

**Response:**

Plaintiff does not dispute this fact. The contract also provided that material should not be dredged more than 1.5 feet beyond the contractually required depth and warned that "Potential environmental consequences from dredging below -48.5 feet MLW could result in violations of the Ocean Dumping provisions of the Marine Protection, Research, and Sanctuaries Act (33 U.S.C. §§ 1401-1445) and may lead to a federal enforcement action." Pl. Supp. App. 25-26. This was the first Phase II KVK contract to contain this restriction. Pl. Supp. App. 27-28. In order to avoid possible environmental penalties, Plaintiff attempted to minimize any dredging more than 1.5 feet beyond the contractually required depth. Pl. App. 41.

35. When preparing Cashman's bid, Mr. Wood assumed that Cashman would need to perform dredging even beyond the paid overdepth to meet the required depth of 47 feet. Def. App. 161.

**Response:**

Plaintiff disputes this fact as stated. In his deposition, Mr. Wood testified that he assumed that Plaintiff would perform some dredging beyond the paid overdepth because "it's just the nature of the business." Def. App. 161. Mr. Wood did not testify that Plaintiff "would need to perform dredging even beyond the paid overdepth to meet the required depth of 47 feet." Furthermore, Mr. James Galli testified that Plaintiff would minimize any dredging beyond the paid overdepth because of the potential of a federal enforcement action for environmental penalties. Pl. App. 41.

36. The KVK 8 contract required both Cashman and the Corps to use multibeam surveys for a number of purposes. Pl. App. 22, Def. App. 68; 242 (Declaration of Salvatore DiDato ¶ 8).

**Response:**

Plaintiff does not dispute this fact.

37. The KVK 8 contract required Cashman to perform monthly progress payment surveys, to determine the quantity of material dredged for progress payment purposes. Def. App. 168-69. When Cashman believed that it had reached the contractually required depth, it was required to perform a pre-final acceptance survey to advise the Corps that it believed that the area was ready for final acceptance. Pl. App. 22. The Corps would then perform a final acceptance survey to determine that the work had been dredged to the contractually required depth. Id. The Corps also

performed final payment surveys to determine the final quantity of material removed for payment purposes. Def. App. 168-69.

**Response:**

Plaintiff does not dispute this fact.

38. In some instances, the Corps' survey data taken from a final acceptance survey could also be used to produce a final payment survey. However, this could only occur if an area was accepted on the first attempt. Def. App. 237 (Declaration of William McDonald ¶ 11).

**Response:**

Plaintiff does not dispute this fact.

39. There were three primary types of materials to be dredged under the KVK 8 Contract softer materials, such as silt, that could not be placed in the Historic Area Remediation Site ("HARS") after removal, hard materials such as glacial till, clay and rock material, that could be placed in the HARS after removal, and rock. Def. App. 70; 162-63.

**Response:**

Plaintiff disputes the fact as stated. The contract provided that non-rock materials unsuitable for placement at the HARS were composed of 1) Dark gray to black, very soft, organic Silt and Clay, 2) Red-brown, dense to very dense Sand and Gravel, 3) Red-brown, soft to hard Silt and Clay, and 4) Cobbles and Boulders, located in specific areas shown on the contract drawings, Pl. Supp. App. 29-30, capable of being dredged with an "environmental" bucket. Pl. Supp. App. 31. The materials suitable for placement at the HARS were defined as the contents of barges that consisted of more than 25 percent materials less than 2.5 inches in diameter. Pl. Supp. App. 32. Rock, which was to be deposited on a reef in the ocean, was defined as the

contents of barges that consisted of more than 75% materials more than 2.5 inches in diameter. Pl. Supp. App. 33.

40. For the material unsuitable for placement in the HARS, the contractor was to perform monthly progress payment surveys. Def. App. 168-69. In addition, the Corps conducted final payment surveys to determine the final quantity of material removed after dredging of the material unsuitable for the HARS in a contractually defined area was complete. Def. App. 69. However, the contractor was not required to perform pre-final acceptance surveys for the material unsuitable for placement in the HARS, and the Corps did not perform acceptance surveys for this material, because all of this material was located above the contractually required depth of 47 feet. See Def. App. 71; 242 (Declaration of Salvatore J. DiDato ¶ 10). The contractor was simply required to dredge this material with an environmental "bucket" until there was no more material to dredge. Def. App. 72-73.

