IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-101C<br>(Judge Francis M. Allegra) |

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of the Rules of this Court, Plaintiff replies to Defendant's responses to Plaintiff's proposed findings of uncontroverted facts. The Defendant's responses were often repetitive in nature and, while Plaintiff does not want to burden the Court needlessly, Plaintiff's replies are, of necessity, repetitive. In order to be as brief as possible, Plaintiff only replies to Defendant's responses to the extent that a reply is warranted.

****

15. The Congressionally authorized project depth for the Contract was 45 feet. (App. 3). The Contract, however, required excavation to a depth of 47 feet with an allowable overdepth of one and one-half additional feet. (App. 12). The two foot cushion between the authorized depth, 45 feet, and the project depth, 47 feet, was an additional safety factor adopted by the Corps. (App. 13).

**Response:**

Defendant does not dispute that the Congressionally authorized project depth for the Contract for navigational purposes was 45 feet. Defendant also agrees that the contract required excavation to a depth of 47 feet with an allowable overdepth of one and one-half additional feet.

The Corps considers the two foot safety factor to be part of the authorized depth. Def. App. 4; 127.

**Reply:**

Plaintiff has no independent basis to form a belief as to the truth of the statement by Defendant that "the Corps considers the two foot safety factor to be part of the authorized depth." However, this statement is not consistent with defendant's proposed uncontroverted fact ¶6 that the channels are currently authorized as 45-foot channels. Pl. App. 4; Def. App. 5-6; 65; 79-80.

****

20. These Corps of Engineers acceptance surveys are used by the Corps to determine how much material has been removed from an area for final payment purposes, and to also assure that the required depth has been achieved in a particular acceptance area sufficient to excuse the contractor from performing any further dredging in that area. (App. 14).

**Response:**

Defendant disputes this fact. Acceptance survey data is rarely used for purposes of final payment to the contractor, and when it is, the data is handled differently than for acceptance purposes. Def. App. 236-37 (Declaration of William McDonald ¶¶ 7, 11). For the KVK Phase II project, the Corps produced payment surveys using the average depth, and acceptance surveys using the minimum depth. Def. App. 236-37 (Declaration of William McDonald ¶¶ 7, 11). Defendant also disputes that the purpose of an acceptance survey is to “assure that the required depth has been achieved in a particular acceptance area sufficient to excuse the contractor from performing any further dredging in that area.” The contract required that Cashman dredge the area to 47 feet below mean low water, and that if material was found shallower than 47 feet below mean low water, Cashman would remove the material at its cost.

Def. App. 71.

**Reply:**

Plaintiff does not dispute that the evidence cited supports the statement that "the contract required that Cashman dredge the area to 47 feet below mean low water, and that if material was found shallower than 47 feet below mean low water, Cashman would remove the material at its cost." However, the contract also provided that "when an area is found to be in a satisfactory condition, it will be accepted." Pl. App. 22. The Defendant, therefore, could exercise discretion in determining what constituted "a satisfactory condition" so that the dredging work could be accepted without the removal of all materials above a depth of 47 feet.

****

31. The subject dredging Contract did not contain any of this technical information regarding the hydrographic survey system that the Defendant intended to employ on the project. The Contract only stated the following concerning acceptance surveys: "As soon as practicable after the completion of an entire acceptance area, a final examination of the work will be conducted by the Contracting Officer, at the cost and expense of the Government by acoustic sweep survey system." (App. 22).

**Response:**

Defendant agrees that the contract specifications themselves did not contain the technical information regarding the hydrographic survey system that the Corps intended to use on the project. However, the contract referenced Engineering Circular ("EC") 1130-2-210, 1 October 1998, which in turn stated that "procedural guidance and accuracy standards for performing hydrographic surveys are contained in EM 1110-2-1003." Def. App. 128, 130. The Corps believed that this was sufficient to provide contractors with the necessary information. Def. App.

84-85; 164-65.

