IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Drive, Suite 100
Fort Washington, PA 19034
Tel: (215) 542-2777
Fax: (213) 542-2779
mhp@phslegal.com

Date: April 14, 2008

Attorney of Record for
Jay Cashman, Inc.

Of Counsel:
Joseph A. Hackenbracht, Esquire
Payne Hackenbracht & Sullivan

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ........ 1

I. Standard for Summary Judgment ........ 1

II. Plaintiff Met The Contract Objective As Properly Measured Under The Terms Of The Contract ........ 1

III. The Corps' Failure To Comply With Its Own Engineering Manual Lends Persuasive Strength To Plaintiff's Claims That It Reasonably Interpreted The Contract To Allow Use Of The Average Depth Method ........ 7

IV. The Plaintiff Did Not Fail To Inquire Regarding A Patent Ambiguity, Since There Was No Ambiguity. Alternatively, If There Was An Ambiguity, It Was Clearly Latent ........ 11

V. Because Any Ambiguity, If It Existed, Was Latent, The Plaintiff's Reasonable Choice Of The Average Depth Method Should Be Upheld By The Court ........ 16

VI. The Corps Breached Its Duty To Cooperate With The Plaintiff, But The Corps Was Not Guilty Of Bad Faith ........ 22

VII. Conclusion ........ 30

# TABLE OF AUTHORITIES

Page(s)

**CASES**

Ace Constructors, Inc. v. U.S.,
499 F.3d 1357 (Fed.Cir. 2007)....5, 6, 12

Alliant Techsystems Inc. v. United States,
74 Fed Cl. 566 (2007)....15, 17

Am-Pro Protective Agency, Inc. v. U.S.,
281 F.3d 1234 (Fed Cir. 2002)....23

Andersen Consulting v. U.S., 959 F.2d 929 (Fed.Cir. 1992)....19

Banknote Corp. of America, Inc. v. U.S., 356 F.3d 1345 (Fed.Cir. 2004)....12

Blake Constr. Co. v. U.S.,
987 F.2d 743 (Fed. Cir. 1993)....5

Blinderman Const. Co., Inc., v. U.S.,
39 Fed.Cl. 529 (1997)....18

C & L Const. Co. v. U.S.,
6 Cl.Ct. 791 (1984)....9, 10

CEMS, Inc. v. U.S.,
59 Fed.Cl.168 (2003)....6

Community Heating & Plumbing Company, Inc. v. Kelso,
987 F.2d 1575 (Fed Cir. 1993)....12

Connor Brothers Constr. Co., Inc. v. U.S.,
65 Fed.Cl. 657 (2005)....5

Freightliner Corp. v. Caldera,
225 F.3d 1361 (Fed.Cir. 2000)....9

Fruin-Colon Corp. v. U.S.,
912 F.2d 1426 (Fed.Cir. 1990)....20

Fry Communications, Inc. v. U.S.,
22 Cl.Ct. 497 (1991)....20

Galen Medical Associates, Inc. v. U.S.,
369 F.3d 1324 (Fed.Cir. 2004)....23

Gresham & Co. v. United States,
200 Ct.Cl. 97, 470 F.2d 542 ....25

HPI/GSA-3C, LLC v. Perry,
364 F.3d 1327 (Fed Cir. 2004) ....16

Int'l Resource Recovery, Inc. v. United States,
60 Fed.Cl. 428 (2004) ....25

Interwest Construction v. Brown,
29 F.3d 611 (Fed.Cir. 1994) ....12

L.P. Consulting Group, Inc. v. U.S.,
66 Fed.Cl. 238 (2005) ....25

Lockheed Martin IR Imaging Systems, Inc. v. West,
108 F.3d 319 (Fed.Cir. 1997) ....12, 14, 15

M.A.Mortenson Co. v. U.S.,
29 Fed.Cl. 82 (1993) ....20

Maintenance Engineers, Inc. v. U.S.,
21 Cl.Ct. 553 (1990) ....20

Medlin Constr. Group, Ltd v. Harvey,
449 F.3d 1195 (Fed.Cir. 2006) ....6

Metric Constructors, Inc. v. National Aeronautics and Space Administration,
169 F.3d 747 (Fed.Cir. 1999) ....14

Miller Elevator Co., Inc. v. U.S.,
30 Fed.Cl. 662 (1994) ....20

North Star Alaska Housing Corp. v. U.S.,
76 Fed. Cl. 158 (2007) ....23, 25

P.R. Burke Corp. v. U.S.,
277 F.3d 1346 (Fed.Cir. 2002) ....5

PCL Construction Services, Inc. v. U.S.,
47 Fed.Cl. 745 (2000) ....19, 20

Precision Pine & Timber v. U.S.,
50 Fed.Cl. 35 (1993) ....22

Record Steele & Construction, Inc. v. U.S., 62 Fed.Cl. 508 (2004) ....17

Sipco Services & Marine Inc. v. United States,
41 Fed.Cl. 196 (1998) ....6

St. Christopher Associates, L.P. v. United States,
511 F.3d 1376 (Fed Cir. 2008)........................................................................................10

Stuyvesant Dredging Co. v. U.S.,
834 F.2d 1576 (Fed. Cir. 1987)..........................................................................................5

Tecom, Inc. v. U.S.,
66 Fed.Cl. 736 (2005) .......................................................................................................20

Transtechnology Corp. Space Ordnance Systems Div. v. U.S.,
22 Cl.Ct. 349 (1990) ...........................................................................................................6

Travelers Casualty and Surety of America v. U.S.,
74 Fed.Cl. 75 (2006) .......................................................................................12, 15, 17

Travelers Casualty and Surety Company of America v. United States,
75 Fed.Cl. 696 (2007) ...........................................................................................14, 17

Triax Pacific, Inc. v. West,
130 F.3d 1469 (1997)..........................................................................................15, 16

United States v. Turner Construction Co.,
819 F.2d 283 (Fed.Cir. 1987)...........................................................................................17

WPC Enterprises, Inc. v. United States,
163 Ct.Cl. 1, 323 F.2d 874 (1963) ..................................................................................15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Jay Cashman, Inc. ("Cashman"), by its undersigned counsel, hereby submits the following reply to the memorandum submitted by the Defendant. In order to facilitate the Court's review, the Plaintiff will reply to the Defendant's arguments in the order they were presented.

## I. Standard For Summary Judgment

The standard of review does not appear to be in dispute, that matter will therefore not be addressed.

## II. Plaintiff Met The Contract Objective As Properly Measured Under The Terms Of The Contract

Defendant, in Part II of its memorandum, creates an extensive argument concerning the difference between design and performance specifications, purporting to rebut a position supposedly taken by Plaintiff, absolving it from achieving the required depth of dredging. This argument by Defendant is one of several instances in which the Defendant misconstrues the position of the Plaintiff and then offers an argument in response to its misconstrued version of the Plaintiff's position. The Plaintiff fully understands, and does not contest, that the required depth of the dredging was -47 feet. That is not the issue. Nor, as the Defendant argues, has the

Plaintiff ever contended that the requirement to achieve the project depth of -47 feet was a "change to Cashman's contract." Def. Memo, p. 16. In fact, the Defendant concedes that the required depth was successfully achieved by the Plaintiff. Def. Memo, p. 16. The issue is, at what point did Cashman achieve the required depth – before or after the additional dredging required by the Corps – and was the Corps' insistence that performance could be demonstrated only by using the minimum depth method justifiable under this contract, which required the use of multibeam sonar surveying equipment generally but which, on its face, left the method of processing the resulting data points open.

