No. 06-101C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JAY CASHMAN, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972

Attorney for Defendant

OF COUNSEL:

Donald M. Harris
Counsel
U.S. Army Engineer District
New York

May 5, 2008

## TABLE OF CONTENTS


I. Average Depth Acceptance Surveys Would Not Require Cashman To Dredge To The Contractually Required Depth . .................................................. 1

II. The Contract Did Not Permit Cashman To Choose The Survey Product That The Corps Would Use To Determine Acceptance. ..................................... 4

III. Whether The Corps Complied With Paragraph 11-4(g) of EM 1110-2-1003 Is Irrelevant To Determining Whether Cashman Reasonably Interpreted The Contract To Provide That The Corps Would Use An Average Depth Acceptance Survey Product . ...................................................................... 6

IV. The Corps's Engineering Manuals And Circulars Did Not Prohibit The Use Of Minimum Depth Acceptance Surveys, And In Fact, Required Their Use For The Kill Van Kull Project . ........................................................... 9

V. If The Contract Failed To Specify The Method That The Corps Would Use To Produce Its Acceptance Surveys, The Contract Was Patently Ambiguous. ........................................................................................ 13

VI. If The Contract Were Latently Ambiguous, Cashman Could Not Recover Because Its Interpretation That An Average Depth Acceptance Survey Product Would Be Used Was Unreasonable ..................................................... 15

A. The Corps's Engineering Manuals and Circulars Could Not Reasonably Be Interpreted to Provide That An Average Depth Survey Product Would Be Used. ........................................................... 15

B. Cashman's Assumption That The Corps Would Change Its Method For Determining Acceptance Of Hard Bottom New Work Dredging Was Unreasonable. ................................................................. 18

C. It Was Unreasonable For Cashman To Assume That The Corps Would Use An Average Depth Acceptance Survey Product Due To Potential Navigational Hazards ......................................................... 18

VII. Cashman Has Failed To Establish That The Corps Breached The Duty To Cooperate. ........................................................................................ 19

A To Establish A Breach Of The Duty of Good Faith And Fair Dealing, Cashman Must Overcome The Presumption That The Corps Acted In Good Faith . ......................................................................... 19

B. The Corps Did Not Breach The Duty To Cooperate Because Personnel In The Construction Division Were Unfamiliar With Multibeam Survey Products ........ 20

C. The Corps Did Not Lead Cashman To "Reasonably Conclude" That The Corps Was Using An Average Depth Acceptance Survey Product ........ 22

D. There Is No Evidence That Other Dredging Contractors For The KVK Projects Believed That An Average Depth Acceptance Survey Product Would Be Used........ 23

E. Cashman Is Responsible For Complying With, And Successfully Performing, The Contract ........ 25

CONCLUSION........ 26

# TABLE OF AUTHORITIES

## CASES


Asco-Falcon II Shipping Co. v. United States,
32 Fed. Cl. 595 (1994). .......... 20

Avtel Servs. v. United States,
70 Fed. Cl. 173 (2005). .......... 20

P.R. Burke Corp. v. United States,
277 F.3d 1346 (Fed. Cir. 2002). .......... 4, 15

Capital Props. v. United States,
56 Fed. Cl. 427 (2003). .......... 16

Doyle Shirt Mfg. Corp. v. United States,
199 Ct. Cl. 150 (Ct. Cl. 1972). .......... 23

E.L. Hamm & Assocs. v. England,
379 F.3d 1334 (Fed. Cir. 2004). .......... 14

Galen Med. Assocs. v. United States,
369 F.3d 1324 (Fed. Cir. 2004). .......... 20

Hoppmann Corp. v. United States,
18 Cl. Ct. 220 (1989). .......... 7

Int'l Res. Recovery, Inc. v. United States,
60 Fed. Cl. 428 (2004). .......... 23

J.L. Simmons Co. v. United States,
188 Ct. Cl. 684 (1969). .......... 4

North Star Alaska Hous. Corp. v. United States,
76 Fed. Cl. 158 (2007). .......... 20

Precision Pine & Timber v. United States,
50 Fed. Cl. 35 (2001). .......... 20

Reynolds Assocs. v. United States,
31 Fed. Cl. 335 (1994). .......... 9

Ryan Co. v. United States,
43 Fed. Cl. 646 (1999). .......... 14

S. Cal. Edison v. United States,
58 Fed. Cl. 313 (2003). .......... 20

St. Christopher Assocs., L.P. v. United States,
511 F.3d 1376 (Fed. Cir. 2008). .......... 9

Stuyvesant Dredging Co. v. United States,
834 F.2d 1576 (Fed. Cir. 1987). .......... 4

Tecom, Inc. v. United States,
66 Fed. Cl. 736 (2005). .......... 20

Teg-Paradigm Envtl., Inc. v. United States,
465 F.3d 1329 (Fed. Cir. 2006). .......... 13

Texas v. United States,
210 Ct. Cl. 522 (1976). .......... 9

Torncello v. United States,
681 F.2d 756 (1982). .......... 20

Travelers Cas. & Sur. Co. of Am. v. United States,
75 Fed. Cl. 696 (2007). .......... 15

United States v. Turner Constr. Co.,
819 F.2d 283 (Fed. Cir. 1987). .......... 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JAY CASHMAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-101C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rules 7.2(c) and 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, hereby submits this reply to Jay Cashman, Inc.'s ("Cashman's") opposition to our cross-motion for summary judgment.

I. Average Depth Acceptance Surveys Would Not Require Cashman To Dredge To The Contractually Required Depth

In our initial brief, we established that the KVK 8 contract unambiguously required Cashman to dredge to a contractually required depth of 47 feet below mean low water, and that an average depth acceptance survey product would not have required Cashman to meet the contract depth. See Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion For Summary Judgment ("Def. Mot.") at 15. In Cashman's response brief, Cashman asserts that it does not dispute that the contract required Cashman to dredge to a depth of 47 feet. See Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Pl. Reply") at 1. However, Cashman argues that the relevant issue is "at what point did Cashman achieve the required depth." See Pl. Reply at 2.

