# In The United States Court of Federal Claims

No. 06-101C

(Filed: August 4, 2009)

_____

| | |
|---|---|
| JAY CASHMAN, INC., | *  Partial motion for summary judgment/cross- |
| | *  motion for summary judgment; Government |
| Plaintiff, | *  contract case – action under the Contract |
| | *  Disputes Act; Dredging contract; |
| | *  Hydrographic multibeam acoustic survey; |
| v. | *  Minimum depth versus average depth |
| | *  method; Equitable adjustment; Contract |
| THE UNITED STATES, | *  ambiguity/missing term; Duty to Cooperate; |
| | *  Alleged violation of manual provision not |
| Defendant. | *  actionable; Patent ambiguity; Numerous |
| | *  genuine issues of material fact identified; |
| | *  Summary relief largely denied; Trial to be |
| | *  scheduled. |

_____

**OPINION**

_____

*Michael H. Payne,* Cohen Segalias Pallas Greenhall & Furman, PC, Philadelphia, PA, for plaintiff.

*Tara J. Kilfoyle*, Civil Division, Commercial Litigation, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

**ALLEGRA, Judge:**

This case, which arises under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-13, finds its roots in a contract between plaintiff, Jay Cashman, Inc. (Cashman) and the United States to provide dredging services for a project known as the "New York Harbor, Kill Van Kull and Newark Bay Channels, Navigation Project Phase II, Contract 8 (Area 8)" – referred to as the Kill Van Kull 8 project or KVK 8. In a motion for partial summary judgment, plaintiff alleges, *inter alia*, that defendant used a stricter acceptance method than was specified by the contract, requiring plaintiff to dredge more material than should have been required, and thereby entitling it to an equitable adjustment. In its response and cross-motion for summary judgment, defendant claims that it required plaintiff to do nothing more than meet the stated objective of the contract – to dredge the channels to a level of forty-seven feet. It asserts that plaintiff should have clarified any supposed ambiguities about how to achieve this objective before bidding and that failing that, should not be permitted to recover now. Because the court concludes that multiple layers of

genuine issues of material fact exist here, it denies plaintiff's motion and denies, in large part, defendant's cross-motion. The court instead will set this case for trial.

I.   BACKGROUND

Plaintiff is an experienced construction contractor, which has performed dredging projects for the Army Corps of Engineers (the Corps). Dredging involves the excavation of materials, such as soil and rock, that are located under a body of water and must be removed either to deepen or maintain a navigable waterway. The deepening of a waterway by dredging below the published elevation is known as "new work." "Maintenance dredging," by comparison, entails removing material that has shoaled since the last time a waterway was dredged.

The Port of New York and New Jersey is the third largest port in the nation and the largest on the East Coast, through which billions of dollars of cargo pass annually. Beginning in 1985, Congress authorized a series of projects to deepen the navigational channels in this port, to meet industry demand for larger and deeper-bottomed cargo vessels to use the channels. *See* Supplemental Appropriation Act of 1985, Pub. L. No. 99-88, 99 Stat. 293 (1985). As part of this effort, the New York District of the Corps embarked on the KVK Project to deepen the Kill Van Kull and Newark Bay Channels that form the main artery linking the Ports of Elizabeth and Newark Bay. Phase I of the KVK project, which was substantially completed in 1995, involved a series of contracts to lower the depth of the channels to forty-two feet below mean low water (MLW). Phase II of the project, which was completed in 2004, involved a series of contracts to lower the depth of the channels to forty-seven feet below MLW.[1] On May 23, 2003, Cashman was awarded the final contract in KVK Phase II, in the amount of $35,460,430.[2]

This last KVK Phase II contract involved "new work" dredging, requiring plaintiff to remove "hard bottom" materials such as rock, compacted gravel, and heavy clays. The project was divided into six main "acceptance areas" of varying dimensions, totaling 820,000 square yards. The specifications for the contract provided that Cashman would be required to dredge the

---

[1] There are future plans to lower the depth of the channels to fifty-two feet below MLW, but the channels are currently authorized to a depth of forty-five feet for navigational purposes and are expected to remain so for a substantial period of time. For the KVK projects, the Corps included a two-foot safety cushion beyond the authorized depth of the channel for navigational purposes, because the channels contained rock and hard material, raising concerns that a vessel hitting the bottom of the channel would be seriously damaged.

[2] Prior to KVK 8, Cashman had not been awarded any of the KVK Phase II contracts. It had submitted bids for several harbor deepening contracts for the New York District and had been the apparent low bidder for the KVK contract for Area 5, but had requested and was granted permission to withdraw its bid.

contractually-defined area to a depth of forty-seven feet below MLW.  In this regard, the specifications stated:

> If during the dredging or upon completion of the post-dredging surveys and soundings, materials are found above the required depth of 47 feet, below MLW, these materials shall be removed immediately at the Contractor's expense.