**Response:**

Plaintiff does not dispute this fact.

41. For the material that was suitable for placement in the HARS and rock, the contractor also performed monthly progress payment surveys. Def. App. 68-69. In addition, the contractor was required to perform a pre-final acceptance survey to advise the Corps that the contractor believed that the area was ready for final acceptance. Def. App. 130. The Corps would then perform a final acceptance survey to determine whether the work had been dredged to the contractually required depth. Id. After the work had been accepted, the Corps would either perform or produce another survey to determine the final volume that had been dredged for payment purposes. Def. App. 68-69.

**Response:**

Plaintiff does not dispute this fact.

42. For all of the KVK Phase II contracts, payment surveys were produced using the average depth, because it provided a more equitable volume calculation for payment purposes. Def. App. 123. Acceptance surveys were produced using the minimum depth, because it ensured that the contractor had achieved the contractually required depth, and there were no high spots or "shoals" that could potentially cause damages to vessels. Def. App. 123; 167.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact as it relates to any KVK Phase II contract not performed by Plaintiff, and avers that it is immaterial for the purpose of resolving the pending motions.

43. The Corps produced all of its acceptance surveys for the KVK 8 contract using the minimum depth. Def. App. 59-60; 237 (Declaration of William McDonald ¶ 10).

**Response:**

Plaintiff does not dispute this fact.

44. Paragraph 1.15 of the Section 0800 of the specifications for the KVK 8 contract, entitled

"Final Examination and Acceptance," provided:

> As soon as practicable after the completion of an entire acceptance area a final examination of the work will be conducted by the Contracting Officer at the cost and expense of the Government by acoustic sweep survey system. Should any shoals or lumps or other lack of contract depth be disclosed by this examination the Contractor will be required to remove same. The Contractor or his authorized representative will be notified when soundings or sweepings are to be made and will be permitted to accompany the survey party. . . . The Contractor shall perform pre-final hydrographic sweep surveys of an entire acceptance area to

verify the area is satisfactorily completed prior to final examination by the Government. The pre-final surveys shall be performed using a multitrack or multibeam survey system to insure 100% coverage of the entire acceptance area. The proposed method for performing these surveys and all equipment and programs shall be submitted for approval. The Contractor's hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210 HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys.

Def. App. 130.

**Response:**

Plaintiff does not dispute this fact. However, the excerpted portion of the quoted statement from the contract included the statement that "When an area is found to be in a satisfactory condition, it will be accepted." Def. App. 130. The Defendant, therefore, could exercise discretion in determining what constituted "a satisfactory condition" so that the dredging work could be accepted without the removal of all materials above a depth of 47 feet.

45. Paragraph A-2 of Appendix A of EC 1130-2-210, entitled “Revised Survey Classifications,” provides:

Hard Bottom Material and/or New Work. This category of dredge measurement, payment, and acceptance surveys includes dredging of newly authorized projects containing hard bottom material, such as rock or compacted material, or maintenance projects containing hard bottom material. . . . Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary’s River, MI.

Def. App. 7, see also Def. App. 168 (EM 1110-2-1003, 1 January 2002, Paragraph 3.5).

**Response:**

Plaintiff does not dispute this fact.

46. EC 1130-2-210 provided that “procedural guidance and accuracy standards for performing multibeam surveys are contained in EM 1110-2-1003.” Def. App. 128. EM 1110-2-1003 (1 Jan 02) was a publicly available document, and was referenced in EC 1130-2-210, which the KVK 8 contract stated set forth standards that the contractor should “meet or exceed” for its hydrographic surveys, as a manual containing “[p]rocedural guidance and accuracy standards for performing hydrographic surveys.” See Pl. Memo at 4; Pl. Memo at 6 fn. 2; Pl. Memo at 9; Plaintiff’s Proposed Finding of Uncontrovered Fact No. 62; Def. App. 128; 130; see also http://web.archive.org/web/19980529092937/www.usace.army.mil/inet/usace-docs/eng-manuals/em1110-2-1003/toc.htm.