Defendant agrees that the contract made the statement in quotations in sentence 2 of paragraph 31, but disagrees that it is the "only" statement concerning acceptance surveys. See Def. App. 130.

**Reply:**

Plaintiff has no independent basis to form a belief as to the truth of the statement by Defendant that "the Corps believed that this was sufficient to provide contractors with the necessary information." Plaintiff does not dispute that the evidence cited supports the statement that "However, the contract referenced Engineering Circular ("EC") 1130-2-210, 1 October 1998, which in turn stated that "procedural guidance and accuracy standards for performing hydrographic surveys are contained in EM 1110-2-1003." However, EC 1130-2-210, 1 October 1998, also provided that "The revised accuracy standards and related technical guidance contained in this circular [EC1130-2-210] supersede applicable portions of EM 1110-2-1003." Pl. Supp. App. 1-2.

****

37. In other words, even if these three data points indicated that the material was above grade by as little as one-tenth of a foot, that survey was then utilized by the Corps as the basis to direct the Plaintiff to re-dredge the acceptance area. (App. 31).

**Response:**

Defendant agrees that if three data points indicated that the material was above grade by one-tenth of a foot, the area would not be accepted by the Corps. However, disagrees that the evidence cited supports the statement that the "survey was then utilized by the Corps as the basis to direct the Plaintiff to re-dredge the acceptance area." Rather, it states that the contractor would

be required to remove the shoal or high spot. Pl. App. 31. Furthermore, the KVK8 contract required Cashman to dredge to a depth of 47 feet, and to remove materials above that depth at its expense. Def. App. 14; 71.

**Reply:**

When Plaintiff was notified that an acceptance area was not acceptable, it was repeatedly directed to re-dredge the acceptance area. Pl. Supp. App. 4-9. It was not until November 29, 2004 that the Defendant only directed the removal of the shoal or high spot. Pl. Supp. App. 10-11. Plaintiff does not dispute that the evidence cited supports the statement that "the KVK8 contract required Cashman to dredge to a depth of 47 feet, and to remove materials above that depth at its expense." However, the contract also provided that "when an area is found to be in a satisfactory condition, it will be accepted." Pl. App. 22. The Defendant, therefore, could exercise discretion in determining what constituted "a satisfactory condition" so that the dredging work could be accepted without the removal of all materials above a depth of 47 feet.

****

46. The contract required the Plaintiff to perform its pre-acceptance surveys using a multibeam survey system, and the Plaintiff did so, but the Contract did not specify what method (minimum or average) Plaintiff was to use to process the data for its pre-final surveys. (Answer, ¶14).

**Response:**

This proposed finding of fact is not supported by the evidence cited. Defendant agrees that contract required the Cashman to perform its pre-acceptance surveys using a multibeam survey system, and that Cashman did so. Defendant agrees that the contract specifications themselves did not contain the technical information regarding the process that Cashman should

use to produce its pre-final acceptance surveys. Defendant avers that for acceptance, the relevant inquiry was the process that the Corps would use to produce its final acceptance surveys, as the Corps surveys were used to determine acceptance. Def. App. 130.

Furthermore, the contract specifications provided that "the Contractor's hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys." Def. App. 130. Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

> Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI
> .
> Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b) of EM 1110-2-1003 (January 1, 2002) provided that "the average depth over the series can overly smooth the data . . . ." Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes." Def. App. 52. Paragraph 11-12(c) also provides that "[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. The Corps believed that these references were sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-66.

**Reply:**

Plaintiff has no independent basis to form a belief as to the truth of the statement by Defendant that "the Corps believed that these references were sufficient to provide contractors with the necessary information." Although "EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003," EC 1130-2-210, 1 October 1998, also provided that "The revised accuracy standards and related technical guidance contained in this circular [EC1130-2-210] supersede applicable portions of EM 1110-2-1003." Pl. Supp. App. 1-2. EM1110-2-1003 also provides that the use of the average depth method "may be desirable in some instances." Def. App. 52. Although Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes," it also warns that "[u]se of minimum shoal-biased depths can . . . erroneously portray clearance data," and "[s]hoal biasing can also skew minimum clearance computations . . ." Def. App. 52. Furthermore, "the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. EM 1110-2-1003 provided that minimum, or shoal-biased depths shall not be used for dredging acceptance. Def. App. 56.