The measurement of the depth to which a channel has been dredged requires the use of many measurements over a large area. In fact, the survey of a channel bottom by a multi-beam survey such as was required under this contract, results in hundreds of data points within each three by three foot bin, and millions of such points within an acceptance section. Many of these data points accurately portray the location of the bottom. However, some of those data points which purportedly show material above the required grade are necessarily incorrect, either phantom returns (i.e. "noise") or stray soundings from the equipment or reflections of fluff, turbidity, or floating objects in the water that would not conceivably present a hazard to navigation. Pl. Supp. App. 44-45. Indeed, in recognition of this fact, even the Corps' application of the minimum depth method required a minimum of three soundings above grade in a particular bin before a "hit," or high spot, was assumed. Def. App. 236.

The point is that in using a multibeam survey procedure, we are not dealing with a precise, visual observation or physical measurement; we are dealing with a computer generated depiction based on digitally processed sonar soundings plotted on a chart, a truly remote sensing of a "virtual reality". As previously set forth in Plaintiff's opening brief, moreover, there are

various methods of processing the data, all of which have advantages and disadvantages, and no single one of these methods can claim to provide the "true" depiction of the bottom. All provide measurements which may be accurate under some circumstances and not accurate under others.

For example, ¶ 11-12(b) of the EM 1110-02-1003 (January 2002), the Corps' Engineering Manual in effect at the time this contract was entered into, noted that there were advantages and disadvantages to the average depth method which Plaintiff employed: "The average depth over the series can overly smooth the data; however, this may be desirable in some instances." Def. App. 52. Even more discussion is devoted, however, to the potential failings of the minimum depth method that was insisted on by the Corps in evaluating performance. Thus, although ¶ 11-12(c) provides that "the minimum depth recorded within a bin area may be used for some strike detection purposes," it also warns that "[u]se of minimum shoal-biased depths can ... erroneously portray clearance data," and that "[s]hoal biasing can also skew minimum clearance computations . . ." Def. App. 52. Presumably for these reasons, ¶ 11-13(k) of the EM 1110-2-1003 went on to provide that the minimum depth method should not be used for dredging acceptance. Def. App. 56. Paragraph 11-13(k) reads in pertinent part as follows:

> . . . . For dredging measurement, payment, or acceptance, the bin size should be kept as small as possible - typically less than 1 to 5 m is recommended. The shot point depth nearest the bin centroid shall be used; not average or minimum, or shoal-biased depths . . .

Def. App. 56.

Richard Kiss, who was the Chief of the Defendant's Survey Section during the contract, testified that the New York District's use of the minimum depth for acceptance surveys was contrary to the centroid method required by EM 1110-2-1003, and conceded that the Manual was not changed to allow for the use of the minimum depth method until the April, 2004 revision, which was well after this contract was entered into. Pl. Supp. App. 23-24. The fact is, neither

Defendant nor Plaintiff followed the actual recommendation in ¶ 11-13(k), which favored the use of the centroid depth to represent each bin. Mr. Kiss justified Defendant's failure to use the centroid method by his opinion that such a method would not have been appropriate for the KVK projects. Pl. Supp. App. 21-22.

As can be seen from all this, the Defendant's assertion that the minimum depth method is good, and provides a reliable actual depth of dredging, and that the average method is bad, and provides an unreliable actual depth of dredging, is simply inaccurate – as was reflected in the version of the EM 1110-2-1003 in effect at the time the contract was entered into. Since there were advantages and disadvantages to each of the possible data processing methods, and since the whole multibeam sonar system of surveying channel bottoms was and is a relatively new technology that has not been adopted uniformly by the Corps, Pl. Supp. App. 48-52, it was eminently reasonable for Defendant, in the contract at issue, to choose not to specify a particular data processing method.

The problem is, that despite the fact that the contract leaves the choice of data processing method open, the New York District of the Corps insisted that the minimum depth method, restrictively and conservatively applied, was the only valid method of measuring contract performance. Pl. Supp. App. 23. Furthermore, although the Defendant contends that the Plaintiff should have known what to expect when performing work for the New York District, Def. App. 231, the fact is that Plaintiff had never before performed a dredging project for the New York District, PPFOUF ¶ 5, and was entitled to be advised if the Corps intended to require a specific data processing method. See more detailed discussion in Parts III and V below. In the absence of such advice, it was reasonable, and authorized under the contract, for Plaintiff to

utilize the average depth method in determining whether an area had been dredged to the necessary depth and was ready for acceptance.

As a result of Defendant's mis-statement of the issue factually, the Defendant has cited the Court to a number of decisions which are simply irrelevant to the issue before the Court. The issue is not whether the -47 foot dredging depth was a design or performance specification; it was a performance specification. The fact is, however, that there was no design specification in the contract as to the method of measuring whether that performance specification had been achieved. Accordingly, under the very cases cited by the Defendant, Plaintiff was free to use any reasonable means of achieving that performance, and the Defendant, by necessary implication, was required to accept performance which, when measured by the reasonable method chosen by Plaintiff within its contractual discretion, met the -47 foot performance standard. See, e.g., Blake Constr. Co. v. U.S., 987 F.2d 743, 745 (Fed. Cir. 1993) (contractor faced with a performance specification is permitted to select the means for achieving the required result); Connor Brothers Constr. Co., Inc. v. U.S., 65 Fed.Cl. 657, 685 (2005) (to similar effect); P.R. Burke Corp. v. U.S., 277 F.3d 1346, 1357 (Fed.Cir. 2002) (to similar effect); Stuyvesant Dredging Co. v. U.S., 834 F.2d 1576, 1582 (Fed. Cir. 1987) (to similar effect).

Thus, the relevant case law is the line of authority which has been previously cited to the Court in Part V of Plaintiff's opening memorandum, holding that the use by the Government of acceptance criteria which are different from the criteria specified in the contract, constitutes a constructive change to the contract, giving rise to an action for the contractor's resulting increased costs. Indeed, in a very recent case decided by the Federal Circuit just last fall, the Court reaffirmed just this principle. In Ace Constructors, Inc. v. U.S., 499 F.3d 1357 (Fed.Cir. 2007), a case involving the government's post-contract change in the performance specifications

and the acceptance criteria, the Court concluded that the contractor had been reasonable in concluding from the specifications that it could use either of two testing methods. 499 F.2d at 1361-1364. See also Transtechnology Corp. Space Ordnance Systems Div. v. U.S., 22 Cl.Ct. 349 (1990); Medlin Constr. Group, Ltd v. Harvey, 449 F.3d 1195 (Fed.Cir. 2006) (specifications in contract gave contractor choice between using concrete or polystyrene retainers, notwithstanding drawings which showed only concrete retainers, and contractor was awarded equitable adjustment due to government's insistence on the use of concrete); also see CEMS, Inc. v. U.S., 59 Fed.Cl.168, 205-208 (2003); Sipco Services & Marine Inc. v. United States, 41 Fed.Cl. 196, 217 (1998).