The issue is not, as Cashman contends, when the contractually required depth of 47 feet was achieved, but whether the depth of 47 feet had been achieved. As discussed in our opening brief, if an average depth survey product were used to determine acceptance, the Corps would necessarily not have required Cashman to remove all materials in each three foot by three foot bin above the contractually required depth. See Def. Mot. at 15; see also Plaintiff's Proposed Finding Of Uncontroverted Fact ("Pl. PFOUF") No. 39 ("The average method is less likely to result in a requirement to re-dredge because the average of all of the data points in a bin may be below grade even though not all of the data points in the bin are below grade."). In contrast, a minimum depth acceptance survey product, which represents whether the highest data points in each three foot by three foot bin are above the contractually required depth, would. See Defendant's Proposed Finding of Uncontroverted Fact ("Def. PFOUF") No. 15; Defendant's Appendix ("Def. App.") 52, 120-21; 235. Cashman was simply held to the contract requirement. See Pl. Reply at 2.

In an attempt to confuse the relevant issue, Cashman implies that because hydrographic multibeam surveys are created by plotting sonar soundings, they are somehow less reliable than a physical measurement, and that that no multibeam acceptance survey product is "accurate" in all circumstances.[1] See Pl. Reply at 2-5. The "accuracy" of multibeam surveys is not at issue; rather, the relevant issue is which multibeam acceptance survey product would require Cashman

---

[1] Any concerns that Cashman had regarding the general accuracy of multibeam surveys, as opposed to physical measurements, should have been raised before Cashman submitted its bid, because under the contract, multibeam surveys were indisputably going to be used to determine acceptance.

to achieve the contractually required depth throughout each three foot by three foot bin.[2]

Different multibeam survey products are simply different ways to represent processed data from a multibeam sonar system. See Def. App. 235. Defendant agrees that there are a variety of survey products that can be produced from this data, each of which can be used for different, legitimate purposes. For example, although Cashman accuses defendant of arguing that average depth survey products are "bad," this is not the case. See Pl. Reply at 4. In fact, the Corps recognizes that average depth survey products should be used for payment surveys, because they provide a more equitable volume calculation for payment purposes. See Def. PFOUF 42; Def. App. 123. For the reasons discussed above and in defendant's initial brief, however, an average depth acceptance survey product would not measure whether Cashman had removed all materials above the contractually required depth, because if the average of the data points within a bin is 47 feet, some points would be deeper and some would be shallower.

---

[2] Furthermore, Cashman's arguments regarding the alleged inaccuracy of multibeam surveys are incorrect as a technical matter. For example, Cashman argues that some of the data points generated by hydrographic multibeam surveys are "noise" or stray soundings, and thus, may not accurately represent the true condition of the bottom of a channel. See Pl. Reply at 2. This is irrelevant, because as we have explained, the Corps's acceptance surveys are produced using an edited multibeam data set, in which the extraneous noise spikes or stray soundings are edited out before the acceptance survey product is produced. See Def. App. 235. Furthermore, as Cashman recognizes, in producing acceptance surveys, the Corps required that shoals above the contractually required depth be assessed based upon a minimum of three hits over successive passes. See Pl. Reply at 2; Def. App. 236. In addition, as Richard Kiss, the former Chief of the Survey Section for the New York District of the Corps testified, the Corps employed numerous quality control procedures to ensure that its surveys were accurate and reproducible. Def. App. 117-18. Cashman also continues to insist that multibeam surveys result in "hundreds of data points" within each three foot by three foot bin, although defendant has previously explained, and the evidence in the record demonstrates, that there are only "fifty or sixty" data points generated in any given three foot by three foot bin. See Def. App. 58; Defendant's Response to Plaintiff's Proposed Finding of Uncontrovered Fact No. 34.

II. The Contract Did Not Permit Cashman To Choose The Survey Product That The Corps Would Use To Determine Acceptance

In its response brief, Cashman again argues that the contract did not specify the method of producing acceptance surveys, and therefore, Cashman was entitled to use any method that it wanted. See Plaintiff's Memorandum of Points and Authorities In Support of Plaintiff's Motion for Partial Summary Judgment ("Pl. Mot.") at 15; Pl. Reply at 2; 4; 5; 13. This argument makes no sense, because Cashman's surveys were not used to determine acceptance of an area; rather, the Corps's surveys were. See Def. App. 130; see also Def. App. 71. Cashman's argument, therefore, is not that Cashman was entitled to select its own means and methods of achieving a defined performance objective. Rather, Cashman contends that in the absence of contractual guidance, Cashman would be entitled to dictate how the Corps would determine acceptance, and accordingly, what performance the contract required (i.e., not the required depth of 47 feet). Defendant is unaware of any legal authority to support such a proposition, and Cashman has cited none.

Performance specifications specify the results to be obtained, and leave it to the contractor to exercise his ingenuity in achieving that objective or standard of performance. See Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987); P.R. Burke Corp. v. United States, 277 F.3d 1346, 1357 (Fed. Cir. 2002); J.L. Simmons Co. v. United States, 188 Ct. Cl. 684, 689 (1969). The parties agree that the requirement to dredge to a depth of 47 feet was a performance specification. See Pl. Reply at 5. However, if this case is not resolved upon the basis that the contract unambiguously required Cashman to dredge to a depth of 47 feet, the relevant inquiry would not be the "means and methods" of achieving the contractually

defined result, but rather, what result the contract required - dredging to a depth of 47 feet, as measured by a minimum depth survey product, or dredging to a depth of 47 feet, as measured by an average depth survey product.

Cashman's arguments that the Corps imposed acceptance criteria "which are different from the criteria specified in the contract" are equally unavailing. See Pl. Reply at 5-6. First, these arguments fundamentally contradict Cashman's prior arguments that the contract failed to specify the survey product that the Corps would use for its acceptance surveys. See Pl. Reply at 2 (" . . . this contract, which required the use of multibeam sonar surveying equipment generally but which on its face, left the method of processing the resulting data points open."); Id. at 4 ("[i]t was eminently reasonable for Defendant, in the contract at issue, to choose not to specify a particular data processing method."); Id. at 5. If, as Cashman contends, the contract did not specify an acceptance criteria, then the Corps could not have employed an acceptance criteria "different from the criteria specified in the contract." Furthermore, Cashman has not identified a single contractual provision, or provision of any engineering manual or circular, which states that the Corps would use an average depth survey product for acceptance surveys, as Cashman assumed that the Corps would.