The contract provided for payment to the contractor of a fee per cubic yard of material excavated, with unit prices that differed according to the location and type of material removed.  The specifications indicated that the awardee also would be compensated at the contract price for "allowable overdepth," defined as material removed up to 1.5 feet beyond the depth of forty-seven feet.  The contractor assumed responsibility for any material removed beyond this overdepth, for which it would not be compensated.[3]  Although the specifications permitted the contractor some flexibility in choosing the means of performance, the contractor was prohibited from using particular types of dredges (*e.g.*, hopper and cutterhead dredges) and obliged to dredge non-rock material using a closed "environmental" bucket.

The KVK 8 contract envisioned that both Cashman and the Corps would use acoustic (also known as "hydrographic") surveying equipment.  The multibeam version of that equipment generates thousands of data points ("hits") by bouncing sound waves off the channel bottom or underwater objects.  The data is fed into a computer, which filters out extraneous data (noise) and then produces various survey products.  The contract required Cashman to perform monthly surveys to determine the quantity of material dredged for progress payment purposes.  In addition, it required that additional surveys be used to establish final acceptance, providing, in relevant part:

> The Contractor shall perform pre-final hydrographic sweep surveys of an entire acceptance area to verify the area is satisfactorily completed prior to final examination by the Government.  The pre-final surveys shall be performed using a multitrack or multibeam survey system to insure 100% coverage of the entire acceptance area.  The proposed method for performing these surveys and all equipment and programs shall be submitted for approval.  The Contractor's hydrographic surveys shall meet or exceed the survey standards listed in EC 1130-2-210 HYDROGRAPHIC SURVEYING, 1 October 1998 for Class I surveys.[4]

---

[3]  The contract warned that "[p]otential environmental consequences from dredging below -48.5 feet MLW could result in violations of the Ocean Dumping provisions of the Marine Protection, Research, and Sanctuaries Act (33 U.S.C. §1401-1445) and may lead to a federal enforcement action."

[4]  This "EC" reference was to an Engineering Circular issued by the Corps' Chief of Engineers.  As in effect during the years in question, paragraph A-2 of Appendix A of EC 1130-2-210, entitled "Revised Survey Classifications," provided:

Regarding this acceptance process, the same paragraph of the specifications continued –

> As soon as practicable after the completion of an entire acceptance area, a final examination of the work will be conducted by the Contracting Officer at the cost and expense of the Government by acoustic sweep survey system. Should any shoals or lumps or other lack of contract depth be disclosed by this examination the Contractor will be required to remove same. The Contractor, or his authorized representative, will be notified when soundings or sweepings are to be made, and will be permitted to accompany the survey party. The Government shall notify the Contractor of the findings of survey within ten (10) calendar days from the date the survey was performed by the Government. When the area is found to be in a satisfactory condition, it will be accepted.

Once an area of the project had been accepted, Cashman could move its equipment to other areas of the project.

The Corps Engineering Manual (a document different than the Engineering Circular referenced above), as in effect when the contract was entered, indicated that dredging contracts should specify the method that would be used to determine whether an area is dredged to the required depth.[5]  The contract between Cashman and the Corps, however, appears to be silent on this point. In fact, there are various methods by which data generated by an after-dredging

---

> Hard Bottom Material and/or New Work. This category of dredge measurement, payment, and acceptance surveys includes dredging of newly authorized projects containing hard bottom material, such as rock or compacted material, or maintenance projects containing hard bottom material. . . . Mechanical or acoustic sweep methods must be employed to insure 100% bottom coverage in order to detect small objects remaining above the required dredging prism. The most precise positioning and depth measurement standards and techniques must be employed for this class of project. In actuality, only a small number of Corps projects fall under this category - for example, projects like Kill Van Kull, NJ and St. Mary's River, MI.

[5]  The Engineering Manual states:

> Measurement and payment provisions in dredging contract specifications shall clearly stipulate the type of survey system, acoustic frequency, navigation guidance system and software, data acquisition parameters (horizontal and vertical control, density, etc.), data processing and binning techniques, and mathematical volume computational method/software that will be employed by the government.

EM 1110-2-1003 11-15g (1 JAN 02).

multibeam survey can be processed, two of which figure prominently in this case: the "average depth" and "minimum depth" methods. In both, the area surveyed is subdivided into three-foot by three-foot areas called "bins." In general, the "average depth" method requires the average of all data points within a bin to be at the targeted level, *i.e.*, forty-seven feet below MLW or deeper. By comparison, the "minimum depth" or "shoaling" method requires that no more than two data points within a single bin be shallower than the targeted level. Depending on the data method chosen, a computer survey model would represent each bin by its average or minimum depth, respectively.[6] In terms of the contract at issue, a bin shallower than forty-seven feet was considered a "high spot" and the Corps would reject the entire acceptance area until it was redredged and, once resurveyed, met the required depth. Contractors try to dredge an area in one pass, as it is time-consuming and costly to remobilize dredging equipment to redredge an area believed to be completed.