**Response:**

Plaintiff does not dispute that the evidence cited supports the statement that the contract referenced Engineering Circular ("EC") 1130-2-210, 1 October 1998, which in turn stated that "procedural guidance and accuracy standards for performing hydrographic surveys" are contained in EM 1110-2-1003. However, EC 1130-2-210, 1 October 1998, also provided that "The revised accuracy standards and related technical guidance contained in this circular [EC1130-2-210] supersede applicable portions of EM 1110-2-1003." Pl. Supp. App. 1-2.

47. The stated purpose of EM 1110-2-1003 is to “provide technical guidance for performing hydrographic surveys.” Def. App. 169.

**Response:**

Plaintiff does not dispute this fact.

48. EM 1110-2-1003 discussed multiple survey products that could be produced from multibeam survey data. See Def. App. 52.

**Response:**

Plaintiff does not dispute this fact.

49. EM 1110-2-1003 paragraph 11-12(c) provides that “the minimum depth recorded within a bin area may be used for some strike detection purposes.” Def. App. 52. Paragraph 11-12(c) also provides that “[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object.” Def. App. 52.

**Response:**

Plaintiff does not dispute that the quoted statements are as referenced. However, EM1110-2-1003 also provides that the use of the average depth method "may be desirable in some instances." Def. App. 52. Although Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes," it also warns that "[u]se of minimum shoal-biased depths can . . . erroneously portray clearance data," and "[s]hoal biasing can also skew minimum clearance computations . . ." Def. App. 52. EM 1110-2-1003 also provided that minimum, or shoal-biased depths shall not be used for dredging acceptance. (For dredging measurement, payment, or acceptance, the bin size should be kept as small as possible - typically less than 1 to 5 m is recommended. The shot point depth nearest the bin centroid shall be used; not average or minimum, or shoal-biased depths.") Def. App. 56. Richard Kiss, who was the Chief of the Defendant's Survey Section during the contract, testified that the New York District's use of the minimum depth for acceptance surveys was contrary to the method required by EM 1110-2-1003. Pl. Supp. App. 23. Mr. Kiss also

testified that when the Corps revised EM 1110-2-1003 in April, 2004, the method for acceptance surveys was changed to the minimum depth. Pl. Supp. App. 24.

50. In performing its surveys, the Corps assessed shoals based upon multiple hits over successive passes. See Def. App. 57-58; 166.

**Response:**

Plaintiff does not dispute this fact.

51. The basic language of the specifications for the KVK 8 contract was not changed from the earlier KVK Phase II contracts. Def. App. 13; 44-48.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact, and avers that it is immaterial for the purpose of resolving the pending motions.

52. There is no indication that any of the other contractors assumed that the Corps would produce final acceptance surveys using a method other than the minimum depth, or encountered any confusion. Def. App. 167. Therefore, the Corps assumed that Cashman understood this as well. Def. App. 82-83; 166-67.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact as to what other contractors assumed or what the Corps assumed. With regard as to what other contractors assumed, Plaintiff avers that it is immaterial for the purpose of resolving the pending motions.

53. The specifications for the KVK 8 contract provided that it was the contractor's responsibility to ensure that it had an adequate system in place to produce an end product that complied with the contract objectives. See Def. App. 75.

**Response:**

Plaintiff disputes the fact as stated. The evidence cited supports that it was the contractor's responsibility to provide a "quality control system . . . necessary to produce an end product which complies with the contract requirements." Def. App. 75.

54. The KVK 8 contract required Cashman to formally submit the proposed method for performing its pre-final acceptance surveys to the Corps for approval. See Def. App. 130.

**Response:**

Plaintiff disputes this fact as stated. The evidence cited provides "The proposed method for performing these surveys and all equipment and programs shall be submitted for approval." Def. App. 130. However, the contract submittal register in the specifications did not include this item as a "formal" submittal. Pl. Supp. App. 34-36.

55. Mr. Wood testified that he "believed" that Cashman had submitted its proposed method for performing pre-final acceptance surveys to the Corps for approval. Def. App. 170-71.

**Response:**

Plaintiff does not dispute this fact.