****

47. There was no guidance in the contract, or elsewhere, that specified whether the minimum or average depth method was to be used.

**Response:**

This proposed finding of fact is not supported by the evidence cited. Defendant agrees that contract required the Cashman to perform its pre-acceptance surveys using a multibeam survey system, and that Cashman did so Defendant agrees that the contract specifications

themselves did not contain the technical information regarding the process that Cashman should use to produce its pre-final acceptance surveys. Defendant avers that for acceptance, the relevant inquiry was the process that the Corps would use to produce its final acceptance surveys, as the Corps surveys were used to determine acceptance. Def. App. 130.

Furthermore, the contract specifications provided that "the Contractor's hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys." Def. App. 130. Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

> Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b) of EM 1110-2-1003 (January 1, 2002) provided that "the average depth over the series can overly smooth the data . . . ." Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes." Def. App. 52. Paragraph 11-12(c) also provides that "[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. The Corps believed that these references were sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-66.

Defendant also disagrees with this proposed finding of fact because Mr. Galli testified

that Administrative Contracting Officer Ronald Conetta advised him to write a letter seeking formal direction on the issue of how multibeam acceptance surveys would be processed "many times." Def. App. 92.

**Reply:**

Plaintiff has no independent basis to form a belief as to the truth of the statement by Defendant that "the Corps believed that these references were sufficient to provide contractors with the necessary information." Although "EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003," EC 1130-2-210, 1 October 1998, also provided that "The revised accuracy standards and related technical guidance contained in this circular [EC1130-2-210] supersede applicable portions of EM 1110-2-1003." Pl. Supp. App. 1-2. EM1110-2-1003 also provides that the use of the average depth method "may be desirable in some instances." Def. App. 52. Although Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes," it also warns that "[u]se of minimum shoal-biased depths can . . . erroneously portray clearance data," and "[s]hoal biasing can also skew minimum clearance computations . . ." Def. App. 52. Furthermore, "the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. EM 1110-2-1003 provided that minimum, or shoal-biased depths shall not be used for dredging acceptance. Def. App. 56.

Plaintiff does not dispute that the evidence cited supports the statement that Mr. Galli testified that Administrative Contracting Officer Ronald Conetta advised him to write a letter seeking formal direction on the issue of how multibeam acceptance surveys would be processed "many times." However, since Administrative Contracting Officer Ronald Conetta testified that

he could not recall that anyone from the Cashman organization ever asked him how multibeam acceptance surveys would be processed, Pl. Supp. App. 12, and Mr. Bruce Wood testified that the Corps' representatives response to the question how multibeam acceptance surveys would be processed was "They'll get back to us," Pl. Supp. App. 13-14, Plaintiff disputes that the statement quoted by Defendant supports the Defendant's disagreement with the proposed statement of fact that "There was no guidance in the contract, or elsewhere, that specified whether the minimum or average depth method was to be used."

****

48. The Contract only required that Plaintiff's pre-final "hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys." (App. 22). None of these referenced standards addressed the data processing method for multibeam surveys. (App. 38, 39).

**Response:**

This proposed finding of fact is not supported by the evidence cited. Defendant agrees that contract required the Cashman to perform its pre-acceptance surveys using a multibeam survey system, and that Cashman did so. Defendant agrees that the contract specifications themselves did not contain the technical information regarding the process that Cashman should use to produce its pre-final acceptance surveys. Defendant avers that for acceptance, the relevant inquiry was the process that the Corps would use to produce its final acceptance surveys, as the Corps surveys were used to determine acceptance. Def. App. 130.