In the instant case, the Defendant's refusal to use the average depth method which was employed by Plaintiff, and its stringent application of the minimum depth method instead – despite the contractual term embracing either – clearly constituted just such a change as formed the basis for the holdings in Ace Constructors, Transtechnology, and the other cited cases. As a result, Plaintiff was required to engage in the costly re-dredging of alleged, computer generated, "high spots," even though there was no physical evidence that such high spots actually existed. If the solicitation had alerted bidders that this particular data processing method was going to be employed by the Corps, the Plaintiff could have planned, at a higher bid price, to dig deeper on the first pass in order to compensate for the inevitable distortions inherent to the minimum depth method. Pl. Supp. App. 53-54.

As things transpired, however, Defendant failed to give any such notice, and its employment of the minimum depth method was a change from the terms of the contract as written entitling the Plaintiff to summary judgment.

## III. The Corps' Failure To Comply With Its Own Engineering Manual Lends Persuasive Strength To Plaintiff's Claims That It Reasonably Interpreted The Contract To Allow Use Of The Average Depth Method

It is not Plaintiff's contention, as Defendant suggests, that the Corps' failure to follow its internal guidance by not specifying its planned acceptance survey method gives rise to a "cause of action" by the Plaintiff. Plaintiff does claim, however, that the Corps' failure in this regard speaks volumes to the issue of whether it reasonably interpreted the contract when it required extensive re-dredging to meet the -47 foot objective as measured by the minimum depth data processing method instead of the equally authorized average depth method. Plaintiff furthermore claims that the Corps failed to disclose that it intended to use a data processing method different from the one which had been reasonably chosen and used by Plaintiff, as the contract progressed. Clearly, a mandatory requirement in the Corps' own engineering manual, requiring disclosure of the data processing method to be used in evaluating performance, lends persuasive strength to Plaintiff's positions, as does the fact that the manual also prohibited the use of the Corps' particular chosen method.

To refresh the Court's recollection, ¶ 11-4(g) of EM 1110-2-1003, which is rendered mandatory by ¶ 11-15, reads as follows:

> Measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters (horizontal and vertical control, density, etc.), data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government.

Pl. App. 21 (emphasis added). The non-mandatory prohibition against use of the minimum depth method is contained in ¶ 11-13(k), which has been quoted in Part II above.

In some of its most egregious factual mis-statements, Defendant asserts that this Court is prohibited from considering the Defendant's own policies when assessing the reasonableness and cooperativeness of its actions, because its policies were not intended to benefit the Plaintiff. See Def. Memo, p. 18. What is startling about these assertions is that they are directly contradicted by the very terms of EM 1110-2-1003 itself. Just two paragraphs following the statement of "purpose" to provide technical guidance, the Manual goes on to explain under the heading of "discussion" that:

> [T]he intent of this manual is to establish definitive Corps-wide accuracy and quality control standards along with survey performance <u>and procedural policy</u> that will ensure uniform and accurate hydrographic surveying products. This will reduce costly errors, <u>enhance the equitability of contracted construction administration</u>**,** and increase the overall quality and safety of Corps navigation and flood control projects.

Def. App. 169 (emphasis added). Moreover, ¶ 1-7 ("Mandatory Requirements"), in the introductory chapter of the Manual, specifically states that:

> The mandatory criteria contained in this manual are based on the following considerations: (1) assurance of navigational safety, (2) essential to navigation project function, (3) previous Corps experience and practice has demonstrated criteria are critical, (4) Corps-wide geospatial data standardization requirements, (5) adverse economic impacts if criteria are not followed, and (6) <u>HQUSACE commitments to the dredging industry</u>**.**

Pl. App. 18 (emphasis added). Thus, clearly, it is <u>not</u> true, as Defendant so adamantly maintains, that the Manual was not issued with the intent to benefit dredgers such as Plaintiff. On the contrary, the intent to deal <u>equitably</u> and in accordance with the agency's commitments to the industry was part and parcel of the rationale for the issuance of the Manual.

Similarly insupportable is Defendant's claim, at p.18, n.10 of its Memorandum, that Plaintiff is attributing "concerns or beliefs" to the Office of the Chief of Engineers which are not supported in the record. Presumably Defendant is referencing Plaintiff's allusions to the Corps'

concern for water resources engineering, its desire to ensure consistency and uniformity within the agency, and its policy favoring compliance with requirements deemed mandatory in its publications. All these concerns and beliefs are directly referenced in the excerpts from the Manual quoted above, as well as in ¶1-1 and the "Purpose" paragraph in the transmittal document. Pl. App. 17. Thus, it is no accident that ¶ 11-4, governing "USACE Multibeam Policies, Procedures, and Applications" – including subparagraph 11-4(g), requiring that "data processing and binning techniques" be "clearly stipulated" in all dredging contract specifications – is one of the two items in Chapter 11 which are specifically flagged as being "considered mandatory." See EM 1110-2-1003, ¶¶ 11-4(g), 11-15. Pl. App. 21; Def. App. 56.

Nor is there any validity to the argument that the Manual was not intended to protect Plaintiff because it was not disclosed to Plaintiff. On the contrary, the failure to so disclose, was yet another violation of the Manual's own terms, which provide in ¶ 1-5 specifically that "[t]his manual . . . should be directly referenced in contract specifications for dredging . . . services." Clearly, therefore, contractors such as Plaintiff were intended to be directed to, and protected by the Manual. Pl. App. 17.

The cases cited by Defendant in its Memorandum are, therefore, factually distinguishable and not controlling in the instant situation. In Freightliner Corp. v. Caldera, 225 F.3d 1361, 1365 (Fed.Cir. 2000), for example, the Federal Circuit held that a defense acquisition regulation imposing prerequisites to the use of options in certain multiyear contracts, existed solely to ensure that contracting officer would be exercising the option to fulfill existing needs, and in the best interests of the government. In C & L Const. Co. v. U.S., 6 Cl.Ct. 791 (1984), similarly, the Court of Claims rejected a claim based in part upon the fact that the government had failed to follow its source selection plan, which had been developed "for official use only," and which, the

Court found and the plaintiff conceded, was not designed for the benefit of contractors. 6 Cl.Ct. at 803-804. Unlike these cases, the EM 1110-2-1003 in question here, specifically and by its own terms, was developed in part for the protection of Plaintiff and other dredging contractors, and, moreover, by its own terms, should have been referenced in the specifications themselves.