Bizarrely, Cashman also contends that because there are future plans to eventually lower the depth of the Kill Van Kull and Newark Bay Channels (the "channels") to 52 feet, any acceptance survey product that Cashman wanted the Corps to use should have been reasonable. See Pl. Reply at 13. The fact that the channels may be lowered at some point in the future has nothing to do with whether Cashman was permitted to select the Corps's method of performing acceptance surveys. Furthermore, the channels are currently authorized for use by vessels as 45

foot channels, and will be used as such for a substantial period of time. See Plaintiff's Response To Defendant's Proposed Finding of Uncontroverted Fact ("Pl. Resp. to Def. PFOUF") No. 6. Whether the authorized depth of the channels will be lowered to 52 feet at some point in the future is irrelevant, because the Corps needs to ensure that they are safe for navigational use at their present depth. Indeed, more than three and a half years has gone by since the completion of Cashman's contract, and the area has not been further deepened. More importantly, the Corps paid Cashman over $35 million to dredge the contractually defined area to a depth of 47 feet, to include a two foot safety factor for navigational purposes, because the project involved rock and hard material, raising concerns that a vessel could hit the bottom of the channel and be seriously damaged. See Pl. Resp. To Def. PFOUF 8. The Corps was entirely within its rights to insist that Cashman achieve this requirement.

III. Whether The Corps Complied With Paragraph 11-4(g) of EM 1110-2-1003 Is Irrelevant To Determining Whether Cashman Reasonably Interpreted The Contract To Provide That The Corps Would Use An Average Depth Acceptance Survey Product

In Cashman's initial brief, Cashman argued that the Corps failed to follow guidance in paragraph 11-4(g) of Engineering Manual ("EM") 1110-2-1003, which provides that:

> Measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, . . . . data processing and binning techniques, and mathematical volume computational method and software that will be employed by the government.

See Pl. Mot. at 10-14; Pl. App. 21. Cashman contended that an issue to be determined by the Court was ". . . the legal effect of the Defendant's failure to place information in the contract specifications that it was required to insert by mandatory internal guidance . . . .". Pl. Mot. at 9

Simultaneously, however, Cashman argued that paragraph 11-4(g) of EM 1110-2-1003

was "internal guidance" that was "not part of the contract and was not disclosed to the Plaintiff prior to award of the contract." See Pl. Mot. at 4; 11. Presumably, Cashman raised this assertion to avoid the possibility that defendant would argue, and the Court would find, that in light of a provision stating that the Corps was required to specify the data processing and binning techniques that would be used, any failure to do so was an obvious omission, giving rise to a patent ambiguity. See Hoppmann Corp. v. United States, 18 Cl. Ct. 220, 225 (1989) ("when an omission is obvious . . . the resulting ambiguity becomes patent and imposes on the contractor a duty to inquire . . . .").

In our initial brief, we established that, according to Cashman's own arguments, "internal guidance" that was "not part of the contract" could confer no legal rights upon Cashman. See Def. Mot. at 16-19. However, we also explained that EC 1130-2-210 is referenced in the KVK 8 contract as standards that the contractor should "meet or exceed" for its hydrographic surveys. See Def. App. 130. EC 1130-2-210 referenced EM 1110-2-1003 as a manual containing "[p]rocedural guidance and accuracy standards for performing hydrographic surveys." See Def. Mot. at 17 n.9; see also Def. PFOUF No. 46. Therefore, Cashman had every reason to be aware of EM 1110-2-1003, which was publicly available, and it should have reviewed the manual to determine how Cashman would perform the work required by the contract.

Cashman's response to our arguments is somewhat difficult to follow. First, Cashman argues that "[i]t is not [Cashman's] contention, as Defendant suggests, that the Corps's failure to follow its internal guidance gives rise to a 'cause of action' by [Cashman]." See Pl. Reply at 7. Cashman contends that it merely claims that a failure to comply with paragraph 11-4(g) would be relevant to whether Cashman reasonably interpreted the contract to provide that the Corps would

use an average depth acceptance survey product. See Pl. Reply at 7; 11. However, a failure by the Corps to clearly stipulate data processing and binning techniques has no effect upon whether, in the absence of such a clear direction, Cashman reasonably interpreted the contract to provide that the Corps would use an average depth acceptance survey product. Otherwise, all ambiguous contracts would necessarily be construed against the Government, regardless of whether the ambiguity was latent or patent, or whether the contractor's interpretation was reasonable. This position, which Cashman appears to advocate, is plainly incorrect as a matter of law. See Pl. Reply at 11 ("If Em 1110-2-1003 (1 January 2002) had been followed by the Corps, Plaintiff would have been on notice that acceptance surveys would be conducted using the minimum depth method and the additional dredging costs - and ultimately, this claim would not have occurred.").

Cashman spends the next five pages of its response arguing that the manual that Cashman previously characterized as the Corps's "internal guidance" was intended to benefit dredging contractors, and that the Corps's violation of instructions in the manual resulted in harm to Cashman. See Pl. Reply at 7-11. Therefore, Cashman presumably is seeking to recover based upon a claim that the Corps failed to comply with paragraph 11-4(g). It appears that Cashman contends that because paragraph 1-5 of EM 1110-2-1003 states that the manual "should be directly referenced in contract specifications for dredging or Architect-Engineer survey services," the manual was intended to benefit Cashman, should have been disclosed to Cashman, and accordingly, the Corps should be held liable for a failure to comply with paragraph 11-4(g). See Pl. Reply at 9-11; Pl. App. 17.