As it dredged the project area, plaintiff periodically furnished the Corps' construction branch with pre-final survey charts. The first of these was submitted on December 1, 2003, and plainly noted that the "average sounding" method had been used. The same notation was prominently displayed on six subsequent survey charts submitted by plaintiff. Plaintiff asserts that it presumed defendant also was using the "average depth" method. For payment surveys, the Corps, in fact, was doing that, but for acceptance surveys, it was using the minimum depth method, assertedly to ensure no high spots remained that might damage vessels using the channels. Plaintiff has provided evidence that it was unaware of the latter fact during the time it

---

[6] The Engineering Manual described not only the minimum and average depth methods, but also two other ways of representing the depth of a bin – the maximum and center point (centroid) method. Describing these methods, it states:

> The shot cell closest to the cell center should be used rather than minimum, maximum, or average options. The "shot" depth is recommended for USACE navigation and dredging surveys. The average depth over the series can overly smooth the data; however; this may be desirable in some instances. It is not desirable on excavated slopes since the average depth does not correlate with the position. . . . The minimum depth within a bin area may be used for some strike detection purposes. However, such biased depths shall not be used for dredging payment surveys, and should be used with caution on navigation project condition surveys. This is due to the relatively high variance in acoustic depth data – see discussion on data accuracy and confidence intervals in Chapter 4. Use of minimum shoal-biased depths can adversely skew dredge quantity computations and erroneously portray clearance data. Shoal biasing can also skew minimum clearance computations on channel condition surveys. Shoals above grade must be assessed based on multiple hits over successive phases—the least depth recorded in a bin is not necessarily the absolute elevation over an object.

EM 1110-2-1003 11-29 b-c (1 JAN 02).

was conducting its dredging activities. Meanwhile, the Corps' survey branch purportedly was unaware that plaintiff was using the average depth method because, according to defendant, the construction branch did not furnish the Corps' survey personnel with plaintiff's actual acoustic surveys. Rather, the branch merely informed the survey personnel that plaintiff had submitted a particular area for acceptance.

Using the minimum depth method, the survey branch, on June 22, 2004, approved the first area plaintiff submitted for acceptance. As work progressed, however, the survey branch repeatedly directed plaintiff, in writing, to redredge certain areas because the Corps' acceptance surveys showed high spots, even though plaintiff's pre-acceptance surveys did not. News of the rejection of plaintiff's work came in a series of eight letters beginning on August 11, 2004, although none of these letters revealed to plaintiff the survey method the Corps was using.

Perplexed by the discrepancies between its surveys and those performed by the Corps, plaintiff raised the issue at weekly meetings with the Corps representatives, specifically asking those representatives if the Corps was using the average depth method. Again, though, it was the Corps construction branch personnel who were at these meetings and they were apparently unfamiliar with the differing survey methods and unable to provide Cashman with an answer. Instead, they directed plaintiff to seek a formal response from the survey branch. Plaintiff apparently did just that. On August 31, 2004, after being informed orally that the Corps had been and would continue using the minimum depth method, plaintiff sent defendant a letter seeking formal verification of this. On October 1, 2004, defendant responded in a letter confirming that it was using the minimum depth method. While plaintiff continued to perform the redredging requested by the Corps, it notified defendant that it considered the redredging extra work for which it was entitled to additional compensation.

On July 22, 2005, plaintiff submitted a certified claim under the CDA, requesting $6,538,769 – $4,430,561 for "extra effort to remove . . . material" and $2,108,208 for "days spent removing shoaling." Plaintiff asserted that defendant had failed to disclose the manner in which the Corps would perform its post-dredge acceptance surveys and had, in fact, used more stringent acceptance criteria than normally were applied by the Corps. The Contracting Officer (CO) issued a final decision denying plaintiff's claim on October 26, 2005. The CO concluded that the contract: (i) demanded dredging to forty-seven feet; (ii) directed the contractor to remove any materials found above that depth at its own expense; and (iii) required using the minimum depth method, as the government had always done for determining acceptance, to ensure safety to vessels in the channel without undue hazard.

On February 10, 2006, plaintiff filed a complaint in this court. Therein, it averred that it was required to perform extra dredging because the contract did not specify a data processing method, that defendant led plaintiff to believe the average depth method would be used, and that defendant used the minimum depth method in violation of its own Engineering Manual. The complaint incorporated three claims: (i) equitable adjustment; (ii) breach of contract; and (iii) quantum meruit. Defendant filed its answer on June 9, 2006, raising several affirmative defenses (*e.g.*, accord and satisfaction). On December 14, 2007, plaintiff filed a motion for partial

summary judgment. Defendant filed its response and cross-motion for summary judgment on January 31, 2008. A reply was filed by plaintiff on April 14, 2008, and by defendant on May 5, 2008. Oral argument on the cross-motions was held November 12, 2008.