56. However, the Corps has no record of Cashman submitting a proposed method for performing pre-final acceptance surveys, or the Corps receiving a proposed method for performing pre-final acceptance surveys from Cashman. Def. App. 224-26; 241 (Declaration of Salvatore J. DiDato ¶ 7).

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact. However, the Defendant's project files did contain, in a folder marked "SURVEY EQUIP," the Quality Control Survey Plan prepared by the Plaintiff that identified the survey equipment and programs Plaintiff would use and its method of performing surveys. Pl. Supp. App. 37-38.

57. Alex Dick, Cashman’s Dredging Project Manager, had no opinion as to the method that the Corps would use to produce acceptance surveys at the time that he assisted in preparing Cashman’s bid for the KVK 8 contract, or at the time that work began under the contract. See Def. App. 172-74.

**Response:**

Plaintiff does not dispute this fact.

58. James Galli, Cashman’s Project Manager, did not have an opinion as to the method that the Corps would use to produce acceptance surveys at the time that Cashman began work on the project. See Def. App. 175-77.

**Response:**

Plaintiff does not dispute this fact.

59. Dan Gaudet, one of Cashman’s surveyors for the KVK 8 project, began work on the contract, he had “no clue” what method the Corps would use to produce acceptance surveys at the time that work began on the contract. See Def. App. 93; 178.

**Response:**

Plaintiff does not dispute this fact.

60. At the time that Cashman began work on the KVK 8 project, Cashman's Quality Control Manager, Paul Poirier, had no opinion as to the method that the Corps would use to produce multibeam acceptance surveys under the contract. Def. App. 179-80.

**Response:**

Plaintiff does not dispute this fact.

61. Dredging equipment and the nature of the material to be removed made it impossible to dredge to an even, neat, uniform line. See Def. App. 81; 159; 181-82.

**Response:**

Plaintiff does not dispute this fact.

62. The bucket of a backhoe dredge contains large teeth. Def. App. 227-28.

**Response:**

Plaintiff does not dispute this fact. However, the portion of the bucket that actually excavates material is the flat, horizontal lip of the bucket. Mr. Wood testified that the computer system on the dredge was used to set the depth of the dredge cuts and monitor the excavation on the computer screen at the operator's location on the dredge. Pl. Supp. App. 15-16. In its Operation Plan, Plaintiff notified the Defendant that its dredges would be equipped with "a satellite based state of the art positioning system" for horizontal and vertical control. Pl. Supp. App. 17. This system provided "accurate positioning on all three axes" and supplied the dredge operators with a "cross section and plan view of the bucket position."

63. The size of a bucket on a backhoe dredge does not directly relate to whether a cell is dredged to a uniform depth. Def. App. 232 (Declaration of James Thomas ¶ 7).

**Response:**

Plaintiff does not dispute this fact. However, the portion of the bucket that actually cuts and excavates material is the flat, horizontal lip of the bucket. Mr. Wood testified that the computer system on the dredge was used to set the depth of the dredge cuts and monitor the excavation on the computer screen at the operator's location on the dredge. Pl. Supp. App. 15-16. In its Operation Plan, Plaintiff notified the Defendant that its dredges would be equipped with "a satellite based state of the art positioning system" for horizontal and vertical control. Pl. Supp. App. 17. This system provided "accurate positioning on all three axes" and supplied the dredge operators with a "cross section and plan view of the bucket position."

64. Either at the time of bid or as work progressed, Cashman's employees decided that the Corps would produce final acceptance surveys using the average depth. Def. App. 58. Therefore, Cashman produced its pre-final acceptance surveys using the average depth. See Def. App. 177.

**Response:**

Plaintiff does not dispute this fact. In addition, Cashman's employees understood that the Corps would produce final acceptance surveys using the average depth based on statements made by Corps' representatives during weekly meetings. Pl. Supp. App. 39-41.

65. However, Cashman produced surveys for its own internal use using the minimum depth, because Cashman found it useful in determining how deep to set the digging system on the dredge, and to compare the difference between the average and minimum depth survey products. Def. App. 89-91.

**Response:**

Plaintiff does not dispute this fact. However, the evidence cited does not establish when Plaintiff "produced surveys for its own internal use using the minimum depth" other than it was before October 2004. Def. App. 90.