Defendant agrees that the contract specifications themselves did not contain the technical information regarding the process that Cashman should use to produce its pre-final acceptance surveys. Defendant avers that for acceptance, the relevant inquiry was the process that the Corps

would use to produce its final acceptance surveys, as the Corps surveys were used to determine acceptance. Def. App. 130.

Furthermore, the contract specifications provided that “the Contractor’s hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys.” Def. App. 130. Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary’s River, MI.

Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b) of EM 1110-2-1003 (January 1, 2002) provided that “the average depth over the series can overly smooth the data . . . .” Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that “the minimum depth recorded within a bin area may be used for some strike detection purposes.” Def. App. 52. Paragraph 11-12(c) also provides that “[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object.” Def. App. 52. The Corps believed that these references were sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-66.

**Reply:**

Plaintiff has no independent basis to form a belief as to the truth of the statement by Defendant that "the Corps believed that these references were sufficient to provide contractors

with the necessary information." Although "EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003," EC 1130-2-210, 1 October 1998, also provided that "The revised accuracy standards and related technical guidance contained in this circular [EC1130-2-210] supersede applicable portions of EM 1110-2-1003." Pl. Supp. App. 1-2. EM1110-2-1003 also provides that the use of the average depth method "may be desirable in some instances." Def. App. 52. Although Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes," it also warns that "[u]se of minimum shoal-biased depths can . . . erroneously portray clearance data," and "[s]hoal biasing can also skew minimum clearance computations . . ." Def. App. 52. Furthermore, "the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. EM 1110-2-1003 provided that minimum, or shoal-biased depths shall not be used for dredging acceptance. Def. App. 56.

****

50. Plaintiff used the results obtained by using the average depth method on a daily basis to evaluate and direct the performance of the dredging, and based on the previous day's survey, Plaintiff would determine each day how deep to dredge. (App. 41).

**Response:**

Defendant does not dispute this fact. However, Mr. Dick also testified that Cashman would produce multibeam surveys using the minimum depth to determine how to set the dredge. Def. App. Def. App. 89-91. Mr. Gaudet also testified that he would produce surveys using the minimum depth out of “curiosity.” Def. App. 94. Mr. Galli testified that Cashman produced surveys using the minimum depth as part of an investigation into why Cashman was not passing

the Corps' acceptance surveys. Def. App. 95-96.

**Reply:**

Mr. Wood testified that the computer system on the dredge was used to set the depth of the dredge cuts and monitor the excavation on the computer screen at the operator's location on the dredge. Pl. Supp. App. 15-16. In its Operation Plan, Plaintiff notified the Defendant that its dredges would be equipped with "a satellite based state of the art positioning system" for horizontal and vertical control. Pl. Supp. App. 17. This system provided "accurate positioning on all three axes" and supplied the dredge operators with a "cross section and plan view of the bucket position."

****

51. When Plaintiff completed the first phase of the dredging, excavation of the upland disposal material, it submitted its after-dredge surveys based on the average depth method, the Corps accepted the work based on the average depth method, and the Corps paid for the work based on the average depth method surveys. (App. 42,43).

**Response:**

Defendant disputes that the Corps produced acceptance surveys for the upland material based upon the average depth method, or any other method. Surveys for the upland material were only performed for payment purposes, not acceptance. Def. App. 242 (Declaration of Salvatore DiDato ¶ 10); 237 (Declaration of William McDonald ¶ 9). Because all of the "upland material" was above the required grade no acceptance survey was performed. Id. Rather the "upland material" dredging was considered complete when a specific type of bucket (known as an "environmental bucket") was no longer able to dig material. Def. App. 72-73. Defendant agrees that Cashman submitted its payment surveys for the upland work, which were produced

using the average depth method, and that the Corps paid for the work based upon this method.