In this respect, this case differs also from situations where courts have refused to privately enforce regulatory documents which were not specifically incorporated into the contract. In the recently decided case of St. Christopher Associates, L.P. v. United States, 511 F.3d 1376 (Fed Cir. 2008) (aff'g 75 Fed.Cl. 1 (2006), cited by Defendant), the Federal Circuit held that a HUD regulation and provision in HUD's Handbook, requiring the agency to act on landlord's request for rent increase, could not be considered as a basis for a breach of contract action, because they were not incorporated by reference into the agreement. 511 F.3d at 1385. Here, by contrast, the Manual itself instructs that it is to be referenced in the specifications. Surely the Defendant cannot be permitted to first defy the directive to include the Manual in the specifications, and then argue to this Court that its very defiance precludes consideration of the "mandatory criteria."

Furthermore, it is noteworthy that when deciding the St. Christopher case, the Federal Circuit made specific mention of the fact that "St. Christopher's rationale for looking to the statutes, regulations or agency guidance in interpreting the Regulatory Agreement is not that the Regulatory Agreement is ambiguous and that, therefore, the court needs to look to the statutes and regulations in order to resolve the ambiguity . . . ." 511 F.2d at 1383. This comment aptly illustrates the difference between the arguments being in fact made by Plaintiff, and the arguments Defendant first creates from whole cloth, and then proceeds to rebut, in Part III of its Memorandum. This Plaintiff's rationale is precisely (a) that it reasonably interpreted the contract

as written, (b) that alternatively, if the contract was ambiguous as written, it reasonably resolved the ambiguity, and (c) that Defendant, by its silence even after learning that Plaintiff was using the average depth method, failed to advise the Plaintiff, at the time when damages could still have been mitigated, its differing – and ultimately unreasonable – intended use of the minimum depth method to measure performance.

The fact that the Defendant violated its own internal guidance by failing to include pertinent information in the specifications, simply tends to confirm both the unreasonableness of the Corps' conduct, and reasonableness of Plaintiff's own. If EM 1110-2-1003 (1 January 2002) had been followed by the Corps, Plaintiff would have been on notice that acceptance surveys would be conducted using the minimum depth method and the additional dredging costs – and ultimately, this claim would not have occurred. If, moreover, as appears from this record, the Defendant simply failed to think about the issue until the contract had already been performed, ignoring its own agency Manual in the process, then this lends credence to Plaintiff's claim that the contract as written was intended to permit a reasonable choice of data processing method, including the one actually chosen by Plaintiff. Therefore, Plaintiff's motion for summary judgment should be granted, and Defendant's denied.

## IV. The Plaintiff Did Not Fail To Inquire Regarding A Patent Ambiguity, Since There Was No Ambiguity. Alternatively, If There Was An Ambiguity, It Was Clearly Latent

> General rules of contract interpretation apply to contracts to which the government is a party. Thus, the various contract provisions must be read as part of an organic whole, according reasonable meaning to all of the contract terms . . . Such interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant . . . The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties . . .

Lockheed Martin IR Imaging Systems, Inc. v. West, 108 F.3d 319, 322 (Fed.Cir. 1997) (citations omitted). See also, to similar effect, Travelers Casualty and Surety of America v. U.S., 74 Fed.Cl. 75, 87-88 (2006).

Applying these general principles, then, a contract term is "ambiguous only if its language is susceptible to more than one reasonable interpretation," but "[i]f the provisions of the solicitations are clear and unambiguous, they must be given their plain and ordinary meaning." Ace Constructors, supra, 499 F.3d at 1361, quoting Banknote Corp. of America, Inc. v. United States, 356 F.3d 1345, 1353 (Fed.Cir. 2004). In deciding whether a term is ambiguous or not, the court must consider the contract language as a whole. Interwest Construction v. Brown, 29 F.3d 611, 614 (Fed.Cir. 1994). Contracts are not, however, necessarily ambiguous merely because the parties disagree as to their meaning. Community Heating & Plumbing Company, Inc. v. Kelso, 987 F.2d 1575, 1579 (Fed Cir. 1993).

The Government's citation to Interwest is particularly illustrative of its desire to re-state the actual issues presented by this case. In Interwest, the Court held that installation of a 900 ton cooling capacity in a building was an explicit requirement of contract, and that the contractor's attempt to excuse its provision of only 747 tons of cooling capacity due to change in the nature of the refrigerant was unavailing. In the instant case, this would be analogous to Plaintiff having only dredged to -40 feet instead of -47 feet. That is not the case presented, however. Here, the issue is one of how to measure a -47 foot bottom. There was no such measurement issue in Interwest.

In the instant case, as previously argued, Defendant did specify the method of measuring the depth to which the channel had been dredged; it specified the use of an acoustic sweep survey system. The fact that the data processing method was not likewise specified does not *ipso*

*facto* render the term ambiguous. On the contrary, that fact, reasonably interpreted, vests discretion in the contractor to choose an appropriate method within the prescribed parameters of an "acoustic sweep survey system." This is not a situation in which one part of the contract specifies use of the minimum depth method and another part specifies use of the average. On the contrary, <u>neither</u> the specifications concerning how Plaintiff was to <u>do</u> the work, <u>nor</u> the specifications as to how Defendant <u>or</u> the Corps was to <u>measure</u> the work, put limits on the data processing software to be employed. The only reasonable interpretation of such a consistent and across-the-board omission of detail, is that the detail did not matter. In other words, any reasonable data processing method could be used.

This is particularly reasonable given the circumstances of this particular contract. As previously explained in Plaintiff's opening memorandum, this particular dredging project, to a depth of -47 feet, is only an interim step in a much larger dredging objective which will eventually take the bottom down to -52 feet. The channel, meanwhile, moreover, is cleared for use at only -45 feet, leaving a full two foot clearance over and above the current contractual depth, which means that ships using the channel will draft considerably less than that. Under these circumstances, it is <u>not</u> a reasonable interpretation of the contract's omission to specify a data processing method, that only the most rigorous, stringent, and expensive method of measuring depth – a method as likely to require re-dredging of spare tires as of actual "pinnacles" in the bottom material – must be employed to ensure the absolute perfection of the bottom line. On the contrary, recognizing that the -47 foot bottom will then be re-dredged to achieve yet another five feet, the contractual decision to <u>not</u> specify any particular data processing method is eminently reasonable recognition that any reasonable method will be quite acceptable.

As previously mentioned, Defendant relies with pride on the fact that it has used the minimum depth method in previous contracts with other contractors, and in fact, has applied that method in a particularly rigorous fashion. Pl. Supp. App. 55-57. However, "[a] contracting party cannot . . . invoke trade practice and custom to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting. Trade practice evidence is not an avenue for a party to avoid its contract obligations by later invoking a conflicting trade practice . . . ." Metric Constructors, Inc. v. National Aeronautics and Space Administration, 169 F.3d 747, 752 (Fed.Cir. 1999). See also, to similar effect, Travelers Casualty and Surety Company of America v. United States, 75 Fed.Cl. 696, 709 (2007). Accordingly, since there is only one reasonable interpretation of the contractual terms, no ambiguity exists, there was no duty on Plaintiff to inquire, and it was entitled to use the reasonable method of data processing it in fact chose.