Regardless of who the manual was intended to benefit, if it was not incorporated into the contract, it provides Cashman with no legally enforceable rights. See Reynolds Assocs. v. United States, 31 Fed. Cl. 335, 339 (1994) ("Even if the HUD Handbook obligated HUD as plaintiff alleges, the HUD handbook was not incorporated into the agreement."); see also Texas v. United States, 210 Ct. Cl. 522, 530-32 (1976). Furthermore, there is no basis for Cashman's convoluted argument that because a manual which Cashman contends was not incorporated into the contract stated that it should have been referenced in dredging contracts, the Court should consider the manual to be incorporated. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1384 (Fed. Cir. 2008) ("In sum, there is simply no Federal Circuit precedent holding that it is proper to read into a contract statutes, regulations, or agency guidance when they are not incorporated by reference into the contract.").

## IV. The Corps's Engineering Manuals And Circulars Did Not Prohibit The Use Of Minimum Depth Acceptance Surveys, And In Fact, Required Their Use For The Kill Van Kull Project

Throughout its initial motion and response, Cashman focuses upon two sentences at the end of chapter 11 of the Corps's Engineering and Design Manual ("EM") 1110-2-1003 (1 January 2002), which state that:

> For dredging measurement, payment, or acceptance, the bin size should be kept as small as possible - typically less than 1 to 5 m is recommended. The shot point depth nearest the bin centroid shall be used; not average or minimum, or shoal-biased depths.

Def. App. 56. Cashman contends that this provision requires the use of a centroid survey product for all acceptance surveys, thus prohibiting use of a minimum depth survey product. See Pl. Reply at 28.

First, paragraph 11-13(k) of EM 1110-2-1003 is irrelevant because Cashman has never contended that it reviewed or relied upon this provision, or believed that a centroid acceptance survey product would be used. See Pl. Reply at 3. In fact, in Cashman's opening brief, Cashman asserted that it believed that use of a centroid acceptance survey was "clearly arbitrary." See Pl. Mot. at 6. Furthermore, Cashman fails to mention that paragraph 11-13(k) would also prohibit an average depth acceptance survey product, which Cashman contends that the Corps should have used. See Pl. Reply at 4-5.

In addition, in Cashman's reply brief, Cashman acknowledges that paragraph 11-13(k) of EM 1110-2-1003 is "non-mandatory." See Pl. Reply at 7. Thus, it could not have "required" the use of a centroid acceptance survey product. See Pl. Reply at 3. Furthermore, as discussed in our initial brief, preceding sections of the manual discuss circumstances where it would be appropriate to use minimum or average depth survey products. See Def. Mot. at 43; Def. App. at 52. Cashman itself relies upon earlier language in Chapter 11 of EM 1110-2-1003 to support its contention that an average depth acceptance survey product should have been used. See Pl. Reply at 3.

Finally, both EC 1130-2-210 and EM 1110-2-1003 recognized that the Kill Van Kull and Newark Bay Navigation Improvement Project had special survey requirements as a hard bottom, new work dredging project. These engineering manuals and circulars specified:

> Hard Bottom Material and/or New Work. This category of dredge measurement, payment, and acceptance surveys includes dredging of newly authorized projects containing hard bottom material, such as rock or compacted material, or maintenance projects containing hard bottom material. . . . Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be

> employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

Def. App. 7, see also Def. App. 168 (EM 1110-2-1003, 1 January 2002, Paragraph 3.5). Therefore, even if EM 1110-2-1003 Paragraph 11-13(k) required the Corps to use a centroid survey product for acceptance surveys for most dredging projects (which it does not), the KVK 8 contract was identified as a project that would be excepted from this requirement. See Def. App. 7; 168; Pl. Supp. App. 21-22. A centroid survey product, in which a data point nearest the geometric center of a three foot by three foot bin is selected as representative of the bin depth, would not "detect small objects remaining above the required dredging prism" and is not "[t]he most precise positioning and depth measurement standards and techniques." See Def. App. 7; 168; Plaintiff's Supplemental Appendix ("Pl. Supp. App.") 21; see also Pl. Mot. at 6 (asserting that a centroid survey product was "clearly arbitrary").

Relying upon paragraph 11-13(k), Cashman insinuates that the New York District of the Corps used a minimum depth acceptance survey product, while all other districts used a centroid survey product. See Pl. Reply at 19 ("Finally, if in fact the New York District was using the minimum depth method while the rest of the Corps was following the requirements of EM 1110-2-1003 . . . . ."). There is no evidence in the record that other districts actually used a centroid acceptance survey product. If, as Cashman suggests, all other districts of the Corps were using a centroid acceptance survey product, it would make no sense for Cashman to assume that an average depth acceptance survey product would be used, since Cashman had previously performed dredging contracts for other districts. See Pl. PFOUF 5; Def. PFOUF 26.

To imply that the New York District used a different acceptance survey product than all

other districts, Cashman has grossly mischaracterized both defendant's arguments and the testimony of Richard Kiss, the former Chief of the Survey Section for the New York District. Cashman contends that Mr. Kiss testified that EM 1110-2-1003 was not "changed to allow for the use of the minimum depth method until the April [sic] 2004 revision, which was well after the contract was entered into." See Pl. Reply at 23-24. Mr. Kiss did not testify that the January 2002 version of EM 1110-2-1003 did not "allow for" the use of a minimum depth survey product. See Plaintiff's Supplemental Appendix at 23-24. Rather, Mr. Kiss simply testified that use of a minimum depth acceptance survey product was contrary to paragraph 11-13(k) of EM 1110-2-1003 (1 January 2002), and that no special authority was required to deviate from paragraph 11-13(k). See Pl. Supp. App. at 23. Mr. Kiss further explained why a centroid acceptance survey project would not have been appropriate for the Kill Van Kull deepening projects. See Pl. Supp. App. 21-22. Although Mr. Kiss testified that in April 2004, EM 1110-2-1003 was revised to remove the statement in paragraph 11-13(k) that a centroid survey product should be used for all dredging acceptance surveys, the previous version of EM 1110-2-1003 permitted, and in fact required, the use of a minimum depth acceptance survey product for hard bottom new work dredging projects, such as the Kill Van Kull project. See Pl. Supp. App. at 24; see also Plaintiff's Appendix ("Pl. App.") at 58; see also Def. App. 52; 168 (EM 1110-2-1003, 1 January 2002, Paragraph 3.5).