## II.  DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). Rather, the court must determine whether the evidence presents a disagreement sufficient to require fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52; *Lockheed Martin Corp. v. United States*, 70 Fed. Cl. 745, 748-49 (2006). In doing this, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)); *see also Lockheed Martin*, 70 Fed. Cl. at 749; *L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

### A.

In its motion for partial summary judgment, plaintiff squarely raises two theories and more tangentially raises a third. It first asserts that it is entitled to an equitable adjustment because defendant's insistence upon using the "minimum depth" method was a change to the contract terms that entitles plaintiff to recover its increased cost of performance. Second, it argues that defendant's failure to disclose to plaintiff that it was calculating the post-dredge survey data in a manner different from plaintiff's method was a breach of the duty to cooperate. Finally, it appears to contend that it is entitled to damages because the Corps did not follow its internal guidance in drafting the contract specifications relating to the final acceptance surveys, claiming that failure amounted to arbitrary and capricious conduct. For its part, defendant contends that plaintiff should not receive additional compensation for doing what it originally promised – to dredge the affected channels to forty-seven feet below MLW. Defendant claims that the only way for it to ensure that this objective was being met was to use the minimum depth method for acceptance surveys. Defendant argues that there was no ambiguity in this regard and

that plaintiff should have known which method was being used for acceptance purposes. Yet, it asserts that if there was any ambiguity on this point, it was a patent ambiguity, requiring plaintiff to inquire about it prior to submitting its bid. Its failure to do so, defendant contends, precludes plaintiff from recovering here.

**1.**

For reasons that will become apparent, we will begin with plaintiff's last claim, which is predicated upon the Engineering Manual, as in force at the time the contract in question was awarded. As noted above, paragraph EM 1110-2-1003 11-15g stated that contract specifications "shall clearly stipulate the type of survey system . . . and data processing and binning techniques . . . that will be employed by the government." It is at least arguable that the specifications here did not do this. But, for that alleged failure to be actionable, plaintiff must show that the manual provision either was part of the contract here or can be fairly interpreted as a "regulation" creating a substantive right to monetary compensation from the United States. *See* 28 U.S.C. § 1491; *Aragon v. United* States, 146 F.3d 819, 824-26 (10th Cir. 1998); *Hamlet v. United States*, 63 F.3d 1097, 1105 n.6 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1155 (1996). Neither is the case here.

The cited paragraph of the manual, unlike parts of the Engineering Circular, was not incorporated by reference into the contract and thus cannot provide the basis for a contract claim. Nor is there any indication that the Corps intended this provision to have the force of a binding regulation, so as to give rise to enforceable rights in favor of third parties. The manual was neither published in the Federal Register nor otherwise promulgated as a rule – and thereby lacked the procedural dressing of a binding regulation. *See Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir. 1998); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536-38 (D.C. Cir. 1986); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 301-03 (1979); *cf. Hamlet*, 63 F.3d at 1103-04. And it also lacked the normative content of such a regulation – there is nothing in the language of the manual, its purpose or its context to suggest that the agency intended to confer therein any rights on third parties. *See Farrell v. Dep't of Interior*, 314 F.3d 584, 590-91 (Fed. Cir. 2002); *Hamlet*, 63 F.3d at 1105; *Lincoln Servs., Ltd. v. United States*, 678 F.2d 157, 164 (Ct. Cl. 1982). Rather, every indication is that the manual was intended merely to serve as a form of non-binding guidance.[7] *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 234 (1997)

---

[7] This is not to say that the technical specifications in the manual were not intended to benefit those contracting with the Corps. Indeed, the letter introducing the 2002 manual made this purpose explicit stating:

> Insufficient, inaccurate, or misinterpreted hydrographic surveys can contribute to costly errors and omissions in the various phases of project development. This directly impacts incidences of construction claims as well as navigation safety. Therefore, the intent of this manual is to establish definitive Corps-wide accuracy and quality control standards along with survey performance and procedural

(referring to the Engineering Manual as "nonbinding").  And, "violations" of that sort of guidance do not give rise to legally-cognizable claims.  *See also Frazier v. United States*, 79 Fed. Cl. 148, 164-65 (2007), *aff'd*, 301 Fed. Appx. 974 (Fed. Cir. 2008); *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 840 (1999).[8]

In the face of such authorities, plaintiff appeared to retreat from this argument in its reply brief and, further still, at oral argument.[9]  But, assuming *arguendo*, that these retreats fell short of a full withdrawal, the court finds, as a matter of law, that defendant is entitled to judgment as to this limited portion of plaintiff's case.

**2.**

The other claims at issue – that plaintiff is entitled to an equitable adjustment or to damages upon defendant's breach of the duty to cooperate – are not nearly so straightforward.  In the court's view, these claims are inextricably intertwined with a number of genuine issues of material fact, the existence of which precludes the court from granting summary relief to either party.  A few words of explanation are in order.