66. The Corps believed that Cashman understood that acceptance surveys would be produced using the minimum depth, and payment surveys would be produced using the average depth. See Def. App. 82-83; 164-64; 167.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact as to what the Corps believed that Cashman understood.

67. There is no indication that any of the other KVK Phase II contractors assumed that the Corps would produce final acceptance surveys using a method other than the minimum depth, or encountered any confusion. Def. App. 83-83; 167.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact as to what other KVK Phase II contractors assumed, and avers that it is immaterial for the purpose of resolving the pending motions.

68. The Survey Section did not make presentations at the pre-construction conferences for the KVK Phase II projects, and were simply present to meet the contractor, and to answer questions regarding surveys if the contractor raised them. Def. App. 86; 233-34 (Declaration of William McDonald ¶ 4); If there were no questions, the Survey Branch would not make any presentation. Def. App. 86.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact as to what occurred at preconstruction conferences other than the one held for its Phase II contract, and avers that it is immaterial for the purpose of resolving the pending motions.

69. The type of survey products that the Corps would use for payment and acceptance surveys were generally not discussed at the preconstruction conferences for KVK Phase II contracts. Def. App. 87, Def. App. 233-34 (Declaration of William McDonald ¶ 4).

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact as to what occurred at preconstruction conferences other than the one held for its Phase II contract, and avers that what occurred or did not occur at other preconstruction conferences is immaterial for the purpose of resolving the pending motions. Otherwise, Plaintiff does not dispute this fact.

70. For the other KVK Phase II contracts, additional meetings between contractors and the Survey Section were not held "uniformly or routinely." Def. App. 183. Representatives from the Survey Section occasionally attended partnering meetings throughout the KVK 8 contract. Def. App. 96.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact as to what occurred on other KVK Phase II contracts, and avers that it is immaterial for the purpose of resolving the pending motions. Plaintiff does not dispute that representatives from the survey section attended partnering meetings occasionally on the KVK 8 Contract.

71. William McDonald, a Cartographic Technician with the Survey Section at the time of the KVK 8 contract, attended a KVK 8 partnering meeting with representatives of Cashman, which was held 11 days after the preconstruction conference. Def. App. 228; 232 (Declaration of William McDonald ¶ 3); Def. App. 88. At this meeting, Mr. McDonald met Mr. Dick, Cashman's Dredging Project Manager. Def. App. 88.

**Response:**

Plaintiff does not dispute this fact.

72. Mr. Dick testified that he was able to contact Richard Kiss, the Chief of the Survey Section, to ask him questions regarding multibeam surveys during contract performance. Def App. 89.

**Response:**

Plaintiff disputes this fact as stated. The evidence cited only indicates that Mr. Dick, at some unknown point in time, talked with Mr. Kiss about bin sizes for multibeam surveys. Def. App. 89.

73. Although the contract provided that Cashman's employees could accompany the Corps' surveyors when the Corps conducted its acceptance surveys, Cashman did not pursue this option. See Def. App. 96; 130; 180; 187.

**Response:**

Plaintiff disputes this fact as stated. The evidence cited only establishes that Mr. Galli and Mr. Poirier did not accompany the Corps' surveyors. Def. App. 96; 180; 187.

74. The KVK 8 contract was divided into a number of sub-areas for acceptance purposes. Answer ¶ 6.

**Response:**

Plaintiff does not dispute this fact.

75. As work progressed, on numerous occasions, the Corps' final acceptance surveys showed high spots above the contractually required depth in sub-areas that Cashman's pre-final acceptance surveys indicated had been dredged to grade. Def. App. 132-48.

**Response:**

Plaintiff does not dispute this fact.

76. The Corps provided Cashman with survey results showing the high spots. Def. App. 132-48; 243-45.

**Response:**

Plaintiff does not dispute this fact.

77. It is fairly common for the Corps' acceptance surveys to find some high spots in areas that contractors believe have been dredged to grade, based upon a variety of different factors**,** including the way that survey equipment is mounted on the survey boat, the quality of the survey equipment used, and differences in conditions on days that surveys are performed. Def. App. 159; 184-86; 188.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact as to what was fairly common on other Corps' contracts.