**Reply:**

The proposed finding of uncontroverted fact was misstated. The testimony cited supports that when Plaintiff completed the first phase of the dredging of the unconfined aquatic disposal material, ("HARS material"), it submitted its after-dredge surveys based on the average depth method, the Corps accepted the work based on the average depth method, and the Corps paid for the work based on the average depth method surveys. (App. 42,43).

****

57. The survey charts that Defendant provided Plaintiff did not identify the survey system or data analysis method employed by the Defendant to reject the work as unacceptable. (App. 47). The only information provided by Defendant was to note that: "The sounding data depicted on this map was collected using Class I survey standards. . ." and that "The data on this map is representative of a larger data set."

**Response:**

Defendant does not dispute this fact. However, Mr. Galli testified that Administrative Contracting Officer Ronald Conetta advised him to write a letter seeking formal direction on the issue of how multibeam acceptance surveys would be processed “many times.” Def. App. 92. In addition, The Corps provided Cashman with survey results showing the high spots. Def. App. 132-48; 243-45.

**Reply:**

Plaintiff does not dispute that the evidence cited supports the statement that Mr. Galli testified that Administrative Contracting Officer Ronald Conetta advised him to write a letter seeking formal direction on the issue of how multibeam acceptance surveys would be processed

"many times." However, Administrative Contracting Officer Ronald Conetta does not recall these conversations, Def. App. 112, and, furthermore, testified that he could not recall that anyone from the Cashman organization ever asked him how multibeam acceptance surveys would be processed. Def. App. 111**.** Mr. Bruce Wood testified that the Corps' representatives response was not to submit the question in writing, but rather that the response to the question of how multibeam acceptance surveys would be processed was "They'll get back to us." Pl. Supp. App. 13-14.

****

61. As the work proceeded, Defendant failed to identify the data analysis method, causing Plaintiff to rely, to its detriment, on the average depth surveying method.

**Response:**

This is not a fact, but rather, argument and legal conclusions. Cashman never inquired regarding the method that the Corps would use to produce final acceptance surveys prior to submitting its bid for the contract. Def. App. 10.

Furthermore, the contract specifications provided that "the Contractor's hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys." Def. App. 130. Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

> Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b) of EM 1110-2-1003 (January 1, 2002) provided that “the average depth over the series can overly smooth the data . . . .” Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that “the minimum depth recorded within a bin area may be used for some strike detection purposes.” Def. App. 52. Paragraph 11-12(c) also provides that “[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object.” Def. App. 52. The Corps believed that this was sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-65.

Furthermore, Mr. Galli testified that Mr. Conetta advised him to write a letter seeking formal direction on the issue of how acceptance surveys would be produced “many times.” Def. App. 92. In addition, the contract required Cashman to submit the proposed method for performing its pre-final acceptance surveys to the Corps for approval, and Cashman did not do so. Def. App. 130; Def. App. 224-26; 241 (Declaration of Salvatore J. DiDato ¶ 7).

Furthermore, although Cashman was not passing numerous Government acceptance surveys, and had conducted an investigation into whether it would pass the surveys using a minimum depth product, Cashman did not change its course of action or seek formal direction. Def. App. 95-96.

**Reply:**

Plaintiff has no independent basis to form a belief as to the truth of the statement by Defendant that "the Corps believed that these references were sufficient to provide contractors with the necessary information." Although "EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-

1003," EC 1130-2-210, 1 October 1998, also provided that "The revised accuracy standards and related technical guidance contained in this circular [EC1130-2-210] supersede applicable portions of EM 1110-2-1003." Pl. Supp. App. 1-2. EM1110-2-1003 also provides that the use of the average depth method "may be desirable in some instances." Def. App. 52. Although Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes," it also warns that "[u]se of minimum shoal-biased depths can . . . erroneously portray clearance data," and "[s]hoal biasing can also skew minimum clearance computations . . ." Def. App. 52. Furthermore, "the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. EM 1110-2-1003 provided that minimum, or shoal-biased depths shall not be used for dredging acceptance. Def. App. 56.