Even if the Court were to find ambiguity in the contract, however, any such ambiguity would clearly have to be considered latent and not patent. In discussing the standards for categorizing ambiguities, the Defendant's memorandum unfortunately under-states the strict criteria for finding "patent" ambiguity, even as expressed in its own cited cases. In Lockheed Martin, supra, for example, the Federal Circuit held:

> A contract provision is deemed to be patently ambiguous if it is susceptible of two different yet reasonable interpretations, each of which is consistent with the contract language and with the other provisions of the contract, and if the ambiguity would be apparent to a reasonable person in the claimant's position. See Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1579 (Fed.Cir.1993). If a patent ambiguity exists, the rules of government contracting place the obligation of inquiry upon the contractor. Fortec Constructors, 760 F.2d 1288 (Fed.Cir. 1989) at 1291; Newsom v. United States, 230 Ct.Cl. 301, 676 F.2d 647, 649-50 (1982). However, if there is no facial ambiguity, the criterion is whether the contractor reasonably interpreted the contract, applying the usual rule of *contra preferentem* against the contract drafter:

> [I]f some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted.... If the [government] chafes under the continued application of this check, it can obtain a looser rein by a more meticulous writing of its contracts....

WPC Enterprises, Inc. v. United States, 163 Ct.Cl. 1, 323 F.2d 874, 877-78 (1963). Lockheed Martin, supra, 108 F.3d at 322-323 (emphasis added). See also, to similar effect, Traveler's Casualty and Surety, supra, 74 Fed.Cl. at 88. In Alliant Techsystems Inc. v. United States, 74 Fed Cl. 566 (2007), similarly, the Court warned:

> A patent ambiguity in a contract is one that is, on its face, glaring and obvious. This has been described as encompassing "an obvious omission, inconsistency, or discrepancy of significance," Beacon Constr. Co. of Mass. v. United States, 161 Ct.Cl. 1, 7, 314 F.2d 501 (1963), or "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap." WPC Enterprises, Inc. v. United States, 163 Ct.Cl. 1, 6, 323 F.2d 874 (1963).

74 Fed.Cl. at 577 (emphasis added). Defendant's memorandum omits all such language, despite citing these cases.

In a similar vein, Defendant cites the Federal Circuit's opinion in Triax Pacific, Inc. v. West, 130 F.3d 1469 (1997) for the proposition that the patent ambiguity doctrine is designed to ensure that a common understanding is achieved prior to bidding, and to prevent contractors from taking advantage of ambiguities by adopting narrow constructions for bidding purposes and then seeking equitable adjustments post-award. The Defendant neglects, however, to mention that the Court went on to warn against over-use of the doctrine:

> While this court has invoked the patent ambiguity doctrine in appropriate cases, it has not given the doctrine broad application. Because the doctrine has the effect of relieving the government from the consequences of its own poorly drafted contracts, the doctrine has been applied only to contract ambiguities that are judged so "patent and glaring" that it is unreasonable for a contractor not to discover and inquire about them**.** See Beacon Constr. Co., 314 F.2d at 504. More subtle ambiguities are deemed latent and accorded an interpretation favorable to the contractor under the doctrine of *contra proferentum.* See

> Interstate Gen. Gov't Congrators, Inc., 980 F.2d [1433] at 1434 [(Fed.Cir. 1992)].

130 F.3d at 1475 (emphasis added). See also, to similar effect, HPI/GSA-3C, LLC v. Perry, 364 F.3d 1327, 1334 (Fed Cir. 2004).

From all of the above, therefore, it is quite clear that Defendant's claim of patent ambiguity is unsupported as a matter of either fact or law. Accordingly, Plaintiff's interpretation of the contract should be considered binding, so long as it is a reasonable interpretation.

**V. Because Any Ambiguity, If It Existed, Was Latent, The Plaintiff's Reasonable Choice Of The Average Depth Method Should Be Upheld By The Court**

Unfortunately, in addressing this section, Plaintiff found it difficult to discern the pertinence of some of the individual sub-sections contained in Defendant's memorandum, to the issue being briefed. Defendant has attempted to respond generally and in an orderly fashion to the various points which Defendant appears to be making, without necessarily following the organization of Defendant's memorandum.

For the reasons previously set forth above, the contractual language failing to specify the precise type of data processing software was at most, latently ambiguous. On the face of the contract itself, there is no contradiction, glaring or otherwise. Nor was the omission to specify the data processing method such a "obvious omission" or such a "glaring gap" as to place a reasonable person upon notice to further inquire. The Defendant did not inform the Plaintiff that it was using the minimum depth method until the latest stages of the project, and any possible ambiguity was not apparent until that time. Such circumstances fit the classic definition of a "latent" ambiguity. As this Court has put it:

> Unlike a patent ambiguity, which should be, to the reasonable contractor, apparent on the face of the contract**,** "[a] latent ambiguity generally becomes evident, when, 'considered in light of objective circumstances, two conflicting interpretations appear reasonable.'" Input/Output [Tech, Inc. v. United States], 44

> Fed.Cl. [65] at 72, n.10 (quoting Cray Research, Inc. v. United States, 41 Fed.Cl. 427, 438 (1998)). A latent ambiguity is an ambiguity that arises only once the contract is applied**.** C.f. Cherry v. Auburn Gear, Inc., 441 F.3d 476, 484 (7th Cir.2006); see also Black's Law Dictionary (7th ed.2002) (defining latent ambiguity as "an ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed**.**")

Travelers Casualty and Surety, supra, 75 Fed.Cl. at 711 (emphasis added). See also United States v. Turner Construction Co., 819 F.2d 283, 286 (Fed.Cir. 1987) (ambiguity was latent, not patent, where location of certain transmitters was a "nonissue" in the specifications, suggesting that their location was meant to be discretionary with the contractor).

Also indicative of the latent nature of the claimed ambiguity, is the fact that the Defendant has never before raised, in the Contracting Officer's decision, or in its pleadings prior to the current cross-motion for summary judgment, its current claim of patent ambiguity. As in Travelers Casualty and Surety, supra, therefore, "[t]he protracted delay between the onset of the dispute and the raising of the patent ambiguity argument is evidence that the ambiguity is not patent." 75 Fed.Cl. at 717, n. 40, citing Record Steel & Construction, Inc. v. United States, 62 Fed.Cl. 508, 517 (2004) (similar effect).

As argued in the previous section, the ambiguity in this contract – if there was any ambiguity – was at most latent. Thus, under the contra proferentem rule – construing the ambiguity against the drafter – the Court should adopt the Plaintiff's interpretation so long as that interpretation is reasonable. Alliant Techsystems, Inc. v. United States, supra, 74 Fed.Cl. at 577. See also, to similar effect, Traveler's Casualty and Surety, supra, 74 Fed.Cl. at 88. In other words, where a contract is susceptible of two different and reasonable interpretations, each of which is found consistent with the contract language, and where the ambiguity is latent, not patent, the doctrine places "the risk of ambiguity, lack of clarity, and absence of proper warning

on the drafting party which could have forestalled the controversy**."** Blinderman Const. Co., Inc., v. U.S., 39 Fed.Cl. 529, 538 (1997). (emphasis added).