Similarly, Cashman argues that defendant claimed that Cashman "should have known what to expect when performing work for the New York District," although Cashman had "never performed a dredging contract for the New York District." Defendant has never argued that Cashman should have "known what to expect when performing work for the New York District."

However, it is clear that after reviewing the contractual requirement to dredge to 47 feet, as well as relevant engineering manuals and circulars, and recognizing that the Kill Van Kull project was a hard bottom, new work deepening project in an extremely busy port, a reasonable contractor should have reasonably concluded that the Corps would use a minimum depth acceptance survey product, or at least made inquiry prior to submitting its bid. Instead, Cashman relied upon its unreasonable assumptions.

## V. If The Contract Failed To Specify The Method That The Corps Would Use To Produce Its Acceptance Surveys, The Contract Was Patently Ambiguous

In Cashman's response brief, Cashman argues that the contract was not ambiguous as to the survey product that the Corps would use to determine acceptance. See Pl. Reply at 12-13. However, when a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous. See Teg-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006). Cashman contends that the contract contained "consistent and across-the board omission of detail" regarding the survey product that the Corps would use to determine acceptance, and under the contract "any reasonable" survey product could be used. See Pl. Reply at 13. If Cashman's assertions were true, it would by definition be an ambiguity.

According to Cashman's own arguments, information regarding the acceptance survey product that the Corps would use was essential in determining Cashman's "daily dredging regimen" and how deep Cashman would dredge the contractually defined areas. See Pl. Memo. at 8, 19; see also Pl. Memo. at 4, 6, 12-13, 19, 22; see also Pl. Reply at 6 ("If the solicitation had alerted bidders that this particular data processing method was going to be employed by the Corps, the Plaintiff could have planned, at a higher bid price, to dig deeper on the first pass . . .

.").[3] Therefore, if Cashman were unable to determine the survey product that the Corps would use, then the obvious omission of this essential information was a patent ambiguity, giving rise to a duty of inquiry by Cashman. See E.L. Hamm & Assocs. v. England, 379 F.3d 1334, 1339 (Fed. Cir. 2004) (describing a patent ambiguity as an "obvious omission"); Ryan Co. v. United States, 43 Fed. Cl. 646, 654 (1999) ("A patent ambiguity is one that is recognized as 'an obvious omission . . . .'").[4]

In Cashman's response brief, Cashman argues that because the Corps did not raise patent ambiguity in the contracting officer's final decision denying Cashman's certified claim, or in defendant's prior "pleadings," any ambiguity cannot be patent. See Pl. Reply at 17. First, the Court can consider whether an ambiguity is patent, even if neither party asserts that a contract is ambiguous. See United States v. Turner Constr. Co., 819 F.2d 283, 285-86 (Fed. Cir. 1987). Furthermore, patent ambiguity is not an affirmative defense that defendant would be required to raise in its answer, and there have been no substantive pleadings filed other than the cross-motion for summary judgment.[5] The fact is, we did not understand until discovery, and did not fully

[3] This argument appears inconsistent with the testimony of Cashman's technical personnel, who testified that they had no opinion as to the acceptance survey product that the Corps would use at the time that Cashman began work on the KVK 8 contract. See Def. App. 172-74; 175-77; 93; 178-80.

[4] In Cashman's response brief, Cashman also contends that defendant "under-states the strict criteria for finding 'patent ambiguity,'" and expends significant effort expounding upon the standard. See Pl. Reply at 14. Defendant has correctly stated the well-known standard for determining whether an ambiguity is patent. See Def. Mot. at 20. Furthermore, defendant presumes that the Court is intimately familiar with the standard, which is a relatively basic legal principle.

[5] Therefore, defendant presumes that Cashman intended to refer to the joint preliminary status report, which is merely a preliminary identification of the issues to be decided in this case, in referencing defendant's "pleadings."

understand until the filing of Cashman's motion for partial summary judgment, that Cashman contended that its decision how to perform the dredging work required by the contract, and its bid, were based upon an assumption regarding the multibeam acceptance survey product that the Corps would use. Therefore, if such essential information were omitted, it should have been obvious to Cashman upon reviewing the contract.[6] P.R. Burke, 277 F.3d at 1355; Travelers Cas. & Sur. Co., 75 Fed. Cl. at 711. (A patent ambiguity is "should be, to the reasonable contractor, apparent on the face of the contract . . .").

## VI. If The Contract Were Latently Ambiguous, Cashman Could Not Recover Because Its Interpretation That An Average Depth Acceptance Survey Product Would Be Used Was Unreasonable

Even if the Court were to find that the contract was latently ambiguous, Cashman cannot recover because its interpretation that the Corps would use an average depth acceptance survey product was unreasonable. See P.R. Burke, 277 F.3d at 1355; Travelers Cas. & Sur. Co. of Am. v. United States, 75 Fed. Cl. 696, 712 (2007).

### A. The Corps's Engineering Manuals and Circulars Could Not Reasonably Be Interpreted to Provide That An Average Depth Survey Product Would Be Used

In our initial brief, we established that the use of an average depth survey product was inconsistent with EC 1130-2-210. See Def. Mot. at 24-25. In response, Cashman contends that Cashman reasonably interpreted the requirement in Paragraph A-2 of Appendix A of EC 1130-2-210 that "[t]he most precise positioning and depth measurement standards and techniques

[6] Amazingly, in Cashman's response brief, Cashman contends that "[t]he Defendant did not inform the Plaintiff that it was using the minimum depth method until the latest stages of the project, and any possible ambiguity was not apparent until that time." See Pl. Reply at 16. Aside from being internally contradictory, what Cashman also fails to mention was that throughout the contract, the Corps's surveys, which were provided to Cashman, continuously found high spots on areas that Cashman believed had been dredged to grade. See Def. App. 132-48; 195-96.

must be employed for" projects such as KVK simply to mean that multibeam surveys would be used. See Pl. Reply at 18. This interpretation is unreasonable, however, because it would be utterly redundant. See Capital Props. v. United States, 56 Fed. Cl. 427, 431 (2003) ("[i]nterpretation of the contract must assure that no contract provision is made inconsistent, superfluous, or redundant.") (internal quotations omitted). EC 1130-2-210 itself is entitled "Hydrographic Surveying" and Appendix A is entitled "Hydrographic Survey Accuracy Standards and Classification." See Def. App. 7; 128. Obviously, the contract and EC 1130-2-210 provided for the use of hydrographic multibeam surveys. There would be no reason to state this again.