We begin with plaintiff's equitable adjustment claim.  "Equitable adjustments are corrective measures that make a contractor whole when the Government modifies a contract."  *Int'l Data Products Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (citing *Ets-Hokin Corp. v. United States*, 420 F.2d 716, 720 (Ct. Cl. 1970)); *see also Praecomm, Inc. v. United States,* 78 Fed. Cl. 5, 11 (2007), *aff'd*, 296 Fed. Appx. 929 (Fed. Cir. 2008).  A

---

> policy that will ensure uniform and accurate hydrographic surveying products.  This will reduce errors, enhance the equitability of construction administration, and increase the overall quality and safety of Corps navigation and flood control projects.

But it is a leap to conclude that the conferral of these indirect benefits simultaneously gave rise to rights that were directly-enforceable by contractors.

[8]  It should be noted that this ruling is a double-edged sword.  In its briefs, defendant has repeatedly cited several provisions of the manual describing dredging techniques as if they were binding upon plaintiff.  It would appear, however, that these provisions are not binding on plaintiff and instead provide only evidence impacting the contract's interpretation.

[9]  At oral argument, the court asked "[y]ou're not arguing that the manual is sort of sum and substance part of the contract and so that anything it says would in fact be viewed as defining, actually the requirements of the contract?"  "That is correct," plaintiff's counsel responded, "I am not arguing that the manual creates any rights on the part of my client or any cause of action on the part of my client."  Oral Argument of November 12, 2009, Argument of Mr. Michael Payne at 2:39:09 - 2:39:20.

government contractor seeking an equitable adjustment bears the "essential burden of establishing the fundamental facts of liability, causation, and resultant injury." *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 968-69 (Ct. Cl. 1965); *Ralph L. Jones Co. v. United States*, 33 Fed. Cl. 327, 331-32 (1995). This "require[s] record evidence that the [agency] demanded work above and beyond that in the contract." *Int'l Data Prods.*, 492 F.3d at 1325; *see also Aydin Corp. v. Widnall*, 61 F.3d 1571, 1577 (Fed. Cir. 1995). The contractor must also show that the increased costs arose from work which was materially different from that contemplated by the parties, and that such conditions were reasonably unforeseeable based on the information available to the contractor at the time. *Mojave Enters. v. United States*, 3 Cl. Ct. 353, 357 (1983); *see also Sterling Millwrights, Inc. v. United States*, 26 Cl. Ct. 49, 72 (1992); *SIPCO Servs. & Marine, Inc. v. United States*, 41 Fed. Cl. 196, 224-25 (1998)*; Miller Elevator Co., Inc. v. United States*, 30 Fed. Cl. 662, 678 (1994). Finally, plaintiff must show that the added costs were the direct and necessary result of the changes. *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1, 33 (1987).

To determine whether defendant demanded work above and beyond that which the contract required, the court obviously must first determine what the contract required. *See Medlin Constr. Group, Ltd. v. Harvey*, 449 F.3d 1195, 1199 (Fed. Cir. 2006). Familiar contract construction rules provide that "'the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" *Metric Constrs., Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965)); *see also TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). "When the contract's language is unambiguous," the Federal Circuit recently stated, "it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." *TEG-Paradigm*, 465 F.3d at 1338; *see also Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc); *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citing numerous cases). However, "when a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous" and, in such an instance, the court "may then resort to extrinsic evidence to resolve the ambiguity." *TEG-Paradigm*, 465 F.3d at 1338; *see also Metric Constrs., Inc.*, 169 F.3d at 752; *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986). Such extrinsic evidence may be employed to "interpret the terms of a contract when the plain and ordinary meaning is not clear from the contract itself." *TEG-Paradigm*, 465 F.3d at 1339; *see also Schortmann v. United States*, 82 Fed. Cl. 1, 10 (2008); Restatement (Second) Contracts § 215 cmt. b (1981); 6-26 Corbin on Contracts § 579 (2006).

Defendant claims that the requirements of the contract come into clear focus once viewed through the prism of its overarching purpose – to have the contractually-defined area dredged to a depth of forty-seven feet below MLW. While defendant admits that the contract did not specify a particular data processing method, it, nonetheless, maintains that the only method that would ensure that there were no materials above the required dredging depth was the minimum depth method. By comparison, use of the average depth method, it contends, would have, by

...

definition, allowed for portions of the bins to be above the forty-seven foot level, not only defeating the central purpose of the contract, but constituting a hazard to those ships traversing the channels involved.  This assertion, however, proves too much for several reasons.