78. Cashman began an internal investigation as to why the Corps continued to find high spots when Cashman believed that areas were clear. Def. App. 95-96. As a result of this investigation, Cashman determined that surveys produced using the minimum depth would be more likely to

show high spots above the contractually required depth than surveys produced using the average depth method. Def. App. 95-96.

**Response:**

While Plaintiff does not dispute this fact, the evidence cited does not establish when Plaintiff concluded that "the shoalest method shows more higher -- the shoalest method would show non-acceptance more than the average method would." Def. App. 95-96.

79. The contract provided that after two final acceptance survey attempts for any sub-area of the KVK 8 contract, the Corps was to charge Cashman $8,200 for each additional final acceptance survey. See Def. App. 130. The Corps has never sought to charge Cashman for any final acceptance surveys, although it could have done so pursuant to the contract.

**Response:**

Plaintiff disputes this fact as stated. On November 22, 2004, Defendant did request a credit from Plaintiff for twelve additional acceptance surveys performed by the Government. Pl. Supp. App. 42-43.

80. It was not the policy of the New York District for the Survey Section to receive the contractor's pre-final acceptance surveys, and the Survey Section did not receive Cashman's pre-final acceptance surveys. Def. App. 99-101. The Survey Branch did not need to receive Cashman's pre-final acceptance surveys, because Corps surveys were used for final acceptance, not Cashman's surveys. Def. App. 130.

**Response:**

Plaintiff does not have sufficient information either to confirm or dispute this fact as to what was not the policy of the New York District. Plaintiff agrees that the evidence cited

appears to support the fact that the survey section did not receive Plaintiff's pre-final acceptance surveys. Plaintiff does not have sufficient information either to confirm or dispute this fact as to whether the survey branch needed to receive Plaintiff's pre-final acceptance surveys.

81. Cashman's pre-final acceptance surveys were furnished to Mark Alton, a project engineer in the Construction Branch, who let the Survey Section know that the contractor believed that it was ready for an acceptance survey. Def. App. 99-102; 183-84.

**Response:**

Plaintiff does not dispute this fact.

82. Mr. Alton was responsible for administrative functions and quality assurance, had no training in multibeam surveys, and did not know that there were multiple ways to produce them. Def. App. 102-06. If the pre-final survey submitted by Cashman appeared to be a blank piece of paper showing no high spots above the contractually required project depth, Mr. Alton would simply call the Survey Branch and represent that Cashman was ready for a final acceptance survey. Def. App. 100; 183-84.

**Response:**

Plaintiff does not dispute this fact. Moreover, the evidence cited supports that Plaintiff did not just submit a "blank piece of paper showing no high spots," but rather submitted sounding charts and computer discs containing the survey data for its pre-final surveys. Def. App. 100; 101.

83. Mr. Galli testified that he verbally asked Ronald Conetta, the Administrative Contracting Officer, how the Corps was producing its acceptance surveys. Def. App. 92; 192.

**Response:**

Plaintiff does not dispute this fact.

84. Mr. Conetta had no experience with dredging prior to the KVK Phase II contracts, no knowledge of which survey products were available for use and in use by the Corps' Survey Section to produce final acceptance surveys, and did not even know that there were multiple ways to produce surveys from multibeam survey data. Def. App. 107-113; 189-92.

**Response:**

Plaintiff does not dispute this fact.

85. Mr. Galli testified that Mr. Conetta stated that he did not know, but advised Mr. Galli to write a letter seeking formal direction on the issue "many times." Def. App. 92.

**Response:**

Plaintiff does not dispute that the evidence cited supports the statement that Mr. Galli testified that Mr. Conetta advised him to write a letter seeking formal direction on the issue of how multibeam acceptance surveys would be processed "many times." However, since Administrative Contracting Officer Ronald Conetta testified that he could not recall that anyone from the Cashman organization ever asked him how multibeam acceptance surveys would be processed, Pl. Supp. App. 12, and Mr. Bruce Wood testified that the Corps' representatives response to the question how multibeam acceptance surveys would be processed was "They'll get back to us," Pl. Supp. App. 13-14, Plaintiff disputes this fact.