Plaintiff does not dispute that the evidence cited supports the statement that Mr. Galli testified that Administrative Contracting Officer Ronald Conetta advised him to write a letter seeking formal direction on the issue of how multibeam acceptance surveys would be processed “many times.” However, since Administrative Contracting Officer Ronald Conetta testified that he could not recall that anyone from the Cashman organization ever asked him how multibeam acceptance surveys would be processed, Pl. Supp. App. 12, and Mr. Bruce Wood testified that the Corps' representatives response to the question how multibeam acceptance surveys would be processed was "They'll get back to us," Pl. Supp. App. 13-14, Plaintiff disputes that the statement quoted by Defendant supports the Defendant's disagreement with the proposed statement of fact that "As the work proceeded, Defendant failed to identify the data analysis method, causing Plaintiff to rely, to its detriment, on the average depth surveying method."

Furthermore, Plaintiff did seek direction from the representatives of the Corps whom were responsible for administering the contract, direction that was not provided timely.

****

62. Defendant did not furnish the technical information that its internal guidance, EM 1110-2-1003, had required to be in the Contract specifications, until October 1, 2004. (App. 51-53).

**Response:**

Defendant disputes this fact. First, Mr. Galli's serial letter of August 31, 2004 stated that he had been informed on that day that the Corps would produce and had been producing multibeam acceptance surveys using the minimum depth. Def. App. 114-115.

the contract specifications provided that "the Contractor's hydrographic survey standards shall meet or exceed the survey standards listed in EC 1130-2-210, HYDROGRAPHIC SURVEYING, 1 October 1998, for Class I surveys." Def. App. 130.

Appendix A of Paragraph A-2(a)(1) of EC 1130-2-210, provided that for hard bottom material and/or new work dredging:

> Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7.

EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003. Def. App. 128. Paragraph 11-12(b)

of EM 1110-2-1003 (January 1, 2002) provided that “the average depth over the series can overly smooth the data . . . .” Def. App. 52. Paragraph 11-12(c) of EM 1110-2-1003 provides that “the minimum depth recorded within a bin area may be used for some strike detection purposes.” Def. App. 52. Paragraph 11-12(c) also provides that “[s]hoals above grade must be assessed based on multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object.” Def. App. 52. The Corps believed that this was sufficient to provide contractors with the necessary information. Def. App. 84-85; 164-65.

The Corps did not know that Cashman was confused, because Cashman waited until August 31, 2004 to seek formal direction from the Corps. Def. App. 114-15.

**Reply:**

Plaintiff has no independent basis to form a belief as to the truth of the statement by Defendant that "the Corps believed that these references were sufficient to provide contractors with the necessary information." Plaintiff has no independent basis to form a belief as to the truth of the statement by Defendant that "The Corps did not know that Cashman was confused." Although "EC 1130-2-210 also stated that procedural guides and accuracy standards for performing hydrographic surveys were contained in EM 1110-2-1003," EC 1130-2-210, 1 October 1998, also provided that "The revised accuracy standards and related technical guidance contained in this circular [EC1130-2-210] supersede applicable portions of EM 1110-2-1003." Pl. Supp. App. 1-2. EM1110-2-1003 also provides that the use of the average depth method "may be desirable in some instances." Def. App. 52. Although Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes," it also warns that "[u]se of minimum shoal-biased depths can . . . erroneously portray clearance data," and "[s]hoal biasing can also skew minimum clearance

computations . . ." Def. App. 52. Furthermore, "the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. EM 1110-2-1003 provided that minimum, or shoal-biased depths shall not be used for dredging acceptance. Def. App. 56.

****

64. Not only did the Defendant fail to disclose that it was processing the survey data in a manner that had not been disclosed to the Plaintiff, the Defendant applied a more stringent tolerance to determine whether a minimum depth acceptance survey had “passed” than was customary in the Corps of Engineers or than was anticipated by Corps' policy in effect when the Plaintiff’s contract was awarded. (App. 54, 55).