In Part V of its Memorandum, however, Defendant spends about nine pages discussing at length the supposedly unreasonable nature of Plaintiff's interpretation of the contract as permitting the use of the average depth method. These claims amount to three basic points: (a) that Plaintiff's chosen data processing method was inconsistent with the provision in EC 1130-2-210 (which was incorporated by reference into the contract) directing that "the most precise . . . depth measurement standards and techniques must be employed" when dredging hard bottom material (Def. Memo. p. 24-26; Def. App. 7, 2); (b) that Plaintiff's chosen method differed from the method historically employed by the New York District to perform acceptance surveys (Def. Memo. p. 28-29); and (c) that the average depth method does not rule out the possibility of "extreme high spots" in a three foot by three foot bin, which might exceed the two foot safety margin between the -47 foot dredging depth and the current -45 foot clearance for navigation (Def. Memo. p. 29-30). Not one of these three rationales is actually supported on the record, however.

First of all, Plaintiff's interpretation was not inconsistent with EC 1130-2-210, as that document was reasonably interpreted by the Plaintiff. Mr. Wood, Plaintiff's president, reasonably believed that the term "'most precise depth measurement standards and techniques' required the use of multibeam acoustic sweep surveying." Pl. Supp. App. 45**.** No witness has testified that the words "most precise depth measurement standards and techniques" required that the data be processed in any particular way. In effect, therefore, the EC 1130-2-210 is just as silent on data processing methods as is the actual contract itself.

Defendant also argues that Plaintiff's use of the average depth method was unreasonable was "because it presumed a fundamental change" in the way that the New York District had historically accepted hard bottom, new work projects. Def. Memo. p. 28. Defendant notes that in the old days it used to use the "bar drag method," which would have necessitated removal of any above-grade shoals that were hit by a physical bar being physically dragged through the water at the desired grade. From this it concludes that the use of the average depth data processing method on a multibeam sonar survey is necessarily incompatible with historical practice, whereas the use of the minimum depth method is not. The technologies are not comparable, and as previously explained in Part II above, neither the average nor the minimum depth method is the equivalent of a mechanical measurement.

Finally, if in fact the New York District was using the minimum depth method while the rest of the Corps was following the requirements of EM 1110-2-1003, the Defendant has yet to explain why that fact, unknown to Plaintiff, can be read into the contract as a design criterion. "The ordinary meaning of the language in contractual documents governs, and not a party's subjective but unexpressed intent." PCL Construction Services, Inc. v. U.S., 47 Fed.Cl. 745, 785 (2000), citing Andersen Consulting v. U.S., 959 F.2d 929, 934 (Fed.Cir. 1992).

As the evidence shows, Plaintiff had no prior experience with the New York District, and all that it knew, as a result of reading the contract specifications, was that the District was using multibeam surveys. PPFOUF ¶ 41. The Plaintiff's understanding that the average depth method was acceptable was confirmed by the fact that Defendant in fact accepted Plaintiff's dredging of material from the very first acceptance area, which had clearly been surveyed by the Plaintiff while using the average depth data processing method. (Defendant now claims that the dredging in the first acceptance area was actually surveyed by the Corps using the minimum depth

method. Plaintiff, however, was unaware of this assertion until Defendant submitted its Response to Plaintiff's Proposed Statements of Uncontroverted Facts, ¶54. Until that time, all appearances were that the average depth method, as used by Plaintiff, had been ratified.)

Contrary to Defendant's assertion, it is perfectly acceptable for the Court to consider the course of dealing between the parties in interpreting an ambiguity in the contract, so long as that course of conduct relates to the period of time prior to the current dispute arising. Tecom, Inc. v. U.S., 66 Fed.Cl. 736, 749 (2005); Miller Elevator Co., Inc. v. U.S., 30 Fed.Cl. 662 (1994); M.A.Mortenson Co. v. U.S., 29 Fed.Cl. 82, 97 (1993). Indeed, one of the cases cited by Defendant for the contrary proposition – Fry Communications, Inc. v. U.S., 22 Cl.Ct. 497 (1991) – clearly states that "in construing ambiguous contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises." 22 Cl.Ct. at 503. The other two cases cited by Defendant for this proposition, are silent on the issue. See Maintenance Engineers, Inc. v. U.S., 21 Cl.Ct. 553, 562 (1990) and Fruin-Colon Corp. v. U.S., 912 F.2d 1426, 1430 (Fed.Cir. 1990) – both cited by Defendant at p. 31 of its Memorandum. In fact, this Court has held, such evidence "is entitled to great weight." PCL Construction, supra, 47 Fed.Cl. at Since the alleged representations and other conduct by the Defendant date from before the controversy arose with later performance, the Court can and should consider such evidence as persuasive.

In a final bid to establish Plaintiff's supposed "unreasonableness," Defendant argues Plaintiff's average depth processing method would likely leave "extreme high spots" balanced by equally "extreme low spots" in hard bottom material, such as might "seriously damage" passing vessels by compromising the contemplated two foot safety zone between the 45 foot authorized depth for navigational purposes and the 47 foot contractual dredging depth. Def. Memo, pp. 29-

30. However, the averaging which takes place by the average depth method is not averaging over an entire acceptance area, but averaging of data points within a small, 3 foot by 3 foot area known as a “bin”. As previously noted in Plaintiff’s opening memorandum, the size of the bucket on the hydraulic excavator used by Plaintiff was much larger in size than one square yard which comprises a bin. While the bucket may not excavate a "uniform" depth, it is not reasonable to conclude that a bucket of this size could possibly create a two foot upward spike, or "pinnacle," as well as a two foot downward hole, all within a bin measuring one square yard. Furthermore, Plaintiff’s Operation Plan specified that its dredges would be equipped with "a satellite based state of the art positioning system" for horizontal and vertical control. Pl. Supp. App. 17. This system was used to set the depth of the dredge cuts and monitor the excavation on the computer screen on the dredge, Pl. Supp. App. 15-16, and provided "accurate positioning on all three axes," thereby supplying the dredge operators with a "cross section and plan view of the bucket position." Pl. Supp. App. 17. This "level of X-Y-Z bucket positioning accuracy" appears to be what Defendant's own witness stated was one of the most important variables in the process of dredging a bin to a uniform depth. Def. App. 232. Given the accurate control over the elevation of its bucket, the possibility that an "extreme" high spot would be left is highly remote – even assuming the area of averaging had been larger.

In sum, therefore, Plaintiff respectfully suggests that Defendant’s arguments attacking the reasonableness of its choice to use the average depth method are unpersuasive. The Plaintiff’s choice was reasonable, and as such, should be adopted by the Court in an order granting partial summary judgment to the Plaintiff.