In addition, in our initial brief, we also explained that Paragraph A-2 of Appendix A of EC 1130-2-210, entitled "Revised Survey Classifications," provided that for hard bottom, new work dredging projects, such as the KVK projects, "[m]echanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism." See Def. Mot. at 25-26. We established that an average depth survey product, which would "overly smooth the data," would not detect small objects remaining above the required dredging prism. See Def. Mot. at 25; Def. App. 52. Cashman has failed to respond to this argument, or explain how this provision could reasonably be interpreted to provide for an average depth acceptance survey product.

In Cashman's response brief, Cashman notes that EM 1110-2-1003 provides that "the average depth over the series can overly smooth the data; however, this may be desirable in some instances." See Pl. Reply at 3; Def. App. 52. However, Cashman has failed to explain why it would be desirable to "overly smooth the data" for acceptance surveys for a hard bottom, new

work dredging project in one of the largest ports in the nation, with millions of dollars of cargo passing through. See DPFOUF 1.

Cashman also misquotes or misconstrues sections of EM 1110-2-1003, in an attempt to make it appear that minimum depth survey products were inaccurate or prohibited. For example, Cashman notes that although paragraph 11-12(c) of EM 1110-2-1003 specifically provides that "[t]he minimum depth recorded within a bin may be used for some strike detection purposes," it also states that "[u]se of minimum shoal-biased depths can adversely skew dredge quantity computations and erroneously portray clearance data." See Def. App. 52.[7] However, paragraph 12(c) proceeds to explain how surveys should properly be performed to avoid these issues. It explains that:

> Shoals above grade must be assessed based upon multiple hits over successive passes - the least depth recorded in a bin is not necessarily the absolute elevation over an object.

See Def. App. 52. As Cashman concedes, in performing its acceptance surveys, the Corps required that "shoals above grade be assessed based on multiple hits, a minimum of three hits, over successive passes," to ensure that the survey results were accurate. See Def. App. 236; see also Pl. Reply at 2. Paragraph 11-12(c) simply provides instruction on how to ensure the accuracy of a minimum depth survey product - it does not discourage the use of a minimum

---

[7] Cashman also argues that paragraph 11-12(c) provides that "[s]hoal biasing can also skew minimum clearance computations on channel condition surveys." See Pl. Reply at 3. However, channel condition surveys are not at issue in this litigation - acceptance surveys are. Accordingly, the provision cited by Cashman is irrelevant.

depth survey product.[8]

B. Cashman's Assumption That The Corps Would Change Its Method For Determining Acceptance Of Hard Bottom New Work Dredging Was Unreasonable

In our initial brief, we established that Cashman's interpretation that the Corps would use an average depth acceptance survey product was unreasonable, because it presumed a fundamental change in the method that the Corps used to accept dredging projects.[9] See Def. Mot. at 28. In response, Cashman argues that because a multibeam sonar system rather than a physical bar sweep was being used, the historical way that the Corps accepted dredging work was irrelevant. See Pl. Reply at 19. Cashman has failed to present any coherent explanation why the use of a sonar system, as opposed to a bar sweep, would change the basic premise that all points in an acceptance area must be dredged to the contractually required depth.

C. It Was Unreasonable For Cashman To Assume That The Corps Would Use An Average Depth Acceptance Survey Product Due To Potential Navigational Hazards

In our initial brief, we established that it was unreasonable for Cashman to assume that the Corps would only require that each three foot by three foot bin be dredged to an average

---

[8] Cashman also claims that "paragraph 11-12(b) [of of EM 1110-2-1003] specifically recommends not using the minimum depth for dredging surveys." See Pl. Reply at 28. In fact, paragraph 11-12(b) states that minimum depth survey products should not be used for "dredging payment surveys," not "dredging surveys." See Def. App. 52. The Corps did not use a minimum depth survey product for payment surveys, but rather, an average depth survey product, because it provided a more equitable volume calculation for payment purposes. See Def. App. 123-24.

[9] Cashman implies that only the New York District accepted hard bottom new work dredging work by use of a bar sweep, which ensures that the contractually required depth was the minimum depth of an acceptance area. See Pl. Reply at 28. The use of a bar sweep for acceptance was not limited to the New York District.

depth of 47 feet, due to potential navigational hazards. See Def. Mot. at 29-30. The KVK project contained rock and other hard materials. See Def. App. 4; 77-78. It was entirely possible that during the dredging process, boulders or pinnacles of rock could flip, causing extreme high spots within a three foot by three foot bin, which an average depth acceptance survey might not detect.[10] "Accurate control" over Cashman's dredge bucket would not prevent rock materials from flipping during the dredging process. See Pl. Reply at 21. In addition, the "legs" that a backhoe dredge stands upon can also create high spots, regardless of the accuracy of the dredge operation. Furthermore, if dredge operation was as accurate as Cashman contends, there would be no reason for the KVK contracts to provide for a foot and a half of paid overdepth to achieve the contractually required depth. See Def. App. 74; 159-60.

## VII. Cashman Has Failed To Establish That The Corps Breached The Duty To Cooperate

### A To Establish A Breach Of The Duty of Good Faith And Fair Dealing, Cashman Must Overcome The Presumption That The Corps Acted In Good Faith

Cashman argues that defendant has misconstrued Cashman's argument that the Corps breached the duty to cooperate as an argument that Cashman was "alleging bad faith on the part of the Corps, or an intent to mislead and financially harm [Cashman]," and has confused Cashman's claim with a claim for "malicious bad faith." See Pl. Reply at 22. Cashman has misconstrued defendant's arguments, and fails to understand the standard for establishing a breach of the duty to cooperate.