     The first problem is that it is not so clear what was meant by the forty-seven-foot requirement.  Defendant proceeds from the notion that the meaning of this requirement, which was not further defined in the contract, is self-evident – that no material may lie above the forty-seven-foot mark, lest channel navigation be threatened.[10]  But, plaintiff blunts this contention by noting that the Corps employs a two-foot safety cushion, authorizing the channels in question for use by vessels with drafts no deeper than forty-five feet.  This raises questions as to whether there might be some error bound surrounding the forty-seven-foot requirement – one under which a slight variance above that line would still be viewed as qualifying.  Various provisions in the Engineering Manual suggest the existence of such tolerances based, *inter alia*, upon the imprecision of the acoustic methods, which were first introduced to dredging in the late 1990s.[11]  Indeed, even the minimum depth method employed by defendant did not require that every point within a bin be forty-seven feet or lower.  Rather, a bin passed inspection as long as it did not contain more than two points shallower than the target elevation – further indication that the forty-seven-foot level perhaps was not as absolute as defendant suggests.[12]  Adding to this conundrum, there is evidence that the forty-seven-foot level was only an interim mark and that

---

[10]  At oral argument, defendant maintained that there is a one-tenth of a foot tolerance on this measurement, that is, that a bin would be accepted if the minimum depth was below 46.9 feet.  But, nothing in the contract indicates such a tolerance.  Notably, the contract talks in round numbers – "47 feet" – and does not employ a decimal that would suggest greater precision, *e.g.*, "47.0 feet."  There are, to be sure, various tolerance references in the Engineering Manual, but it is unclear whether and how they apply to the instant case.  That said, it appears that there are instances in which the bins here were rejected because there were three or more points therein that were two-tenths of a foot above the forty-seven-foot level.

[11]  *See* EM 1110-2-1003 sec. 4.2 (1 JAN 02) (stating that "[d]epth] measurement accuracy . . . has many potential error components," including "measurement method (mechanical or acoustic) . . . water temperature and salinity, transducer beam width, bottom irregularity, bottom consistency, and vessel heave-pitch roll motions . . . [all of which] make up the error budget of the depth measurement"); *see also id*. at sec. 4.8.

[12]  One could envision a variety of scenarios in which these acceptable "high points" could contribute to the sorts of navigational hazards that defendant claims would be associated with the use of the average depth method, particularly since the record leaves unanswered questions concerning the performance precision of the survey instruments involved. While the manual addresses some accuracy standards, for the moment, it raises more questions in this regard than it answers.  It is undoubtedly relevant, for example, whether the multibeam sonar results in margins of error exceeding an inch or a foot.  Of similar importance is the precision of detecting protruding objects beyond a particular size.  And the facts on these points are again disputed.

the Corps intended to lower the channel to at least fifty feet before reducing the authorized depth below forty-five feet for navigational purposes – further undercutting defendant's assertion that the forty-seven-foot floor had to be strictly maintained in order to protect shipping.

In general, then, it would appear that the prism through which defendant would have the court read this contract is more like a kaleidoscope – with the contract taking on different shapes and forms depending upon how the factual lenses are rotated.  Indeed, one has the impression that the forty-seven foot target might be defined tautologously only in terms of which survey and data plotting method the dredging industry would view as an acceptable means of measuring that target.  If that is so, the objective tells us little about the method to be employed, and vice-versa.  At any rate, before the court can rely upon the depth mark as signifying anything about performance, it must better understand how the industry would interpret that mark – a point on which the parties offer harshly clashing evidence.

Assuming *arguendo* that the meaning of the forty-seven-foot mark was more certain, it hardly follows, *a fortiori* – and certainly not from the four corners of the document – that the minimum depth method is the only method that would ensure that objective was met.  To decide whether that is the case, the court needs to consider extrinsic evidence regarding the nature and inherent limitations of not only the survey and data processing methods involved, but also of the dredging equipment and site conditions involved.  Defendant, of course, is willing to offer that information now – seemingly forgetting, for a brief moment, that its root contention is that the contract is clear on its face.  But, even if the court were inclined to credit defendant's representations regarding dredging industry standards and the like, plaintiff systematically controverts each of those points with its own evidence, leaving in its wake a lengthy litany of genuine issues of material fact.  Indeed, the contract itself suggests that the parties did not believe it was obvious that the minimum depth method would be employed for acceptance purposes.  After all, it stated that "[t]he proposed method for performing these surveys and all equipment and programs shall be submitted for approval" – a requirement that seemingly would have been unnecessary had the method been as obvious as defendant contends.

Unwilling to give up the ghost, defendant attempts to plug the many holes in its arguments with references to the Engineering Circular and Engineering Manual.  But that effort comes up short for several reasons.  First, there are the lingering questions, highlighted above, as to the weight that should be attached to the manual's provisions, questions that extend to at least parts of the circular.  Second, in some instances, defendant's reliance on these authorities seems to be overreaching.  For example, in claiming the minimum depth method was required, defendant cites the portion of the circular that requires "100% bottom coverage."  But, viewed in context, that language appears to refer only to the proper survey density, *i.e.*, the beam spread and number of data points taken.  Complicating matters further, the circular and manual make various comments regarding the minimum and average depth methods, some of which favor defendant's position, others of which favor plaintiff.  For instance, while defendant cites the portion of the circular that states that for hard-bottom channels "[t]he most precise positioning and depth measurement standards and techniques" must be used, plaintiff quotes the portion of the manual

that seems to disfavor use of the minimum depth method because it "can adversely skew dredge quantity computations," "erroneously portray clearance data," and "does not necessarily [represent] the absolute elevation over an object." Defendant also quotes a portion of the manual that appears to criticize the average depth method because it "can overly smooth the data," but seemingly ignores the end of the same sentence, which states that "this may be desirable in some instances." While it may be that these provisions can be reconciled, that task seems a ripe topic for expert testimony.