86. On August 31, 2004, Mr. Galli wrote a letter seeking direction. Def. App. 114. The letter stated that Mr. Galli had been verbally informed on August 31, 2004 that the Corps produced

acceptance surveys using the minimum depth, and requested confirmation of the acceptance standard that the Corps was using. Def. App. 114.

**Response:**

Plaintiff does not dispute this fact.

87. The Corps responded by letter on October 1, 2004, stating that the Corps produced acceptance surveys using the minimum depth. Pl. App. 51-53. The letter was signed by Mr. Conetta, as the Corps' contract correspondence went through him, but he believed that someone else drafted it. Def. App. 193-94.

**Response:**

Plaintiff does not dispute this fact.

88. Until receiving the letter, Cashman continued to produce pre-final acceptance surveys using the average depth. Def. App. 197-200.

**Response:**

Plaintiff does not dispute this fact.

89. After the October 1, 2004 letter, Cashman began to produce its pre-final acceptance surveys using the minimum depth. Def. App. 97-98. However, the Corps' acceptance surveys continued to find shoals on many areas of the project that Cashman believed had been dredged to the contractually required depth. Def. App. 143-48; 195-96.

**Response:**

Plaintiff does not dispute this fact.

90. Mr. Wood testified that this “happened from the beginning of the job until the end of the job.” Def. App. 195-96.

**Response:**

Plaintiff does not dispute that the evidence cited supports that Mr. Wood made the statement quoted, however, the evidence cited does not clearly indicate as to what Mr. Wood was referring. The questions and answers indicate that Mr. Wood was referring to the fact that Plaintiff "performed a survey of areas, did not find high spots, and then the Corps survey found high spots," not to events after October 1, 2004. Def. App. 195-6.

91. Cashman completed work on KVK 8 in November 2004. Def. App. 9; Pl. App. 3.

**Response:**

Plaintiff does not dispute this fact.

92. On July 22, 2005, Cashman submitted a certified claim under the Contract Disputes Act, requesting $6,538,769 in damages, consisting of $4,430,561 in damages for “Extra Effort to Remove HARS material,” and $2,108,208 in damages for “Days Spent Removing Shoaling.” Def. App. 201-15; 213.

**Response:**

Plaintiff does not dispute this fact.

93. The Contracting Officer, issued a final decision denying Cashman’s claim on October 26, 2005. Def. App. 216-23.

**Response:**

Plaintiff does not dispute this fact.

94. Mr. Kiss testified that the Corps performed more stringent quality control procedures of its own surveys than EM 1110-2-1003, 1 January 2002 required, to ensure that the results were accurate and reproducible. Def. App. 117-18.

**Response:**

Plaintiff does not dispute this fact. Mr. Kiss, who was the Chief of the Defendant's Survey Section during the contract, testified that the New York District's use of the minimum depth for acceptance surveys was contrary to the method required by EM 1110-2-1003. Pl. Supp. App. 23. Mr. Kiss also testified that when the Corps revised EM 1110-2-1003 in April, 2004, the method for acceptance surveys was changed to the minimum depth. Pl. Supp. App. 24.

95. EM 1110-2-1003, 1 January 2002**,** Table 3-1, identifies the accuracy standards for Corps surveys as “minimum performance standards.” Def. App. 131.

**Response:**

Plaintiff does not dispute this fact.

96. Navigation project condition surveys are not acceptance surveys, and were not at issue in Cashman’s contract. Def. App. 122. Payment surveys are also not acceptance surveys, and the Corps produced payment surveys using the average depth, not the minimum. Def. App. 123-24.

**Response:**

Plaintiff disputes the fact that "navigation project condition surveys are not acceptance surveys, and were not at issue in Cashman's contract." The evidence cited does not support the proposed fact. Def. App. 122. Plaintiff does not dispute the remainder of the proposed fact concerning payment surveys.

Respectfully submitted,

Dated: April 14, 2008

/s/ Michael H. Payne

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Drive, Suite 100
Fort Washington, PA 19034
Tel: (215) 542-2777
Fax: (213) 542-2779
mhp@phslegal.com

Attorney of Record for
Jay Cashman, Inc.

Of Counsel:
Joseph A. Hackenbracht, Esquire
Payne Hackenbracht & Sullivan