**Response:**

Defendant disputes this fact. Mr. Kiss testified that the quality control procedures employed by the Corps to ensure the quality and accuracy of their survey data were more stringent than was required by Corps manuals, not that the Corps was imposing more stringent requirements upon the contractor. Def. App. 117-18. This was done to ensure that the Corps could identify high spots in the interest of navigational safety, and that the Corps would not send contractors after “fake” high spots that did not actually exist. EM 1110-2-1003, 1 January 2002**,** Table 3-1, identifies the accuracy standards for Corps surveys as “minimum performance standards.” Def. App. 131.

**Reply:**

Mr. Kiss did testify that the New York District applied a more stringent tolerance in its surveys than the "minimum" requirements in the Corps manuals. As an example, Mr. Kiss stated that although the manuals provided a depth accuracy of plus or minus one foot, the New York District met a tolerance of plus or minus two tenths of a foot. Pl. Supp. App. 18-19. Mr. Kiss

also testified that, to his knowledge, the more stringent requirements of the New York District was not communicated in the dredging plans and specifications. Pl. Supp. App. 20. Furthermore, Mr. Kiss testified that the New York District used the minimum depth for acceptance surveys rather than the method required by EM 1110-2-1003, centroid, because the minimum depth was more accurate. Pl. Supp. App. 21-22.

****

65. The version of EM 1110-2-1003 in effect at the time of contract award provided that for dredging acceptance the minimum depth method shall not be used. (App. 20,56,57).

**Response:**

Defendant disputes this fact, which is unsupported by the evidence cited. Mr. Wood's testimony states that EM 1110-2-1003 provided that the minimum depth method was not to be used for acceptance surveys based upon paragraph 11-12(b), which states that the minimum depth method "shall not be used for dredging payment surveys, and should be used with caution on navigation project surveys." Def. App. 52. Payment surveys and navigation project surveys are not acceptance surveys. Navigation project surveys are not at issue in this case, and were not performed as part of Cashman's contract. Def. App. 122-24. The Corps produced payment surveys using the average depth method. Def. App. 123-24. EM 1110-2-1003 paragraph 11-12(b) specifically provided that "[t]he minimum depth method within a bin area may be used for some strike detection purposes." Def. App. 52.

**Reply:**

EM1110-2-1003 also provides that the use of the average depth method "may be desirable in some instances." Def. App. 52. Although Paragraph 11-12(c) of EM 1110-2-1003 provides that "the minimum depth recorded within a bin area may be used for some strike

detection purposes," it also warns that "[u]se of minimum shoal-biased depths can . . . erroneously portray clearance data," and "[s]hoal biasing can also skew minimum clearance computations . . ." Def. App. 52. Furthermore, "the least depth recorded in a bin is not necessarily the absolute elevation over an object." Def. App. 52. EM 1110-2-1003 provided that minimum, or shoal-biased depths shall not be used for dredging acceptance. Def. App. 56. Richard Kiss, who was the Chief of the Defendant's Survey Section during the contract, testified that the New York District's use of the minimum depth for acceptance surveys was contrary to the method required by EM 1110-2-1003. Pl. Supp. App. 23. Mr. Kiss also testified that when the Corps revised EM 1110-2-1003 in April, 2004, the method for acceptance surveys was changed to the minimum depth. Pl. Supp. App. 24.

Respectfully submitted,

Dated: April 14, 2008

/s/ Michael H. Payne

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Drive, Suite 100
Fort Washington, PA 19034
Tel: (215) 542-2777
Fax: (213) 542-2779
mhp@phslegal.com

Attorney of Record for
Jay Cashman, Inc.

Of Counsel:
Joseph A. Hackenbracht, Esquire
Payne Hackenbracht & Sullivan