## VI. The Corps Breached Its Duty To Cooperate With The Plaintiff, But The Corps Was Not Guilty Of Bad Faith

The Plaintiff argued, in its opening brief, that the Defendant's failure to disclose that it was performing the acceptance surveys using the minimum depth method was a breach of its duty to cooperate. There is nothing about the underlying discussion of that issue that could reasonably be construed to mean that Plaintiff was also alleging bad faith on the part of the Corps, or an intent to mislead and financially harm the Plaintiff. To the contrary, the Plaintiff simply argued that to the extent that the Corps had a duty to disclose its acceptance survey method, it breached that duty. Although the Plaintiff is well aware that many of the cases that deal with a breach of the "duty to cooperate" expressly or implicitly involve accusations of bad faith (in the context of a breach of contract action), this is not such a case. The Plaintiff has the highest respect for the Corps of Engineers and the honesty and integrity of the Corps' personnel with whom it dealt on this project. This does not mean, however, that the Corps did not make mistakes and that it did not administer this contract in an inattentive and careless manner that amounted to a breach of contract. Most assuredly, a breach of contract can happen without malicious intent and without bad faith.

As this Court explained in Defendant's own cited case, Precision Pine & Timber v. U.S., 50 Fed.Cl. 35 (1993),

> If the Government fails to take essential action, or when the Government's conduct during contract performance is unreasonable such as failing to help in a solution of a problem that has arisen in contract performance, it will be said to have breached its implied duty to cooperate with the performance of the contract. *See* Cibinic & Nash, Administration of Government Contracts 297 (3d Ed.1995).

50 Fed.Cl. at 58-59 & n.31 (1993). Defendant's memorandum, however, confuses Plaintiff's claim for breach of the Defendant's duty to disclose its acceptance survey with a fictional claim which Plaintiff has not made for malicious bad faith. In so doing, Defendant overstates

Plaintiff's burden of proof by referring to cases involving alleged bad faith in contract awards, such as Galen Medical Associates, Inc. v. U.S., 369 F.3d 1324 (Fed.Cir. 2004), or threats amounting to duress, such as Am-Pro Protective Agency, Inc. v. U.S., 281 F.3d 1234 (Fed Cir. 2002), or outright bad faith as in North Star Alaska Housing Corp. v. U.S., 76 Fed. Cl. 158, 187-188 (2007).

On page 10 of its opening Memorandum of Law, the Plaintiff states that "the Corps is one of the most prestigious and well-respected water resources engineering organizations in the world." The Defendant does not rebut or refute that observation in its Memorandum, but incredibly admits that "Cashman submitted its pre-final acceptance surveys to employees of the Construction Division responsible for administrative contract functions, who were not aware that there were multiple ways to produce acceptance surveys. No employee of the Corps who had any familiarity with multi-beam survey products knew that Cashman was proceeding upon an incorrect assumption and failed to inform Cashman." (emphasis added). (See Defendant's Opposition to Plaintiff's Motion, page 32). If the people who the Corps placed in the most important administrative positions on this project (the Resident Engineer, Mr. Conetta, and the Project Engineer, Mr. Alton), as the main points of contact with the contractor, Pl. Supp. App. 58-59, did not understand the significance between an acceptance survey produced using the average depth method and one produced using the minimum depth method, how can the Plaintiff be faulted for continuing to use the average depth survey method that it disclosed on the face if its pre-acceptance survey submissions? The Plaintiff was not prohibited from using the average depth method by the terms of the solicitation or by anyone in the Corps.

The Defendant had an obligation to administer the contract in a proper and competent manner. Instead, the Defendant admittedly placed people in key positions who were not aware

of what the contractor and the Corps' own survey branch were doing with regard to acceptance surveys. During depositions, the Corps' witnesses explained that it was not their practice to even furnish copies of the Plaintiff's pre-acceptance surveys (the ones that were marked as based on "average soundings") to their survey personnel; they simply telephoned the survey branch and notified them that an acceptance section was ready to be surveyed. Pl. Supp. App. 60. This was a very poor procedure that the Plaintiff only learned about during discovery, but it explains the failure to properly administer the contract for which the Defendant must be held accountable. What was unknown to both the Plaintiff and the administrative personnel on the construction side of the Corps, was that the survey branch was plotting the survey results after not only employing the minimum depth method, but after employing that method in a stringent manner that exceeded published tolerances. Pl. App. 66. The Plaintiff does not contend, however, that the Defendant was intentionally hiding its "acceptance survey product" from the Plaintiff, nor does the Plaintiff attribute bad faith to the Corps.

The Corps' survey branch, which apparently intended to not only use the minimum depth method, but to apply stringent acceptance tolerances as well, was not consulted with regard to the preparation of the plans and specs, did not attend the pre-construction conference, was not furnished with copies of the Plaintiff's pre-acceptance surveys, and was not informed that the Plaintiff was employing the average depth method for the purpose of determining acceptance. In fact, the Corps' survey personnel did not even discuss the nature of their survey results with the Corps' own construction personnel, much less the contractor. Pl. App. pp. 24 - 28; Pl. Supp. App. pp. 18 - 23.

The Plaintiff and the Defendant were interpreting and depicting the multi-beam survey data in two very different ways, but both of those ways (average and minimum) were accepted

means of data interpretation. It must be recognized that the Plaintiff does not contend that the Defendant could not require a depiction of the channel bottom using the minimum depth method, its internal guidance to the contrary notwithstanding, it simply should have communicated that intent to the Plaintiff in a timely manner. By failing to place a specific data processing requirement in the solicitation, and by further failing to advise the Plaintiff that its use of the average depth method it noted on its pre-acceptance surveys would lead to discrepancies when compared to the Corps' minimum depth surveys, the Corps led the Plaintiff to reasonably conclude that it acquiesced in its acceptance survey method. Even if the Defendant could demonstrate the use of the minimum depth method was a contract requirement, which it cannot, "a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead." North Star Alaska Housing Corp. v. U.S., 76 Fed.Cl. 158 (2007), citing Gresham & Co. v. United States, 200 Ct.Cl. 97, 470 F.2d 542 (1972, 470 F.2d at 554; L.P. Consulting Group, Inc. v. U.S., 66 Fed.Cl. 238, 241 (2005); Int'l Resource Recovery, Inc. v. United States, 60 Fed.Cl. 428, 431-32 (2004).

This Corps' obligation to be explicit as to its survey methods should have been all the more apparent in view of the fact that the Defendant's witnesses conceded that other dredging contractors, who performed the earlier KVK projects were often required to re-dredge high spots after they apparently believed that an area was clear. Pl. Supp. App. 61. Rather than attempting to address this problem in the drafting of more explicit contract specifications, the Defendant simply went from project to project using essentially boilerplate technical requirements, Pl. Supp. App. 62-64, while apparently being content with the notion that the dredging industry was generally familiar with the District's survey requirements.