---

[10] Cashman argues that the Government claims that an average depth acceptance survey product "would likely" leave such extreme high spots. See Pl. Reply at 20. In fact, we argued that an average depth acceptance survey product could leave such extreme high spots, and that it was the Corps's responsibility to ensure that no high spots would remain above the required depth.

The duty to cooperate is part of the duty of good faith and fair dealing. See Precision Pine & Timber v. United States, 50 Fed. Cl. 35, 58-59 (2001); see also Pl. Reply at 22. In order to prevail upon a claim that the Corps breached the duty of good faith and fair dealing, however, Cashman must overcome the presumption that Government officials act in good faith in the discharge of their duties. See Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004); Avtel Servs. v. United States, 70 Fed. Cl. 173, 222 (2005). This requires Cashman to allege and prove, by clear and convincing evidence, specific acts of bad faith on the part of the Corps. See S. Cal. Edison v. United States, 58 Fed. Cl. 313, 325 (2003); Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 604 (1994); Torncello v. United States, 681 F.2d 756, 771 (1982); cf., Tecom, Inc. v. United States, 66 Fed. Cl. 736, 757-72 (2005); but see North Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 188 n.34 (2007) ("It is unclear whether Tecom may be squared either with Federal Circuit precedent or the jurisprudential underpinnings of the doctrine, in which performing in good faith and bad faith are often viewed as mutually exclusive."). Therefore, defendant has not misconstrued or misunderstood Cashman's claim, but has simply set forth the relevant legal standard.

B. The Corps Did Not Breach The Duty To Cooperate Because Personnel In The Construction Division Were Unfamiliar With Multibeam Survey Products

In its response brief, Cashman argues that because the Corps's construction personnel were not aware that there were multiple survey products that could be produced from multibeam survey data, "how can the Plaintiff be faulted for continuing to use the average depth survey method that it disclosed on the face of its pre-acceptance survey submissions?" See Pl. Reply at 23. The answer to this question is simple - because the Corps's acceptance surveys continuously

found high spots in areas that Cashman's pre-final acceptance surveys indicated had been dredged to grade, and because the Corps provided Cashman with survey results showing the high spots. See Def. PFOUF 75; 76; Def. App. 132-48, 243-45. If Cashman failed to understand why this was occurring, Cashman should have contacted the Corps's Survey Section, submitted a request for information, or written Adminstrative Contracting Officer Ron Conetta a letter, as Mr. Conetta advised Cashman to do.[11]

Furthermore, the Corps's construction personnel did not need to be experts in multibeam surveying, because the Corps's Survey Section was responsible for surveys. Nor was there any need for the Construction Division to discuss Cashman's pre-final acceptance surveys with the Survey Section, since the Corps's surveys were used to determine acceptance, not Cashman's. Interestingly, although Cashman contends that it was inappropriate for the Corps's construction personnel to be unfamiliar with the multibeam acceptance survey product being used, Cashman does not dispute that its own surveyor and dredging project manager had no idea what acceptance survey product the Corps would use at the time that Cashman began work on the contract. See Def. PFOUF 57; 59. These individuals, who were intimately involved in Cashman's dredging regimen and pre-final acceptance surveys, should have taken steps to obtain this information, or at a minimum, formulated an opinion on the issue before Cashman submitted its bid and began

---

[11] Cashman attempts to discredit the testimony of its former employee, James Galli to this effect. See Pl. Reply at 28. Cashman contends that Mr. Galli's testimony is contradicted by Mr. Conetta's testimony that he didn't have a "specific recollection" of asking Mr. Galli to write a letter. See Def. App. 112. This does not contradict Mr. Galli's testimony, since it only reflects that Mr. Conetta could not recall whether the conversation had occurred. Nor is it inconsistent with Bruce Wood, Cashman's Project Director's, recollection that he inquired about the issue and was verbally informed that the Corps would "get back" to Cashman. See Pl. Supp. App. at 14. Furthermore, if the Corps did not "get back" to Mr. Wood, it is unclear why Cashman did not seek formal direction.

work.

C. The Corps Did Not Lead Cashman To "Reasonably Conclude" That The Corps Was Using An Average Depth Acceptance Survey Product

Cashman's arguments that "the Corps led Cashman to reasonably believe that it acquiesced in its acceptance survey method" are similarly unavailing. See Pl. Reply at 25. Throughout the contract, the Corps did not accept contractually-defined areas that Cashman believed had been dredged to grade, and required Cashman to return and remove high spots. See Def. App. 132-48; 195-196; 212. Bruce Wood, Cashman's Project Director for the KVK 8 contract, testified that the Corps continued to find high spots on areas that Cashman believed had been dredged to grade "from the beginning of the job until the end of the job." Def. App. 196. In fact, this is the basis of Cashman's claim in this litigation. See Compl. ¶ 19 ("As the work progressed, however, Defendant repeatedly notified Plaintiff that its acceptance surveys indicated that material remained above the contract excavation limits and directed Plaintiff to redredge those areas."). There is no factual basis for Cashman's contention that the Corps somehow misled Cashman into believing that its work was being accepted.

Nor is there any validity to Cashman's assertion that the Corps somehow waived its right to use a minimum depth acceptance survey product, or that a "course of dealings" led to the conclusion that the Corps would be using an average depth acceptance survey product.[12] See Pl. Reply at 19-20; 25. There was only one occasion involving one contractually defined area where Cashman performed its pre-final acceptance survey using an average depth survey product, and

[12] At pages 19-20 of Cashman's response brief, Cashman references a "course of dealings" "alleged representations" and "conduct" by the Government, but fails to specify precisely what course of dealings, conduct, or "alleged representations" it is referring to, making it impossible for defendant to respond to these contentions.

the work was accepted by the Corps using a minimum depth survey product on the first survey attempt. See Pl. PFOUF 54; Def. PFOUF 54. The area was accepted because it met the contractually required depth according to a minimum depth acceptance survey product.[13] See Def. PFOUF 43. Furthermore, even if one area reflected a single instance of non-enforcement, it could not establish waiver of a contractual requirement. See Int'l Res. Recovery, Inc. v. United States, 60 Fed. Cl. 428, 432 (2004) ("waiver of a contractual requirement by course of dealing cannot be established by a single occurrence."); see also Doyle Shirt Mfg. Corp. v. United States, 199 Ct. Cl. 150 (Ct. Cl. 1972).