In the end, there are several possibilities here: (i) the contract is ambiguous in terms of which data processing method was required; (ii) the contract omitted an essential term; or (iii) the contract anticipated that the survey issue would be resolved through a subsequent approval process. Each of these theories brings with it its own thorny set of unresolved genuine issues of material fact.

If the contract is ambiguous, genuine issues of material fact abound as to which data processing method was required by or, at least, was reasonable under the contract. As outlined above, resolution of that issue seems to require a range of extrinsic evidence currently not before the court – including, again, more evidence about the survey and data processing methods at issue and the dredging characteristics associated with the equipment.[13] The same result, as it turns out, holds true if one views the contract as entirely leaving open the survey method. A "failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction." *Dobson v. Hartford Fin. Servs. Group, Inc.*, 389 F.3d 386, 399 (2d Cir. 2004); *see also Schortmann*, 82 Fed. Cl. at 10-11. Rather, Restatement (Second) of Contracts, § 204 provides that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."[14] And, determining what is "reasonable in the circumstances" manifestly represents a genuine issue of material fact that the court cannot resolve at this juncture, again requiring proof of industry standards. Then, there is the possibility that the contract did not resolve the survey

---

[13] *See Daewoo Eng'g and Constr. Co., Ltd. v. United States*, 557 F.3d 1332, 1337 (Fed. Cir. 2009); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("The question of interpretation of language and conduct – the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law." (quoting 3 Arthur L. Corbin, Corbin on Contracts § 554 (1960))); 11 Richard A. Lord, Williston on Contracts § 30:7 (4th ed. 1999) ("Where a written contract is ambiguous, a factual question is presented as to the meaning of its provisions. . . .").

[14] *See David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (Ct. Cl. 1977) ("[T]he task of supplying a missing, but essential term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court."); *Schortmann*, 82 Fed. Cl. at 11; *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003); *see also Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 236 (4th Cir. 2006).

question, but that it was intended that the issue would be resolved by the parties in a subsequent approval process. Extrinsic evidence may well bear on whether this is the case. And, if such an approval process was involved, it remains that the parties have offered widely divergent versions of what happened (or did not happen) pursuant to that process.

All in all, the court is left with the firm conviction that what is needed here is a trial.

**3.**

Much of what has been said above also characterizes plaintiff's claim based upon the duty to cooperate. That duty, of course, derives from the implied duty of good faith and fair dealing, which, in turn, gives rise to both the affirmative duty to cooperate and the negative obligation not to hinder performance. *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988). Both subspecies of the broader good faith requirement are analyzed under a reasonableness standard "dependent on the particular circumstances of the case." *Orlosky, Inc. v. United States*, 68 Fed. Cl. 296, 311 (2005); *see also Metric Constr. Co., Inc. v. United States*, 81 Fed. Cl. 804, 818 (2008); *Axion Corp. v. United States*, 75 Fed. Cl. 99, 121 (2007); *see also* John Cibinic, Jr., Robert C. Nash, Jr. & James F. Nagle, Administration of Contracts 460 (4th ed. 2006). And, under this standard, a breach may arise even if defendant does not breach the basic terms of the contract. *See Centex Corp.*, 395 F.3d at 1306; *North Star Alaska Housing Corp. v. United States*, 76 Fed. Cl. 158, 188 (2007) ("the covenant may be breached if, in ways unenvisioned by the contract, a party proceeds in a fashion calculated to frustrate or hinder performance by its contracting partner"); *see also Info. Sys. & Networks Corp. v. United States*, 81 Fed. Cl. 740, 750-51 (2008). For example, courts have held that an agency breaches the duty to cooperate when, through its negligence, it causes a contractor to incur unnecessary costs. *See, e.g., Orlosky Inc.*, 68 Fed. Cl. at 313; *see also C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed. Cir. 1993) ("The government must avoid actions that unreasonably cause delay or hindrance to contract performance.").