Counsel for the Defendant attaches unwarranted significance to the alleged failure of the Plaintiff to submit its "method of performing pre-final surveys," before commencing work. Def. Memo. p. 40. It appears that, at no time, did the individuals responsible for contract administration, Mr. Conetta and Mr. Alton, both of whom Defendant has admitted had no knowledge about surveying methods, request that the submittal be provided. In fact the allegedly required submittal was not even listed in the submittal register that was included as part of the contract. Def. App. 224-226. Since the Defendant failed to recognize the importance of the Plaintiff's use of the average depth method even when it was clearly delineated on its initial and subsequent pre-acceptance surveys, it is unlikely the importance of that information would have been recognized by the Defendant on an earlier submittal either. After all, the Corps' construction management personnel did not even know what method the Corps' own survey branch was employing during most of the project. Def. App. 102-106; 107-113; 189-192.

Moreover, whether or not the proposed survey method was submitted is a matter in dispute; one witness testified that he believed it was submitted, while another testified that no record of, or copy of, the submittal could be found. Def. App. 170-171; 241. While counsel for the Defendant contends that the submittal would have permitted Defendant to "correct" Plaintiff's "confusion" as to the appropriate method to use, it is hard to imagine how, since Defendant did not "correct" Plaintiff's "confusion" when Plaintiff repeatedly submitted its actual pre-final surveys that clearly denoted the use of the average depth method. Pl. App. 43-44.

Significantly, the contract provision that counsel for the Defendant references did not require the Plaintiff to identify the method it would use to analyze the survey data, it only required that the Plaintiff identify how it would obtain the data (method of performing surveys and all equipment and programs). Def. App. 130. While Defendant apparently did not require a

"pre-final survey method submittal," the documents produced in discovery did contain a submittal that provided Plaintiff's method of performing surveys, identifying the equipment to be employed and the computer programs that would be used, but not the method of analyzing the data. Pl. Supp. App. 38. In this submittal, which was part of Plaintiff's quality control plan, Plaintiff clearly indicated how the data would be obtained, including the equipment and programs Plaintiff would use, to evaluate and direct the performance of the dredging. Pl. App. 41. Even though this submittal did not include the use of the average depth, it was approved by Defendant, with no apparent comment and no request for more detail. Def. App. 225. Counsel for the Defendant's assertion that the "missing" submittal would have permitted Defendant to "correct" Plaintiff's "confusion" is not supported by uncontroverted fact and constitutes unfounded speculation. Plaintiff respectfully submits that, for these reasons, the Court should refrain from adopting Defendant's position.

In its zeal to shift responsibility to the Plaintiff, the Defendant also argues that Plaintiff did not "mitigate its damages," and in support of this contention refers to Plaintiff's continued submission of pre-final surveys based on average depth after Defendant verbally informed Plaintiff that Defendant was using the minimum depth for acceptance surveys. Def. Memo. pp. 40-41. Defendant's verbal notification was given to Plaintiff on August 31, 2004, but three of the four average depth submittals relied upon by Defendant were provided to the Defendant during the same week (September 3, 4, and 5) and the fourth involved work that was completed before the notice was given. Def. App. 197-200; Pl. Supp. App. 44. Since Plaintiff had been using the average depth to evaluate and direct the dredging on a daily basis, Pl. App. 41, the pre-final surveys Defendant relies on for its assertion clearly pertained to work that had been performed,

for the most part, before Plaintiff was informed that its understanding that acceptance was based on average depth was incorrect.

Defendant also argued that Plaintiff had been repeatedly asked during weekly meetings to submit its request for clarification of the Defendant's acceptance survey method in writing. However, in support of this assertion, Defendant relies solely upon the recollection of Plaintiff’s Mr. Galli, even though the individual to whom the statement is attributed, Mr. Conetta, testified that he did not recall asking Plaintiff to submit its request in writing. Def. App. 112. Other witnesses who attended the weekly meetings did not recall that the defendant asked for the request in writing. For example, Mr. Wood recalled that the Defendant's response to inquiries about the Corps’ acceptance survey method was "they'll get back to us." Pl. Supp. App. 13-14. Accordingly, the Defendant's assertions lack factual support and Plaintiff respectfully requests that this Honorable Court refrain from concluding that Plaintiff "unreasonably delayed in seeking formal direction."

The Defendant argues that EM 1110-2-1003 "did not prohibit the use of the minimum depth method for producing acceptance surveys," but, in doing so, quotes only portions of sentences from the manual. Def. Memo. pp. 41-44. As explained more fully in Part II above, the manual also provides many warnings as to why the minimum depth should not be used. In addition to these warnings, ¶ 11-12(b) specifically recommends not using the minimum depth for dredging surveys, Def. App. 52, and ¶ 11-13(k) mandates that the centroid be used, not the minimum. Def. App. 56. Significantly, when Richard Kiss, who was the Chief of the Defendant's Survey Section during the contract, testified that the New York District used the minimum depth for acceptance surveys, he admitted that use of the minimum depth was contrary to the method required by EM 1110-2-1003. Pl. Supp. App. 23.

Furthermore, ¶ 11-14 of the EM states that "All calibration, QC, and QA criteria summarized in Table 11-2 are mandatory," Def. App. 56, and Table 11-2 does not mention the use of minimum depth for hard bottom material at all. Def. App. 54. When the Corps revised the manual in April, 2004, the method for acceptance surveys was changed to the minimum depth for hard bottom materials. Pl. Supp. App. 24; Pl. App. 58. Although the Defendant characterized the 2004 revision as a more "explicit" statement of the criteria, there would have been no reason to revise the criteria at all if the manual had permitted use of the minimum depth for acceptance purposes. (Def. Memo., p. 44). Accordingly, Plaintiff respectfully submits that the preponderance of the evidence supports its contention that the agency's guidance prohibited the use of the minimum depth until the issuance of the revised manual in April, 2004. The New York District had an affirmative duty to inform its dredging contractors of its intent to deviate from the agency practice by implying the minimum depth method.

By failing to follow the mandatory ("shall") requirement of the Engineer Manual the Defendant created the very result that the Manual intended to prevent – the issuance of a solicitation that did not furnish the "data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government." Since the New York District's reliance on the minimum depth method was not known to the Plaintiff, much less its planned stringent application of that method, it was incumbent upon the Defendant to place the required information in the solicitation whether internal guidance required it or not.

It is not significant, moreover, that EM 1120-2-1003 (1 January 2002) was not part of the contract; what is important is that the Defendant failed to insert important information in the solicitation that was required by the Manual. Is the Defendant suggesting that if the Engineer Manual had been part of the contract its failure to follow the mandatory requirements would

have been more egregious? The fact is that since the Manual was not part of the contract the Plaintiff had no reason to suspect, much less to know, that the Corps planned to use the minimum depth method for acceptance survey purposes.

**VII. Conclusion**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's motion for summary judgment and deny Defendant's cross-motion for summary judgment.

Respectfully submitted,

Dated: April 14, 2008

/s/ Michael H. Payne

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Drive, Suite 100
Fort Washington, PA 19034
Tel: (215) 542-2777
Fax: (213) 542-2779
mhp@phslegal.com

Attorney of Record for
Jay Cashman, Inc.

Of Counsel:
Joseph A. Hackenbracht, Esquire
Payne Hackenbracht & Sullivan