D. There Is No Evidence That Other Dredging Contractors For The KVK Projects Believed That An Average Depth Acceptance Survey Product Would Be Used

In alleging that the Corps breached the duty to cooperate, Cashman insinuates that dredging contractors for other KVK projects were also required to re-dredge high spots due to confusion regarding the acceptance survey product that the Corps would use. See Pl. Reply at 25. There is no evidence to support this allegation. No other KVK dredging contractor has filed a claim regarding the acceptance survey product used. Mr. Hawkins, the Corps's KVK Project Manager, testified that it was "clearly understood" by other dredging contractors a minimum

[13] Amazingly, Cashman claims that it did not know that the Corps accepted area one using a minimum depth survey product until defendant submitted its responses to Cashman's proposed findings of uncontroverted fact. See Pl. Reply at 19-20. Although Cashman may not have known that the Corps's acceptance surveys were produced using the minimum depth at the time it submitted area one for an acceptance survey, it was aware that the Corps always used a minimum depth acceptance survey product long before defendant filed its response to Cashman's proposed findings of uncontroverted fact. See Def. App. 59 ("Q: But you always used the shoalest method for acceptance purposes? A: Yes."); Def. App. 221 ("The government has always used the shoalest (or shallowest) point in an area for determination of acceptance."); Def. App. 222 ("The Government followed the same acceptance criteria of the shoalest principle in all survey standards."); see also Def. App. 52.

depth acceptance survey product would be used for acceptance. See Def. App. 166-167. Mr. Weinberg, a Team Leader in the Corps's Engineering Division, testified:

> Well, since this has not been an issue heretofore in my experience of dredging, it seems to me that contractors understood clearly how things were to be done. I have never heard of this being a conflict in my time or in my predecessor's time, so my understanding was that everything was, frankly, fairly fine.

Def. App. 83.

Apparently, Cashman contends that any instance where a Corps acceptance survey found a high spot in an area that a dredging contractor believed had been dredged to grade was attributable to confusion regarding the acceptance survey product to be used. See Pl. Reply at 25. This accusation is baseless. Mr. Galli, Cashman's former project manager, explained that there are multiple reasons that the Corps's surveys could find high spots in areas that a contractor believed were clear. See Def. App. 187-88. He explained that:

> . . . the methodologies are not precise, and no two surveys are ever going to agree. The environment, the water, the water depth, the chop, the water temperature all affect how accurate the surveys are. . . . Two surveys taken by the same method with the same boat half an hour apart are different.

Id. Furthermore, Mr. Wood testified that even after Cashman recognized that the Corps was using a minimum depth acceptance survey product, and began performing its pre-final acceptance surveys using a minimum depth survey product, the Corps’s surveys continued to find high spots in areas that Cashman’s surveys indicated had been dredged to the contractually required depth. See Def. App. 195-96. Cashman’s assertions that other dredging contractors were confused are not substantiated by the record, and in fact, are contradicted.

E. Cashman Is Responsible For Complying With, And Successfully Performing, The Contract

Cashman repeatedly blames the Corps for not correcting Cashman's erroneous assumptions, presuming that Cashman itself had no responsibility to comply with, or take affirmative steps to ensure that it could successfully complete, a $35 million dredging contract. For example, Cashman blames the Corps for not insisting that Cashman comply with the contract requirement to submit its proposed method for performing its pre-final acceptance surveys for approval. See Pl. Reply at 26. Cashman also assumes, without any supporting evidence, that such a submital would not have been reviewed by the Corps's Survey Section.

Cashman also contends that the contract provision that required Cashman to submit "the proposed method for performing these surveys" would not have required Cashman to identify the acceptance survey product that it would use to perform its pre-final acceptance surveys. See Pl. Reply at 30. Presumably, Cashman takes this position to contend that its Quality Control Survey Plan, which did not contain this information, was adequate to fulfill the contract requirement. However, Cashman has not explained why the survey product it would use would not be part of "the proposed method for performing these surveys." Furthermore, this position appears fundamentally inconsistent with Cashman's position that the Corps's acceptance survey product was essential information that needed to be provided.

Frankly, however, it is irrelevant whether submitting this information would have permitted the Corps to correct Cashman's confusion. If Cashman were confused, it was Cashman's responsibility to make inquiry with the Corps to enable Cashman to successfully perform the contract, rather than continuing to perform its dredging and pre-final acceptance

surveys in the same way, although the work was not being accepted by the Corps, and the Corps provided Cashman with survey results showing the spots above the contractually required depth. Def. App. 132-48; 243-45.

Similarly unpersuasive is Cashman's argument that it was acceptable for Cashman to continue to submit areas for acceptance that had only passed an average depth pre-final acceptance survey, after being advised that the Corps would use a minimum depth survey product to determine acceptance, because the dredging work had already been performed. See Pl. Reply at 27. The fact that the dredging work had already been performed does not justify submitting it for acceptance, knowing that it would likely not be determined to be at the contractually required depth, and certainly places no responsibility upon the Corps for continuing to reject it. Nor have we argued that Cashman failed to "mitigate its damages" by doing so. See id. Rather, we have responded to Cashman's argument that it was unable to "mitigate its damages." See Pl. Memo at 8. We do not believe that Cashman could have "mitigated its damages," because Cashman is not entitled to any damages in the first instance.

## CONCLUSION

For the foregoing reasons and for all of the reasons set forth in our opening brief, the United States respectfully requests that Cashman's motion for partial summary judgment be denied, and summary judgment be granted in favor of the United States.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

OF COUNSEL:
Donald M. Harris
Counsel
U.S. Army Engineer District
New York

s/ Tara Kilfoyle
TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972

May 5, 2008

Certificate of Filing

I hereby certify that on May 5, 2008, a copy of the foregoing DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Tara Kilfoyle