Given the nature of this inquiry, it is not surprising that courts have often denied motions for summary judgment involving the alleged breach of this duty. *See Blue Lake Forest Prods, Inc. v. United States*, 86 Fed. Cl. 366, 380-83 (2009); *Axion Corp.*, 75 Fed. Cl. at 121-22; *H.N. Wood Prods., Inc. v. United States,*, 59 Fed. Cl. 479, 486 (2003). Here too, core facts as to how the parties interacted with each other during the contract's performance are in dispute, with each side presenting conflicting deposition testimony on that count. Plaintiff has identified evidence that could prove the Corps acted unreasonably – evidence suggesting, for example, that defendant knew or should have known that plaintiff was using the average depth method, allowed plaintiff to continue dredging relying upon the results of that method, yet knew that it was using a different method to determine acceptance. But, defendant has supplied evidence that controverts plaintiff's evidentiary claims in this regard. In addition, many of the factual matters

subsumed within this issue are linked to the factual disputes previously noted, providing yet another reason that summary determination is unwarranted.[15]

**B**.

Defendant's primary defense to plaintiff's claims itself raises a number of factual questions. Defendant asserts that if there was an ambiguity in the contract regarding which data processing method should be used, it was a patent ambiguity about which plaintiff was obliged to inquire before bidding. Plaintiff's failure in that regard, defendant argues, bars it from pursuing an adjustment now. Various cases, to be sure, hold that the failure to alert the government to a patent ambiguity precludes recovery for an equitable adjustment. *See Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1474-75 (Fed. Cir. 1997); *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1306 (Fed. Cir. 1996); *see also E.L. Hamm & Assocs. v. England*, 379 F.3d 1334, 1342 (Fed. Cir. 2004) ("A contractor may not recover for a patent ambiguity"). But, these cases merely beg the question whether the court may determine, as a matter of law, that such an ambiguity existed here.

A patent ambiguity is one that is "obvious, gross, glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start." *H & M Moving, Inc. v. United States*, 499 F.2d 660, 671 (Ct. Cl. 1974). Such ambiguities encompass "an obvious omission," *Beacon Constr. Co. of Mass. v. United States*, 314 F.2d 501, 504 (Ct. Cl. 1963), or an "inadvertent but glaring gap," *WPC Enters., Inc. v. United States*, 323 F.2d 874, 876 (Ct. Cl. 1963); *see also Triax Pacific, Inc.*, 130 F.3d at 1475. The inquiry as to whether such an ambiguity exists is "not a simple yes-no proposition," *Newsom v. United States*, 676 F.2d 647, 650 (Ct. Cl. 1982), but rather requires the court to determine whether the ambiguity is "to the reasonable contractor apparent on the face of the contract," *Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696, 711 (2007). *See also West Bay Builders, Inc. v. United States*, 85 Fed. Cl. 1, 15 (2008); *Jaynes v. United States*, 75 Fed. Cl. 218, 235 (2007) ("What constitutes a patent ambiguity must be determined 'on an *ad hoc* basis by looking to what a reasonable man would find to be patent and glaring.'" (quoting *L. Rosenman Corp. v. United States*, 390 F.2d 711, 713 (Ct. Cl. 1968))).

---

[15] At oral argument, plaintiff indicated that it was not asserting that defendant acted in "bad faith" here. While most cases seem to suggest that there can be no violation of the duty to cooperate without a showing of bad faith, that view is not universal. *Compare Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (suggesting a showing of bad faith is required); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 757-72 (2005) (same) *with Malone v. United States*, 849 F.2d 1441, 1445-46 (Fed. Cir. 1988) (suggesting a showing of negligence may be sufficient); *Trinity River Lumber v. United States*, 66 Fed. Cl. 98, 107-12 (2005) (suggesting unreasonable conduct may be sufficient). While the parties touched on this issue in their briefs, additional briefing is necessary to resolve this issue. Accordingly, the court will resolve this matter in a motion *in limine* should plaintiff decide to pursue this issue at trial.

While this "reasonable person" determination may be made in a summary judgment context, *see Helix Elec., Inc. v. United States*, 68 Fed. Cl. 571, 585-86 (2005), such is not the case here. That is particularly true because the alleged ambiguity here does not derive from facially inconsistent provisions, but rather from an alleged omission. Various decisions make clear that in determining whether such an omission is a patent ambiguity the court must consider both what a reasonable offeror in the industry would know and even, to an extent, the offeror's particular business acumen. *See Dalton*, 98 F.3d at 1305-06; *Helix Elec.*, 68 Fed. Cl. at 585. The parties have again supplied inconsistent evidence on this count, including different interpretations of the manual provisions that bear on this subject. This suggests, yet again, that this matter must await resolution at trial.

### III.   CONCLUSION

In many ways, the subject matter of this case serves up a ready metaphor for the state of the record here. The evidentiary waters here are muddied and the legal channels to a final decision are, as yet, choked and obscured – obstacles to judgment of all sorts abound. A trial is needed to make ready a pathway to decision.

Based on the foregoing, the court **DENIES** plaintiff's motion for partial summary judgment and **GRANTS**, in part, and **DENIES**, in part, defendant's motion for summary judgment. On or before August 17, 2009, the parties shall file a joint status report proposing a location for trial and a time (factoring in a short period for expert discovery, if necessary). As discussed at oral argument, should the parties desire to do so, the court would be amenable to bifurcating this matter, to focus initially only on liability. Following the receipt of that report, the court will conduct a scheduling conference to establish the filing schedule that will lead up to trial.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge